## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE NEW YORK TIMES COMPANY,<br>620 Eighth Avenue<br>New York, NY 10018;<br><br>JULIAN E. BARNES,<br>The New York Times Company<br>1627 I Street NW, Suite 700<br>Washington, DC 20006,<br><br><div align="right">*Plaintiffs*,</div><br><div align="center">v.</div><br>DEPARTMENT OF DEFENSE A/K/A<br>DEPARTMENT OF WAR,<br>1600 Defense Pentagon,<br>Washington, DC 20301;<br><br>PETE HEGSETH,<br>in his official capacity as Secretary of<br>Defense, 1600 Defense Pentagon,<br>Washington, DC 20301;<br><br>SEAN PARNELL,<br>in his official capacity as Chief Pentagon<br>Spokesman, 1600 Defense Pentagon,<br>Washington, DC 20301,<br><br><div align="right">*Defendants*.</div> | **Civil Case No. 25-4218**<br><br>**COMPLAINT FOR DECLARATORY<br>AND INJUNCTIVE RELIEF** |

## INTRODUCTION

1.    Plaintiffs The New York Times Company ("The New York Times" or the "The Times") and its reporter Julian E. Barnes ("Barnes") bring this action to enjoin provisions of a recently implemented policy of the United States Department of Defense or Department of War ("Department" or "Pentagon") that violates their First and Fifth Amendment rights.  If allowed to stand, that policy will upend the longstanding and "healthy adversarial tension between the government, which may seek to keep its secrets" and "the press, which may endeavor to" report them, Alexander Bickel, *The Morality of Consent* at 79 (1977), and will deprive the public of vital information about the United States military and its leadership.

2.    On October 6, 2025, the Department promulgated a new policy pertaining to PFACs—Pentagon Facility Alternate Credentials.  PFACs (also called Pentagon badges or building passes) are credentials members of the press receive to access the Pentagon.  The Times' and its reporters' interests in maintaining their PFACs are exactly the type of "liberty interests" the D.C. Circuit has held "may not be denied without due process of law under the fifth amendment." *Karem v. Trump*, 960 F.3d 656, 660 (D.C. Cir. 2020).  And the policy—which vests Department officials with unbridled discretion to immediately suspend and ultimately revoke a reporter's PFAC for engaging in lawful newsgathering, both on and off Pentagon grounds, or for reporting any information Department officials have not approved—is neither reasonable nor viewpoint-neutral.  It is exactly the type of speech- and press-restrictive scheme that the Supreme Court and D.C. Circuit have recognized violates the First Amendment.  *See City of Lakewood* v. *Plain Dealer Publ'g Co.*, 486 U.S. 750, 757 (1988); *Ateba v. Leavitt*, 133 F.4th 114, 124–125 (D.C. Cir. 2025); *see also Minnesota Voters Alliance v. Mansky*, 585 U.S. 1, 11–12 (2018).

3.    The policy, in violation of the First Amendment, seeks to restrict journalists' ability to do what journalists have always done—ask questions of government employees and gather information to report stories that take the public beyond official pronouncements.  If and when they do and then publish anything that has not been approved by Pentagon officials, the policy permits those officials to, at any time and without any standards to guide their decisions, immediately suspend and ultimately revoke those journalists' PFACs in violation of the First Amendment, the Due Process Clause, and binding D.C. Circuit precedent.

4.    Specifically, the policy confers on Pentagon officials the unfettered discretion to determine that a journalist "pose[s] a security or safety risk to [Department] personnel or property," *see* Ex. A (hereinafter the "Policy") at 8, 12, based solely on a journalist's or news organization's receipt, publication, or "solicitation" of any "unauthorized" information, regardless of secrecy classification, *id*. at 12–13.  It then provides that such a determination "may result in an immediate suspension of Pentagon access . . . ."  *Id*. at 8, 12.  The Policy also allows the Department to suspend or revoke PFACs when Pentagon officials—again exercising standardless discretion—determine journalists have engaged in "[u]nprofessional conduct that might serve to disrupt Pentagon operations."  *Id.* at 15; *see Karem*, 960 F.3d at 666.

5.    The Pentagon has made clear that lawful, routine newsgathering techniques—asking questions of government employees and interviewing them for stories—whether on or off Pentagon grounds could, in the Department's view, "constitute a solicitation that could lead to revocation" of their PFACs.  Ex. A at 11.  But such communications are a core journalistic practice and a public good—the kind of basic source work that led to some of the most important news stories in history, including the Pentagon Papers.  In addition, the Department has made clear, those journalistic practices that can be sanctioned also include, for example, "public

2

advertisements or calls for tips," including via "social media." *Id.* at 10.  Providing a means for sources to convey information is, likewise, routine.  The Times, for instance, has a "tips page" on its website that "offer[s] several ways to get in touch with and provide materials to [Times] journalists."[1]

6.    Through the Policy, Pentagon officials have dealt to themselves the power to suspend and eventually revoke journalists' PFACs for publishing stories that Pentagon leadership may perceive as unfavorable or unflattering, in direct contravention of Supreme Court precedent.

7.    In issuing the Policy, the Department insisted that journalists sign an "Acknowledgment," Ex. A. at 12, acceding to their "understand[ing]" of the Policy in order to maintain their PFACs.  Reporters from every major news organization, including The Times, refused to comply with that demand as a condition to access the Pentagon,[2] and were compelled to turn in their PFACs as a result.[3]

8.    While Plaintiffs and many other journalists and news organizations no longer possess PFACs because they refused to accede to a Policy that would restrict independent

---

[1] *See* https://www.nytimes.com/tips.

[2] Erik Wemple, *Several News Outlets Reject Pentagon's Reporting Restrictions*, N.Y. Times (Oct. 13, 2025), https://www.nytimes.com/2025/10/13/business/pentagon-restrictions-news-outlets.html ("Several news organizations, including The Washington Post, The New York Times, Newsmax and NPR, have announced that their journalists will not sign a new set of Pentagon restrictions affecting news gathering in the vast military complex. . . . . Other news outlets, including The Guardian and CNN, have also said they would reject the policy.  The announcements reflect the news media's wide-ranging frustration with efforts by Pete Hegseth, the defense secretary, to curtail the physical movement of reporters in the building and impose fresh limits on their activities.").

[3] Erik Wemple, *How the Pentagon Is Blocking Out News Organizations*, N.Y. Times (Oct. 15, 2025), https://www.nytimes.com/interactive/2025/10/15/business/media/pentagon-press-rules.html; David Baudner, *Journalists turn in access badges, exit Pentagon rather than agree to new reporting rules*, Associated Press (Oct. 15, 2025), https://apnews.com/article/pentagon-press-access-hegseth-trump-restrictions-5d9c2a63e4e03b91fc1546bb09ffbf12.

reporting, the Department has welcomed what it calls the "next generation of the Pentagon press corps"[4]—individuals and media outlets strongly supportive of the Trump administration and whose viewpoints the Department favors.[5]  Among that group are Mike Lindell, the chief executive of MyPillow, who has promised to "make [the Administration] proud" with his Pentagon coverage; Laura Loomer, an influential pro-Trump activist; and Raheem Kassam, editor in chief of the National Pulse, who described his publication as "basically an industry mag/site for MAGA world."[6]

9.    These developments place the purpose and effect of the Policy in stark relief: to fundamentally restrict coverage of the Pentagon by independent journalists and news organizations, either by limiting what kind of information they can obtain and publish without incurring punishment, or by driving them out of the Pentagon with an unconstitutional Policy. While Plaintiffs' enterprising reporting on the military will continue, the Pentagon's Policy ensures the suppression of certain newsworthy information—information, for instance, gathered by directly questioning officials at press conferences or through routine unplanned interactions between journalists and Pentagon personnel on Pentagon grounds.

10.    The Policy abandons scrutiny by independent news organizations for the public's benefit, and it violates the Constitution's guarantees of due process, freedom of speech, and freedom of the press.  The Policy fails to provide fair notice to Plaintiffs and other journalists and news organizations of what, in the Department's "unbridled discretion," will (or will not) be

---

[4] Sean Parnell (@SeanParnellASW), X (Oct. 22, 2025, at 1:21 PM), https://x.com/SeanParnellASW/status/1981048206923329719.

[5] *See* Ken Bensinger & Erik Wemple, *New Pentagon Press Crew Is All In on Trump*, N.Y. Times (Nov. 4, 2025), https://www.nytimes.com/2025/11/04/business/media/new-pentagon-press-crew-is-all-in-on-trump.html.

