## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

THE NEW YORK TIMES COMPANY, *et al.*

*Plaintiffs*,

v.

DEPARTMENT OF DEFENSE A/K/A
DEPARTMENT OF WAR,
*et al.*,

*Defendants*.

**Civil Case No.** 25-cv-04218 (PLF)

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Theodore J. Boutrous, Jr. (D.D.C. Bar No. 420440)
Katie Townsend (D.D.C. Bar No. 1026115)
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
(213) 229-7000
TBoutrous@gibsondunn.com
KTownsend@gibsondunn.com

Lee R. Crain (D.D.C. Bar No. NY0337)
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166-0193
(212) 351-4000
LCrain@gibsondunn.com

Susan M. Pelletier*
Gibson, Dunn & Crutcher LLP
1700 M Street, NW
Washington, DC 20036-5306
(202) 955-8500
SPelletier@gibsondunn.com

*admitted pro hac vice*

*Counsel for Plaintiffs The New York Times
Company and Julian E. Barnes.*

**TABLE OF CONTENTS**

**Page(s)**

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 5

LEGAL STANDARDS ...................................................................................... 19

ARGUMENT .................................................................................................... 20

I.      Plaintiffs Have Standing to Challenge the Policy. ............................... 20

II.     The Policy Violates the Due Process Clause....................................... 23

        A.      The Policy Is Void for Vagueness........................................... 24

        B.      The Policy Does Not Provide Adequate Pre-Deprivation Process........................... 28

III.    The Policy Violates the First Amendment. .......................................... 29

        A.      The Policy Impermissibly Vests Pentagon Officials with "Unbridled
                Discretion."............................................................................. 30

        B.      The Policy Is Impermissibly Content-Based and Viewpoint-Discriminatory............ 34

        C.      The Policy Unconstitutionally Restricts the Exercise of First Amendment
                Rights in Nonpublic Fora. ....................................................... 38

IV.     The Policy Is Arbitrary and Capricious in Violation of the Administrative
        Procedure Act. ................................................................................... 41

V.      Plaintiffs Will Be Irreparably Harmed Absent Permanent Injunctive Relief..................... 42

CONCLUSION…………………………………………………………………..44

i

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*303 Creative LLC v. Elenis*,
  600 U.S. 570 (2023)..................................................................................................35

*Act Now to Stop War & End Racism Coal. v. District of Columbia*,
  846 F.3d 391 (D.C. Cir. 2017)..............................................................................21, 27

*Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*,
  429 F.3d 1136 (D.C. Cir. 2005)....................................................................................42

*Allina Health Servs. v. Sebelius*,
  746 F.3d 1102 (D.C. Cir. 2014)....................................................................................19

*Am. Freedom Def. Initiative v. Wash. Metro. Area Transit Auth.*,
  901 F.3d 356 (D.C. Cir. 2018)..................................................................................5, 40

*Am. Radio Relay League, Inc. v. FCC*,
  524 F.3d 227 (D.C. Cir. 2008)..................................................................................41, 42

*Anatol Zukerman & Charles Krause Reporting, LLC v. U.S. Postal Serv.*,
  64 F.4th 1354 (D.C. Cir. 2023)..................................................................................20, 21

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)..................................................................................................19

*Ateba v. Jean-Pierre*,
  706 F. Supp. 3d 63 (D.D.C. 2023)..............................................................................20

*Ateba v. Leavitt*,
  133 F.4th 114 (D.C. Cir. 2025)....................................................................4, 21, 38, 39, 40*

*Axon Enter., Inc. v. FTC*,
  598 U.S. 175 (2023)..................................................................................................19

*Bennett v. Spear*,
  520 U.S. 154 (1997)..................................................................................................19

*Bryant v. Gates*,
  532 F.3d 888 (D.C. Cir. 2008)....................................................................................39

*Cable News Network, Inc., et al. v. Trump, et al.*,
  No. 1:18-cv-02610, Mem. Order (D.D.C. Nov. 16, 2018) ..............................................28, 43

*Cable News Network, Inc. v. American Broadcasting Cos.*,
  518 F. Supp. 1238 (N.D. Ga. 1981)..............................................................................44

## TABLE OF AUTHORITIES
### (*Continued*)

Page(s)

*Citizens United v. FEC,*
 558 U.S. 310 (2010).................................................................35

*City of Chicago v. Morales,*
 527 U.S. 41 (1999)...........................................................3, 24, 28

*City of Lakewood v. Plain Dealer Publ'g Co.,*
 486 U.S. 750 (1988)...............................3, 21, 29, 30, 31, 34, 40*

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.,*
 473 U.S. 788 (1985)................................................................39

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.,*
 603 U.S. 799 (2024)................................................................42

*Counterman v. Colorado,*
 600 U.S. 66 (2023).................................................................35

*Dep't of Commerce v. New York,*
 588 U.S. 752 (2019)................................................................41

*Elrod v. Burns,*
 427 U.S. 347 (1976)................................................................43

*FCC v. Fox Television Stations, Inc.,*
 556 U.S. 502 (2009)................................................................41

*FCC v. Fox Television Stations, Inc.,*
 567 U.S. 239 (2012)..............................................24, 25, 26, 27, 29*

*Federal Deposit Ins. Corp. v. Mallen,*
 486 U.S. 230 (1988)................................................................23

*First Nat. Bank of Boston v. Bellotti,*
 435 U.S. 765 (1978)................................................................38

*Forsyth Cnty. v. Nationalist Movement,*
 505 U.S. 123 (1992)................................................................40

*Frederick Douglass Found., Inc. v. District of Columbia,*
 82 F.4th 1122 (D.C. Cir. 2023)......................................................4

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.,*
 561 U.S. 477 (2010)................................................................19

*Gertz v. Robert Welch, Inc.,*
 418 U.S. 323 (1974)................................................................34

# TABLE OF AUTHORITIES

## (*Continued*)

Page(s)

*Goldberg v. Kelly*,
    397 U.S. 254 (1970) ................................................................................................28

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972) ..........................................................................................25, 28

*Hassay v. Mayor*,
    955 F. Supp. 2d 505 (D. Md. 2013) ......................................................................44

*Jenner & Block LLP v. U.S. Dep't of Just.*,
    784 F. Supp. 3d 76 (D.D.C. 2025) .........................................................................21

*Kaahumanu v. Hawaii*,
    682 F.3d 789 (9th Cir. 2012) .................................................................................31

*Karem v. Trump*,
    960 F.3d 656 (D.C. Cir. 2020) ...........................2, 6, 20, 23, 25, 26, 27, 29, 40, 44*

*Karem v. Trump*,
    404 F. Supp. 3d 203 (D.D.C. 2019) ......................................................................43

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ...............................................................................................20

*Media Matters for Am. v. Paxton*,
    138 F.4th 563 (D.C. Cir. 2025) ..............................................................................21

*Miami Herald Publ'g Co. v. Tornillo*,
    418 U.S. 241 (1974) ...............................................................................................37

*Mills v. District of Columbia*,
    571 F.3d 1304 (D.C. Cir. 2009) .............................................................................43

*Minn. Voters All. v. Mansky*,
    585 U.S. 1 (2018) .........................................................................................4, 39, 40

*Monsanto Co. v. Geerston Seed Farms*,
    561 U.S. 139 (2010) ...............................................................................................42

*Moody v. NetChoice, LLC*,
    603 U.S. 707 (2024) ...................................................................................30, 35, 37

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*,
    463 U.S. 29 (1983) ...........................................................................................41, 42

*NAACP v. Button*,
    371 U.S. 415 (1963) ...............................................................................................34

# TABLE OF AUTHORITIES
## (*Continued*)

Page(s)

*Nat'l Ass'n of Home Builders v. Norton,*
 415 F.3d 8 (D.C. Cir. 2005) .......................................................................................................19

*Nat'l Council of Resistance of Iran v. Dep't of State,*
 251 F.3d 192 (D.C. Cir. 2001) ...................................................................................................28

*Nat'l Urb. League v. Trump,*
 783 F. Supp. 3d 61 (D.D.C. 2025) .............................................................................................22

*New York Times Co. v. Sullivan,*
 376 U.S. 254 (1964) ...................................................................................................................34

*President v. Vance,*
 627 F.2d 353 (D.C. Cir. 1980) ...................................................................................................43

*Pursuing America's Greatness v. FEC,*
 831 F.3d 500 (D.C. Cir. 2016) ...................................................................................................43

*Reed v. Town of Gilbert,*
 576 U.S. 155 (2015) ...............................................................................................34, 35, 37, 38

*Richmond Newspapers, Inc. v. Virginia,*
 448 U.S. 576 (1980) (1995) .......................................................................................................29

*Sanjour v. E.P.A.,*
 56 F.3d 85 (D.C. Cir. 1995) ..................................................................................................31, 34

*Savignac v. Jones Day,*
 754 F. Supp. 3d 135 (D.D.C. 2024) ...........................................................................................19

*SEC v. Chenery Corp.,*
 332 U.S. 194 (1947) ...................................................................................................................42

*Sherrill v. Knight,*
 569 F.2d 124 (D.C. Cir. 1977) ......................3, 4, 6, 23, 24, 25, 26, 28, 31, 33, 34, 37, 43, 44*

*Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.,*
 502 U.S. 105 (1991) ...................................................................................................................35

*Sorrell v. IMS Health Inc.,*
 564 U.S. 552 (2011) ...................................................................................................................29

*State Farm Mut. Auto. Ins. Co. v. Campbell,*
 538 U.S. 408 (2003) ...................................................................................................................33

*State of New York v. Biden,*
 636 F. Supp. 3d 1 (D.D.C. 2022) ...............................................................................................42

# TABLE OF AUTHORITIES
## (*Continued*)

Page(s)

*Stavrianoudakis v. U.S. Fish & Wildlife Serv.*,
  108 F.4th 1128 (9th Cir. 2024) ............................................................22

*Steffel v. Thompson*,
  415 U.S. 452 (1974) ..........................................................................22

*Telemundo v. City of Los Angeles*,
  283 F. Supp. 2d 1095 (C.D. Cal. 2003) ............................................43

*Turner v. U.S. Agency for Glob. Media*,
  502 F. Supp. 3d 333 (D.D.C. 2020) ..................................................22

*United States Telecom Ass'n v. FCC*,
  825 F.3d 674 (D.C. Cir. 2016) ....................................................20, 22

*United States v. Nassif*,
  97 F.4th 968 (D.C. Cir. 2024) .....................................................4, 39

*United States v. Williams*,
  553 U.S. 285 (2008) ....................................................................27, 30

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
  455 U.S. 489 (1982) ..........................................................................25

*Whitman v. Am. Trucking Ass'ns*,
  531 U.S. 457 (2001) ..........................................................................19

*Williams Gas Processing-Gulf Coast Co., L.P. v. FERC*,
  475 F.3d 319 (D.C. Cir. 2006) ..........................................................42

*Woodhull Freedom Found. v. United States*,
  72 F.4th 1286 (D.C. Cir. 2023) .........................................................24

*Yakima Valley Cablevision, Inc. v. FCC*,
  794 F.2d 737 (D.C. Cir. 1986) ..........................................................42

*Zerilli v. Smith*,
  656 F.2d 705 (D.C. Cir. 1981) ..........................................................44

**Statutes**

5 U.S.C. § 702 ..........................................................................................19

5 U.S.C. § 706 ..................................................................................19, 41

28 U.S.C. § 2201 ......................................................................................19

**TABLE OF AUTHORITIES**
(*Continued*)

Page(s)

**Other Authorities**

Alexander Bickel, *The Morality of Consent* (1977).........................................................................1

**Rules**

Fed. R. Civ. P. 56..................................................................................................................19

## INTRODUCTION

Plaintiffs The New York Times Company ("The New York Times" or "The Times") and its reporter Julian E. Barnes ("Barnes") seek an order vacating, declaring unconstitutional, and permanently enjoining provisions of a newly implemented policy of the United States Department of Defense (the "Department" or "Pentagon") that violates their First and Fifth Amendment rights.

