IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE NEW YORK TIMES COMPANY, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> DEPARTMENT OF DEFENSE, *et al.*, <br> *Defendants*. | Civil Case No. 25-cv-4218 <br><br> **DECLARATION OF** <br> **JULIAN E. BARNES** |

### DECLARATION OF JULIAN E. BARNES

I, Julian E. Barnes, hereby declare as follows:

1. I am over the age of 18 and make this declaration based upon my personal knowledge and experience. If called to do so, I could and would competently testify to these matters under oath.

   *My career as a reporter.*

2. I am a national security reporter with The New York Times ("The Times") and a plaintiff in the above-captioned case. I make this declaration in support of Plaintiffs' Motion for Summary Judgment.

3. I have worked for The Times since June 2018. I reside in the District of Columbia and am assigned to The Times' Washington Bureau.

4. My work for The Times focuses on the Pentagon, United States intelligences agencies, and international security, among other subjects. I am one of seven Times reporters who held Pentagon Facility Alternate Credentials ("PFACs") issued by the Department of Defense (the "Department") as recently as summer or fall 2025.

5. Before I joined The Times, I covered the Pentagon for other news organizations including U.S. News and World Report, the Los Angeles Times, and The Wall Street Journal.

1

*My access to the Pentagon.*

6. I first obtained a PFAC in 2004, when I worked for U.S. News and World Report. I held a PFAC continuously from 2004 until August 2025 with the exception of a period of approximately 18 months in 2016 and 2017 when I did not regularly access the Pentagon because I was based in Brussels, Belgium. After I joined The Times in June 2018, I held a PFAC continuously until August 2025.

7. When I first obtained a PFAC, I was required to renew it every few months. After my initial renewals, I was required to renew it only annually. In my experience, this was typical of reporters who held PFACs: As long as you had been a continuous PFAC holder for an extended period of time, you would renew on an annual basis. At no point between 2004 and August 2025 was my PFAC ever denied, suspended, revoked, or not renewed. I am also not aware of any incident involving me or any other PFAC holder that occurred during my time covering the Pentagon that placed the safety or security of Department personnel or property at risk.

8. Between 2004 and 2025, I regularly accessed the Pentagon in the course of my work as a national security and intelligence reporter. As a reporter, there are myriad benefits to being at the Pentagon. Being onsite at the Pentagon enabled me to attend press briefings held at the Pentagon—which are often held on short notice and sometimes announced less than an hour before they occur. I also could and would regularly visit the Public Affairs offices of the United States military branches, which are housed at the Pentagon, to converse with Public Affairs staff and ask questions about United States military operations, the Department, or other topics pertinent to my reporting. I also sometimes met with intelligence officials at the Pentagon for background briefings or off-the-record discussions related to topics I was covering. I attended hundreds of

press briefings at the Pentagon and had countless discussions at the Pentagon with Department employees and officials.

9. Being at the Pentagon and, in particular, the ability to have face-to-face conversations with Pentagon officials and staff, has been integral to my reporting about the Department, national security, and United States intelligence agencies.

10. In my view, the longstanding tradition of press access to the Pentagon and to its personnel has helped provide the American public with a more in-depth, nuanced understanding of the United States military that has been beneficial to the press, the public, and to the Pentagon itself. I think that the American public has greater respect for the military because Pentagon leadership has in the past fostered a culture of permitting and even facilitating press access, which has led to a better understanding of military operations among the public.

***The Department's new policy leads to the loss of my PFAC.***

11. In May 2025, the Department announced new restrictions on reporters' physical access to certain parts of the Pentagon. As a result of those restrictions, even with my PFAC, I was no longer able to access spaces within the Pentagon that I had previously accessed routinely for years. Even with those new restrictions on physical access, however, I continued to report regularly from the Pentagon because it significantly benefitted my reporting to be in the building— both in order to cover formal proceedings, like press conferences, and to converse with Department personnel.

12. In or around August 2025, I learned that Department leadership was preparing to issue additional new restrictions relating to the press and, specifically, new rules relating to reporters' PFACs. I found this deeply concerning. In particular, I was concerned that under those new rules, the Department and its leadership would have free rein to suspend or revoke PFACs on

the basis of what journalists and news organizations reported, and that if they disliked something I had written for The Times, they would find a basis to suspend or revoke my PFAC.

13. My PFAC lapsed on August 31, 2025. At that time, I was—and I still am—a member in good standing of the Pentagon Press Association. I also was covering and still actively cover the Pentagon. Despite the lapse of my PFAC, a Department official invited me to renew it. Normally I would have renewed it without hesitation, as I had nearly every year dating back to 2004, but in August and September of 2025, I was concerned about the new rules that I understood at the time were going to be put in place by the Department regarding PFACs. Accordingly, I decided that I would wait to renew my PFAC until any new rules were announced. If not for the new rules relating to PFACs that were announced by the Department in September and October of 2025, I would have renewed my PFAC and expect that the Department would have granted my renewal, as it had for nearly twenty years.

