THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE NEW YORK TIMES COMPANY, *et al.*<br><br>*Plaintiffs*,<br><br>v.<br><br>DEPARTMENT OF DEFENSE A/K/A DEPARTMENT OF WAR, *et al.*,<br><br>*Defendants*. | Civil Case No. 25-cv-04218 (PLF) |

**STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Civil Rule 7(h)(1), Plaintiffs The New York Times Co. ("The Times") and Julian E. Barnes ("Barnes") respectfully submit the following statement of material facts that are not in genuine dispute.

**I.     Journalists and News Organizations Have Reported from the Pentagon for Decades.**

1. A Pentagon Facilities Alternate Credential ("PFAC") is a credential that members of the press are issued to access the Pentagon. Decl. of Theodore J. Boutrous, Jr. ("Boutrous Decl.") ¶ 3, Ex. 1.

2. Since the Pentagon opened in 1942, journalists from news organizations across the country have covered the Department of Defense (the "Department" or "Pentagon") from Pentagon grounds. Boutrous Decl. ¶ 4, Ex. 2.

3. Having a consistent presence at the Pentagon has enabled and enhanced the ability of Plaintiffs and other members of the press to report on the Department and its leadership during

1

some of the most consequential moments in American history. Decl. of Richard W. Stevenson ("Stevenson Decl.") ¶ 5; Decl. of Julian E. Barnes ("Barnes Decl.") ¶ 9; Decl. of Robert Burns ("Burns Decl.") ¶ 7.

4. Journalists' presence at the Pentagon made possible real-time, eyewitness reporting on the Department's response to the terrorist attacks of September 11, 2001, including the attack on the Pentagon itself. Boutrous Decl., ¶ 5, Ex. 3.

5. For decades, the Department has had a process for issuing press credentials that included a standard background check and the submission of a letter confirming a reporter's employment and assignment. Burns Decl. ¶ 15; Decl. of Pete Williams ("Williams Decl.") ¶ 5.

6. The Department's PFAC process prior to October 2025 was similar to the credentialing process for other secure federal government buildings like the White House, Congress, and the Supreme Court. Boutrous Decl. ¶ 6, Ex. 4; *Sherrill v. Knight*, 569 F.2d 124, 126-27 & n.3 (D.C. Cir. 1977); *Karem v. Trump*, 960 F.3d 656, 660–61 (D.C. Cir. 2020).

7. For decades, the Department provided dedicated physical workspace for news organizations within the Pentagon. Burns Decl. ¶ 5; Williams Decl. ¶ 4.

8. Beginning in or around the 2000s, reporters who received PFACs were also asked to sign a one-page form that set forth certain "basic, noncontroversial" requirements relating to PFACs, including that they be "visible and worn above the waist at all times while in the Pentagon" and that "[l]ost PFACs should immediately be reported to the Public Affairs Operations." Burns Decl. ¶ 15.

9. When Pete Williams ("Williams") was Assistant Secretary of Defense for Public Affairs, he worked down the hall from reporters' dedicated workspace and interacted with reporters on a daily basis. Williams Decl. ¶ 4.

10. When Robert Burns ("Burns") was covering the Pentagon for The Associated Press from 1999 through 2022, reporters with PFACs were restricted from accessing certain secure areas within the Pentagon and respected those boundaries. Burns Decl. ¶¶ 2–3, 13.

11. The regular presence of PFAC holders at the Pentagon has enhanced the ability of journalists and news organizations, including Plaintiffs, to keep Americans informed about the United States military, while posing no security or safety risk to Department property or personnel. Stevenson Decl. ¶ 5; Barnes Decl. ¶ 9; Burns Decl. ¶¶ 8–10; Williams Decl. ¶¶ 8, 10, 13–16.

12. From the Pentagon, reporters have historically been able to cover official press briefings, including those called on short notice (or without notice), and to ask questions of Pentagon officials at (and before and after) those briefings. Burns Decl. ¶¶ 7–12.

