IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE NEW YORK TIMES COMPANY, *et al.*, <br><br>                              *Plaintiffs*, <br><br>          v. <br><br> DEPARTMENT OF DEFENSE, *et al.*, <br>                              *Defendants*. | Civil Case No. 25-cv-4218 <br><br> **DECLARATION OF <br> PETE WILLIAMS** |

### DECLARATION OF PETE WILLIAMS

I, Louis Alan (Pete) Williams, hereby declare as follows:

1.      I am over 18 years of age and I make this declaration based upon my own personal knowledge.  If called to do so, I could and would competently testify to these matters under oath.

*My professional background.*

2.      I am a journalist and former public servant.  I started my career in journalism in the 1970s as a local radio and television broadcaster in Casper, Wyoming, where I grew up, after graduating from Stanford University with a degree in journalism.  I later served as press secretary for then-Congressman Dick Cheney from 1986 until 1989, when I went to work at the Department of Defense (the "Department") under then-Secretary of Defense Cheney.  I served as Assistant Secretary of Defense for Public Affairs, a Senate-confirmed position, from May 1989 until January 1993.

3.      After leaving the Defense Department, I became a justice correspondent for NBC News in late March 1993.  I retired from NBC News in July 2022.  During my nearly 30 years at the network, spanning five U.S. presidential administrations, I covered both the Department of Justice and the Supreme Court of the United States.

1

4.     During my time as Assistant Secretary of Defense for Public Affairs, I interacted with reporters at the Pentagon every day, both formally in press briefings, and informally. My office was just down the hall from where the journalists' workspaces were located.

### *My experience as Assistant Secretary of Defense for Public Affairs.*

5.     During my time at the Pentagon, the Department had a process for providing journalists with press credentials—now called Pentagon Facility Alternative Credentials or PFACs—that enabled them to have a regular presence at the Pentagon. My recollection is that the process for obtaining a press credential was relatively straightforward and involved undergoing a background check. When I was at the Department, we did not decide who was eligible to obtain or maintain a press credential based on whether we thought a particular reporter or news organization would report favorably about the Department or its leadership.

6.     In my experience, it was a tremendous advantage to the Department to have journalists from news organizations that reach a large and broad segment of the American public present in the Pentagon. During my time as Assistant Secretary of Defense for Public Affairs, I frequently would talk to reporters who were present in the building as their stories were being developed and, in that way, get a sense of what was important to them and what issues would be at the forefront for the American public. I could also help provide guidance to journalists if I thought they were not headed in the right direction on a story; I could help correct mistakes or misunderstandings or provide additional context where needed.

7.     For instance, during the Gulf War, many of the more experienced Pentagon and national security reporters were reporting from the Gulf, so news organizations had less experienced reporters working at the Pentagon. It was helpful both for those reporters and for the Department to have them in the building, where they were able to ask questions, confirm facts,

and learn information that would help them avoid making mistakes in their reporting. Always, but especially during times of war or national crises, it benefits everyone to ensure that timely, accurate information is being conveyed to the American public.

8. The regular presence of reporters in the Pentagon also helped develop respect and trust between those reporters and Department officials. While it did not prevent those journalists from writing critical stories about the Department and its leadership, the trust that was built up over time between journalists and Department officials was mutually beneficial. I recall instances where I asked journalists to hold back specific pieces of information they had learned because we believed, if it was made public right away, it would damage operational security. The reporters that I encountered regularly at the Pentagon would often consider and honor those requests. In those situations, it was vital that journalists and Department officials trusted one another.

9. During my service as Assistant Secretary of Defense for Public Affairs, some Department officials may have found it inconvenient or challenging to have journalists in the building covering the Department and the United States military. For example, there were times when journalists published critical stories or reported information that Department officials believed had come out too soon or wished had not been made public. But Department leadership understood and respected the role of an independent press in our democracy, and cutting off access to the Pentagon for journalists could never stop reporting that was critical of the Department. We would never have considered suspending, revoking, or not renewing a journalist's press credential in response to a critical story.

10. During my time as Assistant Secretary of Defense for Public Affairs, I did not encounter any security or safety incident arising out of the presence of a credentialed journalist at the Pentagon. To the contrary, in my experience, journalists were very sensitive to security

3

considerations and cared deeply about the safety of men and women in the United States military. I do not recall the Pentagon suspending, revoking, or not renewing any journalist's press credential because of a safety or security concern.

### *My experience as a journalist covering the Department of Justice and Supreme Court.*

11. As a correspondent covering the Department of Justice for NBC News, I had a long-term "hard" building pass issued by the Justice Department's Office of Public Affairs and frequently reported from Justice Department headquarters.

12. As was the case when I was at the Pentagon, when I was covering the Justice Department, credentialed journalists had desks in the building and places where cameras were set up to allow journalists to report live. As a credentialed journalist covering the Justice Department, I could walk unescorted to areas in the building, including where the offices of the Attorney General and Deputy Attorney General were located, that were not restricted or secure. Similarly, when I was Assistant Secretary of Defense for Public Affairs, journalists could go anywhere in the Pentagon where they did not require clearance—only secure areas, like the National Military Command Center, were off limits.

13. I found it beneficial as a reporter to be in the building both when I was covering the Justice Department and the Supreme Court. I learned things by being there on a regular basis that improved my reporting. Reporters get to know the rhythms of the building and can sense when something newsworthy is happening.

14. When I was covering the Justice Department, being in the building gave me ready access to experts—people who could answer questions about, for example, the wording in a federal criminal statute, and help me better understand how a particular procedure or process worked. By being present in the building, I was also able to quickly verify information, which is critical for

4

good journalism.  In my view, trying to cover the Justice Department or the Pentagon without regularly being present in the building is like trying to write a restaurant review without going to the restaurant and trying the food.

### *The Department's new policy harms the American public.*

15. I am familiar with changes that have been made by the Department to press access under Secretary Hegseth, and I have read the policy concerning press credentials at issue in this litigation.  Based on my experience both as a journalist and as Assistant Secretary of Defense for Public Affairs, I believe these measures are counterproductive for the Department and will ultimately harm the American public.

16. In early February 2025, after learning that the Department had announced that it would be shifting news organizations out of the Pentagon press room, I wrote to then-chief Pentagon spokesman John Ullyot to share my view that such a move would not be in the Department's best interests.  Among other things, I pointed out that when I was in his position, I had found it essential to have journalists close at hand when I needed to reach them to urge corrections, suggest approaches in reporting, or provide guidance to avoid mistakes.  I also noted that journalists from three of the news organizations singled out to vacate their spaces in the Pentagon—The New York Times, NBC, and NPR—had died covering United States military operations abroad.  A true and correct copy of my email is attached hereto as Exhibit A.

17. The press credential policy put into the place by the Department in October 2025 is, in my view, even worse and even more counterproductive for the Department.  The policy states that the Department can take away a press credential if a journalist reports even unclassified information that the Department hasn't approved for release.  That is offensive and counter to the role of an independent press.  Journalists should not risk the loss of their credentials simply because

they are doing their job as reporters. And by promulgating that policy, the Department forced knowledgeable and experienced national security and defense reporters out of the building entirely—journalists from news organizations that reach a large and broad segment of the American public.

18. As fewer Americans have any involvement with or direct connection to the United States military, it is more important than ever for the Department to be transparent and to build and maintain trust with the American people. Interacting with the press is an important way to build and maintain that trust. Unfortunately, the Pentagon's new press credential policy will only undermine it.

I declare under the penalty of perjury that the foregoing is true and correct.

Dated: December 19, 2025, Washington, D.C.

_____

Louis Alan (Pete) Williams