UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

THE NEW YORK TIMES COMPANY;
JULIAN E. BARNES,

                  *Plaintiffs*,

        v.

DEPARTMENT OF DEFENSE a/k/a
DEPARTMENT OF WAR; PETE HEGSETH,
Secretary of Defense, in his official capacity;
SEAN PARNELL, Chief Pentagon Spokesman,
in his official capacity,

                  *Defendants*.

Case No. 1:25-cv-04218 (PLF)


**BRIEF FOR STATE OF NEW YORK AS AMICUS CURIAE
IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

                                                                                   **Page**

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION AND INTERESTS OF AMICUS CURIAE ...................................................... 1

ARGUMENT

    THE CHALLENGED POLICY HARMS THE PUBLIC INTEREST ......................................... 3

        A.    The Nation and New York State Have a Long History of Protecting
                Informed and Independent Reporting. ................................................................... 3

        B.    The Challenged Policy Unduly Interferes with the Public's Ability to
                Report and Receive Accurate Information. ............................................................ 5

CONCLUSION ....................................................................................................................... 8

## TABLE OF AUTHORITIES

**Cases**                                                                                                                      **Page(s)**

*Branzburg v. Hayes*,
   408 U.S. 665 (1972) ................................................................................................. 3

*Flynt v. Rumsfeld*,
   355 F.3d 697 (D.C. Cir. 2004) ................................................................................. 3

*Immuno AG. v. Moor-Jankowski*,
   77 N.Y.2d 235 (1991) ............................................................................................. 4

*Leigh v. Salazar*,
   677 F.3d 892 (9th Cir. 2012) ................................................................................... 3

*Matter of Beach v. Shanley*,
   62 N.Y.2d 241 (1984) ............................................................................................. 4

*Mills v. Alabama*,
   384 U.S. 214 (1966) ................................................................................................. 7

*New York Times Co. v. Sullivan*,
   376 U.S. 254 (1964) ................................................................................................. 3

*O'Neill v. Oakgrove Constr.*,
   71 N.Y.2d 521 (1988) ............................................................................................. 4

*People for the Ethical Treatment of Animals, Inc. v. North Carolina Farm Bureau Fed'n*,
   60 F.4th 815 (4th Cir. 2023) ................................................................................... 3

*Richmond Newspapers, Inc. v. Virginia*,
   448 U.S. 555 (1980) ................................................................................................. 3

*Sherrill v. Knight*,
   569 F.2d 124 (D.C. Cir. 1977) ................................................................................. 4

*United States v. Associated Press*,
   52 F. Supp. 362 (S.D.N.Y. 1943) ............................................................................. 3

*von Bulow v. von Bulow*,
   811 F.2d 136 (2d Cir. 1987) ..................................................................................... 5

**Constitution**                      **Page(s)**

N.Y. Const. art. I, § 8 .................................................................................................4

**Miscellaneous Authorities**

C. Todd Lopez, U.S. Dep't of Def., *War Department Welcomes New Pentagon Press Corps* (Dec. 3, 2025), https://www.war.gov/News/News-Stories/Article/Article/4348000/war-department-welcomes-new-pentagon-press-corps/ ...................................6

Elizabeth Grieco, *One in Five U.S. Newsroom Employees Live in New York, Los Angeles, or D.C.*, Pew Rsch. Ctr. (Oct. 24, 2019), https://www.pewresearch.org/short-reads/2019/10/24/one-in-five-u-s-newsroom-employees-live-in-new-york-los-angeles-or-d-c/ ................................................................................1

Gina Harkins, *Fake News Is Wreaking Havoc on the Battlefield. Here's What the Military's Doing About It*, Military.com (Aug. 16, 2020), https://www.military.com/daily-news/2020/08/16/fake-news-wreaking-havoc-battlefield-heres-what-militarys-doing-about-it.html .......................................6

Ivan L. Nagy, *The Pentagon Press Corps is Gone*, Colum. Journalism Rev. (Oct. 15, 2025), https://www.cjr.org/news/the-pentagon-press-corps-is-gone.php ...............................................6

