# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

THE NEW YORK TIMES COMPANY, *et al.*,

                Plaintiffs,

       v.

DEPARTMENT OF DEFENSE a/k/a/ DEPARTMENT OF WAR, *et al.*,

              Defendants.

Civil Action No. 1:25-cv-04218-PLF

## BRIEF OF *AMICUS CURIAE* PENTAGON PRESS ASSOCIATION IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

## **TABLE OF CONTENTS**

TABLE OF CONTENTS............................................................................................ i

TABLE OF AUTHORITIES ..................................................................................... ii

INTEREST OF *AMICUS* PENTAGON PRESS ASSOCIATION .................................. 1

PRELIMINARY STATEMENT ................................................................................. 1

ARGUMENT ............................................................................................................. 3

I.   The Department Has Always Allowed Reporters To Do Their Work from Inside the Pentagon, and for Good Reason .............................................................. 3

   A.  Journalists Have Worked at the Pentagon Since It Opened During World War II....... 3

   B.  Allowing Credentialed Journalists to Work at the Pentagon Serves the Interests of Both the Defense Department and the Public ...................................................... 8

II.  The First Amendment Flatly Prohibits the Department's New Restrictions on the Work of Credentialed Journalists ................................................................. 15

   A.  The Pentagon Is a Nonpublic Forum for First Amendment Activity ........................ 15

   B.  The Department's New Restrictions on Credentialed Journalists Are Patently Unreasonable Given the Purposes of that Forum ....................................................... 16

   C.  The Department's New Restrictions on Credentialed Journalists Are Based Impermissibly on the Perceived Viewpoint of Their Reporting................................ 18

   D.  First Amendment Limits Strictly Apply to the Department's Effort to Restrict Investigation and Criticism by the Press..................................................................... 23

CONCLUSION.......................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                           **Page(s)**

*Ateba v. Leavitt*,
    133 F.4th 114 (D.C. Cir. 2025) ..................................................................15, 16, 17

*Bose Corp. v. Consumers Union of United States, Inc.*,
    466 U.S. 485 (1984) ..........................................................................................25

*Branzburg v. Hayes*,
    408 U.S. 665 (1972) .....................................................................................15, 18

*Brooklyn Inst. of Arts & Scis v. City of N.Y.*,
    64 F. Supp. 2d 184 (E.D.N.Y. 1999) ...............................................................18

*Cornelius v. NAACP*,
    473 U.S. 788 (1985) ..........................................................................................16

*Cox Broad. Corp. v. Cohn*,
    420 U.S. 469 (1975) ..........................................................................................23

*Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*,
    505 U.S. 672 (1992) ..........................................................................................16

*Karem v. Trump*,
    960 F.3d 656 (D.C. Cir. 2020) ........................................................................18

*Mills v. Alabama*,
    384 U.S. 214 (1966) ..........................................................................................24

*Minneapolis Star and Trib. Co. v. Minnesota Com'r of Revenue*,
    460 U.S. 575 (1983) ............................................................................................8

*Minnesota Voters All. v. Mansky*,
    585 U.S. 1 (2018) .......................................................................................15, 16, 18

*New York Times Co. v. Sullivan*,
    376 U.S. 254 (1964) ......................................................................................8, 23

*New York Times Co. v. United States*,
    403 U.S. 713 (1971) ......................................................................................9, 24

*Nicholson v. McClatchy Newspapers*,
    223 Cal. Rptr. 58 (Cal. Ct. App., 3d Dist., 1986) ...........................................17

*Pell v. Procunier*,
    417 U.S. 817 (1974) ..........................................................................................17

*Perry Educ. Ass'n v. Perry Local Educators Ass'n*,
  460 U.S. 37 (1983) ...................................................................................15, 16, 19

*Police Dep't of City of Chicago v. Mosley*,
  408 U.S. 92 (1972) ..............................................................................................18

*Price v. Garland*,
  45 F.4th 1059 (D.C. Cir. 2022) ..........................................................................16

*Reed v. Town of Gilbert*,
  576 U.S. 155 (2015) ............................................................................................19

*Richmond Newspapers, Inc. v. Virginia*,
  448 U.S. 555 (1980) ............................................................................................23

*Rosenberger v. Rector and Visitors of Univ. of Virginia*,
  515 U.S. 819 (1995) ......................................................................................18, 19

*Sherrill v. Knight*,
  569 F.2d 124 (D.C. Cir. 1977) ............................................................................25

*Smith v. Daily Mail Pub. Co.*,
  443 U.S. 97 (1979) ..............................................................................................17

*Time, Inc. v. Hill*,
  385 U.S. 374 (1967) ............................................................................................23

*Turner Broad. Sys. v. F.C.C.*,
  512 U.S. 622 (1994) ............................................................................................19

*W. Va. State Bd. of Educ. v. Barnette*,
  319 U.S. 624 (1943) ............................................................................................19

*Wilmer Hale v. Exec. Office of the President*,
  774 F. Supp. 3d 86 (D.D.C. 2025) ......................................................................18

*Zerilli v. Smith*,
  656 F.2d 705 (D.C. Cir. 1981) ............................................................................18

**Other Authorities**

Adam Gabbatt, *Rightwing Bloggers and Maga Minions: Meet the Trump-Loving
  Pentagon Press Corps*, Guardian (Jan. 11, 2026) .............................................14

Aidan McLaughlin, *Inside Pete Hegseth's "Soviet-Style" War on the Press*, Vanity
  Fair (Oct. 17, 2025) ............................................................................................20

Al Kamen, *Pentagon Upgrade of 'Correspondents Corridor' to Cost About
  $90,000*, Wash. Post (Oct. 15, 2012) ...................................................................5

Alfred Goldberg, The Pentagon: The First Fifty Years (1992) .......................................................4

Alfred Goldberg, et al., Defense Studies Series: Pentagon 9/11 (2007).........................................6

Amanda Terkel, *Pentagon removes major media outlets, including NBC News*,
  *from dedicated workstations in new 'rotation program'*, NBC News (Feb. 1,
  2025) ........................................................................................................................................20

Anna Merlan and Julianne McShane, *Meet the New Pentagon Press Corps*,
  Mother Jones (Oct. 24, 2025) ................................................................................................22

Barbara Starr, *The Reshuffling of the Pentagon Press Corps Is a Warning*,
  Columbia Journalism Review (Feb. 5, 2025) ...........................................................................6

Brian Stelter, *Pentagon to Swap Traditional Media with Pro Trump Outlets
  Under New Rotational Program for Defense Department Workspace*, CNN
  (Feb. 1, 2025).............................................................................................................................5

Chloe Melas, Courtney Kube & Sarah Fitzpatrick, *Pete Hegseth's drinking
  worried colleagues at Fox News, sources tell NBC News*, NBC News (Dec. 3,
  2024) ........................................................................................................................................20

Craig Whitlock & Bob Woodward, *Pentagon Buries Evidence of $125 Billion in
  Bureaucratic Waste*, Wash. Post (Dec. 5, 2016)....................................................................13

Dana Priest & Anne Hull, *Walter Reed and Beyond*, Wash. Post (2007)....................................12

David Anderson, *The Origins of the Press Clause*, 30 UCLA L. Rev. 455 (1983)......................25

David E. Sanger, *The Pentagon, the Press and the Fight to Control National
  Security Coverage*, N.Y Times (Sept. 24, 2025) ....................................................................11

Debra Gersh Hernandez, *Pentagon Backs Off*, 130 Ed. & Publisher 10 (1997)............................2

Dep't of War, For the Media: Badges, https://perma.cc/77KH-NW2V .........................................2

Eleanor Watson, *CBS News Ends Over 60-year Presence at Pentagon After
  Declining to Sign New Press Requirements*, CBS News (Oct. 17, 2025) ..............................10

Erik Wemple, *Inside Hegseth's Effort to Limit Press Access at the Pentagon*, N.Y.
  Times (Oct. 10, 2025)..............................................................................................................11

Farnoush Amiri & Tara Copp, *Pete Hegseth's former sister-in-law alleges abuse
  against second wife in affidavit to Senate*, AP (Jan. 21, 2025)..............................................20

Floyd Abrams et al., *The Press Clause: The Forgotten First Amendment*, 5 J. Free
  Speech L. 561 (2024)..........................................................................................................24, 3

Heb Scribner, *Pentagon to move NBC, Politico, NPR and NYT out of dedicated media offices*, Wash. Post (Feb. 1, 2025) ...................................................................5

