**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

THE NEW YORK TIMES CO., *et al.*,

        *Plaintiffs,*

        v.

DEPARTMENT OF DEFENSE, a/k/a
DEPARTMENT OF WAR, *et al.*,

        *Defendants.*

**Case No. 1:25-cv-04218-PLF**

**BRIEF OF PROPOSED AMICI CURIAE THE REPORTERS COMMITTEE**
**FOR FREEDOM OF THE PRESS AND 23 MEDIA ORGANIZATIONS**
**IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

## CORPORATE DISCLOSURE STATEMENTS

The Committee to Protect Journalists is a nonprofit organization with no parent corporation and no stock.

The First Amendment Coalition is a nonprofit organization with no parent company.  It issues no stock and does not own any of the parties' or amici's stock.

The Inter American Press Association (IAPA) is a not-for-profit organization with no corporate owners.

The International Women's Media Foundation (IWMF) is a nonprofit charitable organization based in Washington, D.C., with tax-exempt status under 26 U.S.C. § 501(c)(3).

The Media Institute is a 501(c)(3) non-stock corporation with no parent corporation.

The Media Law Resource Center has no parent corporation and issues no stock.

Military Reporters and Editors (MRE) is a non-profit organization for journalists covering the military, national security, homeland defense, those who serve, have served and their families.  It has no parent corporation and issues no stock.

The National Freedom of Information Coalition is a nonprofit organization that has not issued any shares or debt securities to the public, and has no parent companies, subsidiaries, or affiliates that have issued any shares or debt securities to the public.

National Newspaper Association is a non-stock nonprofit Florida corporation.  It has no parent corporation and no subsidiaries.

The National Press Club is a not-for-profit corporation that has no parent company and issues no stock.

The National Press Photographers Association is a 501(c)(6) nonprofit organization with no parent company.  It issues no stock and does not own any of the parties' or amici's stock.

The New England First Amendment Coalition has no parent corporation and no stock.

The New England Newspaper and Press Association, Inc. is a non-profit corporation.  It has no parent, and no publicly held corporation owns 10% or more of its stock.

The News/Media Alliance represents the newspaper, magazine, and digital media industries, including nearly 2,200 diverse news and magazine publishers in the United States and internationally.  It is a nonprofit, non-stock corporation organized under the laws of the commonwealth of Virginia.  It has no parent company.

The News Guild – CWA is an unincorporated association.  It has no parent and issues no stock.

The Online News Association is a not-for-profit organization.  It has no parent corporation, and no publicly traded corporation owns 10% or more of its stock.

PEN American Center, Inc. has no parent or affiliate corporation.

The Pulitzer Center on Crisis Reporting is a non-profit organization with no parent corporation and no stock.

The Radio Television Digital News Association is a nonprofit organization that has no parent company and issues no stock.

The Reporters Committee for Freedom of the Press is an unincorporated association of reporters and editors with no parent corporation and no stock.

The Society of Environmental Journalists is a 501(c)(3) non-profit educational organization.  It has no parent corporation and issues no stock.

The Society of Professional Journalists is a non-stock corporation with no parent company.

The Student Press Law Center is a 501(c)(3) not-for-profit corporation that has no parent and issues no stock.

The Tully Center for Free Speech is a subsidiary of Syracuse University.

# TABLE OF CONTENTS

**Page:**

CORPORATE DISCLOSURE STATEMENTS ........................................................................ i

TABLE OF AUTHORITIES ................................................................................................. v

INTEREST OF AMICI CURIAE ......................................................................................... 1

INTRODUCTION ............................................................................................................... 4

ARGUMENT ...................................................................................................................... 7

I.    Journalists asking questions of military personnel fosters a vast amount of reporting in the public interest. ................................................................................. 7

II.   Journalists cannot agree to a policy that affords the Pentagon standardless discretion to punish reporters for asking questions. ................................................. 16

CONCLUSION ................................................................................................................... 21

CERTIFICATE OF COMPLIANCE ................................................................................... 22

# TABLE OF AUTHORITIES

**Page(s):**

**Cases**

*Ateba v. Leavitt,*
    133 F.4th 114 (D.C. Cir. 2025)................................................................... 20

*City of Lakewood v. Plain Dealer Publ'g Co.,*
    486 U.S. 750 (1988)...................................................................... 16, 20

*N.Y. Times Co. v. United States,*
    403 U.S. 713 (1971)............................................................................ 13

*Nicholson v. McClatchy Newspapers,*
    177 Cal. App. 3d 509 (Cal. Ct. App. 1986) ............................................. 18

*Smith v. Daily Mail Publ'g Co.,*
    443 U.S. 97 (1979)........................................................... 8, 18, 20, 21

*Trump v. Trump,*
    79 Misc. 3d. 866 (N.Y. Cnty. Sup. Ct. 2023) ........................................ 18

**Statutes**

5 U.S.C. § 552(a)(4)(A)(ii) .......................................................................... 18

Colo. Rev. Stat. § 13-90-119(1)(c) ............................................................. 19

Fla. Stat. § 90.5015(1)(b)............................................................................ 19

La. Stat. § 45:1451 ..................................................................................... 19

Minn. Stat. § 595.023 ................................................................................. 19

Nev. Rev. Stat. § 49.275 ............................................................................ 19

Tex. Civ. Prac. & Rem. Code § 22.021(2) ................................................. 19

**Other Authorities**

Aaron Glantz, *Revealed: Pentagon Orders States' National Guards To Form 'Quick Reaction*
    *Forces' For 'Crowd Control'*, Guardian (Oct. 29, 2025),
    https://perma.cc/B4LB-XNK9 .............................................................. 12

