# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

THE NEW YORK TIMES COMPANY, et al.,

   *Plaintiffs*,

       v.

UNITED STATES DEPARTMENT
OF DEFENSE, et al.,

*Defendants.*

Civil Action No. 1:25-cv-04218-DLF

# DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................ 3

I.      The Department is required to protect the Pentagon .......................................... 3

II.     The Department proposes the initial PFAC Policy ............................................ 4

III.    The Department engages with stakeholders on changes to the policy ................ 7

IV.     The Department issues the operative Policy ...................................................... 9

LEGAL STANDARDS ...................................................................................................... 11

ARGUMENT ...................................................................................................................... 12

I.      The PFAC Policy Satisfied Due Process Under the Fifth Amendment ............ 13

        A.      The PFAC Policy provides reasonable standards for the denial, revocation,
                or non-renewal of a PFAC sufficient to provide notice to any that might be
                affected .............................................................................................. 13

        B.      The PFAC Policy provides ample process to satisfy the Fifth Amendment ......... 20

II.     The PFAC Policy Does Not Violate the First Amendment ................................ 25

        A.      The Department is unable to exercise unbridled discretion via the PFAC
                Policy ................................................................................................. 25

        B.      The PFAC Policy contains no viewpoint or content-based restrictions ............... 29

        C.      The PFAC Policy is reasonable ............................................................ 37

III.    The PFAC Policy was the product of reasoned decisionmaking ...................... 39

IV.     Plaintiffs Are Not Entitled to an Injunction .................................................... 42

V.      Remand is the appropriate remedy .................................................................. 44

CONCLUSION .................................................................................................................. 45

# TABLE OF AUTHORITIES

## Cases

*Act Now to Stop War & End Racism Coal. & Muslim Am. Soc'y Freedom Found. v. District of Columbia*,
  846 F.3d 391 (D.C. Cir. 2017) ............................................................. 20

*Allied-Signal, Inc.v. U.S. Nuclear Regul. Comm'n*,
  988 F.2d 146 (D.C. Cir. 1993) ............................................................. 44

*Am. Great Lakes Ports Ass'n v. Zukunft*,
  301 F. Supp. 3d 99 (D.D.C. 2018*), aff'd sub nom. Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510 (D.C. Cir. 2020) ............................................................. 45

*Ark. Educ. Tel. Comm'n v. Forbes*,
  523 U.S. 666 (1998) ............................................................. 37

*Ateba v. Jean-Pierre*,
  706 F. Supp. 3d 63 (D.D.C. 2023), *aff'd*, 133 F.4th 114 (D.C. Cir. 2025) ............................... 29

*Ateba v. Leavitt*,
  133 F.4th 114 (D.C. Cir. 2025), *cert. denied*, No. 25-338, 2025 WL 3260204 (U.S. Nov. 24, 2025) ............................................................. *passim*

*Ayele v. Dist. of Columbia*,
  704 F. Supp. 3d 231 (D.D.C. 2023) ............................................................. 42

*Bayshore Cmty. Hosp. v. Azar*,
  325 F. Supp. 3d 18 (D.D.C. 2018) ............................................................. 45

*Bellion Spirits, LLC v. United States*,
  7 F.4th 1201 ............................................................. 19

*Boardley v. U.S. Dep't of the Interior*,
  615 F.3d 508 (D.C. Cir. 2010) ............................................................. 19, 24

*Boyce Motor Lines, Inc. v. United States*,
  342 U.S. 337 (1952) ............................................................. 14

*Bryant v. Gates*,
  532 F.3d 888 (D.C. Cir. 2008) ............................................................. 37

*Bucklew v. Precythe*,
  587 U.S. 119 (2019) ............................................................. 12

*Burlington Truck Lines, Inc. v. United States*,
  371 U.S. 156 (1962) ............................................................. 40

*Califano v. Yamasaki*,
   442 U.S. 682 (1979)...................................................................................................... 43

*California v. Texas*,
   593 U.S. 659 (2021)...................................................................................................... 43

*Chaplaincy of Full Gospel Churches v. England*,
   454 F.3d 290 (D.C. Cir. 2006) .................................................................................... 42

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
   401 U.S. 402 (1971)................................................................................................. 39, 40

*Citrus HMA, LLC v. Becerra*,
   597 F. Supp. 3d 450 (D.D.C. 2022) .........................................................................44-45

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC*,
   596 U.S. 61 (2022) ........................................................................................................ 30

*City of Lakewood v. Plain Dealer Publ'g Co*,
   486 U.S. 750 (1988)................................................................................................. 25, 27

*Cleveland Bd. of Educ. v. Loudermill*,
   470 U.S. 532 (1985)...................................................................................................... 20

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*,
   473 U.S. 788 (1985)............................................................................................. 29, 30, 38

*Cox v. Louisiana*,
   379 U.S. 559 (1965)...................................................................................................... 19

*Cronin v. FAA*,
   73 F.3d 1126 (D.C. Cir. 1996)...................................................................................... 23

*Diamond A Ranch, W. Div., LLC v. Noem*,
   No. 20-CV-3478 (CRC), 2025 WL 2760959 (D.D.C. Sept. 29, 2025), *appeal filed*, No. 25-
   05433 (D.C. Cir. Dec. 5, 2025) .................................................................................... 22

*Dep't of the Navy v. Egan*,
   484 U.S. 518 (1988)............................................................................................. *passim*

*Eichenlaub v. Township of Ind.*,
   385 F.3d 274 (3d Cir. 2004) ......................................................................................... 30

*FCC v. Fox Television Stations, Inc.*,
   567 U.S. 239 (2012).................................................................................................13-14, 14

*Fla. Power & Light Co. v. Lorion*,
   470 U.S. 729 (1985)................................................................................................. 39, 41

iv

*Forsyth County, Ga. v. Nationalist Movement*,
  505 U.S. 123 (1992) .................................................................................. 25

*Free Speech Coal., Inc. v. Paxton*,
  606 U.S. 461 (2025) .................................................................................. 34

*Frohwerk v. United States*,
  249 U.S. 204 (1919) .................................................................................. 33

*FTC v. Standard Oil*,
  449 U.S. 232 (1980) .................................................................................. 42

*FW/PBS, Inc. v. City of Dallas*,
  493 U.S. 215 (1990) .............................................................................. 23-24

*Giboney v. Empire Storage & Ice Co.*,
  336 U.S. 490 (1949) .................................................................................. 33

*Gill v. Whitford*,
  585 U.S. 48 (2018) .................................................................................... 43

*Glob. Van Lines, Inc. v. ICC*,
  804 F.2d 1293 (D.C. Cir. 1986) ................................................................ 45

*Good News Club v. Milford Cent. Sch.*,
  533 U.S. 98 (2001) ................................................................................ 37-38

*Graff v. City of Chicago*,
  9 F.3d 1309 (7th Cir. 1993) ...................................................................... 28

*Grayned v. City of Rockford*,
  408 U.S. 104 (1972) .................................................................................. 14

*Haig v. Agee*,
  453 U.S. 280 (1981) .................................................................................. 33

*Hill v. Colorado*,
  530 U.S. 703 (2000) .................................................................................. 20

*Holder v. Humanitarian L. Project*,
  561 U.S. 1 (2010) ...................................................................................... 40

*Hudson v. Palmer*,
  468 U.S. 517 (1984) .................................................................................. 22

*Husain v. Power*,
  630 F. Supp. 3d 188 (D.D.C. 2022) ..................................................... 11, 12

*In re Sealed Case*,
77 F.4th 815 (D.C. Cir. 2023) ................................................................ 35

*Int'l Union, UMW v. FMSHA*,
920 F.2d 960 (D.C.Cir.1990) ................................................................ 44

*Karem v. Trump*,
960 F.3d 656 (D.C. Cir. 2020) ................................................ 16, 17, 22

*Kovacs v. Cooper*,
336 U.S. 77 (1949) ................................................................ 18-19, 19

*Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*,
508 U.S. 384 (1993) ................................................................ 29

*MacDonald v. Chi. Park Dist.*,
132 F.3d 355 (7th Cir. 1997) ................................................................ 28

*Meinhold v. U.S. Dep't of Def.*,
34 F.3d 1469 (9th Cir. 1994) ................................................................ 43

*Minn. Voters All. v. Mansky*,
585 U.S. 1 (2018) ................................................................ 37, 38

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024) ................................................................ 12, 13

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ................................................................ 40

*Murphy v. Nat'l Collegiate Athletic Ass'n*,
584 U.S. 453 (2018) ................................................................ 43

*N.C. Fisheries Ass'n, Inc. v. Gutierrez*,
550 F.3d 16 (D.C. Cir. 2008) ................................................................ 45

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*,
597 U.S. 1 (2022) ................................................................ 23

*Nat'l Council of Resistance of Iran v. Dep't of State*,
251 F.3d 192 (D.C. Cir. 2001) ................................................................ 21

*Nat'l Shooting Sports Found., Inc. v. Jones*,
716 F.3d 200 (D.C. Cir. 2013) ................................................................ 40

*Nebraska Dep't of Health & Hum. Servs. v. Dep't of Health & Hum. Servs.*,
435 F.3d 326 (D.C. Cir. 2006) ................................................................ 43

vi

*Nken v. Holder,*
    556 U.S. 418 (2009) ............................................................................... 43

*Oberwetter v. Hilliard,*
    639 F.3d 545 (D.C. Cir. 2011) .............................................................. 30

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n,*
    460 U.S. 37 (1983) ................................................................................. 37

*Phoenix Herpetological Soc'y, Inc. v. U.S. Fish & Wildlife Serv.,*
    998 F.3d 999 (D.C. Cir. 2021) .............................................................. 41

*Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations,*
    413 U.S. 376 (1973) ............................................................................... 33

*Price v. Garland,*
    45 F.4th 1059 (D.C. Cir. 2022) ................................................. 25, 37, 38

*Reed v. Town of Gilbert,*
    576 U.S. 155 (2015) ......................................................................... 29, 30

*Rice v. Paladin Enters.,*
    128 F.3d 233 (4th Cir. 1997) ................................................................. 32

*Rosenberger v. Rector and Visitors of Univ. of Va.,*
    515 U.S. 819 (1995) ............................................................................... 29

*Shands Jacksonville Med. Ctr. v. Burwell,*
    139 F. Supp. 3d 240 (D.D.C. 2015) ................................................. 44, 45

*Sherrill v. Knight,*
    569 F.2d 124 (D.C. Cir. 1977) ...................................................... *passim*

*Smith v. Goguen,*
    415 U.S. 566 (1974) ............................................................................... 14

*Sorrell v. IMS Health Inc.,*
    564 U.S. 552 (2011) ............................................................................... 32

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs,*
    985 F.3d 1032 (D.C. Cir. 2021) ............................................................ 44

*Talavera v. Shah,*
    638 F.3d 303 (D.C. Cir. 2011) .............................................................. 12

*Thomas v. Chi. Park Dist.,*
    534 U.S. 316 (2002) ......................................................................... 23, 24

*TikTok Inc. v. Garland,*
   122 F.4th 930 ........................................................................................ 34

*Trump v. CASA, Inc.,*
   606 U.S. 831 (2025) ............................................................................... 43

*United States v. Hansen,*
   599 U.S. 762 (2023) ........................................................... 12, 13, 34, 35

*United States v. Kim,*
   808 F. Supp. 2d 44 (D.D.C. 2011) ...................................................... 33

