## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

THE NEW YORK TIMES COMPANY, *et al.*

      *Plaintiffs*,

  v.

DEPARTMENT OF DEFENSE A/K/A
DEPARTMENT OF WAR,
*et al.*,

      *Defendants*.

**Civil Case No.** 25-cv-04218 (PLF)

## COMBINED MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND IN FURTHER SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Theodore J. Boutrous, Jr. (D.D.C. Bar No. 420440)
Katie Townsend (D.D.C. Bar No. 1026115)
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
(213) 229-7000
TBoutrous@gibsondunn.com
KTownsend@gibsondunn.com

Lee R. Crain (D.D.C. Bar No. NY0337)
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166-0193
(212) 351-4000
LCrain@gibsondunn.com

Susan M. Pelletier*
Gibson, Dunn & Crutcher LLP
1700 M Street, NW
Washington, DC 20036-5306
(202) 955-8500
SPelletier@gibsondunn.com

*admitted pro hac vice*

*Counsel for Plaintiffs The New York Times Company and Julian E. Barnes.*

**TABLE OF CONTENTS**

Page(s)

INTRODUCTION ................................................................................................................ 1

ARGUMENT ...................................................................................................................... 3

I.    The Policy Violates the Due Process Clause........................................................ 3

      A.    The Policy is Unconstitutionally Vague....................................................... 3

      B.    The Policy Fails to Provide Adequate Process............................................. 9

II.   The Policy Violates the First Amendment by Imposing Unreasonable and
      Viewpoint-Discriminatory Restrictions in a Nonpublic Forum. .......................... 11

      A.    The Policy is Viewpoint Discriminatory..................................................... 11

      B.    The Policy is Unreasonable Because it Violates the Unbridled Discretion
            Doctrine and Lacks Objective, Workable Standards................................... 18

III.  The Policy Violates the First Amendment by Impermissibly Regulating the Content
      of Newsgathering, Reporting, and Publication Off Pentagon Grounds. ............. 24

      A.    The Policy is Content-Based. ..................................................................... 25

      B.    The Policy Fails Strict Scrutiny................................................................. 27

IV.   The Policy Is Arbitrary and Capricious in Violation of the APA. ....................... 29

V.    The Policy Should Be Vacated.......................................................................... 33

VI.   Plaintiffs Are Entitled To Permanent Injunctive Relief. .................................... 35

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Act Now to Stop War & End Racism Coal. & Muslim Am. Soc'y Freedom Found.
  v. District of Columbia*,
  846 F.3d 391 (D.C. Cir. 2017) ................................................................................8

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
  570 U.S. 205 (2013) ...........................................................................................36

*Alabama Ass'n of Realtors v. HHS*,
  539 F. Supp. 3d 211 (D.D.C. 2021) ....................................................................35

*Allied-Signal, Inc. v. Nuclear Regul. Comm'n*,
  988 F.2d 146 (D.C. Cir. 1993) ............................................................................33

*Am. Bankers Ass'n v. Nat'l Credit Union Admin.*,
  934 F.3d 649 (D.C. Cir. 2019) ............................................................................33

*Am. Freedom Def. Initiative v. Washington Metro. Area Transit Auth.*,
  901 F.3d 356 (D.C. Cir. 2018) ..............................................................16, 19, 24

*Am. Radio Relay League, Inc. v. FCC*,
  524 F.3d 227 (D.C. Cir. 2008) .....................................................................29, 32

*Ateba v. Jean-Pierre*,
  706 F. Supp. 3d 63 (D.D.C. 2023) ......................................................................36

*Ateba v. Leavitt*,
  133 F.4th 114 (D.C. Cir. 2025) ...........................................................11, 18, 19, 20

*Bellion Spirits, LLC v. United States*,
  7 F.4th 1201 (D.C. Cir. 2021) ...............................................................................4

*Boardley v. Dep't of the Interior*,
  615 F.3d 508 (D.C. Cir. 2010) ...............................................................................4

*Bradley v. Vill. of Univ. Park*,
  929 F.3d 875 (7th Cir. 2019) ...............................................................................10

*Branzburg v. Hayes*,
  408 U.S. 665 (1972) .........................................................................................3, 25

*Cath. Soc. Serv. v. Shalala*,
  12 F.3d 1123 (D.C. Cir. 1994) ............................................................................35

# TABLE OF AUTHORITIES
## (*Continued*)

Page(s)

*Child Evangelism Fellowship of MD, Inc. v. Montgomery Cnty. Pub. Sch.*,
  457 F.3d 376 (4th Cir. 2006) ............................................................................16, 20

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
  508 U.S. 520 (1993)...................................................................................................16

*Citizens Against Burlington, Inc. v. Busey*,
  938 F.2d 190 (D.C. Cir. 1991) ..................................................................................21

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC*,
  596 U.S. 61 (2022).....................................................................................................27

*City of Lakewood v. Plain Dealer Publ'g Co.*,
  486 U.S. 750 (1988).............................................12, 19, 20, 21, 22, 23, 36

*City of Littleton v. Z.J. Gifts D-4, LLC*,
  541 U.S. 774 (2004)...................................................................................................11

*City of Port Isabel v. FERC*,
  130 F.4th 1034 (D.C. Cir. 2025) ..............................................................................33

*Comcast Corp. v. FCC*,
  579 F.3d 1 (D.C. Cir. 2009) ...............................................................................34, 35

*In re Core Commc'ns, Inc.*,
  531 F.3d 849 (D.C. Cir. 2008) ..................................................................................33

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*,
  473 U.S. 788 (1985)................................................................................11, 15, 17

*Cox v. Louisiana*,
  379 U.S. 559 (1965)......................................................................................................4

*Dakota Rural Action v. United States Dep't of Agric.*,
  668 F. Supp. 3d 1 (D.D.C. 2023) ..............................................................................34

*Dep't of Commerce v. New York*,
  588 U.S. 752 (2019)...................................................................................................30

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009)...................................................................................................32

*FW/PBS, Inc. v. City of Dallas*,
  493 U.S. 215 (1990)...................................................................................................11

*Graff v. City of Chicago*,
  9 F.3d 1309 (7th Cir. 1993) ......................................................................................21

## TABLE OF AUTHORITIES
### (*Continued*)

Page(s)

*Grayned v. City of Rockford*,
  408 U.S. 104 (1972) ............................................................................................3, 9

*Heffernan v. City of Paterson*,
  578 U.S. 266 (2016) ...............................................................................................14

*Hill v. Colorado*,
  530 U.S. 703 (2000) .................................................................................................8

*Int'l Ladies' Garment Workers' Union v. Donovan*,
  722 F.2d 795 (D.C. Cir. 1983) ...............................................................................32

*Johnson v. United States*,
  576 U.S. 591 (2015) .................................................................................................5

*Judulang v. Holder*,
  565 U.S. 42 (2011) .................................................................................................33

*Karem v. Trump*,
  404 F. Supp. 3d 203 (D.D.C. 2019) .......................................................................36

*Karem v. Trump*,
  960 F.3d 656 (D.C. Cir. 2020) ...................................................................3, 5, 7, 36

*Kovacs v. Cooper*,
  336 U.S. 77 (1949) ...................................................................................................4

*Lamb's Chapel v. Center Moriches Union Free Sch. Dist.*,
  508 U.S. 384 (1993) ...............................................................................................12

*Legal Services Corp. v. Velazquez*,
  531 U.S. 533 (2001) ...............................................................................................12

*Logan v. Zimmerman Brush Co.*,
  455 U.S. 422 (1982) ...............................................................................................10

*Luokung Tech. Corp. v. Dep't of Def.*,
  538 F. Supp. 3d 174 (D.D.C. 2021) .......................................................................32

*MacDonald v. Chicago Park District*,
  132 F.3d 355, 360 (7th Cir. 1997) .........................................................................22

*McCullen v. Coakley*,
  573 U.S. 464 (2014) ...............................................................................................26

*Miami Herald Pub. Co. v. Tornillo*,
  418 U.S. 241 (1974) ...............................................................................................28

## TABLE OF AUTHORITIES
### (*Continued*)

Page(s)

*Mills v. District of Columbia*,
    571 F.3d 1304 (D.C. Cir. 2009) .............................................................................36

*Minnesota Voters Alliance v. Mansky*,
    585 U.S. 1 (2018) .............................................................12, 15, 16, 18, 19, 24

*Miot v. Trump*,
    2026 WL 266413 (D.D.C. Feb. 2, 2026) ......................................................30, 32

*Moody v. NetChoice, LLC*,
    603 U.S. 707 (2024)..........................................................................2, 28, 31

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*,
    463 U.S. 29 (1983) ...............................................................................29

*Nat'l Parks Conservation Ass'n v. Semonite*,
    422 F. Supp. 3d 92 (D.D.C. 2019) .............................................................34

*New York Times Co. v. United States*,
    403 U.S. 713 (1971)................................................................................3

*Phillips v. District of Columbia*,
    2022 WL 1302818 (D.D.C. May 2, 2022) ....................................................14

*Pleasant Grove City, Utah v. Summum*,
    555 U.S. 460 (2009).............................................................................27

*Price v. Garland*,
    45 F.4th 1059 (D.C. Cir. 2022) ................................................................19

*Promotions, Ltd. v. Conrad*,
    420 U.S. 546 (1975)............................................................................19

*R.I.L-R v. Johnson*,
    80 F. Supp. 3d 164 (D.D.C. 2015) ...........................................................28

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015)......................................................11, 14, 25, 26, 27

*Rosenberger v. Rector and Visitors of the Univ. of Va.*,
    515 U.S. 819 (1995)...........................................................11, 12, 13

*Sherrill v. Knight*,
    569 F.2d 124 (D.C. Cir. 1977)........................................2, 3, 4, 5, 9, 10, 12, 18, 28

*Sorenson Commc'ns Inc. v. F.C.C.*,
    755 F.3d 702 (D.C. Cir. 2014) ................................................................31

## TABLE OF AUTHORITIES
### (*Continued*)

Page(s)

*Sorrell v. IMS Health Inc.*,
   564 U.S. 552 (2011)............................................................................................................15

*Standing Rock Sioux Tribe v. Army Corps of Eng'rs*,
   282 F. Supp. 3d 91 (D.D.C. 2017)......................................................................................34

*Standing Rock Sioux Tribe v. Army Corps of Eng'rs*,
   985 F.3d 1032 (D.C. Cir. 2021)..........................................................................................33