[6] *Id.*

deemed improper newsgathering or reporting that warrants the immediate suspension and eventual revocation of a PFAC. *City of Lakewood*, 486 U.S. at 757; *see also Ateba*, 133 F.4th at 125. And its incurably vague language and lack of standards invite arbitrary as well as content- and viewpoint-based determinations as to which reporters and news organizations will be granted or denied access to the Pentagon and for what reasons. Indeed, Department officials have made clear their viewpoint discriminatory aim in promulgating and implementing the Policy: Department officials have publicly derided journalists who declined to sign the Acknowledgement as "activists" and "propagandists" who spread "lies . . . to the American people," while praising individuals approved to receive PFACs under the Policy as free from "a biased agenda."[7]

11.     The fact that the Department has conditioned journalists' access on their willingness to attest to their understanding of an inscrutable Policy that targets their exercise of First Amendment rights inflicts separate and additional constitutional harm on top of the Policy's already irreparable chilling effect.

12.     As the Supreme Court has recognized, the First Amendment guarantees "a 'right to gather information'" because "without some protection for seeking out the news, freedom of the press could be eviscerated." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 576 (1980) (quoting *Branzburg v. Hayes*, 408 U.S. 665, 681 (1972)). The D.C. Circuit held nearly fifty years ago in the context of media access to the White House that "press facilities having been made publicly available as a source of information for [journalists], the protection afforded newsgathering under the first amendment guarantee of freedom of the press . . . requires that . . .

---

[7] Sean Parnell (@SeanParnellASW), X (Oct. 22, 2025, at 1:21 PM), https://x.com/SeanParnellASW/status/1981048206923329719; DOW Rapid Response (@DOWResponse), X (Dec. 2, 2025, at 11:21 am), https://x.com/DOWResponse/status/1995890967002452302.

access not be denied arbitrarily or for less than compelling reasons." *Sherrill v. Knight*, 569 F.2d 124, 129 (D.C. Cir. 1977) (citations omitted). The D.C. Circuit has since reaffirmed that "'the interests of a bona fide Washington correspondent in obtaining [such a] pass' is not only 'protected by the first amendment' but also 'undoubtedly qualifies as [a] liberty [interest] which may not be denied without due process of law under the fifth amendment.'" *Karem*, 960 F.3d at 660 (second and third alternations in original) (quoting *Sherrill*, 569 F.2d at 130–131).

13.    The D.C. Circuit also has made clear that "the government creates a 'nonpublic forum' when it provides 'selective access for individual speakers.'" *Ateba*, 133 F.4th at 122 (citations omitted). Areas of the Pentagon, including the Pentagon Briefing Room, are nonpublic forums under the First Amendment, and therefore any regulation on speech within those forums must be reasonable and not intended to suppress expression based on the speaker's viewpoint. *See Minnesota Voters Alliance*, 585 U.S. at 11–12. The Policy fails that test and violates the First Amendment because it is "an effort to suppress" speech and newsgathering based on viewpoint, and because its restrictions are not reasonable "in light of the purpose served by the forum." *Id*. at 12–13.

14.    This binding precedent applies with full force here. There is no legitimate, let alone compelling, justification for the provisions of the Policy targeting lawful newsgathering and reporting—purposefully vague and overbroad provisions designed to give Department officials free rein to grant or deny Pentagon access to journalists and media outlets on the basis of viewpoint and that are wholly untethered to any interest in the "safe, efficient and secure operation of the Pentagon Reservation." 10 U.S.C. § 2674(c)(1). Those provisions violate the First Amendment. *City of Lakewood*, 486 U.S. at 757; *see also Ateba*, 133 F.4th at 125. Further, because the Policy permits the immediate suspension of a PFAC without providing reporters procedural protections,

6

it plainly violates the Due Process Clause.  *See Karem*, 960 F.3d at 660; *Sherrill*, 569 F.2d at 130–131.

15.    The Policy marks a radical departure from longstanding tradition, violates the Due Process Clause and the First Amendment, and is inflicting irreparable harm on The Times and its reporters, including Barnes, and on the American public.  By this Complaint, Plaintiffs seek a declaration that the provisions of the Policy targeting the exercise of First Amendment rights are unlawful and an order preliminarily and permanently enjoining Defendants from enforcing those provisions of the Policy.

## **PARTIES**

16.    The New York Times Company is a privately owned for-profit corporation located in New York.  The Times is headquartered at 620 8th Avenue, New York, NY 10018.  The Times' Washington Bureau is located at 1627 I Street NW, Suite 700, Washington, DC 20006.  Prior to the implementation of the Policy, six Times journalists, including Barnes, held PFACs.  The Times and its reporters, including Julian E. Barnes, are eligible to and, if the challenged portions of the Policy were enjoined, would reobtain their PFACs.

17.    Julian E. Barnes is a national security reporter with The Times who focuses on the Pentagon, United States intelligence agencies, and international security, among other subjects. Barnes has been with The Times since June 2018.  Prior to that, Barnes covered the Pentagon for other news organizations including U.S. News and World Report, The Los Angeles Times, and The Wall Street Journal.  He was first issued a PFAC in 2004.  With the exception of an approximately 18-month period in 2016 and 2017, Barnes continuously held a PFAC from 2004 until the end of August 2025, when it lapsed.  Though he was eligible to and invited to do so, Barnes did not seek to renew his PFAC due to the Policy.  As a result of the Policy, Barnes was compelled to turn in his lapsed PFAC on October 15, 2025.  Barnes resides in the District of

Columbia and is assigned to The Times' Washington Bureau.

18.    Defendant United States Department of Defense, also known as the Department of War, is an executive agency of the U.S. federal government tasked with overseeing the U.S. Armed Forces.  The Department is headquartered at the Pentagon and maintains offices and facilities in Washington, DC, and conducts a substantial amount of official business in and relating to this District.  The Department's address is 1400 Defense Pentagon, Washington, DC 20301.

19.    Defendant Pete Hegseth is the U.S. Secretary of Defense.  He is sued in his official capacity.  Secretary Hegseth is responsible for overseeing the operations and administration of the Department of Defense and the U.S. Armed Forces, which include the Army, the Navy, the Marine Corps, the Air Force, and the National Guard, as well as developing national defense policy.  He has ultimate authority over all Department policies, including the Policy at issue here, and he conducts a substantial amount of official business in and relating to this District.  As a member of the President's Cabinet, Secretary Hegseth regularly performs his official duties within the District of Columbia.

20.    Defendant Sean Parnell is the Chief Spokesman for the Pentagon and Assistant to the Secretary of Defense for Public Affairs and conducts a substantial amount of official business in and relating to this District.  He is sued in his official capacity.  Parnell serves as the Department's principal spokesperson responsible for providing timely and accurate information about the Department to the media, the U.S. Congress, and the public.  He also coordinates and conducts press briefings with members of the media.  He issued the "Memorandum for Senior Pentagon Leadership" ("Memorandum") that, together with the "Pentagon Reservation In-Brief for Media Members" ("In-Brief"), constitute the Policy and, on information and belief, is responsible for implementation of the Policy.

8

## JURISDICTION AND VENUE

21.    This Court has subject-matter jurisdiction because this action arises under the Constitution of the United States and federal statutes, 28 U.S.C. § 1331, and because the individual Defendants are U.S. officials sued in their official capacities, 28 U.S.C. § 1346(a)(2).

22.    The Court is authorized to grant the requested relief under 28 U.S.C. §§ 2201 and 2202, 5 U.S.C. § 706, Rule 65 of the Federal Rules of Civil Procedure, and pursuant to its inherent equitable powers.

23.    Venue is proper in this District under 28 U.S.C. § 1391(b) and 28 U.S.C. § 1391(e)(1) because Barnes resides in this District, because The Times and its journalists, including Barnes, regularly engage in newsgathering and reporting in this District, including at The Times' Washington Bureau, and because Defendants conduct a substantial amount of official business in this District, and a substantial part of the events giving rise to the claims occurred in the District of Columbia.  In particular, among other things, Secretary Hegseth, as a member of the President's Cabinet, "'performs a significant amount of his official duties in the District of Columbia,'" *Bartman v. Cheney*, 827 F. Supp. 1, 2 n.2 (D.D.C. 1993) (citation omitted); *see also Chin-Young v. Esper*, 2019 WL 4247260, at *5 (D.D.C. Sep. 6, 2019), and the Department's decision-making with respect to the development and implementation of the Policy occurred, in substantial part, within this District.