For decades, press access at the Pentagon—regardless of who led the Department—was not predicated on the Department's approval of the content of a reporter's or news organization's journalism.  Such access has benefitted the American public and the United States military, both in times of peace and in the midst of wars or other major military actions, like Saturday's "Operation Absolute Resolve" involving Venezuela, by ensuring a balanced playing field in the time-honored "contest between press and government"—a contest that serves the interest of neither "the government alone nor of the press" but "of society as a whole."  Alexander Bickel, *The Morality of Consent* 79 (1977).  But on October 6, 2025, the Department issued new "rules" for members of the press with a Pentagon Facilities Alternate Credential ("PFAC"), a credential that enables journalists to regularly access Pentagon press areas, that rig that contest.  *See* Statement of Undisputed Material Facts in Support of Plaintiffs' Motion for Summary Judgment ("SUMF") at 1 (¶ 1), 10 (¶ 54).  Far from serving any legitimate or permissible purpose, the Policy[1] was implemented to rid the Pentagon of journalists and news organizations, including Plaintiffs, whose willingness to question and report information beyond official pronouncements the Department dislikes, and to chill reporting critical of Pentagon leadership and the decisions and actions of the Department.

---

[1] As detailed in their Proposed Order, Plaintiffs challenge certain provisions of the Department's new policy pertaining to PFACs.  As used herein, the term "Policy" refers to those provisions.

Under the new Policy, Pentagon officials possess unbridled and standardless discretion to deem a journalist "a security or safety risk to [Department] personnel or property," including expressly on the basis of that journalist's (or his or her news organization's) receipt, publication, or "solicitation" of any information, classified or unclassified, that is not "authorized" by the Department. SUMF at 10–12 (¶¶ 55–65); *see also* Administrative Record, NYTIMES-DOW-25cv04218-0000001–78 ("AR") at 1–17. And the Policy provides that such a determination—or a Department official's equally standardless and discretionary conclusion that a journalist has engaged in "[u]nprofessional conduct"—"may result in an immediate suspension of Pentagon access[.]" *Id*. Simply put, under the Policy, lawful, First Amendment-protected reporting and newsgathering, including asking questions of government employees and interviewing them for stories, whether on or off Pentagon grounds, can be deemed a "failure to abide by" the Department's "rules" and "may result" in the immediate loss of a PFAC. *Id*. Unwilling to subject themselves to this Policy—which effectively requires PFAC holders to report only what the Department wants them to report—journalists from every major news organization, including The Times, refused the Department's demand that they sign an "Acknowledgement" attesting that they "understand" the Policy. As a result, they lost their press credentials.

On its face and as applied to Plaintiffs the Policy violates the Constitution in multiple ways.

As an initial matter, the Policy cannot be squared with this Circuit's binding precedent addressing the demands of due process in the context of government-issued press credentials. As the D.C. Circuit has expressly recognized, "the interest[s] of a bona fide Washington correspondent in obtaining" a press credential "is not only 'protected by the first amendment' but also 'undoubtedly qualifies as [a] liberty [interest] which may not be denied without due process of law under the fifth amendment.'" *Karem v. Trump*, 960 F.3d 656, 660 (D.C. Cir. 2020) (quoting

*Sherrill v. Knight*, 569 F.2d 124, 130–131 (D.C. Cir. 1977)).  By giving Pentagon officials standardless discretion to suspend or revoke journalists' PFACs, the Policy both fails to provide fair notice to PFAC holders of what will and will not lead to the loss of their credentials—a "fundamental" requirement of due process that is of particular importance when First Amendment rights are implicated, *id*. at 664–65—and impermissibly "authorize[s] and even encourage[s] arbitrary and discriminatory enforcement," *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999) (plurality op.).  For these reasons, alone, the Policy violates the Fifth Amendment and should be vacated and enjoined.

But the Policy's constitutional infirmities do not end there.  The First Amendment flatly prohibits the government from granting itself the unbridled power to restrict speech because the mere existence of such arbitrary authority can lead to self-censorship.  *City of Lakewood v. Plain Dealer Publ'g Co*., 486 U.S. 750, 757 (1988).  Because Department officials possess boundless discretion under the Policy to determine that First Amendment-protected activity, whether on or off Pentagon grounds, is subject to sanction, the Policy is unconstitutional, on its face, whether or not it is implemented in a discriminatory manner.  *Id*. at 757, 763.  Requiring journalists and news organizations, including Plaintiffs, to either surrender their PFACs—credentials they have a liberty and property interest in maintaining—or subject the exercise of their First Amendment rights to the unbridled whims of Department officials is a choice the Constitution forbids.  *Id*. at 764.

To be clear, the Policy is indisputably content-based and viewpoint discriminatory in both purpose and effect.  The Policy was not promulgated in a vacuum.  Pentagon leadership has faced a stream of what it perceives to be unfair and unfavorable press coverage and, in response, promulgated the Policy to jettison journalists and news organizations whose reporting the Department disfavors, and to chill future reporting critical of the Pentagon.  Department officials

3

have derided those who no longer have PFACs as "activists" and "propagandists" who spread "lies . . . to the American people," while praising those the Department selected to receive PFACs under the Policy as free from "a biased agenda." SUMF at 13–15 (¶¶ 74, 84). "Content-based criteria" for press credentials are "prohibited" by the First Amendment, *Sherrill*, 569 F.2d at 129, and the Department's selection of PFAC holders based on whose reporting it prefers amounts to precisely the kind of impermissible viewpoint discrimination the D.C. Circuit has deemed "poison." *Frederick Douglass Found., Inc. v. District of Columbia*, 82 F.4th 1122, 1141 (D.C. Cir. 2023) (quotation marks omitted). For this reason too, the Policy violates the First Amendment.

Finally, under binding D.C. Circuit precedent, the Pentagon's press areas, including the Pentagon Press Briefing Room, are nonpublic fora subject to the First Amendment's commands. *See Ateba v. Leavitt*, 133 F.4th 114, 124–125 (D.C. Cir. 2025) (holding that White House press areas are nonpublic fora), *cert. denied*, -- S. Ct. --, 2025 WL 3260204 (Nov. 24, 2025); *United States v. Nassif*, 97 F.4th 968, 978 (D.C. Cir. 2024) (holding that Capitol buildings are nonpublic fora). Accordingly, the First Amendment requires that any restrictions on access to those press areas be both viewpoint neutral and "reasonable in light of the purpose served by the for[a]." *Minn. Voters All. v. Mansky*, 585 U.S. 1, 11–12 (2018). They are neither. The Policy is an unabashed "effort to suppress expression merely because public officials oppose the speaker's view," *id*. at 12—in this case, independent journalism that Department leadership dislikes. And because the Policy lacks any "objective, workable standards," and serves no permissible objective in view of the purpose of the fora—areas designated for journalists to gather and report newsworthy information for the benefit of the American public—it is patently unreasonable and thus unconstitutional. *Id*. at 21–22; *see also Ateba,* 133 F.4th at 125 ("unbridled discretion" to

4

restrict First Amendment activity in a nonpublic forum is unreasonable (citing *Am. Freedom Def. Initiative v. Wash. Metro. Area Transit Auth*. 901 F.3d 356, 372 (D.C. Cir. 2018))).

In short, the Policy is unconstitutional on its face and as applied to Plaintiffs.  In addition, as the administrative record of how the Policy came to be underlines, it is also arbitrary and capricious agency action in violation of the Administrative Procedure Act ("APA").  The Court should enter summary judgment in Plaintiffs' favor, vacate and declare the challenged provisions of the Policy unlawful and unconstitutional, enjoin Defendants from enforcing those provisions, and require Defendants to immediately reinstate Plaintiffs' PFACs.

## BACKGROUND

### I.  Journalists and News Organizations Have Reported from the Pentagon for Decades.

The Policy is a sharp break from longstanding tradition and historical practice.  Since the Pentagon opened in 1942, journalists from news organizations across the country, including The Times, have covered the Department from Pentagon grounds.  SUMF at 1 (¶ 2).  Having a consistent presence at the Pentagon has enabled and enhanced the ability of Plaintiffs and other members of the press to report on the Department and its leadership during some of the most consequential moments in American history.  *Id*. at 1–2 (¶ 3).  For example, Hanson W. Baldwin, a Times reporter who won a Pulitzer Prize for his coverage of World War II, frequently reported from the Pentagon.  And journalists' daily presence at the Pentagon also made possible real-time, eyewitness reporting on the Department's response to the terrorist attacks of September 11, 2001, including the attack on the Pentagon itself.  *Id*. at 2 (¶ 4).

For decades, the Department has had a process for issuing journalists press credentials or PFACs.  SUMF at 2 (¶ 5).  In the past, PFAC applicants were required to submit a letter confirming their employment with a news organization and their assignment and undergo a standard background check, *id*.—a process similar to the press credentialing processes used by other federal

government institutions, including Congress, the White House, and the Supreme Court.  *See Sherrill*, 569 F.2d at 126–27 & n.3 (describing the procedures for the White House and Congress); *Karem*, 960 F.3d at 660–61 (same); SUMF at 2 (¶ 6).  Beginning in or around the 2000s, reporters who received PFACs also signed a one-page form setting forth certain "basic, noncontroversial" requirements relating to PFACs, including that they be "visible and worn above the waist at all times while in the Pentagon."  *Id*. (¶ 8); Decl. of Robert Burns ("Burns Decl.") ¶ 15.  Beginning in the 1970s, the Department also provided dedicated physical workspace for news organizations within the Pentagon.  SUMF at 2 (¶ 7); Decl. of Pete Williams ("Williams Decl.") ¶ 4; Burns Decl. ¶ 5.  Pentagon public affairs staff worked down the hall from that dedicated workspace and interacted with reporters on a daily basis.  SUMF at 2 (¶ 9); Williams Decl. ¶ 4.  Reporters with PFACs were restricted from accessing certain secure areas within the Pentagon and respected those boundaries.  SUMF at 3 (¶ 10); Burns Decl. ¶¶ 2–3, 13.

For decades, the regular presence of credentialed journalists at the Pentagon has enhanced their ability to keep Americans informed about the United States military, while posing no security or safety risk to Department property or personnel. According to Robert Burns, the former President of the Pentagon Press Association who spent more than thirty years covering the Department for the Associated Press, being in the Pentagon enables reporters to cover official press briefings, including those called on short notice (or without notice), and to ask questions of Pentagon officials at (and before and after) those briefings.  SUMF at 3 (¶¶ 11–12); Burns Decl. ¶¶ 2, 7–12.  Reporters at the Pentagon also can engage in additional semi-formal and informal conversations with senior Department officials and their aides, as well as public affairs staff; these in-person interactions can be crucial to obtaining the context and detail needed to report accurately and effectively about defense policy and military operations.  SUMF at 3 (¶ 13); Burns Decl. ¶ 8;

Decl. of Julian E. Barnes ("Barnes Decl.") ¶ 19. For example, according to Burns, former Secretary of Defense Donald Rumsfeld regularly invited reporters into his office on weekend mornings for wide-ranging, off-the-record discussions. SUMF at 3 (¶ 14); Burns Decl. ¶ 10.

Through regular in-person interactions, Pentagon reporters build professional relationships and trust with Department officials; those relationships not only enhance journalists' reporting but also benefit the Department. SUMF at 3–4 (¶¶ 15-16). Pete Williams, who served as Assistant Secretary of Defense for Public Affairs and also covered government institutions, including the Justice Department, for NBC News, calls it "a tremendous advantage to the Department to have journalists from news organizations that reach a large and broad segment of the American public present in the Pentagon." SUMF at 4 (¶¶ 16–18); Williams Decl. ¶¶ 2–3, 6. According to Williams, Department officials can glean from reporters in the building what issues are at the forefront for the American public, and help confirm facts, provide guidance, supply additional context, and correct mistakes or misunderstandings. Williams Decl. ¶¶ 6–7.