14. In September 2025, the Department announced a new PFAC policy that confirmed my concerns: the policy gave Department officials broad discretion to suspend or revoke reporters' PFACs (or to refuse to renew or issue PFACs) if it did not approve of information that a reporter had "solicited," obtained, attempted to obtain, or published. The Department announced and then implemented an updated version of that policy in early October 2025, which I reviewed shortly after it was issued. The updated version did not address the parts of the policy that I and other reporters who cover the Pentagon found concerning and unworkable.

15. I was particularly concerned by portions of the new PFAC policy that appeared to grant Department officials the discretion to suspend, revoke, or refuse to issue PFACs based on newsgathering or the content of reporting. For example, the policy gives Department officials the discretion to suspend or revoke a journalist's PFAC if that journalist gathers and reports

4

information that isn't classified or secret but that the Department leadership does not want reported, which happens frequently.  Under the policy, I do not know what standards Department officials would apply to determine whether or not to revoke, suspend, or refuse to issue a PFACs to me or any other reporter.  Under the policy, as I read it, my PFAC could be suspended or revoked (or the Department might refuse to renew it) simply because I did things that are fundamental to my job as a reporter, like asking questions of Department personnel and writing articles that reflect the information I gather.  It is not clear to me, based on the language of the new PFAC policy, what steps I would need to take to ensure that my PFAC was not subject to revocation, suspension, or non-renewal—other than to stop reporting on the Pentagon and the United States military.

16. Because of the new Policy, I did not renew my PFAC after it lapsed on August 31, 2025.  In order to renew, I would have been required to sign the "Acknowledgment" form that is part of the Department's new PFAC policy, which would have required me to confirm that I "underst[ood]" and acknowledged the new policies and procedures regarding PFACs.  I was not willing to sign that Acknowledgment because I did not understand, agree with, or agree to be bound by the new rules.  If not for the new PFAC policy and the requirement that I sign the Acknowledgment, I would have renewed my PFAC.

17. The Department revoked the PFACs of PFAC holders who did not agree to sign the Acknowledgment. I gave my lapsed PFAC to my colleague at The Times, John Ismay, who handed in my PFAC, along with his, to the Department on October 15, 2025.  All of the reporters at The Times who held PFACs turned them in.

### *The Department's policy has limited my access and reporting opportunities.*

18. I have not been back to the Pentagon since the Department implemented its new policy pertaining to PFACs in early October 2025.  Because my Times colleagues and I no longer

have PFACs, we cannot access the Pentagon as we did before. While the Pentagon permits non-PFAC holding members of the press to apply for a "day pass," it is not clear whether, as a former PFAC holder who refused to sign the Acknowledgment, I would be viewed as eligible for a day pass. In any event, applications for day passes must be submitted at least 48 hours in advance and are thus not particularly useful given the rapid-pace news cycle in which we report.

19. There have been press events at the Pentagon since October 15, 2025 that I would have attended had I still had a PFAC but that I was not able to attend because I no longer have a PFAC. For example, on December 2, 2025, the Pentagon held a news conference on less than one day's notice—which meant that even if I were eligible to obtain a day pass, I would not have been able to obtain one in time to cover the news conference. At the December 2, 2025 news conference, Pentagon staff discussed Defense Secretary Pete Hegseth and Admiral Frank M. Bradley's involvement in a military strike on a Venezuelan boat that occurred on September 2, 2025. This topic was (and continues to be) the subject of extensive news coverage, and I am one of the reporters covering it for The Times. In fact, at the December 2, 2025 news conference, Pentagon press staff, speaking from the podium, discussed a story I had published and mischaracterized my reporting. It would have been very valuable to my further coverage efforts if I could have attended the news conference to ask follow-up questions and also to address the mischaracterizations of my reporting. Because I no longer have a PFAC, I was not able to attend that press conference.

20. Relatedly, over the weekend, the United States military launched what President Trump called a "large scale strike" on the nation of Venezuela, capturing its leader Nicolás Maduro and his wife, and bringing them to the United States. I am one of The Times reporters covering that operation—what the United States military has named "Operation Absolute Resolve"—and my colleagues and I are currently working to learn as much as we can about that operation and its

6

larger implications for national security, so that we can inform the American public. It would have been very valuable to my reporting efforts and those of my colleagues to be at the Pentagon both before at the time that operation was carried out, and it would be beneficial to our reporting to be there now. But because I no longer have a PFAC, and because my colleagues at The Times no longer have PFACs, we cannot have a regular presence in the Pentagon.

21.  Because of the Pentagon's new PFAC policy, I and other reporters whose job it is to provide independent and probing coverage of the Pentagon and the United States military that goes beyond official pronouncements are being prevented from accessing press events at the Pentagon and from engaging in newsgathering and reporting onsite. As a result, the Pentagon's new PFAC policy is causing significant harm to reporters like me who cover national security and the Pentagon, to the news organizations like The Times, and to the American public.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 4 day of January 2026 in Washington, D.C.

_____
Julian E. Barnes