13. Reporters at the Pentagon can also engage in additional semi-formal and informal conversations with senior Department officials and their aides, as well as public affairs staff; such in-person interactions can be crucial to obtaining the context and detail needed to report accurately and effectively about defense policy and military operations. Burns Decl. ¶ 8; Barnes Decl. ¶ 19; Williams Decl. ¶¶ 6–10.

14. For example, former Secretary of Defense Donald Rumsfeld regularly invited reporters into his office on weekend mornings for wide-ranging, off-the-record discussions. Burns Decl. ¶ 10.

15. In-person interactions allow reporters at the Pentagon to build professional relationships and develop trust with Department officials. Burns Decl. ¶ 11; Williams Decl. ¶¶ 6–8.

16. Professional relationships between reporters and Department officials facilitate and enhance reporting and benefit not only journalists but also the Department. Burns Decl. ¶¶ 11, 21; Williams Decl. ¶ 6.

17. The Department has benefitted from the regular presence of reporters from news outlets that reach a broad and diverse population of Americans. Williams Decl. ¶ 6.

18. During Williams' tenure as Assistant Secretary of Defense for Public Affairs, he was able to glean from reporters regularly present at the Pentagon what issues were at the forefront for the American public, help confirm facts, provide guidance, supply additional context, and correct mistakes or misunderstandings. Williams Decl. ¶¶ 6–7.

19. There have been times when journalists with PFACs have published critical stories or reported information that Department officials believed had come out too soon or would have preferred had not been made public. Such stories have led to scrutiny by lawmakers and the public, and sometimes spurred beneficial reforms. Williams Decl. ¶¶ 8–9; Burns Decl. ¶¶ 17, 22.

20. During Williams' tenure as Assistant Secretary of Defense for Public Affairs, even when Department leadership disliked a journalist's or news organization's reporting, they did not consider suspending, revoking, or not renewing their press credentials in response to that reporting. Williams Decl. ¶ 9.

21. Reporters who spent decades covering the Pentagon, as well as former Pentagon officials, are not aware of any journalist's press credential being suspended, revoked, or not renewed due to a concern over the safety or security of Department personnel or property. Williams Decl. ¶ 10; Burns Decl. ¶¶ 16–17; Barnes Decl. ¶ 7.

22. For more than forty years, The Times has had multiple reporters with PFACs regularly working at the Pentagon. Stevenson Decl. ¶ 5.

23. For most of 2025, seven Times reporters, including Barnes, held PFACs. Stevenson Decl. ¶ 11; Barnes Decl. ¶ 6.

24. Barnes is a national security reporter with The Times who focuses on the Pentagon, United States intelligence agencies, and international security, among other subjects. Barnes Decl. ¶¶ 2, 4.

25. Barnes has held a PFAC almost continuously since 2004. Barnes Decl. ¶ 6.

26. In the last two decades, Barnes has attended hundreds of Pentagon press briefings, and has had countless discussions with Department employees and officials in connection with his reporting. Barnes Decl. ¶ 8.

27. Barnes's access to and regular presence at the Pentagon allowed him to attend press briefings that were scheduled on short notice, ask follow-up questions of Department spokespeople during and after press conferences, and ask questions of the Public Affairs representatives of every branch of the United States military. Barnes Decl. ¶¶ 8–9.

28. The Times solicits tips via a "tips page" on its website that "offer[s] several ways to get in touch with and provide materials to [Times] journalists." Boutrous Decl., ¶ 29, Ex. 27.

29. For The Times, having journalists with access to the Pentagon has enhanced the depth, detail, quality, and accuracy of its coverage of the Department, the United States military, and national security issues. Stevenson Decl. ¶ 5.

30. Covering the Pentagon accurately, independently, and fairly requires that Times journalists not only report on the Department's official pronouncements, but also that they contextualize, investigate, and fact-check those official pronouncements—and sometimes that they gather and report information that Department leadership does not intend to make public at all. Stevenson Decl. ¶ 6.

31. Times reporters' ability to access the Pentagon facilitates their reporting and enhances the quality of their journalism.  Stevenson Decl. ¶ 6.