Military State Pol'y Source, *New York* (data as of Dec. 31, 2024), https://statepolicy.militaryonesource.mil/state/NY ......................................................1

Tom Bowman, *Why I'm Handing in My Pentagon Press Pass*, NPR (Oct. 14, 2025), https://www.npr.org/2025/10/14/g-s1-93297/pentagon-reporter-opinion-press-policy ...............6

U.S. Mil. Acad., *Brief History of West Point*, https://www.westpoint.edu/about/history-of-west-point/brief-history-of-west-point ........................................................1

**INTRODUCTION AND INTERESTS OF AMICUS CURIAE**

The State of New York submits this amicus curiae brief in support of plaintiffs' motion for summary judgment.

New York State has long played an important role in the nation's military defense. Numerous Revolutionary War battles were fought in the State, including the pivotal Battle of Saratoga. In 1802, President Thomas Jefferson founded the nation's first military academy at West Point; today, that site is the oldest continuously occupied regular Army post in the United States. *See* U.S. Mil. Acad., <u>Brief History of West Point</u>. Since the Founding, the State's military forces—the organized militia, the Army and Air National Guard, the New York Guard, and the Naval Militia—have consistently supported the State and served in our nation's conflicts. Countless New Yorkers have proudly served in the various branches of the United States military. Today, New York State is home to over 28,000 active-duty service members, nearly 25,000 spouses and children of active-duty service members, and tens of thousands of National Guard troops and reservists. *See* Military State Pol'y Source, <u>New York</u> (data as of Dec. 31, 2024).[1]

New York State is also a global leader in media and journalism. The State is home to hundreds of newspapers, magazines, and television news organizations, including several of the largest in the world. For hundreds of years, individual New Yorkers have contributed to public discourse and knowledge through journalism. According to a recent survey, approximately twelve percent of all U.S. newsroom employees live in New York City alone. *See* Elizabeth Grieco, <u>One in Five U.S. Newsroom Employees Live in New York, Los Angeles, or D.C.</u>, Pew Rsch. Ctr. (Oct. 24, 2019).

---

[1] For authorities available online, full URLs appear in the table of authorities. All URLs were last visited on January 15, 2026.

The resolution of this case affects the State's interests in several crucial ways. First, the State has a strong interest in ensuring that its officials and residents—both those who have military ties and those who do not—have access to independent reporting about defendant United States Department of Defense. This information is especially valuable to New Yorkers directly affected by the Department's decisions, including service members and their families. Second, the State has a compelling interest in ensuring that independent media organizations, many of which are in New York, retain access to the credentials necessary to provide timely and accurate reports about governmental developments.

The Department's revised press access policy challenged in this case undermines both interests. The policy has already caused over a hundred seasoned journalists from leading news organizations to give up their press credentials, leaving a small corps of inexperienced individuals to cover the Department and its actions. Every day that this policy remains in effect undermines the right of the State and its residents to access and to provide independent and fully informed reporting on events of national significance.

# ARGUMENT

## THE CHALLENGED POLICY HARMS THE PUBLIC INTEREST

**A.    The Nation and New York State Have a Long History of Protecting Informed and Independent Reporting.**

The First Amendment safeguards "uninhibited, robust, and wide-open" debate of public issues. *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). Courts have long recognized that the First Amendment's freedom of the press protects not only the right to speak, broadcast, and publish news free from government interference but also to "gather information." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 576 (1980) (quotation marks omitted); *see also Leigh v. Salazar*, 677 F.3d 892, 897 (9th Cir. 2012) ("[N]ewsgathering is an activity protected by the First Amendment."). As the Supreme Court explained, "without some protection for seeking out the news, freedom of the press could be eviscerated." *Branzburg v. Hayes*, 408 U.S. 665, 681 (1972).