Hope Hodge Sacks, *Pentagon Bars Most Foreign Visitors as More Personnel Contract Virus*, Military.com (Mar. 14, 2020) .........................................................6

Interview by Marvin Kalb with Secretary of Defense William J. Perry, The Pentagon and the Press, 1 Harv. Int'l J. Press/Pol. 121 (1996) .................................11

James C. Goodale, Fighting for the Press: The Inside Story of the Pentagon Papers and Other Battles (2013) ....................................................................6

Jamie Crawford, *Pentagon Denies Special Forces Fighting ISIS on Front Lines*, CNN (May 27, 2018) .................................................................................12

Jeffrey Goldberg & Shane Harris, *Here Are the Attack Plans That Trump's Advisers Shared on Signal*, The Atlantic (Mar. 26, 2025) .......................................21

Jacob M. Schriner-Briggs, *Guaranteeing the Press*, 98 St. John's L. Rev. 903 (2025) .................................................................................................25

Jack M. Balkin, *Which Republican Constitution?*, 32 Const. Comment. 31 (2017) ...................25

John M. Diamond, *The Media: Witness to the National Security Enterprise*, in The National Security Enterprise: Navigating the Labyrinth (Roger Z. George & Harvey Rishikof eds., 2d ed. 2017) .................................................................5, 10

Jonathan Allen, *Four Times Media Reporting Improved Conditions for Service Members*, NBC News (Oct. 17, 2025) ..................................................................12

Katie Robertson, *Trump Administration to Remove 4 Major News Outlets From Pentagon Office Space*, N.Y. Times (Feb. 1, 2025) .............................................5

Konstantin Toropin (@Ktoropin), X (Jan. 3, 2026, at 10:28 a.m.) ...............................................14

Mark Thompson, *Pentagon's Correspondents' Corridor Renamed*, Time (Sept. 27, 2012) ................................................................................................6

Megan Forrester, *Messages with Yemen War Plans Inadvertently Shared with Reporter*, ABC News (Apr. 22, 2025) ..................................................................21

Melissa Chan, *Pete Hegseth's remarks about women in combat are met with disgust and dissent*, NBC News (Nov. 15, 2024) .................................................20

Nancy A. Youssef, *The Last Days of the Pentagon Press Corp*, The Atlantic (Oct. 15, 2025) ................................................................................................9

Nancy Youssef, *Exclusive: U.S. Admits to Bombing 29 Civilians in ISIS War*, Daily Beast (Jan. 21, 2016) ......................................................................13

Natasha Bertrand, Katie Bo Lillis and Zachary Cohen, *Exclusive: Early US intel assessment suggests strikes on Iran did not destroy nuclear sites, sources say*, CNN (June 25, 2025) .......................................................................................22

Naval Training Command, Journalist 3 & 2 (1973) ......................................................17

Navy Goes to the Pentagon, N.Y. Times (Aug. 12, 1948) ...........................................4

Paul McLeary, Joe Gould & Connor O'Brien, *Hegseth's defense: Deny, blame and shrug*, Politico (Jan. 14, 2025) ...............................................................20

Peter Eisler, et al., *Pentagon Balked at Pleas for Safer Vehicles*, USA Today (July 15, 2007) ..............................................................................................................13

Phil Stewart & Idrees Ali, *80% of Russia's Forces Around Ukraine in Attack Positions, U.S. Official Says*, Reuters (Feb. 23, 2022) ...........................................11

Phil Stewart, *Activist Laura Loomer Blasts Pentagon Over Planned Qatar Military Facility in Idaho*, Reuters (Oct. 11, 2025) .................................................12

Rebecca Boone, *Things to Know About the Qatar Training Facility Planned for and Idaho Air Force Base*, AP (Oct. 10, 2025) ................................................12

Robert B. Sims, The Pentagon Reporters (1983) ............................................... *passim*

Sonja R. West, *Awakening the Press Clause*, 58 UCLA L. Rev. 1025 (2011) ...........24

Sonja R. West, *The Majoritarian Press Clause*, 2020 U. Chi. Legal F. 311 (2020) ....24

Steve Vogel, The Pentagon: A History (2007) ...............................................................4

Sean Parnell (@SeanParnellUSA), X (Aug. 20, 2025, at 7:45 ET).............................20

Sean Parnell (@SeanParnellUSA), X (July 17, 2025, at 17:18 ET).............................22

Sean Parnell (@SeanParnellUSA), X (July 23, 2025, at 15:20 ET).............................20

Sean Parnell (@SeanParnellUSA), X (June 29, 2025, at 14:51 ET) ............................21

Sean Parnell (@SeanParnellUSA), X (Oct. 1, 2025, at 17:49 ET)...............................20

Sean Parnell (@SeanParnellUSA), X (Oct. 22, 2025, at 13:21 ET).............................22

Scott Norver & Drew Harwell, '*I Voted So Hard for This': How the New Pentagon Press Corps Covered Venezuela*, Wash. Post (Jan. 7, 2026)...............................9, 15

Sydney Shaw, *Pentagon Press Office Says It Got Too Personal*, Wash. Post (May 16, 1987) .............................................................................................................7

Tara Copp, *Hegseth told senator he paid $50,000 to woman who accused him of 2017 sex assault*, AP (Jan. 23, 2025) ...................................................................20

The Papers of Thomas Jefferson, vol. 9, 1 November 1785 – 22 June 1786 (Julian P. Boyd ed., 1954)..........................................................................................25

Tom Bowman, *Opinion: Why I'm handing in my Pentagon press pass*, NPR (Oct. 14, 2025) .........................................................................................................4, 11

Vincent Blasi, *The Checking Value in First Amendment Theory*, 2 Am. Bar Found. Rsch. J. 521 (1977) .................................................................................24

## INTEREST OF *AMICUS* PENTAGON PRESS ASSOCIATION [1]

The Pentagon Press Association ("PPA") is a nonprofit association founded in 2010 to promote the interests and protect the rights of journalists assigned to report on the U.S. Department of Defense ("Department"). Approximately 100 members of the PPA had their Pentagon press badges revoked on October 15, 2025, solely because they would not accept an unconstitutional Department press policy. That new policy imposes unprecedented restrictions on how Pentagon reporters may seek information and what they may report, and it grants Department officials unbridled discretion to expel any reporter from the Pentagon who fails to abide by those restrictions. The PPA has a vital interest in protecting the constitutional rights of its members and submits this *amicus curiae* brief to assist the Court in understanding the long history of reporters working at the Pentagon, the significant value this access has provided to both the public and the Department, and the fundamental threat to press freedom posed by the Department's attempt to change how reporters have worked at the Pentagon for over 80 years.

## PRELIMINARY STATEMENT

The Defense Department's new press policy is a frontal assault on the "freedom . . . of the press" guaranteed by the First Amendment. It seeks to regulate how reporters do their work at the Pentagon, declaring that any reporter who seeks out, acquires, or publishes information the Department has not approved—or engages in anything the Department deems "unprofessional conduct"—could be expelled immediately from the building.[2] The First Amendment flatly prohibits the Department from asserting such control over the press.

---

[1] No party or its counsel had any role in authoring this brief. No person or entity—other than amici curiae and their counsel—contributed money to fund the preparation of this brief. All Parties consent to the filing of this brief.

[2] SUMF ¶¶ 54-72, ECF No. 10-36. Undefined terms have the meaning ascribed to them in Plaintiffs' Memorandum of Law in Support of Summary Judgment, ECF No. 10-1.

Scores of PPA members working for organizations with a wide range of editorial perspectives were summarily denied continued access to the Pentagon last October because they refused to accept this unconstitutional policy. Many were experts on military affairs who had covered the Department for decades. These reporters were forced to surrender the Pentagon Facility Access Credentials ("PFACs" or "credentials") they had obtained by demonstrating they were professional journalists who required building access at least three times per month and passing a basic security screening.[3] The PFAC conferred substantial benefits, including unescorted access to unsecured areas of the building, eligibility for a physical work space in the Pentagon, participation in press briefings, and notice of press availabilities and announcements.[4]

Over the decades, the Department imposed various rules of conduct on credentialed journalists, such as requiring PFACs to be worn at all times, requiring an invitation to walk into a private office, and the like.[5] But no rule controlled how reporters did their jobs or what they could report, until now. No security risk or misconduct prompted the Department's drastic move to control the work of professional journalists. Rather, the new restrictions were imposed in retaliation for news reports and criticism that Department officials disliked. Before the new policy was announced, Secretary Hegseth frequently expressed his disdain for the reporting of the Pentagon press corps, accusing those reporters of "cheer[ing] against Trump so hard, its like in their DNA," and expressing his belief that the credentialed journalists working at the Pentagon just

---

[3] *E.g.*, SUMF ¶¶ 5, 8; Dep't of War, For the Media: Badges, https://perma.cc/77KH-NW2V; Debra Gersh Hernandez, Pentagon Backs Off, 130 Ed. & Publisher 10, 10 (1997) (interviewing Clifford H. Bernath, Principal Deputy Assistant Secretary of Defense for Public Affairs at the time).