Alex Horton & David Ovalle, *Pentagon Plan Would Create Military 'Reaction Force' For Civil Unrest*, Wash. Post (Aug. 12, 2025), https://www.washingtonpost.com/national-security/2025/08/12/national-guard-civil-unrest/ ................................................................................................................. 12

Alexander M. Bickel, The Morality of Consent (1975) ............................................................. 8

Barak Ravid et al., *"It Was a Headfake": Inside Trump's Secret Orders to Strike Iran*, Axios (June 22, 2025), https://www.axios.com/2025/06/22/trump-iran-strike-israel-behind-scenes ............... 12

Barak Ravid, *Inside Biden's Push For The Israel-Hamas Hostage Deal*, Axios (Nov. 23, 2023), https://www.axios.com/2023/11/23/biden-israel-hamas-hostage-deal .................... 12, 13

Barbara Starr, *Mr. Hegseth: Don't Ban the Free Press from the Pentagon*, Substack (Oct. 13, 2025), https://perma.cc/L622-DYJ9 .............................................................................. 9, 10

Br. of Amici Curiae Reps. Comm. for Freedom of the Press & Comm. to Protect Journalists, *Radio Free Europe/Radio Liberty, Inc. v. Lake*, No. 1:25-cv-00799 (D.D.C. Mar. 28, 2025), Dkt. No. 17-1 .................................................................... 2

Br. of Amici Curiae Reps. Comm. for Freedom of the Press & Independent NPR Member Stations, *Nat'l Pub. Radio, Inc. v. Trump*, No. 1:25-cv-01674 (D.D.C. June 20, 2025), Dkt. No. 26-1 .................................................................. 2

Br. of Reps. Comm. for Freedom of the Press as Amicus Curiae, *Associated Press v. Budowich*, No. 1:25-cv-00532 (D.D.C. Feb. 24, 2025), Dkt. No. 17-1 .................................................................... 2

Br. of Amici Curiae Reps. Comm. for Freedom of the Press, Comm. to Protect Journalists, PEN Am., Press Freedom Ctr. at the Nat'l Press Club, & Soc'y of Pro. Journalists, *Widakuswara v. Lake*, No. 25-5144 (D.C. Cir. July 28, 2025) ................................................. 2

Br. of Amici Curiae Reps. Comm. for Freedom of the Press, White House Correspondents' Ass'n & 46 News & Media Orgs., *Associated Press v. Budowich*, No. 25-5109 (D.C. Cir. Oct. 6, 2025) ..................................... 2

Chris Cameron, *Trump Proposes Huge Increase in Military Spending*,
  N.Y. Times (Jan. 7, 2026),
  https://www.nytimes.com/2026/01/07/us/politics/trump-military-spending-
  budget.html ................................................................................................................ 4

Craig Whitlock, *The Man Who Seduced the 7th Fleet*,
  Wash. Post (May 27, 2016),
  https://www.washingtonpost.com/sf/investigative/2016/05/27/the-man-who-seduced-
  the-7th-fleet/ ............................................................................................................. 13

Dan Lamothe, *Pentagon Deploys Navy Destroyer for Unusual U.S. Border Mission*,
  Wash. Post (Mar. 16, 2025),
  https://www.washingtonpost.com/national-security/2025/03/16/navy-destroyer-
  border-security/ ........................................................................................................ 12

Daniel Arkin, *Five Major Broadcast Networks Say They Won't Sign New Pentagon Media
  Policy*, NBC News (Oct. 14, 2025),
  https://perma.cc/9ADQ-DKW3 ............................................................................... 6

Dave Davies, *How a Colorful Malaysian Businessman Bilked the U.S. Navy for Millions*,
  NPR (May 23, 2024),
  https://perma.cc/P9YL-PYQY .................................................................................. 13

Dave Philipps, *Other than Honorable: Disposable*, The Gazette (May 19, 2013),
  https://cdn.csgazette.biz/soldiers/day1.html ............................................... 14, 15

Dave Philipps, *A Green Beret Went on a Shooting Rampage. Is the Army at Fault?*,
  N.Y. Times (Jan. 12, 2026),
  https://www.nytimes.com/2026/01/12/us/blast-brain-injury-green-beret-shooting-
  duke-webb.html ........................................................................................................ 15

Editorial, *Patriotism and the Press*, N.Y. Times (June 28, 2006),
  https://www.nytimes.com/2006/06/28/opinion/patriotism-and-the-press.html ........... 15

Eric Schmitt, *Pentagon to Send 1,500 Additional Troops to U.S.-Mexico Border*,
  N.Y. Times (Jan. 22, 2025),
  https://www.nytimes.com/2025/01/22/us/politics/troops-border-trump.html ............. 12

*Harmless or Hazardous? Troops Say Chemicals and Medical Waste Burned at Balad are Making
  Them Sick, but Officials Deny Risk*, Mil. Times (Nov. 3, 2008),
  https://bit.ly/4jHWDvb ............................................................................................. 14

Hillary Profita, *A Day In The Life Of A Pentagon Correspondent*,
   CBS News (July 3, 2006),
   https://perma.cc/7T64-73AA .............................................................................. 10

Jasmine Baehr & Jennifer Griffin, *Pentagon Halts Some Weapons Shipments to Ukraine Over
   Concerns About US Stockpiles*, Fox News (July 1, 2025),
   https://perma.cc/JSK6-EFHJ.............................................................................. 12

Jim Garamone, *Senior CNN Pentagon Correspondent Recalls 9/11*,
   DOD News (Sept. 7, 2021),
   https://perma.cc/XQZ4-VVRK...................................................................... 10, 11