*United States v. Kistner,*
   68 F.3d 218 (8th Cir. 1995) .............................................................28-29

*United States v. Morison,*
   844 F.2d 1057 (4th Cir. 1988) .............................................................. 34

*United States v. Stevens,*
   559 U.S. 460 (2010) ............................................................................... 33

*United States v. Williams,*
   553 U.S. 285 (2008) .................................................................. 13, 14, 33

*Ward v. Rock Against Racism,*
   491 U.S. 781 (1989) ........................................................................ 14, 28

*White House Vigil for the ERA Comm. v. Watt,*
   717 F.2d 568 (D.C. Cir. 1983) .............................................................. 26

*Wilkinson v. Austin,*
   545 U.S. 209 (2005) ............................................................................... 20

*Winter v. Nat. Res. Def. Council, Inc.,*
   555 U.S. 7 (2008) ............................................................................ 42, 43

*Wis. Gas Co. v. Fed. Energy Regul. Comm'n,*
   758 F.2d 669 (D.C. Cir. 1985) .............................................................. 42

*Woodhull Freedom Found. v. United States,*
   72 F.4th 1286 (D.C. Cir. 2023) ............................................................ 34

## **Statutes**

5 U.S.C. § 552(a) ......................................................................................... 10

5 U.S.C. § 706(2)(A) .................................................................................... 39

10 U.S.C. § 2674 ............................................................................................ 3

18 U.S.C. § 793 ........................................................................................................... 15

18 U.S.C. § 1752(a)(4) ............................................................................................... 15

18 U.S.C. § 1905 ......................................................................................................... 10

Chi. Park Dist. Code § C(5)(e) ................................................................................... 28

UCMJ art. 92, 10 U.S.C. § 892 .................................................................................. 10

**Rules**

Fed. R. Civ. P. 56(a) ................................................................................................... 11

**Administrative & Executive Materials**

32 C.F.R. § 234.3 .......................................................................................................... 3

32 C.F.R. § 234.4 .......................................................................................................... 3

Exec. Order 13526, Classified National Security Information,
    75 Fed. Reg. 707 (Dec. 29, 2009), corrected by 75 Fed. Reg. 1013 (Dec. 29, 2009 ............... 33

Exec. Order 13556, Controlled Unclassified Information,
    75 Fed. Reg. 68675 (Nov. 4, 2010) ............................................................................. 33

**Other Authorities**

U.S. Courts of the D.C. Circuit, Courthouse Decorum Policy (effective Dec. 13, 2022),
    https://www.dcd.uscourts.gov/sites/dcd/files/Courthouse%20Decorum%20Policy%20Final%2
    0Version.pdf ............................................................................................................. 19

# INTRODUCTION

This case is about the rules for who may enter and work with limited escort inside the Pentagon. This is not a trivial exercise, because the Pentagon is the headquarters of the Department of War, which creates, uses, and relies upon national security information that, if disclosed or disseminated, could put national security and American lives at risk.

The Department could have decided not to allow any press access to the Pentagon: access to the Pentagon is a privilege, not a right. But because the Department is committed to transparency, it allows certain members of the media to enter portions of the Pentagon, use portions of the Pentagon to work on content, and have access to Department personnel. At the same time, the Department must always ensure that national security information is protected. To that end, the Department restricts portions of the Pentagon and only grants access to any member of the media that meets the requirements of the "Implementation of New Media In-Brief." AR-1-18 (PFAC Policy). The PFAC Policy restricts media members from certain areas of the Pentagon and provides the process by which a Pentagon Facility Alternate Credential (PFAC) is granted, denied, revoked, or non-renewed. The goal of that process is to prevent those who pose a security risk from having broad access to American military headquarters. While the PFAC Policy does not detail every conceivable scenario in which someone could be a security risk, it provides pragmatic, common-sense guidance, including consideration of prior convictions related to safety and national security as well as attempts to gain access to information not authorized for release. To be sure, the PFAC Policy does vest some discretion in the hands of implementing officials. Such discretion is appropriate because determining a "security risk" is not a ministerial act; rather, it requires the exercise of judgment, which does not offend the Constitution or federal law.

Plaintiffs, the New York Times and one of its reporters, seek an order declaring

unconstitutional, vacating, and permanently enjoining provisions of the PFAC Policy. They allege that the PFAC Policy on its face violates the Fifth Amendment for being void for vagueness and for not providing adequate pre-deprivation process. They further assert that the PFAC Policy violates the First Amendment by providing the Department unbridled discretion, engaging in viewpoint and content discrimination, being unreasonable in light of the forum. Finally, they allege that the PFAC Policy violates the APA as being arbitrary and capricious. None of these claims have merit.

The PFAC Policy does not violate the Fifth Amendment. It is not unconstitutionally vague. Rather, the D.C. Circuit has recognized that, for security matters, no exhaustive or narrow set of criteria for a "security risk" can cover every possibility, so courts should trust an agency's expertise to determine security risks. Therefore, courts have found that general, written policy guidelines are sufficient to govern a member of the media's access to restricted areas. The PFAC Policy provides ample guidance—it instructs the implementing official to determine whether an individual is a "security risk" by using multiple factors. Nor does it provide insufficient process if applied in a particular instance. The PFAC Policy provides pre-deprivation process if a PFAC is denied, revoked, or not renewed, including written notice, an opportunity to respond, and an opportunity to be heard, as well as judicial review. This process is also adequate when applied in rare, post-deprivation cases, such as when there is an exigent and unforeseen security risk requiring immediate revocation of a pass.

Nor does the PFAC Policy violate the First Amendment. Plaintiffs' unbridled discretion arguments mirror their vagueness arguments—these arguments fail because the Department's decision to grant a PFAC is adequately constrained by the requirement to reasonably determine that a person poses a "security or safety risk" and the guidance to consider multiple factors in

making that determination. The PFAC Policy does not discriminate on viewpoint or content. It contains no references to viewpoint or content on its face. While the PFAC Policy allows the Department to consider attempts to solicit disclosure of information not authorized for release from servicemembers, i.e., classified or other protected information that servicemembers and Department employees have independent legal obligations not to disclose, this restriction falls cleanly within non-protected speech because it address the solicitation of unlawful acts from Department personnel. Finally, the PFAC Policy is reasonable because it is calculated to protect national security while still allowing press access. For the same reason, it is not arbitrary and capricious.

Accordingly, the Court should rule for Defendants on all claims.

## BACKGROUND

### I.      The Department is required to protect the Pentagon

The Secretary of War has jurisdiction, custody and control over the Pentagon. 10 U.S.C. § 2674(a). As part of these duties, the Secretary is required to protect its buildings, grounds, and property. 10 U.S.C. § 2674(b)(1). The Secretary is empowered to prescribe rules and regulations to ensure the safe, efficient and secure operation of the Pentagon. 10 U.S.C. § 2674(c)(1). Pursuant to this authority, the Secretary restricted access to the Pentagon to ensure the orderly and secure conduct of Department business. 32 C.F.R. § 234.3(a). For example, only employees and authorized persons can enter the Pentagon. *Id.* Other persons who wish to enter the Pentagon require express invitation or the consent of properly authorized personnel. 32 C.F.R. § 234.4. To conduct activities within the Pentagon, an individual must file an application, which is provided by the Department and must be submitted in the manner specified by the Department. 32 C.F.R. § 234.3(d); Pls.' Statement of Undisputed Material Fact ("SUMF") ¶ 72, ECF No. 10-36. Failure to

abide by the conditions of the permit may result in loss of access to the Pentagon. AR-15.

## II.    The Department proposes the initial PFAC Policy

On May 23, 2025, the Secretary issued a memorandum to update physical control measures for press and media access within the Pentagon. AR-18. The memorandum affirmed that the highest priority of the Department is the defense of the nation and national security. *Id.* Pursuant to that priority, the protection of Classified National Security Information (CNSI) and Controlled Unclassified Information (CUI) is an imperative for the Department. *Id.* The memorandum then laid out updated security measures for resident and visiting press to reduce the opportunities for in-person inadvertent and unauthorized disclosures of protected information. *Id.*

On September 18, 2025, the Department implemented the new policy by issuing an initial "Implementation of New Media In-Brief" to all media member who are issued a PFAC. AR-22. These members of the press would be required to read and sign the updated in-brief form outlining information security requirements, new physical control measures, and the Department's expectations of their compliance with safety and security requirements. AR-24-26.

Critically, the in-brief also explained that PFACs may be denied, revoked, or not renewed if a person is reasonably determined to pose a security or safety risk to Department personnel or property. AR-27.

In Appendix A to the in-brief, the Department described the PFAC denial, revocation, and non-renewal process in more detail with respect to whether a person is reasonably determined to pose a security or safety risk to Department personnel or property. AR-34-35. Persons are presumed to present such a risk when they have been convicted of any offense involving:

- National defense (such as treason, sabotage, terrorism, or espionage)

- The use, attempted use, or threatened use of physical force against another person

or conduct that presents a serious potential risk of physical injury to another

- Unlawful manufacturing or distribution of drugs

- Threatening or harassing communications

- Theft, embezzlement, trespassing, or property destruction

- Fraud or deceit

- Prostitution or other prohibited sexual conduct

- Engaging in unsafe operations and activities, failing to abate an identified hazard, endangering others, or creating a condition immediately dangerous to life or health

- Unprofessional conduct that might serve to disrupt Pentagon operations.

AR-34. Actions other than convictions, such as attempts to improperly obtain CNSI or CUI, or being found in physical possession of CNSI or CUI without reporting it to appropriate officials, may be deemed a security or safety risk. *Id.* Similarly, the policy explained that Department information must be approved for public release by an appropriate authorizing official before it is released, even if it is unclassified. AR-26. Approval is required because the unauthorized disclosure of CNSI or CUI poses a security risk that could damage the national security of the United States or place Department personnel in jeopardy. *Id.*

Appendix A also describes the procedure for the denial, revocation, or non-renewal of a PFAC. AR-34-35. If the Department anticipates that there may be an adverse decision on a PFAC, the Department will notify the applicant of the basis for the proposed denial. *Id.* The notification will provide the applicant the right to respond and rebut any factual basis supporting the decision. *Id.* The applicant is given 30 days from the mailing date of the decision to make an appeal appointment with the Director of the Pentagon Access Control Branch (PACB). AR-35. If the applicant is unable to make an appointment within 30 days, the applicant is granted a 30-day

extension as a matter of right on request. *Id.* If mitigating information is presented at the appointment to substantiate a reversal of the decision, the applicant may receive a PFAC at that time. *Id.* But if no mitigating information is presented or if it is insufficient to reverse the original decision, the applicant will be allowed 30 days from the appeal appointment to respond in writing to the Director or designee. *Id.* The response can contain any explanation or rebuttal. *Id.* With the response, the applicant can request, and will normally be granted, the opportunity to personally appear before the Director. *Id.*

Based on these submissions, the Department will determine whether a final decision can be made or if a further inquiry or investigation is necessary. AR-35. If further inquiry is necessary, the Department will continue the investigation. *Id.* Otherwise, it will issue a final decision. *Id.* The final decision shall be expeditiously made and the applicant will be notified in writing. *Id.* The notification will provide the factual basis for the denial. *Id.* This decision constitutes the final agency action. *Id.* While pre-deprivation process is the norm, the Department reserves the right to make an initial determination of a security or safety risk that would result in the immediate suspension of PFAC access prior to reaching a final decision. AR-8. A determination that a media member poses a security risk may be based on the unauthorized access, attempted unauthorized access, or unauthorized disclosure of CNSI or CUI. AR-35.