*Sugar Cane Growers Co-Opp. of Fla. v. Veneman*,
   289 F.3d 89 (D.C. Cir. 2002)..............................................................................................33

*Trump v. CASA*,
   606 U.S. 831 (2025)............................................................................................................35

*Turner Broad. Sys., Inc. v. FCC*,
   512 U.S. 622 (1994)............................................................................................................15

*United States v. Am. Libr. Ass'n, Inc.*,
   539 U.S. 194 (2003)............................................................................................................17

*United States v. Kistner*,
   68 F.3d 218 (8th Cir. 1995) ................................................................................................22

*United States v. Robel*,
   389 U.S. 258 (1967)............................................................................................................28

*United States v. Dist. Ct. for E. Dist. of Mich., S. Div.*,
   407 U.S. 297 (1972)..............................................................................................................3

*United States v. Williams*,
   553 U.S. 285 (2008)..............................................................................................................7

*United Steel v. Mine Safety & Health Admin.*,
   925 F.3d 1279 (D.C. Cir. 2019) ..........................................................................................33

*Ward v. Rock Against Racism*,
   491 U.S. 781 (1989)................................................................................................15, 21, 27

*Ziglar v. Abbasi*,
   582 U.S. 120 (2017)............................................................................................................28

**Statutes**

10 U.S.C. § 2674.......................................................................................................................30

18 U.S.C. § 793(d) ....................................................................................................................29

**TABLE OF AUTHORITIES**
(*Continued*)

Page(s)

**Other Authorities**

CUI Categories and Abbreviations, *DOD CUI Program*,
https://www.dodcui.mil/CUI-Categories-and-Abbreviations/ ...................................................6

Elina Shirazi, *Trump's 'new media' darlings who relished their Pentagon
takeover now feel gagged by Pete Hegseth*, Daily Mail, *available at*
https://www.dailymail.co.uk/news/article-15509645/Trumps-media-darlings-
Pentagon-Pete-Hegseth.html .....................................................................................................8

## INTRODUCTION

At issue in this case is an unprecedented and unconstitutional press credentialing policy that permits Defense Department officials to suspend, revoke, or refuse to renew the Pentagon Alternate Facility Credential ("PFAC") of any journalist they deem to be "a security or safety risk to [Pentagon] personnel or property," for any reason, including on the basis of that journalist's (or his or her news organization's) receipt, publication, or "solicitation" of any information, classified or unclassified, that is not "authoriz[ed]" by the Department.  ECF No. 10-36 ("SUMF") at 10–12 (¶¶ 55–65); ECF No. 22-2 ("SUMF Response") at 4 (¶¶ 55–65); *see also* Administrative Record, NYTIMES-DOW-25cv04218-0000001–78 ("AR") at 1–17.  The provisions of that policy that are challenged by Plaintiffs (collectively the "Policy"), on their face, vest the Department with standardless, unbridled authority to make credentialing decisions based on the subjects that journalists probe and the content of the stories they report, reserving to Pentagon officials the absolute discretion to determine that routine, lawful newsgathering and reporting will result in the loss of a journalist's PFAC.  The Policy has but one purpose and one predictable effect: to chill vigorous, independent reporting on the Department and its leadership.

In attempting to defend its Policy, the Department gestures to the importance of protecting the Pentagon and national security.  But however legitimate such concerns may be in general, they ring hollow here.  The Department does not dispute that for decades journalists and news organizations, including The Times and its reporter Julian E. Barnes, have reported from the Pentagon grounds, "keep[ing] Americans informed about the United States military, while posing no security or safety risk to Department property or personnel."  SUMF at 3 (¶ 11); SUMF Response at 2 (¶ 11).  And the Department admits it "identif[ied]" no "breach of physical security or other incident necessitating new safety and security requirements."  SUMF at 7–8 (¶ 44); SUMF Response at 4 (¶ 44).  Simply put, while the Department's brief invokes "security" early and often,

the undisputed facts foreclose any suggestion that the purpose of the Policy is "to prevent those who pose a security risk from having broad access to American military headquarters." ECF No. 22-1 ("Opp.") at 1.

To the contrary, the evidence makes clear that the Department's decision to abandon decades of straightforward, content-neutral credentialing criteria—standards that had proved effective both in safeguarding the security of the Pentagon and in ensuring fact-based coverage of the Department by a broad range of media organizations—was driven not by any "security or safety" concern but by a desire to control the content of news coverage. Though the Department's brief pays scant attention to the statements of its own leadership, those statements remove any doubt that the Policy was a reaction to what Department officials perceived as negative reporting. It was designed and implemented to rid the Pentagon of journalists and news organizations, like Plaintiffs, that Department officials have deemed "activists" and "propagandists" who spread "lies . . . to the American people," and ensure that PFACs are held only by those members of the media who, in the Department's view, are free from "a biased agenda[.]" SUMF at 13–15 (¶¶ 74, 83–84).

But as the Supreme Court has many times held, "it is no job for government to decide what counts as the right balance of private expression—to 'un-bias' what it thinks biased, rather than to leave such judgments to speakers and their audiences." *Moody v. NetChoice, LLC*, 603 U.S. 707, 719 (2024). And that fixed principle applies with full force under this Circuit's binding precedent in the context of press credentialing policies like the one at issue here. *Sherrill v. Knight*, 569 F.2d 124, 128 (D.C. Cir. 1977) (both First and Fifth Amendment "concerns are heavily implicated" by denial of a White House press credential to a bona fide journalist). The Policy violates the Constitution many times over. Nothing in the Department's brief suggests otherwise.

For the reasons herein and in Plaintiffs' opening brief, the Court should deny Defendants' summary judgment motion, enter summary judgment in Plaintiffs' favor, vacate and declare the challenged provisions of the Policy unlawful and unconstitutional, enjoin Defendants from enforcing those provisions, and require Defendants to immediately reinstate Plaintiffs' PFACs.

**ARGUMENT**

**I. The Policy Violates the Due Process Clause.**

**A.   The Policy is Unconstitutionally Vague.**

The Department's brief does not meaningfully grapple with this Circuit's controlling precedent applying the demands of due process in the context of press credentials.  While it may be a truism that no law can be written with "mathematical certainty," Opp. at 13–14 (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972)), it is well settled that "laws which regulate persons or entities must give fair notice of conduct that is forbidden or required," especially when First Amendment interests are at stake.  *Karem v. Trump*, 960 F.3d 656, 664 (D.C. Cir. 2020) (citation omitted).  The Policy fails this basic test.  It is unconstitutionally vague both because it does not tell journalists and news organizations what routine reporting and newsgathering— activity that unquestionably "qualif[ies] for First Amendment protection," *Branzburg v. Hayes*, 408 U.S. 665, 681 (1972); *see also Sherrill*, 569 F.2d at 128—will (or will not) cause them to lose their PFACs and because its criteria are so open-ended that it permits (indeed, it encourages) arbitrary and discriminatory enforcement by Department officials.  *See* ECF No. 10-1 ("MSJ") at 20–29.

The Supreme Court has long warned that "security" is a "vague . . . concept."  *United States v. Dist. Ct. for E. Dist. of Mich., S. Div.*, 407 U.S. 297, 314 (1972); *see also New York Times Co. v. United States*, 403 U.S. 713, 719 (1971) (Black, J., concurring) ("The word 'security' is a broad, vague generality whose contours should not be invoked to abrogate the fundamental law embodied

3

in the First Amendment."). And, in the press credentialing context, the D.C. Circuit has already set the constitutional floor: "security" is too vague a standard. *Sherrill*, 569 F.2d at 130. In *Sherrill*, the court held that a policy permitting press credentials to be denied for "reasons of security" was too "vague" to be enforced absent a "formally articulate[d]" narrowing construction. *Id.* at 130. The Policy, which broadly authorizes the discretionary denial, suspension, and revocation of a PFAC for "security or safety" reasons, does not meet *Sherrill*'s minimum bar.

The Department contends that *Sherrill* stands for the proposition that it need not provide a "detailed articulation of narrow and specific standards" for making PFAC determinations. Opp. at 15–16, 18. But the language it quotes, in context, only supports Plaintiffs' position. In *Sherrill*, the court noted that a standard for the issuance of White House press credentials that was "guided solely by the principle of whether the applicant presents a potential source of physical danger to the President and/or his immediate family so serious as to justify his exclusion" would be "sufficiently circumspect" and did not "lend itself to detailed articulation of narrow and specific standards or precise identification of all the factors which may be taken into account in applying this standard." *Sherrill*, 569 F.2d at 130. The Policy, which allows Department officials to deem a journalist a "security or safety risk" for any reason—including for routine, lawful newsgathering and reporting—is a far cry from the "circumspect" hypothetical standard discussed in *Sherrill*.

The other authorities the Department cites also involve considerably narrower and more specific standards. *See Kovacs v. Cooper*, 336 U.S. 77, 79 (1949) (prohibition on "loud and raucous" noise was not vague); *Cox v. Louisiana*, 379 U.S. 559, 568–69 (1965) (restriction on protests based on "near[ness]" to a courthouse was not vague); *Bellion Spirits, LLC v. United States*, 7 F.4th 1201, 1213–14 (D.C. Cir. 2021) (requirement that alcohol-related advertising be "truthful and adequately substantiated by scientific or medical evidence" was not vague); *Boardley*

4

*v. U.S. Department of the Interior*, 615 F.3d 508, 517 (D.C. Cir. 2010) (regulation allowing event permit to be denied if it "reasonably appears that the event will present a clear and present danger to the public health or safety" was not vague); D.C. Circuit Courthouse Decorum Policy (prohibiting conduct that "imped[ed]" proceedings). None of these authorities support the Department's argument that an expressly open-ended "security or safety" standard for determining who is (and who is not) eligible for a PFAC provides constitutionally adequate notice.

The Department complains that "list[ing] *every* security issue in *every* context beforehand" would be "impossible." Opp. at 13. But even setting aside the fact that the Department's purported "security" concerns are unfounded—because, as the Department admits, journalists have reported from the Pentagon for decades without issue, Dkt. 10-36 ¶ 21—the Department misses the point. Plaintiffs are not insisting that the Policy "list out every conceivable situation that constitutes a security risk" that could result in the suspension or revocation of a PFAC in granular detail. *Id*. Plaintiffs are seeking what the D.C. Circuit has held due process requires: a press credentialing policy with "an explicit and meaningful standard[,]" *Sherrill*, 569 F.2d at 131; *Karem*, 960 F.3d at 666—not an unrestricted, wholly discretionary "security or safety" rationale that can be invoked at the whim of Department officials.