## FACTUAL ALLEGATIONS

### The Pentagon Announces a New PFAC Policy

24.    There is a long tradition of journalists covering the military from the grounds of the Pentagon.  That access has enabled, among other things, real-time, eyewitness reporting on the Department's response to the terrorist attacks of September 11, 2001, including the attack on the

Pentagon itself—coverage the Department has lauded.[8]  Indeed, the ability of journalists to cover the military from Pentagon grounds benefits the American public, in part, because it gives Department officials the ability to correct misinformation and get accurate information to journalists and, in turn, to the public quickly when there is a crisis.

25.     Since the Pentagon opened in 1942, Department officials have afforded qualified members of the press, including reporters with The Times, access to the Pentagon complex to report on the military and other defense activities.[9]  Hanson W. Baldwin, a Times reporter who won a Pulitzer Prize in 1943 for his coverage of World War II, for example, routinely visited the Pentagon to gather news and speak with Department sources.

26.     Historically, the press has had unescorted access to areas including the Pentagon Press Briefing Room.  As Times opinion columnist Maureen Dowd described in an October 18, 2025 column about the Policy, journalists from The Times and other media outlets previously "could stake out Jim Mattis, a defense secretary in President Trump's first term, when he picked up his clothes at an in-house dry cleaners and have an off-the-record chat as he walked back to his office, shirts slung over his shoulder" or "might bump into the chairman of the Joint Chiefs of Staff at a Pentagon Starbucks and have a conversation that could turn into a story."[10]  In addition, since the 1970s, the Pentagon provided reporters with dedicated office space in the building,

---

[8] *See, e.g.*, Jim Garamone, *Senior Pentagon Correspondent Recalls 9/11*, DOD News (Sept. 7, 2021), https://www.war.gov/News/Feature-Stories/Story/Article/2765676/senior-cnn-pentagon-correspondent-recalls-911/ (Department press office interview with then-ABC News producer Barbara Starr recounting her coverage of 9/11 from the Pentagon).

[9] Eleanor Watson, *CBS News Ends Over 60-Year Presence at Pentagon After Declining to Sign New Press Requirements*, CBS News (Oct. 17, 2025), https://www.cbsnews.com/news/cbs-news-pentagon-60-year-presence-press-requirements/.

[10] Maureen Dowd, *Fraidy-Cat at the Pentagon*, N.Y. Times (Oct. 18, 2025), https://www.nytimes.com/2025/10/18/opinion/pentagon-journalists-news-hegseth.html.

known as the Pentagon News Room, where reporters set up desks and TV network booths. Qualified members of the press, including Times journalists, have had access to such areas within the Pentagon building for more than eight decades. That access, which was not conditioned on the perceived viewpoint of journalists and their news organizations, or the content of their reporting, served the interests of the American public and posed no security or safety risk to Pentagon property or personnel.

27.    Since Secretary Hegseth took office—and, in particular, since March of 2025, when Secretary Hegseth and other top officials inadvertently disclosed details regarding imminent U.S. airstrikes in Yemen to journalist Jeffrey Goldberg of *The Atlantic* by adding him to a group chat on the messaging platform Signal—the Department has sought to impose increasingly stringent and unprecedented restrictions on journalists covering the Department and its leadership.[11]

28.    On May 23, 2025, Secretary Hegseth issued what he called "Updated Physical Control Measures for Press/Media Access Within the Pentagon," imposing restrictions on journalists' access to specific areas of the building, including in the vicinity of his office, and requiring journalists to be accompanied by official "escorts" when visiting certain areas. *See* Ex. F at 1–2. These changes were not precipitated by any security or safety incident involving a PFAC holder. On the contrary, according to the "Memorandum for Resident and Visiting Press Assigned to the Pentagon," these "updated security measures" were purportedly "needed to reduce the opportunities for in-person inadvertent and unauthorized disclosures." *Id.*; *see also* Erik Wemple, *Inside Hegseth's Effort to Limit Press Access at the Pentagon*, N.Y. Times (Oct. 10, 2025) ("Under [Secretary Hegseth's] leadership, the [D]epartment has removed national news outlets

---

[11] *See* Jeffrey Goldberg, *The Trump Administration Accidentally Texted Me Its War Plans*, The Atlantic (Mar. 24, 2025), https://www.theatlantic.com/politics/archive/2025/03/trump-administration-accidentally-texted-me-its-war-plans/682151/.

from a shared media workspace . . . ; [and] has scaled back reporters' ability to roam Pentagon corridors.").[12]  These restrictions coincide with other efforts by the Department to restrict the flow of newsworthy information to the public, both via the press,[13] and via Congress.[14]

29.     On September 18, 2025, Parnell issued a "Memorandum for Senior Pentagon Leadership" ("September 18 Memorandum") attaching a "Pentagon Reservation In-Brief for Media Members" ("September 18 In-Brief"; together, the "September 18 Policy").   In the September 18 Memorandum, which purported to implement the Department's "Updated Physical Control Measures for Press/Media Access Within the Pentagon," Parnell announced new policies governing the issuance, renewal, suspension, and revocation of PFACs that went even further than the newly instituted "physical control measures."   Ex. E at 3–10.

30.     The September 18 Memorandum explained that "[a]ll members of the press issued a [PFAC] will be required to read and sign a new in-brief form outlining information security requirements, the new physical control measures, and [Department] expectations of their compliance with safety and security requirements."  Ex. E at 1.

31.     In addition to setting out specific requirements for physical presence within the facility, including restrictions on journalists' access to certain floors of the Pentagon, Ex. E at 4, the September 18 In-Brief also included provisions addressed to the "unauthorized" disclosure of

---

[12] https://www.nytimes.com/2025/10/10/business/media/hegseth-pentagon-press-access.html.

[13] *See, e.g.*, Dan Lamothe & Ellen Nakashima, *Hegseth team told to stop polygraph tests after complaint to White House*, Wash. Post (July 26, 2025), https://www.washingtonpost.com/national-security/2025/07/26/pete-hegseth-leak-investigation-trump/.

[14] *See, e.g.*, Ben Finley & Konstantin Toropin, *Hegseth changes policy on how Pentagon officials communicate with Congress*, Wash. Post (Oct. 21, 2025), https://www.washingtonpost.com/politics/2025/10/21/defense-department-pentagon-hegseth-congress/90711972-aef4-11f0-ab72-a5fffa9bf3eb_story.html.

information.  Specifically, it stated that "[Department] information must be approved for public release by an appropriate authorizing official before it is released, even if it is unclassified" because "[u]nauthorized disclosure of CNSI [classified national security information] or CUI [controlled unclassified information] poses a security risk that could damage the national security of the United States and place [Department] personnel in jeopardy." *Id.* at 5.

32.    The September 18 iteration of the In-Brief was followed by an "Acknowledgment" that required PFAC holders to agree that they could be "determined to pose a security or safety risk . . . based on the unauthorized access, attempted unauthorized access, or unauthorized disclosure of [classified national security information] or [controlled unclassified information]," and to initial next to other statements, including that "PFACs are a courtesy."  Ex. E at 11.

33.    The September 18 In-Brief also set forth a process for PFAC issuance, renewal, and termination.  It provided that "PFACs may be denied, revoked, or not renewed if a person is reasonably determined to pose a security or safety risk to [Department] personnel or property[.]"  Ex. E at 6, 11.  It further provided that "[a]n initial determination of security or safety risk may result in an immediate suspension of Pentagon access during the process for making a final determination," which "may be based on the unauthorized access, attempted unauthorized access, or unauthorized disclosure" of Department information.  *Id.* at 6; *see id.* at 11.

34.    An Appendix to the September 18 Policy provided that the grounds for determining whether a journalist poses a security or safety risk "include, but are not limited to," convictions for certain offenses or "actions other than conviction . . . such as attempts to improperly obtain" Department information, or "being found in physical possession of" such information "without reporting it."  Ex. E at 13.  This Appendix also stated that a PFAC holder would be notified of a

decision to deny, revoke, or not renew a PFAC in writing, including the basis for the decision, after which the journalist would have 30 days to appeal that decision.  *Id*. at 13–14.

## Members of the Press Object to the Policy

35.     The Department's announcement of its new Policy sparked widespread confusion and concern among news organizations and journalists who cover the Pentagon.  On September 22, the Reporters Committee for Freedom of the Press (the "Reporters Committee" or "RCFP") sent a letter to Parnell asking for clarification as to how the Policy's restriction on disclosure would be applied and whether the Acknowledgment was intended to require journalists to agree not to publish information without first obtaining Department approval.  Ex. B.