Over the past several decades, there have been times when credentialed journalists have published stories critical of the Pentagon or reported information that Department officials believed had come out too soon or wished had not been made public. SUMF at 4 (¶ 19). These stories have led to scrutiny of the Defense Department and its officials by lawmakers and the public—and sometimes spurred beneficial reforms. *Id.* And even when Department leadership disliked a journalist's or news organization's reporting, they did not consider suspending, revoking, or not renewing a journalist's press credential in response to that reporting. *Id.* (¶ 20); Williams Decl. ¶ 9. Reporters who spent decades covering the Pentagon, as well as former Pentagon officials, are not aware of any journalist's press credential being suspended, revoked, or not renewed due to a concern about the safety or security of Department personnel or property.

SUMF at 4 (¶ 21); Williams Decl. ¶ 10 ("During my time as Assistant Secretary of Defense for Public Affairs, I did not encounter any security or safety incident arising out of the presence of a credentialed journalist at the Pentagon"); Burns Decl. ¶ 16 ("I am not aware of any instance in which a qualified Pentagon reporter's credential was denied, suspended, revoked, or not renewed based on any security or safety issue.").

For more than forty years, The Times has had multiple reporters with press credentials regularly working at the Pentagon.  SUMF at 4 (¶ 22); Decl. of Richard W. Stevenson ("Stevenson Decl.) ¶ 5.[2]  For most of 2025, seven Times reporters, including Barnes, held PFACs.  SUMF at 5 (¶ 23).  Barnes is a national security reporter with The Times who focuses on the Pentagon, United States intelligence agencies, and international security.  *Id*. (¶ 24).  He has held a PFAC almost continuously since 2004.  *Id*. (¶ 25).  He has attended hundreds of Pentagon press briefings and had countless discussions with Department employees and officials in connection with his reporting.  *Id*. (¶ 26).  According to Barnes, there were "myriad benefits to being at the Pentagon," including "attend[ing] press briefings," some of which were "held on short notice," "visit[ing] the Public Affairs offices of the United States military branches," and "me[eting] with intelligence officials . . . for background briefings or off-the-record discussion."  SUMF at 5 (¶ 27); Barnes Decl. ¶¶ 8–9.

According to Richard W. Stevenson, The Times' Washington bureau chief, "the ability of Times reporters to access the Pentagon on a regular basis has enhanced the depth, detail, and quality of The Times' coverage of the Pentagon, the Department, the United States military, and national security issues."  SUMF at 5 (¶ 29); Stevenson Decl. ¶ 5.  In his experience, "Times

---

[2] The Times also solicits tips via a "tips page" on its website that "offer[s] several ways to get in touch with and provide materials to [Times] journalists."  SUMF at 5 (¶ 28).

reporters who cover the Pentagon and national security . . . strive[] to be accurate, independent, probing, and fair in their coverage," which requires that they not only report on the Department's "official pronouncements" and "the information that Department leadership wants to convey to the public," but also that they "contextualize, investigate, and fact-check [those] official pronouncements"—and sometimes report information "that Department leadership does not intend to make public at all." he Stevenson Decl. ¶ 6; *see also* SUMF at 5 (¶ 30).  Times reporters' ability to regularly access the Pentagon enhances the quality of their journalism and, as Barnes explains, is "integral to [their] reporting about the Department, national security, and United States intelligence agencies."  SUMF at 6 (¶ 31); Stevenson Decl. ¶ 6; Barnes Decl. ¶ 9.

## II.  The Department Announces New Restrictions on Press Access to the Pentagon Including a New PFAC Policy.

On November 12, 2024, then-President-elect Trump named Defendant Pete Hegseth as his nominee to serve as Secretary of Defense.  SUMF at 6 (¶ 32).  Before and during his confirmation process, news outlets, including The Times, reported extensively on Secretary Hegseth's background, including allegations of past sexual assault, excessive drinking, and infidelity, as well as questions about his lack of relevant experience.  *Id.* (¶ 34).  He was confirmed on January 24, 2025.  *Id.* (¶ 33).

Secretary Hegseth and other Department officials have openly complained about reporting they perceive as unfavorable to them and the Department, SUMF at 6 (¶ 35), and have imposed new and increasingly stringent restrictions on journalists covering the Pentagon.  For example, in or around February 2025, the Department announced that it was requiring several news outlets— specifically, The Times, NBC News, Politico, National Public Radio, CNN, the Hill, and the War Zone, all of whom had covered criticisms of Secretary Hegseth during his confirmation process— to give up their dedicated working spaces in the Pentagon as part of a new so-called "rotation"

system.  *Id.* ¶ 36; *see also* Williams Decl. ¶ 16.  That decision was criticized, including by former Defense Department officials.  SUMF at 6 (¶ 37); Williams Decl. Ex. A.

In May 2025, Secretary Hegseth issued "Updated Physical Control Measures for Press/Media Access Within the Pentagon," that imposed new restrictions on journalists' access to specific areas of the building.  SUMF at 6–7 (¶ 38); AR at 18.  According to the memorandum, these "updated security measures" were "needed to reduce the opportunities for in-person inadvertent and unauthorized disclosures."  SUMF at 7 (¶ 39); AR at 18.  They prohibited journalists from being present in the areas around the Secretary's office and required official-escort-only access to other sections of the building, including the public affairs offices of the military service branches.  *Id.* (¶ 40).  And the Department also took other steps to stop "unauthorized disclosures" of information to the press, including making plans to implement random polygraph testing of Department personnel in a purported effort to stop "leaks." *Id.* (¶ 41).

On September 18, 2025, chief Pentagon spokesperson Sean Parnell, issued a memorandum to agency personnel that purported to implement the Department's Updated Physical Control Measures.  SUMF at 7 (¶ 42); AR at 22–36.  The memorandum stated that "[a]ll members of the press issued a [PFAC] will be required to read and sign a new in-brief form outlining information security requirements, the new physical control measures, and [Department] expectations of their compliance with safety and security requirements."  *Id.* (¶ 43); AR at 22.  The Department did not identify any breach of physical security or other incident as necessitating new restrictions or requirements.  SUMF at 7–8 (¶ 44); AR at 22–36.  And journalists, including Barnes, are not aware of any such incident.  *Id.* (¶ 44); *see* Burns Decl. ¶ 16; Barnes Decl. ¶ 7; Stevenson Decl. ¶¶ 7–8.

The "Reservation In-Brief" ("September In-Brief") attached to Parnell's memorandum announced new rules relating to PFACs that, notably, restricted journalists from engaging in

routine newsgathering by speaking to Pentagon employees about anything not approved by the Department.  SUMF at 8 (¶¶ 45–46); AR at 26 (providing that "information must be approved for public release by an appropriate authorizing official before it is released, even if it is unclassified"). It also gave the Department free rein to decide when a journalist had violated its new rules and whether such a violation warranted the suspension or revocation of a journalist's PFAC.  The September In-Brief stated, among other things, that "PFACs may be denied, revoked, or not renewed if a person is reasonably determined to pose a security or safety risk to [Department] personnel or property[,]" and that a reporter could be deemed a "security or safety risk" "based on the unauthorized access, attempted unauthorized access, or unauthorized disclosure" of Department information, and on grounds that "include[d], but [were] not limited to," "attempts to improperly obtain" Department information, or "being found in physical possession of" Department information "without reporting it."  SUMF at 8 (¶ 46); AR at 24–35.  The September In-Brief also included an "Acknowledgment" that journalists would be required to sign as a condition to obtaining or maintaining a PFAC.  SUMF at 8 (¶ 47); AR at 32–33.

### III.  Members of the Press Object to the New PFAC Policy.

Following issuance of the September In-Brief, the Reporters Committee for Freedom of the Press sent a letter to Parnell asking for clarification as to how the new PFAC policy would be applied and whether the Acknowledgment was intended to require journalists to agree not to publish information without first obtaining Pentagon approval.  SUMF at 8 (¶ 48); AR at 44–45.

In a response letter dated September 24, Parnell wrote to "clarify" that the September In-Brief's requirement that "information must be approved for public release by an appropriate authorizing official before it is released, even if it is unclassified," was directed at Pentagon personnel and did "not impose restrictions on journalistic activities, such as investigating, reporting, or publishing stories."  SUMF at 9 (¶ 49); AR at 41–43.  But Parnell's letter made clear

that journalists and news organizations could face the loss of their PFACs simply for engaging in newsgathering and reporting. It stated that the new policy's "focus" was "on preventing active solicitation that encourages [Department] personnel to violate these disclosure rules, as such conduct is not always protected by the First Amendment." SUMF at 9 (¶ 50); AR at 42. And, according to the letter, the Department considers any "attempts to improperly obtain" Department information, including unclassified information, or "being found in physical possession" of such information, even "without reporting on it[,]" to be conduct that could, if the Department so chooses, prompt the immediate suspension of a PFAC. SUMF at 9 (¶ 51); AR at 42–43. The letter further stated that in "rare, extreme cases," the "[r]eceipt of unsolicited information and subsequent publication" "could factor into" the "discretionary" decision to revoke a PFAC. SUMF at 9 (¶ 52); AR at 42.

The Times and other news organizations objected that the Department's new PFAC policy violated the First Amendment and they engaged with Pentagon officials in an effort to bring that policy in line with the Constitution. SUMF at 9–10 (¶ 53); AR at 50–74. Those efforts were ultimately unsuccessful. SUMF at 12 (¶¶ 64–67).

## IV. The Pentagon Promulgates the Policy in its Final Form.

On October 6, 2025, the Department issued the Policy in its final form, including final versions of the In-Brief and Acknowledgment. SUMF at 10 (¶ 54); AR at 1–17. Over the objections of The Times and other news organizations, the Department persisted in making lawful newsgathering and publication—First Amendment-protected activity that Plaintiffs engage in everyday—punishable under the Policy, and vested Pentagon officials with unbridled discretion to decide when a violation of the Policy has occurred and what punishment, if any, to impose.

As promulgated, the Policy provides that a PFAC "may be denied, revoked, or not renewed if a person is reasonably determined to pose a security or safety risk to [Department] personnel or

property" and that "[s]uch an initial determination may result in an immediate suspension of [a journalist's] Pentagon access while the procedures preceding a final determination are pending." SUMF at 10 (¶ 55); AR at 12.  The Policy further states that "[s]uch determination may be based on factors including, but not limited to, the unauthorized access, attempted unauthorized access, or unauthorized disclosure of" classified or unclassified information "based on a reasonable assessment informed by the unique facts and circumstances of each case."  SUMF at 10 (¶ 56); AR at 12.

The Policy provides that a journalist's receipt, publication, or "solicitation" of "controlled unclassified information[,]" which "may include, but is not limited to, information protected by the Privacy Act, information that is law enforcement-sensitive, and certain operational security information[,]" may result in the immediate suspension or revocation of a PFAC.  SUMF at 10 (¶ 58); AR at 6, 12.  And it instructs, "[t]o ensure the safety of U.S. personnel," that "news media who find themselves in possession of information that appears to be [classified national security information] or [controlled unclassified information] should discuss those materials with the [Pentagon Press Operations] prior to publication."  SUMF at 11 (¶ 59); AR at 6.  As to "solicitation," the Policy states:

> Solicitation may include direct communications with specific [Department] personnel or general appeals, such as public advertisements or calls for tips encouraging [Department] employees to share non-public [Department] information.  For example, an advertisement or social media post by an individual journalist or media outlet that directly targets [Department] personnel to disclose non-public information without proper authorization would constitute a solicitation that could lead to revocation.  Additionally, publication that recklessly endangers American lives could factor into an assessment of whether continued unescorted access to the Pentagon poses a security risk.