II. **The Pentagon Announces New Restrictions on Journalists' Access to the Pentagon Including a Revised PFAC Policy.**

32. On November 12, 2024, then President-elect Donald Trump named Defendant Pete Hegseth as his nominee for Secretary of Defense.  Boutrous Decl. ¶ 7, Ex. 5.

33. Hegseth was confirmed as Secretary of Defense on January 24, 2025.  Boutrous Decl. ¶ 9, Ex. 7.

34. Before and during Secretary Hegseth's confirmation process, news outlets, including The Times, reported extensively on his background, including allegations of past sexual assault, excessive drinking, and marital infidelity, as well as questions about his lack of relevant experience.  Boutrous Decl. ¶ 8, Ex. 6.

35. Secretary Hegseth and other Department officials have openly complained about reporting they perceive as unfavorable to them and the Department.  Boutrous Decl. ¶ 10, Ex. 8.

36. In or around February 2025, the Department announced that it was requiring several news outlets—specifically, The Times, NBC News, Politico, National Public Radio, CNN, the Hill, and the War Zone—to give up their dedicated working spaces in the Pentagon as part of a new so-called "rotation" system.  Williams Decl., ¶ 16; Boutrous Decl. ¶ 11, Ex. 9.

37. The Department's decision to require specified news outlets to give up their dedicated workspaces in the Pentagon press room was criticized, including by former Defense Department officials.  Williams Decl. ¶ 16; Boutrous Decl. ¶ 12, Ex. 10.

38. In May 2025, the Department issued a memorandum entitled "Updated Physical Control Measures for Press/Media Access Within the Pentagon," that imposed new restrictions on

6

journalists' physical access to specific areas within the Pentagon. Administrative Record ("AR"), at NYTIMES-DOW-25cv04218-000000018.

39. According to the memorandum, these "updated security measures" were "needed to reduce the opportunities for in-person inadvertent and unauthorized disclosures." AR at NYTIMES-DOW-25cv04218-00000018.

40. The memorandum prohibited journalists from being present in the areas around the Secretary's office and required official-escort-only access to other sections of the building, including the public affairs offices of the military service branches. AR at NYTIMES-DOW-25cv04218-00000018-19; Barnes Decl., ¶ 11; Boutrous Decl. ¶ 12, Ex. 10.

41. Under Secretary Hegseth's leadership, the Department made plans to implement random polygraph testing of Department personnel in a purported effort to stop "leaks." Boutrous Decl. ¶ 13, Ex. 11.

42. On September 18, 2025, chief Pentagon spokesperson Sean Parnell ("Parnell"), issued a memorandum to agency personnel that purported to implement the Department's Updated Physical Control Measures. AR at NYTIMES-DOW-25cv04218-00000022–36 (the "September 18 Memorandum").

43. The September 18 Memorandum stated that "[a]ll members of the press issued a [PFAC] will be required to read and sign a new in-brief form outlining information security requirements, the new physical control measures, and [Department] expectations of their compliance with safety and security requirements." AR at NYTIMES-DOW-25cv04218-00000022.

44. The Department did not identify any breach of physical security or other incident necessitating new safety and security requirements. Journalists, including Barnes and Burns, the

7

former-President of the Pentagon Press Association, are not aware of any such incident.  Burns Decl., ¶ 16; Barnes Decl., ¶ 7; Stevenson Decl., ¶¶ 7–8.

46. 45. The "Reservation In-Brief" ("September In-Brief") attached to the September 18 Memorandum announced new rules relating to PFACs.  AR at NYTIMES-DOW-25cv04218-00000024–36.

46. The September In-Brief stated that "PFACs may be denied, revoked, or not renewed if a person is reasonably determined to pose a security or safety risk to [Department] personnel or property[,]" and that a reporter could be deemed a "security or safety risk" "based on the unauthorized access, attempted unauthorized access, or unauthorized disclosure" of Department information, and on grounds that "include[d], but [were] not limited to," "attempts to improperly obtain" Department information, or "being found in physical possession of" Department information "without reporting it."  AR at NYTIMES-DOW-25cv04218-00000024–35.