The right to gather information directly from sources plays a distinctly important role in journalism. As Judge Learned Hand explained over eighty years ago, the First Amendment is predicated on the understanding "that right conclusions are more likely to be gathered out of a multitude of tongues, than through any kind of authoritative selection." *United States v. Associated Press*, 52 F. Supp. 362, 372 (S.D.N.Y. 1943). And today, "[f]irst-hand accounts . . . enhance accuracy and credibility in reporting and increase transparency and reader trust." *People for the Ethical Treatment of Animals, Inc. v. North Carolina Farm Bureau Fed'n*, 60 F.4th 815, 829 (4th Cir. 2023).

To be sure, the Supreme Court has not recognized a "per se right of access to government activities simply because such access might lead to more thorough or better reporting." *Flynt v. Rumsfeld*, 355 F.3d 697, 408 (D.C. Cir. 2004) (alteration and quotation marks omitted). But as the D.C. Circuit has explained, the government's decision to make press facilities "publicly available as a source of information for newsmen . . . requires that this access not be denied arbitrarily or for less

3

than compelling reasons." *Sherrill v. Knight*, 569 F.2d 124, 129 (D.C. Cir. 1977). That is because "[n]ot only newsmen and the publications for which they write, but also the public at large have an interest protected by the first amendment in assuring that restrictions on newsgathering be no more arduous than necessary, and that individual newsmen not be arbitrarily excluded from sources of information." *Id.* at 129-30.

Although plaintiffs' claims rise under the Federal Constitution, it is important to note that the New York Times, like many other media organizations, is headquartered in New York State, which has "long provided one of the most hospitable climates for the free exchange of ideas." *Matter of Beach v. Shanley*, 62 N.Y.2d 241, 255 (1984) (Wachtler, J., concurring). The State Constitution expressly guarantees the right to "freely speak, write and publish . . . on all subjects" and provides that "no law shall be passed to restrain or abridge the liberty of speech or of the press." N.Y. Const. art. I, § 8; *see Immuno AG. v. Moor-Jankowski*, 77 N.Y.2d 235, 249 (1991) (describing history of provision).

Courts have recognized that New York's constitutional guarantee of a free press requires special solicitude to "those engaged in publishing and particularly to those performing the sensitive role of gathering and disseminating news of public events." *Matter of Beach*, 62 N.Y.2d at 256 (Wachtler, J., concurring). *See also O'Neill v. Oakgrove Constr.*, 71 N.Y.2d 521, 528-29 (1988) ("the guarantee of a free press in article I, § 8 of the New York Constitution independently mandates the protection afforded . . . to prevent undue diversion of journalistic effort and disruption of press functions."). The views of New York courts on this issue are especially relevant because the history of both federal *and* state protections for the press date back to colonial New York. *See Matter of Beach*, 62 N.Y.2d at 255-56 (Wachtler, J., concurring). Although this Court is "not bound to follow New

4

York law, neither should [it] ignore New York's policy of giving protection to professional journalists." *von Bulow v. von Bulow*, 811 F.2d 136, 144 (2d Cir. 1987).

**B.    The Challenged Policy Unduly Interferes with the Public's Ability to Report and Receive Accurate Information.**

The Department, like many other governmental institutions, has a process for issuing press credentials to reporters who cover the critical work of the Department onsite from the Pentagon. For many years, a reporter could obtain such credentials by "submit[ting] a letter confirming their employment with a news organization and their assignment and undergo[ing] a standard background check." Mem. of Law in Support of Pls.' Mot. for Summ. J. at 5 (Jan. 5, 2026), ECF No. 10-1. Since the early 2000s, reporters who received press credentials for the Department were required to comply with other "basic, noncontroversial requirements" such as ensuring that press credentials are "visible and worn above the waist at all times while in the Pentagon." *Id.* at 6 (quotation marks omitted). Reporting from the Pentagon allows journalists to cover official press briefings, to ask questions of Pentagon officials at briefings, and to engage in additional conversations with department officials and aides or public affairs staff. *Id.* "[T]hese in-person interactions can be crucial to obtaining the context and detail needed to report accurately and effectively about defense policy and military operations." *Id.*

Under the revised policy challenged in this case (*see* Administrative Record (A.R.) 1-17), the Department may now deny, revoke, or not renew a press credential for a journalist based on a unilateral determination that such a journalist "pose[s] a security or safety risk to [Department] personnel or property" (A.R. 12). The policy further provides that this standard can be met merely by a journalist's receipt, publication, or solicitation of various types of information (whether classified or unclassified). (A.R. 12-13.) And the policy suggests that news media should discuss certain "materials with the [Department] prior to publication" to avoid possible sanction. (A.R. 6.) All

journalists seeking to obtain or maintain their press credential are required to sign an acknowledgment of the revised policy. (*See* A.R. 14.)