[4] SUMF ¶¶ 7, 9, 14, 36-40; Barnes Decl. ¶ 8, ECF No. 10-3; Burns Decl. ¶¶ 7-13, ECF No. 10-4.

[5] A Martínez, *Former Deputy Pentagon Press Secretary Talks About New Pentagon Press Corps*, NPR (Oct. 23, 2025), https://perma.cc/8CA4-25NR.

"want [Trump] to be unsuccessful so bad."[6]  The aim of the new press restrictions is to shape reporting in the future and limit press criticism.  This conclusion is only reinforced by the Department's replacement of the experienced journalists who would not sign away their rights with a hand-picked "new Pentagon Press Corps" comprised of individuals and organizations with little experience or desire to report on the military, but who have strongly expressed support for the Trump Administration.  *See* SUMF ¶¶ 75-81.

Our nation's Founders recognized that democracy requires a free and vibrant press capable of uncovering and disseminating the knowledge necessary for citizens to hold their government to account.[7]  A press whose ability to investigate is constrained and whose ability to publish is restricted is neither free nor vibrant.  The Department's new restrictions mark the top of a slippery slope down which the government must not be allowed to proceed.

## ARGUMENT

## I.    THE DEPARTMENT HAS ALWAYS ALLOWED REPORTERS TO DO THEIR WORK FROM INSIDE THE PENTAGON, AND FOR GOOD REASON

The Department has long recognized that the close proximity of the press to the leaders of our nation's military serves a vital public interest and has always provided press access to the Pentagon, even in times of crisis.

### A.  Journalists Have Worked at the Pentagon Since It Opened During World War II

When the military first began moving to the Pentagon in Arlington, Virginia from offices in Washington, D.C. in 1942, Secretary of War Henry Stimson recognized the burden reporters would face in making trips across the Potomac and determined that providing press access to the

---

[6] Stephen Sorrace, *Hegseth tears into reporters, alleging they 'cheer against Trump, and Iran strikes,'* Fox News (June 26, 2025), https://perma.cc/D2HT-BFNC.

[7] *See* Floyd Abrams et. al., *The Press Clause: The Forgotten First Amendment*, 5 J. Free Speech L. 561, 616 (2024).

new building would benefit reporters and keep them close to key "sources of information."[8]  Once the Pentagon became the central command node of all U.S. global military power in 1943,[9] access to the building afforded reporters rapid, unparalleled access to nearly all corners of an otherwise sprawling government organization.

Journalists began reporting from the Pentagon even before construction was complete.[10] By the end of World War II, the Pentagon hosted an established press corps and had become "one of the four geographic cornerstones of Washington journalism, the others being the White House, Congress, and the Department of State."[11]  On August 11, 1948, a "combined National Defense press room" was opened in the Pentagon, meaning the press has had a longer tenancy in the building than the U.S. Navy, which only began moving into the Pentagon that day.[12]

From the outset, reporters were allowed to roam freely through "all but the most secure corridors of the vast building."[13]  The ability to walk the halls enabled reporters to meet and build relationships with senior uniformed officials, which assisted them in developing stories and gathering information.[14]  Recognizing that maintaining a physical office in the building reinforces

---

[8] Steve Vogel, *The Pentagon: A History* 278–79 (2007).

[9] *See Pentagon History*, Office of the Secretary of War: Historical Office, https://perma.cc/44NH-FV8Q.

[10] Vogel, *supra* note 8, at 289–90.

[11] *See* Robert B. Sims, *The Pentagon Reporters* 4 (1983).

[12] *Navy Goes to the Pentagon*, N.Y. Times, (Aug. 12, 1948), https://perma.cc/623X-ATRX; *see also* Alfred Goldberg, *The Pentagon: The First Fifty Years* 157 (1992).

[13] John M. Diamond, *The Media: Witness to the National Security Enterprise*, in *The National Security Enterprise: Navigating the Labyrinth* 353, 355 (Roger Z. George & Harvey Rishikof eds., 2d ed. 2017); Hillary Profita, *A Day in the Life of a Pentagon Correspondent*, CBS News (July 3, 2006), https://perma.cc/J8XM-6CXL.

[14] Tom Bowman, *Opinion: Why I'm handing in my Pentagon press pass* (Oct. 14, 2025), https://perma.cc/3ZPE-XAP7 (noting the value in "talking to and getting to know officers from all over the globe, at times visiting them in their offices").

the "journalistic value" of access to the Pentagon,[15] the Department has also dedicated physical space within the building for press use since the Pentagon's earliest days.[16] Press office spaces in the Pentagon include cubicles, desks, hardwired technical equipment (like phone lines, cameras, and internet access), and booths that allow journalists to broadcast live feeds "within minutes of breaking news."[17]

A second floor hallway in the middle ring of the Pentagon houses a set of offices reserved for media outlets.[18] These are on the same hallway as the Pentagon's public affairs offices[19] and near a press briefing room where the Department has provided wi-fi access for credentialed reporters.[20] These dedicated press spaces and resources allow reporters to "be in touch with trusted

---

[15] Brian Stelter, *Pentagon to Swap Traditional Media with Pro Trump Outlets Under New Rotational Program for Defense Department Workspace*, CNN (Feb. 1, 2025), https://perma.cc/Y7BT-SV4V (statements of Pentagon spokesperson).

[16] Goldberg, *supra* note 12, at 158 (1992); Sims, *supra* note 11, at 24 (describing plaque unveiled by Secretary of Defense Robert S. McNamara in 1966 in honor of Baltimore Sun correspondent Mark Watson above the desk he used in the Pentagon).

[17] Amanda Terkel, *Pentagon removes major media outlets, including NBC News, from dedicated workstations in new 'rotation program,'* NBC News (Feb. 1, 2025), https://perma.cc/UCF3-7HNH; Heb Scribner, *Pentagon to move NBC, Politico, NPR and NYT out of dedicated media offices*, Wash. Post (Feb. 1, 2025), https://perma.cc/94W5-FZ4G.

[18] Katie Robertson, *Trump Administration to Remove 4 Major News Outlets From Pentagon Office Space*, N.Y. Times (Feb. 1, 2025), https://perma.cc/V2AX-YF6V.

[19] Al Kamen, *Pentagon Upgrade of 'Correspondents Corridor' to Cost About $90,000*, Wash. Post (Oct. 15, 2012), https://perma.cc/9NWR-58CE; SUMF ¶ 9.

[20] Mark Thompson, *Pentagon's Correspondents' Corridor Renamed*, Time (Sept. 27, 2012), https://perma.cc/DQP6-792B (quoting Secretary of Defense Donald Rumsfeld's April 2004 remarks to the Newspaper Association of America/American Society of Newspaper Editors, explaining how the corridor is named for a correspondent who "said of the working Pentagon news bureaus—he called them a wonderful crowd, and he's right. And he said, 'I do hope that they remain as surly, suspicious, aggressive and thirsty as always.' It seems to me that's about right.").

sources throughout the day and be ready to quickly file news stories."[21]  In 1972, then-Secretary of Defense Melvin Laird christened an earlier iteration of the press space the "Correspondents' Corridor" to honor "a free and strong American press" and to memorialize correspondents killed while covering the nation's wars.[22]

Even during periods of crisis, when the Department had strong incentives to keep reporters away, the Pentagon consistently remained open so that journalists could report timely and accurate information.  During the heated controversy over the publication of the Pentagon Papers, for example, the government fought the *New York Times* and *Washington Post* in court rather than retaliating with access restrictions—the Pentagon never even threatened to revoke the reporters' credentials.[23]  Pentagon press briefings continued as normal.