Jim Garamone, *September 11 at the Pentagon*,
   Am. Forces Press Serv. (Oct. 11, 2001),
   https://perma.cc/4VE8-5TUN ............................................................................ 11

Joel Schectman & Aruna Viswanatha, *The Pentagon Disinformation That Fueled America's
   UFO Mythology*, Wall St. J. (June 6, 2025),
   https://bit.ly/4qkv5yh ........................................................................................ 12

Megan Stack, *The Soldiers Came Home Sick. The Government Denied It Was Responsible.*,
   N.Y. Times (Jan. 11, 2022),
   https://www.nytimes.com/2022/01/11/magazine/military-burn-pits.html .................. 14

Melissa Korn & Alexandra Bruell, *Major Media Outlets Rebuff New Pentagon Press Policy*,
   Wall St. J. (Oct. 14, 2025),
   https://www.wsj.com/business/media/major-media-outlets-rebuff-new-pentagon-
   press-policy-6c6b05c7 ................................................................................... 6, 7

Nancy A. Youssef, *The Last Days of the Pentagon Press Corps*,
   The Atlantic (Oct. 15, 2025),
   https://www.theatlantic.com/national-security/archive/2025/10/pentagon-press-corps-
   hegseth/684570/ .............................................................................................. 9

Queen City News, *Former Reporter Recounts Being Among First Inside Pentagon on 9/11*,
   YouTube (Sept. 11, 2024),
   https://www.youtube.com/watch?v=YhWD4MA2s9s .................................................... 11

*RCFP Pushes Back Against Pentagon Policy Restricting Press Access*,
   Reps. Comm. for Freedom of the Press (last updated on Oct. 8, 2025),
   https://www.rcfp.org/pentagon-press-restrictions-statement/ ......................................... 5

T. Christian Miller et al., *Brain Injuries Remain Undiagnosed in Thousands of Soldiers*,
  ProPublica (June 7, 2010),
  https://perma.cc/57EY-LU2S................................................................................................. 15

Tara Copp & Lolita C. Baldor, *Pentagon leaders cite military tactics to show destruction from
  US attacks on Iran*, Associated Press (June 26, 2025),
  https://perma.cc/VKA2-FC4S ............................................................................................. 12

*The Executive Branch*, The White House,
  https://perma.cc/MS42-358S (last visited Jan. 13, 2026) .................................................... 8

Thomas Whiteside, *Defoliation*, The New Yorker, Feb. 7, 1970, at 32,
  https://www.newyorker.com/magazine/1970/02/07/defoliation ................................... 14

Tom Bowman, *Opinion: Why I'm Handing In My Pentagon Press Pass*,
  NPR (Oct. 14, 2025),
  https://perma.cc/BQ5Q-J4FD ...................................................................................... 8, 9, 15

## INTEREST OF AMICI CURIAE

Proposed amici curiae are the Reporters Committee for Freedom of the Press (the "Reporters Committee"), Committee to Protect Journalists ("CPJ"), First Amendment Coalition, Inter American Press Association, International Women's Media Foundation ("IWMF"), The Media Institute, Media Law Resource Center ("MLRC"), Military Reporters and Editors ("MRE"), National Freedom of Information Coalition ("NFOIC"), National Newspaper Association ("NNA"), National Press Club, National Press Photographers Association ("NPPA"), New England First Amendment Coalition ("NEFAC"), New England Newspaper and Press Association, Inc. ("NENPA"), News/Media Alliance ("N/MA"), News Guild – CWA, Online News Association ("ONA"), PEN American Center, Inc. ("PEN America"), Pulitzer Center on Crisis Reporting, Radio Television Digital News Association ("RTDNA"), Society of Environmental Journalists ("SEJ"), Society of Professional Journalists ("SPJ"), Student Press Law Center ("SPLC"), and Tully Center for Free Speech (together, "amici").

Amici include media organizations whose members publish military and national security reporting. Some have members who were part of the Pentagon press corps and had their credentials revoked following the implementation of the new policy challenged in this proceeding. Amici know first-hand the importance of access by the press to government places and personnel, as well as the need for independence from

undue government influence so that journalists can keep the public informed and perform their watchdog role.

Lead amicus, the Reporters Committee, is an unincorporated nonprofit association of reporters and editors dedicated to defending the First Amendment and newsgathering rights of the news media. Founded by journalists and media lawyers in 1970, when the nation's press faced an unprecedented wave of government subpoenas forcing reporters to name confidential sources, the Reporters Committee today provides *pro bono* legal representation, amicus curiae support, and other resources to protect the legal rights of journalists.[1] The Reporters Committee regularly appears as amicus in this and other federal and state courts on First Amendment issues of importance to journalists. *See* Br. of Reps. Comm. for Freedom of the Press as Amicus Curiae, *Associated Press v. Budowich*, No. 1:25-cv-00532 (D.D.C. Feb. 24, 2025), Dkt. No. 17-1; Br. of Amici Curiae Reps. Comm. for Freedom of the Press, White House Correspondents' Ass'n & 46 News & Media Orgs., *Associated Press v. Budowich*, No. 25-5109 (D.C. Cir. Oct. 6, 2025); Br. of Amici Curiae Reps. Comm. for Freedom of the Press & Comm. to Protect Journalists, *Radio Free Europe/Radio Liberty, Inc. v. Lake*, No. 1:25-cv-00799 (D.D.C. Mar. 28, 2025), Dkt. No. 17-1; Br. of Amici Curiae Reps. Comm. for Freedom of the Press & Independent NPR Member Stations, *Nat'l Pub. Radio, Inc. v.*

---

[1]    Statements of interest of individual amici are set forth in the accompanying motion for leave to file this brief.