The September 18 in-brief included a series of acknowledgements for the media members to sign. AR-32-33. One acknowledgement was that the PFAC could be denied, revoked, or not renewed if a person is reasonably determined to pose a security or safety risk to Department personnel or property, and that this determination may be based on the unauthorized access, attempted unauthorized access, or unauthorized disclosure of CNSI or CUI. *Id.* Together, these policies form a robust process by which the Department manages access to its most sensitive

information and areas.

### III.    The Department engages with stakeholders on changes to the policy

On September 22, 2025, the Reporters Committee for Freedom of the Press addressed a letter to the Assistant to the Secretary of War for Public Affairs, laying out concerns with the policy. AR-44-45. The first concern was whether the provision stating that "DoW information must be approved for public release by an appropriate authorizing official before it is released, even if it is unclassified" and that "unauthorized disclosure of CNSI or CUI [by media members] poses a security risk that could damage the security of the United States" create obligations for reporters holding PFACs or only apply to Pentagon personnel. AR-44 (alteration in original). The letter stated that requiring media members to agree to pre-authorization presented First Amendment concerns. AR-44-45.

Another concern related to the acknowledgement that "a determination [that a person poses a security or safety risk] . . . may be based on the unauthorized access, attempted unauthorized access, or unauthorized disclosure" of CNSI or CUI. AR-45. It was purportedly unclear whether the PFAC holder was agreeing not to take those actions or instead was acknowledging that this was Pentagon policy. *Id.*

Finally, the letter stated that the in-brief was not clear whether the disclosure of CNSI "shall" or "may" result in the denial or revocation of a PFAC, and if the latter, what standards would guide the Department's discretion. *Id.*

The Assistant to the Secretary responded on September 24, 2025. AR-041. He explained that the in-brief does "not impose restrictions on journalistic activities, such as investigating, reporting, or publishing stories." *Id.* Rather, it informs PFAC holders of Department policies and processes. In response to the Reporter's Committee's first concern, the Assistant to the Secretary clarified that the requirement for approval prior to the release of information applied to

servicemembers and Department civilian employees, not to non-governmental media members. AR-41-42. As for the second concern, the acknowledgements were intended as "acknowledgments of DoW policies and potential grounds for discretionary action, not as commitments by reporters to refrain from newsgathering or disclosure." AR-042. The Assistant to the Secretary stated that receipt of unsolicited information and subsequent publication, even of CNSI or CUI, would not normally, on its own, trigger revocation. *Id.* But in rare, extreme cases where publication recklessly endangers lives, it could be used in an assessment whether a PFAC should be maintained. *Id.* In addition, soliciting information not authorized for release, including CNSI or CUI, could weigh in a PFAC determination. *Id.* Finally, the decision to revoke a PFAC because of the disclosure of CNSI or CUI is discretionary, "based on a reasonable determination of security and safety risk as informed by the unique facts and circumstances of each application." *Id.*

On or about September 26, Department representatives met with the Washington, D.C. bureau chiefs for the major television news outlets to hear their concerns with the policy. AR-048.

On September 30, 2025, the Department paused implementation of the new policy so that it could clarify items in the in-brief. AR-49. The media members would then have an additional seven days to review the clarifications after the new in-brief issues. *Id.*

During this time, the Department corresponded with the Pentagon Press Association (PPA) and the Reporter's Committee. AR-74, AR-70. The PPA stated that the revisions discussed with the Department will bring the policy very close to something most journalists can agree to, but asked the for acknowledgements to change to a single paragraph stating, in part, that the "in-brief contains a description of DoW policies and does not constitute my agreement with them. Signing this acknowledgment is not a waiver of any rights." AR-74. The Department implemented this change and expanded the section describing the difference between active solicitation and

publication of CNSI and CUI. AR-71. The Reporter's Committee stated that the change did not provide enough clarity between active solicitation and passive receipt of information. AR-70. The PPA was also concerned with the language in Appendix A that "attempts to improperly obtain CNSI or CUI, or being found in physical possession of CNSI or CUI without reporting it" would cause some reporters not to sign. AR-67. The Department agreed to change that language as well. AR-66. Finally, the PPA requested that the acknowledgement remove any reference to "understanding" the policy, which the Department did not remove. AR-50.

## IV.    The Department issues the operative Policy

On October 6, 2025, the Department issued the updated PFAC Policy. AR-1. This version, which reflected discussions with media representatives, superseded the September 18, 2025 issuance. *Id.* The update was meant to clarify policy and ameliorate concerns from the public and press.

The operative PFAC Policy described the rules of conduct on the Pentagon to maintain a PFAC. AR-3. The PFAC Policy reminded members of the news media that they did not possess a legal right to access the Pentagon; rather, access was at the discretion of the appropriate authority as regulated by federal law and Department policy. *Id.* It described the federal law and regulations supporting the PFAC Policy. *Id.* It informed members of the press of expectations for maintaining the security of their PFAC, security procedures in the Pentagon, and physical restrictions within the Pentagon. AR-003-5.

The PFAC Policy also updated and provided a fuller explanation of the restrictions on CNSI and CUI. AR-5-6. The Department reaffirmed its commitment to transparency in order to promote accountability and the public trust. *Id.* But the Department reiterated that it was required to safeguard both CNSI and CUI. *Id.* (referencing the Atomic Energy Act; Executive Order 13526;

Executive Order 13556). The PFAC Policy explained that additional authorities or policies may restrict the release of certain information. AR-6.

The PFAC Policy was explicit that military members, Department civilian employees, and contractor personnel can face criminal liability or other severe consequences for the unauthorized disclosure of information. 18 U.S.C. § 1905; 5 U.S.C. § 552(a); UCMJ art. 92, 10 U.S.C. § 892; AR-6. Because the authorities, policies, laws, and regulations are complex and intersect, and due to the possibility of severe consequences, the PFAC Policy requires Department information to be approved for public release before it is "released by any *military member, DoW civilian employee, or contract employee*." AR-5 (emphasis added). The PFAC Policy is clear that these laws and regulations only apply to military members, Department civilian employees, and contractor personnel. *Id.* The PFAC Policy stated that members of the news media are not required to submit their writings to the Department for approval, but soliciting Department personnel to commit unlawful acts is not considered protected activity under the First Amendment. *Id.* at 6. The PFAC Policy states that media members who find themselves in possession of CNSI or CUI should discuss those materials with the Department prior to publication to ensure the safety of Department personnel. *Id.* Publication of this information that would recklessly endanger American lives could factor into a PFAC decision. AR-13.

The PFAC Policy clarified that it does not prohibit members of the press from engaging in constitutionally protected journalistic activities, such as investigating, reporting, or publishing stories. AR-12. This includes receiving unsolicited CNSI or CUI and publishing it, which would not on its own normally trigger the denial, revocation, or non-renewal of a PFAC. *Id.* But soliciting the disclosure of such information or encouraging Department personnel to violate laws and policies concerning the disclosure of such information, may lead to a determination that a media

member poses a safety or security risk. *Id.*

The PFAC Policy included examples of solicitation that would factor into a decision on a PFAC. The PFAC Policy explained that solicitation may include direct communication with specific personnel. AR-12. It can also include general appeals, such as public advertisements or calls for tips encouraging Department employees to share non-public Department information. *Id.* Specifically, an advertisement that directly targets Department personnel to disclose non-public information without proper authorization would constitute a solicitation that could lead to a revocation. AR-12-13. Additionally, publication that recklessly endangers American lives could factor into a PFAC assessment. AR-13.

The PFAC Policy maintained Appendix A but updated the list of security risk factors to refer to the explanation of security risks in the in-brief. AR-15 (referencing AR-12-13). This change was made in response to a request by the Pentagon Press Association. AR-66-67.

The PFAC Policy removed the series of acknowledgements and instead includes a single acknowledgement for the media member requesting PFAC access to sign. The acknowledgement states that the signature represents that the Media member has read and understands the in-brief and appendices, which address the standard and procedures for denying, revoking, and not renewing a PFAC and describe Department policies and procedures. AR-14. The acknowledgement explicitly states that signing does not waive any rights the media member may have under law and that the member does not have to agree with the polices or procedures. *Id.*

## LEGAL STANDARDS

"Summary judgment is warranted if a party can 'show that there is no genuine dispute as to any material fact and that the party is entitled to judgment as a matter of law.'" *Husain v. Power*, 630 F. Supp. 3d 188, 194 (D.D.C. 2022) (internal brackets omitted) (quoting Fed. R. Civ. P. 56(a)).

"A fact is 'material' if it could affect the outcome of the litigation under governing law, and a dispute is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (citations omitted). "The evidence is to be viewed in the light most favorable to the nonmoving party and the court must draw all reasonable inferences in favor of the nonmoving party." *Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011). "[S]ummary judgment is appropriate if the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* (cleaned up).

## ARGUMENT

### I.    Plaintiffs must satisfy the high standard applicable to facial challenges.

Plaintiffs bring facial challenges to the PFAC Policy itself. ECF 1, ¶¶ 60-134. While they make reference to the PFAC Policy being invalid "as applied," Pls.' Mem. of L. in Supp. of Pls.' Mot. for Summ. J. ("MSJ") at 2, 5, ECF No. 10-1, the PFAC Policy has not been applied to any Plaintiff because there are no allegations that any Plaintiff has applied for or been denied a PFAC under the PFAC Policy. *Id.* "A facial challenge is really just a claim that the law or [PFAC Policy] at issue is unconstitutional in all its applications." *Bucklew v. Precythe*, 587 U.S. 119, 138-39 (2019).

The Supreme Court has regularly reaffirmed the strict limits on facial challenges. "[L]itigants mounting a facial challenge to a statute normally 'must establish that *no set of circumstances* exists under which the [PFAC Policy] would be valid.'" *United States v. Hansen*, 599 U.S. 762, 769 (2023) (citation omitted); *see also Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024). There is a limited exception to that rule in the First Amendment context, but even there, the plaintiff must "demonstrate[] that the statute prohibits a substantial amount of protected speech relative to its plainly legitimate

sweep." *Hansen*, 599 U.S. at 770 (cleaned up). "Because it destroys some good along with the bad, invalidation for overbreadth is strong medicine that is not to be casually employed. To justify facial invalidation, a law's unconstitutional applications must be realistic, not fanciful, and their number must be *substantially disproportionate* to the statute's lawful sweep." *Id.* (internal quotation marks omitted) (quoting *United States v. Williams*, 553 U.S. 285, 293 (2008)) (emphasis added). "In the absence of a lopsided ratio, courts must handle unconstitutional applications as they usually do—case-by-case." *Id.*; *see also Moody*, 603 U.S. at 723. Plaintiffs cannot satisfy these standards.

## I.    The PFAC Policy Satisfied Due Process Under the Fifth Amendment

### A.  The PFAC Policy provides reasonable standards for the denial, revocation, or non-renewal of a PFAC sufficient to provide notice to any that might be affected

Pursuant to the PFAC Policy, the Department will not grant a PFAC to any individual who it reasonably determines to pose a security or safety risk to Department personnel or property. Plaintiffs' vagueness allegations can be boiled down to the simple complaint that the PFAC Policy does not list out every conceivable situation that constitutes a security risk. But it would be impossible for the Department to list *every* security issue in *every* context beforehand. Indeed, such a predetermination would run afoul of the process Plaintiffs are afforded here. The Due Process Clause does not require agencies to list out every conceivable scenario. Rather, it requires the Department to provide intelligible standards and considerations: here, the Department provided ample guidelines by providing consideration to past convictions, solicit information not authorized for release, and recklessly endangering American lives.