That the Policy provides examples of "conduct that could be deemed a security risk" does not, as the Department suggests, solve its incurable vagueness. Opp. at 17. The Supreme Court has rejected "the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within [its] grasp." *Johnson v. United States*, 576 U.S. 591, 602 (2015); *see also id.* at 603 (rejecting argument that "a statute is void for vagueness only if it is vague in all its applications")*.* And, more fundamentally, the cited examples do not cabin the Policy's "security or safety" standard. The Policy repeatedly couches those examples in non-limiting language

("include, but are not limited to"; "may be based on factors including, but not limited to"), and it expressly reserves to Department officials the discretion to deny, suspend, or revoke a PFAC based on "actions other than [a] conviction" that "may be deemed to pose a security or safety risk."  AR at 12, 15.  A non-exhaustive list followed by an open-ended residual clause is not a limit; a regulation is only as narrow as its broadest provision.  Simply put, that the Policy identifies some conduct that may (or may not) result in the loss of a PFAC does not allay the Policy's vagueness or diminish its chilling effect because the Policy also makes clear that PFACs may be suspended or revoked for other reasons.

The examples provided in the Policy are, in any event, themselves impermissibly vague.  The Policy's prohibition on the "solicitation" of unauthorized information, for example, encompasses not only classified information but also "controlled unclassified information," which, according to the Policy, "may include, but is not limited to, information protected by the Privacy Act, information that is law enforcement-sensitive, and certain operational security information."  SUMF at 10 (¶ 58); AR at 6.  The Department recognizes 113 categories of "controlled unclassified information."[1]  In practice, virtually any newsgathering could be characterized as prohibited "solicitation" of controlled unclassified information, if the Department so chooses.  Indeed, as the Department's brief underscores, it reads that prohibition to forbid the Washington Post from stating publicly that it "wants to hear from Defense Department civilians and service members about changes within the Pentagon and throughout the U.S. military."  See Opp. at 27–28; Dkt. 10-36 ¶ 88; Exs. 21–22; see also AR at 12–13.  Thus, while the Department's brief asserts that journalists are still allowed to "simply ask[] questions of Department employees," Opp. at 19, that

---

[1]  See CUI Categories and Abbreviations, DOD CUI Program, https://www.dodcui.mil/CUI-Categories-and-Abbreviations/ (last visited Feb. 18, 2026).

is in tension both with the Department's own reading of the Policy and the Policy's express language, which states that prohibited "[s]olicitation may include" "direct communication with specific" employees as well as "general appeals[,]" like those made by the Post and The Times. AR at 12–13.  In short, the Policy fails to provide fair notice of what routine, lawful journalism will result in the denial, suspension, or revocation of a PFAC and thus violates the Due Process Clause.[2]

The Policy is also unconstitutionally vague for the separate but related reason that it "is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams,* 553 U.S. 285, 304 (2008); *see* MSJ at 27–28.  The Policy does not provide Department officials with clear standards to guide them when determining—"on a case-by-case basis reviewing the totality of the circumstances" and based "on the unique facts and circumstances of each case"—whether to deny, revoke, or suspend a journalist's PFAC.  SUMF at 10 (¶¶ 56–57); AR at 12–13.  It thus not only allows for but impermissibly encourages Department officials to apply the Policy in arbitrary and discriminatory ways.  The Department's claim that the Policy identifies "numerous factors to guide the discretion of the official," Opp. at 20, again ignores that those factors are themselves vague and not exhaustive.  Nor does the Department address the Policy's express invitation for Department officials to consider the content of a journalist's reporting and to conclude, without any guiding standards whatsoever, that a publication involves

---

[2] The Department contends that the Policy's provision allowing it to deny, suspend, or revoke a PFAC for "[u]nprofessional conduct that might serve to disrupt Pentagon operations," AR at 15, is not unconstitutionally vague because it is limited to situations in which an individual was convicted of a crime that the Department later determines involved "unprofessional conduct." Opp. at 16.  That proffered interpretation does little to address the issue of vagueness.  Because any crime could conceivably be described as "unprofessional," in practice "unprofessional conduct" will mean anything the Department does not like.  The D.C. Circuit in *Karem*, 960 F.3d at 666, made this exact point when holding that the government "may not rely on unarticulated standards of professionalism" to suspend a press credential.  *See also* MSJ at 25.

an "unauthorized disclosure" or otherwise "recklessly endangers American lives." *See* AR at 12–13.

The Department cites *Hill v. Colorado*, 530 U.S. 703 (2000), to argue that Plaintiffs cannot bring their discriminatory-enforcement argument as a facial attack because the Policy is "valid in the vast majority of . . . intended applications." Opp. at 20. But *Hill* is readily distinguishable. The law at issue in *Hill* was clear and narrow: it "applie[d] to a person who 'knowingly' approaches within eight feet of another, without that person's consent, for the purpose of engaging in oral protest, education, or counseling." 530 U.S. at 732. The law's challengers proffered "hypothetical theories as to what the statute covers, such as whether an outstretched arm constitutes 'approaching.'" *Id.* at 732–33. But the Court explained that any vagueness in such edge cases that were "not before the Court" would "not support a facial attack on a statute when it is surely valid in" most cases. *Id.* at 733. Here, by contrast, the Policy encourages arbitrary and discriminatory enforcement in virtually every application (if not all applications), as the Department has already demonstrated. *See* MSJ at 16–17. Plaintiffs' challenge is thus "by its nature facial." *Act Now to Stop War & End Racism Coal. & Muslim Am. Soc'y Freedom Found. v. D.C.*, 846 F.3d 391, 410 (D.C. Cir. 2017). Indeed, "it is not apparent how" a challenge to a Policy that "is so vague as to fail to guide the government's enforcement discretion" could be brought in any other way. *Id.*

The Policy makes any newsgathering and reporting not approved by the Department a potential basis for the denial, suspension, or revocation of a journalist's PFAC. That uncertainty forces members of the media who wish to retain their press credentials to refrain from engaging in lawful, First Amendment-protected journalistic activity that Department officials may dislike, for

fear it will lead to an adverse PFAC determination.[3]  This chilling effect is precisely what the Due Process Clause's vagueness doctrine is intended to protect against.  *See Grayned*, 408 U.S. at 109 (citation omitted) ("[W]here a vague statute abuts upon sensitive areas of basic First Amendment freedoms," it "inevitably lead[s] citizens to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked.").  The Policy is unconstitutionally vague and its vagueness, alone, warrants the relief Plaintiffs seek.

### B.  The Policy Fails to Provide Adequate Process.

The "minimum" pre-deprivation process required in the press pass context is notice of the grounds for an adverse action and an opportunity to rebut.  *Sherrill*, 569 F.2d at 131.  By allowing for the immediate suspension of a PFAC, the Policy falls short of that constitutional minimum.  MSJ at 29.  The Department's arguments to the contrary are unavailing.  Opp. at 22.

First, Plaintiffs did not forfeit their claim that adequate pre-deprivation process is required.  Opp. at 21.  They cited *Sherrill* for the requisite process, and that decision makes clear that "notice of the factual bases for the denial of a press credential 'with an opportunity to rebut is a minimum prerequisite' under the Fifth Amendment[.]"  MSJ at 28 (citing *Sherrill*, 569 F.2d at 131).

Second, the Department's claim that the Policy contemplates pre-deprivation process "in the vast majority of cases" is not supported by the Policy's plain text.  Opp. at 21.  The Department claims that the process set forth in Appendix A "normal[ly]" will occur prior to the suspension or revocation of a PFAC, except in "rare" cases.  Opp. at 21–23.  But that is not what the Policy says.

---

[3] Indeed, at least some new PFAC holders who were welcomed by the Department are now reportedly bristling at the Policy's chilling effect.  *See, e.g.*, Elina Shirazi, *Trump's 'new media' darlings who relished their Pentagon takeover now feel gagged by Pete Hegseth*, Daily Mail (Jan. 31, 2026) ("When asked if they believed the department was practicing 'censorship,' the source said yes after a long pause."), *available at* https://www.dailymail.co.uk/news/article-15509645/Trumps-media-darlings-Pentagon-Pete-Hegseth.html

The Policy affords the Department discretion to "immediate[ly] suspen[d]" a PFAC whenever it makes "an initial determination that an individual is a security or safety risk," AR at 8, 12; it does not limit immediate suspension to rare or exigent circumstances, *contra* Opp. at 21–23. Regardless, even if pre-deprivation process were the norm, that does not answer Plaintiffs' claim (and the Department cites no case saying otherwise). There *will* be cases when the Department provides no pre-deprivation process and, in those cases, the Policy is unconstitutional. The Department cannot dispute that the Policy permits it to revoke the PFAC of a journalist at any moment.

Third, the fact that notice might be provided before or concurrently with an immediate suspension is beside the point. Opp. at 21–22. Even assuming the Policy's provision concerning notice of "proposed denial[s]" covers immediate suspensions, AR at 15, due process requires both notice *and* "an opportunity to rebut." *Sherrill*, 569 F.2d at 131. Nothing in the Policy guarantees a PFAC holder the opportunity to rebut *before* an immediate suspension. MSJ at 29. To the contrary, Appendix A provides that "mitigating information" may be presented "to substantiate a reversal of . . . [a] revocation," AR at 16, suggesting that the Policy contemplates revocation prior to rebuttal.

Fourth, the post-deprivation process the Department points to is not an adequate substitute. Opp. at 22. "[A]bsent the necessity of quick action by the State or the impracticality of providing any predeprivation process, a postdeprivation hearing [ ] would be constitutionally inadequate." *Bradley v. Vill. of Univ. Park*, 929 F.3d 875, 886 (7th Cir. 2019) (quoting *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 436 (1982) (citation omitted)). Here, adequate pre-deprivation process is feasible.

Finally, the Policy's post-deprivation process is also inadequate because it allows for indefinite suspension.  MSJ at 29.  The Department claims no time limit is necessary because the Policy is content-neutral, an action is preliminary until final, and a final decision will be made "expeditiously."  Opp. at 23–24.  But the Policy is not content-neutral on its face.  *See infra* at 12, 24–26.  And the Department is to issue a final decision "expeditiously" only after it "complete[s]" whatever "additional inquiry" it "deem[s] appropriate"—a process with no apparent time constraints.  AR at 16.  The Due Process Clause demands more.  MSJ at 29.[4]

## II. The Policy Violates the First Amendment by Imposing Unreasonable and Viewpoint-Discriminatory Restrictions in a Nonpublic Forum.