36.     In a response letter dated September 24, Parnell wrote to "clarif[y]" that the restriction against disclosure in the Policy is one that Pentagon personnel must follow, and "does not impose restrictions on journalistic activities, such as investigating, reporting, or publishing stories."  Ex. C at 1, 3.  According to Parnell, "it informs PFAC holders of [the Department]'s internal policies and the process for managing building access, which is a privilege extended to facilitate responsible coverage."  *Id*.  The letter disclaimed any attempt to require that "reporters . . . seek [Department] approval for their stories or endorse any viewpoint on pre-authorization," and stated that "[j]ournalists remain free to gather information through legitimate means, such as Freedom of Information Act requests, official briefings, or unsolicited tips, and to publish as they deem newsworthy."  *Id.* at 2.

37.     This letter, however, provided cold comfort.  According to Parnell, the "focus" of the Policy was "on preventing active solicitation that encourages [Department] personnel to violate these disclosure rules, as such conduct is not always protected by the First Amendment."  Ex. C at 2.  Parnell also confirmed that the First Amendment-protected receipt and publication of

14

unsolicited, classified or protected information "could factor" into the Department's wholly "discretion[ary]" decision to revoke a reporter's PFAC.  *Id.*

38.    On September 28, 2025, Timothy Parlatore—Secretary Hegseth's private attorney and advisor[15]—circulated a redlined, revised version of the Acknowledgement to members of the media integrating language from the Parnell letter.  Ex. D.  The revisions included a number of statements that appeared designed to characterize the Policy, including the Acknowledgment requirement, as "not impos[ing] any obligations on [PFAC holders] to refrain from constitutionally protected journalistic activities."  *Id.* at 2.  But these statements contradicted other specific statements in the Policy that do in fact directly intrude on "constitutionally protected journalistic activities."  *Id.*  For example, the Policy as revised continued to expressly claim that Department officials had uncabined "discretion[]" to immediately suspend a PFAC based on a determination that activities protected by the First Amendment, including lawful newsgathering and publication, posed a "security or safety risk."  Ex. A at 10.  And, according to the redlined Acknowledgement, any "direct communications with specific [Department] personnel or general appeals, such as public advertisements or calls for tips"—typical, lawful newsgathering techniques that journalists routinely utilize—would constitute "solicitation" in violation of the Policy.  Ex. D at 2.

39.    News organizations and PFAC-holding journalists from numerous outlets, including The Times, informed Pentagon leadership that the September 28, 2025 revisions to the Policy did not cure its constitutional defects and that they could not sign the Acknowledgement consistent with their rights and responsibilities as members of the press.

---

[15] *See* Dan Lamothe, *Hegseth's legal fixer at the center of Pentagon's new media restrictions*, Wash. Post (Oct. 15, 2025), https://www.washingtonpost.com/national-security/2025/10/15/hegseth-media-restrictions-tim-parlatore/.

**The Pentagon Announces Its Final Policy and Mandates That PFAC Holders Sign the Acknowledgement**

40.    On October 6, 2025, the Department issued its final Policy, a true and correct copy

of which is attached hereto as Exhibit A.

41.    The current and final version of the Policy includes an Acknowledgment that states:

I have received, read, and understand the "Pentagon Reservation In-brief for Media Members," with [relevant appendices] which address[] the standard and procedures for denying, revoking, and not renewing a PFAC.    The in-brief describes [Department] policies and procedures.    My signature represents my acknowledgement and understanding of such [Department] policies and procedures, even if I do not necessarily agree with such policies and procedures.    Signing this acknowledgment does not waive any rights I may have under law.

Exhibit A at 14.

42.    Even though the Policy invokes the Secretary's statutory authority under 10 U.S.C.

§ 2674 to safeguard the physical property of the Pentagon itself, the Policy was neither motivated

by nor narrowly tailored to any such interest.    To the contrary, the Policy reaffirms the

Department's position that it possesses unbridled discretion to rescind a PFAC based on First

Amendment-protected newsgathering and reporting wherever it occurs.    Specifically, the In-Brief

states that while allowing that "the receipt of unsolicited" classified or unclassified information

"and its subsequent publication is generally protected by the First Amendment and would not, on

its own, normally trigger denial, revocation, or non-renewal of a PFAC," if a journalist "solicit[s]

the disclosure of such information or otherwise encourages [Department] personnel to violate laws

and policies concerning the disclosure of such information," the Department may deem the

journalist a "security or safety risk."  *Id*. at 12.

43.    With respect to what constitutes improper "solicitation" in the Department's view,

the In-Brief states that "solicitation" in violation of the Policy "may include direct communications

with specific [Department] personnel or general appeals, such as public advertisements or calls for

tips . . ."  and it cites "an advertisement or social media post by an individual journalist or social media outlet that directly targets [Department] personnel to disclose non-public information without proper authorization" as an "example" of what "would constitute a solicitation that could lead to revocation" of a PFAC.  Ex. A at 12–13.

44.     The Policy also takes an expansive approach to what "non-public information" the Department may view as being off limits, and if "solicited," obtained or published could result in the denial, suspension or revocation of a reporter's PFAC.   According to the Policy, such unclassified information "may include, but is not limited to, information protected by the Privacy Act, information that is law enforcement-sensitive, and certain operational security information." *Id.* at 6.  And purportedly "[t]o ensure the safety of U.S. personnel," the Policy instructs journalists "who find themselves in possession of information that appears to be [classified national security information] or [controlled unclassified information]" to "discuss those materials with the [Pentagon Press Operations] prior to publication."  *Id*.

45.     In addition to reiterating the Department's view that "members of the news media do not possess a legal right to access the Pentagon" and that "such access is a privilege subject to the discretion of government authorities," Ex. A, at 3, the Policy explains that a PFAC "may be denied, revoked, or not renewed if a person is reasonably determined to pose a security or safety risk to [Department] personnel or property," and that "[s]uch determination may be based on factors including, but not limited to, the unauthorized access, attempted unauthorized access, or unauthorized disclosure of" classified or unclassified information "based on a reasonable assessment informed by the unique facts and circumstances of each case."  *Id*. at 12.

46.     The Policy further states that Pentagon officials have the discretion to "deny, revoke, or refuse to renew the PFAC of any person reasonably determined to pose a security or

17

safety risk to [Department] personnel or property." Ex. A at 15. It explains that "[p]ersons presumed to present such a risk include, *but are not limited to*, those who have been convicted of any offense involving," among other things "[u]nprofessional conduct that might serve to disrupt Pentagon operations." *Id*. (emphasis added). The Policy does not explain what type of "conviction" it refers to with respect to "[u]nprofessional conduct," and expressly notes that "actions other than conviction may be deemed to pose a security or safety risk." *Id*.

47.    The Policy expressly states that an "initial determination" that a journalist "pose[s] a security or safety risk . . . may result in an immediate suspension" of a PFAC "while the procedures preceding a final determination are pending." Ex. A at 12.

48.    Following its issuance of the Policy on October 6, the Department gave PFAC holders until October 14 to review and sign the Acknowledgment.

49.    The decision to issue the Policy, as well as related decisions regarding the content of the Policy, were made either in full or in substantial part by Secretary Hegseth and other Department officials and advisors located in the District of Columbia.

**The Department Revokes Reporters' Access**

50.    Prior to the Department's deadline, journalists with PFACs at The Times and virtually every other major news organization covering the Pentagon uniformly declined to sign the Acknowledgment. Instead, they informed Pentagon officials that they believed the Policy, and the Department's insistence that they sign the Acknowledgment, violated their First Amendment rights. As a result, on October 15, 2025, they were compelled to turn in their PFACs. On information and belief, of the 56 news outlets represented in the Pentagon Press Association (PPA), only one agreed to sign the Acknowledgement.

**The Department Selects a New "Pentagon Press Corps" Based on Viewpoint**

51.    Within days, Parnell took to his official X account to "announce the next generation of the Pentagon press corps."  In describing the "[n]ew media outlets" willing to accede to the Department's "media access policy," Parnell wrote that they "circumvent the lies of the mainstream media and get real news to the American people," and "[t]heir reach and impact collectively are far more effective and balanced than the self-righteous media who chose to self-deport from the Pentagon"—journalists "in the mainstream media" whom Parnell described as "activists who masquerade as journalists."[16]

52.    New PFAC recipients include the National Pulse, which was described by its editor-in-chief as "an industry mag/site for MAGA world"; Laura Loomer, an "influential pro-Trump activist"; and former congressman Matt Gaetz, President Trump's one-time choice for Attorney General of the United States, who is now affiliated with One America News.[17]  Many have expressed ideological support for the Trump administration or indicated that they do not intend to report critically on the Pentagon.[18]  For example, Libby Emmons, the editor-in-chief of Human Events and the Post Millennial who requested four passes for her staff after "receiv[ing] an unsolicited invitation to apply for credentials," stated that "[t]here should be a place for reporting on what they are doing without always trying to expose the dark underbelly," and Tim Pool, who

---

[16] Sean Parnell (@SeanParnellASW), X (Oct. 22, 2025, at 1:21 PM), https://x.com/SeanParnellASW/status/1981048206923329719.