SUMF at 11 (¶ 60); AR at 12–13.

The Policy includes an Appendix, which states that "[p]ersons presumed to present" a "security or safety risk to [Department] personnel or property" will "include, but are not limited

to, those who have been convicted of any offense involving," *inter alia*, national defense, theft, trespassing, fraud, deceit, and "[u]nprofessional conduct that might serve to disrupt Pentagon operations." SUMF at 11 (¶ 61); AR at 15. The Appendix further states: "Additionally, actions other than conviction may be deemed to pose a security or safety risk, such as discussed in the [In-Brief]." SUMF at 11 (¶ 62); AR at 15.

The Appendix also outlines "[p]rocedures for [d]enial, [r]evocation, or [n]on-[r]enewal" of a PFAC, including written "notification[.]" SUMF at 11 (¶ 63); AR at 15–16. Those procedures allow for an appeal after the "immediate suspension" of a reporter's PFAC, SUMF at 12 (¶ 64); AR at 12, 15–16, and authorize the Department to "conduct such inquiry as deemed appropriate" after receipt of a reporter's "written or oral response to the proposed denial, revocation, or non-renewal," prior to making a "final decision," SUMF at 12 (¶ 65); AR at 16. The procedures do not include a deadline for the Department to make a "final decision." SUMF at 12 (¶ 66); AR at 16.

Finally, the Policy includes an Acknowledgment that states:

I have received, read, and understand the "Pentagon Reservation In-brief for Media Members," with [relevant appendices] which address[] the standard and procedures for denying, revoking, and not renewing a PFAC. The in-brief describes [Department] policies and procedures. My signature represents my acknowledgement and understanding of such [Department] policies and procedures, even if I do not necessarily agree with such policies and procedures. Signing this acknowledgment does not waive any rights I may have under law.

SUMF at 12 (¶ 67); AR at 14.

Following the issuance of the Policy, PFAC holders, including Barnes and his colleagues at The Times, were told their PFACs would be revoked if they did not sign the Acknowledgement by October 15, 2025. SUMF at 12 (¶ 68). Seven Times journalists with PFACs, including Barnes, and the majority of other journalists with PFACs at the time, refused to sign the Acknowledgement. *Id*. (¶ 69). On or around October 15, 2025, Barnes and his Times colleagues turned in their PFACs.

14

*Id*. (¶ 70).  Barnes has not been back to the Pentagon since October 15, 2025.  *Id*. (¶ 71).  Two other Times reporters have applied for "day passes" to access the Pentagon for specific press events, but their applications were denied.  *Id*. (¶ 72).

## V.  The Department Selects a New "Pentagon Press Corps."

One week later, Parnell "announce[d] the next generation of the Pentagon press corps." SUMF at 13 (¶ 73).  In describing the "[n]ew media outlets" that "signed the . . . media access policy," he wrote that they "circumvent the lies of the mainstream media and get real news to the American people[.]"  *Id*. (¶ 74).  According to Parnell, "[t]heir reach and impact collectively are far more effective and balanced than the self-righteous media who chose to self-deport from the Pentagon"—former PFAC holders that he called "activists who masquerade as journalists."  *Id*.

The new PFAC recipients the Department selected were individuals and media outlets who had expressed ideological agreement with and support for the Trump administration in the past. SUMF at 13 (¶ 75).  They include the National Pulse, which its editor-in-chief describes as an "industry mag/site for MAGA world"; Laura Loomer, an "influential pro-Trump activist"; and former congressman Matt Gaetz, President Trump's one-time choice for Attorney General of the United States.  *Id*. at 13–14 (¶¶ 76–78).  Many new PFAC recipients indicated that they did not intend to report on the Pentagon regularly—or critically.  New PFAC recipient Mike Lindell, CEO of MyPillow and current candidate for Governor of Minnesota, for example, promised to make the Trump administration "proud" with his Pentagon coverage, and Libby Emmons, editor-in-chief of Human Events and the Post Millennial, who received an "unsolicited invitation to apply for credentials," stated that there "should be a place for reporting on what they are doing [at the Pentagon] without always trying to expose the dark underbelly[.]"  *Id*. at 14 (¶¶ 80–81). Conservative political commentator and podcaster Tim Pool said that his outlet, which received a

PFAC, was "not an investigative news organization" and did "not intend to maintain a significant presence in the Pentagon." *Id*. (¶ 82).

On December 2, 2025, at the first in-person press event on Pentagon grounds since the Policy took effect, Pentagon Press Secretary Kingsley Wilson praised the new recipients of PFACs as people who "actually reach Americans, ask real questions, and don't pursue a biased agenda." SUMF at 14 (¶ 83).  At the same time, she criticized journalists and news organizations, like The Times, that had previously held PFACs, calling them "propagandists" who "stopped telling the truth."  *Id*. at 14–15 (¶ 84); *see also id*. (Wilson stating that "a lot of the mainstream media continues to lie").  In an interview that day with new PFAC holder Cam Higby—which was posted to his X account with the title "MSM Journalists wreaked havoc on the Pentagon during their time in the building.  Pentagon Press Sec Kingsley Wilson explains the hostile work environment created for DoW staff by adversarial media"—Wilson criticized the "former Pentagon press corps" for what she called "unprofessional behavior," including coming to her office in the Pentagon to speak with her.  SUMF at 15 (¶¶ 85–86).

The Department also has demonstrated that it will interpret and enforce the Policy in inconsistent and discriminatory ways.  For example, in her X post announcing that LOOMERED "is now a credentialed outlet at the Pentagon," Laura Loomer stated: "I have developed a Rolodex of sources and if you have any tips, feel free to contact the Loomered Tip Line: the most influential Tip Line in all of DC."  SUMF at 15 (¶ 87).  Loomer's post appeared to violate the Policy's prohibitions on the solicitation of unauthorized information.  *Id*. at 11 (¶ 60).  But when asked whether Loomer's "request for tips violates" the Policy, the Department stated it does not.  *Id*. at 15 (¶ 88).  In a statement attributed to Wilson, the Department said Loomer's post is "a general tip line, which is constitutionally permissible," while simultaneously asserting that a tip line

frequently published alongside Pentagon-related stories by the Washington Post *does* violate the Policy because it "targets military personnel and [Department] employees." *Id*. The statement attributed to Wilson added: "If Fake News reporters actually had a brain and could read our policy correctly, then maybe one day they will be as effective of a journalist as Ms. Loomer is." *Id*. (¶ 89). Similarly, at the December 2, 2025 press conference at the Pentagon, Wilson praised James O'Keefe, founder of the conservative group Project Veritas, for surreptitiously recording a Pentagon official making unguarded criticisms of President Trump that were plainly unapproved by Department leadership. *Id*. at 16 (¶¶ 90–91). Even though such newsgathering is ostensibly prohibited by the Policy, Wilson called O'Keefe's work "so important," adding that Department officials "want to make sure" that Pentagon personnel "are on board and willing to serve our commander-in-chief." *Id*. at 16 (¶ 91).

**VI.  The Loss of Plaintiffs' PFACs Is Causing Ongoing Harm.**

As of November 2025, The Times had more than 12 million subscribers across all of its print and digital products, including news. SUMF at 16 (¶ 92). The Times website is the most visited news website in the United States. *Id*. (¶ 93). The Times has multiple reporters dedicated to covering national security, the Department, and the Pentagon. *Id*. (¶ 94). No Times reporter has held a PFAC since on or around October 15, 2025. *Id*. (¶ 95).

The loss of Plaintiffs' PFACs "has created an unprecedented and significant impediment to [The Times'] ability to cover the Pentagon, Department leadership, national security, and the United States military." SUMF at 16 (¶ 96); Stevenson Decl. ¶ 13. For example, the Pentagon has held press conferences in the Pentagon Press Briefing Room that Times reporters have been unable to attend because they no longer have PFACs. As a result, those reporters have been unable to ask questions of Department leadership that would further their reporting. SUMF at 16 (¶ 97);

Stevenson Decl. ¶ 13.  At the December 2, 2025 news conference, for example, Pentagon press staff, speaking from the podium, mischaracterized Barnes's reporting about Department officials' involvement in a military strike on a Venezuelan boat.  SUMF at 17 (¶ 98); Barnes Decl. ¶ 19.  As Barnes attests, "[i]t would have been very valuable to [his] further coverage efforts" to "attend[] the news conference," "ask follow-up questions," and "address the mischaracterizations of [his] reporting"—but without a PFAC, he could not attend.  *Id*.

Similarly, Barnes is one of The Times reporters currently covering "Operation Absolute Resolve": what the President has called a "large scale strike" that was carried out by the United States military in Venezuela on January 3, 2026, and resulted in the capture of that nation's President Nicolás Maduro and his wife.  SUMF at 17 (¶ 99); Barnes Decl. ¶ 20.  According to Barnes, it "would have been very valuable to" to his and his colleagues' reporting efforts "to be at the Pentagon" both before and during that military operation, "and it would be beneficial to [their] reporting to be there now," shortly after the operation was carried out.  SUMF at 17 (¶ 100); Barnes Decl. ¶ 20; *see also* Williams Decl. ¶ 7 ("Always, but especially during times of war or national crises, it benefits everyone to ensure that timely, accurate information is being conveyed to the American public.").  But because Barnes and other national security reporters with The Times no longer have PFACs, they cannot be present at the Pentagon to further their coverage of "Operation Absolute Resolve."  SUMF at 17 (¶ 101); Barnes Decl. ¶ 20.

Because they no longer have PFACs, Barnes and other Times reporters are also unable to have face-to-face interactions with Department officials and personnel without a prearranged meeting away from the Pentagon, which is more difficult and time-consuming to arrange.  SUMF at 17 (¶ 102).  While Plaintiffs have continued to provide in-depth coverage of the Department since October 15, their reporting is no longer informed by having a regular presence in the

18

Pentagon. *Id*. (¶ 103). In short, their coverage "has been made more difficult and burdensome because no Times reporter has a PFAC." *Id*.; Stevenson Decl. ¶ 13.

## LEGAL STANDARDS

The Court has jurisdiction over Plaintiffs' claims, which arise under the Constitution and a federal statute, under 28 U.S.C. § 1331. *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 185 (2023). The Court is empowered to review the Policy under the Administrative Procedure Act, 5 U.S.C. § 702, and pursuant to its equitable authority. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478 (2001); *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010).[3] Under the APA, the Court must "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "[V]acatur is the normal remedy" for such unlawful actions. *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014).

Summary judgment is appropriate if "there is no genuine dispute as to any material fact" and the movant "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). When parties file cross-motions for summary judgment, each party "must carry its own burden under the applicable legal standard." *Savignac v. Jones Day*, 754 F. Supp. 3d 135, 163 (D.D.C. 2024). Plaintiffs are entitled to declaratory relief for any claim on which they prevail, 28 U.S.C. § 2201(a), and to permanent injunctive relief if

---

[3] The APA waives sovereign immunity and provides a cause of action to challenge final agency action. *Nat'l Ass'n of Home Builders v. Norton*, 415 F.3d 8, 13 (D.C. Cir. 2005). For agency action to be "final," it "must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature," and it must "be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (quotation marks and citations omitted). The Policy is unquestionably final. Any member of the media who seeks to obtain or maintain a PFAC is subject to the Policy and, indeed, Defendants have already enforced it against Plaintiffs. *See Whitman*, 531 U.S. at 478–79.

they demonstrate (1) "irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction," *Anatol Zukerman & Charles Krause Reporting, LLC v. U.S. Postal Serv.*, 64 F.4th 1354, 1364 (D.C. Cir. 2023).