47. The September In-Brief included an "Acknowledgment" that journalists would be required to sign as a condition to obtaining or maintaining a PFAC.  AR at NYTIMES-DOW-25cv04218-00000032–33.

### III. Members of the Press Object to the New PFAC Policy

48. On September 22, 2025, the Reporters Committee for Freedom of the Press (the "Reporters Committee") sent a letter to Parnell regarding the September In-Brief.  The Reporters Committee's letter asked for clarification as to how the new PFAC policy would be applied and whether the Acknowledgment was intended to require journalists to agree not to publish information without first obtaining Pentagon approval.  AR at NYTIMES-DOW-25cv04218-00000044–45.

49. In a response letter dated September 24, 2025, Parnell stated his intent to "clarify" that the September In-Brief's requirement that "information must be approved for public release by an appropriate authorizing official before it is released, even if it is unclassified," was directed at Pentagon officials, and did "not impose restrictions on journalistic activities, such as investigating, reporting, or publishing stories." AR at NYTIMES-DOW-25cv04218-00000041–43.

50. Parnell's September 24, 2025 letter to the Reporters Committee stated that the Policy's "focus" was "on preventing active solicitation that encourages [Department] personnel to violate these disclosure rules, as such conduct is not always protected by the First Amendment." AR at NYTIMES-DOW-25cv04218-00000042.

51. Parnell's September 24, 2025 letter to the Reporters Committee stated that the Department considers any "attempts to improperly obtain" Department information, including unclassified information, or "being found in physical possession" of such information, even "without reporting on it[,]" to be violations of the Policy that could, if the Department so chooses, prompt the immediate suspension of a PFAC. AR at NYTIMES-DOW-25cv04218-00000034, NYTIMES-DOW-25cv04218-00000042–43.

52. Parnell's September 2024, 2025 letter to the Reporters Committee stated that in "rare, extreme cases," the "[r]eceipt of unsolicited information and subsequent publication" "could factor into" the "discretionary" decision to revoke a PFAC. AR at NYTIMES-DOW-25cv04218-00000042.

53. The Times, along with other media organizations, informed the Pentagon that these provisions of the new PFAC policy were incompatible with their First Amendment rights and responsibilities as members of the press, and that they could not sign the Acknowledgement.

9

Stevenson Decl. ¶¶ 10–11; Barnes Decl. ¶¶ 16–17; AR at NYTIMES-DOW-25cv04218-00000050–74.

### IV. The Pentagon Promulgates its Final Policy and Mandates that PFAC Holders Sign an "Acknowledgement."

54. On October 6, 2025, the Department promulgated a final new PFAC policy, including final versions of the In-Brief and Acknowledgment (the "Policy"). AR at NYTIMES-DOW-25cv04218-00000001–17.

55. The Policy promulgated by the Department provides that a PFAC "may be denied, revoked, or not renewed if a person is reasonably determined to pose a security or safety risk to [Department] personnel or property" and that "[s]uch an initial determination may result may result in an immediate suspension of [a journalist's] Pentagon access while the procedures preceding a final determination are pending." AR at NYTIMES-DOW-25cv04218-000000012.

56. The Policy states that "[s]uch determination may be based on factors including, but not limited to, the unauthorized access, attempted unauthorized access, or unauthorized disclosure of" classified or unclassified information "based on a reasonable assessment informed by the unique facts and circumstances of each case." AR at NYTIMES-DOW-25cv04218-000000012.

57. The Policy states that "[a]ll determinations under th[e] Policy are undertaken on a case-by-case basis reviewing the totality of the circumstances[.]" AR at NYTIMES-DOW-25cv04218-000000013.

58. The Policy provides that a journalist's receipt, publication, or "solicitation" of "controlled unclassified information[,]" which "may include, but is not limited to, information protected by the Privacy Act, information that is law enforcement-sensitive, and certain operational security information[,]" may result in the immediate suspension or revocation of a PFAC. AR at NYTIMES-DOW-25cv04218-00000006, NYTIMES-DOW-25cv04218-00000012.

59. The Policy states that, "[t]o ensure the safety of U.S. personnel, news media who find themselves in possession of information that appears to be [classified national security information] or [controlled unclassified information] should discuss those materials with the [Pentagon Press Operations] prior to publication." AR at NYTIMES-DOW-25cv04218-00000006.