Nearly all the news organizations with an established presence in the Pentagon refused to sign the acknowledgment and instead turned in their press credentials, including journalists from outlets as varied as ABC News, Fox News, CBS News, CNN, the Wall Street Journal, and Newsmax. *See* Ivan L. Nagy, *The Pentagon Press Corps is Gone*, Colum. Journalism Rev. (Oct. 15, 2025). Journalists from smaller publications specializing in covering the military likewise refused to sign the acknowledgment. *Id.* As a result, the renowned and experienced Pentagon press corps has been reduced to approximately seventy "journalists, bloggers and social media influencers." *See* C. Todd Lopez, U.S. Dep't of Def., *War Department Welcomes New Pentagon Press Corps* (Dec. 3, 2025).

The policy and its implementation harm the public interest in several ways. Most fundamentally, the policy has deprived millions of Americans of the benefit of independent reporting from journalists with decades of experience covering the military. While the policy does not prevent any journalist from reporting on the Department, it locks out the most experienced and principled journalists from the Pentagon and leaves only amateur or semiprofessional reporters with almost no relevant expertise in covering sensitive governmental news with direct access to Department officials.

Access to timely, reliable, and informed press coverage of the military is critical to the American public, especially given the rise in misinformation flowing on unregulated social media platforms. *See e.g.*, Gina Harkins, *Fake News Is Wreaking Havoc on the Battlefield. Here's What the Military's Doing About It*, Military.com (Aug. 16, 2020). Without a reliable Pentagon press corps, it is much more challenging for the American people to "find out what is being done at the Pentagon in their name, with their hard-earned tax dollars, and more importantly, the decisions that may put their sons and daughters in harm's way." Tom Bowman, *Why I'm Handing in My Pentagon Press*

6

*Pass*, NPR (Oct. 14, 2025). Military families are particularly harmed by the policy because they are deprived of critical information about decision-making at the Department and cannot rely on independent reporters to doggedly pursue information or to challenge Department officials about the government's actions.

As a government actor, the State understands and respects the Department's concerns about sensitive operational information and the safety of military personnel. (*See* A.R. 6.) The State also recognizes that governmental agencies have latitude to impose reasonable time, place, and manner restrictions on access to otherwise nonpublic spaces like the Pentagon. Indeed, various state entities such as the New York Legislature also have press credentialing processes that include requirements to abide by basic and nonintrusive safety requirements. These processes, however, do not purport to restrict the methods by which journalists gather information or to penalize reporters for coverage that is unfavorable to public officials, unlike the policy challenged here.

"Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs." *Mills v. Alabama*, 384 U.S. 214, 218 (1966). "[T]he press serves and was designed to serve as a powerful antidote to any abuses of power by governmental officials and as a constitutionally chosen means for keeping officials elected by the people responsible to all the people whom they were selected to serve." *Id.* at 219. The policy challenged in this case undermines this constitutionally designed function of the press.

## CONCLUSION

This Court should grant plaintiffs' motion for summary judgment.

Dated:    New York, New York
          January 15, 2026

                                                Respectfully submitted,

                                                LETITIA JAMES
                                                  *Attorney General*
                                                  *State of New York*
                                              Attorney for Amicus Curiae
                                              State of New York

                                     By:    */s/ Ester Murdukhayeva*
                                                    ESTER MURDUKHAYEVA
BARBARA D. UNDERWOOD                    Deputy Solicitor General
  *Solicitor General*
ESTER MURDUKHAYEVA                     28 Liberty Street
  *Deputy Solicitor General*             New York, New York 10005
    *of Counsel*                                   (212) 416-6279