The Department likewise maintained press access to the Pentagon during the immediate aftermath of the terrorist attack on September 11, 2001.  When the strike by a hijacked airliner caused 184 deaths, extensive damage, and a temporary shutdown of the building, the Department made sure the press was back in the building within hours.[24]  The press briefing room was up and

---

[21] Barbara Starr, *The Reshuffling of the Pentagon Press Corps Is a Warning*, Columbia Journalism Review (Feb. 5, 2025), https://perma.cc/DG6P-CZY9; Graham Kates, *CBS News and other media outlets won't sign on to new Pentagon press restrictions*, CBS News (October 14, 2025), https://perma.cc/CS3M-CMDN (observing that the press offices were "near the public affairs office and press briefing room to communicate information about the world quickly").

[22] Thompson, *supra* note 20; *Reporters Killed in War Honored*, N.Y. Times (Sept. 20, 1948), https://perma.cc/28GK-J4MW (noting that in 1948, Defense Secretary James Forrestal had first unveiled a plaque honoring forty-five war correspondents who lost their lives covering World War II).

[23] *See generally* James C. Goodale, Fighting for the Press: The Inside Story of the Pentagon Papers and Other Battles (2013) (recounting the legal fight from the perspective of *The New York Times*'s legal team).

[24] Alfred Goldberg et al., *Defense Studies Series: Pentagon 9/11* at 145, 169–70, 204 (2007), https://perma.cc/GN9V-FGK5.

running by the next day, with Secretary Rumsfeld keeping reporters apprised of rescue efforts.[25] Journalists were allowed into the wrecked areas of the building even before the grieving families of the victims.[26]  Again, when the COVID-19 pandemic struck, the Pentagon suspended all tours and encouraged telework for employees,[27] but never limited access to journalists.[28]  The persistent efforts to maintain press access to the Pentagon reflect the wide recognition across prior Administrations that a free press and a free country are inseparable.[29]

Given the vital interests served by credentialed journalists working at the Pentagon, the Department promptly rescinded past proposals that were seen as potentially imposing subjective or viewpoint criteria on eligibility for a PFAC.  In April 1987, for example, the Department began requesting information from PFAC applicants regarding their political affiliations, citizenship, club memberships, and other personal characteristics.[30]  But when news organizations expressed concern over the intrusive new questions, the Department promptly recalled the questionnaires, claiming "inadvertent" error.[31]   Again, in 1997, the Department distributed new security questionnaires asking for such personal information as financial data, familial details, medical and psychological records, and references, only to quickly strike many of the new questions and retain

---

[25] Secretary of Defense Donald H. Rumsfeld Briefs Reporters in the Pentagon, Dep't of Defense (Sept. 12, 2001), https://perma.cc/QS4K-KEAK.

[26] Goldberg *et al.*, *supra* note 16, at 195.

[27] Hope Hodge Sacks, *Pentagon Bars Most Foreign Visitors as More Personnel Contract Virus*, Military.com (Mar. 14, 2020), https://perma.cc/48KJ-229C; Jackson Barnett, *Pentagon Further Restricts Building Access, Boosting Telework Demand, After Contractor Dies*, Fedscoop (Mar. 23, 2020), https://perma.cc/3FZN-3XX2.

[28] *See* Lisa Fernando, NORTHCOM, FEMA Brief Reporters on COVID Response, Def. Visual Info. Distrib. Serv. (Feb. 16, 2021), https://perma.cc/7G4N-TT55; Dep't of Defense, Coronavirus: A Timeline, https://perma.cc/SA2R-RMEP.

[29] *See* Thompson, *supra* note 20.

[30] Sydney Shaw, *Pentagon Press Office Says It Got Too Personal*, Wash. Post (May 16, 1987), https://perma.cc/L4QZ-3MZN.

[31] *Id.* (quoting Pentagon spokesman Bill Caldwell).

only those necessary to conduct checks of "national criminal and security data bases to ensure a determination of trust can be accomplished."[32]

The new press policy marks the first time the Department has restricted credentialed journalists from "soliciting" or publishing unauthorized information or engaging in activity the Department considers "unprofessional."  Throughout its history, the Pentagon has remained broadly accessible to journalists from all types of news organizations, without regard to how they did their work, the content of their reports, or the viewpoints they expressed.  Reporters working for the Soviet Union wire service TASS were even provided access to the Pentagon at the height of the Cold War, despite the Soviet Union's role as the United States's primary adversary and principal military and intelligence threat.[33]

### B.  Allowing Credentialed Journalists to Work at the Pentagon Serves the Interests of Both the Defense Department and the Public

Unescorted access to areas of the Pentagon, the freedom to interact with Department officials, and close physical proximity to those who can provide accurate, up-to-date information are vital to complete, correct, and timely reporting on military operations.[34]  Facilitating the work of journalists at the Pentagon recognizes that "[a]n untrammeled press is a vital source of public information, and an informed public is the essence of a working democracy." *Minneapolis Star and Trib. Co. v. Minnesota Com'r of Revenue*, 460 U.S. 575, 585 (1983) (citation omitted); *see also New York Times Co. v. Sullivan*, 376 U.S. 254, 275 (1964) (underscoring that the press's "right of free public discussion of the stewardship of public officials" is a "fundamental principle of the American form of government").  And it does so in an arena, where "informed and critical

---

[32] Hernandez, *supra* note 3, at 10 (quoting Deputy Assistant Secretary of Defense Clifford Bernath).

[33] Sims, *supra* note 11, at 12.

[34] *Id.* at 10; SUMF ¶¶ 11-19, 27-31; Barnes Decl. ¶¶ 5-14.

public opinion" may be "the only effective restraint upon executive policy and power" given the President's broad constitutional authority over the national defense. *New York Times Co. v. United States*, 403 U.S. 713, 728 (1971) (Stewart, J., concurring). Recent, unanticipated, and largely unexplained uses of the military—internationally and domestically—underscore the need for experienced reporters to work from the Pentagon, where they can discover, present, and explain military activity in a timely and accurate manner.[35]

The Pentagon reporters expelled by the Department last October have a deep trove of military and journalistic experience.[36] The most effective coverage of the Department leverages the interpersonal relationships of trust these reporters developed through repeated, face-to-face interactions and years of reputable reporting, relationships that can be indispensable to timely reporting and preventing the spread of misinformation.[37] As former Assistant Secretary of Defense for Public Affairs Robert Sims's history of the Pentagon press corps candidly documents, regular press briefings are often "useless," because some Department officials see press relations "as a game of manipulation" and briefings too often provide basic information that is "surprisingly wrong."[38] He noted that "[i]t takes skill and thought on the part of the reporter to pierce the barrier the first time, and continuing sensitivity to develop a relationship of mutual confidence" that is needed for effective reporting.[39] As a result, reporters get "95 percent of the good stories" in the

---

[35] Scott Norver & Drew Harwell, *'I Voted So Hard for This': How the New Pentagon Press Corps Covered Venezuela*, Wash. Post (Jan. 7, 2026), https://perma.cc/98AH-YU4D.

[36] *See* SUMF ¶¶ 68-70; Sims, *supra* note 11, at 18-20; Nancy A. Youssef, *The Last Days of the Pentagon Press Corp*, The Atlantic (Oct. 15, 2025), https://perma.cc/NN3E-YU3U.

[37] *See* Profita, *supra* note 13.

[38] Sims, *supra* note 11, at 28, 34.

[39] *Id.* at 45.

Pentagon's hallways.[40] Opportunities to "bump[] into senior officials" and "drop[] in on various offices" make possible "face-to-face conversation (whether authorized or not) [which] may elicit information more quickly than a phone call or email."[41] Having access to multiple sources and the ability to quickly get the views of senior officials with "significant policy information" promotes the accuracy and quality of credentialed Pentagon reporters.[42]

Reporting by journalists with PFACs has been the primary means by which the public and the rest of the press stay informed about the Department's vast and consequential operations. History is replete with examples of significant news that reporters could cover in a timely and accurate manner because they were inside the Pentagon.  For example:

> CBS News correspondent Joseph F. McCaffrey was able to provide the public with accurate information about the D-Day attacks live from the Pentagon, where the historic operations were being coordinated.[43]

> Fred Hoffman of the Associated Press was able to verify and report during the 1973 Yom Kippur War that an angry ultimatum issued by Soviet leader Brezhnev had caused a significant increase in U.S. military activity by being at the Pentagon early one morning with a senior official who knew and trusted him.[44]

> George Wilson of the *Washington Post* in 1980 became the first reporter to provide accurate details of the plan to rescue American embassy workers during the Iran Hostage Crisis because "he knew enough people who would trust him with that information."[45]

---

[40] *See* Profita, *supra* note 13 ("Over the years, you learn that 95 percent of the good stories you get in the hallways. The more you're out in the hallways the more likely you are to stumble on a story or pick up on vibes.").