*Trump*, No. 1:25-cv-01674 (D.D.C. June 20, 2025), Dkt. No. 26-1; Br. of Amici Curiae

Reps. Comm. for Freedom of the Press, Comm. to Protect Journalists, PEN Am., Press

Freedom Ctr. at the Nat'l Press Club, & Soc'y of Pro. Journalists, *Widakuswara v. Lake*

(and related appeals), Nos. 25-5144, 25-5145, 25-5150, 25-5151 (D.C. Cir. July 28, 2025).

 No party or party's counsel authored this brief in whole or in part, or made a

monetary contribution intended to fund its preparation or submission.  No person other

than amici made a monetary contribution to the preparation or submission of this brief.

## INTRODUCTION

This case unfolds against a backdrop of intense public interest in the Pentagon and the military policies of the nation. On January 3, 2026, U.S. servicemembers and law enforcement conducted Operation Absolute Resolve, in which American forces bombed Venezuela to suppress air defenses, while Delta Force operators extracted Venezuelan President Nicolás Maduro and his wife to face charges of drug trafficking in federal court in New York. The following Tuesday, the White House released a statement that refused to rule out a military invasion to wrest the island of Greenland away from our NATO ally Denmark and to put it under the U.S. flag. As he heads into the second year of his term, the president has called for $1.5 trillion in military spending in his next budget, an increase of more than 50% from current levels, making the restoration of press access to the Pentagon all the more urgent to aid in the public's understanding of the administration's priorities.[2]

The events of the past few weeks occurred with the Pentagon virtually empty of the press corps that has walked its halls since it opened during World War II. That is because, on October 15, 2025, nearly every journalist with a press badge was forced to hand it in and leave the building following the implementation of the Pentagon's new policy challenged in this litigation. Many of these journalists had covered the policies

---

[2]     *See* Chris Cameron, *Trump Proposes Huge Increase in Military Spending*, N.Y. Times (Jan. 7, 2026), https://www.nytimes.com/2026/01/07/us/politics/trump-military-spending-budget.html.

and activities of the world's largest armed force for decades, across numerous administrations; reported as embeds with U.S. troops in conflict zones; and spent years stationed in Iraq, Afghanistan, and other regions with a U.S. military presence.  But they all lost their credentials because the Department of Defense now takes the view that posing questions to its personnel outside the confines of official briefings presents a potential security threat.  Under the new policy, a reporter's effort to obtain information beyond what the Department has approved for public release may be the basis to deny, revoke, or not renew a Pentagon press pass, regardless of whether that contact with a source takes place inside or outside the Pentagon and no matter how banal, on the one hand, or how newsworthy, on the other, the information at issue.  *See* Pentagon Reservation In-Brief for Media Members, Compl., Ex. A at 2–4 & 10–11 (Dkt. No. 1-1) (hereinafter, "Ex. A").[3]

The Pentagon's new policy is incompatible with the role of journalists in our democracy to seek information and ask questions, including in the domain of national defense and foreign affairs.  Without vigorous and responsible journalism, and the give and take between reporters and Pentagon personnel, the public is left in the dark about

---

[3]    Lead amicus, the Reporters Committee, sent a letter to the Pentagon on September 22, 2025, expressing concern with certain provisions in the initial September 18 in-brief form and requesting that the Department provide clarification.  Assistant Secretary of War for Public Affairs Sean Parnell responded on September 24, 2025.  That correspondence and other background can be found at *RCFP Pushes Back Against Pentagon Policy Restricting Press Access*, Reps. Comm. for Freedom of the Press (last updated on Oct. 8, 2025), https://www.rcfp.org/pentagon-press-restrictions-statement/.

matters of life and death that go to the heart of Americans' right to know.  These essential stories range from health risks facing veterans exposed to burn pits, to taxpayer dollars spent to develop weapons technology, to plans to deploy troops or send resources around the world.  They include breaking news such as the September 11 attacks, the 2003 fall of Baghdad, the withdrawal from Afghanistan, and U.S. strikes on Iranian nuclear facilities, to name only a few.  The loss of institutional and historical knowledge possessed by long-standing members of the press corps from within the hallways in Arlington benefits no one—including the Pentagon itself, a cabinet department currently entrusted with spending nearly 1 trillion public dollars per year and managing three million employees, and whose legitimacy and effectiveness depend on an informed public and an accountable bureaucracy.

Plaintiffs supply the legal basis to argue for the Pentagon policy's constitutional infirmities, but amici write to offer the perspective of organizations representing the interests of news organizations and journalists who seek to ascertain and report the news.  Nearly every reporter in the Pentagon press corps—diverse as their outlets are— reached the same conclusion that they could not function under these rules.  *See, e.g.*, Daniel Arkin, *Five Major Broadcast Networks Say They Won't Sign New Pentagon Media Policy*, NBC News (Oct. 14, 2025), https://perma.cc/9ADQ-DKW3 (quoting ABC, CBS, CNN, Fox News, and NBC joint statement that new Pentagon policy "is without precedent and threatens core journalistic protections"); Melissa Korn & Alexandra

Bruell, *Major Media Outlets Rebuff New Pentagon Press Policy*, Wall St. J. (Oct. 14, 2025),

https://www.wsj.com/business/media/major-media-outlets-rebuff-new-pentagon-press-

policy-6c6b05c7 (reporting that credential holders from *The Wall Street Journal*,

*Associated Press*, *Washington Post*, and Newsmax, among others, would not be able to

sign the new policy).