The "[v]agueness doctrine is an outgrowth not of the First Amendment, but of the Due Process Clause of the Fifth Amendment." *Williams*, 553 U.S. at 304. A "punishment fails to comply with due process if the statute or regulation under which it is obtained 'fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it

authorizes or encourages seriously discriminatory enforcement.'" *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) (citation omitted)). The Due Process Clause prohibits uneven enforcement, and ensures notice, of requirements with which the public must comply. *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972)

"[P]erfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *Williams,* 553 U.S. at 304 (quoting *Ward v. Rock Against Racism,* 491 U.S. 781, 794 (1989)). "Condemned to the use of words, we can never expect mathematical certainty from our language." *Grayned*, 408 U.S. at 110. "[M]ost statutes must deal with untold and unforeseen variations in factual situations, and the practical necessities of discharging the business of government inevitably limit the specificity with which legislators can spell out prohibitions. Consequently, no more than a reasonable degree of certainty can be demanded." *Boyce Motor Lines, Inc. v. United States,* 342 U.S. 337, 340 (1952). Moreover, "[t]here are areas of human conduct where, by the nature of the problems presented, legislatures simply cannot establish standards with great precision." *Smith v. Goguen,* 415 U.S. 566, 581 (1974). "[T]he mere fact that close cases can be envisioned" does not "render[] a statute vague." *Williams*, 553 U.S. at 305. The same constitutional standard applies to regulatory actions as to statutes under the Due Process Clause. *See Fox Television*, 567 U.S. at 253.

The PFAC Policy provides ample notice of the grounds on which a PFAC can be denied, revoked, or not renewed. As laid out by Appendix A, persons will not be granted a PFAC if they are "reasonably determined to pose a security or safety risk to DoW personnel or property." AR-15. Appendix A provides specific factors that guide the determination of whether a person is a security or safety risk, such as being convicted of specific categories of offenses. AR-15. It also explained the additional actions that could be considered when making that determination. *Id.* The

Department explains that soliciting the disclosure of CNSI or CUI or encouraging Department personnel to violate laws and policies concerning the disclosure of such information may factor into a decision that a media member poses a safety or security risk. AR-12. And the PFAC Policy provided examples of what such solicitation might look like: general appeals, direct communications, and advertisements that directly target Department personnel to disclose information without authorization. AR-12-13.

Persons of ordinary intelligence would understand that they might not be granted a PFAC if they are convicted of a crime involving any of the listed factors. For example, a PFAC may be denied to an individual with a conviction involving national defense. AR-15. So, individuals who have been convicted of "obtaining information respecting the national defense with [the] intent or reason to believe that the information is to be used to the injury of the United States" would understand that they may not be granted a PFAC. 18 U.S.C. § 793. Similarly, a PFAC may be denied to individuals with a conviction connected to unprofessional conduct that might serve to disrupt Pentagon operations. AR-15. Individuals who have been convicted of "knowingly engag[ing] in [an] act of physical violence against any person or property in [a] restricted building or grounds" would understand that they may not be granted a PFAC. 18 U.S.C. § 1752(a)(4). Moreover, the Department has made clear the situations where soliciting CNSI or CUI could be grounds for revocation. That is more than enough.

The D.C. Circuit, in applying the lead case in defining the security standards applicable in press pass cases, has recognized that the Due Process Clause does not require explicit, ex ante discussion of all potential factors that could be considered in security determinations. *See Sherrill v. Knight*, 569 F.2d 124, 130 (D.C. Cir. 1977). The court of appeals there upheld the White House's press pass policy against a journalist's challenge that it was "unnecessarily vague and subject to

ambiguous interpretation," recognizing that assessing security risks "does not lend itself to detailed articulation of narrow and specific standards or precise identification of all the factors which may be taken into account" and the government could permissibly maintain a standard that was "sufficiently circumspect so as to allow the Secret Service, exercising expert judgment which frequently must be subjective in nature, considerable leeway in denying press passes for security reasons." *Id.*

Plaintiffs argue that the PFAC Policy's reference to "unprofessional conduct that might serve to disrupt Pentagon operations" echoes the "unprofessional conduct" guideline struck down in *Karem v. Trump*, MSJ at 27, where plaintiff's White House hard pass was revoked after a verbal altercation in the press area based on the alleged violation of journalistic norms. 960 F.3d 656, 662–63 (D.C. Cir. 2020). *Karem* is inapposite for several reasons. First, in *Karem*, press passes could be revoked for "unprofessional conduct" in the White House press area. *Id.* But unlike *Karem*, the PFAC Policy does not bar "unprofessional conduct" generally; rather, it is a "*convict[ion]* of any offense involving… [u]nprofessional conduct that might serve to disrupt Pentagon operations." AR-15 (emphasis added). Thus, the only discretion in applying this narrower standard would be to determine, only after a conviction, whether the underlying criminal act could be one that would disrupt Pentagon activity. This standard is sufficiently detailed while still allowing the Department to "exercise[] [its] expert judgment" in maintaining and securing the Pentagon property. *Sherrill*, 569 F.2d at 130.

Second, in *Karem*, there was no written policy for the White House press area, whereas here the PFAC Policy provides written notice of what conduct could result in the denial or revocation of a PFAC. In *Karem*, the White House issued a letter stating that

> (1) members of the press, at all times at White House press events, must act
> professionally, maintain decorum and order, and obey instructions from White

> House staff, and (2) disruptive behavior that interferes with the conduct of a press event or is otherwise a breach of professional decorum—including but not limited to taunting other members of the press, White House officials, or guests in an effort to provoke a confrontation—is prohibited.

960 F.3d at 662–63 (citation omitted). However, the White House expressly declined to adopt "specific provisions for journalist conduct in the open (non-press room) areas of the White House" "in the hope that professional journalistic norms" would "suffice to regulate conduct in those places." *Id.* at 665 (citation omitted). Nor did the letter state that journalists' hard passes would be suspended if unprofessional behavior occurred. *Id.* It was the fact that consequences were issued for behavior imposed in *non-press areas*, where no consequences had previously been hinted at, that was in large part the basis for *Karem*'s due process holding.

In contrast, the Department here has set out explicit and clear standards for conduct within the Pentagon for PFAC holders. AR-15. The PFAC Policy is clear that violating these standards could result in the loss of a PFAC. *Id.* And, critically, the PFAC Policy describes specific conduct that could be deemed a security risk resulting in the loss of a PFAC, as demarcated by particular exemplar situations—such as having been convicted of certain crimes or soliciting the unauthorized disclosure of information—rather than making a general reference to "unprofessional conduct."

Plaintiffs also rely on *Sherrill* for the proposition that the PFAC Policy is unnecessarily vague and subject to ambiguous interpretation when it relies on security reasons to deny a PFAC. MSJ at 25-26. *Sherrill* is inapposite to the PFAC Policy here. In *Sherrill*, an otherwise-qualified journalist was denied a White House hard pass based on the security recommendation of the Secret Service. 569 F.2d 126. At that time, the Secret Service had not promulgated any published regulations regarding the security screening criteria for hard pass applicants, and the Secret Service also had a policy of not even informing rejected applicants of the specific reasons for a denial, let

alone providing any opportunity to challenge the factual basis of the denial. *Id.* The D.C. Circuit concluded that this practice offended due process and that the Secret Service was required to "publish or otherwise make publicly known the actual standard employed in determining whether an otherwise eligible journalist will obtain a White House press pass," thereby "specify[ing] in a meaningful way the basis upon which persons will be deemed security risks." *Id.* at 130. Here, the Department has promulgated prospective standards on which a person will be deemed a security risk, as well as factors that can inform those standards and detailed procedures for adjudicating any potential violation.

*Sherrill* is also inconsistent with Plaintiffs' argument that the PFAC Policy needs detailed and exact standards for the denial, revocation, or non-renewal of a PFAC. *Sherrill* rejected the contention that the White House was required to articulate "detailed criteria upon which the granting or denial of White House press passes is to be based." 569 F.2d 128. The *Sherrill* Court recognized that the government should be given "considerable leeway" in fashioning the applicable standards, and accordingly reversed the district court's decision insofar as it had required the government to promulgate "narrow and specific standards." *Id.* at 130, 131-32.

As stated in *Sherrill*, the degree of specificity demanded of the government also must take account of whether the PFAC Policy is one that "lend[s] itself to detailed articulation of narrow and specific standards or precise identification of all the factors which may be taken into account." *Sherrill*, 569 F.2d at 130. The Department can hardly predict every conceivable form that a potential security risk might take, and it is entitled to rely on standards at a sufficient level of generality to allow responsive action to be taken in cases involving novel security risks.

Not explicitly defining every situation in which a security risk exists beyond what is promulgated in the PFAC Policy sits comfortably within Supreme Court precedent. In *Kovacs v.*

*Cooper*, the Supreme Court rejected with "only a passing reference" the contention that the standard "loud and raucous" was too vague and thus afforded licensors excessive discretion. 336 U.S. 77, 79 (1949). While these were "abstract words," they had "through daily use acquired a content that conveys to any interested person a sufficiently accurate concept of what is forbidden." *Id.*; *see also Cox v. Louisiana*, 379 U.S. 559, 568-69 (1965) (statute prohibiting demonstrations "near" a courthouse did not leave enforcement officials excessive discretion). This Court has similarly upheld standards requiring health claims to be "adequately substantiated," *Bellion Spirits, LLC v. United States*, 7 F.4th 1201, 1213 (D.C. Cir. 2021) (citation omitted), and standards premised on a "clear and present danger to the public health or safety," *Boardley v. U.S. Dep't of the Interior*, 615 F.3d 508, 517 (D.C. Cir. 2010); U.S. Courts of the D.C. Circuit, Courthouse Decorum Policy (effective Dec. 13, 2022), https://www.dcd.uscourts.gov/sites/dcd/files/Courthouse%20Decorum%20Policy%20Final%20Version.pdf (stating that "no person will engage in . . . forms of conduct that involve the communication or expression of views or grievances when such conduct is reasonably likely to draw attention or to impede the administration of justice or the decorum of court proceedings."). Here, the PFAC Policy provides more detail than those standards generally found to be constitutional. AR-15.

Plaintiffs then specifically object to the PFAC Policy factor of soliciting the unauthorized disclosure of information. MSJ at 26-27. This factor isn't vague. The PFAC Policy itself provides examples of what constitutes improper solicitation, and they do not include simply "asking questions of Department employees." MSJ at 26; *see* AR-12-13.

Finally, Plaintiffs argue that the PFAC Policy "authorizes or encourages seriously discriminatory enforcement." MSJ at 27-28 (citation omitted). But "speculation about possible

vagueness in hypothetical situations not before the Court will not support a facial attack" when the provisions are "valid in the vast majority of [their] intended applications." *Hill v. Colorado*, 530 U.S. 703, 733 (2000) (cleaned up). Nor is it enough to say that an agency might "exercise[] [its] discretion unlawfully" under the policy at issue. *Act Now to Stop War & End Racism Coal. & Muslim Am. Soc'y Freedom Found. v. District of Columbia*, 846 F.3d 391, 412 (D.C. Cir. 2017) (citation and brackets omitted). The question is instead whether "anything in the" provision "prevent[s]" the agency "from doing so." *Id.* (citation omitted). And the PFAC Policy meets that standard on its face; it lists numerous factors to guide the discretion of the official; it does not vest unconstrained, unreviewable discretion in the agency.