The Department agrees that the Pentagon's press areas are nonpublic fora and, accordingly, that the Policy—which restricts journalists' access to and use of those fora—must be both viewpoint neutral and reasonable.  Opp. at 37.  The Policy meets neither requirement.

### A.  The Policy is Viewpoint Discriminatory.

The Department concedes, as it must, that in the context of a nonpublic forum the government "violates the First Amendment when it regulates speech based on 'the . . . opinion or perspective" of a speaker, *Reed v. Town of Gilbert*, 576 U.S. 155, 168–69 (2015) (quoting *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 828–29 (1995)), or "den[ies] access to a speaker solely to suppress the point of view he espouses," *Rosenberger*, 515 U.S. at 894 (Souter, J., dissenting) (quoting *Cornelius v. NAACP Legal Def. & Ed. Fund, Inc.*, 473 U.S.

---

[4]  The Department argues that this challenge is better brought on an as-applied basis, Opp. at 23–24, but a party may bring a facial challenge to a licensing scheme governing First Amendment conduct that is not content-neutral and permits a licensor to indefinitely delay the determination of whether to grant a license.  *See City of Littleton, Colo. v. Z.J. Gifts D-4, L.L.C.*, 541 U.S. 774, 779 (2004); *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 223 (1990) (plurality op.); *cf. Ateba v. Leavitt*, 133 F.4th 114, 126 (D.C. Cir. 2025) ("[N]either the Supreme Court nor this court has ever held that processing deadlines are constitutionally required *in the context of a content-neutral licensing scheme*." (emphasis added)).

788, 806 (1985)).  That requirement of viewpoint neutrality means that government restrictions on

access to or the use of a nonpublic forum are permissible only if they are "not an effort to suppress

expression merely because public officials oppose the speaker's view."  *Minnesota Voters Alliance*

*v. Mansky*, 585 U.S. 1, 12 (quoting *Perry Ed. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37,

46 (1983)).  The Policy is precisely such an effort.[5]

      The Department's brief conflates viewpoint and content-based restrictions on speech and

confuses both with the First Amendment's prohibition on prior restraints.  Opp. at 25–39.[6]  To be

clear, in basing eligibility for a PFAC on whether the information that a journalist gathers or reports

is approved by the Pentagon, the Policy is content-based on its face.  *Rosenberger*, 515 U.S. at 828

(1995) (explaining, generally, that "the government may not regulate speech based on its

substantive content").  And because the Policy was designed and implemented to chill reporting

critical of the Department and its leadership, and to exclude from the Pentagon journalists and

---

[5] For this reason, the Department's insistence that "access to the Pentagon is a privilege, not a right" and that it "could have decided not to allow any press access to the Pentagon," Opp. at 1, is irrelevant.  When the government provides resources or support to "facilitate private speech," the First Amendment bars it from discriminating based on perceived viewpoint. *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 542 (2001). That is true whether the government provides physical facilities for private speech, *see, e.g., Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 392–94 (1993), or "a subsidy," *Velazquez*, 531 U.S. at 544. And it is most certainly true in the press credential context.  *Sherrill*, 569 F.2d at 129 ("[W]here the White House has voluntarily decided to establish press facilities for correspondents who need to report therefrom . . . the protection afforded newsgathering under the first amendment guarantee of freedom of the press . . . requires that this access not be denied arbitrarily or for less than compelling reasons.")

[6] Defendants also incorrectly claim that Plaintiffs' viewpoint discrimination argument is "a reiteration of their unbridled discretion argument." *Id.* at 31. To be sure, that the Policy vests Department officials with unbridled discretion to deny, suspend, and revoke a PFAC for any reason, including on the basis of perceived viewpoint, enables Department officials to engage in viewpoint discrimination.  That is why the Policy is unconstitutional, on its face, even if that discretion is "never actually abused."  *City of Lakewood*, 486 U.S. at 757.  But whether the Policy violates the unbridled discretion doctrine, and whether the Policy is, in fact, viewpoint discriminatory, are separate inquiries.  MSJ at 30–40.  Here, the Policy cannot pass constitutional muster under either.

news organizations whose unapproved reporting Department officials dislike, the Policy amounts to content discrimination in its most "egregious form": viewpoint discrimination. *Rosenberger*, 515 U.S. at 828–29 (where the "rationale" for a restriction on speech is the "perspective of the speaker" it is viewpoint based).

The record is replete with undisputed evidence that the Policy is viewpoint discriminatory.

Prior to the Policy's adoption, Secretary Hegseth and other Department officials openly complained about reporting they perceived as unfavorable. *See* SUMF at 6 (¶ 35); *see also* Supplemental Declaration of Theodore Boutrous ("Supp. Boutrous Decl.") ¶¶ 3–9 (specifically referring to The Times in Ex. 6, ¶ 8). And they took a number of adverse actions aimed at the publications responsible for that coverage. SUMF at 6 (¶ 36). They even publicly asserted that such coverage should be "punished." Supp. Boutrous Decl. ¶ 6.

The Policy—which was enacted despite decades of press access at the Pentagon that had posed no risk to national security, or to the safety or security of Pentagon personnel—empowers the Department to do just that: deem disfavored journalists a "security or safety risk" based on run-of-the-mill newsgathering and reporting and suspend or revoke their PFACs as a result. SUMF at 8 (¶ 46). When journalists and news organizations, including Plaintiffs, expressed publicly and to the Department that they could not abide such a Policy, Secretary Hegseth responded on social media with an emoji of a hand waving goodbye. Supp. Boutrous Decl. ¶ 3. And after those journalists and news organizations lost their PFACs as a result of the Policy, Parnell publicly celebrated, posting to X that "Americans have largely abandoned digesting their news through the lens of activists who masquerade as journalists in the mainstream media," and "[w]e look forward to beginning a fresh relationship with members of the new Pentagon press corps." Boutrous Decl. in Support of Summary Judgment, ECF No. 10-8, ¶ 13.

13

Department leaders have continued to openly express their view that former PFAC holders are "propagandists" who "lie[] . . .to the American people" while praising the members of the media who have been issued PFACs since the Policy went into effect for not "pursu[ing] a bias[ed] agenda" and "get[ting] real news to the American people." *See* MSJ at 35–36 (citing SUMF at 6–7, 13–15). As detailed in Plaintiffs' opening brief, Defendants have repeatedly expressed their satisfaction that the Policy had its intended effect: to remove journalists and publications like Plaintiffs that the Department disfavors from the Pentagon and to usher in those the Department believes will report on it favorably and uncritically. *See* MSJ at 36.[7] And, as explained, the Department has interpreted its new Policy in a manner that conspicuously allows its preferred members of the media to engage in First Amendment activity that it has made clear would be grounds for the denial, suspension, or revocation of a PFAC if engaged in by a disfavored journalist or news organization. *See infra* at 21–22. Where, as here, an agency "evinces a clear intent to apply differential treatment to . . . [speech] expressing a certain viewpoint," it impermissibly regulates "speech based on the specific motivating ideology or the opinion or perspective of the speaker." *Phillips v. District of Columbia*, 2022 WL 1302818, at *7 (D.D.C. May 2, 2022) (quoting *Reed*, 576 U.S. at 168–69).

The Department largely ignores this overwhelming evidence—dismissing it as mere "characterizations of different media outlets" or "praising one set of journalists and criticizing another." Opp. at 32. All told, the Department devotes only two sentences of its brief to the extensive and undisputed evidence of Pentagon officials' open disdain for Plaintiffs and other former PFAC holders based specifically on the content of their reporting, and the Department's

---

[7] Whether the Department's perception of the views of either current or former PFAC holders is accurate or not is irrelevant. *See Heffernan v. City of Paterson*, 578 U.S. 266, 274 (2016) (discrimination based on perceived viewpoints is unconstitutional).

delight at the Policy's effectiveness in shutting them out of the Pentagon.  MSJ at 35–37.  Instead, the Department argues, in effect, that the purpose of the Policy does not matter.  According to the Department, because the Policy does not *expressly* "reference[] . . . viewpoint" or *explicitly* "contain" its impermissible "aim" of excluding journalists whose coverage Department officials do not like, it survives First Amendment scrutiny.  Opp. at 29, 31.  But that is not the law.

Courts have long recognized that facially viewpoint-neutral restrictions can be viewpoint discriminatory.  *See Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 645 (1994); *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) ("The government's purpose is the controlling consideration"—*i.e.*, "whether the government has adopted a regulation of speech because of disagreement with the message it conveys.").  After all, "[a] government bent on frustrating an impending demonstration might pass a law demanding two years' notice before the issuance of parade permits."  *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 566 (2011).  "Even if th[at] hypothetical measure on its face appeared neutral as to content and speaker, its purpose to suppress speech and its unjustified burdens on expression would render it unconstitutional."  *Id.*  Said another way, as the Supreme Court has stated with respect to nonpublic fora specifically, facially viewpoint neutral language or proffered "justifications cannot save an exclusion that is in fact based on the desire to suppress a particular point of view."  *Cornelius*, 473 U.S. at 812 (remanding to address "whether the exclusion of respondents" from a nonpublic forum "was impermissibly motivated by a desire to suppress a particular point of view").