[17] Besinger & Wemple, *New Pentagon Press Crew Is All In on Trump*, *supra* n.5; David Bauder, *Some friendly, some on-the-news questions at first briefing for new Pentagon press corps*, AP News (Dec. 2, 2025), https://apnews.com/article/pentagon-press-corps-access-journalists-96163e7ac0c8a73a44178fb5bb852863.

[18] Besinger & Wemple, *New Pentagon Press Crew Is All In on Trump*, *supra* n. 5.

disclosed that his outlet would be getting a credential, explained that his is "not an investigative news organization" and he did "not intend to maintain a significant presence in the Pentagon."[19]

53.    Earlier this week, the Department held its first in-person press events on Pentagon grounds since the Policy went into effect, which included a press briefing and a "meet-and-greet" event with Secretary Hegseth.[20]  In welcoming what she called the "official new members of the Pentagon Press Corps," Pentagon Press Secretary Kingsley Wilson ("Wilson") specifically focused on the Department's preference for their First Amendment activities.  She criticized journalists and news organizations, like Plaintiffs, who had previously held PFACs, calling them "propagandists" who "stopped telling the truth," and she praised those the Department had selected to cover the Pentagon, asserting that they "actually reach Americans, ask real questions, and don't pursue a biased agenda."[21]

54.    Similarly, in determining when solicitation of unapproved information is permissible, the Department has already drawn distinctions based on favored and disfavored content and speakers.  In her X post announcing that LOOMERED "is now a credentialed outlet at the Pentagon," Loomer stated: "I have developed a Rolodex of sources and if you have any tips, feel free to contact the Loomered Tip Line: the most influential Tip Line in all of DC."[22]  When

---

[19] *Id.*

[20] Scott Nover, *Pentagon's right-wing, pared press corps gets a meet-and-greet*, Wash. Post (Nov. 29, 2025), https://www.washingtonpost.com/business/2025/11/29/pentagon-press-policy-hegseth/.

[21] DOW Rapid Response (@DOWResponse), X (Dec. 2, 2025, at 11:21 am), https://x.com/DOWResponse/status/1995890967002452302.

[22] Laura Loomer (@LauraLoomer), X (Nov. 3, 2025, at 11:13 PM), https://x.com/LauraLoomer/status/1985560924720124414.

asked whether Loomer's "request for tips violates its new press policy,"[23] the Department responded that it did not. Through a statement attributable to Wilson, the Department stated:

> Unlike [the Washington Post's] solicitation, which explicitly and exclusively targets military personnel and DoW employees, Laura Loomer's X post regarding tips to her news outlet is a general tip line, which is constitutionally permissible. Therefore it does not violate the Pentagon's media access policy. This distinction was explained in detail to the Pentagon Press Association before they chose to engage in a dishonest and performative walk out. If Fake News reporters actually had a brain and could read our policy correctly, then maybe one day they will be as effective of a journalist as Ms. Loomer is.[24]

This explanation came on the heels of another statement from Wilson in which she asserted that "we have seen a lot of the mainstream media continue to lie."[25]

55.    In another instance, at the first official press conference held by Wilson on December 2, 2025, James O'Keefe, founder of the conservative group Project Veritas, noted that he had surreptitiously recorded a high-level Pentagon official making unguarded statements that were plainly unapproved by Department leadership—newsgathering now ostensibly prohibited by the Policy. Wilson, however, praised O'Keefe's work, which appeared to expose a critic of President Trump, noting: "That's why the work you all do is so important."[26]

56.    While the Pentagon has opened its press room to those who are willing to report only the official line, the need for independent reporting has been underscored by the ongoing public controversies involving the Pentagon. For example, on December 1, 2025, The Times

---

[23] Scott Nover (@ScottNover), X (Nov. 4, 2025, at 1:53 PM), https://x.com/ScottNover/status/1985782401755128207.

[24] Scott Nover (@ScottNover), X (Nov. 4, 2025, at 2:02 PM), https://x.com/ScottNover/status/1985784630100804036.

[25] Besinger & Wemple, *New Pentagon Press Crew Is All In on Trump*, *supra* n. 5.

[26] *James O'Keefe Asks Pentagon Press Secretary Question About Identifying Anti-Trump Members of DOD*, Forbes Breaking News, YouTube (Dec. 2, 2025), https://www.youtube.com/watch?v=BQfpJfAgIdU; *see also* James O'Keefe (@JamesOKeefeIII), X (Apr. 23, 2025 at 3:46 PM), https://x.com/JamesOKeefeIII/status/1915175452404035624.

reported that the U.S. military's strikes on a boat in the Caribbean Sea, which occurred on September 2, 2025, were made in response to a directive by Secretary Hegseth that the strike should kill the people on board and destroy the vessel and its contents, including a purported cargo of drugs.[27] The Times' reporting was based on information gathered from "five U.S. officials, who spoke separately and on the condition of anonymity."[28]

57. In recent weeks, The Times also has reported, *inter alia*, on efforts by Secretary Hegseth to fire or sideline generals and admirals,[29] the Pentagon's inquiry into Senator Mark Kelly's remarks urging members of the military not to follow illegal orders,[30] and significant changes to United States military personnel policies and training requirements.[31]

58. While reporters from The Times and other news organizations without PFACs have continued and will continue to gather news and publish important stories about the Department and the United States military, the Policy ensures that certain stories will no longer be available to those journalists and news organizations—and to the public that relies on their reporting. As one new PFAC recipient put it earlier this week when asked why he was reporting from the Pentagon:

---

[27] Charlie Savage, Julian E. Barnes, Eric Schmitt & John Ismay, *Hegseth Ordered a Lethal Attack but Not the Killing of Survivors, Officials Say*, N.Y. Times (Dec. 1, 2025), https://www.nytimes.com/2025/12/01/us/hegseth-drug-boat-strike-order-venezuela.html.

[28] *Id.*

[29] Greg Jaffe, Eric Schmitt & Helene Cooper, *Hegseth Is Purging Military Leaders With Little Explanation*, N.Y. Times (Nov. 7, 2025), https://www.nytimes.com/2025/11/07/politics/hegseth-firing-military-leaders.html.

[30] Greg Jaffee, *Pentagon Opens Inquiry Into Senator Mark Kelly Over What Hegseth Calls 'Seditious' Video*, N.Y. Times (Nov. 24, 2025), https://www.nytimes.com/2025/11/24/us/politics/mark-kelly-pentagon-investigation.html.

[31] *See, e.g.*, Dave Phillipps, *Veterans See Costs and Risks in Hegseth's Military Rewind to 1990*, N.Y. Times (Oct. 2, 2025), https://www.nytimes.com/2025/10/02/us/hegseth-military-veterans-standards.html; John Ismay, *What Women Heard in Hegseth's Remarks About Physical Standards*, N.Y. Times (Oct. 2, 2025), https://www.nytimes.com/2025/10/02/us/politics/women-military-hegseth-physical-standards.html.

"Press have always worked at the Pentagon. . . .  Correspondents place themselves at the buildings so when a major story breaks they're there to cover it."[32]

59.     Stories based on routine unplanned interactions between journalists and Pentagon personnel on Pentagon grounds, stories based on probing questions asked at press briefings and news conferences, stories built from follow-up questions posed to officials by reporters from other outlets, and stories that capture the mood and atmosphere within the Pentagon during times of consequential military operations are all examples of what Plaintiffs can no longer report.  In-person, and often spontaneous exchanges, in which reporters can judge the demeanor of government officials as they respond to questions in real time and press for more information on the spot, are different in kind and can elicit different information than inquiries by phone or by email.  Without their PFACs, Plaintiffs and other journalists and news organizations are deprived of unique, newsworthy information that can only be obtained in person and through such exchanges.  *Cf. ABC, Inc. v Stewart*, 360 F.3d 90, 99 (2d Cir. 2004) ("[O]ne cannot transcribe an anguished look or a nervous tic.").

## CLAIMS FOR RELIEF

### COUNT I
### Violation of the Due Process Clause (Void for Vagueness)
### (APA, 5 U.S.C. § 706)

60.     Plaintiffs incorporate by reference the allegations of the preceding paragraphs of the Complaint.

61.     The Due Process Clause of the Fifth Amendment provides that "No person shall be . . . deprived of life, liberty, or property, without due process of law."  U.S. Const. amend. V.