## ARGUMENT

There is no material factual dispute, and Plaintiffs are entitled to judgment as a matter of law. The Policy is unconstitutional under the First and Fifth Amendments, and unlawful under the APA. For the reasons below, Plaintiffs are entitled, specifically, to an order (1) vacating the challenged provisions of the Policy; (2) declaring them unlawful; (3) permanently enjoining their enforcement; and (4) requiring the Pentagon to immediately reinstate Plaintiffs' PFACs.

## I. Plaintiffs Have Standing to Challenge the Policy.

"[T]o establish standing, a plaintiff must demonstrate an 'injury in fact,'" "'fairly traceable' to the defendant's action," that "can be 'redressed by a favorable decision.'" *U.S. Telecom Ass'n v. FCC*, 825 F.3d 674, 739 (D.C. Cir. 2016) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). Plaintiffs readily meet these requirements.

Plaintiffs have suffered and continue to suffer cognizable injuries. Barnes and other Times reporters were prevented from maintaining their PFACs unless they agreed to subject themselves to a Policy that abridges their constitutional rights. As a result, they have lost their PFACs—press credentials they have liberty and property interests in possessing, *Karem*, 960 F.3d at 660, and can no longer regularly access the Pentagon to the irremediable detriment of their reporting. *See, e.g.*, SUMF at 12–13 (¶¶ 70–72); *id*. at 16–17 (¶¶ 95–103). A member of the press is "plainly injured" by the loss of a credential that, *inter alia*, provides "expedited access" to press areas in buildings like the Pentagon. *Ateba v. Jean-Pierre*, 706 F. Supp. 3d 63, 74 n.3 (D.D.C. 2023), *aff'd sub nom.*

*Ateba v. Leavitt*, 133 F.4th 114 (D.C. Cir. 2025); *see also Media Matters for Am. v. Paxton*, 138 F.4th 563, 579 (D.C. Cir. 2025) (finding "alleged present, concrete, and objective harms" from "retaliatory government actions" that "adversely affected" media organization's and journalist's "newsgathering activities and media business operations" are sufficient to confer standing).

That the Department promulgated and implemented the Policy to chill journalism it disfavors, inflicts separate, cognizable First Amendment harm on Plaintiffs.  *See, e.g., Jenner & Block LLP v. U.S. Dep't of Just.*, 784 F. Supp. 3d 76, 105 (D.D.C. 2025) (noting "the mere existence" of an order targeting a party on the basis of viewpoint inflicts a cognizable injury and "confers standing" given the party's "constitutional right to express itself without fear of government reprisal"); *see also Anatol Zukerman & Charles Krause Reporting, LLC*, 64 F.4th at 1362 (plaintiff "sustained a real, concrete injury because he was denied customized postage" due to "unlawful viewpoint discrimination").

Irrespective of whether they currently hold PFACs, Plaintiffs also have standing to challenge the Policy because the unbridled discretion it vests in Department officials inflicts cognizable constitutional injury on those—like Barnes and The Times—who seek to obtain and maintain press credentials and report regularly from the Pentagon without being subjected to the arbitrary decisions of Department officials.  SUMF at 16–17 (¶¶ 96–103); *City of Lakewood*, 486 U.S. at 755–56 (facial First Amendment challenge lies to a licensing scheme that "allegedly vests unbridled discretion in a government official" even where plaintiff has not yet applied for a license); *Act Now to Stop War & End Racism Coal. v. District of Columbia*, 846 F.3d 391, 410 (D.C. Cir. 2017) (a Fifth Amendment challenge brought under an "arbitrary-enforcement theory" is "by its nature facial").

21

That Plaintiffs have already lost their PFACs as a result of the Policy does not lessen their injuries. *See, e.g.*, SUMF at 16–17 (¶¶ 95–103). To the contrary, by conditioning Plaintiffs' ability to obtain or maintain their PFACs on their willingness to subject themselves to the Policy, the Department presented—and continues to present—Plaintiffs with the kind of "forced" or "lose-lose-lose" choice that, *alone*, constitutes an injury in fact. *Nat'l Urb. League v. Trump*, 783 F. Supp. 3d 61, 85 (D.D.C. 2025). As the Supreme Court has made clear, Plaintiffs need not "first expose" themselves to sanction "to be entitled to challenge" a policy they "claim[] deters the exercise of [their] constitutional rights." *Steffel v. Thompson*, 415 U.S. 452, 459 (1974); *see also Turner v. U.S. Agency for Glob. Media*, 502 F. Supp. 3d 333, 359 (D.D.C. 2020) (quoting *U.S. Telecom Ass'n*, 825 F.3d at 739) (explaining, "in the context of a pre-enforcement challenge to" government action "that burdens a plaintiff's First Amendment rights, the injury in fact requirement is satisfied by the plaintiff's demonstration of an 'intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by [the policy]'" (quoting *U.S. Telecom Ass'n*, 825 F.3d at 739)). Here, Plaintiffs suffer cognizable injury by being forced to choose between losing their PFACs immediately or subjecting themselves to an unconstitutional Policy that would expose them to the arbitrary loss of their PFACs eventually. The "injury in fact is the forced choice." *Stavrianoudakis v. U.S. Fish & Wildlife Serv.*, 108 F.4th 1128, 1138 (9th Cir. 2024).

These injuries are "fairly traceable" to Defendants, who promulgated the Policy and are responsible for enforcing it; indeed, Defendants "are the sole cause of [Plaintiffs'] injuries." *Turner*, 502 F. Supp. 3d at 361. And those injuries can and would be directly redressed by the order Plaintiffs seek from this Court. Plaintiffs thus have standing.

22

**II. The Policy Violates the Due Process Clause.**

Nearly 50 years ago, the D.C. Circuit recognized that "the interest of a bona fide Washington correspondent" in obtaining or retaining a press credential is not only "protected by the first amendment," but also "undoubtedly qualifies as [a] liberty [interest] which may not be denied without due process of law under the fifth amendment." *Sherrill*, 569 F.2d at 130–31.[4]  In considering a constitutional challenge brought by a Washington correspondent for The Nation to the denial of his application for a White House press pass for undefined "reasons of security," the Court in *Sherrill* explained that, where the government "has voluntarily decided to establish press facilities for correspondents who need to report therefrom," important First Amendment rights are implicated, and access cannot be denied "arbitrarily or for less than compelling reasons."  *Id*. at 129–30; *see also id*. at 129 ("[A]rbitrary or content-based criteria for press pass issuance are prohibited" by the First Amendment).  The D.C. Circuit held that the White House's failure "to articulate and publish an explicit and meaningful standard governing denial" of press passes "for security reasons," and to afford procedural protections—namely, notice of the factual bases for denial, an opportunity for the applicant to respond, and a final written statement of the reasons for denial—to those denied passes, alone, violated the Due Process Clause.  *Id*. at 130–31.

Decades later in *Karem*, the D.C. Circuit reaffirmed and expanded on that holding.  960

---

[4] In addition to a liberty interest, Plaintiffs also have a property interest in their PFACs. *See, e.g.*, *Fed. Deposit Ins. Corp. v. Mallen*, 486 U.S. 230, 240 (1988) (the right "to participate in the conduct of [an employer's] affairs is a property right protected by the Fifth Amendment Due Process Clause").  In fact, in *Sherrill* itself, the Court of Appeals stated that "a related and perhaps equally compelling property interest may also be said to require the procedural protections of the [F]ifth [A]mendment," but "because appellee's [F]irst [A]mendment liberty interest independently requires the standards and procedural protections set forth in this opinion, we do not reach the question of whether appellee also has a property entitlement of constitutional magnitude."  569 F. 2d at 131 n.22.

F.3d at 660 (quoting *Sherrill*, 569 F.2d at 130–31). Considering a journalist's challenge to a one-month suspension of his White House "hard pass" based on his purportedly "unprofessional conduct" at a Rose Garden event, the Court held that a "duly issued hard pass may not be suspended without due process," and because the suspension of a hard pass "implicates important first amendment rights," any suspension must be analyzed "under a particularly stringent vagueness and fair-notice test." *Id*. at 665 (quotation marks and alterations omitted). Finding that the White House had failed to apprise the journalist of the conduct that would subject him to punishment and of the severity of the penalty that might be imposed, the D.C. Circuit held that the suspension of his hard pass likely violated due process and affirmed the district court's preliminary injunction ordering that the White House restore the reporter's hard pass. *Id*.

Here, too, the Policy violates the Due Process Clause, and it does so in multiple ways. It is "impermissibly vague" both because it "fail[s] to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits" and because it "authorize[s] and even encourage[s] arbitrary and discriminatory enforcement." *Morales*, 527 U.S. at 52, 56 (plurality op.). In addition, the Policy does not provide meaningful, pre-deprivation process.

### A. The Policy Is Void for Vagueness.

A law or regulation "is unconstitutionally vague if it fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Woodhull Freedom Found. v. United States*, 72 F.4th 1286, 1303 (D.C. Cir. 2023) (quotation marks omitted). Put another way, due process demands that people know what the law requires so that they can act accordingly and so "that those enforcing the law do not act in an arbitrary or discriminatory way." *FCC v. Fox Television Stations, Inc*., 567 U.S. 239, 253 (2012). And where, as here, First Amendment rights are implicated "rigorous adherence to those requirements is necessary to ensure that ambiguity does

not chill protected speech." *Id.* at 253–54; *see also Grayned v. City of Rockford*, 408 U.S. 104, 108–109 (1972). The Policy violates those principles.

First, the Policy fails to give fair notice of the conduct it prohibits—a "fundamental principle in our legal system." *FCC v. Fox*, 567 U.S. at 253; *see also id.* ("This requirement of clarity" is "essential to the protection" afforded by the Due Process Clause). "Such '[e]lementary notions of fairness' . . . 'dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that [the government] may impose.'" *Karem*, 960 F.3d at 664 (alterations in original) (quotation omitted). And because PFACs implicate important First Amendment rights, "a particularly 'stringent vagueness [and fair notice] test'" applies. *Id.* at 665 (alteration in original) (quoting *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498–99 (1982)).

As *Karem* makes clear, the Department "may not rely on unarticulated standards of professionalism," 960 F.3d at 666, to justify the suspension, revocation, or non-renewal of a PFAC. But the Policy does exactly that. Nor may the Department point to unspecified "reasons of security"—an explanation that is "unnecessarily vague and subject to ambiguous interpretation," *Sherrill*, 569 F.2d at 130. But, again, the Policy does exactly that. Due process requires, instead, that the Department "articulate and publish an explicit and meaningful standard[.]" *Id*. at 131; *Karem*, 960 F.3d at 666. It has not come close to doing so.

Here, the Policy's lack of meaningful standards is evident on its face. The Policy, echoing the approach struck down in *Sherrill*, provides that PFACs "may be denied, revoked, or not renewed if a person is reasonably determined to pose a security or safety risk to [Department] personnel or property." SUMF at 10 (¶ 55); AR at 12. And whether a journalist "pose[s] a security or safety risk" is a wholly discretionary, ad hoc determination to be made by Department officials

25

"on a case-by-case basis."  SUMF at 10 (¶¶ 56–57); AR at 12–13; *see* AR at 42 (emphasizing "the Department's discretion").  While the Policy provides a non-exhaustive list of "factors" that "may" be considered in making such a determination, Department officials are expressly "not limited to" those factors.  SUMF at 10 (¶ 56); AR at 12.  In short, far from providing an "explicit and meaningful standard governing" suspension, revocation, or non-renewal of a PFAC, *Sherrill*, 569 F.2d at 131, the Policy gives Pentagon officials free rein to "determin[e]" that any reporter "pose[s] a security or safety risk," and that their PFAC should be immediately suspended or revoked, for any reason, SUMF at 10 (¶ 55); AR at 12.  That is a far cry from fair notice of what "is forbidden or required."  *FCC v. Fox*, 567 U.S. at 253.