60. The Policy states:

> Solicitation may include direct communications with specific [Department] personnel or general appeals, such as public advertisements or calls for tips encouraging [Department] employees to share non-public [Department] information. For example, an advertisement or social media post by an individual journalist or media outlet that directly targets [Department] personnel to disclose non-public information without proper authorization would constitute a solicitation that could lead to revocation. Additionally, publication that recklessly endangers American lives could factor into an assessment of whether continued unescorted access to the Pentagon poses a security risk.

AR at NYTIMES-DOW-25cv04218-000000012–13.

61. The Policy includes an Appendix, which states that "[p]ersons presumed to present" a "security or safety risk to [Department] personnel or property" will "include, but are not limited to, those who have been convicted of any offense involving," *inter alia*, national defense, theft, trespassing, fraud, deceit, and "[u]nprofessional conduct that might serve to disrupt Pentagon operations." AR at NYTIMES-DOW-25cv04218-000000015.

62. The Appendix further states: "Additionally, actions other than conviction may be deemed to pose a security or safety risk, such as discussed in the [In-Brief]." AR at NYTIMES-DOW-25cv04218-000000015.

63. The Appendix sets forth "[p]rocedures for [d]enial, [r]evocation, or [n]on-[r]enewal" of a PFAC, including written "notification[.]" AR at NYTIMES-DOW-25cv04218-000000015–16.

64. The procedures set forth in the Appendix allow for an appeal after the "immediate suspension" of a reporter's PFAC. AR at NYTIMES-DOW-25cv04218-000000008, NYTIMES-DOW-25cv04218-000000012, NYTIMES-DOW-25cv04218-000000015–16.

65. The procedures set forth in the Appendix authorize the Department to "conduct such inquiry as deemed appropriate" after receipt of a reporter's "written or oral response to the proposed denial, revocation, or non-renewal," prior to making a "final decision." AR at NYTIMES-DOW-25cv04218-00000016.

66. The procedures set forth in the Appendix do not include a deadline for the Department to make a "final decision." AR at NYTIMES-DOW-25cv04218-00000016.

67. The Policy includes an Acknowledgment that states:

I have received, read, and understand the "Pentagon Reservation In-brief for Media Members," with [relevant appendices] which address[] the standard and procedures for denying, revoking, and not renewing a PFAC. The in-brief describes [Department] policies and procedures. My signature represents my acknowledgement and understanding of such [Department] policies and procedures, even if I do not necessarily agree with such policies and procedures. Signing this acknowledgment does not waive any rights I may have under law.

AR at NYTIMES-DOW-25cv04218-00000014.

68. Following the issuance of the Policy, PFAC holders, including Barnes and other reporters at The Times, were informed that their PFACs would be revoked if they did not sign the Acknowledgement by October 15, 2025. Stevenson Decl. ¶ 10.

69. Seven Times journalists, including Barnes, and the majority of other journalists from other news organizations that held PFACs at the time, refused to sign the Acknowledgement. Stevenson Decl. ¶ 11; *see also* Boutrous Decl. ¶ 14, Ex. 12.

70. On or about October 15, 2025, Barnes and his Times colleagues turned in their PFACs. Barnes Decl. ¶ 17; Stevenson Decl. ¶ 11.

71. Barnes has not been back to the Pentagon since October 15, 2025. Barnes Decl. ¶ 18.

72. Since October 15, 2025, two Times reporters have applied for "day passes" to access the Pentagon for specific press events, but their applications were denied. Stevenson Decl. ¶ 12.

V. **The Department Selects a New "Pentagon Press Corps."**

73. On October 22, 2025, in a post on his official X account, Parnell "announce[d] the next generation of the Pentagon press corps." Boutrous Decl. ¶ 15, Ex. 13.