[41] Diamond, *supra* note 13, at 355; *see also* SUMF ¶¶ 13-16; Barnes Decl. ¶¶ 8-9; Burns Decl. ¶¶ 8-12.

[42] Sims, *supra* note 11, at 42; *see also, e.g.*,  SUMF ¶¶ 4, 11, 16. Longtime Pentagon correspondent Barabara Starr has explained that the ability to walk the corridors and maintain a presence in the building allowed her to obtain useful background record comments from former Defense Secretary James Mattis or benefit from feedback from the Joint Chiefs of Staff that improved the accuracy of her reporting. *See also* Starr, *supra* note 21.

[43] Eleanor Watson, *CBS News Ends Over 60-year Presence at Pentagon After Declining to Sign New Press Requirements*, CBS News (Oct. 17, 2025), https://perma.cc/76TY-3EV8.

[44] Sims, *supra* note 11, at 9–10.

[45] *Id.* at 50, 52.

NPR correspondent Tom Bowman's encounters with officers at the Pentagon enabled him to report, after Defense Secretary Donald Rumsfeld declared "mission accomplished" with the fall of Baghdad, that U.S. supply lines were still under attack and more troops would be needed in Iraq for years to fight an insurgency.[46]

The day before Russia invaded Ukraine, information provided to trusted credentialed Pentagon journalists enabled them to report that Russia had placed 80% of its forces around Ukraine into an attack position.[47]

The presence of reporters at the Pentagon not only enables the public to receive such significant information in a timely and reliable manner but also serves the interests of the Defense Department. Reporters play a vital supporting role by dispelling damaging rumors and misinformation spread by foreign adversaries and by shedding light on improper or illegal behavior so it can be corrected.[48] Senior Pentagon officials, therefore, have until now sought to build trust with the Pentagon press corps by regularly speaking with credentialed reporters to "build up a level of access—a level of credibility—with the press on a day-to-day basis."[49]

For example, during the Solidarity labor movement in Poland in 1980, Pentagon connections that Associated Press reporter Fred Hoffman developed over two decades enabled him to quickly dispel speculation that a Soviet invasion was "probably" imminent.[50] Hoffman also "gained a reputation for being helpful" at press briefings by coming to the rescue when a spokesperson was "off base," or did not "remember the finer points of a subject."[51]

---

[46] Tom Bowman, Opinion, *Why I'm Handing In My Pentagon Press Pass*, NPR (Oc. 14, 2025), https://perma.cc/N8SG-JQH3.

[47] Phil Stewart & Idrees Ali, *80% of Russia's Forces Around Ukraine in Attack Positions, U.S. Official Says*, Reuters (Feb. 23, 2022), https://perma.cc/993G-ZYYB.

[48] *See* David E. Sanger, *The Pentagon, the Press and the Fight to Control National Security Coverage*, N.Y Times (Sept. 24, 2025), https://perma.cc/B22B-UJ2X.

[49] Interview by Marvin Kalb with Secretary of Defense William J. Perry, *The Pentagon and the Press*, 1 Harv. Int'l J. Press/Pol. 121, 125-26 (1996) (quoting Secretary Perry).

[50] Sims, *supra* note 11, at 17.

[51] *Id.*

Again, when ISIS claimed one of its "covert unit[s]" assassinated an American military officer in Turkey, reporters at the Pentagon assisted the Department in quickly refuting the terrorist propaganda, explaining that the officer's death was accidental.[52] And when a foreign news outlet incorrectly claimed that American special forces operatives were battling ISIS fighters alongside Syrian forces in violation of their rules of engagement, Pentagon reporters immediately corrected the public record.[53]

More recently, credentialed reporters with access to informed sources at the Pentagon were able quickly to correct false claims by blogger Laura Loomer and others that the Department was giving Qatar "a military base on U.S. soil" and end misinformed criticism of Secretary Hegseth.[54] These reporters learned from Pentagon sources that the Air Force base in Idaho would remain entirely under U.S. military control and the arrangement to train Qatari troops there was not unusual—Germany and Singapore have similar arrangements.[55]  Under the Department's new press policy, bloggers who spread that misinformation now hold PFACs, while the experienced reporters who corrected the record had theirs revoked.[56]

Reporting by credentialed journalists can also improve the Defense Department's operations and has been celebrated by past leaders of the Department for doing so.  For example, influenced by reporting during the War on Terror that the Department failed to obtain "life-saving

---

[52] *Pentagon Denies ISIS Assassination Claim*, Fox News (June 16, 2016), https://perma.cc/CBG8-XDUK.

[53] Jamie Crawford, *Pentagon Denies Special Forces Fighting ISIS on Front Lines*, CNN (May 27, 2018), https://perma.cc/W7AN-US8H.

[54] Phil Stewart, *Activist Laura Loomer Blasts Pentagon Over Planned Qatar Military Facility in Idaho*, Reuters (Oct. 11, 2025), https://perma.cc/RY9B-FMBK.

[55] *See, e.g.*, *id.*; Rebecca Boone, *Things to Know About the Qatar Training Facility Planned for and Idaho Air Force Base*, AP (Oct. 10, 2025), https://perma.cc/A3LV-BEV5.

[56] SUMF ¶¶ 69–70, 73–91.

Mine Resistant Ambush Protected" vehicles for troops despite knowing their effectiveness, then-Defense Secretary Robert Gates directed the Department to acquire the vehicles, likely saving many service members' lives.[57]   This type of reporting is made possible by access to the Pentagon,[58] and critical coverage of the Department by credentialed reports often has such tangible benefits on the lives of American soldiers.[59]

To take another example, then-Defense Secretary Gates personally thanked journalists at the *Washington Post* for bringing deplorable conditions at Walter Reed Army Medical Center to his attention.[60]   Their Pulitzer-prize-winning series led to significant reforms at the center and an extensive analysis of the entire veterans' healthcare system.[61]   In a similar fashion, journalists have used the access afforded by a PFAC to expose wasteful Department contracts,[62] uncover inefficiencies and other problems in the operations of the Department,[63] and reveal the bases of public dissatisfaction so the Department can address it.[64]   Despite often seeming like a "horsehair shirt" for Pentagon officials, this reporting has salutary effects on the Department's operations.[65]

---

[57] Peter Eisler, et al., *Pentagon Balked at Pleas for Safer Vehicles*, USA Today (July 15, 2007), https://perma.cc/T48B-66YL.

[58] *Behind the Story: Covering Afghanistan and American Vets*, NBCU Academy (Nov. 11, 2021), https://perma.cc/WKD5-YD5K; Barnes Decl. ¶ 9.

[59] *E.g.*, Jonathan Allen, *Four Times Media Reporting Improved Conditions for Service Members*, NBC News (Oct. 17, 2025), https://perma.cc/AYG3-55Y5; Barnes Decl. ¶ 10; Burns Decl. ¶¶ 20-22.

[60] *Gates Calls Squalid Conditions at Walter Reed 'Unacceptable'*, ABC News (Feb. 23, 2007), https://perma.cc/Y243-EKMM.

[61] Dana Priest & Anne Hull, *Walter Reed and Beyond*, Wash. Post (2007), https://perma.cc/YF5K-LLQ9 .

[62] Craig Whitlock & Bob Woodward, *Pentagon Buries Evidence of $125 Billion in Bureaucratic Waste*, Wash. Post (Dec. 5, 2016), https://perma.cc/5YQQ-2Z57.

[63] Nancy Youssef, *Exclusive: U.S. Admits to Bombing 29 Civilians in ISIS War*, Daily Beast (Jan. 21, 2016), https://perma.cc/6J6C-TVQE.

[64] Sims, *supra* note 11, at 49–51; Williams Decl. ¶ 6, ECF No. 12.

[65] Sims, *supra* note 11 at 49.