Amici write to offer illustrations to the Court of the influential and informative

coverage of the Pentagon in this and prior administrations made possible by the

everyday interactions between journalists and military officials, both inside and outside

of the building.  These examples underscore what the American public, including our

Armed Forces, stands to lose under the new policy.  Vagueness is often incurable under

the law for poorly drawn government rules but, from a journalist's perspective, a

credentialing scheme that grants officials unlimited discretion to revoke on a whim a

reporter's press pass is a handcuff on bona fide journalism that will be fatal every time.

For the reasons set forth herein, amici urge the Court to grant Plaintiffs' motion

for summary judgment.

## ARGUMENT

**I.    Journalists asking questions of military personnel fosters a vast amount of reporting in the public interest.**

The freedom to ask questions of public officials is fundamental to the work of

journalism.  As recognized by the Founders, and confirmed across generations of

historical events, the information most essential to informing the public is "not the press

release, not the handout, but the firsthand story based on the candid talk of a primary

news source." Alexander M. Bickel, The Morality of Consent 84 (1975). The imperative

of journalists to obtain the facts beyond the press release or official line is why "[a] free

press cannot be made to rely solely upon the sufferance of government to supply it with

information." *Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97, 104 (1979). And it is why of

more than 100 credentialed Pentagon reporters, nearly all could not agree to a policy

that punishes them "simply [for] asking" for information about how the country's

largest federal cabinet agency operates. *Id.* at 99; *see* Tom Bowman, *Opinion: Why I'm*

*Handing In My Pentagon Press Pass*, NPR (Oct. 14, 2025), https://perma.cc/BQ5Q-J4FD

(noting that nearly all of the more than 100 Pentagon reporters declined to sign policy);

*The Executive Branch*, The White House, https://perma.cc/MS42-358S (last visited Jan. 13,

2026) ("The Department of Defense is the largest government agency and includes those

serving on active duty, civilian personnel, and those who serve in the National Guard

and Reserve forces.").

　　After accommodating without major incident over 80 years of reporting from

inside the building, the Pentagon now claims that journalists who engage with

Department officials are a security threat. The day-in, day-out work of reporting on

high-stakes and complicated national security and military matters paints a different

picture. In reality, long-time Pentagon reporters develop expertise and relationships

that enable them to report with vigor, fairness, and discernment. *See, e.g.*, Bowman,

*supra* (describing 28 years of covering the Pentagon, including reporting when

administrations of either political party would misrepresent events surrounding

military actions because "[i]nstead of toeing the official line, that reporting helped

people understand what U.S. troops were really facing"); Nancy A. Youssef, *The Last*

*Days of the Pentagon Press Corps*, The Atlantic (Oct. 15, 2025),

https://www.theatlantic.com/national-security/archive/2025/10/pentagon-press-corps-

hegseth/684570/ (explaining that "something intangible" is lost when credentialed

journalists leave the building, including "meeting people like Jimmy," a Pentagon

police officer, "whose names may never appear in print but who are essential to how

we understand the U.S. military").

Indeed, important stories, and often relationships of trust and respect, emerge

from the Pentagon's corridors.  As former CNN Pentagon correspondent Barbara Starr

put it in a recent column: "Every Secretary of Defense until now has seen the value of

talking to reporters even in the hallways of the Pentagon."  Barbara Starr, *Mr. Hegseth:*

*Don't Ban the Free Press from the Pentagon*, Substack (Oct. 13, 2025),

https://perma.cc/L622-DYJ9.  Starr recounted how James Mattis would chat with

reporters on his way back from the Pentagon cleaners; that the "notoriously shy" Lloyd

Austin "would always say hello and ask[] how things are going"; and that Leon Panetta

and Chuck Hagel were likewise voluble with journalists in the building.  *Id.*  "I

9

guarantee they had reporters they didn't like, stories out there they wish weren't," Starr noted.  *Id.*  "But each of them saw the value of a free press in America."  *Id.*

Similarly, veteran CBS national security reporter David Martin observed that "95 percent of the good stories you get in the hallways.  The more you're out in the hallways the more likely you are to stumble on a story or pick up on vibes."  Hillary Profita, *A Day In The Life Of A Pentagon Correspondent*, CBS News (July 3, 2006), https://perma.cc/7T64-73AA.  He would "spend[] a great deal of his time walking through the building, checking in with public affairs officers and sources" and "hoping to run into someone who might be useful" because he had learned that a reporter is more likely to get a Pentagon official to comment and provide information for a story by encountering them in the building.  *Id.*  Martin analogized the work of a Pentagon reporter to "almost like being a beat cop," explaining that he found that "[y]ou become very sensitive to what's out of order."  *Id.*

While physical access to government buildings is only part of what journalists need to cover federal agencies effectively, that access can be particularly consequential for major news stories.  Barbara Starr recounted being inside the Pentagon on September 11, 2001, for DOD News: "I was sitting with other reporters in the office of the public affairs chief for the chairman of the Joint Chiefs.  We're all looking at the TV, and the second plane hits."  Jim Garamone, *Senior CNN Pentagon Correspondent Recalls 9/11*, DOD News (Sept. 7, 2021), https://perma.cc/XQZ4-VVRK.  Starr then followed an

aide down the hall when a general coming out of a command center said, "It's terrorism." *Id.*

Other reporters on the scene that day have similar accounts of how their proximity to Pentagon sources helped advance early reporting on the unfolding attacks. In fact, Pentagon officials deliberately brought the Pentagon press corps *back* into the building the day of the attack, notwithstanding the still smoldering damage, as a "show of strength" and to keep the public informed. Queen City News, *Former Reporter Recounts Being Among First Inside Pentagon on 9/11*, YouTube (Sept. 11, 2024), https://www.youtube.com/watch?v=YhWD4MA2s9s, at 1:55; *see also* Jim Garamone, *September 11 at the Pentagon*, Am. Forces Press Serv. (Oct. 11, 2001), https://perma.cc/4VE8-5TUN ("At 6 p.m., with the building still on fire, Pentagon officials announced Rumsfeld would hold a press conference in the Pentagon. Buses arrived at the gas station to take reporters, photographers and videographers to the Pentagon.").