### B.  The PFAC Policy provides ample process to satisfy the Fifth Amendment

The PFAC Policy provides all the notice required by the Due Process Clause: "notice of the factual bases for denial, an opportunity . . . to respond to these, and a final written statement of the reasons for denial." *Sherrill*, 569 F.2d at 130; *see also Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) ("An essential principle of due process is that a deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'") (citation omitted); *Wilkinson v. Austin*, 545 U.S. 209, 225–26 (2005) ("[N]otice of the factual basis" for the decision "and a fair opportunity for rebuttal" are "among the most important procedural mechanisms for purposes of avoiding erroneous deprivations").

The PFAC Policy provides the required process. First, the PFAC Policy provides notice, both of the substantive standards (as discussed above) and how they will be specifically applied to an applicant in a particular case. AR-15 ("The Director, PFPA, or designee, shall deny, revoke, or refuse to renew the PFAC of any person reasonably determined to pose a security or safety risk to DoW personnel or property"); *id.* ("Persons presumed to present such a risk include, but are not limited to those who have been convicted of any offense involving [various subjects]"). If the

Department anticipates that there may be an adverse decision on a PFAC, the Department will notify the applicant of the basis for the proposed denial—and will ordinarily do so before any consequences will be imposed, i.e. "pre-deprivation notice." AR-15-16 ("If the Director, PFPA, or -designee *anticipates* that a PFAC *might* be denied, revoked, or not renewed, the applicant or his or her authorizing official shall be notified in writing . . . of the basis for the proposed denial, in as much detail as security considerations permit." (emphasis added)).

Second, the PFAC Policy provides an opportunity to respond to the factual bases for the denial. When the Department anticipates there will be a denial, it will send a written notice of the factual basis for the proposed denial. AR-15-16. The applicant can have a hearing, then submit a written response, then have a second hearing. *Id.* The written response can contain any explanation, rebuttal, or additional information. *Id.* Again, under normal circumstances, the applicant will have full access to their pass while this process plays out AR-15-16.

Third, the PFAC Policy provides for a final written statement of the reasons for denial. The final decision shall be expeditiously made and the applicant will be notified in writing. *Id.* The notification will provide the factual basis for the denial. *Id.* This decision constitutes the final agency action. *Id.*

Plaintiffs argue that there is no adequate pre-deprivation process, MSJ at 28. As an initial matter, they do not substantiate a requirement for pre-deprivation process. They cite *National Council of Resistance of Iran v. Department of State*, 251 F.3d 192, 206 (D.C. Cir. 2001), which promulgates a test for how much process is required. *Id.* But Plaintiffs make no effort to apply that test and have thus forfeited it. In any event, the PFAC Policy as written contemplates pre-deprivation process in the vast majority of cases. AR-15. Notice will be provided to an applicant when the Department "anticipates" there will be an adverse decision on a PFAC. *Id.* The notice

will provide the justifications for the "proposed" adverse action. *Id.* And up until the "final decision" by the Department, the adverse action remains a "proposed" action rather than a "final action." AR-16. There *is* considerable pre-deprivation process—which is the ordinary baseline. *Diamond A. Ranch, W. Div., LLC v. Noem*, No. 20-CV-3478 (CRC), 2025 WL 2760959, at *11 (D.D.C. Sept. 29, 2025) *appeal filed*, No. 25-05433 (D.C. Cir. Dec. 5, 2025).

Plaintiffs also argue that deprivation can occur without prior notice of the specific conduct at issue, relying on the portion of the PFAC Policy that says "[a]n initial determination of a security or safety risk may result in an *immediate suspension of Pentagon access* during the process for making a final determination.". MSJ at 29 (alteration in original) (citing AR-12). But this does not mean that deprivation will occur without notice – the PFAC Policy states that when a PFAC is "anticipated" to be revoked, notice will be provided. AR-15. Moreover, notice could also be provided simultaneously with the revocation of the PFAC.

Even in the rare case where an individual is not afforded pre-deprivation process, the process laid out by the PFAC Policy must still be applied post-deprivation. AR-16. This meaningful post-deprivation process—written notice, opportunity to respond, and a hearing—satisfies the Fifth Amendment. *Hudson v. Palmer*, 468 U.S. 517, 533 (1984) ("[W]e hold that an unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the [Fifth or] Fourteenth Amendment if a meaningful post-deprivation remedy for the loss is available."). Indeed, in unforeseeable circumstances, like an exigent security risk, post-deprivation process is adequate and practicable. *Ranch v. Noem*, 2025 WL 2760959, at *11 (D.D.C. Sept. 29, 2025) ("Considering the unforeseeable nature and scope of the deprivation in this case and the impracticality of a pre-construction hearing, the Court finds that the Ranch's due process claim fails so long as it has

sufficient post-deprivation remedies."); *see also Karem,* 960 F.3d at 667 ("White House can rest assured that principles of due process do not limit its authority to maintain order and decorum at White House events by, for example, ordering the immediate removal of rogue, mooning journalists")

And, of course, in the hypothetical situation that a PFAC is temporarily revoked because of an exigent security risk, the applicant can bring an as-applied due process challenge at that time; but a facial challenge to the entire policy is not justified just by the possibility that post-deprivation process may be provided in some unknown context. *Cronin v. FAA*, 73 F.3d 1126, 1128 (D.C. Cir. 1996) ("[I]n the event that an air carrier employee faces adverse action and is allegedly denied the requisite procedural due process, such a claim is best considered in the context of a specific factual setting.").

Next, Plaintiffs argue that, by allowing for an additional inquiry or investigation during a limited situation (again, not the norm) where there has been only post-deprivation process and not providing a deadline, the PFAC Policy allows for the indefinite suspension of a PFAC. MSJ at 29. Again, that hypothetical unusual application would be far better addressed in the "context of a specific factual setting." *Cronin*, 73 F.3d at 1128; *see also N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 39 n.9 (2022) (in a second amendment context, rejecting a facial challenge but reserving the possibility of as applied challenges to "abusive" practices). Regardless, Plaintiffs provide no authority for the novel argument that due process for press pass revocation requires determinations to be made in a certain time frame. As the Supreme Court explained in *Thomas v. Chicago Park District*, a policy need not "specify a deadline for judicial review of a challenge to a permit denial" where the scheme at issue "is not subject-matter censorship but content-neutral time, place, and manner regulation" and "[n]one of the grounds for denying a permit has anything

to do with what a speaker might say." 534 U.S. 316, 322 (2002); *see also FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 228 (1990) (plurality opinion). The procedural requirements for a timely decision with expedited judicial review therefore do not apply outside the limited context of a "prepublication license deemed a denial of liberty since the time of John Milton," like a "classic censorship scheme." *Thomas*, 534 U.S. at 322-33; *accord Boardley*, 615 F.3d at 518 (noting that "[m]ost circuits have held content-neutral licensing schemes need not contain explicit timeframes for processing permit applications" and citing authority from the Sixth, Ninth, Eleventh, and Federal Circuits); *see also id*. (noting absence of any "post-*Thomas* decision holding that a content-neutral licensing scheme must contain an explicit timeframe for official action in order to withstand constitutional scrutiny").

Because the PFAC Policy is content-neutral (*see, infra,* Section II.B), heightened procedural requirements such as a deadline for a decision do not apply. *Ateba v. Leavitt*, 133 F.4th 114, 126–27 (D.C. Cir. 2025), *cert. denied*, No. 25-338, 2025 WL 3260204 (U.S. Nov. 24, 2025) ("The Hard Pass Policy, which is intended to decrease the number of hard passes in circulation for administrative and security purposes, is the type of 'traditional' exercise of government authority that does not trigger heightened procedural protections"). Regardless, the PFAC Policy requires the Department to issue its final decision "expeditiously." AR-16. Given the fact-intensive nature of the inquiry, the variable amount of material any PFAC holder might proffer to rebut a revocation, and the variable demands on the Department's resources, a stricter timeline would be unreasonable, certainly for a facial challenge.

## II.    The PFAC Policy Does Not Violate the First Amendment

### A.  The Department is unable to exercise unbridled discretion via the PFAC Policy[1]

In traditional public forum permitting cases, "unbridled discretion" means "[t]here are no articulated standards either in the ordinance or in . . . established practice[, where] [t]he administrator is not required to rely on any objective factors [and] . . . need not provide any explanation for his decision, and that decision is unreviewable." *Forsyth County, Ga. v. Nationalist Movement,* 505 U.S. 123, 133 (1992). For example, in the seminal case *City of Lakewood v. Plain Dealer Publishing Co.*, the ordinance at issue contained no explicit limits on the mayor's discretion to deny a permit for a newsstand, and the mayor was only required to make the statement "it is not in the public interest" when denying a permit application. 486 U.S. 750, 769 (1988)

As an initial matter, the PFAC Policy is not "directedly narrowly and specifically at expression or conduct commonly associated with expression" like "the circulation of newspapers." *Id.* at 759. Instead, it is concerned with entrance to portions of the Pentagon—i.e., PFAC—which is a noncommunicative, preparatory step in the production of speech. *Price v. Garland*, 45 F.4th 1059, 1068 (D.C. Cir. 2022) (concluding that filmmaking is "a noncommunicative step in the production of speech").

Even if it were directly targeted at expression, the PFAC Policy does contain limits on the discretion of the Department to deny, revoke, or not renew a PFAC. A PFAC will only be denied,

---

[1] Plaintiffs' "unbridled discretion" claim is duplicative of their reasonableness claim. *Leavitt*, 133 F.4th at 122  ("[W]e have held that a violation of the unbridled discretion doctrine is generally unreasonable under the First Amendment.  We therefore consider Ateba's unbridled-discretion argument within the framework of reasonableness.").  Out of an abundance of caution, Defendants address both separately, but as they have been distilled to the same test, Defendants incorporate arguments made in response to unbridled discretion allegations to reasonableness allegations, and vice versa.

revoked, or not renewed where the Department "reasonably" determines the individual poses a security or safety risk, and that determination is informed by factors that the Department must consider, such as prior convictions for certain offenses relating to safety and national security. AR-15. The PFAC Policy also explains that the Department may also consider soliciting or encouraging the disclosure of information not authorized for release. AR-12. But this is not unbounded; it is clearly defined. Any denial or revocation of a PFAC will explain the grounds, the initial denial or revocation is subject to an appeal process, and the final decision is a final agency action subject to judicial review. AR-16.

Plaintiffs argue that because of the PFAC Policy's language that CUI "may include, but is not limited to" definitional language, the grounds that someone may be a security or safety risk can "include, but are not limited to" certain factors, and that determinations that are made on a "case-by-case basis reviewing the totality of the circumstances" amount to unbridled discretion in issuing PFACs. MSJ. at 32. But the degree of specificity demanded of the government also must take account of whether the policy is one that "lend[s] itself to detailed articulation of narrow and specific standards or precise identification of all factors which may be taken into account." *Sherrill*, 569 F.2d at 130. The Department can hardly predict every conceivable form that a security risk in the Pentagon might take, and it is entitled to rely on standards at a sufficient level of generality to allow responsive action to be taken in cases presenting novel security risks. *See also White House Vigil for the ERA Comm. v. Watt*, 717 F.2d 568, 572 (D.C. Cir. 1983) ("[t]he balance that must be struck between First Amendment rights and other public interests is especially delicate when one of those interests is the safety of the President"); *cf. Dep't of the Navy v. Egan*, 484 U.S. 518, 529 (1988) ("protection of classified information must be committed to the broad discretion of the agency responsible").