Simply put, contrary to the Department's arguments, this Court should not look solely to whether the Policy is viewpoint neutral on its face but rather to whether the Policy is "an effort to suppress expression[.]"  *Mansky*, 585 U.S. at 11–12; *see also Cornelius*, 473 U.S. at 811 ("[T]he existence of reasonable grounds for limiting access to a nonpublic forum . . . will not save a

regulation that is in reality a facade for viewpoint-based discrimination.").  In assessing whether a policy discriminates on the basis of perceived viewpoint, courts look to facts surrounding the decision to adopt it, as well as whether, in its design or operation, it disfavors a particular perspective.  *See Mansky*, 585 U.S. at 11–12; *cf. Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 535–42 (1993).  Specifically, courts consider (1) retrospective evidence from before the action was taken, including the "specific sequence of events leading up to the challenged decision," and any mismatch between the stated aims and the policy's sweep, as well as (2) prospective evidence of "what happened once the forum was closed," with "a lack of evenhandedness in the [g]overnment's actions" proving "most relevant."  *Am. Freedom Def. Initiative v. Washington Metro. Area Transit Auth.*, 901 F.3d 356, 365–66 (D.C. Cir. 2018) ("*AFDI*"); *see also Child Evangelism Fellowship of MD, Inc. v. Montgomery Cnty. Pub. Sch.*, 457 F.3d 376, 386 (4th Cir. 2006) (explaining that "in determining whether a governmental forum access policy was viewpoint neutral . . . " the "history of the forum and a comparison of the characteristics of the included and excluded groups" are "of course, relevant").  As the undisputed facts make clear, each of these factors leads to the inexorable conclusion that the Department enacted the Policy to chill vigorous reporting and shut out journalists whose coverage Department officials claim is "bias[ed]."  SUMF at 13–15 (¶¶ 74, 84).[8]  Because the Policy is "in fact based on

---

[8]  To the extent the Department contends there is insufficient evidence of its viewpoint discriminatory motive already before the Court, there is ample additional evidence in the public record.  *See, e.g.*, Supp. Boutrous Decl. ¶¶ 4–6, Exs. 2–4 (Defendants referring to unfavorable reporting about Department officials as "dox[xing]" that "puts lives at risk" and calling for journalists to be punished in the weeks prior to the Policy's adoption); *id.* ¶¶ 7–8, Ex. 6 at 15:30–16:00, 18:30–20:20 (Secretary Hegseth asserting that former PFAC holders' "proximity to the Pentagon" made it possible for them to "spin" information for political purposes); *id.* ¶ 9, Ex. 7 (chief Pentagon spokesperson Sean Parnell claiming The Times "appear[s] to have a motive to sabotage the Secretary and the President's agenda").

the desire to suppress a particular point of view," *Cornelius*, 473 U.S. at 812, it violates the First Amendment.

That Department officials "conferred with the major news outlets and journalist professional organizations on revisions to the PFAC Policy," and "made particular changes" as a result of those discussions does not, as the Department suggests, refute that conclusion. Opp. at 31. To begin, the examples of "changes" Defendants cite are inaccurate. The final Policy does not, as the Department asserts, "reflect[] the removal of unauthorized attempts to obtain CNSI and CUI as a factor to deny a PFAC." *Id.* (citing AR at 15). The Policy expressly provides that a PFAC "may be" denied, suspended, or revoked "based on factors including . . . attempted unauthorized access . . . of CNSI or CUI[.]" AR at 12.[9] And while Defendants did *move* language that journalists and news organizations objected to from the Acknowledgement to the Policy itself, they *kept* the substance of those provisions intact. *See* AR at 12–13.[10] Moreover, although members of the press, including Plaintiffs, made clear they could not sign the revised version of the Acknowledgement consistent with their First Amendment rights, signing the Acknowledgement remains a threshold requirement through which the Department has implemented its unconstitutional Policy. The Department has continued, over the objections of Plaintiffs and others, to condition PFACs on journalists' willingness to accede to a Policy that infringes their constitutionally protected rights. *See United States v. Am. Library. Ass'n, Inc.*, 539 U.S. 194, 210 (2003) (discussing unconstitutional conditions on speech benefits, "even if [the

---

[9] The Department's brief repeatedly either ignores or mischaracterizes this provision of the Policy. *See, e.g.,* Opp. at 10–11, 15, 19, 35.

[10] To be sure, Defendants did clarify that the Policy does not require PFAC holders to submit articles to Defendants for approval prior to publication. AR at 6. But clarifying that the Policy does not impose that specific unconstitutional requirement does not demonstrate that the Policy is viewpoint neutral.

speaker] has no entitlement to that benefit") (citation omitted).  Far from abandoning that requirement, Defendants revoked Plaintiffs' and others' PFACs on the basis of their refusal to agree to this regime.  SUMF at 12 (¶¶ 68–70).  If anything, the fact that Defendants knew based on these discussions that the vast majority of existing PFAC holders would not sign the Acknowledgement is further evidence of the Policy's viewpoint discriminatory purpose and effect.

### B.  The Policy is Unreasonable Because it Violates the Unbridled Discretion Doctrine and Lacks Objective, Workable Standards.

Even if the Policy were viewpoint neutral (it is not), it would still violate the First Amendment because the restrictions it imposes on access to and use of the Pentagon's press areas are patently unreasonable in light of the purposes of the fora.  *Mansky*, 585 U.S. at 11–12 (considering whether ban on political apparel in polling places was "reasonable in light of the purpose served by the forum: voting" (internal quotation marks omitted)).  According to Defendants, the primary purpose of opening areas within the Pentagon to the press is "transparency."  Opp. at 1.  And, indeed, the Pentagon has historically been open to credentialed journalists to facilitate their newsgathering and reporting and to ensure that the American public gets timely and accurate information about the United States military.  SUMF at 1–4 (¶¶ 2–22); Pentagon Press Ass'n Amicus Br., ECF No. 15-1, at 3–14.  That purpose is unquestionably undermined by a Policy that vests Department officials with the unbounded discretion to select PFAC holders based on whose journalism they like best,[11] shuts out experienced Pentagon reporters and news outlets like Plaintiffs, and chills independent newsgathering and reporting

---

[11] The D.C. Circuit has already recognized that press credentialing decisions "based upon the content of the journalist's speech" are fundamentally incompatible with the purposes served by "establish[ing] press facilities" on government property.  *See Sherrill*, 569 F.2d at 129–30. "Although *Sherrill* predated modern forum analysis," *Ateba,* 133 F.4th 114 at 122, its flat rejection of the use of "content-based criteria" in the press credentialing context as a violation of the First Amendment fits easily within the framework of reasonableness, *Sherrill*, 133 F.4th at 129.

about the Department and its leadership.  Because the Policy fails to provide "objective, workable standards" *Mansky*, 585 U.S. at 21–22, and violates the unbridled discretion doctrine, MSJ at 30–34, it is unreasonable under the First Amendment.

The Supreme Court "has held, repeatedly, that the 'danger of censorship and of abridgment of our precious First Amendment freedoms is too great where officials have unbridled discretion over a forum's use.'"  *AFDI*, 901 F.3d at 356 (quoting *Promotions, Ltd. v. Conrad*, 420 U.S. 546, 553 (1975)).  For that reason, any government licensing, permitting, or credentialing scheme that has a "close enough nexus to expression, or to conduct commonly associated with expression, to pose a real and substantial threat" of censorship violates the First Amendment if it grants official decisionmakers "boundless discretion."[12]  *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 764 (1988).  This standard applies whether the forum in question is public or nonpublic: "[W]hen government censors control access to a forum, but have no standards to govern their decisions, first amendment freedoms are abridged."  *AFDI*, 901 F.3d at 372 (applying *City of Lakewood* to speech restrictions in a nonpublic forum); *cf. Ateba v. Leavitt*, 133 F.4th 114, 125 (D.C. Cir. 2025).  In the nonpublic forum context, courts in this Circuit consider application of the

---

[12] The Department's contention that the Policy lacks a sufficient nexus to expression or to conduct "commonly associated with expression" to trigger application of the unbridled discretion doctrine is wrong.  *See* Opp. at 25 (quoting *City of Lakewood*, 486 U.S. at 769).  The D.C. Circuit has previously recognized the doctrine's application to a press credentialing policy, *see Ateba*, 133 F.4th at 124–25, and, in any event, the very purpose of a PFAC is to enable journalists to engage in First Amendment-protected speech and newsgathering activity on Pentagon grounds.  *See* MSJ at 31.  The Department's own description of entering the Pentagon as a "noncommunicative, preparatory step in the production of speech" effectively concedes that, at minimum, it is conduct with a close nexus to expression, a conclusion only bolstered by the authority cited by the Department.  Opp. at 25 (citing *Price v. Garland*, 45 F.4th 1059, 1071–72 (D.C. Cir. 2022) (applying reasonableness standard to "noncommunicative first amendment activity")).

19

unbridled discretion doctrine "within the framework of reasonableness." *Id.* at 124.[13]  The Policy, which vests Department officials with unbounded authority to control the exercise of First Amendment rights on Pentagon grounds, violates that doctrine and is therefore unreasonable under the First Amendment.  None of the Department's arguments to the contrary have merit.

As an initial matter, the Department's assertion that Plaintiffs' facial challenge fails because the Policy has some constitutional applications badly misapprehends the unbridled discretion doctrine.  Opp. at 12–13.  "[I]n the context of a rule that delegates overly broad discretion to the decisionmaker, plaintiffs may facially challenge the rule even though some applications of the rule may be constitutionally unobjectionable, because every application creates an impermissible risk of suppression of ideas."  *Ateba*, 133 F.4th at 119 n. 5.  Put another way, because the "mere existence of the licensor's unfettered discretion" can "intimidate[] parties into censoring their own speech," such a scheme is unconstitutional, on its face, even if that discretion is "never actually abused."  *City of Lakewood*, 486 U.S. at 757.  A plaintiff may therefore challenge such a scheme "without the necessity of first applying for, and being denied, a license," *id.* at 755– 56, and is not required to address individual, hypothetical applications.  Indeed, the whole purpose of the unbridled discretion doctrine is to avoid that "case-by-case" morass.  *Id.* at 759.

The Department's central claim in defense of the Policy is that while it "does vest some discretion in the hands of implementing officials," that discretion is not unbridled and does not

---

[13] Other Circuits take a different approach.  The Fourth Circuit, for instance, treats the unbridled discretion inquiry as a component of viewpoint discrimination analysis in the nonpublic forum context.  *See Child Evangelism Fellowship of MD, Inc.*, 457 F.3d at 389 (holding that permitting a government entity "to deny access to" a nonpublic "forum—for any reason at all, including antipathy to a particular viewpoint—does not ensure the requisite viewpoint neutrality").  Regardless of the specific lens they apply, however, "there is broad agreement" among federal courts that "in . . . nonpublic forums, investing governmental officials with boundless discretion over access to the forum violates the First Amendment."  *Id*. at 386–87 (collecting cases).