---

[32] Cam Higby (@camhigby), X (Dec. 1, 2025, at 4:45 PM), https://x.com/camhigby/status/1995655541474165162.

The Times and its reporters, including Barnes, have both a liberty and a property interest in their PFACs.

62.     The Policy violates the Due Process Clause because it "fail[s] to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits" and "authorize[s] and even encourage[s] arbitrary and discriminatory enforcement." *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999).  In both respects the Policy is unconstitutionally vague.

63.     "A law is unconstitutionally vague if it fails to provide a person of ordinary intelligence fair notice of what is prohibited or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Woodhull Freedom Found. v. United States*, 72 F.4th 1286, 1303 (D.C. Cir. 2023) (quotations omitted).  The vagueness doctrine serves to ensure that "regulated parties [] know what is required of them so they may act accordingly" and "that those enforcing the law do not act in an arbitrary or discriminatory way." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).  "When speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech." *Id.* at 253–54; *see also Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972) ("[W]here a vague statute 'abut[s] upon sensitive areas of basic First Amendment freedoms,' it 'operates to inhibit the exercise of [those] freedoms.'  Uncertain meanings inevitably lead citizens to 'steer far wider of the unlawful zone' . . . than if the boundaries of the forbidden areas were clearly marked.'").

64.     It is "[a] fundamental principle  in  our  legal  system" that "laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *Karem*, 960 F.3d at 664 (quoting *Fox Television*, 567 U.S. at 253).  As the D.C. Circuit has recognized, "[s]uch '[e]lementary notions of fairness' . . . 'dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that [the

government] may impose.'" *Id.* (quoting *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574 (1996) (alternations in original)).  Simply put, as the Supreme Court has made clear, "the Due Process Clause does not permit" the Department "to classify arbitrariness as a virtue." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003) (quoting *Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 59 (O'Connor, J., dissenting) (explaining that the government "can have no legitimate interest in deliberately making the law so arbitrary that citizens will be unable to avoid punishment based solely upon bias or whim")).  These principles carry special force in the First Amendment context, *Karem*, 960 F.3d at 660, and alone warrant injunctive relief, *id.* at 668.

65.     "[T]he suspension of a hard pass, like the denial of a hard pass, 'implicate[s]' 'important first amendment rights,'" and therefore must be "evaluate[d] . . . under a particularly 'stringent vagueness [and fair-notice] test.'" *Karem*, 960 F.3d at 665 (quoting *Sherrill*, 569 F.2d at 130).  To afford adequate process, the government must provide sufficient advance notice through "explicit and meaningful standard[s]" that are "formally articulated or published," and specifically describe both the conduct that would warrant sanctions and the severity of the sanctions that may be imposed.  *Id.* at 660 (quoting *Sherrill*, 569 F.2d at 130–31).

66.     The Policy fails to provide fair notice.  Instead, it makes immediate suspension and eventual revocation of a PFAC a wholly discretionary determination such that Department officials "may" (or may not) determine that a PFAC holder is a "safety or security" risk based on a number of factors, including the lawful newsgathering and reporting that Plaintiffs engage in every day and intend to continue to engage in.  *See* Ex. A at 12–13.  The Policy also threatens to revoke PFACs when Pentagon officials in their sole discretion conclude journalists have engaged in "[u]nprofessional conduct that might serve to disrupt Pentagon operations."  *Id.* at 15.  The Policy is also internally contradictory; it claims not to target constitutionally protected activities but

25

creates a system that, on its face, does just that.  The Policy's lack of objective, discernible enforcement standards, coupled with its inherently contradictory provisions, deprive PFAC holders of the requisite "fair notice" to satisfy the demands of Due Process.

67.    The Act is independently void for vagueness because the law "is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008).

68.    In each respect, the Policy violates the Fifth Amendment facially and as applied to Plaintiffs.

69.    Defendants' adoption of the Policy constitutes final agency action reviewable under the APA, 5 U.S.C. § 706.

70.    The Policy has caused Plaintiffs irreparable harm and is causing ongoing irreparable harm to Plaintiffs as well as the public.

71.    The Court should declare specified provisions of the Policy contrary to law, enjoin Defendants from implementing them, and vacate any agency action implementing those provisions of the Policy.

## COUNT II

### Violation of the First Amendment (Unbridled Discretion)
### (APA, 5 U.S.C. § 706)

72.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

73.    The Supreme Court has long recognized "the time-tested knowledge that in the area of free expression a licensing statute placing unbridled discretion in the hands of a government official or agency constitutes a prior restraint and may result in censorship." *City of Lakewood*, 486 U.S. at 757.  "[E]ven if the government may constitutionally impose content-neutral prohibitions on a particular manner of speech, it may not *condition* that speech on obtaining a

license or permit from a government official in that official's boundless discretion." *Id*. at 764. That is because "a law or policy permitting communication in a certain manner for some but not for others raises the specter of content and viewpoint censorship" and that "danger is at its zenith when the determination of who may speak and who may not is left to the unbridled discretion of a government official." *Id*. at 763.

74.     The Policy has established a licensing regime that conditions Plaintiffs' ability to gather news on Pentagon grounds on obtaining a PFAC that can be suspended, denied, or revoked in the Department's "boundless discretion," including for speech and newsgathering that takes place off Pentagon grounds. *Id.* at 764.

75.     The Policy expressly permits Pentagon officials to determine that a journalist "pose[s] a security or safety risk to [Department] personnel or property," based on that journalist's receipt, publication, or "solicitation" of any "unauthorized" information, Ex. A at 12–13, without limitation, and expressly provides that such a determination "may result in an immediate suspension of Pentagon access . . . ." *Id*. at 8, 12.  This determination is made by Department officials based on "the unique facts and circumstances of each case," "on a case-by-case basis," and considering "the totality of the circumstances." *Id*. at 12–13.  The Policy thereby vests Department officials with unbridled discretion to suspend and/or revoke reporters' access to the Pentagon for engaging in lawful newsgathering or for reporting any information not approved by Department officials—regardless of whether such newsgathering occurs on or off Pentagon grounds, and regardless of whether the information at issue is classified or unclassified. *Id*.; *see also* Ex. C. at 2.

76.     By vesting Department officials with unbridled discretion to cause the "immediate suspension of [reporters'] Pentagon access" and to "den[y], revoke[], not renew[], or suspend[]" a

reporter's PFAC based on the information that reporter has "solicited," received, written, or published, Ex. A at 8, 12–13, 15, the Policy constitutes precisely the kind of "prior restraint" described in *City of Lakewood*, 486 U.S. at 757. "[T]he mere existence of the [Department's] unfettered discretion, coupled with the power of prior restraint," is designed to "intimidate[] parties into censoring their own speech, even if the discretion and power are never actually abused." *Id*. The Policy is "unconstitutional, because without standards governing the exercise of discretion," the Department "may decide who may" access the Pentagon and "who may not based upon the content of the speech or the viewpoint of the speaker." *Id*. at 763–64.

77.    The risk of discretionary punishment based on protected newsgathering and publication chills the exercise of First Amendment rights. The Policy as written necessarily forces news organizations and journalists, including Plaintiffs, to weigh the risk of suspension or revocation of their Pentagon access against the public interest in engaging in lawful newsgathering and reporting. *Id.* at 757–58. In this way, the Policy impermissibly chills speech and "discourage[s] the 'uninhibited, robust, and wide-open debate that the First Amendment is intended to protect.'" *See Counterman v. Colorado*, 600 U.S. 66, 68 (2023) (quoting *Rogers v. United States*, 422 U.S. 35, 48 (1975) (quoting *Sullivan*, 276 U.S. at 270)).

78.    In this respect, the Policy violates the First Amendment facially and as applied to Plaintiffs.

79.    Defendants' adoption of the Policy constitutes final agency action reviewable under the APA, 5 U.S.C. § 706.

80.    The Policy has caused Plaintiffs irreparable harm and is causing ongoing irreparable harm to Plaintiffs as well as the public.

81.     The Court should declare specified provisions of the Policy contrary to law, enjoin Defendants from implementing them, and vacate any agency action implementing those provisions of the Policy.

## COUNT III
### Violation of the First Amendment (Unconstitutional Denial of Access to Nonpublic Forum) (APA, 5 U.S.C. § 706)

82.     Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

83.     News organizations and journalists, including Plaintiffs, have historically had access to the Pentagon, including to the Pentagon Press Briefing Room, and such access has not posed any risk to the safety or security of Pentagon property or personnel.