Even where the Policy purports to identify specific grounds that may lead to the suspension, revocation, or non-renewal of a PFAC, it is open to ambiguous interpretation.  *Sherrill*, 569 F.2d at 130.  The "factors" that may (or may not) lead to a reporter being deemed "a security or safety risk" include obtaining or attempting to obtain information that the Department has not approved for release, whether or not that information is classified.  SUMF at 10 (¶¶ 55–58); AR at 8, 12–13.  In other words, lawful journalistic practices that Plaintiffs engage in daily—like asking questions of Department employees—may (or may not) trigger a determination by the Department that a journalist is a "security or safety risk."  *Id*.  And that includes First Amendment-protected activity that takes place anywhere in the world—not solely at the Pentagon.  As the D.C. Circuit explained in *Sherrill*, merely citing "'reasons of security' does not inform the public or other" journalists of what conduct will result in the loss of a press credential.  569 F.2d at 130.  Nor does it inform a reasonable reporter about the severity of the punishment that may, or may not, be imposed for any particular alleged infraction, leaving that to the arbitrary whim of Pentagon officials, in violation of due process.  *Karem*, 960 F.3d at 665.  As Barnes avers: "It is not clear to me, based on the

26

language of the new PFAC policy, what steps I would need to take to ensure that my PFAC was not subject to revocation, suspension, or non-renewal—other than to stop reporting on the Pentagon and the United States military." Barnes Decl. ¶ 15.

Further, echoing the government's asserted rationale rejected in *Karem*, the Policy's list of offenses that may (or may not) lead to a reporter being deemed a "security or safety risk" also includes "[u]nprofessional conduct that might serve to disrupt Pentagon operations." SUMF at 11 (¶ 61); AR at 15. What constitutes "unprofessional conduct" is not defined. The D.C. Circuit has squarely held that the government "may not rely on unarticulated standards of professionalism" to suspend a press credential. *Karem*, 960 F.3d at 666. And the fact that the Pentagon Press Secretary has described it as "unprofessional" for journalists to do what they have done for decades—come to her office at the Pentagon to speak with her and other Department personnel—only underscores why "unprofessional conduct" lacks any discernible meaning. *See* SUMF at 15 (¶ 86); Williams Decl. ¶ 4 (as Assistant Secretary of Defense for Public Affairs, Williams "interacted with reporters at the Pentagon every day," including "informally," and his "office was just down the hall" from journalists' workspaces). The Policy thus "fails to provide . . . fair notice of what is prohibited" and violates the Due Process Clause on its face. *FCC v. Fox*, 567 U.S. at 253 (citation omitted).

Second, the Policy is unconstitutionally vague for the additional reason that it "is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008); *see also Act Now to Stop War*, 846 F.3d at 410 (explaining that "in a pre-enforcement posture, such a claim is by its nature facial"). The Policy does not provide Department officials with clear standards to guide them when determining whether a journalist's PFAC should (or should not) be suspended, revoked, or not renewed, thereby empowering Department officials to do whatever they want, depending on their own personal

predilections. *Morales*, 527 U.S. at 56, 62. The Policy expressly contemplates that Pentagon officials will determine which journalists and news organizations may obtain and maintain PFACs on a "case-by-case" basis for any reason they see fit, *see* SUMF at 10 (¶ 57), and thus invites Pentagon officials to make those determinations "on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Grayned*, 408 U.S. at 108–09. Because the Policy fails to establish standards "sufficient to guard against the arbitrary deprivation" of the protected liberty and property interests that journalists have in their PFACs, *Morales*, 527 U.S. at 52 (plurality op.), it violates the Due Process Clause.

   **B.  The Policy Does Not Provide Adequate Pre-Deprivation Process.**

   The Policy also violates the Due Process Clause by failing to provide sufficient process *before* the immediate suspension of a reporter's PFAC. "[T]he fundamental norm of due process clause jurisprudence requires that before the government can constitutionally deprive a person of [a] protected liberty or property interest, it must afford him notice and hearing." *Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 205–08 (D.C. Cir. 2001). The amount of pre-deprivation process due "depends upon whether the recipient's interest in avoiding that loss outweighs the governmental interest in summary adjudication." *Goldberg v. Kelly*, 397 U.S. 254, 263–64 (1970). In *Sherrill*, the D.C. Circuit held that notice of the factual bases for the denial of a press credential "with an opportunity to rebut is a minimum prerequisite" under the Fifth Amendment. 569 F.2d at 131; *see also* Mot. Hr'g Tr. at 6:11–15, 9:25–10:8, 10:17–11:8, 13:2–18, *Cable News Network, Inc., et al. v. Trump, et al.*, No. 1:18-cv-02610, Mem. Order (D.D.C. Nov. 16, 2018), Dkt. 22 (Kelly, J.) (granting temporary restraining order requiring restoration of White House reporter's hard pass because of lack of fair notice and opportunity to be heard on

claim that alleged unprofessional conduct could lead to revocation) (discussed in *Karem*, 960 F.3d at 661). The Policy does not even meet this minimum requirement.

The Policy provides that "[a]n initial determination of a security or safety risk may result in an *immediate suspension of Pentagon access* during the process for making a final determination." SUMF at 10 (¶ 55); AR at 12. The Policy thus allows the Department to suspend a PFAC without prior notice and without any pre-deprivation opportunity to contest the suspension. While the Policy claims to "incorporate due process" by providing for certain *post-deprivation* procedures, including what it calls an "appeal" process, it contemplates that a journalist will be without access while that process unfolds. *Id*. at 11–12 (¶¶ 64–66); AR at 8, 12, 15–16. The Policy also does not provide any end date for the appeal process or deadline for the Department to make a "final determination." *Id*. Instead, by allowing Pentagon officials to conduct whatever "further inquiry or investigation" it deems necessary before reaching a final decision, *see id*., the Policy, in effect, allows for the indefinite suspension of a PFAC without due process. The Due Process Clause unquestionably requires more. *See FCC v. Fox*, 567 U.S. at 253–54.

## III. The Policy Violates the First Amendment.

The First Amendment protects both the freedom to publish and the right "to gather information." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 576 (1980) (quoting *Branzburg v. Hayes*, 408 U.S. 665, 681 n.20 (1972)). The Policy curtails the exercise of those rights. First, by giving the Department officials unfettered power to suspend, revoke, or not renew a journalist's PFAC, the Policy effectuates self-censorship. Under the Policy, in order to avoid losing their PFACs, journalists must conform their reporting to the Department's preferences—a chilling effect the First Amendment forbids. *City of Lakewood*, 486 U.S. at 763. Second, the Policy—in both purpose and "inevitable effect," *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 565

(2011) (citation omitted)—imposes impermissible content-based criteria for PFAC-holders designed to stifle independent journalism the Department disfavors. Third, even if viewed solely as a restriction on First Amendment activity in press areas of the Pentagon—nonpublic fora under binding D.C. Circuit precedent—the Policy is both impermissibly viewpoint driven and unreasonable in light of the purposes of the fora.

The Policy violates the First Amendment both as applied to Plaintiffs and on its face. In the First Amendment context, facial relief is warranted when a law (or policy) "prohibits a substantial amount of protected speech" "relative to [its] plainly legitimate sweep." *Williams*, 553 U.S. at 292. Thus, "even a law with a 'plainly legitimate sweep' may be struck down in its entirety" to ensure adequate "breathing room for free expression." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024). Here, the Court need not even decide whether certain applications of the Policy might be lawful because the Policy sweeps far too broadly. By vesting Department officials with unfettered discretion to decide which journalists may retain PFACs, including expressly on the basis of the content of their reporting, the Policy inherently risks the "illegitimate abuse of censorial power" in a way that "only a facial challenge can effectively test," *City of Lakewood*, 486 U.S. at 758, and has far-reaching "unconstitutional applications" that "substantially outweigh" any constitutional ones, *Moody*, 603 U.S. at 724.

### A. The Policy Impermissibly Vests Pentagon Officials with "Unbridled Discretion."

As the Supreme Court has long recognized, a "policy permitting communication in a certain manner for some but not for others raises the specter of content and viewpoint censorship[,]" and that "danger is at its zenith when the determination of who may speak and who may not is left to the unbridled discretion of a government official." *City of Lakewood*, 486 U.S. at 763. For that reason, the Supreme Court has held that "even if the government may constitutionally impose content-neutral prohibitions on a particular manner of speech, it may not

*condition* that speech on obtaining a license or permit from a government official in that official's boundless discretion." *Id*. at 764 (emphasis original). That is because "the mere existence" of unfettered discretion "intimidates parties into censoring their own speech, even if" that discretion is "never actually abused," and makes abuse difficult to detect. *Id*. at 757–59 (explaining that unbridled discretion makes "the use of shifting or illegitimate criteria far too easy" for government officials). Thus, a licensing scheme that involves expression but places "no explicit limits," or provides merely "illusory 'constraints,'" on officials' discretion, violates the First Amendment, and "those portions" of the scheme that confer such unbounded discretion must be held unconstitutional. *Id*. at 759, 770, 772; *see also Kaahumanu v. Hawaii*, 682 F.3d 789, 800–01 (9th Cir. 2012); *Sanjour v. E.P.A.*, 56 F.3d 85, 97 (D.C. Cir. 1995). That doctrine is fully applicable here and, alone, justifies vacatur and declaratory and injunctive relief.

First, it is beyond reasonable dispute that the Policy has a close enough nexus to expression to "pose a real and substantial" threat of self-censorship and content-based decisions. *City of Lakewood*, 486 U.S. at 759. As an initial matter, the entire purpose of a PFAC is to facilitate certain First Amendment-protected activity by journalists on Pentagon grounds. *See Sherrill*, 569 F.2d at 130 (the "refusal to grant White House press passes to bona fide Washington journalists" "implicate[s]" "important first amendment rights"). And even were that not the case, the Policy *still* would have a direct nexus to expression because it makes the *content* of journalists' newsgathering and reporting—*i.e.*, the information they and their news organizations obtain and publish—on and off Pentagon grounds a "factor" for the Department to consider when determining whether a PFAC should be renewed, suspended, or revoked. *City of Lakewood*, 486 U.S. at 755; *see also Sanjour*, 56 F.3d at 97 (scheme giving agency "essentially unbridled discretion" to "make [a reimbursement] determination" based on an employee's viewpoint was "impermissible").

31

Second, as detailed above, there can be no question that the Policy vests Department officials with unbridled discretion to determine whether a journalist's PFAC will be suspended, revoked, or not renewed.  The Policy provides that journalists may lose their credentials if they obtain, attempt to obtain, or disclose classified or "controlled unclassified" information the Department has not approved for release.  SUMF at 10–11 (¶¶ 55–62); AR at 6, 8, 12–13.  The Policy's definition of "controlled unclassified information" that the Department may (or may not) deem out of bounds is itself unbounded:  It "may include, *but is not limited to*, information protected by the Privacy Act, information that is law enforcement-sensitive, and certain operational security information."  SUMF at 10 (¶ 58) (emphasis added); AR at 6.  And the Policy expressly leaves the door open for a reporter to be deemed a "security or safety risk" for other reasons—which may "*include, but are not limited to*," whatever the Department decides is "[u]nprofessional conduct."  SUMF at 11 (¶ 61) (emphasis added); AR at 15.