74. In his October 22, 2025 X post, Parnell wrote that the "[n]ew media outlets" that "signed the . . . media access policy" "circumvent the lies of the mainstream media and get real news to the American people[.]" Parnell also wrote that "[t]heir reach and impact collectively are far more effective and balanced than the self-righteous media who chose to self-deport from the Pentagon"—former PFAC holders that Parnell called "activists who masquerade as journalists." Boutrous Decl. ¶ 15, Ex. 13.

75. The new PFAC recipients selected by the Department were individuals and media outlets who had expressed ideological agreement with and support for the Trump administration in the past. Boutrous Decl. ¶¶ 16–18, Exs. 14–16.

76. The new PFAC recipients selected by the Department include the National Pulse, which its editor-in-chief describes as an "industry mag/site for MAGA world." Boutrous Decl. ¶ 16, Ex. 14.

77. The new PFAC recipients selected by the Department include Laura Loomer ("Loomer"), an "influential pro-Trump activist." Boutrous Decl. ¶ 16, Ex. 14.

13

78. The new PFAC recipients selected by the Department include Matt Gaetz, President Trump's one-time choice for Attorney General of the United States. Boutrous Decl. ¶¶ 17–18, Exs. 15–16.

79. The new PFAC recipients selected by the Department include James O'Keefe ("O'Keefe"), who pleaded guilty to federal charges for entering federal property under false pretenses and was under federal investigation for an unrelated offense. Boutrous Decl. ¶¶ 16, 18, 28, Exs. 14, 16, 26.

80. New PFAC recipient Mike Lindell, CEO of MyPillow and current candidate for Governor of Minnesota, promised to make the Trump administration "proud" with his Pentagon coverage. Boutrous Decl. ¶ 16, Ex. 14.

81. New PFAC recipient Libby Emmons, editor-in-chief of Human Events and the Post Millennial, who received an "unsolicited invitation to apply for credentials," stated that there "should be a place for reporting on what they are doing [at the Pentagon] without always trying to expose the dark underbelly[.]" Boutrous Decl. ¶ 16, Ex. 14.

82. Conservative political commentator and podcaster Tim Pool said that his outlet, which received a PFAC, was "not an investigative news organization" and did "not intend to maintain a significant presence in the Pentagon." Boutrous Decl. ¶ 16, Ex. 14.

83. On December 2, 2025, Pentagon Press Secretary Kingsley Wilson ("Wilson") described the new recipients of PFACs as people who "actually reach Americans, ask real questions, and don't pursue a biased agenda." Boutrous Decl. ¶ 19, Ex. 17.

84. During the December 2, 2025 press conference, Wilson called journalists and news organizations who had previously held PFACs "propagandists" who "stopped telling the truth."

Wilson also stated that "a lot of the mainstream media continues to lie." Boutrous Decl. ¶ 19, Ex. 17.

85. On December 3, 2025, new PFAC holder Cam Higby posted to his X account a video of an interview with Wilson, under the header "MSM Journalists wreaked havoc on the Pentagon during their time in the building. Pentagon Press Sec Kingsley Wilson explains the hostile work environment created for DoW staff by adversarial media." Boutrous Decl. ¶ 21, Ex. 19.

86. In her December 3, 2025 interview with Cam Higby, Wilson said members of the "former Pentagon press corps" engaged in "unprofessional behavior," including coming to her office to speak with her. Boutrous Decl. ¶ 21, Ex. 19.

87. In her X post announcing that LOOMERED "is now a credentialed outlet at the Pentagon," Loomer stated: "I have developed a Rolodex of sources and if you have any tips, feel free to contact the Loomered Tip Line: the most influential Tip Line in all of DC." Boutrous Decl. ¶ 22, Ex. 20.

88. In response to a question regarding whether Loomer's "request for tips violates" the Policy, on November 4, 2025, the Department issued a statement attributed to Wilson which said that Loomer's call for tips is "a general tip line, which is constitutionally permissible." The Department stated that a tip line frequently published alongside Pentagon-related stories by the Washington Post does violate the Policy because it "targets military personnel and [Department] employees." Boutrous Decl. ¶¶ 23–24, Exs. 21–22.