13

The Department's new restrictions substantially impede this reporting that benefits the public, the Department, and service members.  Having stripped experienced reporters of their PFACs and replacing them with perceived political allies of the Trump administration, *see* Pls.' Br. 15, the impact is already clear.  Since the U.S. military captured Venezuelan leader Nicholas Maduro on January 3, 2025, the Department has not held any press briefings, issued any press releases, or provided any press advisories about the operation.[66]  This is in stark contrast to a similar military operation involving the capture of Panama's leader, General Manuel Noriega, where the Department hosted multiple press briefings for credentialed reporters with the Secretary of Defense, Chairman of the Joint Chiefs, and other Department officials.[67]  Yet, the Department's handpicked new Pentagon press corps has failed to push for information and has been unable to provide the American public with even basic facts about the Department's operations in Venezuela or the preceding boat strikes in the Caribbean Sea.[68]  Commentary from the "new" press corps has been largely uncritical and sycophantic—asserting, for example, that the operation "represented nothing but success for the country," boasting they had "voted so

---

[66] *See Today in DOW*, Department of War, https://perma.cc/P8LH-LX8Y (last visited Jan. 15, 2026) (reflecting no Pentagon briefings or releases on the topic of the military operation in Venezuela); Konstantin Toropin (@Ktoropin), X (Jan. 3, 2026, at 10:28 a.m.), https://perma.cc/C4C5-J9TM.

[67] *Fighting in Panama: The Pentagon; Excerpts From Briefings on U.S. Military Action in Panama,* N.Y. Times (Dec. 21, 1989), https://perma.cc/KML4-GA62; *Military Action in Panama*, CSPAN (Dec. 20, 1989), https://www.c-span.org/program/news-conference/military-action-in-panama/6982; *Panamanian Situation*, CSPAN (Dec. 20, 1989), https://www.c-span.org/program/news-conference/panamanian-situation/6845; *Panama*, CSPAN (Dec. 22, 1989), https://www.c-span.org/program/news-conference/panama/6854.

[68] Dan Levin, *Pentagon's New Press Corps Shies Away From Ongoing Boat Strike Saga*, Straight Arrow News (Dec. 10, 2025), https://perma.cc/8CHZ-UCNY.

hard" for this, dismissing those questioning the action as "leftist globalists," and saying the same thing should be done to Minneapolis.[69]

## II. THE FIRST AMENDMENT FLATLY PROHIBITS THE DEPARTMENT'S NEW RESTRICTIONS ON THE WORK OF CREDENTIALED JOURNALISTS

As laid bare in Plaintiffs' summary judgment motion papers, the Department's new press policy violates the First Amendment in multiple respects, both substantive and procedural. Among the basic First Amendment barriers to that policy, it impermissibly regulates a nonpublic forum for First Amendment activity in a way that is 1) patently unreasonable given the purpose for which the forum exists, and 2) based on hostility towards the perceived viewpoint of the First Amendment activity occurring in the forum.

### A. The Pentagon Is a Nonpublic Forum for First Amendment Activity

The Department created a nonpublic forum for First Amendment activity by granting reporters who regularly cover the military access to all unsecured areas of the Pentagon, provided they pass a basic security screening. As explained in *Ateba v. Leavitt*, 133 F.4th 114, 121-22 (D.C. Cir. 2025), a nonpublic forum is any government property "not by tradition or designation a forum for public communication" that is opened for expressive conduct by select individuals or groups. *See also Minnesota Voters All. v. Mansky*, 585 U.S. 1, 11 (2018); *Perry Educ. Ass'n v. Perry Local Educators Ass'n*, 460 U.S. 37, 46 (1983). Unsecured areas of the Pentagon constitute such a nonpublic forum. The Department has made them available to credentialed journalists for more than 80 years to facilitate their newsgathering and reporting, which is expressive conduct protected by the First Amendment. *See Branzburg v. Hayes*, 408 U.S. 665, 707-08 (1972) (noting First Amendment protection for newsgathering); *Ateba*, 133 F.4th at 122-23 (finding areas of White

---

[69] Norver & Harwell, *supra* note 35; Adam Gabbatt, *Rightwing Bloggers and Maga Minions: Meet the Trump-Loving Pentagon Press Corps*, Guardian (Jan. 11, 2026), https://perma.cc/XV57-TJMN.

House open to credentialed journalists to be nonpublic fora because selected journalists are provided controlled access to engage in expressive activity).  That the Pentagon contains some secured areas not accessible to credentialed journalists does not alter the analysis.  *See Ateba*, 133 F.4th at 121-22.

Because the Pentagon is a nonpublic forum, the First Amendment limits the Department's ability to restrict the private expressive conduct of credentialed journalists in that forum.  Any regulation of their First Amendment-protected activity must be reasonable, given the purpose served by the forum, and cannot seek "to suppress expression merely because public officials oppose the speaker's view." *Mansky*, 585 U.S. at 12 (citing *Perry Ed. Assn.*, 460 U.S. at 46); *see also Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678-79 (1992); *Ateba*, 133 F.4th at 123.  The Department's new press policy violates the First Amendment on both fronts.

### B. The Department's New Restrictions on Credentialed Journalists Are Patently Unreasonable Given the Purposes of that Forum

The Department's new restrictions are unreasonable as a matter of law for two reasons: they undermine the purpose for which the forum exists, *Cornelius v. NAACP*, 473 U.S. 788, 806 (1985); *Price v. Garland*, 45 F.4th 1059, 1072 (D.C. Cir. 2022), and they grant "the decisionmaker unbridled discretion" to suppress expressive activity, *Ateba*, 133 F.4th at 125; *Mansky*, 585 U.S. at 22.

The Department now prohibits "solicitation" or publication of any information not authorized for release and defines "solicitation" to include both "direct communications" with Department personnel and "general appeals, such as public advertisements or calls for tips" from Department personnel. SUMF ¶¶ 58, 60.  These restrictions defeat a key reason for a reporter to be at the Pentagon—asking questions to solicit information is what reporters *do*.  As long-used Navy training materials explain, "[a]bout 90% of everything in a news story is based on some form

of interviewing," so journalists "must learn techniques for handling different kinds of people," and reporting hard news means "interviewing competent news sources … and asking well-defined, carefully considered questions."[70]  A reporter who cannot ask questions is just a stenographer.

The vague restrictions on soliciting information also impede ongoing cultivation and communication with sources.  Yet, these interactions are central to building the professional relationships and trust a reporter often needs to get the context and detail to convey a story accurately and effectively. *See, e.g.*, SUMF ¶¶ 11-16.

The activities of credentialed journalists restricted by the Department's new policy are routine newsgathering activities protected by the First Amendment. *See Nicholson v. McClatchy Newspapers*, 223 Cal. Rptr. 58, 63 (Cal. Ct. App., 3d Dist., 1986) (holding the First Amendment to bar interference with "the traditional function of a free press in seeking out information by asking questions"); *cf. Smith v. Daily Mail Pub. Co.*, 443 U.S. 97, 103 (1979) (describing speaking to government officials as a "routine newspaper reporting technique[]"); *Pell v. Procunier*, 417 U.S. 817, 834 (1974) (noting that "a journalist is free to seek out sources of information not available to members of the general public").  Prohibiting routine newsgathering at the Pentagon is patently unreasonable, given that the forum exists to facilitate this very activity.

The policy is independently unreasonable because it "provides the decisionmaker with unbridled discretion" to suppress expression in the forum. *Ateba*, 133 F.4th at 124-25 (cleaned up).  As demonstrated in Plaintiffs' summary judgment papers, the Department's authority to expel a reporter under the new policy is indeterminate and standardless. Pls.' Br. 30-34, 40.  For example,

---

[70] Naval Training Command, *Journalist 3 & 2*, at 42 (1973), https://perma.cc/N69Y-QHRP; *see also, e.g.*, *Developing Sources Within Your Beat*, NBCU Academy (May 28, 2021), https://perma.cc/RKL6-UJJ3; *How NBC News Reporters Earn the Trust of Sources*, NBCU Academy (Jan. 24, 2024), https://perma.cc/M4BE-YFP4.

it authorizes revocation of a PFAC for "unprofessional conduct," SUMF ¶ 61, but Pentagon Press Secretary Kingsley Wilson has deemed it unprofessional for a credentialed reporter to come to her office to ask a question. SUMF ¶¶ 85-86.  The D.C. Circuit has already held that revoking press credentials on such "unarticulated standards of professionalism" is unconstitutionally vague. *Karem v. Trump*, 960 F.3d 656, 666 (D.C. Cir. 2020).  The authority to expel a reporter based on such vague terms applied on a "case-by-case basis" considering the "totality of circumstances," does not provide a "reasonable line" or "sensible basis" for enforcement. *Mansky*, 585 U.S. at 16.