Direct communications with first-hand sources are fundamental to military-affairs reporting beyond the Pentagon's walls—where the Pentagon's new policy also threatens journalists with the loss of their credentials for unauthorized contacts. *See* Ex. A. Recently, communications with government officials, beyond what was offered at the podium, have allowed journalists to know and understand important news events, from the government's position on hostages, to plans for deployment of

National Guard troops to U.S. cities, to a host of other stories that involve the security of the American people and the exercise of military power.  Aaron Glantz, *Revealed: Pentagon Orders States' National Guards To Form 'Quick Reaction Forces' For 'Crowd Control'*, Guardian (Oct. 29, 2025), https://perma.cc/B4LB-XNK9; Alex Horton & David Ovalle, *Pentagon Plan Would Create Military 'Reaction Force' For Civil Unrest*, Wash. Post (Aug. 12, 2025), https://www.washingtonpost.com/national-security/2025/08/12/national-guard-civil-unrest/; Jasmine Baehr & Jennifer Griffin, *Pentagon Halts Some Weapons Shipments to Ukraine Over Concerns About US Stockpiles*, Fox News (July 1, 2025), https://perma.cc/JSK6-EFHJ; Tara Copp & Lolita C. Baldor, *Pentagon leaders cite military tactics to show destruction from US attacks on Iran*, Associated Press (June 26, 2025), https://perma.cc/VKA2-FC4S; Barak Ravid et al., *"It Was a Headfake": Inside Trump's Secret Orders to Strike Iran*, Axios (June 22, 2025), https://www.axios.com/2025/06/22/trump-iran-strike-israel-behind-scenes; Eric Schmitt, *Pentagon to Send 1,500 Additional Troops to U.S.-Mexico Border*, N.Y. Times (Jan. 22, 2025), https://www.nytimes.com/2025/01/22/us/politics/troops-border-trump.html; Joel Schectman & Aruna Viswanatha, *The Pentagon Disinformation That Fueled America's UFO Mythology*, Wall St. J. (June 6, 2025), https://bit.ly/4qkv5yh; Dan Lamothe, *Pentagon Deploys Navy Destroyer for Unusual U.S. Border Mission*, Wash. Post (Mar. 16, 2025), https://www.washingtonpost.com/national-security/2025/03/16/navy-destroyer-border-

security/; Barak Ravid, *Inside Biden's Push For The Israel-Hamas Hostage Deal*, Axios (Nov.

23, 2023), https://www.axios.com/2023/11/23/biden-israel-hamas-hostage-deal.

The same interests are at stake regarding reporting on waste, fraud, and

corruption in the military, which is naturally dependent on unofficial communications

between Pentagon personnel and journalists. *The Washington Post*'s reporting on the

"Fat Leonard" scandal—"perhaps the worst national-security breach of its kind to hit

the Navy since the end of the Cold War"—relied both on public records and Pentagon

sources to reveal that defense contractor Leonard Francis "doled out sex and money to a

shocking number of people in uniform who fed him classified material about U.S.

warship and submarine movements." Craig Whitlock, *The Man Who Seduced the 7th

Fleet*, Wash. Post (May 27, 2016), https://www.washingtonpost.com/sf/investigative/

2016/05/27/the-man-who-seduced-the-7th-fleet/. *The Post* discovered that the

investigation encompassed nearly 1,000 people, including 90 admirals. *See* Dave

Davies, *How a Colorful Malaysian Businessman Bilked the U.S. Navy for Millions*, NPR (May

23, 2024), https://perma.cc/P9YL-PYQY. And the Justice Department eventually

charged 35 people in connection with the scandal. *Id.* In these and other stories,

reporters played a crucial role in outing corruption, a vital public good given our

country's recognition that "[s]ecrecy in government" breeds "bureaucratic errors." *N.Y.

Times Co. v. United States*, 403 U.S. 713, 724 (1971).

Or consider the health and safety of active-duty soldiers and veterans.  In Iraq and Afghanistan, for instance, reporters gave voice to troops suffering chronic health issues after their exposure to cancer-causing toxins from the use of burn pits, even as military and Veterans Affairs officials publicly denied a link.  *See Harmless or Hazardous? Troops Say Chemicals and Medical Waste Burned at Balad are Making Them Sick, but Officials Deny Risk*, Mil. Times (Nov. 3, 2008), https://bit.ly/4jHWDvb (discussing an internal Air Force memo acknowledging that burn pits are "an acute health hazard" and quoting active-duty and retired military servicemembers on the topic); Megan Stack, *The Soldiers Came Home Sick. The Government Denied It Was Responsible.*, N.Y. Times (Jan. 11, 2022), https://www.nytimes.com/2022/01/11/magazine/military-burn-pits.html ("Several V.A. doctors told me that their bosses pressured them to ignore data pertaining to burn-pit exposure; prevented them from publishing findings; and threatened or retaliated against those who persistently argued for a link between such exposure and illness.").