As argued above in response to Plaintiff's vagueness argument, *Sherrill* rejected the contention that the White House was required to articulate "detailed criteria upon which the granting or denial of White House press passes is to be based." 569 F.2d at 128. The D.C. Circuit recognized that the government should be given "considerable leeway" in fashioning the applicable standards and accordingly reversed the district court's decision insofar as it had required the government to promulgate "narrow and specific standards." *Id.* at 130, 131-32. Rather, there must merely be an "explicit and meaningful standard governing denial of . . . press passes for security reasons." *Id.* at 131. And recently, the D.C. Circuit reiterated that "the government is entitled to 'exercise expert judgment' that may 'be subjective in nature' when deciding who may be barred from the Press Area for security reasons. *Leavitt*, 133 F.4th at 122 (quoting *Sherrill*, 569 F.2d at 130). Here, Plaintiffs are arguing for the narrow standards explicitly rejected by *Sherrill*, and the discretion retained by the Department has been endorsed in *Ateba*.

Plaintiffs allege that the Department will exercise their discretion on an *ad hoc* basis, ignoring the PFAC Policy to reward journalists it likes and punish journalists it disapproves of. MSJ at 32-33. But the unbridled discretion doctrine is concerned with making explicit the limits on an official's discretion, not the mere possibility that government officials will act in violation of such limits. *City of Lakewood*, 486 U.S. at 770 ("The [unbridled discretion] doctrine requires that the limits the city claims are implicit in its law be made explicit by textual incorporation, binding judicial or administrative construction, or well-established practice"). And Plaintiffs have not provided any compelling evidence that the Department will act in violation of its own policy. Plaintiffs complain that the PFAC Policy is applied to forbid a Washington Post tip line but permits Laura Loomer to do "the same" thing. MSJ at 33. But the tip lines are not the same. The Loomer tip line solicits information from general public on any matter. MSJ Ex. 20, ECF 10-28. In contrast,

the Post's Tip Line appears at the end of military defense related stories and "explicitly and exclusively targets military personnel and DoW employees." SUMF ¶ 88; MSJ Ex. 22, ECF 10-30. It is not arbitrary for the PFAC Policy to draw a line between the two. In any event, this would hardly lead to a legal conclusion that the Department violates the PFAC Policy, much less that it allows unbridled discretion. Similarly, Plaintiffs complain that James O'Keefe obtained then published unauthorized statements by Department personnel, MSJ at 33, but the PFAC Policy is explicit that "the receipt of unsolicited NCSI or CUI and its subsequent publication is generally protected by the First Amendment and would not, on its own" lead to an adverse PFAC decision. AR-12. This example thus does no more than confirm that the PFAC Policy means what it says.

Ultimately, the Supreme Court has regularly recognized that standards potentially implicating First Amendment rights, as here, pass constitutional muster even if they entail the exercise of discretion in their execution. In *Ward*, the Supreme Court considered a challenge to a city sound quality ordinance requiring the city to "provide the best sound for all events" and to "insure appropriate sound quality balanced with respect for nearby residential neighbors and the mayorally decreed quiet zone." 491 U.S. at 794 (quoting the relevant ordinance). The Court upheld the ordinance, stating: "While these standards are undoubtedly flexible, and the officials implementing them will exercise considerable discretion, perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *Id.*; *see also Graff v. City of Chi.,* 9 F.3d 1309, 1318 (7th Cir. 1993) (*en banc*) (upholding ordinance that gave the Commissioner of Transportation "discretion to remove a newsstand that 'endangers public safety or property'"); *MacDonald v. Chi. Park Dist.,* 132 F.3d 355, 361 (7th Cir. 1997) (vacating a preliminary injunction preventing enforcement of a permitting scheme authorizing denial of a permit application if the use or activity "would present an unreasonable danger to [] health and

safety") (quoting Chi. Park Dist. Code § C(5)(e)); *United States v. Kistner*, 68 F.3d 218, 221 (8th Cir. 1995) (upholding a permitting scheme allowing imposition of terms and conditions necessary "to preserve peace and tranquility" and "to prevent dangers to public health and safety"); *Ateba v. Jean-Pierre*, 706 F. Supp. 3d 63, 71 (D.D.C. 2023) (upholding a policy where the Secret Service determined "eligibility based on whether the applicant presents a potential risk to the safety or security of . . . the White House complex."), *aff'd*, 133 F.4th 114 (D.C. Cir. 2025).

Like the policies found permissible in *Ward, Graff, MacDonald, Kistner,* and *Ateba,* the PFAC Policy does not delegate unbridled discretion to the Department.

### B.  The PFAC Policy contains no viewpoint or content-based restrictions

The PFAC Policy does not discriminate based on content or viewpoint because it contains no viewpoint or content-based restrictions. The government violates the First Amendment when it regulates speech based on "the specific motivating ideology or the opinion or perspective of the speaker." *Reed v. Town of Gilbert*, 576 U.S. 155, 168-69 (2015) (quoting *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)). The government may not "den[y] access to a speaker solely to suppress the point of view he espouses." *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 393 (1993) (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985)). Viewpoint discrimination occurs when the government targets "a specific premise, a perspective, a standpoint from which a variety of subjects may be discussed and considered.'" *Rosenberger*, 515 U.S. at 831.

But once again, the PFAC Policy contains no references to restrictions on either content or viewpoint. On its face, the PFAC Policy states that "members of the news media are not required to submit their writings to DoW for approval." AR-6. The PFAC Policy also explicitly states that a PFAC holder is not prohibited from "investigating, reporting, or publishing stories." AR-12. Similarly, the "receipt of unsolicited CNSI or CUI and its subsequent publication . . .  would not,

on its own, trigger denial, revocation, or non-renewal of the PFAC." AR-12. Therefore, Plaintiffs' claim that the PFAC Policy chills the "newsgathering and publication" of information "not authorized by the Department" contradicts the PFAC Policy on its face. MSJ at 34-35. Indeed, the PFAC Policy requires prior authorization for public release only if the public release is done by a "military member, DoW civilian employee, or contract employee." AR-5. It does not require prior authorization for journalists. It is telling that Plaintiffs do not point to a specific portion of the PFAC Policy that is content or viewpoint based.

What the PFAC Policy does restrict are attempts to solicit information not authorized for release from individuals who may be subject to prosecution for disclosing such information, or otherwise encourage DoW personnel to violate laws and policies concerning the disclosure of such information. AR-12. This prohibited conduct is not content based because it does not "target[] speech based on its communicative content." *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 69 (2022) (quoting *Reed*, 576 U.S. at 163). CUI and CNSI are categories of information, not themselves "topics" or "messages." Instead, CUI and CNSI encompass myriad topics and convey countless messages.

Nor is this prohibited conduct itself a viewpoint. *See Oberwetter v. Hilliard*, 639 F.3d 545, 553 (D.C. Cir. 2011) (regulations that "prohibit disruptive speech regardless of its message" "plainly do not discriminate on the basis of viewpoint"); *Eichenlaub v. Township of Ind.*, 385 F.3d 274, 281 (3d Cir. 2004) (concluding that "a motive. . . to prevent [ ] badgering, constant interruptions, and disregard for the rules of decorum" is "sustainable and content-neutral."); *see also Cornelius*, 473 U.S. at 811 ("The First Amendment does not forbid a viewpoint-neutral exclusion of speakers who would disrupt a nonpublic forum and hinder its effectiveness for its intended purpose.").

Seeming to recognize that the PFAC Policy does not contain viewpoint restrictions, Plaintiffs argue that the PFAC Policy is viewpoint discriminatory because it will be applied at the Department's discretion against outlets it does not like. MSJ at 36-37. This is just a reiteration of their unbridled discretion argument, which the D.C. Circuit has held is not viewpoint discrimination. *Leavitt*, 133 F.4th at 124. Moreover, for the reasons discussed earlier regarding Loomer and O'Keefe, Plaintiffs' evidence of alleged discriminatory application falls flat. *See supra* at 27-28. In any event, this argument would only appear to support an as-applied claim. But because the PFAC Policy has not been applied to any Plaintiff (nor is Loomer, O'Keefe, or the Washington Post a party here), Plaintiffs cannot bring an as-applied challenge or argue that it has been applied unfairly to non-parties.

Because the PFAC Policy does not contain content or viewpoint discrimination, and the Department has not applied the policy to Plaintiffs at all—much less discriminated against them—Plaintiffs fabricate an unwritten "aim" of the policy is to "drive [] disfavored speakers and their disfavored journalism out of the [Department.]" MSJ at 35-36. But the record does not support any such aim. As stated, the PFAC Policy itself does not contain this aim. AR-1-18. And the Department conferred with the major news outlets and journalist professional organizations on revisions to the PFAC Policy that would accommodate their concerns. AR-18-74. The Department made particular changes to the PFAC Policy in response to such concerns. *Compare* AR-15 (reflecting the removal of unauthorized attempts to obtain CNSI and CUI as a factor to deny a PFAC) *with* AR-66-67 (Pentagon Press Association requesting removal of that language and just referred to the in-brief); *compare* AR-14 (removed specific acknowledgements, stated media members do not waive rights, stated that media members do not have to agree with policies and procedures) *with* AR-74 (MFIA requesting change); *compare* AR-5 (adding a statement that "news

media are not required to submit their writings to DoW to approval") *with* AR-44-45 (expressing concern that media members might need to agree to preauthorization). If the aim was to force out legacy news media, the Department would not have accommodated so many of their requests and concerns in issuing the revised PFAC Policy. What's more, none of these legacy news media have been denied a PFAC—they lack a PFAC because they refuse to sign the PFAC Policy. SUMF ¶¶ 69-70.

Plaintiffs' attempt to tie Department officials' characterizations of different media outlets to Government action that discriminates based on content or viewpoint fares no better. MSJ at 36. While Plaintiffs assert, without authority, that the "First Amendment violation could not be more obvious," *id.*, there is no evidence of viewpoint or content discrimination in officials praising one set of journalists and criticizing another, while providing the same types of press conditions to the praised and criticized alike. Indeed, the Supreme Court has primarily followed the principle that speaker-based discrimination is prohibited when it accompanies content discrimination. *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 565 (2011). And here, there is no content discrimination (or speaker discrimination).