"offend the Constitution[.]"  Opp. at 1.  The Department is wrong.  As detailed above and in

Plaintiffs' opening brief, the Policy's operative standard—whether a journalist poses a "security

or safety risk"—is no standard at all.  AR at 12, 15.  The Policy imposes no meaningful constraints

on Department officials' discretion to determine that a journalist poses a "security or safety risk"

and to deny, suspend, or revoke that journalist's PFAC on that basis.  *Supra* at 5–7.  While the

Policy may offer examples of activity that might trigger such a determination and thus might (or

might not) lead to the loss of a PFAC, those examples are non-exhaustive and non-binding.  *See*

*supra* at 6.  None of the Policy's purportedly "specific" bases for an adverse PFAC decision—

such as being convicted of certain crimes or engaging in "unprofessional conduct"—actually

constrains the Department's decisionmaking, or ensures journalists have the adequate breathing

space to engage in protected newsgathering and reporting without fear they will lose their PFACs

as a result.  Opp. at 14–15.  And the Policy's exhortation that Department officials act "reasonably"

is not itself a restraint.  AR at 15.  "[T]he word 'reasonable' is not self-defining," *Citizens Against*

*Burlington, Inc. v. Busey*, 938 F.2d 190, 196 (D.C. Cir. 1991), and does not limit an exercise of

discretion *ex ante*.[14]  Simply put, the Policy places "no explicit limits" on Department officials'

discretion; it offers, at best, only "illusory 'constraints.'"  *City of Lakewood*, 486 U.S. at 770

(citations omitted).

None of the cases the Department cites suggests otherwise.  *See* Opp. at 28–29.  Each

involved laws or regulations granting officials limited discretion to interpret and apply explicit

standards.  *See Ward v. Rock Against Racism*, 491 U.S. 781, 794–95 (1989) (allowing city officials

to "balance[]" "sound quality" against "respect for nearby residential neighbors"); *Graff v. City of*

---

[14] The Department emphasizes the purported importance of an appeal process and judicial review,
but "[judicial] review cannot substitute for concrete standards to guide the decision-maker's
discretion" in the first instance.  *City of Lakewood*, 486 U.S. at 771.

*Chicago*, 9 F.3d 1309, 1318 (7th Cir. 1993) (giving city "discretion to remove a newsstand that 'endangers public safety or property,' that 'interferes with or impedes the flow of pedestrian or vehicular traffic,' or [that] is placed 'in such a manner as to impede or interfere with the reasonable use of [a display window]'"); *MacDonald v. Chicago Park Dist.*, 132 F.3d 355, 360 (7th Cir. 1997) (allowing city to deny event permit if "the use or activity intended by the applicant would present an unreasonable danger to the health or safety of the applicant, or other users of the park, of Park District Employees or of the public"); *United States v. Kistner*, 68 F.3d 218, 221 (8th Cir. 1995) (upholding ordinance listing "several content neutral reasons for requiring permits: to avoid overcrowding and overlapping activities, to preserve peace and tranquility, to prevent dangers to public health or safety, and to minimize damage to park resources and facilities"). And, notably, none involves regulations that provided a residual, open-ended grant of discretion to government officials. Indeed, that is the lesson of *City of Lakewood*: although the ordinance at issue there listed concrete, content and viewpoint-neutral bases for disapproving newsstands (*e.g.*, they "shall not be placed in . . . residential use districts"), the mayor's residual power to deny a permit for any other "reason[] he may give" swallowed them. 486 U.S. at 754 n.2, 771.

Because the Policy on its face will always allow (but never require) the Department to suspend or revoke the PFAC of virtually any journalist, it impermissibly vests Department officials with the unbridled discretion that the First Amendment forbids. *See* MSJ at 32–34. And while Plaintiffs need not point to specific examples, nothing illustrates that boundless discretion quite as well as the ad-hoc line-drawing and after-the-fact justifications that the Department has already engaged in. The Department condemned the Washington Post's call for tips as a violation of the Policy while deeming permissible a social media post by Laura Loomer which likewise called for tips—in the context of a post that stated, among other things, that "LOOMERED is now a

credentialed outlet at the Pentagon"; that "her investigative reporting has had a massive impact on the landscape of personnel decisions within . . . the Pentagon"; and that she was looking forward to "breaking more stories that impact our country and our national security."  The difference, according to the Department, is that the Post's tip line "appears at the end of military defense related stories," and despite its repeated references to the "Pentagon," Loomer's post is supposedly more "general" and invites tips "on any matter."  Opp. at 27–28; ECF No. 10-28.  With respect to James O'Keefe, who obtained a PFAC after surreptitiously recording and publishing the unauthorized statements of a Pentagon official, *see* SUMF at 16 (¶ 90), the Department explains that the Policy vests it with the discretion not to treat what it calls O'Keefe's "receipt of unsolicited" information, "on its own," as the basis for "an adverse PFAC decision"—though the plain language of the Policy makes clear that it could.  Opp. at 28.  The Department does not address why O'Keefe's criminal convictions involving "trespassing" and "deceit"—offenses the Policy treats as "presum[ptively]" disqualifying for a PFAC—were not treated as such in his case. MSJ at 33 n.6; AR at 15.

These examples, among other undisputed facts, underline that the Department will invoke its unbounded discretion under the Policy in a manner that favors PFAC holders it prefers based on their perceived viewpoints and disfavors journalists whose reporting it dislikes.  But even if these examples were not clear evidence of viewpoint discrimination (they are), they illustrate, at minimum, the vice of unbridled discretion: without "express standards" and meaningful constraints on government decisionmaking, "*post hoc* rationalizations" and "shifting or illegitimate criteria are far too easy," viewpoint-based decisions difficult to detect, and the threat of self-censorship all too real.  *City of Lakewood*, 486 U.S. at 758.  Because the Policy's grant of

23

unbridled discretion makes any outcome permissible and leaves nothing to restrain the Department's decision to deny, revoke or suspend a PFAC, the Policy is unreasonable.

Even if the Policy did not vest Pentagon officials with constitutionally impermissible unbridled discretion (it does), the discretion it affords the Department would still be unreasonable under the First Amendment for the separate but related reason that it is not "guided by objective, workable standards." *Mansky*, 585 U.S. at 21–22 (holding that an unqualified ban on "political" apparel in polling places failed to draw "a reasonable line" between what was permissible and what was not and was thus "unreasonable"); *see also AFDI*, 901 F.3d at 372. "[W]hether the discretion vested in a government official to permit or prohibit speech is 'guided by objective, workable standards'" is a "related inquiry" to questions of vagueness and unbridled discretion; it too asks whether a challenged regulation or policy "is so broad as to provide [Defendants] with no meaningful constraint upon its exercise of . . . power." *AFDI*, 901 F.3d at 372.

"Although there is no requirement of narrow tailoring in a nonpublic forum," the Department "must be able to articulate some sensible basis for distinguishing what may come in from what must stay out." *Mansky*, 585 U.S. at 16. As explained, the Policy's "expansive" language, which encompasses within its prohibitions lawful, constitutionally protected newsgathering and reporting that Plaintiffs and other journalists and media organizations routinely engage in fails that test. It creates vast "potential for erratic application," *id.*, at 10—as the Department's attempted line-drawing in its brief underscores, *supra* at 22.

## III.  The Policy Violates the First Amendment by Impermissibly Regulating the Content of Newsgathering, Reporting, and Publication Off Pentagon Grounds.

For purposes of vacating and enjoining the Policy, it is enough that it imposes both unreasonable and viewpoint-discriminatory restrictions on First Amendment activity *within* the Pentagon. *See Mansky*, 585 U.S. at 11–12. But the Policy goes well beyond that. It encompasses

24

constitutionally protected newsgathering and reporting not approved by the Department that takes place anywhere in the world.  *See Branzburg*, 408 U.S. at 681 ("freedom of the press could be eviscerated" without "some protection for seeking out the news").  Such overreach is, as the Department admits, a feature of the Policy, not a bug.  *See* Opp. at 36 (arguing that "given the global, interconnected media and communications environment, the [Policy] would be underinclusive if it did not encompass off-grounds communication").  Because the Policy threatens adverse consequences—the denial, suspension, or revocation of a PFAC—on the basis of First Amendment-protected activity that takes place off government property—it is subject to the rules governing content-based and viewpoint discriminatory restrictions on the exercise of First Amendment rights more generally.  The Policy cannot survive such scrutiny.

### A.  The Policy is Content-Based.

Defendants' argument that the Policy cannot be content-based if it does not turn on the "specific motivating ideology or the opinion or perspective of the speaker" is badly confused. Opp. at 29 (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 168–69 (2015)).  As the quoted sentence from *Reed* makes clear, that is the standard for viewpoint discrimination.  *See Reed*, 576 U.S. at 168 ("Government discrimination among viewpoints—or the regulation of speech based on the specific motivating ideology or the opinion or perspective of the speaker—is a more blatant and egregious form of content discrimination.") (citation omitted).  And while the Policy satisfies that standard, as explained in Plaintiffs' opening brief and above, it need not to in order to trigger strict scrutiny.

Because a journalist's PFAC may be denied, suspended, or revoked for journalism that goes beyond certain (*i.e.*, authorized) topics, the Policy is content-based on its face.  None of the Department's arguments to the contrary have merit.  That the Policy does not purport to require journalists to obtain prior authorization to publish a story does not make the Policy content-neutral.

25

Opp. at 29–30.  Nor does the Department's assurance that a PFAC holder is "not prohibited from investigating, reporting, or publishing stories[.]"  *Id*. at 29 (citing AR at 12).

The Department's suggestion that the Policy's prohibition on the "solicit[ation]" of unauthorized information does not turn on "communicative content" is specious.  Opp. at 30.  The Policy calls on Department officials to "examine the content of the message that is conveyed," *McCullen v. Coakley*, 573 U.S. 464, 479 (2014), in order to determine whether a journalist should be deemed a "security or safety" risk.  That is the hallmark of a content-based regulation.  *See id.*  And, contrary to Defendants' argument, that the Policy provides that the "receipt of unsolicited [information] . . . would not, on its own, *normally* trigger denial, revocation, or non-renewal of a PFAC" does not make the Policy content-neutral.  AR at 12 (emphasis added).[15]  The fact that Department officials have unbridled discretion under the Policy to enforce its prohibitions (or not) is a separate constitutional problem.  *Supra* at 18–24.