84.     "Although the government is not required to open such spaces for any speech at all, the government creates a 'nonpublic forum' when it provides 'selective access for individual speakers.'" *Ateba*, 133 F.4th at 122 (citations omitted).  Areas of the Pentagon, including the Pentagon Briefing Room, are nonpublic forums for First Amendment purposes.  *See Ateba*, 133 F.4th at 121–22 (holding that White House press area was a nonpublic forum for First Amendment purposes); *see also United States v. Nassif*, 97 F.4th 968, 976–77 (D.C. Cir. 2024) (United States Capitol buildings are nonpublic forums for First Amendment purposes).

85.     As the Supreme Court has recognized, the government may reserve a nonpublic forum "for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Minnesota Voters Alliance*, 585 U.S. at 11–12.

86.     Because the Policy is "an effort to suppress" speech and newsgathering on Pentagon grounds by members of the press, including Plaintiffs, whose reporting and perceived viewpoints the Department disfavors, the Policy violates the First Amendment.  *Id.*

87.    The Policy also violates the First Amendment because its provisions targeting Plaintiffs' newsgathering and reporting are not reasonable "in light of the purpose served by the forum." *Minnesota Voters Alliance*, 585 U.S. at 12–13 (citation omitted).  Those provisions of the Policy were not prompted by any specific security or safety concern or security incident involving a PFAC holder and are unrelated to the "security or safety" of "[Department] personnel or property," objectives they purport to further.  Ex. A at 12.

88.    That the Policy provides that a PFAC can be suspended, denied, or revoked in the Department's standardless and "boundless discretion," *City of Lakewood*, 486 U.S. at 764, alone makes the provisions targeting Plaintiffs' newsgathering and reporting unreasonable.  *See Minnesota Voters Alliance*, 585 U.S. at 21–22 (holding that a state's "indeterminate prohibition" on certain apparel in polling places—nonpublic forums—was unreasonable and therefore violated the First Amendment including because it failed to include "objective, workable standards" for enforcement); *see also Ateba*, 133 F.4th at 125 (explaining that "the exercise of unbridled discretion to deny access to a nonpublic forum is unreasonable" (citing *Am. Freedom Def. Initiative v. Wash. Metro. Area Transit Auth*. 901 F.3d 356, 364 372 (D.C. Cir. 2018))).

89.    In this respect, the Policy violates the First Amendment facially and as applied to Plaintiffs.

90.    Defendants' adoption of the Policy constitutes final agency action reviewable under the APA, 5 U.S.C. § 706.

91.    The Policy has caused Plaintiffs irreparable harm and is causing ongoing irreparable harm to Plaintiffs as well as the public.

92.     The Court should declare specified provisions of the Policy contrary to law, enjoin

Defendants from implementing them, and vacate any agency action implementing those provisions

of the Policy.

**Count IV**

**Violation of the First Amendment (Content-Based and Viewpoint-Based Restraint on Newsgathering and Publication)**
**(APA, 5 U.S.C. § 706)**

93.     Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

94.     "The First Amendment guarantees a free press primarily because of the important

role it can play 'as a vital source of public information.'" *Zerilli v. Smith*, 656 F.2d 705, 710 (D.C.

Cir. 1981) (quoting *Grosjean v. American Press Co.*, 297 U.S. 233, 250 (1936)).  "Without an

unfettered press, citizens would be far less able to make informed political, social, and economic

choices," and "journalists frequently depend on informants to gather news."  *Id.* at 711.  The First

Amendment protects not only the right to publish but also journalists' "right to gather information"

because "without some protection for seeking out the news, freedom of the press could be

eviscerated."  *Richmond Newspapers, Inc.*, 448 U.S. at 576 (quoting *Branzburg*, 408 U.S. at 681).

95.     The First Amendment right to gather information protects reporters' ability to

receive information, including by developing and speaking to sources.  *In re Grand Jury Subpoena*,

*Judith Miller*, 438 F.3d 1141, 1168 (D.C. Cir. 2006) (Tatel, J., concurring in judgment) (explaining

that the "public harm that would flow from undermining all source relationships would be

immense").

96.     The newsgathering and publication of information about the Department and its

leadership that Plaintiffs engage in routinely, including the publication of stories based on

information PFAC holders learn from sources and newsgathering efforts off Pentagon property,

31

are protected by the First Amendment.  Plaintiffs have continued and intend to continue to engage in such First Amendment-protected activity, including lawful speech and newsgathering that the Department deems in violation of its Policy.

97.    In its "inevitable effect" and "stated purposes," the Policy is a content-based and viewpoint-based restriction on such newsgathering and publication; it is therefore subject to strict scrutiny.  *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 565 (2011) (citation omitted); *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015) (explaining that content-based restrictions "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests"); *see also Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995) (explaining that viewpoint discrimination is an "egregious form of content discrimination").

98.    The In-Brief explains that Plaintiffs' "PFACs may be denied, revoked, or not renewed if a person is reasonably determined to pose a security or safety risk to [Department] personnel or property."  Ex. A at 8, 12.  In describing what might make an individual "a security or safety risk," the Policy adopts a content-based standard: such a "determination may be based on factors including, but not limited to[,]" the "solicitation" or "unauthorized disclosure" of classified or unclassified information.  *Id.* at 12.  The Policy thus permits Department officials, in their discretion, to cause the "immediate suspension of [Plaintiffs'] Pentagon access" and to "den[y], revoke[], not renew[], or suspend[]" Plaintiffs' PFACs based on that First Amendment-protected activity.  *Id.* at 8, 12–13, 15.

99.    The Policy is intended to and is being implemented to restrain and chill the speech and newsgathering activity of journalists and news organizations, including Plaintiffs, on the basis of content and perceived viewpoint.  In a recent X post, Parnell explained that the Policy forced

journalists and news organizations, including Plaintiffs, to "self-deport[]" from the Pentagon, asserted that those journalists and news organizations "lie[]," do not report "real news" and are "activists who masquerade as journalists," and called them less "effective and balanced" than their "new media" replacements,[33] who have evinced support for the Trump administration.[34]  Such "viewpoint discrimination is poison."  *Frederick Douglass Found., Inc. v. District of Columbia*, 82 F.4th 1122, 1141 (D.C. Cir. 2023) (quotations omitted).

100.    The Department has made clear that for certain disfavored journalists and news organizations, providing a means for potential sources to give their journalists tips violates the Policy.  Ex. D at 2.  At the same time, the Department has made clear that this same activity, when engaged in by a favored journalist or media outlet, will not be considered by the Department to be a violation.[35]

101.    The provisions of the Policy that target speech and newsgathering by members of the press, including Plaintiffs, are not narrowly tailored to any compelling government interest.

102.    There is an unbroken history of journalists, including journalists with The Times, reporting from Pentagon grounds without posing any risk to the safety or security of Pentagon personnel or property and the Policy was not motivated by or implemented to address any legitimate, specific safety or security concern.  The Policy is wholly untethered to any legitimate interest in preventing "security or safety risk[s] to [Department] personnel or property," Ex. A at

---

[33] Parnell (@SeanParnellASW), X (Oct. 22, 2025, at 1:21 PM).

[34] *See* Besinger & Wemple, *New Pentagon Press Crew Is All In on Trump*, *supra* n. 5.

[35] Scott Nover (@ScottNover), X (Nov. 4, 2025, at 2:02 PM), https://x.com/ScottNover/status/1985784630100804036; *James O'Keefe Asks Pentagon Press Secretary Question About Identifying Anti-Trump Members of DOD*, Forbes Breaking News, YouTube (Dec. 2, 2025), https://www.youtube.com/watch?v=BQfpJfAgIdU.

15, and it fails to leave open adequate "alternative observation opportunities," *Reed v. Lieurance*, 863 F.3d 1196, 1212 (9th Cir. 2017).

103.    Even if the Policy did address a legitimate concern about safety or security at the Pentagon, it is hopelessly overbroad.  It seeks to restrain and chill constitutionally protected newsgathering and reporting that occurs both on and off Pentagon grounds, including "direct communications with specific [Department] personnel or general appeals, such as public advertisements or calls for tips . . . ."  Ex. A at 12–13; *see also, e.g.*, *Grayned*, 408 U.S. at 114 ("A clear and precise enactment may nevertheless be 'overbroad' if, in its reach it prohibits constitutionally protected conduct.").