To dispel any doubt that the Policy vests Pentagon officials with unbounded discretion, the Policy makes clear that a decision to deem a journalist a "security or safety risk" will turn on "the unique facts and circumstances of each case," and be made "on a case-by-case basis reviewing the totality of the circumstances."  SUMF at 10 (¶¶ 56–57); AR at 12–13.  Put another way, nothing in the Policy provides that newsgathering or reporting will necessarily lead to the suspension or revocation of a PFAC in all cases—but it might.  The Policy has no rules or limits; just vague provisions that give Department officials broad, unchecked discretion to deny, suspend, revoke or not renew a PFAC—a license that enables journalists to engage in First Amendment-protected activity on Pentagon grounds.  Information in specified categories "may" (or may not) be "controlled unclassified information," AR at 6; prohibited "[s]olicitation may" (or may not) "include direct communications with [Department] personnel or general appeals," AR at 12–13; a

reporter who receives or discloses "unauthorized" information "may" (or may not) be deemed a "security or safety risk," AR at 15; and a reporter who is deemed a "security or safety" risk "may" (or may not) lose his or her PFAC, AR at 8, 12.  *See also* SUMF at 10–11 (¶¶ 55, 58, 60, 62).  Indeed, in the short time the Policy has been in effect, Department officials have already demonstrated their intent to apply it in an ad hoc fashion.  The Department has asserted, for example, that when The Washington Post makes a general appeal for tips in connection with its Pentagon coverage it is in violation of the Policy, but when Laura Loomer does the same she is not.  SUMF at 15 (¶¶ 87–89).[5]  And the Department has praised James O'Keefe for obtaining and then publishing unauthorized statements by Department personnel while, at the same time, suggesting the same conduct by other media organizations would violate its Policy.  *Id*. at 15–16 (¶¶ 90–91).[6]

The First Amendment, like the Due Process Clause, "does not permit" the government "to classify arbitrariness as a virtue."  *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003) (quotation omitted).  That is particularly true in the context of press credentials.  As the D.C. Circuit observed in *Sherrill*, "arbitrary or content-based criteria for press pass issuance are prohibited under the [F]irst [A]mendment," because "[n]ot only newsmen and the publications for

---

[5] The Times also solicits tips via the "tips page" on its website, which "offer[s] several ways to get in touch with and provide materials to [Times] journalists."  *See* SUMF at 5 (¶ 28).  Presumably, the Department could deem The Times website a violation of the Policy and thus grounds for suspending or revoking the PFACs of Times journalists at any time and for any reason, or it could decide not to do so, without rhyme or reason.

[6] Indeed, even when it comes to the application of other provisions of the Policy, the Department's decisions regarding who should and should not hold a PFAC are entirely ad hoc.  For example, the Policy provides that persons will be "presumed to present" a "security or safety risk to [Department] personnel or property" if they "have been convicted of any offense involving," *inter alia*, "trespassing" or "[f]raud or deceit."  SUMF at 11 (¶ 61); AR at 15.  Notwithstanding that provision, O'Keefe, who pleaded guilty to federal charges for entering federal property under false pretenses, was issued a PFAC as a member of the Pentagon's "new Press Corps."  *See id*. at 13 (¶ 79).

which they write, but also the public at large" have a First Amendment-protected interest "in assuring that restrictions on newsgathering be no more arduous than necessary, and that individual newsmen not be arbitrarily excluded from sources of information."  569 F.2d at 129–30.  A licensing scheme like the Policy, in which "the government could choose to approve or disapprove precisely the same speech," by journalists and news organizations is one that "vests essentially unbridled discretion in the agency," *Sanjour*, 56 F.3d at 97, and "raises the specter of content and viewpoint censorship," *City of Lakewood*, 486 U.S. at 763.

### B.  The Policy Is Impermissibly Content-Based and Viewpoint-Discriminatory.

The Policy does more than just make content- and viewpoint-based discrimination *possible*.  It is expressly aimed at curtailing speech on and off Pentagon grounds on the basis of its content.  Specifically, the Policy aims to suppress independent journalism that seeks to report any information beyond what the Department has approved for public release.

Government regulations "that target speech based on its communicative content—are presumptively unconstitutional." *Reed v. Town of Gilbert*, 576 U.S. 155, 165 (2015).  And, indeed, under D.C. Circuit precedent, "content-based criteria for press pass issuance are prohibited" under the First Amendment.  *Sherrill*, 569 F.2d at 129–31.  Here, the Policy expressly aims to chill speech—including, specifically, speech *off* Pentagon grounds—on the basis of its content, by restricting what information reporters can discuss with Department personnel and what information news outlets can publish without potentially losing their PFACs.[7]  Under the Policy,

---

[7] It is well settled that the threat of punishment alone is enough to chill speech.  Indeed, "the threat of sanctions may deter [the] exercise [of First Amendment rights] almost as potently as the actual application of sanctions." *NAACP v. Button*, 371 U.S. 415, 433 (1963); *see also, e.g., Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 350 (1974) ("[D]iscretion to award punitive damages unnecessarily exacerbates the danger of media self-censorship."); *New York Times Co. v. Sullivan*, 376 U.S. 254, 278 (1964) ("[T]he pall of fear and timidity imposed upon those who would give voice to public criticism is an atmosphere in which the First Amendment freedoms cannot

*(Cont'd on next page)*

journalists must steer clear of newsgathering and publication not "authorized" by the Department or else risk the suspension, revocation, or non-renewal of their PFACs.[8]    And whether newsgathering or publication has been "authorized" will necessarily turn on the "topic discussed or the idea or message expressed." *Reed*, 576 U.S. at 163.

The First Amendment presumptively prohibits content-based burdens on speech because they "raise[] the specter that the government may effectively drive certain ideas or viewpoints from the marketplace." *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 116 (1991).    Here, both the purpose and effect of the Policy is to chill newsgathering and publication of any information—classified or unclassified—not "authorized" by the Department and, even more egregiously, to punish and silence reporting that Department leadership perceives as unfavorable or "biased." *See* SUMF at 14 (¶ 83).    But "[p]remised on mistrust of governmental power, the First Amendment stands against attempts to disfavor certain subjects or viewpoints." *Citizens United v. FEC*, 558 U.S. 310, 340 (2010).    And, as the Supreme Court has many times held, it "is no job for government . . . to 'un-bias' what it thinks biased[.]" *Moody*, 603 U.S. at 719.

The aim of the Policy is readily apparent.    Since the beginning of Secretary Hegseth's tenure at the Pentagon, the Department has been the focus of intense media scrutiny, and the Policy is one of a number of steps taken by the Department in response to news coverage it has perceived

---

survive."); *Counterman v. Colorado*, 600 U.S. 66, 78 (2023) (threat of punishment may "discourage the 'uninhibited, robust, and wide-open debate that the First Amendment is intended to protect.'") (citation omitted).

[8] That the Department also has conditioned the ability to obtain or maintain a PFAC on a journalist's written representation that he or she "acknowledge[s]" and "understand[s]" the Policy's unconstitutional provisions inflicts separate, additional First Amendment harm.    SUMF at 12 (¶ 67); AR at 14.    "Generally . . . the government may not compel a person to speak its own preferred messages." *303 Creative LLC v. Elenis*, 600 U.S. 570, 586 (2023).

as unfavorable—steps designed to hinder the reporting of those journalists and news organizations responsible for that coverage. *See* SUMF at 6–7 (¶¶ 34–41). Simply put, the undisputed facts make clear the Department promulgated the Policy to drive those disfavored speakers and their disfavored journalism out of the Pentagon.

Indeed, Department leadership publicly celebrated forcing Plaintiffs and other journalists and news organizations that declined to sign the Acknowledgement off Pentagon grounds, calling them "activists" and "propagandists" who "stopped telling the truth" and spread "lies . . . to the American people." SUMF at 13–15 (¶¶ 74, 83–84). In contrast, Department officials praised those who signed the Acknowledgment as "circumvent[ing] the lies of the mainstream media and get[ting] real news to the American people," and asserted that they "ask real questions and don't pursue a biased agenda." *Id*. According to Parnell, the outlets that agreed to abide by the Policy are "far more effective and balanced than the self-righteous media," whom he called "activists who masquerade as journalists." *Id*. at 13 (¶ 74). In other words, the Department has praised those willing to subject themselves to the Policy and disparaged those who were not by explicitly referencing the content of their journalism. The First Amendment violation could not be more obvious.

Department leaders also already have demonstrated that they will interpret and implement the Policy in a discriminatory manner based on whether they like or dislike the content of a PFAC holder's journalism, condemning the Post's general appeal for tips in connection with its Pentagon reporting, while blessing Loomer's, declaring Loomer an "effective" journalist and mocking what they called "Fake News reporters" for purportedly lacking a brain. SUMF at 15 (¶¶ 87–89). And when Wilson praised Project Veritas founder O'Keefe for his surreptitious recording of a Pentagon official making plainly "unauthorized" critical comments about the President, she characterized

the recording as "important" for furthering the Department's aim of ensuring that Pentagon personnel are "on board and willing to serve our commander-in-chief." *Id.* at 15–16 (¶¶ 90–91).

Generally speaking, "when a [speech restriction] is content based on its face or when the purpose and justification for [it] are content based," it is subject to "strict scrutiny"—a standard that "requires the [g]overnment to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Reed*, 576 U.S. at 166, 171. The First Amendment flatly prohibits "content-based criteria" for the issuance of press credentials and, as the D.C. Circuit has recognized, the denial of a press credential must be based not only on content-neutral grounds but also "on a compelling governmental interest." *Sherrill*, 569 F.2d at 129–31. For these reasons, the Policy fails First Amendment scrutiny.

To be sure, no legitimate—let alone compelling—interest justifies the Policy. It should go without saying that the government has no valid interest in suspending or revoking a PFAC because it dislikes the content of a journalist's or news organization's reporting or editorial decisions. *Id.*; *see also Moody*, 603 U.S. at 719; *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974). And while the Policy gestures toward the purported "security [and] safety" of Department "personnel [and] property," AR at 12, it is wholly untethered to any such concern. Plaintiffs and other PFAC holders have been regularly reporting from the Pentagon for decades without posing any risk to the "safety" or "security" of Pentagon personnel or property. *See* SUMF at 4 (¶ 21); *see also* Burns Decl. ¶ 5; Williams Decl. ¶ 10; Stevenson Decl. ¶ 7; Barnes Decl. ¶ 7. And the fact that the Policy expressly targets newsgathering and publication that takes place *off* Pentagon grounds—First Amendment-protected activity with no connection to safety or security within the building—belies any claim that the Policy furthers such an interest.

Similarly, while the Policy makes vague reference to a purported interest "in maintaining

37

the confidentiality of sensitive information," AR at 12, its provisions do not define "sensitive information" or mandate punishment if its "confidentiality" is not "maintain[ed]" AR at 13. Thus, even assuming, *arguendo*, that the government has a legitimate interest in ensuring that journalists and news organizations "maintain[] the confidentiality" of any "information" the government deems "sensitive," the challenged provisions of the Policy would not further it. *See First Nat. Bank of Boston v. Bellotti*, 435 U.S. 765, 793 (1978) (government's proffered "purpose [was] belied," by regulation that was "both underinclusive and overinclusive"); *see also Reed*, 576 U.S. at 171–72 (a "hopelessly underinclusive" restriction fails strict scrutiny).

And even if the Policy furthered some compelling government interest (it does not), it is not narrowly tailored. The Policy chills far more First Amendment-protected activity than necessary to ensure the "safety and security of Department property and personnel"—an interest that can be served effectively, as it has been for decades, through content-neutral requirements, such as periodic background checks for PFAC holders. *See* SUMF at 2 (¶¶ 5–6, 8).

## C. The Policy Unconstitutionally Restricts the Exercise of First Amendment Rights in Nonpublic Fora.

While the Policy applies to newsgathering and reporting about the Department and the United States military that takes place anywhere in the world, it would be unconstitutional even if it imposed restrictions *solely* on the exercise of First Amendment rights *within* the Pentagon.