89. The November 4, 2025 statement attributed to Wilson also stated: "If Fake News reporters actually had a brain and could read our policy correctly, then maybe one day they will be as effective of a journalist as Ms. Loomer is." Boutrous Decl. ¶ 24, Ex. 22.

90. O'Keefe, founder of the conservative group Project Veritas and a new PFAC holder, surreptitiously recorded a Pentagon official making unguarded criticisms of President Trump that were plainly unapproved by Department leadership and then reported that official's statements. Boutrous Decl. ¶ 26, Ex. 24.

91. At the December 2, 2025 Pentagon press conference, in response to a question O'Keefe asked regarding his recording of a Pentagon official's criticisms of President Trump, Wilson stated: "That's why the work you all do is so important. . . . [W]e want to make sure that we have the absolute best people working in it to protect Americans . . . [and] that they're on board and willing to serve our commander in chief." Boutrous Decl. ¶¶ 25, 27, Exs. 23, 25.

## VI. The Loss of Their PFACs Has Harmed and is Continuing to Harm Plaintiffs.

92. As of November 2025, The Times had more than 12 million subscribers across all of its print and digital products, including news. Stevenson Decl. ¶ 3.

93. The Times website is the most visited news website in the United States. Stevenson Decl. ¶ 3.

94. The Times has multiple reporters dedicated to covering national security, the Department, and the United States military. Stevenson Decl. ¶ 5.

95. Since October 15, 2025, no Times reporter has held a PFAC. Stevenson Decl. ¶ 13.

96. The loss of PFACs has created an unprecedented and significant impediment to The Times' ability to cover the Department and its leadership, national security, and the United States military. Stevenson Decl. ¶ 13.

97. For example, the Pentagon has held press events, including a press conference in the Pentagon Press Briefing Room, that Times reporters have been unable to attend because they no longer have PFACs. As a result, those reporters have been unable to ask questions of Department leadership that are important to their reporting. Stevenson Decl. ¶ 13.

16

98. At the December 2, 2025 press conference at the Pentagon, Department officials, speaking from the podium, referred to Barnes's reporting about Department leaders' involvement in a military strike on a Venezuelan boat. It would have been valuable to Barnes's coverage efforts to attend the news conference, ask follow-up questions, and address what Department officials said about his reporting—but without a PFAC, he could not attend. Barnes Decl. ¶ 19.

99. Beginning in the early hours of January 3, 2026, Barnes and other reporters at The Times reported on what President Trump called a "large scale strike" on Venezuela by the United States military, which resulted in the capture of Venezuelan President Nicolás Maduro and his wife. Barnes Decl. ¶ 20.

100. As reporters covering the news about the United States military's capture of Maduro for The Times, Barnes and his colleagues would have found it very valuable to be reporting from the Pentagon before, during, and in the hours and days after that military operation. Barnes Decl. ¶ 20.

101. Because Barnes and other national security reporters with The Times no longer have PFACs, they cannot have a regular presence at the Pentagon. Barnes Decl. ¶ 20.

102. Barnes and other Times reporters are also unable to have face-to-face interactions with Department officials and personnel without a prearranged meeting away from the Pentagon, which is more difficult and time-consuming to arrange. Stevenson Decl. ¶ 13.

103. While The Times and Barnes have continued to cover the Pentagon since October 15, 2025, that reporting has been made more difficult and burdensome because no Times reporter has a PFAC. Stevenson Decl. ¶ 13; Barnes Decl. ¶¶ 13, 20.

January 5, 2026

Respectfully submitted,

*/s/ Theodore J. Boutrous, Jr.*

Theodore J. Boutrous, Jr. (D.D.C. Bar No. 420440)
Katie Townsend (D.D.C. Bar No. 1026115)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
(213) 229-7000
TBoutrous@gibsondunn.com
KTownsend@gibsondunn.com

Lee R. Crain (D.D.C. Bar No. NY0337)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York
(212) 351-4000
LCrain@gibsondunn.com

Susan M. Pelletier*
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, NW
Washington, DC 20036
(202) 955-8500
SPelletier@gibsondunn.com

*admitted pro hac vice*

*Counsel for Plaintiffs The New York Times Company and Julian E. Barnes.*