For each of these reasons, the Department's new restrictions on the ability of reporters to do their job in the forum it has provided for this activity are unreasonable and must be struck down. As the Supreme Court cautioned in *Branzburg v. Hayes*, if journalists are not permitted to seek out the news, "freedom of the press could be eviscerated." 408 U.S. at 681; *cf. Zerilli v. Smith*, 656 F.2d 705, 710–11 (D.C. Cir. 1981) (noting that First Amendment press protections are undermined "whenever the ability of journalists to gather news is impaired").

### C. The Department's New Restrictions on Credentialed Journalists Are Based Impermissibly on the Perceived Viewpoint of Their Reporting

Viewpoint discrimination is forbidden in every government-controlled forum. *Mansky*, 585 U.S. at 12; *Rosenberger v. Rector and Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995).  The government simply "may not grant the use of a forum to people whose views it finds acceptable but deny use to those wishing to express less favored or more controversial views." *Police Dep't of City of Chicago v. Mosley*, 408 U.S. 92, 96 (1972); *see also Wilmer Hale v. Exec. Office of the President*, 774 F. Supp. 3d 86, 88 (D.D.C. 2025) (First Amendment prohibits "retaliatory actions based on perceived viewpoint."); *Brooklyn Inst. of Arts & Scis v. City of N.Y.*, 64 F. Supp. 2d 184, 202 (E.D.N.Y. 1999) (holding that a museum may not be ejected from a municipal building "because of the perceived viewpoint of the works in [an] Exhibit").  This unbreachable prohibition

against viewpoint discrimination is compelled by the "fixed star in our constitutional constellation," that government may not "prescribe what shall be orthodox in politics . . . or other matters of opinion." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).

The Department's new press policy violates this core prohibition. It was imposed out of animosity toward the perceived viewpoint of past reporting and a desire to construct a "new Pentagon press corps" of journalists likely to express views more favorable to Department officials. This is rank, impermissible viewpoint discrimination.

The Department's new press policy engages in viewpoint discrimination because the perceived "opinion or perspective" of credentialed journalists "is the rationale for the restriction." *Rosenberger*, 515 U.S. at 829 (citing *Perry Ed. Assn.*, 460 U.S. at 46). Even a facially neutral regulation is viewpoint discriminatory if it is based on the government's animus towards the views of the regulated speaker. *Reed v. Town of Gilbert*, 576 U.S. 155, 164 (2015); *see also Turner Broad. Sys. v. F.C.C.*, 512 U.S. 622, 642 (1994) (a content-based purpose may be sufficient to show that a regulation is content-based). The record of public statements by Department officials leaves no doubt about the viewpoint animus and intended viewpoint control behind the new policy.

The new policy was adopted after an intense attack by Secretary Hegseth and other Department officials on reporting about the Pentagon. Department leadership regularly criticized unfavorable or embarrassing reports as "fake news" and ridiculed news organizations for publishing items it did not like. When *The Washington Post* reported on expenses associated with Secretary Hegseth's security detail, for example, Chief Pentagon Spokesman Sean Parnell promptly declared the report "untrue and irresponsible anonymously sourced garbage,"[71] and

---

[71] Sean Parnell (@SeanParnellUSA), X (Oct. 1, 2025, at 17:49 ET), https://perma.cc/TYB8-2KKD.

dismissed it as coming from a "left-wing blog."[72]  Parnell has boasted that his "[p]ushing back on the near constant lies of the Fake News media is a full time job."[73]  Department Press Secretary Kingsley Wilson recently described the reporters whose credentials were revoked for failing to accept the new policy as "left wing people who acted as activists."[74]

These attacks echoed those of Secretary Hegseth, who has long made plain his animus toward the media working at the Pentagon.  Hegseth reportedly writes "FAILING" above the *New York Times*'s masthead each morning.[75]  During his confirmation hearings, Hegseth expressed the view that the "left-wing media…doesn't care about the truth," and wants  "to destroy me because I'm a change agent and a threat to them."[76]  Hegseth told Senators that press reports about his alleged sexual assault of a woman to whom he paid a confidential settlement,[77] drinking on the job,[78] abusing his wife,[79] and resistance to women in combat roles,[80] were all part of a "coordinated smear campaign orchestrated in the media."[81]  Just days after he was confirmed, Secretary Hegseth

---

[72] Sean Parnell (@SeanParnellUSA), X (Aug. 20, 2025, at 7:45 ET), https://perma.cc/75VQ-4AHV

[73] Sean Parnell (@SeanParnellUSA), X (July 23, 2025, at 15:20 ET), https://perma.cc/9PPQ-DHJ9.

[74] Gabbatt, *supra* note 69.

[75] Aidan McLaughlin, *Inside Pete Hegseth's "Soviet-Style" War on the Press*, Vanity Fair (Oct. 17, 2025), https://perma.cc/Z9XY-MKJT.

[76] Paul McLeary, Joe Gould & Connor O'Brien, *Hegseth's defense: Deny, blame and shrug*, Politico (Jan. 14, 2025), https://perma.cc/AH62-42VT.

[77] Tara Copp, *Hegseth told senator he paid $50,000 to woman who accused him of 2017 sex assault*, AP (Jan. 23, 2025), https://perma.cc/2FVA-EJAJ.

[78] Chloe Melas, Courtney Kube & Sarah Fitzpatrick, *Pete Hegseth's drinking worried colleagues at Fox News, sources tell NBC News*, NBC News (Dec. 3, 2024), https://perma.cc/C48M-AJDK.

[79] Farnoush Amiri & Tara Copp, *Pete Hegseth's former sister-in-law alleges abuse against second wife in affidavit to Senate*, AP (Jan. 21, 2025), https://perma.cc/BX73-YPLL.

[80] Melissa Chan, *Pete Hegseth's remarks about women in combat are met with disgust and dissent*, NBC News (Nov. 15, 2024), https://perma.cc/J4UG-D7M5.

[81] *Live updates: Democrats turn up heat on Hegseth as Republican alleges hypocrisy*, The Hill (Jan. 14, 2025), https://perma.cc/VK8P-8XMT.

retaliated by directing his staff to ban from the Pentagon an *NBC News* journalist who had prominently reported some of those allegations,[82] and to evict from their Pentagon office spaces four outlets that had reported the allegations, including *NBC News*.[83]

In March 2025, a journalist for *The Atlantic* was included by mistake on a Signal group chat in which Secretary Hegseth and other top leaders discussed classified, ongoing airstrikes in Yemen. Subsequent reporting included screenshots of the group chat thread to refute the Secretary's claim that "nobody was texting war plans."[84] In response, Secretary Hegseth labeled the news reports "hoaxes," accused the press of trying "to slash and burn people and ruin their reputations," and warned, "[n]ot going to work with me because we're changing the Defense Department."[85] Making good on that threat, Secretary Hegseth soon imposed new limits on the areas within the Pentagon that credentialed journalists could visit without an escort to "reduce the opportunities for in-person inadvertent and unauthorized disclosures." SUMF ¶ 39. The new restrictions bar unescorted reporters from walking hallways that are still freely traversed by coffee vendors, janitors, delivery personnel, and others without security clearances—reporters cannot even walk to the press relations offices of several military services without an escort.

---

[82] Erik Wemple, *Inside Hegseth's Effort to Limit Press Access at the Pentagon*, N.Y. TIMES (Oct. 10, 2025), https://perma.cc/CRG6-ZDWX.

[83] Amanda Terkel, *Pentagon removes major media outlets, including NBC News, from dedicated workstations in new 'rotation program'*, NBC NEWS (Feb. 1, 2025), https://perma.cc/3HJV-AM7Z.

[84] Jeffrey Goldberg & Shane Harris, *Here Are the Attack Plans That Trump's Advisers Shared on Signal*, The Atlantic (Mar. 26, 2025), https://perma.cc/8B5R-922Y; Tara Suter, *Hegseth says 'nobody was texting war plans' after group chat breach*, The Hill (Mar. 24, 2025), https://perma.cc/LCP4-3UP8.

[85] Megan Forrester, *Messages with Yemen War Plans Inadvertently Shared with Reporter*, ABC News (Apr. 22, 2025), https://perma.cc/52RR-LMXQ.