Similar stories abound, from revelations of the toxicity of Agent Orange in Vietnam, *see* Thomas Whiteside, *Defoliation*, The New Yorker, Feb. 7, 1970, at 32, https://www.newyorker.com/magazine/1970/02/07/defoliation (reporting on impact of herbicides on human health, including drawing on unofficial information, and contrasting findings with public U.S. statements and reports); to reports that the military dishonorably discharged soldiers for minor offenses as part of its downsizing in the early 2010s (denying them military benefits), *see* Dave Philipps, *Other than*

*Honorable: Disposable*, The Gazette (May 19, 2013), https://cdn.csgazette.biz/soldiers/day1.html; to endemic brain injuries caused by blast trauma and the military's failure to adequately diagnose and treat those harms, *see* T. Christian Miller et al., *Brain Injuries Remain Undiagnosed in Thousands of Soldiers*, ProPublica (June 7, 2010), https://perma.cc/57EY-LU2S; Dave Philipps, *A Green Beret Went on a Shooting Rampage. Is the Army at Fault?*, N.Y. Times (Jan. 12, 2026), https://www.nytimes.com/2026/01/12/us/blast-brain-injury-green-beret-shooting-duke-webb.html.[4]  All of this reporting relied on everyday gumshoe journalism, including the ability to ask questions of and learn what is important to military personnel.

None of that, of course, is to say that secrecy has no legitimate place in Pentagon policymaking.  *See* Editorial, *Patriotism and the Press*, N.Y. Times (June 28, 2006), https://www.nytimes.com/2006/06/28/opinion/patriotism-and-the-press.html (noting instances of holding stories for national security reasons).  But as the discussion above makes clear, the ability to pursue government information and to ask public officials questions, to use a hallway conversation to corroborate a tip or learn more about a developing crisis, are all essential to a free press and the liberties it safeguards.  Today,

---

[4]    These are, of course, but a few examples.  The press has played a role in revealing, and spurring action on, countless other stories involving the well-being of servicemembers, such as sexual assault in the military and challenges faced by military families.  And when it comes to sending soldiers to fight, and whether U.S. leaders are properly recognizing and conveying the realities of war, it is often journalists who press for answers and accountability.  *See* Bowman, *supra* (recounting reporting on Iraq, Afghanistan, and Syria that challenged administration claims of victory).

under the Pentagon's new policy, routine reporting on the nation's military might now be grounds for sudden suspension or revocation of a journalist's credentials. The policy is inconsistent with the press's role in a democracy, and the Court should reject it.

II.    **Journalists cannot agree to a policy that affords the Pentagon standardless discretion to punish reporters for asking questions.**

*City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750 (1988), provides the Plaintiffs with the controlling precedent to argue that the new credentialing policy is unconstitutional. In *City of Lakewood*, the Supreme Court recognized that a law conferring unbridled discretion to deny or impose conditions on receipt of a newsstand permit violates the First Amendment. *Id.* at 772. Underlying that holding are two real-world concerns relevant here that underscore why virtually every credentialed Pentagon reporter simply could not sign the Pentagon's new policy and still do their job. First, it is impossible for a journalist to comply with a policy that lacks or provides inconsistent instructions on where and when a violation can occur, leading inevitably to self-censorship. Second, a journalist cannot freely gather news under a policy whose standardless discretion invites pretextual enforcement based on reporting that the government perceives as critical or unfavorable.

The new policy states broadly that soliciting Pentagon information that has not been approved for release may pose a national security risk that could lead to denial, revocation, or non-renewal of a journalist's credentials. Ex. A. at 2–4, 10–11. It cites ordinary newsgathering techniques like "direct communications with specific

16

[Department of War] personnel or general appeals, such as public advertisements or calls for tips encouraging DoW employees to share non-public DoW information" as potential threats to national defense. *Id.* at 10. The policy warns that "an advertisement or social media post by an individual journalist or media outlet that directly targets DoW personnel to disclose non-public information without proper authorization would constitute a solicitation that could lead to revocation." *Id.* at 10–11.

Notably, those examples in the policy are offered only by way of illustration, and the policy makes clear that other, unspecified activities could also lead to a determination that a journalist poses a national security risk. Worse yet, the policy is unclear as to the meaning of "non-public DoW information," which appears to include not just classified information, but also the far larger category of controlled-but-unclassified information, and, critically, virtually any other Pentagon-related information not previously approved for official release. Exacerbating those ambiguities, the policy qualifies the standards it does articulate with open-ended language that reserves ultimate discretion to the Pentagon to deny, revoke, or not renew a reporter's press credentials for virtually any reason, providing that each matter should be decided on a "case-by-case basis," with consideration for the "totality of the circumstances" and the "unique facts and circumstances of each case." *Id.* And despite all that uncertainty piled on uncertainty, the credentialing policy demands that

reporters affirm they "understand" the policy.  *Id.* at 12.  One cannot "understand" a policy that, by its expansive and vague terms, defies comprehension.

The result is an exemplar of the type of standardless restriction on First Amendment rights that cannot survive constitutional scrutiny.  As an initial matter, the conduct the policy purports to punish—the "traditional function of a free press in seeking out information by asking questions," *Nicholson v. McClatchy Newspapers*, 177 Cal. App. 3d 509, 519 (Cal. Ct. App. 1986)—sits at the heart of the First Amendment. The Supreme Court has made clear that the Constitution protects "routine newspaper reporting techniques," and nothing could be more routine than obtaining information "simply by asking [for it]" from a willing source.  *Daily Mail Publ'g Co.*, 443 U.S. at 99, 103; *see also, e.g.*, *Trump v. Trump*, 79 Misc. 3d. 866, 882 (N.Y. Cnty. Sup. Ct. 2023) (failing to find "a single case where any court, whether state or federal, has held that a reporter is liable for inducing his or her source to breach a confidentiality provision").  Even if the policy's restrictions were a model of clarity, that prohibition on the most basic aspect of journalism would be unjustifiable under any First Amendment standard.