Separately, restricting PFAC availability based on attempts to solicit information not authorized for release from individuals who may be punished for disclosing such information, or otherwise encourage DoW personnel to violate laws and policies concerning the disclosure of such information, would not violate the First Amendment for another reason. "[L]ong-established caselaw provides that speech. . . that constitutes criminal aiding and abetting" under traditional principles of accomplice liability "does not enjoy the protection of the First Amendment." *Rice v. Paladin Enters.*, 128 F.3d 233, 242-43 (4th Cir. 1997). It "has never been deemed an abridgement of freedom of speech. . . to make a course of conduct illegal merely because the conduct was in

part initiated, evidenced, or carried out by means of language, either spoken, written, or printed."
*Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949). "[T]he constitutional freedom for speech" does not "extend [] its immunity to speech or writing used as an integral part of conduct in violation of a valid criminal statute." *Id*. at 498. "Many long established criminal proscriptions—such as laws against conspiracy, incitement, and solicitation—criminalize speech (commercial or not) that is intended to induce or commence illegal activities." *Williams*, 553 U.S. at 298. Such "prevention and punishment" of "speech integral to criminal conduct" has "never been thought to raise any Constitutional problem."  *United States v. Stevens*, 559 U.S. 460, 468-69 (2010) (citation omitted). There is thus "no doubt that a newspaper constitutionally could be forbidden to publish a want ad proposing a sale of narcotics or soliciting prostitutes," or that it could be forbidden to publish sex-segregated job ads that "aid" employers in indicating illegal sex preferences in hiring. *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 388-89 (1973).

When a Department employee discloses unauthorized information, the employee risks civil and criminal penalties. *See, e.g.,* Exec. Order 13526, Classified National Security Information, 75 Fed. Reg. 707 (Dec. 29, 2009), corrected by 75 Fed. Reg. 1013 (Dec. 29, 2009); Exec. Order 13556, Controlled Unclassified Information, 75 Fed. Reg. 68675 (Nov. 4, 2010); And these disclosures are not protected by the First Amendment. *United States v. Kim*, 808 F. Supp. 2d 44, 56 (D.D.C. 2011) ("Because § 793(d) makes it unlawful to communicate national defense information to those not entitled to receive it, courts have held that the First Amendment affords no protection for this type of conduct even though it clearly involves speech."); *see also Haig v. Agee,* 453 U.S. 280, 308–09 (1981) (holding that defendant's "repeated disclosures of intelligence operations and names of intelligence personnel" are "clearly not protected by the Constitution"); *Frohwerk v. United States*, 249 U.S. 204, 205-06 (1919) (holding that defendants' attempts to cause

disloyalty and mutiny in the military through the publication of newspaper articles in violation of the Espionage Act were not protected by the First Amendment); *United States v. Morison*, 844 F.2d 1057, 1069 (4th Cir. 1988) ("[I]t seems beyond controversy that a recreant intelligence department employee who had abstracted from the government files secret intelligence information and had willfully transmitted or given it to one 'not entitled to receive it' as did the defendant in this case, is not entitled to invoke the First Amendment as a shield to immunize his act of thievery."). And soliciting or encouraging this conduct would similarly not be protected by the First Amendment. *Hansen*, 599 U.S. at 783 ("Speech intended to bring about a particular unlawful act has no social value; therefore, it is unprotected.").

Because the PFAC Policy does not have content-based restriction on its face, it is not subject to strict scrutiny, as advanced by Plaintiffs. MSJ at 37. Even if the restriction on soliciting information not authorized for release was construed to be a content-based restriction, at most the PFAC Policy would receive rational basis review because it turns, at most, on speech integral to an unlawful act. *Woodhull Freedom Found. v. United States*, 72 F.4th 1286, 1307 (D.C. Cir. 2023) (rejecting strict scrutiny challenge when speech was not protected by First Amendment); *Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 471–72 (2025) (noting prohibitions on unprotected speech are subject only to rational-basis review). Under rational basis review, a law will be upheld "if there is any reasonably conceivable state of facts that could provide a rational basis" for its enactment. *Id.*

Regardless, the PFAC Policy satisfies both strict scrutiny and rational basis. The Government has a compelling interest in protecting national security and the security of the Pentagon. *TikTok Inc. v. Garland*, 122 F.4th 930, 953 (D.C. Cir.) (holding act survived strict scrutiny challenge in a First Amendment context because of the "compelling national security

interest"); *Egan*, 484 U.S. at 527 ("This Court has recognized the Government's 'compelling interest' in withholding national security information from unauthorized persons in the course of executive business"). The Pentagon is part of the Department of War, and is involved in the defense of the nation, and any compromise of its security could compromise its effectiveness.  AR18.

The PFAC Policy is narrowly tailored to protect that interest.  "It bears emphasis that, under the strict-scrutiny standard, a restriction must be narrowly tailored, not perfectly tailored."  *In re Sealed Case*, 77 F.4th 815, 830–31 (D.C. Cir. 2023) (cleaned up). Because the interest protected is the security of the Pentagon, the PFAC Policy restricts granting access to any applicant that is a "security risk" AR 15.  Similarly, the restriction on the solicitation of unauthorized information is narrowly tailored: the PFAC Policy informs the PFAC holder that soliciting or encouraging Department personnel to disclose information not authorized for release may inform a reasonable determination as to whether the PFAC holder poses a security or safety risk. *Hansen*, 599 U.S. at 781 ("[The challenged provision] reaches no further than the purposeful solicitation and facilitation of specific acts known to violate federal law. So understood, the statute does not 'prohibit a substantial amount of protected speech' relative to its 'plainly legitimate sweep'"); *see also Egan*, 484 U.S. at 529 ("the protection of classified information must be committed to the broad discretion of the agency responsible"). As in *Hansen*, the PFAC Policy only reaches the solicitation or facilitation of specific acts that violate federal law.

Plaintiffs argue that the PFAC Policy does not pass strict scrutiny because it is not a valid government interest to suspend or revoke a PFAC because it dislikes the content of the reporting. MSJ at 37.  The Department agrees—and here the valid government interest is maintaining the security of the Pentagon, a government building closed to the public involved in the defense of the country.

Plaintiffs also argue that the government interest cannot be security, because reporters have been reporting from the Pentagon for years and because the PFAC Policy encompasses activity off Pentagon grounds. MSJ at 37. First, whether or not reporters in the past have or have not been safety risks does not bear on the Department's policy to deny PFAC Passes to any reporter that is a security risk. There is no basis to argue that prophylactic measures to prevent security risks cannot pass strict scrutiny. Otherwise, Plaintiffs would have the government forever reacting to risks, rather than preventing them. Second, given the global, interconnected media and communications environment, the PFAC Policy would be underinclusive if it did not encompass off-grounds communication. As Plaintiffs concede, a PFAC allows "Pentagon reporters build professional relationships and trust with Department officials." MSJ at 7. An individual who was a security risk could use those relationships to solicit unauthorized information in informal settings off-grounds. Moreover, if a reporter is able to solicit information off grounds suggests that there is a security problem on grounds.

Finally, Plaintiffs argue that the policy is both under and over inclusive because it does not define "sensitive information" or mandate a punishment if its confidentiality is not maintained. MSJ at 38. But Plaintiffs take the term "sensitive information" out of context. On the same page cited by Plaintiffs, in the same section, the PFAC Policy states "[s]uch determination may be based on factors including… [unauthorized access] of CNSI or CUI." AR-12. The PFAC Policy then again refers to CNSI and CUI in the next paragraph. *Id.* Then, in the portion cited by Plaintiff, the PFAC Policy states that the government has a compelling interest in the confidentiality of sensitive information. This "sensitive information" refers to the CNSI and CUI repeatedly stated immediately above. And as stated, *supra*, the government has a compelling interest in protecting the security of the Pentagon and the security of CNSI and CUI. And the policy tightly fits with

those interests by permitting the Department to end physical access to the Pentagon for reporters who attempt or succeed in unauthorized access of CNSI or CUI when necessary to ensure security.

### C.  The PFAC Policy is reasonable

The Department could have decided to not allow any press access to the Pentagon: access to the Pentagon is a privilege, not a right.  But because the Department has opened its doors to the press, Defendants agree with Plaintiffs that the Pentagon is a non-public forum. A nonpublic forum is government property that "is not by tradition or designation a forum for public communication," such as a government office building. *Minn. Voters All. v. Mansky*, 585 U.S. 1, 11-12 (2018) (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983)). Although the government is not required to open such spaces for any speech at all, the government creates a "nonpublic forum" when it provides "'selective access for individual speakers.'" *Bryant v. Gates*, 532 F.3d 888, 895 (D.C. Cir. 2008) (quoting *Ark. Educ. Tel. Comm'n v. Forbes*, 523 U.S. 666, 679 (1998)). For example, in *Ateba*, the White House press area was found to be a nonpublic forum because there were "restrictions on entry," the purpose of the Press Area was to provide press facilities for correspondents, and that access was limited to those who could meet the White House's admission criteria. *Leavitt*, 133 F.4th at 122.

The Pentagon is an office building—indeed, the headquarters of the American military— that is not a forum for public communication. Like the White House Press Area, there are restrictions on entry to the Pentagon, AR-3, there are designated press areas, AR-19, and access is limited to those who can obtain a PFAC. AR-1-15.

Because the PFAC Policy does not restrict access to a public forum and only implicates access to a nonpublic forum, "the Government has far more leeway to regulate speech," *Price*, 45 F.4th at 1068; all the First Amendment requires in a nonpublic forum is that a "restriction must not discriminate against speech on the basis of viewpoint, and the restrictions must be reasonable in

light of the purpose served by the forum." *Id*. at 1072 (quoting *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106-07 (2001)). In other words, in a nonpublic forum the government may even impose content-based restrictions as long as such restrictions do not discriminate on the basis of viewpoint. *Mansky*, 585 U.S. at 12 ("[O]ur decisions have long recognized that the government may impose some content-based restrictions on speech in nonpublic forum").

As for the first prong, as discussed already, the PFAC Policy does not discriminate based on viewpoint. The policy contains no references to restrictions on any viewpoint. On its face, the PFAC Policy states that "members of the news media are not required to submit their writings to DoW for approval." AR-6. The PFAC Policy also explicitly states that a PFAC holder is not prohibited from "investigating, reporting, or publishing stories." AR-12. Similarly, the "receipt of unsolicited CNSI or CUI and its subsequent publication . . . would not, on its own, trigger denial, revocation, or non-renewal of the PFAC." AR-12. And Plaintiffs' arguments regarding a hidden discriminatory purpose or uneven applications fail for the reasons already discussed. *Supra* at Section II.B.

As for the second prong, the policy is reasonable. A court must assess limitations in light of the "purpose of the forum and all the surrounding circumstances," and a regulation can be reasonable without being "the most reasonable or the only reasonable limitation." *Cornelius*, 473 U.S. at 808-09. "The First Amendment does not demand unrestricted access to a nonpublic forum merely because use of that forum may be the most efficient means of delivering the speaker's message." *Id.* "In contrast to a public forum, a finding of strict incompatibility between the nature of the speech or the identity of the speaker and the functioning of the nonpublic forum is not mandated." *Id*. at 808. The reasonableness of a limitation can be established "by evidence in the record or even by a commonsense inference." *Price*, 45 F.4th at 1072.

The PFAC Policy easily passes constitutional muster. The policy provides objective, workable standards for its application. A PFAC will only be denied, revoked, or not renewed where the Department reasonably determines the individual poses a security or safety risk, and that determination is bounded by factors that the Department must consider, such as prior convictions for certain offenses relating to safety and national security. AR-15. The PFAC Policy also explains that the Department may also consider soliciting or encouraging the disclosure of information not authorized for release. AR-12. Any denial, revocation, or non-renewal of a PFAC will explain the grounds, will be subject to an appeal process, and once it becomes a final agency action, will be subject to judicial review. AR-16.