The Department also erroneously posits that "controlled unclassified information" (CUI) and "classified national security information" (CNSI) are "categories of information, not themselves 'topics' or 'messages,'" and therefore that the Policy is content-neutral.  Opp. at 30.  But the Supreme Court has specifically identified regulations applicable to "categories" of information as facially content-based.  For instance, the Court in *Reed* found a town's regulation that singled out "[t]hree categories of exempt signs" to be content-based on its face.  576 U.S. at 159.  And while the Department is correct that what constitutes unauthorized CUI and CNSI under the Policy "encompass[es] myriad topics and convey[s] countless messages," Opp. at 30, the same

---

[15] Twice in its brief the Department misleadingly omits "normally" from this sentence.  *See* Opp. at 29–30, 38.

was true of the "categories" of signs at issue in *Reed*. 576 U.S. at 159–60 ("ideological" and "political" signs).

*City of Austin v. Reagan National Advertising of Austin, LLC*, 596 U.S. 61, 69 (2022), is distinguishable. There, the Court held that a city regulation governing whether entities could post signs on-premises versus off-premises was content-neutral because a "sign's substantive message" was "irrelevant to [its] application." *Id.* at 71. "A given sign [was] treated differently based solely on whether it is located on the same premises as the thing being discussed or not." *Id.* That is a far cry from the Policy, which expressly distinguishes between authorized and unauthorized information, which is necessarily based on the information's substantive content.

Finally, the Department's cited cases about "disruptive speech" only make Plaintiffs' point. Opp. at 30–31. Determining whether speech is "disruptive" turns on many things other than content—*i.e.*, the place; time; and volume. One need not look to the substance of the speech to assess whether it is disruptive. *See Ward*, 491 U.S. at 792 (a "desire to control noise levels" "has nothing to do with content"). That is, as explained, not true of the Policy.

## B. The Policy Fails Strict Scrutiny.

"Any restriction based on the content of [] speech must satisfy strict scrutiny . . . and restrictions based on viewpoint are prohibited." *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 469 (2009) (citations omitted). That the Policy is viewpoint-discriminatory, as detailed above, ends the inquiry. But even were it not viewpoint discriminatory, the Policy could not survive strict scrutiny. Nothing in the Department's brief "prove[s] that the [Policy] furthers a compelling interest and is narrowly tailored to achieve that interest." *Reed*, 576 U.S. at 171.

The Department has no legitimate—let alone compelling—interest in deciding which journalists and news organizations are eligible to hold PFACs based on the content of their journalism. As a unanimous Supreme Court reiterated just two years ago, "it is no job for

27

government to decide what counts as the right balance of private expression[.]" *Moody*, 603 U.S. at 719; *see also Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 258 (1974) (explaining that the news media's "treatment of public issues and public officials—whether fair or unfair—constitute[s] the exercise of editorial control and judgment" and it "has yet to be demonstrated how governmental regulation of this crucial process can be exercised consistent with First Amendment guarantees of a free press"); *see also id*. at 261 (White, J., concurring) ("[W]e have never thought that the First Amendment permitted public officials to dictate to the press the contents of its news columns or the slant of its editorials."). Indeed, the D.C. Circuit concluded as much in *Sherrill*, when it recognized that the denial of a press credential *must* be based on *content-neutral grounds* that further "a compelling governmental interest." *Sherrill*, 569 F.2d at 129–31 (stating that "content-based criteria for press pass issuance are prohibited under the first amendment."). For that reason, alone, the Policy violates the First Amendment.

In attempting to justify the Policy, the Department asserts an interest in safeguarding national security and the safety of Pentagon property and personnel and claims a need to take "prophylactic measures" to prevent security risks. Opp. at 36. But the "mere mention" of such concerns cannot "be allowed to trump any First Amendment issue." *Sherrill*, 569 F.2d at 128 n.14; *see also Ziglar v. Abbasi*, 582 U.S. 120, 143 (2017) ("national-security concerns must not become a talisman used to ward off inconvenient claims"). Simply invoking "national security" does not absolve the Department of its obligation to adhere to the First Amendment. *See, e.g.*, *United States v. Robel*, 389 U.S. 258, 263 (1967); *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 190 (D.D.C. 2015).

In any event, given the undisputed absence of any security incidents involving PFAC holders, SUMF at 4, 7–8 (¶¶ 21, 44); SUMF Response at 3–4 (¶¶ 21, 44), the Department simply cannot demonstrate either that the Policy furthers such an interest or that it is narrowly tailored.

The Policy's restrictions on lawful newsgathering and reporting anywhere in the world go so far beyond what could be considered necessary to advance any legitimate interest in safeguarding national security or the safety of Pentagon property or personnel—and are otherwise so ill-suited to serve those goals—they are obviously pretextual. MSJ at 37–38. And even if the Department's proffered justifications were not pretextual, its approach is insufficiently tailored to survive. *Id.*

The Department once again attempts to disavow the Policy's broad scope, asserting that it "only reaches the solicitation or facilitation of specific acts that violate federal law," Opp. at 35–37. But that is simply untrue. The Department obliquely cites to a criminal statute, 18 U.S.C. § 793(d), that concerns disclosing "information the possessor has reason to believe could be used to the injury of the United States." Opp. at 33. But the Policy is not limited to such conduct or to such information—as the Department made clear when it characterized the Post's routine, benign call for tips as a violation of the Policy. The Policy applies (but is "not limited" to) the unauthorized "solicit[ation]" or publication of any "controlled unclassified," "sensitive" and/or "non-public" information. AR at 6, 12–13. The Department's refusal to contend with the Policy's reach alone belies any contention that its approach is necessary to achieve a legitimate aim.

## IV. The Policy Is Arbitrary and Capricious in Violation of the APA.

The Policy squarely violates the APA. It is common ground that reasoned decision making requires an agency to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983) (citation omitted); Opp. at 40. There is also no dispute that an agency must "consider responsible alternatives to its chosen policy," *American Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 242 (D.C. Cir. 2008), and forego reliance on factors it is not empowered "to consider," *State Farm*, 463 U.S. at 43. Opp. at 40. Here, the Department considered impermissible factors while failing to find facts, offer a

rational connection between the Policy and facts it never found, or consider obvious alternatives. MSJ at 41–42.  That is antithetical to reasoned decision making[16]

The Department's proffered justifications for these shortcomings lack merit.  First, the Department's brazen statements and actions lay bare its impermissible motives and consideration of improper factors, *see, e.g.*, MSJ at 35–36, 39–40; *supra* at 13, 22–23.  Rather than meaningfully engage with this evidence, the Department claims this Court should ignore it because it is outside the administrative record.  Opp. at 39–40.  But courts are "not required to exhibit a naiveté from which ordinary citizens are free" where "an explanation for agency action . . . is incongruent with what the record reveals."  *Dep't of Commerce v. New York*, 588 U.S. 752, 785 (2019); *see Miot v. Trump*, 2026 WL 266413, at *1, *31 (D.D.C. Feb. 2, 2026).  And a court may inquire into the "mental processes of administrative decisionmakers" where there is a "strong showing of bad faith or improper behavior."  *Dep't of Commerce*, 588 U.S. at 781.  That standard is easily met here. The Policy's sweep is wholly incongruous with the generalized safety and security rationales the Department claims.  *See supra* at 28–29.  And the Department has made no secret of the fact that the Policy aims to chill reporting it disfavors, MSJ at 41—not safeguard the physical property of the Pentagon, AR at 3 (citing 10 U.S.C. § 2674), or even, in the Department's broad reframing, "stop activity that could compromise national security," Opp. at 41.

Second, and relatedly, the Policy lacks the requisite rational connection to the ends the Department claims to be pursuing.  The Department's own argument confirms as much.  The Department says that "there is a rational connection between the compelling Government interest in keeping national security secrets safe and seeking to prevent the solicitation of the disclosure of

---

[16] The Department appears to conflate the full Policy with the defined term "Policy" that is used herein and in Plaintiffs' opening brief.  Plaintiffs' references to the Policy are to those specific provisions of the Policy it is challenging.  *See* MSJ at 1 n.1.

those same national security secrets." Opp. at 41. But even assuming "keeping national security secrets safe" is a fair characterization of reducing "the opportunities for in-person inadvertent and unauthorized disclosures," AR at 18, the Policy is not limited to "national security secrets." It treats classified and unclassified information alike (including in the context of a general request to speak with Department personnel that does not mention any particular type of information), and it encompasses newsgathering and speech that takes place both on and off Pentagon grounds. *See supra* at 34–35. Instead, the Policy is trained on disfavored reporting, *see supra* at 13–15, which the Department cannot permissibly target. *See, e.g.*, *Moody*, 603 U.S. at 732 ("[T]he government cannot get its way just by asserting an interest in improving, or better balancing, the marketplace of ideas.").

Third, the Department does not dispute that it failed to find any facts establishing that the Policy serves any interest in "security or safety." It admits, for example, that the Policy arose in the absence of any precipitating event. Defendants' Statement of Facts at 2-3 (¶¶ 21, 44). The Department claims that its "common sense," "even if not explicitly backed by information in the record," is sufficient. Opp. at 41 (citation omitted). But predictive judgments still "must be based on some logic and evidence, not sheer speculation." *Sorenson Commc'ns Inc. v. F.C.C.*, 755 F.3d 702, 708 (D.C. Cir. 2014) (citation omitted). And while the Department may "hoist the standard of common sense," "the wisdom of agency action is rarely so self-evident that no other explanation is required." *Id.* Such is the case here. There is no "evidence." And neither common sense nor the Department's *post hoc* explanations—such as they are—support the Policy, which denies PFAC holders due process, violates the First Amendment, and vests Department officials with limitless discretion to suspend or revoke a PFAC in response to lawful newsgathering and

31

reporting wholly untethered to national security. *See* ECF No. 10-2 (identifying the Challenged Provisions). For this reason too, the Policy violates the APA.

Fourth, the Department failed to consider alternatives. The Department claims it did so on the basis that it clarified and edited the Policy. *See, e.g.*, Opp. at 8–9, 41–42. But clarifying a policy is not the same thing as adhering to the APA's obligation to consider alternatives to the Policy's approach, and the Department cites nothing for its assertion otherwise. The changes the Department identifies, *see, e.g.*, Opp. at 9, merely adjust the Policy's text without altering its substance. And even if those changes could demonstrate that the Department considered "some alternatives," that would "not free it from considering other obvious alternatives" as well. *Int'l Ladies' Garment Workers' Union v. Donovan*, 722 F.2d 795, 816 n.41 (D.C. Cir. 1983). Here, the Department rejected other suggestions, *see, e.g.*, AR at 50, 70, while failing to give the requisite "reasoned explanation for its rejection." *Am. Radio Relay League, Inc.*, 524 F.3d at 242 (quotation marks omitted). And though the Department attempts to fault Plaintiffs for not offering alternatives, again, the record already reflects obvious alternatives that the Department rejected without explanation. *See, e.g.*, AR at 50, 70. Chief among them: the Department could have simply kept the prior press credentialing policy in place. It is incumbent upon an agency when "depart[ing] from a prior policy" to "show that there are good reasons for the new policy." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). The Department has failed to do so.