104.    The Policy's ever-present threat of PFAC suspension or revocation for "soliciting," receiving, or publishing information about the Department that has not been officially approved chills the exercise of First Amendment rights in multiple ways.  It imposes a gag on all Department employees' communications with the press outside of pre-approved situations.  It also states that a "security or safety risk" determination—warranting potential suspension or revocation of a PFAC—can be based on "unauthorized access [or] attempted unauthorized access" of classified or unclassified information.  Ex. A at 12.  And it provides for potential suspension or revocation of a PFAC if a reporter "solicit[s] the disclosure of such information or otherwise encourage[s] [Department] personnel to violate laws and policies concerning the disclosure of such information." *Id.*

105.    As the Supreme Court has recognized, "self-censorship w[ill] result," if government is permitted to sanction the use of "routine newspaper reporting techniqu[es]."  *The Fla. Star v. B.J.F.*, 491 U.S. 524, 538 (1989).  And "state action to punish the publication of truthful information seldom can satisfy constitutional standards."  *Smith v. Daily Mail Publishing Co.*, 443

U.S. 97, 102 (1979).  The Department has no legitimate justification, let alone a compelling one, for the Policy's restrictions on Plaintiffs' exercise of their First Amendment rights.

106.    In this respect, the Policy violates the First Amendment facially and as applied to Plaintiffs.

107.    Defendants' adoption of the Policy constitutes final agency action reviewable under the APA, 5 U.S.C. § 706.

108.    The Policy has caused Plaintiffs irreparable harm and is causing ongoing irreparable harm to Plaintiffs as well as the public.

109.    The Court should declare specified provisions of the Policy contrary to law, enjoin Defendants from implementing them, and vacate any agency action implementing those provisions of the Policy.

### COUNT V

**Violation of the Due Process Clause (Lack of Adequate Pre-Deprivation Process)
(APA, 5 U.S.C. § 706)**

110.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

111.    The Policy violates the Due Process Clause because it deprives reporters of adequate pre-deprivation process by allowing Department officials to immediately suspend a PFAC before providing the PFAC holder any opportunity to be heard.

112.    A PFAC "undoubtedly qualifies as [a] liberty [interest] which may not be denied without due process of law under the [Fifth Amendment]."  *Sherrill*, 569 F.2d at 130–31.  The degree of pre-deprivation process to which someone is entitled under the Due Process Clause "depends upon whether the recipient's interest in avoiding that loss outweighs the governmental interest in summary adjudication."  *Goldberg v. Kelly*, 397 U.S. 254, 263 (1970); *see Nat'l Council*

*of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 205–08 (D.C. Cir. 2001) (affording due process prior to government action depriving organization of "protected property right").

113.    Given PFAC holders' weighty interest in avoiding a loss of access relative to the government's non-existent interest in abrogating such access, PFAC holders are entitled to meaningful pre-deprivation process, including notice and a meaningful opportunity to be heard prior to any suspension, at least outside of situations in which the government can credibly demonstrate a threat of physical harm. *See Goldberg*, 397 U.S. at 267–68. Indeed, the D.C. Circuit has expressly applied this requirement to the press pass context, holding that prior to a suspension or revocation, the government must provide "notice of the factual bases for denial [of access], an opportunity for the applicant to respond to these, and a final written statement of the reasons for denial." *Sherrill*, 569 F.2d at 130.

114.    In contravention of this requirement, the Policy provides for the immediate suspension of access prior to any opportunity for a PFAC holder to be heard.

115.    In this respect, the Policy violates the Fifth Amendment facially and as applied to Plaintiffs.

116.    Defendants' adoption of the Policy constitutes final agency action reviewable under the APA, 5 U.S.C. § 706.

117.    The Policy has caused Plaintiffs irreparable harm and is causing ongoing irreparable harm to Plaintiffs as well as the public.

118.    The Court should declare specified provisions of the Policy contrary to law, enjoin Defendants from implementing them, and vacate any agency action implementing those provisions of the Policy.

## COUNT VI

### Violation of the First and Fifth Amendments – Unconstitutional Condition (APA, 5 U.S.C. § 706)

119.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

120.    The Department's requirement that PFAC holders sign an "Acknowledgement" attesting to their "understanding" of the Policy imposes an unconstitutional condition on reporters' Pentagon access.  Ex. A at 14.  The Policy requires reporters to confirm they "understand[]" its vague and standardless provisions and misstatements of governing First Amendment standards.

121.    The government "may not deny a benefit to a person on a basis that infringes his constitutionally protected . . . freedom of speech even if he has no entitlement to that benefit." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013) (omission in original); *see also City of Lakewood*, 486 U.S. at 764 ("[E]ven if the government may constitutionally impose content-neutral prohibitions on a particular manner of speech, it may not condition that speech on obtaining a license or permit from a government official in that official's boundless discretion.").

122.    In this respect, the Policy violates the First Amendment facially and as applied to Plaintiffs.

123.    Defendants' adoption of the Policy constitutes final agency action reviewable under the APA, 5 U.S.C. § 706.

124.    The Policy has caused Plaintiffs irreparable harm and is causing ongoing irreparable harm to Plaintiffs as well as the public.

125.    The Court should therefore declare specified provisions of the Policy contrary to law, enjoin Defendants from implementing them, and vacate any agency action implementing those provisions of the Policy.

## COUNT VII

### Violation of the Administrative Procedure Act—Arbitrary & Capricious Action
### (APA, 5 U.S.C. § 706)

126.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

127.    The Department's adoption of the Policy is arbitrary and capricious in violation of the Administrative Procedure Act.

128.    Agency action is arbitrary and capricious if the agency has failed to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicles Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quotation marks omitted). The Department has not offered, and cannot offer, any "rational connection" between the "safety" and "security" of Department personnel and property and the provisions of the Policy targeting First Amendment-protected speech and newsgathering. *Id.*; *FCC v. Fox Television Stations, Inc*., 556 U.S. 502, 515 (2009) (If an agency "depart[s] from a prior policy," it "must show that there are good reasons for the new policy.").

129.    Further, in adopting the Policy, the Department failed to consider less burdensome "alternative way[s] of achieving [its] objectives." *State Farm*, 463 U.S. at 48; *see also, e.g.*, *Yakima Valley Cablevision, Inc. v. FCC*, 794 F.2d 737, 746 n.36 (D.C. Cir. 1986) ("The failure of an agency to consider obvious alternatives has led uniformly to reversal.").

130.    The Department also took into account impermissible factors in crafting the Policy, which in purpose and effect discriminates against journalists and news organizations, including Plaintiffs, on the basis of content and perceived viewpoint. *See Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019) (Courts "cannot ignore the disconnect between the decision made and the explanation given" as they are "not required to exhibit a naiveté from which ordinary citizens are

free." (quoting *United States v. Stanchich*, 550 F.2d 1294, 1300 (2d Cir. 1977) (Friendly, J.))).

Agency action is arbitrary and capricious if the agency, as here, "relied on factors" it is not

empowered "to consider." *State Farm*, 463 U.S. at 43.

131.    In this respect, the Policy violates the Administrative Procedures Act.

132.    Defendants' adoption of the Policy constitutes final agency action reviewable under

the APA, 5 U.S.C. § 706.

133.    The Policy has caused Plaintiffs irreparable harm and is causing ongoing

irreparable harm to Plaintiffs as well as the public.

134.    The Court should therefore declare specified provisions of the Policy contrary to

law, enjoin Defendants from implementing them, and vacate any agency action implementing

those provisions of the Policy.

## PRAYER FOR RELIEF

For these reasons, Plaintiffs respectfully request an order:

   a.   Declaring that the provisions of the Policy targeting Plaintiffs' protected
        newsgathering and speech and all actions implementing those provisions are
        unlawful and unconstitutional;

   b.   Vacating and preliminarily and permanently enjoining the Defendants from
        implementing or seeking to enforce those provisions of the Policy;

   c.   Ordering Defendants to reinstate PFACs formerly held by Barnes and The Times'
        other reporters;

   d.   Entering judgment in favor of Plaintiffs;

   e.   Awarding Plaintiffs their reasonable costs and attorney's fees in accordance with
        law; and

   f.   Issuing any other relief that the Court deems just and proper.

Dated: December 4, 2025

Respectfully submitted,

/s/ Theodore J. Boutrous, Jr.
Theodore J. Boutrous, Jr. (D.D.C. Bar No. 420440)
Katie Townsend (D.D.C. Bar No. 1026115)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
(213) 229-7000
TBoutrous@gibsondunn.com
KTownsend@gibsondunn.com

Lee R. Crain (D.D.C. Bar No. NY0337)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York
(212) 351-4000
LCrain@gibsondunn.com

Susan Pelletier*
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, NW
Washington, DC 20036
(202) 955-8500
SPelletier@gibsondunn.com

*Counsel for Plaintiffs The New York Times Company and Julian E. Barnes*

*\*pro hac vice application forthcoming*