PFACs enable journalists and news organizations, like Plaintiffs, to access specific areas within the Pentagon, including the Pentagon Press Briefing Room and journalists' workspaces, for the purpose of gathering and reporting newsworthy information to the public—areas that are nonpublic fora for First Amendment purposes. *See Ateba*, 133 F.4th at 121. Defendants may constitutionally impose restrictions that "reserve such [fora] 'for [their] intended purposes, communicative or otherwise,'" but *only* if those restrictions are both (1) "reasonable in light of the

38

purpose served by the for[a]" and (2) "not an effort to suppress expression merely because [Department] officials oppose the speaker's view." *Mansky*, 585 U.S. at 11–12.  The challenged provisions of the Policy fail both prongs of that test.

"[T]o evaluate government restrictions on purely private speech that occurs on government property," courts "consider the level of First Amendment scrutiny that should be applied," which "depends on the type of forum" at issue.  *Ateba*, 133 F.4th at 121 (citations omitted); *see also*, *Mansky*, 585 U.S. at 11 (applying "forum based" approach to political apparel ban that "applie[d] only in a specific location: the interior of a polling place").  "[G]overnment property 'that is not by tradition or designation a forum for public communication,' such as a government office building," to which the government "provides 'selective access for individual speakers'" is a nonpublic forum.  *Ateba*, 133 F.4th at 121 (quoting *Mansky*, 585 U.S. at 11; *Bryant v. Gates*, 532 F.3d 888, 895 (D.C. Cir. 2008)).  Press areas within the Pentagon meet this definition.

The D.C. Circuit has held that press areas within the White House and the interior of U.S. Capitol buildings are nonpublic fora for First Amendment purposes.  *Ateba*, 133 F.4th at 121–22; *Nassif*, 97 F.4th at 976–77.  Like those spaces, press areas within the Pentagon are regularly open to the media "for the purpose of expressive activity," though "entry is still 'strictly regulated'" and communications often "'scheduled and controlled.'"  *Ateba*, 133 F.4th 121–22 (quoting *Nassif*, 97 F.4th at 976–77).

Although the government may impose restrictions designed to reserve a nonpublic forum "for its intended purposes communicative or otherwise," it may do so only if those restrictions are "not an effort to suppress expression merely because public officials oppose the speaker's view," *Mansky*, 585 U.S. at 11–12; *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc*., 473 U.S. 788, 800 (1985).  But, as detailed above, the Department promulgated and has implemented the Policy

to chill newsgathering and reporting it disfavors and deny Pentagon access to reporters and news organizations it claims are "biased." *Supra* at 35–36. The Policy is a textbook "effort to suppress" newsgathering and reporting on Pentagon grounds by members of the press, including Plaintiffs, "merely because [Department] officials oppose [their] view." *Mansky*, 585 U.S. at 11–12.

Even if it were not viewpoint discriminatory, the Policy still would violate the First Amendment because its restrictions are not "reasonable in light of the purpose served by the for[a]." *Id.* at 12–13 (citation omitted).

First and foremost, as detailed above, the Policy fails to provide "objective, workable standards" for its enforcement and, accordingly, is precisely the kind of "indeterminate prohibition" on the exercise of First Amendment rights in a nonpublic forum that the Supreme Court has held to be unreasonable in violation of the Constitution. *See id.* at 21–22; *see also Karem*, 960 F.3d at 666 (reliance on "unarticulated standards of professionalism" is unconstitutionally vague). Indeed, under D.C. Circuit precedent "the exercise of unbridled discretion" by officials in the context of a nonpublic forum is necessarily "unreasonable." *Ateba*, 133 F.4th at 125 (citing *Am. Freedom Def. Initiative*, 901 F.3d at 364, 372); *see also City of Lakewood*, 486 U.S. at 755; *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 130 (1992).

Second, the Policy is also unreasonable in light of the purpose of the fora: to facilitate newsgathering and reporting on the Department and its leadership for the benefit of the American public. Applying vague, content- and viewpoint-based criteria to determine who may hold a PFAC, chilling lawful newsgathering and reporting, and excluding experienced Pentagon reporters like Barnes and his colleagues with The Times from Pentagon grounds undermines the purpose of providing press access to the Pentagon. The Policy is thus far from reasonable.

IV.    **The Policy Is Arbitrary and Capricious in Violation of the Administrative Procedure Act.**

In addition to violating the First and Fifth Amendments, the Policy also violates the APA. Beyond being "contrary to a constitutional right, power, privilege, or immunity" for the reasons discussed above, the Department's adoption of the Policy was arbitrary and capricious under 5 U.S.C. § 706(2).  To comport with the APA's requirement of reasoned decision-making, an agency must "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983) (quotation marks omitted).  This is particularly true when reversing a longstanding policy. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).  An agency must "consider responsible alternatives to its chosen policy," "give a reasoned explanation for its rejection of such alternatives," *Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 242 (D.C. Cir. 2008), and forego reliance on factors it is not empowered "to consider," *State Farm*, 463 U.S. at 43.  The Department failed at every step.

First, it is plain the Department considered impermissible factors in promulgating the Policy.  Courts "cannot ignore the disconnect between [a] decision made and [an] explanation given." *Dep't of Commerce v. New York*, 588 U.S. 752, 785 (2019).  And this Court should not ignore the Policy's obvious purpose and effect: to chill newsgathering and, ultimately, reporting that the Department disfavors. *See supra* at 35–36, 39–40; *see Dep't of Commerce*, 588 U.S. at 785 (courts are "not required to exhibit a naiveté from which ordinary citizens are free").  Second and relatedly, the Policy has no "rational connection" to any interest in the "safety" or "security" of Department personnel or property on Pentagon grounds. *See supra* at 23, 25–26, 37; *State Farm*, 463 at 43.  And absent such a "rational connection," the Policy's adoption is arbitrary and capricious.  Third, a court is not "compelled to guess at the theory underlying the agency's action."

41

*SEC v. Chenery Corp.*, 332 U.S. 194, 196–97 (1947). Here, that is the only option because the Department did not "f[in]d" any "facts." *State Farm*, 463 U.S. at 43; *see also*, *e.g.*, *Williams Gas Processing-Gulf Coast Co., L.P. v. FERC*, 475 F.3d 319, 328 (D.C. Cir. 2006) (agency action arbitrary and capricious where its proffered rationale was "not supported by any reasoned analysis in the orders themselves"). Fourth, the Department failed both to consider reasonable alternatives to the Policy and to explain why it rejected them. *Am. Radio Relay League*, 524 F.3d at 242. Nowhere in the Policy or administrative record does the Department mention any alternatives, much less explain why they were inadequate. *See Yakima Valley Cablevision, Inc. v. FCC*, 794 F.2d 737, 746 (D.C. Cir. 1986).

For all these reasons, facial relief is warranted under the APA. *Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136, 1151 (D.C. Cir. 2005) ("[U]nsupported agency action normally warrants vacatur[.]"); *see also Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 829 (2024) (Kavanaugh, J., concurring) ("the APA authorizes vacatur of unlawful agency actions").

## V. Plaintiffs Will Be Irreparably Harmed Absent Permanent Injunctive Relief.

To obtain a permanent injunction, Plaintiffs "must demonstrate (1) that [they] ha[ve] suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff[s] and defendant[s], a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Monsanto Co. v. Geerston Seed Farms*, 561 U.S. 139, 156–57 (2010). Plaintiffs satisfy each of these factors.[9]

[9] Declaratory relief is also warranted because a declaration that the Policy is unlawful will "serve a useful purpose in clarifying the legal relations at issue" and "terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to" this litigation. *State of New York v. Biden*,

*(Cont'd on next page)*

First, the loss of "First Amendment freedoms . . . unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Pursuing America's Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016) (same); *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (same). In *Sherrill*, the D.C. Circuit held that a journalist "arbitrarily excluded from sources of information" suffers irreparable First Amendment harm. 569 F.2d at 129–30. This "is not merely an abstract, theoretical injury," because journalists' "First Amendment interest depends on [their] ability to freely pursue 'journalistically productive conversations.'" *Karem v. Trump*, 404 F. Supp. 3d 203, 217 (D.D.C. 2019); *see also* Mot. Hr'g Tr. at 11:22–13:18, *Cable News Network, Inc.*, No. 1:18-cv-02610, Dkt. 22 ("Each day that [a reporter] is deprived" of his press credential, "he suffers a harm that cannot be remedied in retrospect. The Court cannot restore his access to press briefings that have already occurred or to conversations in the White House press facilities that have already been had."). Here, without their PFACs, Plaintiffs lack the access to pursue such conversations in the Pentagon. And because "the news is time-sensitive and occurs spontaneously, that lack of access cannot be remedied retrospectively." *Karem*, 404 F. Supp. 3d at 217. Plaintiffs therefore have suffered—and continue to suffer—irreparable harm.

Second, and relatedly, Plaintiffs have no adequate remedy at law. As the district court held in *Karem*, "the only way to remedy the injury" arising from the loss of a press credential "is to return the [credential] and the access that comes with it." *Karem*, 404 F. Supp. 3d at 217.

Third, the "significance of [Plaintiffs'] constitutional interests" in their PFACs "outweigh[s]" any possible governmental interest here. *Karem*, 404 F. Supp. 3d at 218; *see also Telemundo v. City of Los Angeles*, 283 F. Supp. 2d 1095, 1103–04 (C.D. Cal. 2003) ("equitable

---

636 F. Supp. 3d 1, 31 (D.D.C. 2022); *see also President v. Vance*, 627 F.2d 353, 364 n.76 (D.C. Cir. 1980) (the power to grant declaratory relief "always rests within the sound discretion of the court").

considerations . . . weigh in favor of" injunctive relief where the injury implicates media plaintiffs' "First Amendment rights").    Constitutional injuries "easily outweigh whatever burden [an] injunction may impose, because the government is in no way harmed by issuance of an injunction that prevents [it] from enforcing unconstitutional restrictions." *Hassay v. Mayor*, 955 F. Supp. 2d 505, 517 (D. Md. 2013) (citation and quotation marks omitted).    And, as in *Cable News Network, Inc. v. American Broadcasting Cos.*, 518 F. Supp. 1238 (N.D. Ga. 1981), which involved the exclusion of television outlets from the White House press pool, restoring Plaintiffs' access would, at most "involve some minor inconvenience to" the Department.    *Id*. at 1246.

Fourth, the public interest will be served by an injunction.    The "enforcement of an unconstitutional law is always contrary to the public interest." *Karem*, 960 F.3d at 668.    Moreover, "the public at large have an interest protected by the first amendment in assuring that restrictions on newsgathering be no more arduous than necessary," and that reporters and news organizations "not be arbitrarily excluded from sources of information." *Sherrill*, 569 F.2d at 129–30.    Because the Policy hampers Plaintiffs' ability to report on the Pentagon, their "function as a vital source of information is weakened" and the public that relies on The Times' reporting is "less able to make informed political, social, and economic choices." *Zerilli v. Smith*, 656 F.2d 705, 711 (D.C. Cir. 1981).    Thus, "the public interest [is] significantly benefitted, and in no way harmed, by the granting of" permanent injunctive relief here. *Cable News Network*, 518 F. Supp. at 1246.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court enter summary judgment in Plaintiffs' favor, vacate and declare the challenged provisions of the Policy unlawful and unconstitutional, enjoin Defendants from enforcing those provisions, and require Defendants to immediately reinstate Plaintiffs' PFACs.

44

Dated:   January 5, 2026

Respectfully submitted,

*/s/Theodore J. Boutrous, Jr.*

Theodore J. Boutrous, Jr. (D.D.C. Bar No. 420440)
Katie Townsend (D.D.C. Bar No. 1026115)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
(213) 229-7000
TBoutrous@gibsondunn.com
KTownsend@gibsondunn.com

Lee R. Crain (D.D.C. Bar No. NY0337)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
(212) 351-4000
LCrain@gibsondunn.com

Susan M. Pelletier*
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, NW
Washington, DC 20036-5306
(202) 955-8500
SPelletier@gibsondunn.com

*admitted pro hac vice*

*Counsel for Plaintiffs The New York Times Company and Julian E. Barnes.*

45