On June 25, 2025, *CNN* broke the news that a series of bomb strikes on Iran did not completely destroy their nuclear facilities, despite Administration claims to the contrary.[86]  The next day, Secretary Hegseth decried "biased leaks to biased publications" during a press conference regarding the strikes, and attacked news organizations for "hunting for scandals all the time."[87]  Pentagon spokesman Parnell soon after accused "mainstream media" of "engaging in a weaponized smear campaign against America & our incredible troops," and posted a screenshot of *Washington Post*'s coverage of the strikes with the caption: "This isn't journalism, it's political activism."[88]  Parnell later compared "[t]he credibility of the Fake News Media . . . to that of the current state of the Iranian nuclear facilities: destroyed, in the dirt, and will take years to recover."[89]

The Department's hostility toward the press and its intent to shape the viewpoints expressed by journalists given credentials to work at the Pentagon are further demonstrated by its promotion of the "new Pentagon Press Corps."  Parnell took to X to celebrate entities that accepted invitations to apply for PFACs and were willing to abide by the Department's new restrictions. This included a grab bag of individuals and organizations with varying levels of journalistic experience and audience reach.  Some have no experience reporting on the military, some have no investigative news experience, and some have no intention of working regularly in the building.[90]

---

[86] Natasha Bertrand, Katie Bo Lillis and Zachary Cohen, *Exclusive: Early US intel assessment suggests strikes on Iran did not destroy nuclear sites, sources say*, CNN (June 25, 2025), https://perma.cc/86PH-U7YN.

[87] PBS News Hour, *WATCH LIVE: Hegseth holds briefing on Israel-Iran war* (YouTube, June 26, 2025), https://perma.cc/Q3BG-Q5A9.

[88] Sean Parnell (@SeanParnellUSA), X (June 29, 2025, at 14:51 ET), https://perma.cc/5WYS-CKWW.

[89] Sean Parnell (@SeanParnellUSA), X (July 17, 2025, at 17:18 ET), https://perma.cc/PQL4-LMQ.

[90] Anna Merlan and Julianne McShane, *Meet the New Pentagon Press Corps*, Mother Jones (Oct. 24, 2025), https://perma.cc/44PG-UQBR.

Most have one thing in common—their regular expression of ideological support for this Administration. *See id.*; Pls.' Br. 15. Spokesman Parnell has portrayed this group as "far more effective and balanced than the self-righteous media who chose to self-deport from the Pentagon," and accused those journalists required to surrender their PFACs last October of being "activists who masquerade as journalists in the mainstream media."[91] This is viewpoint-based discrimination, and it is forbidden by the First Amendment in a nonpublic forum.

### D. First Amendment Limits Must Be Strictly Applied to the Department's Effort to Restrict Investigation and Criticism by the Press

The First Amendment protects freedom "of the press" independently of the freedom of speech because "valuable public debate—as well as other civic behavior—must be informed" and this requires protection "not only for communication itself, but also for the indispensable conditions of meaningful communication." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 587-88 (1980) (Brennan, J., concurring). The Press Clause recognizes that the investigative and reporting work done by journalists is indispensable to the "meaningful communication" necessary for democracy to thrive. "Without the information provided by the press, most of us and many of our representatives would be unable to vote intelligently or to register opinions on the administration of government generally." *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 491-92 (1975); *see also Sullivan*, 376 U.S. at 275 (underscoring role of press in enabling "public discussion of the stewardship of public officials"). It is the guarantee of a free press that "assures the maintenance of our political system and an open society." *Time, Inc. v. Hill*, 385 U.S. 374, 389 (1967).

The recognized First Amendment limits must be applied with exactitude here, because the Department's new press policy seeks to undermine the very press functions that the Founding

---

[91] Sean Parnell (@SeanParnellUSA), X (Oct. 22, 2025, at 13:21 ET), https://perma.cc/BFJ7-88F5

Fathers protected through the First Amendment's Press Clause—holding officials accountable to the People through newsgathering and reporting. The Founders recognized that without someone to unearth and disseminate information, the electoral process cannot produce government accountability.[92] Freedom "of the press" ensures that the press serves as "a powerful antidote to abuses of power by governmental officials and as a constitutionally chosen means for keeping officials elected by the people responsible to all the people whom they were selected to serve." *Mills v. Alabama*, 384 U.S. 214, 219 (1966) (striking down restrictions on the publication of newspaper editorials). As Justice Black explained in the Pentagon Papers case, "[t]he Founding Fathers gave the free press the protection it must have to fulfill its essential role in our democracy. . . . The press was protected so that it could bare the secrets of government and inform the people." *New York Times Co.*, 403 U.S. at 717 (Black, J., concurring).

Founding-era history establishes that "[f]reedom of the press—not freedom of speech— was the primary concern" of those who wrote the Constitution.[93] They understood that an informed public opinion is necessary to restrain abuse in a democracy and protected freedom of the press so that the press could "acquir[e] enough information to pass judgment on the actions of government" and disseminate that informed judgment in support of the People's ultimate veto over government power.[94] The Framers saw freedom of the press as the "'bulwark of Liberty'" that "would have to be protected if their vision of government by the people was to succeed."[95]

---

[92] *See* Sonja West, *Awakening the Press Clause*, 58 UCLA L. Rev. 1025, 1042-43 (2011) (describing the democracy-enabling role of the press); Abrams et al., *supra* note 7, at 616.

[93] David Anderson, *The Origins of the Press Clause*, 30 UCLA L. Rev. 455, 533 (1983).

[94] Vincent Blasi, *The Checking Value in First Amendment Theory*, 2 Am. Bar Found. Rsch. J. 521, 533, 541 (1977).

[95] *Id.* at 537-38 (citing Resolution of the Massachusetts House (1768)); *see also* Sonja R. West, *The Majoritarian Press Clause*, 2020 U. Chi. Legal F. 311, 314 (2020) (explaining that a task of the Press Clause is "safeguarding our collective, majoritarian right to a republican form of government").

While unreasonable regulation and viewpoint discrimination are never permitted in a nonpublic forum for expressive activity, when the expressive activities at issue are core press functions, these limitations must be applied with particular care to ensure that a regulation does not "constitute a forbidden intrusion" on rights secured by the Press Clause.[96]  The D.C. Circuit recognized just this in *Sherrill v. Knight*, holding that the Press Clause prohibits all "content-based criteria for press pass issuance" and forbids any arbitrary or less than compelling reason for denying permission to engage in newsgathering and reporting in a nonpublic forum.[97]  Protecting reporters' ability to investigate and report on government actions, even when officials find those reports embarrassing or derogatory, was vital to the Founders' vision of a republican form of government in which elected officials are responsive to the public will, held accountable for corruption, and serve the public good.[98]

## CONCLUSION

For all the foregoing reasons, *Amicus* Pentagon Press Association respectfully urges the Court to grant Plaintiffs' Motion for Summary Judgment.

Dated: January 15, 2025                          Respectfully submitted,

                                                  /s/ David A. Schulz
                                                 David A. Schulz (#459197)
                                                 Tobin Raju

---

[96] *Cf. Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 499 (1984) (quoting *New York Times*, 376 U.S., at 284–286).

[97] *Sherrill v. Knight*, 569 F.2d 124, 129-31 (D.C. Cir. 1977) ("Not only newsmen and the publications for which they write, but also the public at large have an interest protected by the first amendment in assuring that restrictions on newsgathering be no more arduous than necessary.").

[98] *See* THE PAPERS OF THOMAS JEFFERSON, VOL. 9, 1 NOVEMBER 1785–22 JUNE 1786, at 239-40 (Julian P. Boyd ed., 1954) ("Our liberty depends on the freedom of the press, and that cannot be limited without being lost."); *see also* Jack M. Balkin, *Which Republican Constitution?*, 32 Const. Comment. 31, 45 (2017); Jacob M. Schriner-Briggs, *Guaranteeing the Press*, 98 St. John's L. Rev. 903, 953-56 (2025).

MEDIA FREEDOM & INFORMATION
ACCESS CLINIC
ABRAMS INSTITUTE
YALE LAW SCHOOL[*]
127 Wall Street
New Haven, CT 06520
(212) 850-6103
david.schulzd@yale.edu

*Counsel for Amicus Curiae Pentagon Press Association*

---

[*] Yale Law Students Grace Chisholm, Rick Da, and Taylor Maas contributed significantly to the drafting of this brief. The views expressed in this brief do not purport to represent the institutional views of Yale Law School, if any.