The policy is also dramatically out of step with how the law characterizes journalism as a profession.  For example, various federal and state statutes, from freedom of information laws to provisions shielding a reporter's unpublished work product and confidential communications, recognize that the affirmative solicitation of information is a core aspect of newsgathering.  *See, e.g.*, 5 U.S.C. § 552(a)(4)(A)(ii)

(defining "a representative of the news media" under the Freedom of Information Act as "any person or entity that *gathers information* of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience" (emphasis added)); Minn. Stat. § 595.023 (describing protected individuals under Minnesota reporter's privilege statute as those "engaged in the *gathering, procuring,* compiling, editing, or publishing of information for the purpose of transmission, dissemination or publication to the public" (emphasis added)).[5]  The new Pentagon policy nods to permitting "investigating, reporting, or publishing stories," as well as "lawfully requesting" information, but then undercuts that language by stating that the "First Amendment does not permit journalists to solicit government employees to violate the law by providing confidential government information."  Ex. A at 10.  Apart from it being an incorrect characterization of law, amici highlight this statement as one of several internal inconsistencies that illustrates

---

[5]     Laws across the country consistently define journalists as persons who, *inter alia,* actively gather information.  *See also, e.g.,* Tex. Civ. Prac. & Rem. Code § 22.021(2) ("a person . . . who … gathers, compiles, prepares, collects, photographs, records, writes, edits, reports, investigates, processes, or publishes news or information"); Fla. Stat. § 90.5015(1)(b) ("a person regularly engaged in collecting, photographing, recording, writing, editing, reporting, or publishing news"); La. Stat. § 45:1451 ("person regularly engaged in the business of collecting, writing or editing news for publication"); Colo. Rev. Stat. § 13-90-119(1)(c) ("any member . . . [or] employee . . . of the mass media who is engaged to gather, receive, observe, process, prepare, write, or edit news information for dissemination to the public through the mass media"); Nev. Rev. Stat. § 49.275 ("person[] [who in] professional capacity [is] gathering, receiving or processing information for communication to the public").

how difficult it would be as a practical matter for a journalist to know which questions could lead to the denial, revocation, or non-renewal of a press pass, all of which makes their everyday work covering one of the most important beats in any newsroom impossible to carry out.

But, even aside from how the policy misapprehends the information-seeking imperative of journalism, this case is more straightforward still, because the policy "vests unbridled discretion in a government official over whether to permit or deny expressive activity." *City of Lakewood*, 486 U.S. at 755; *see also Ateba v. Leavitt*, 133 F.4th 114, 125 (D.C. Cir. 2025) (First Amendment prohibits unbridled discretion even in a nonpublic forum). Every daily edition of every major newspaper features information the Pentagon has not expressly authorized for release, but no journalist can predict which stories will or will not draw the Pentagon's ire. And even if a reporter were inclined to forgo seeking nonpublic information about the government entirely—exactly the sort of "self-censorship" against which the First Amendment is intended to guard, *City of Lakewood*, 486 U.S. at 757—it would be impossible for him or her to know in advance whether a question to a source or a follow-up query to verify information provided will elicit an answer the Pentagon considers unauthorized. The result is a classic lack of "neutral criteria to insure that the licensing decision is not based on the content or viewpoint of the speech being considered." *Id.* at 760. Because the policy's standardless sweep encompasses "routine newspaper reporting techniques," *Daily Mail*

*Publ'g Co.*, 443 U.S. at 103, every journalist would be at risk of revocation at all times and would face impermissible pressure to tailor coverage to avoid risking the anger of the Pentagon's decisionmakers.  Indeed, that is why virtually the entire press corps could not sign, leaving the building empty of a sizable contingent of the country's major news organizations for the first time in over 80 years.

## CONCLUSION

For the foregoing reasons, amici respectfully urge the Court to grant Plaintiffs' motion for summary judgment.

Dated: January 15, 2026

Respectfully submitted,

/s/ Bruce D. Brown
Bruce D. Brown (D.C. Bar No. 457317)
   *Counsel of Record for Amici Curiae*
Lisa Zycherman (D.C. Bar No. 495277)
Gabriel Rottman (D.C. Bar No. 992728)
Mara Gassmann (D.C. Bar No. 1014532)
Grayson Clary (D.C. Bar No. 1735810)
Annie Seminara, *Of counsel*
REPORTERS COMMITTEE FOR
  FREEDOM OF THE PRESS
1156 15th Street NW, Ste. 1020
Washington, DC 20005
Telephone: 202.795.9300
bruce.brown@rcfp.org

*Counsel for Proposed Amici Curiae
Reporters Committee for Freedom of the
Press and 23 Other Media Organizations*

**CERTIFICATE OF COMPLIANCE**

This amici curiae brief complies with the type-volume limit of LCvR 7(o)(4) because it is 25 or fewer pages.

This amici curiae brief complies with the typeface and type-style requirements of LCvR 5.1(d) because it has been prepared in a proportionally spaced typeface using Microsoft Word with Palatino Linotype in size 12 font.

Dated: January 15, 2026                    Respectfully submitted,

                                           /s/ Bruce D. Brown
                                           Bruce D. Brown (D.C. Bar No. 457317)

                                           *Counsel of Record for Proposed Amici Curiae Reporters Committee for Freedom of the Press and 23 Other Media Organizations*