The PFAC Policy is not required to provide any more "detailed criteria upon which the granting or denial of [a PFAC] is to be based." *Sherrill*, 569 F.2d at 128. Consistent with the "considerable leeway" the Department has in fashioning an adequate standard, *id.* at 130, the Department "is entitled to exercise 'expert judgment' that may 'be subjective in nature' when deciding who may be barred from the Press Area for security reasons." *Leavitt*, 133 F.4th at 122 (quoting *Sherrill*, 569 F.2d at 130). Plaintiffs' only remaining argument is that the policy is unreasonable in light of the purpose of the forum because they allege it is vague and content- and viewpoint-based. MSJ at 40. Those arguments fail for the reasons explained already.

## III.    The PFAC Policy was the product of reasoned decisionmaking

When evaluating claims brought pursuant to the APA, a court reviews an agency decision based on the administrative record, *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971)), and may hold unlawful and set aside an agency decision that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with [the] law," 5 U.S.C. § 706(2)(A). Under this highly deferential standard, the agency's decision is presumed valid, and a court reviews only whether that decision

"was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park*, 401 U.S. at 416. An agency's decision may be deemed arbitrary and capricious only in circumstances where the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency," or its decision "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). A court may not "substitute its judgment for that of the agency," *id.*, and must "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 214 (D.C. Cir. 2013) (quoting *State Farm*, 463 U.S. at 43). In short, the agency's decision should be affirmed as long as there is a "rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 246 (1962)).

This deferential standard is further heightened where, as here, a case implicates national security and foreign affairs. Courts respect the Executive's expertise in the national security and foreign policy arenas. *See Holder v. Humanitarian L. Project*, 561 U.S. 1, 33-34 (2010).

The Department issued the PFAC Policy to provide "balance between press access and [operational security]." AR-18. While the Department is "committed to transparency," the Department is "obligated to protect CNSI and sensitive information – the unauthorized disclosure of which could put the lives of U.S. Servicemembers in danger." *Id.* The PFAC Policy was intended to "reduce the opportunities for in-person inadvertent and unauthorized disclosure." AR-18

Consistent with that goal, the PFAC Policy is intended to restrict PFACs from individuals who are "security or safety risks." AR-15. That determination is driven by whether an individual

has had prior convictions for certain offenses relating to safety and national security or has attempted to solicit the disclosure of information not authorized for release. AR-15. Contrary to Plaintiffs arguments, MSJ at 41, there is a rational connection between the compelling Government interest of keeping national security secrets safe and seeking to prevent the solicitation of the disclosure of those same national security secrets.

First, Plaintiffs argue that the Department considered impermissible factors in promulgating the policy: to "chill newsgathering" and "reporting the Department disfavors." MSJ at 41. Nowhere does the PFAC Policy state this, nor is there any evidence in the administrative record to support such an allegation. As stated above, the purpose of the policy is to secure the Pentagon and stop activity that could compromise national security. To the extent Plaintiffs are trying to import their unbridled discretion and vagueness arguments, they also import their extra-record evidence, which is impermissible. *Lorion*, 470 U.S. 729, 744. Based on the administrative record, the Department properly considered, and only considered, factors connected to the security of the Pentagon.

Second, Plaintiffs argue that the Department did not engage in any fact finding when creating the PFAC Policy, MSJ at 42, but the Department is allowed to use "common sense . . . even if not explicitly backed by information in the record." *Phoenix Herpetological Soc'y, Inc. v. United States Fish & Wildlife Serv.*, 998 F.3d 999, 1006 (D.C. Cir. 2021). It should be undisputed that it is an exercise of common sense that, to secure the headquarters of the United States armed forces, which contains vast quantities of national security information, the government may limit access to individuals who do not have convictions relating to national security or safety, and do not attempt to gain unauthorized access to that national security information.

Third, contrary to Plaintiff's allegations, MSJ at 42, the Department did consider

alternatives to the PFAC Policy. The Department issued an original PFAC Policy, and based on input from the press, issued a revised PFAC Policy. AR-41-71. The fact that it created a new policy based on alternative language and input from the press shows that it considered alternatives. Nor do Plaintiffs provide any reasonable alternative that the Department should have, but failed, to consider.

## IV.    Plaintiffs Are Not Entitled to an Injunction

The D.C. Circuit "has set a high standard for irreparable injury." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). The moving party must demonstrate an injury "both certain and great" and "of such *imminence* that there is a 'clear and present' need for equitable relief in order to prevent irreparable harm." *Id.* (citation omitted). The injury must also "be beyond remediation," meaning that the possibility of corrective relief "at a later date . . . weighs heavily against a claim of irreparable harm." *Id.* at 297–98 (citation omitted). The mere fact that a complaint alleges a violation of a constitutional right does not automatically demonstrate an irreparable injury. *Ayele v. Dist. of Columbia*, 704 F. Supp. 3d 231, 239 (D.D.C. 2023) ("[T]here is no per se rule that the violation of any constitutional right is inherently irreparable.").

Plaintiffs' alleged harm does not satisfy the D.C. Circuit's requirement that the harm be both certain and great, as well as beyond remediation. *Chaplaincy*, 454 F.3d at 297. Plaintiffs have yet to apply for a PFAC, let alone been denied one. Accordingly, their case law, which all relates to reporters who had press passes denied or revoked, is inapplicable to this facial challenge related to speculative future harm.

In any event, consistent with the "characterization of injunctive relief as an extraordinary remedy," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008), "[a], the injury must be "great" in magnitude. *Wis.* Gas *Co. v. Fed. Energy Regul. Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985); s*ee, e.g., FTC v. Standard Oil*, 449 U.S. 232, 244 (1980). Plaintiffs' injury is not "great."

Unless and until they sign the PFAC acknowledgment and are then denied a PFAC, their harm has not materialized, and may never materialize, because there has not been any viewpoint or content discrimination, nor would the PFAC policy have been applied in a discriminatory way.

The third and fourth requirements for issuance of a preliminary injunction—the balance of harms and whether the requested injunction will disserve the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). These factors tilt decisively against granting a permanent injunction here. As stated above, the Plaintiffs harm is not "great"—they allege only that the *PFAC Policy* burdens their constitutional rights. In contrast, enjoining the Department would hamper its ability to manage security risks, ensure the integrity of military initiatives, and protect the lives and safety of American servicemembers. *Egan*, 484 U.S. at 527. To paraphrase *Winter*: if an injunction is entered and there is a security risk, "it may be too late" to fix the damage. *Winter*, 555 U.S. at 31.

Should the Court issue any relief in this case, it should only be tailored to the specific Plaintiffs, *i.e.*, by remanding for further proceedings consistent with the Court's Memorandum Opinion for relief applicable to Plaintiffs only. *California v. Texas*, 593 U.S. 659, 672 (2021) ("Remedies … ordinarily 'operate with respect to specific parties,'" (quoting *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 489 (2018) (Thomas, J., concurring)); *Nebraska Dep't of Health & Hum. Servs. v. Dep't of Health & Hum. Servs.*, 435 F.3d 326, 330 (D.C. Cir. 2006) (noting that injunctive relief "must be narrowly tailored to remedy the specific harm shown"); *Meinhold v. U.S. Dep't of Def.*, 34 F.3d 1469, 1480 (9th Cir. 1994) (concluding that the district court erred in enjoining the defendant from applying the invalid regulation to all military personnel (citing *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)); *see also Gill v. Whitford,* 585 U.S. 48, 73 (2018) ("A plaintiff's remedy must be tailored to redress the plaintiff's particular injury."); *Trump v.*

*CASA, Inc.*, 606 U.S. 831, 841 (2025).

## V.    Remand is the appropriate remedy

Rather than issue an injunction, to the extent that this Court determines that relief is appropriate, such relief should be limited to remanding the PFAC Policy to the agency and, if necessary, vacating the PFAC Policy to allow the Department to issue a new policy. Courts are "not without discretion. . . to leave agency action in place while the decision is remanded for further explanation." *Standing Rock Sioux Tribe v. U.S.  Army Corps of Eng'rs*, 985 F.3d 1032, 1051 (D.C. Cir. 2021) (citation omitted). The decision whether to vacate depends on "the seriousness of the order's deficiencies" and "the disruptive consequences of an interim change that may itself be changed." *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993) (citation omitted). The seriousness of a deficiency "is determined at least in part by whether there is 'a significant possibility that the agency may find an adequate explanation for its actions' on remand." *Standing Rock Sioux Tribe*, 985 F.3d at 1051 (citation omitted). Second, it must analyze "the disruptive consequences" that vacatur would engender. *Allied-Signal*, 988 F.2d at 150–51 (quoting *Int'l Union, UMW v. FMSHA*, 920 F.2d 960, 966–67 (D.C.Cir.1990)).

Here, if the Court concludes that the Department failed to adequately explain its policy, a remand would permit the Department to provide additional explanation of the need for security on the Pentagon, the dangers of security risks, and the difficulties of articulating specific, narrow guidance to cover every foreseeable security risk.

Even if the first *Allied-Signal* factor weighed in favor of vacatur here, that factor would not be dispositive. *Shands Jacksonville Med. Ctr. v. Burwell*, 139 F. Supp. 3d 240, 270 (D.D.C. 2015). If it were dispositive, the answer would always be vacatur and remand, thereby swallowing the rule. Instead, "resolution of the question turns on the Court's assessment of the overall equities and practicality of the alternatives," *id.*, and courts have often remanded without vacatur

notwithstanding the seriousness of the agency order's deficiencies. *See Citrus HMA, LLC v. Becerra*, 597 F. Supp. 3d 450, 462 (D.D.C. 2022) (remanding without vacatur based on the second *Allied-Signal* factor); *Am. Great Lakes Ports Ass'n v. Zukunft*, 301 F. Supp. 3d 99, 105 (D.D.C. 2018), *aff'd sub nom. Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510 (D.C. Cir. 2020) (remanding without vacatur even though the first *Allied-Signal* factor favored vacatur); *Shands Jacksonville Med. Ctr.*, 139 F. Supp. 3d at 270 (same); *see also N.C. Fisheries Ass'n, Inc. v. Gutierrez*, 550 F.3d 16, 20 (D.C. Cir. 2008) (expressing preference for a "simple remand" (without vacatur) in a case in which the agency had been found to have violated a statute); *Glob. Van Lines, Inc. v. ICC*, 804 F.2d 1293, 1305 n. 95 (D.C. Cir. 1986) ("We agree with the Commission that when an agency committing an error of law has discretion to determine in the first instance how it should be rectified, the proper course is to remand the case for further agency consideration in harmony with the court's holding.") (citing cases); *Bayshore Cmty. Hosp. v. Azar*, 325 F. Supp. 3d 18, 24–25 (D.D.C. 2018) (remanding without vacatur where the agency had committed a legal error because "vacatur . . . exceeds what is required to resolve the parties' dispute"). Here, requiring the Department to rescind its PFAC Policy and issue PFACs to Plaintiffs could compromise the safety of the Pentagon, halt the processing of any future PFACs as there will not be a PFAC Policy, and restrict the Pentagon from revoking PFACs because there will be no written policy in place for the revocation or non-renewal of PFACs.

## CONCLUSION

For the foregoing reasons, the Court should enter judgment for Defendants. If the Court enters judgment and an injunction for Plaintiffs, Defendants request a seven day administrative stay for time to appeal, should any be authorized by the Solicitor General.

DATED: January 30, 2025                Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

JOSEPH E. BORSON
Assistant Branch Director

*/s/ Michael Bruns*
Michael Bruns
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
michael.bruns@usdoj.gov

*Counsel for Defendants*