Finally, the Department's invocation of "national security" and "foreign affairs," Opp. at 40, is misplaced. For one, the Policy sweeps far beyond the confines of national security and foreign affairs. *See supra* at 30–31. For another, "[n]ational security may justify differential treatment, but only where," unlike here, "there is a rational connection between the facts found and the choice made." *Miot*, 2026 WL 266413, at *31 (citation omitted); *see Luokung Tech. Corp.*

32

*v. Dep't of Def.*, 538 F. Supp. 3d 174, 182 (D.D.C. 2021) ("[E]ven in [the national security]
context, courts retain a role, and an important one, in ensuring that agencies have engaged in
reasoned decisionmaking" (quoting *Judulang v. Holder*, 565 U.S. 42, 53 (2011))).  Here, the
Department's failure to engage in reasoned decisionmaking cannot survive APA review.

## V.    The Policy Should Be Vacated.

It is the "ordinary practice" and "normal course" to vacate unlawful agency action.  *United
Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019).  Courts exercise their
discretion to "remand without vacat[ur]" only in "rare cases" where they find the deficiencies not
so "serious[]" or the "disruptive consequences" significant.  *Am. Bankers Ass'n v. Nat'l Credit
Union Admin.*, 934 F.3d 649, 674 (D.C. Cir. 2019) (quoting *United Steel*, 925 F.3d at 1287); *In re
Core Commc'ns, Inc.*, 531 F.3d 849, 862 (D.C. Cir. 2008) (Griffith, J., concurring) ("[E]xperience
suggests that [remand without vacatur] sometimes invites agency indifference.").  Here, neither of
those "two factors governing [a court's] exercise of discretion" weighs against vacatur.  *Standing
Rock Sioux Tribe v. Army Corps of Eng'rs*, 985 F.3d 1032, 1051 (D.C. Cir. 2021) (quoting *Allied-
Signal, Inc. v. Nuclear Regulatory Commission*, 988 F.2d 146, 150–51 (D.C. Cir. 1993)).

First, the deficiencies are "serious."  *Am. Bankers Ass'n*, 934 F.3d at 674.  The Policy
violates Plaintiffs' First and Fifth Amendment rights.  *Supra* §§ I–III.  For those reasons and
because the Policy "clearly violates the APA" it should be "vacate[d]."  *Sugar Cane Growers
Coop. of Fla. v. Veneman*, 289 F.3d 89, 97 (D.C. Cir. 2002).

Second, any "disruptive consequences of vacatur" are at most *de minimis*.  *City of Port
Isabel v. FERC*, 130 F.4th 1034, 1036 (D.C. Cir. 2025) (quotation marks omitted).  As the
undisputed facts make clear, the Department's prior PFAC requirements served its proffered
interests in safety and security effectively for decades.  *See, e.g.*, SUMF at 4, 7–8 (¶¶ 21, 44).  And
by vacating the challenged provisions of the Policy alone, *see* MSJ at 1 n.1, the remainder of the

Policy would be at least as stringent as the previous regime, *see, e.g.*, SUMF at 2, 4, 7–8 (¶¶ 5, 8, 21, 44).  Vacatur would thus be minimally disruptive to the Department, while protecting Plaintiffs' constitutional rights.  *See, e.g.*, *Comcast Corp. v. F.C.C.*, 579 F.3d 1, 9 (D.C. Cir. 2009) (vacating where remand without vacatur would "continue to burden speech protected by the First Amendment").  Vacatur is therefore warranted.

The Department's arguments to the contrary are unavailing.  First, "additional explanation" could not rectify the Policy's deficiencies.  Opp. at 44.  "Because vacatur is the default remedy, . . . [D]efendants bear the burden to prove that vacatur is unnecessary."  *Nat'l Parks Conservation Ass'n v. Semonite*, 422 F. Supp. 3d 92, 99 (D.D.C. 2019).  Yet the Department does not even attempt to explain how it could or would "substantiate the challenged [provisions] on remand."  *Dakota Rural Action v. Dep't of Agric.*, 668 F. Supp. 3d 1, 9 (D.D.C. 2023).  For good reason.  To make up for its failure to find facts, provide reasoning, consider alternatives, or premise the Policy on legitimate, constitutional concerns, the Department would need to start over.  Under such circumstances, vacatur is appropriate.  *See, e.g.*, *Standing Rock Sioux Tribe v. Army Corps of Eng'rs*, 282 F. Supp. 3d 91, 98 (D.D.C. 2017) (declining to vacate where "[c]orrecting th[e] flaw d[id] not require that [d]efendants begin anew").

Second, the Department's disruption concerns are unfounded.  Opp. at 44–45.  To start, because the Department cannot "rehabilitate" the Policy on remand, the Court need not consider the disruptive consequences of vacatur.  *Comcast Corp.*, 579 F.3d at 9.  They are, necessarily, not "weighty" absent some possibility of rehabilitation.  *Id.*  And in any event, vacatur would not lead to any "disruptive consequences."  The Department claims that vacating the Policy in full would "halt the processing of any future PFACs," "restrict the Pentagon from revoking PFACs," and "compromise the safety of the Pentagon."  Opp. at 45.  But the relief Plaintiffs seek would do no

such thing. Plaintiffs do not seek vacatur of the issuance and renewal guidelines, so the Department could continue "processing" PFACs. *See, e.g.*, *Cath. Soc. Serv. v. Shalala*, 12 F.3d 1123, 1128 (D.C. Cir. 1994) ("[C]ourts may 'set aside' only the part of a rule found to be invalid."). And the assertion that vacatur would "compromise the safety of the Pentagon" is baseless. Nothing in the record supports it, and wrongful conduct unprotected by the Constitution is governed by other statutes anyway. *See, e.g.*, *Comcast Corp.*, 579 F.3d at 9 (disruption minimized by presence of other regulations). Vacatur is the proper remedy.

Finally, the Department is wrong that all relief must be "tailored" to Plaintiffs. Opp. at 43. If Plaintiffs prevail on their APA claim, the Policy should be vacated, and "when a court vacates an agency rule, the vacatur applies to all regulated parties, not only those formally before the court." *Alabama Ass'n of Realtors v. HHS*, 539 F. Supp. 3d 211, 216 (D.D.C. 2021); *Trump v. CASA*, 606 U.S. 831, 847 n.10 (2015) (explicitly declining to disturb that rule).

## VI. Plaintiffs Are Entitled To Permanent Injunctive Relief.

If Plaintiffs prevail on the merits of their constitutional claims, they are entitled to a permanent injunction. They face ongoing irreparable injury, have no adequate remedy at law, and the balance of hardships and public interest favor relief. *See* MSJ at 42–44.

Plaintiffs' injury is present, ongoing, and severe. The Department argues that Plaintiffs cannot show "great" or certain injury because they "have yet to apply for PFACs, let alone been denied one[.]" Opp. at 42. That argument makes no sense. The undisputed facts make clear that Plaintiffs' PFACs were revoked because they refused to subject their constitutionally protected newsgathering and reporting to the whims of Department officials pursuant to the unconstitutional provisions of the Policy they now challenge. Moreover, to obtain a PFAC under the Policy, a journalist must sign the Acknowledgement, which is itself an unlawful condition. *See* MSJ at 35 n.8; *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013) (the

government "may not deny a benefit to a person on a basis that infringes his constitutionally protected freedom of speech even if he has no entitlement to that benefit" (citation omitted)). In other words, the Department would force journalists to agree to the unconstitutional, speech-chilling credentialing scheme they challenge. *See* Opp. at 43 ("Unless and until they sign the PFAC acknowledgment and are then denied a PFAC, their harm has not materialized."). The law does not require that. *See City of Lakewood*, 486 U.S. at 755–56 (a party may challenge a licensing law "without the necessity of first applying for, and being denied, a license"). The Policy has inflicted and is continuing to inflict irreparable constitutional injury on Plaintiffs. *See Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (loss of First Amendment rights is irreparable harm); *see also Karem v. Trump*, 404 F. Supp. 3d 203, 217 (D.D.C. 2019) ("[a] lack of access cannot be remedied retrospectively"); *Ateba v. Jean-Pierre*, 706 F. Supp. 3d 63, 74 n.3 (D.D.C. 2023) (a member of the press is "plainly injured" by the loss of a credential that, *inter alia*, provides "expedited access" to press areas in government buildings). That irreparable harm warrants injunctive relief.

The Department identifies no adequate remedy at law for these injuries and there is none. As the district court in *Karem* held in this context, "the only way to remedy the injury" here is to restore "the access that comes with" a credential. *See* 404 F. Supp. 3d at 217.

Finally, an injunction would serve the public interest. The "enforcement of an unconstitutional law is always contrary to the public interest." *Karem*, 960 F.3d at 668. And, here, the public has a uniquely powerful interest in ensuring that journalists and news organizations like Plaintiffs are able to exercise their First Amendment rights and cover the Department and its leadership from Pentagon for the benefit of the American public.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' motion for summary judgment, enter summary judgment in Plaintiffs' favor, vacate and declare the challenged provisions of the Policy unlawful and unconstitutional, enjoin Defendants from enforcing those provisions, and require Defendants to immediately reinstate Plaintiffs' PFACs.

Dated:   February 18, 2026                              Respectfully submitted,

*/s/ Theodore J. Boutrous*

Theodore J. Boutrous, Jr. (D.D.C. Bar No. 420440)
Katie Townsend (D.D.C. Bar No. 1026115)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
(213) 229-7000
TBoutrous@gibsondunn.com
KTownsend@gibsondunn.com

Lee R. Crain (D.D.C. Bar No. NY0337)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
(212) 351-4000
LCrain@gibsondunn.com

Susan M. Pelletier*
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, NW
Washington, DC 20036-5306
(202) 955-8500
SPelletier@gibsondunn.com

*admitted pro hac vice*

*Counsel for Plaintiffs The New York Times Company and Julian E. Barnes.*