**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| THE NEW YORK TIMES COMPANY, et al.,<br><br> *Plaintiffs*,<br><br>        v.<br><br> UNITED STATES DEPARTMENT OF DEFENSE, et al.,<br><br> *Defendants*. | Civil Action No. 1:25-cv-04218-DLF |

**DEFENDANTS' REPLY IN SUPPORT**
**OF THEIR MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

ARGUMENT ................................................................................................................... 2

I.    The PFAC Policy Satisfies Due Process Under the Fifth Amendment. ............................ 2

    A.    The PFAC Policy Provides Reasonable Standards Sufficient to Provide Notice. ................................................................................................. 2

        1.    The Policy provides adequate notice. ....................................................... 3

        2.    Plaintiffs mischaracterize the Policy's solicitation provision. ................... 4

        3.    "Security" is not impermissibly vague as used in the PFAC Policy. .......... 7

        4.    The Policy's enumerated factors are not impermissibly vague. ................. 8

        5.    The Policy does not authorize discriminatory enforcement. ..................... 9

    B.    The PFAC Policy Provides Ample Process. ........................................................... 9

II.   The PFAC Policy Does Not Violate the First Amendment. ............................................... 11

    A.    The Policy Is Not Viewpoint Discriminatory. ....................................................... 11

        1.    The Policy was applied uniformly across the political spectrum. ............. 11

        2.    Officials' statements do not establish discriminatory purpose. ................ 12

        3.    The AFDI framework confirms the Policy is constitutional. ..................... 13

        4.    Stakeholder engagement further refutes Plaintiffs' theory. ...................... 15

    B.    The Policy Does Not Vest the Department with Unbridled Discretion and Is Reasonable. ................................................................................. 15

    C.    The Policy Is Content-Neutral. ............................................................................. 18

    D.    The Acknowledgement Is Not an Unconstitutional Condition. ............................. 20

III.  The PFAC Policy Was the Product of Reasoned Decisionmaking. .................................. 21

IV.   If Relief Is Warranted, the Proper Remedy Is Remand, Not an Injunction. ..................... 23

CONCLUSION ............................................................................................................... 25

i

## TABLE OF AUTHORITIES

### CASES

*Act Now to Stop War & End Racism Coal. v. District of Columbia*,
  846 F.3d 391 (D.C. Cir. 2017)..................................................................... 9

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
  570 U.S. 205 (2013).................................................................................. 21

*Am. Radio Relay League, Inc. v. FCC*,
  524 F.3d 227 (D.C. Cir. 2008)................................................................... 22

*American Freedom Defense Initiative v. Washington Metropolitan Area Transit Authority*,
  901 F.3d 356 (D.C. Cir. 2018)................................................... 13, 14, 15

*Ateba v. Leavitt*,
  133 F.4th 114 (D.C. Cir. 2025)..................................................3, 8, 11, 18

*Begay v. United States*,
  553 U.S. 137 (2008).................................................................................... 8

*Branzburg v. Hayes*,
  408 U.S. 665 (1972).................................................................................... 6

*Bucklew v. Precythe*,
  587 U.S. 119 (2019).................................................................................... 2

*Chaplaincy of Full Gospel Churches v. England*,
  454 F.3d 290 (D.C. Cir. 2006)............................................................ 24, 25

*City of Austin v. Reagan National Advertising of Austin, LLC*,
  596 U.S. 61 (2022).................................................................................... 19

*City of Lakewood v. Plain Dealer Publishing Co.*,
  486 U.S. 750 (1988).......................................................................15, 16, 24

*Clark v. Cmty. for Creative Non-Violence*,
  468 U.S. 288 (1984).................................................................................. 12

*Dep't of Com. v. New York*,
  588 U.S. 752 (2019).................................................................................. 21

*Dep't of the Navy v. Egan*,
  484 U.S. 518 (1988)............................................................................... 7, 19

*Farmers Union Cent. Exch., Inc. v. Fed. Energy Regul. Comm'n*,
  734 F.2d 1486 (D.C. Cir. 1984).................................................................. 22

*Haig v. Agee,*
    453 U.S. 280 (1981) ......................................................................................... 5

*Hill v. Colorado,*
    530 U.S. 703 (2000) ......................................................................................... 9

*Jifry v. FAA,*
    370 F.3d 1174 (D.C. Cir. 2004) ..................................................................... 10

*Johnson v. United States,*
    576 U.S. 591 (2015) ......................................................................................... 8

*Karem v. Trump,*
    960 F.3d 656 (D.C. Cir. 2020) ................................................................... 9, 10

*Moody v. NetChoice, LLC,*
    603 U.S. 707 (2024) ....................................................................................... 20

*New York Times Co. v. United States,*
    403 U.S. 713 (1971) ......................................................................................... 7

*Phx. Herpetological Soc'y, Inc. v. U.S. Fish & Wildlife Serv.,*
    998 F.3d 999 (D.C. Cir. 2021) ....................................................................... 22

*Quigley v. Giblin,*
    569 F.3d 449 (D.C. Cir. 2009) ......................................................................... 9

*Reed v. Town of Gilbert,*
    576 U.S. 155 (2015) ....................................................................................... 19

*Ridley v. Mass. Bay Transp. Auth.,*
    390 F.3d 65 (1st Cir. 2004) ........................................................................... 14

*Sherrill v. Knight,*
    569 F.2d 124 (D.C. Cir. 1977) ................................................................. *passim*

*Snepp v. United States,*
    444 U.S. 507 (1980) ................................................................................... 7, 19

*Sorrell v. IMS Health Inc.,*
    564 U.S. 552 (2011) ....................................................................................... 13

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs,*
    985 F.3d 1032 (D.C. Cir. 2021) ..................................................................... 23

*Turner Broadcasting System, Inc. v. FCC,*
    512 U.S. 622 (1994) ....................................................................................... 12

*United States v. Hansen*,
   599 U.S. 762 (2023) ............................................................................................ 2, 5, 19

*United States v. Kim*,
   808 F. Supp. 2d 44 (D.D.C. 2011) ............................................................................ 5

*United States v. Morison*,
   844 F.2d 1057 (4th Cir. 1988) ............................................................................... 5, 6

*United States v. Raines*,
   362 U.S. 17 (1960) ................................................................................................... 9

*United States v. Williams*,
   553 U.S. 285 (2008) ................................................................................................. 2

*Ward v. Rock Against Racism*,
   491 U.S. 781 (1989) ........................................................................................... 12, 13

## **STATUTES**

5 U.S.C. § 552a ........................................................................................................ 4

10 U.S.C. § 892 ........................................................................................................ 4

18 U.S.C. § 1905 ...................................................................................................... 4

## INTRODUCTION

The Pentagon is the headquarters of the United States military. While the Department was not required to open the Pentagon to the press, conduct press conferences, or operate press facilities, having voluntarily chosen to establish press facilities perceived as open to bona fide journalists, the protection afforded newsgathering under the First Amendment requires that access not be denied arbitrarily or for less than compelling reasons. *See Sherrill v. Knight*, 569 F.2d 124, 129 (D.C. Cir. 1977). The Department has a compelling interest—and a statutory obligation—in ensuring that individuals with unescorted access to this facility do not pose a security risk. *See id.* at 130; AR-3. The PFAC Policy serves that interest through reasonable, viewpoint-neutral criteria consistent with circuit precedent governing press credentials.

Plaintiffs' opposition rests on a narrative that the Policy was designed to purge disfavored journalists and replace them with ideologically aligned media. The undisputed facts contradict that narrative. When the Department required all PFAC holders to sign the Acknowledgement, the outlets that refused included not only the New York Times, the Washington Post, CNN, and NPR, but also Fox News Media—Secretary Hegseth's former employer—Newsmax, the Washington Times, the Washington Examiner, and the Daily Caller. Decl. of Christopher Garver ("Garver Decl.") at ¶ 3. The Policy was applied uniformly: every outlet that refused to sign lost its credentials, and every outlet willing to sign—regardless of its perceived political orientation—received or retained a PFAC. The composition of the current press corps reflects which outlets chose to accept the Policy's terms and which chose not to. That is the opposite of viewpoint discrimination.

The only speech-related conduct the Policy considers is the solicitation of unlawful acts to be committed by Department personnel—conduct categorically unprotected under the First

1

Amendment. *See United States v. Hansen*, 599 U.S. 762, 783 (2023) ("Speech intended to bring about a particular unlawful act has no social value; therefore, it is unprotected."). The Policy does not create new restrictions on journalists' conduct; it incorporates existing federal criminal law into a written policy and asks journalists to acknowledge it. The Policy does not prohibit publication, does not require pre-publication approval, and does not penalize the receipt or possession of information. AR-6, 12. It provides intelligible standards, guided by enumerated factors, and affords robust procedural protections. AR-15–16.

Plaintiffs must satisfy the high standard applicable to facial challenges. "A facial challenge is really just a claim that the law or policy at issue is unconstitutional in all its applications." *Bucklew v. Precythe*, 587 U.S. 119, 138 (2019). In the First Amendment context, the plaintiff must "demonstrate[] that the statute prohibits a substantial amount of protected speech relative to its plainly legitimate sweep." *Hansen*, 599 U.S. at 770 (citation omitted). "Because it destroys some good along with the bad, [i]nvalidation for overbreadth is strong medicine that is not to be casually employed. . . . To justify facial invalidation, a law's unconstitutional applications must be realistic, not fanciful, and their number must be substantially disproportionate to the statute's lawful sweep." *Id.* (quoting *United States v. Williams*, 553 U.S. 285, 293 (2008)). Plaintiffs cannot satisfy these standards.

## ARGUMENT

### I.    The PFAC Policy Satisfies Due Process Under the Fifth Amendment.

#### A.  The PFAC Policy Provides Reasonable Standards Sufficient to Provide Notice.

Plaintiffs advance several arguments that the Policy is unconstitutionally vague on its face. All fail.

1.  <u>The Policy provides adequate notice.</u>

Plaintiffs assert that the Policy does not inform a prospective PFAC holder "what routine reporting and newsgathering" activities may trigger an adverse PFAC determination. Combined Mem. of Law in Opp'n to Defs.' Mot. for Summ. J. & in Further Supp. of Pls.' Mot. for Summ. J. at 3, ECF No. 24. But the Policy extensively details the criteria that will be considered: convictions relating to safety and security, AR-15, and soliciting the disclosure of CNSI or CUI or otherwise encouraging Department personnel to violate disclosure laws, AR-12. The Policy provides examples of prohibited solicitation, including "direct communications with specific DoW personnel or general appeals, such as public advertisements or calls for tips encouraging DoW employees to share non-public DoW information." AR-12–13. This is more than sufficient to put a person of ordinary intelligence on notice.

To the extent Plaintiffs contend that the Constitution requires explicit, *ex ante* identification of every possible activity that might result in an adverse determination, that is not the law. *See Sherrill*, 569 F.2d at 130 (holding that the governmental interest in security "does not lend itself to detailed articulation of narrow and specific standards or precise identification of all the factors which may be taken into account"); *Ateba v. Leavitt*, 133 F.4th 114, 124 (D.C. Cir. 2025). The D.C. Circuit has recognized that, for matters of security, a press pass policy may be "sufficiently circumspect so as to allow the [Government], exercising expert judgment which frequently must be subjective in nature, considerable leeway in denying press passes for security reasons." *Sherrill*, 569 F.2d at 130. The Fifth Amendment does not require the elimination of all discretion in press credentialing decisions, so long as that discretion is guided by concrete standards. *See Ateba*, 133 F.4th at 123-24 (citation omitted) (holding that the Senate Daily Press Gallery's membership requirements, including the "of repute" standard read together with the Governing Rules' concrete eligibility criteria, did not confer unbridled discretion).

2.  <u>Plaintiffs mischaracterize the Policy's solicitation provision.</u>

Much of Plaintiffs' case rests on a mischaracterization of the PFAC Policy. Plaintiffs portray the Policy as prohibiting "routine reporting and newsgathering" and "ask[ing] questions of Department employees." ECF No. 24 at 3, 6. That is a straw man. A careful reading of the Policy's text reveals that its solicitation provision does not create any new restriction on journalists' conduct. It incorporates *existing federal criminal law* into a written policy and asks journalists to acknowledge it.

The prohibitions on unauthorized disclosure that the Policy references are not inventions of the Department. They are laws enacted by Congress. Military members face prosecution under Article 92 of the Uniform Code of Military Justice, 10 U.S.C. § 892, for violating lawful orders and regulations—including orders restricting the disclosure of classified and controlled information. AR-6. Both military and civilian Department employees face potential criminal liability under 18 U.S.C. § 1905 for disclosure of confidential information, and under the Privacy Act, 5 U.S.C. § 552a, for knowing and willful unauthorized disclosures of Privacy Act-protected information. *Id.* The Department must safeguard CNSI in accordance with Executive Order 13526 and the Atomic Energy Act, and CUI in accordance with Executive Order 13556. AR-5. These are not policies the Department invented for the PFAC Policy; they are longstanding federal statutes and executive orders that have governed the conduct of Department personnel for decades. All the Department did was put the laws that Congress passed into a written policy and ask journalists to acknowledge them.

The Policy then draws a clear line. It states: "To be clear, these are the laws and regulations that apply to military members and DoW civilian employees and contractors. Members of the news media are not required to submit their writings to DoW for approval." AR-6 (emphasis added). The Policy further states that "any solicitation of DoW personnel to commit criminal acts would

not be considered protected activity under the 1st Amendment." *Id.* And it reiterates: the Policy "do[es] not prohibit you as a PFAC holder from engaging in constitutionally protected journalistic activities, such as investigating, reporting, or publishing stories." AR-12.

Critically, the Policy does not prohibit journalists from asking questions of Department personnel. Many Department employees are *authorized* to discuss information with the press—Public Affairs Officers, designated spokespersons, and senior officials regularly engage with journalists as part of their official duties. The Policy's solicitation provision is not directed at those lawful interactions. It is directed at a specific and narrow category of conduct: soliciting personnel who are *not* authorized to disclose information to violate their independent legal obligations by providing CNSI, CUI, or other non-public information without authorization. *Id.* The Policy draws "a critical distinction between lawfully requesting information from the government and actively soliciting or encouraging government employees to break the law." *Id.* And it confirms that "[t]he receipt of unsolicited CNSI or CUI and its subsequent publication is generally protected by the First Amendment and would not, on its own, normally trigger denial, revocation, or non-renewal of a PFAC." *Id.*

In other words, the Policy targets the solicitation of conduct that is *independently unlawful* for Department personnel under specific, identified federal statutes. That is precisely the category of speech that the Supreme Court held is unprotected in *Hansen*: "Speech intended to bring about a particular unlawful act has no social value; therefore, it is unprotected." 599 U.S. at 783; *see also United States v. Kim*, 808 F. Supp. 2d 44, 56 (D.D.C. 2011) ("Because § 793(d) makes it unlawful to communicate national defense information to those not entitled to receive it, courts have held that the First Amendment affords no protection for this type of conduct even though it clearly involves speech."); *Haig v. Agee*, 453 U.S. 280, 308–09 (1981); *United States v. Morison*, 844 F.2d

1057, 1069 (4th Cir. 1988). If solicitation of unlawful disclosure is unprotected in the criminal context—where the consequence is imprisonment—it is *a fortiori* a permissible consideration in the context of credentialing for access to a nonpublic forum, where the consequence is not imprisonment but the potential loss of a privilege.

Plaintiffs' attempt to recast this provision as a prohibition on "routine newsgathering" ignores the Policy's explicit text. The Policy does not prohibit asking questions. It does not prohibit receiving information. It does not prohibit publishing stories. It does not require pre-publication approval. It does not restrict interactions with authorized Department spokespersons and officials. What it does is inform PFAC holders that actively soliciting Department personnel to commit criminal acts—acts for which those personnel face prosecution under identified federal statutes— may be considered in determining whether the PFAC holder poses a security risk. It should not be controversial to ask journalists who are granted the privilege of unescorted access to the headquarters of the American military to acknowledge that they understand the law. That is not a restriction on protected speech; it is a commonsense security measure that falls squarely within the category of unprotected speech identified in *Hansen*.

Even if the Policy imposed an incidental burden on newsgathering, "it is clear that the First Amendment does not invalidate every incidental burdening of the press." *Branzburg v. Hayes*, 408 U.S. 665, 682 (1972). In *Branzburg*, the Supreme Court upheld a far more impactful requirement: compelling reporters to testify before a grand jury and answer questions relevant to criminal investigations, rejecting the argument that this would deter confidential sources, because "[t]he preference for anonymity of those confidential informants involved in actual criminal conduct is presumably a product of their desire to escape criminal prosecution, and this preference, while understandable, is hardly deserving of constitutional protection." *Id.* at 691-92. The incidental

burden here—the possibility that soliciting unlawful disclosures *might* factor into a PFAC determination—is far less severe than the certainty of compelled testimony in *Branzburg*.

### 3. "Security" is not impermissibly vague as used in the PFAC Policy.

Plaintiffs argue that "security" is inherently vague. ECF No. 24 at 3–4. But the cases they cite are inapposite. Unlike the injunction against publication in *New York Times Co. v. United States*, 403 U.S. 713 (1971) (per curiam), the PFAC Policy does not impose a prior restraint on publication. AR-6, 12. And the Supreme Court has recognized the Government's "compelling interest" in withholding national security information from unauthorized persons. *Dep't of the Navy v. Egan*, 484 U.S. 518, 527 (1988) (quoting *Snepp v. United States*, 444 U.S. 507, 509 n.3 (1980)).

Plaintiffs also mischaracterize *Sherrill*. *Sherrill* held that "security" *alone*—without any published standards, criteria, or procedures—was too vague. 569 F.2d at 130. The PFAC Policy does not simply state that a PFAC will be denied "for reasons of security." It promulgates prospective standards, enumerates factors, and provides detailed procedures. AR-12, 15–16. The Policy thus "does specify in a meaningful way the basis upon which persons will be deemed security risks." *Sherrill*, 569 F.2d at 130.

Plaintiffs say they are "not insisting that the Policy 'list out every conceivable situation that constitutes a security risk' that could result in the suspension or revocation of a PFAC in granular detail." ECF No. 24 at 5 (quoting ECF No. 10-36 ¶ 21). They instead insist on an "explicit and meaningful standard." *Id.* The PFAC Policy provides exactly that: it identifies the overarching standard (whether an individual poses a "security or safety risk"), enumerates specific factors that guide that determination (including categories of criminal convictions and solicitation of unauthorized disclosures), and provides detailed procedures for notice, rebuttal, and review. AR-12, 15–16. What Plaintiffs actually seek is to deny the Department the exercise of *any* discretion,

for fear that it may be used against them. But the Department cannot meaningfully secure the Pentagon without the exercise of discretion, and the Fifth Amendment does not preclude the exercise of judgment in the application of written policies guided by concrete standards. *See Ateba*, 133 F.4th at 123-24 (general requirements, read together with concrete eligibility criteria, did not confer unbridled discretion).

### 4.  The Policy's enumerated factors are not impermissibly vague.

Plaintiffs cite *Johnson v. United States*, 576 U.S. 591 (2015), to argue that the Policy's enumerated factors do not cure its vagueness. ECF No. 24 at 5–6. But *Johnson*'s vagueness arose from "indeterminacy about how to measure the risk posed by a crime" combined with "indeterminacy about how much risk it takes for the crime to qualify as a violent felony," 576 U.S. at 598, evident only after "[n]ine years' experience" had produced "pervasive disagreement about the nature of the inquiry one is supposed to conduct and the kinds of factors one is supposed to consider," *id.* at 601. The Court made clear it did "not doubt the constitutionality of laws that call for the application of a qualitative standard." *Id.* at 604. Here, the Policy's factors are consistently drawn to crimes involving safety and security and to the solicitation of unauthorized information— unlike in *Johnson*, where the enumerated offenses were "far from clear in respect to the degree of risk each poses" and contributed to the residual clause's indeterminacy. *Id.* at 598 (quoting *Begay v. United States*, 553 U.S. 137, 143 (2008)); *see* AR-15.

As to "unprofessional conduct," the Policy does not bar "unprofessional conduct" generally; it identifies as a presumptive security risk a *conviction* of an offense involving "[u]nprofessional conduct that might serve to disrupt Pentagon operations." AR-15 (emphasis added). The only discretion in applying this narrower standard is to determine, after a conviction, whether the underlying criminal act could disrupt Pentagon operations. This is a far cry from the situation in *Karem v. Trump*, where the White House violated due process by suspending a

8

journalist's hard pass for thirty days without providing fair notice of "the magnitude of the sanction that might be imposed" for unprofessional conduct, where there was no written policy governing such conduct. 960 F.3d 656, 667 (D.C. Cir. 2020) (citation modified).

      5.  <u>The Policy does not authorize discriminatory enforcement.</u>

The question in a facial challenge is not whether the agency *might* exercise its authority unlawfully, but whether "anything in the" provision "prevent[s]" the agency "from doing so." *Act Now to Stop War & End Racism Coal. v. District of Columbia*, 846 F.3d 391, 412 (D.C. Cir. 2017). In *Act Now*, regulations restricted event-related posters, and the enforcement officer was permitted to refer to "all circumstances" to determine whether a poster was event-related. *Id.* In depositions, enforcement officers assessed the same poster differently. *Id.* The D.C. Circuit nonetheless held that "[s]o long as [the officer's] inferences are reasonable . . . the rule's open-endedness about the evidence that may be used to meet that standard does not convert its otherwise clear limitation into an impermissibly vague one." *Id.* The PFAC Policy meets that standard: it lists factors to guide discretion, requires "reasonable" determinations, and provides for notice, rebuttal, and judicial review. AR-12, 15–16. A facial vagueness challenge fails where the provision is "valid in the vast majority of [its] intended applications." *Hill v. Colorado*, 530 U.S. 703, 733 (2000) (quoting *United States v. Raines*, 362 U.S. 17, 23 (1960)); *Quigley v. Giblin*, 569 F.3d 449, 458 (D.C. Cir. 2009). Here, the PFAC Policy is valid in the vast majority of its intended applications because it provides clear standards for determining security risks and applies those standards uniformly.

    **B.  The PFAC Policy Provides Ample Process.**

The PFAC Policy provides the process required by the D.C. Circuit: "notice to the unsuccessful applicant of the factual bases for denial with an opportunity to rebut." *Sherrill*, 569 F.2d at 131. As a default, the Policy relies on pre-deprivation process: when the Department "anticipates" an adverse decision, it notifies the applicant in writing before any final action. AR-

15. The applicant then has 30 days to appeal, an opportunity to present mitigating information, and the right to a personal appearance. AR-15–16. A final written decision is issued "expeditiously." AR-16.

The Policy allows for post-deprivation process only in extreme scenarios—when the Department concludes that a PFAC holder poses an immediate security risk. AR-12. That common-sense exception accords with the Constitution. *See Karem*, 960 F.3d at 667 (noting the White House may order "the immediate removal of rogue, mooning journalists"). The D.C. Circuit has upheld analogous provisions in other security contexts. In *Jifry v. FAA*, 370 F.3d 1174, 1183–84 (D.C. Cir. 2004), the court held that "[w]hatever the risk of erroneous deprivation, the pilots had the opportunity to file a written reply to the TSA's initial determination and were afforded independent *de novo* review of the entire administrative record by the Deputy Administrator of the TSA," and that "[i]n light of the governmental interests at stake and the sensitive security information, substitute procedural safeguards may be impracticable, and in any event, are unnecessary under our precedent." Even Plaintiffs concede that if there is a "necessity of quick action by the State," post-deprivation process suffices. ECF No. 24 at 10. That is precisely where the PFAC Policy contemplates immediate action—but only where an individual poses an exigent security threat to the headquarters of the American military.

*Sherrill* does not mandate pre-deprivation process in all circumstances. It requires "notice" and "an opportunity to rebut" but is silent on timing. 569 F.2d at 131. Plaintiffs were invited to apply the *Mathews v. Eldridge* balancing test in Defendants' opening brief, Defs.' Cross-Mot. for Summ. J. and Opp'n to Pls.' Mot. for Summ. J. at 21–22, ECF No. 22-1, and have again declined, ECF No. 24 at 9–10. Their say-so is not sufficient to establish an absolute right to pre-deprivation process for press passes in all circumstances. Application of the *Mathews* factors here would weigh

10

in the Department's favor: the private interest, while significant, is in a privilege of access to a nonpublic forum, not in employment or a government benefit; the risk of erroneous deprivation is mitigated by the Policy's detailed post-deprivation procedures; and the Government's interest in immediately addressing exigent security threats at the headquarters of the American military is compelling. Even if post-deprivation process could never suffice, the only appropriate remedy would be requiring pre-deprivation process—not invalidating the Policy as a whole.

Finally, Plaintiffs argue that the absence of an explicit timeline renders post-deprivation process inadequate. ECF No. 24 at 11. But the Policy is content-neutral, and heightened procedural requirements do not apply. *Ateba*, 133 F.4th at 126–27 ("The Hard Pass Policy, which is intended to decrease the number of hard passes in circulation for administrative and security purposes, is the type of 'traditional' exercise of government authority that does not trigger heightened procedural protections."). Regardless, the Policy requires a final decision "expeditiously." AR-16. Given the fact-specific nature of the inquiry, variations in what PFAC holder might proffer to rebut a revocation, and variable demands on the Department's resources, a stricter timeline would be unreasonable, certainly for a facial challenge.

## II.    The PFAC Policy Does Not Violate the First Amendment.

### A.  The Policy Is Not Viewpoint Discriminatory.

Plaintiffs concede the Policy is facially viewpoint-neutral. ECF No. 24 at 15. They urge the Court to find an unstated discriminatory "purpose." The undisputed facts refute that theory.

### 1.  The Policy was applied uniformly across the political spectrum.

As detailed in the Introduction, the outlets that forfeited their PFACs spanned the political spectrum—from the New York Times and CNN to Fox News, Newsmax, the Washington Examiner, and the Daily Caller. Garver Decl. at ¶ 3. Every major outlet, conservative and liberal

alike, refused to sign. The new PFAC holders comprise those willing to sign—not those who are favored. The Department applied a uniform requirement; the press corps made its own choices. That virtually every major news organization—conservative and liberal alike—found the Acknowledgement objectionable does not establish that the Policy is unconstitutional. It establishes that the press corps made a collective institutional decision not to accept the Policy's terms. The Constitution does not require the Department to abandon a facially neutral security policy simply because a large number of journalists disagree with it. That is not viewpoint discrimination.

2. Officials' statements do not establish discriminatory purpose.

Plaintiffs urge the Court to infer viewpoint-discriminatory purpose from statements by Department officials praising certain journalists and criticizing others. ECF No. 24 at 13–14. But in no case cited by Plaintiffs has a court inferred such a purpose from political statements of the kind at issue here.

Plaintiffs cite *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 648 (1994), but *Turner* supports Defendants. The Court held that Congress' acknowledgment of the value of broadcast programming did not indicate that "Congress regarded broadcast programming as more valuable than cable programming." *Id.* Similarly, that some Department officials have praised one set of journalists and criticized another does not establish that the Policy was crafted for the purpose of excluding disfavored viewpoints—particularly when the Policy was applied uniformly to conservative and liberal outlets alike.

Plaintiffs also cite *Ward v. Rock Against Racism*, 491 U.S. 781 (1989), but *Ward* supports Defendants. The Court held that "[g]overnment regulation of expressive activity is content neutral so long as it is 'justified without reference to the content of the regulated speech.'" *Id.* at 791 (quoting *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984)) (emphasis in

original). "The government's purpose is the controlling consideration. A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Id.* The PFAC Policy is so justified: it is designed to protect the security of the Pentagon and to prevent the solicitation of unlawful disclosures of protected information. AR-18.

And *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 563–65 (2011), involved a statute with "content- and speaker-based restrictions" *on its face*, *id.* at 563, and legislative findings confirming that "the law's express purpose and practical effect are to diminish the effectiveness of marketing by manufacturers of brand-name drugs," *id.* at 564–65—neither of which is present here. The PFAC Policy has no content or viewpoint-based restrictions on its face, and no stated purpose to target specific viewpoints. At most, Plaintiffs' evidence shows that some Department officials have commented on the unintended effect of the Policy on certain outlets—outlets that, as shown above, made their own choice not to sign.

Plaintiffs' supplemental exhibits (Exs. 1–7) do not change the analysis. Exhibits 3–4 (Parnell and Valdez tweets about a Washington Post article on Hegseth's security detail) and Exhibits 5–6 (Hegseth's press conference on Iran coverage) predate the Policy and concern different subjects—they reflect officials' views about specific articles, not the design of the PFAC Policy. Exhibit 7 (Parnell's "Trump-hating media" tweet about the New York Times) is generic political rhetoric of the kind that is ubiquitous in modern political discourse. None establishes a nexus between officials' statements and the design of the PFAC Policy.

3. The AFDI framework confirms the Policy is constitutional.

Even under the *AFDI* framework Plaintiffs invoke, ECF No. 24 at 16, the Policy is constitutional. In *American Freedom Defense Initiative v. Washington Metropolitan Area Transit Authority*, the D.C. Circuit set forth a framework for evaluating as-applied viewpoint

discrimination challenges, considering both retrospective and prospective evidence. 901 F.3d 356, 365-66 (D.C. Cir. 2018). Again, Plaintiffs are bringing a facial, not an as-applied challenge, so it does not appear that this framework even properly does apply.

As to retrospective evidence, the court looks to "'statements by government officials on the reasons for' closing the forum," the fit between means and ends, and any history of viewpoint discrimination. *Id.* at 366 (quoting *Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 87 (1st Cir. 2004)). Here, the stated reasons for the Policy—Pentagon security and protection of classified and controlled unclassified information—are viewpoint-neutral. AR-18. The means fit the ends: the Policy gives grounds to deny a PFAC to individuals who pose a security risk, as determined by explicit factors relating to security-related convictions and actions that could compromise national security information. AR-12, 15. Plaintiffs point to no history of the Department discriminating against their viewpoint (or any viewpoint) in the credentialing context, nor have there been substantial departures from the Department's commitment to the Pentagon's security—PFACs have always been required.

As to prospective evidence, the most relevant inquiry is whether there is "a lack of evenhandedness in the Government's actions," *Am. Freedom Def. Initiative*, 901 F.3d at 366, which would raise suspicion of viewpoint discrimination. Here, the evidence of evenhandedness is overwhelming: conservative and liberal outlets were treated identically. Garver Decl. at ¶ 3. No PFAC has been denied to any applicant under the new Policy. The journalists who lost credentials did so because they chose not to sign—a uniform consequence applied to all who refused, regardless of viewpoint. And even current PFAC holders whom Plaintiffs allege receive preferential treatment feel restricted by the Policy. ECF No. 24 at 9 n.3. That cuts against any claim of viewpoint discrimination.

In *AFDI*, the court found no viewpoint discrimination because the plaintiff "provided no prospective evidence whatsoever; it cite[d] no example of an issue-oriented advertisement being run on Metrobuses or in Metrorail stations once the Moratorium was adopted, nor ha[d] AFDI pointed to any inconsistency in WMATA's explanation for its decision to close the forum." 901 F.3d at 366. The same is true here: Plaintiffs have not identified a single instance where a PFAC has been denied under the new Policy, let alone denied on the basis of viewpoint.

        4.   Stakeholder engagement further refutes Plaintiffs' theory.

The Department conferred extensively with news outlets and professional organizations on revisions to the Policy. AR-41–74. It made specific changes in response: clarifying that news media need not submit writings for approval, AR-5–6; replacing individual acknowledgements with a single acknowledgement that does not require agreement or waive rights, AR-14; and expanding the section distinguishing between active solicitation and the receipt and publication of unsolicited information, AR-12. *Compare* AR-15 *with* AR-66–67; *compare* AR-14 *with* AR-74. If it aimed to force out disfavored media, the Department would not have accommodated so many of their requests. What's more, none of the legacy news media have been denied a PFAC—they lack a PFAC because they refuse to sign the Acknowledgement. SUMF ¶¶ 69–70.

    **B.   The Policy Does Not Vest the Department with Unbridled Discretion and Is Reasonable.**

Plaintiffs' unbridled discretion and "objective, workable standards" arguments, ECF No. 24 at 18–24, largely repackage their vagueness challenge and fail for the same reasons. *See supra* § I.A. The Policy limits denial, revocation, or non-renewal to a finding of "security or safety risk," guided by explicit factors. AR-15. This is not a standardless regime like *City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 769–70 (1988), where the mayor could deny a permit based on "such other terms and conditions deemed necessary and reasonable by the Mayor," *id.* at

769 (citation omitted), with no articulated standards in the ordinance, such that there is "nothing in the law as written requires the mayor to do more than make the statement 'it is not in the public interest' when denying a permit application," *id.* at 769–70. Here, the only ground to deny a PFAC to an otherwise qualified applicant is a security-risk finding, and that finding is guided by enumerated factors, subject to appeal, and reviewable by this Court. AR-15–16.

Plaintiffs further argue that the PFAC Policy contains a "residual clause" granting unlimited discretion. ECF No. 24 at 22. But Plaintiffs never identify the alleged residual clause. As relevant to this case, the only ground to deny a PFAC to an otherwise qualified applicant is if they are found to be a security risk. AR-15. The Department may not, in its discretion, deny a PFAC to an otherwise qualified applicant on other grounds.

Plaintiffs point to the treatment of Laura Loomer and James O'Keefe as evidence of inconsistent application. ECF No. 24 at 22–23. But no PFAC has been *denied* under the new Policy, so there is no denial to compare these grants against. As to Loomer's tip line, the distinction is textual: the Policy defines prohibited solicitation as communications that "directly target[] DoW personnel to disclose non-public information without proper authorization." AR-12–13. The Post's tip line specifically and exclusively targets "Defense Department civilians and service members" and appears at the end of military defense-related stories. SUMF ¶ 88. Loomer's post is a general solicitation from the public that does not specifically target Department personnel to disclose protected information. ECF No. 22-1 at 27–28. This is a meaningful distinction under the Policy's own terms, not an ad hoc rationalization. As to O'Keefe, the Policy's presumptive disqualifiers require a "reasonable determination" based on "the unique facts and circumstances of each case"— they are not automatic. AR-12–13. The Department's decision to grant O'Keefe a PFAC is consistent with the Policy's terms. And the Policy explicitly states that "the receipt of unsolicited

16

CNSI or CUI and its subsequent publication" would not "on its own, normally trigger" adverse action. AR-12.

Plaintiffs' characterization of the Policy as "unprecedented" and a "radical departure from longstanding tradition," ECF No. 1 ¶ 15; ECF No. 24 at 2, is also unfounded. Security-based press credentialing at the Pentagon is not new—it is as old as the Pentagon press corps itself. Garver Decl., Ex. 1; *see also id.* at 7. (requiring "accredited journalists to sign an agreement swearing to "submit for censorship all statements, written material, and photography intended for publication or release, whether made during or after [the] assignment."); *see also id.* at 9 (requiring journalists to publish stories "accurate in statement and implication," and did not "supply military information to the enemy . . . injure the morale of our forces, the people are home or our allies [or] . . . embarrass the United States, its allies, or neutral countries."); Ex. 2 at 6-7 (restricting journalists from reporting on "the specific number of troops," "information regarding future operations," and "specific information on friendly force troop movement… and dispositions that would jeopardize operational security or lives"). In the past, credentials were "revocable at any time," Garver Decl., Ex. 1 at 7, and correspondents were "subject to military law." *Id.* at 4. While these policies applied to battlefield reporting, operational knowledge is not limited to the battlefield. Exposure to, and the need to protect, sensitive information is the same across these different contexts.

In contrast, the PFAC Policy is dramatically less restrictive than previous policies. It explicitly states that "members of the news media are not required to submit their writings to DoW for approval," AR-6—a far cry from the mandatory prepublication censorship under which Pentagon press credentials were first issued. It provides written notice, an opportunity to respond, a personal hearing, and judicial review before any final adverse action, AR-15–16—protections entirely absent from the original regime, where credentials were revocable "at any time" without

process. And it does not subject journalists to military law. What is new is not that the Department conditions press access on security considerations—it has always done so—but that the Department has *formalized* its credentialing standards in writing with robust procedural protections, which is precisely what *Sherrill* required.

The Policy is also reasonable in light of the forum's purpose. The Department need not provide detailed articulation of narrow and specific standards or precise identification of all factors that may be considered, as the governmental interest in security "does not lend itself to" such specificity. *See Sherrill*, 569 F.2d at 130. It is entitled to considerable leeway in making security determinations, as the applicable standard is "sufficiently circumspect so as to allow the [Government], exercising expert judgment which frequently must be subjective in nature, considerable leeway in denying press passes for security reasons." *Id.*; *see also Ateba*, 133 F.4th at 122 (applying *Sherrill*'s framework to White House hard pass policy). Moreover, Plaintiffs retain ample alternative channels for newsgathering about the Department, including FOIA requests, official briefings, phone and email inquiries to Department personnel, and reporting from outside the Pentagon. The First Amendment does not guarantee the press a right of access to government information or facilities beyond that afforded to the general public, and the availability of these alternative avenues further supports the reasonableness of the Policy.

### C.  The Policy Is Content-Neutral.

Plaintiffs argue for the first time that the Policy governs conduct off Pentagon property and therefore falls outside nonpublic forum jurisprudence. ECF No. 24 at 24–25. Plaintiffs cite no authority for this proposition, and it is contrary to established practice. Press pass policies have always turned on outside conduct—background checks in *Sherrill*, 569 F.2d at 127, and external credentialing in *Ateba*, 133 F.4th at 123. For the PFAC Policy to consider conduct outside of the

Pentagon falls well within the discretion afforded the Government when controlling access to a nonpublic forum.

The Policy is not content-based. A regulation is content-based if it "applies to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). Whether information constitutes CNSI or CUI does not turn on the message conveyed; it turns on the classification or confidentiality status of the message. Nor does the publication of information that recklessly endangers American lives turn on the message; it turns on whether operational security is compromised. The Policy is thus more like the regulation in *City of Austin v. Reagan National Advertising of Austin, LLC*, where a regulation distinguishing between on-premises and off-premises signs was content-neutral because "[a] sign's substantive message itself is irrelevant to the application of the provisions" and "[t]he message on the sign matters only to the extent that it informs the sign's relative location." 596 U.S. 61, 71 (2022).

Regardless, even content-based restrictions are permissible in a nonpublic forum so long as they do not discriminate on the basis of viewpoint. The Policy does not. *See supra* § II.A.

Even if strict scrutiny applied, the Policy would survive. The Government has a compelling interest in protecting national security and the security of the Pentagon. *See Egan*, 484 U.S. at 527 (recognizing the Government's "compelling interest" in withholding national security information from unauthorized persons (quoting *Snepp*, 444 U.S. at 509 n.3)). The Policy is narrowly tailored: it restricts access only for individuals who pose a security risk, as determined by explicit factors. AR-15. The restriction on the solicitation of unauthorized information is similarly tailored: the Policy informs the PFAC holder that soliciting or encouraging Department personnel to disclose information not authorized for release may inform a reasonable determination as to whether the PFAC holder poses a security or safety risk. *Hansen*, 599 U.S. at 781 ("[The challenged provision]

reaches no further than the purposeful solicitation and facilitation of specific acts known to violate federal law."). That there have been no prior security incidents does not preclude prophylactic measures; otherwise, the government would be forever reacting to risks rather than preventing them. And given the global, interconnected media and communications environment, the Policy would be underinclusive if it did not encompass off-grounds communication.

Plaintiffs' reliance on *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024), is misplaced. *Moody* concerned state laws that restricted social media platforms' ability to engage in content moderation—to filter, prioritize, and label third-party content their users wished to post. *Id.* at 717. The Court held that such restrictions implicated the First Amendment because they interfered with the platforms' protected editorial discretion in compiling and curating others' speech into their own expressive product. *Id.* at 731–32. The PFAC Policy presents a fundamentally different situation. It does not regulate what journalists may write, publish, or broadcast. AR-6 ("[m]embers of the news media are not required to submit their writings to DoW for approval."); AR-12 (PFAC holders are not prohibited from "investigating, reporting, or publishing stories"). The Policy governs *who may enter a government building*, not what anyone may say or publish. The Department is not exercising editorial control over the press; it is exercising its statutory authority to manage access to a secure military facility.

### D.  The Acknowledgement Is Not an Unconstitutional Condition.

Plaintiffs argue that requiring PFAC holders to sign the Acknowledgement imposes an unconstitutional condition on their access to the Pentagon. ECF No. 24 at 35–36. This argument fails because the Acknowledgement does not require PFAC holders to surrender any constitutional rights. The Acknowledgement states that the signer's "signature represents my acknowledgement and understanding of such DoW policies and procedures, even if I do not necessarily agree with such policies and procedures." AR-14. It further states: "Signing this acknowledgment does not

waive any rights I may have under law." *Id.* The Acknowledgement thus requires only that a PFAC holder confirm receipt and understanding of the Policy—not agreement with it, endorsement of it, or waiver of any rights. This is materially different from the unconstitutional conditions cases Plaintiffs cite, where the government required affirmative endorsement of a viewpoint or waiver of rights as a condition of receiving a benefit. *Cf. Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 218, 221 (2013) (holding that a funding condition requiring recipients to profess a specific belief opposing prostitution violated the First Amendment because it went "beyond defining the limits of the federally funded program to defining the recipient"). The Acknowledgement requires no such pledge.

### III.    The PFAC Policy Was the Product of Reasoned Decisionmaking.

The Department issued the Policy to "balance between press access and [operational security]," AR-18, and to "reduce the opportunities for in-person inadvertent and unauthorized disclosures," *id.* Plaintiffs' APA arguments fail for four reasons.

*First*, Plaintiffs argue the Department considered improper factors. ECF No. 24 at 30. But the administrative record reflects that the Policy was motivated by security concerns, AR-18, and developed through extensive consultation with the press, AR-41–74. Plaintiffs' extra-record evidence of officials' statements does not establish a "disconnect between the decision made and the explanation given." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019). The Policy's scope matches its stated aim. *See supra* Section II.C. Plaintiffs argue that the Court should consider extra-record information because there is a "strong showing of bad faith." ECF No. 24 at 30. But the PFAC Policy's scope matches its aim of protecting Pentagon security, and there is no "disconnect between the decision made and the explanation given" that would warrant extra-record inquiry. *Dep't of Com.*, 588 U.S. at 785.

*Second*, the Policy has a rational connection to its ends. It is aimed at preventing the disclosure of unauthorized information that could harm national security—encompassing both classified and controlled unclassified information because unauthorized disclosure of either category can compromise operational security and endanger servicemembers. Plaintiffs argue that the Policy is not limited to "national security secrets." ECF No. 24 at 30–31. But the Policy is aimed, and tailored, to prevent the disclosure of unauthorized information, the disclosure of which could harm national security. That this encompasses both classified and controlled unclassified information reflects the reality that unauthorized disclosure of either category can compromise operational security.

*Third*, the Department is permitted to rely on "common sense and predictive judgements . . . even if not explicitly backed by information in the record." *Phx. Herpetological Soc'y, Inc. v. U.S. Fish & Wildlife Serv.*, 998 F.3d 999, 1006 (D.C. Cir. 2021). Plaintiffs cannot meaningfully contest that disclosure of protected information could harm national security, that prohibiting solicitation of such information will reduce disclosures, and that national security is thereby strengthened.

*Fourth*, the Department considered alternatives. The record reflects extensive back-and-forth with the Pentagon Press Association, the Reporters Committee, and individual organizations. AR-41–74. The Department was not required to explain its rejection of every proposed alternative—only "'significant and viable' alternatives." *Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 242 (D.C. Cir. 2008) (quoting *Farmers Union Cent. Exch., Inc. v. Fed. Energy Regul. Comm'n*, 734 F.2d 1486, 1511 n.54 (D.C. Cir. 1984)). The proposed changes were minor textual adjustments, *see, e.g.*, AR-50 (requesting the acknowledgment to be "read and received" rather than "understood"); AR-70 (same), and the key alternative regarding the distinction between

22

passive receipt and active solicitation was in fact addressed, AR-12 ("Receipt of unsolicited CNSI or CUI . . . is generally protected by the First Amendment.").

Plaintiffs' suggestion that the Department should have simply kept the prior credentialing policy in place, ECF No. 24 at 32, ignores that the prior regime lacked the very written standards and procedural protections that *Sherrill* requires and that Plaintiffs themselves demand. Before the PFAC Policy, there were no published criteria for determining who posed a security risk, no formal procedures for denying or revoking a press credential, and no written appeal process—precisely the constitutional deficiencies identified in *Sherrill*. 569 F.2d at 130–31. The Department addressed those deficiencies by promulgating the PFAC Policy, which provides the explicit standards, enumerated factors, and detailed procedures that *Sherrill* held the Constitution requires. The irony of Plaintiffs' position is that they ask this Court to order the Department to revert to a regime with no written standards, no published criteria, and no formal procedures—the regime *Sherrill* held was constitutionally deficient. The APA does not require that result.

## IV.    If Relief Is Warranted, the Proper Remedy Is Remand, Not an Injunction.

If the Court determines relief is appropriate, it should be limited to remanding the Policy to the agency. Courts are "not without discretion to leave agency action in place while the decision is remanded for further explanation." *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1051 (D.C. Cir. 2021) (citation omitted). Remand would permit the Department to provide additional explanation of the need for security at the Pentagon and the difficulties of articulating narrow guidance to cover every foreseeable security risk. ECF No. 22-1 at 44–45. Plaintiffs assert without explanation that the Policy could not be rehabilitated. ECF No. 24 at 34. The Department should have an opportunity to fill in any gaps the Court may find—and cannot explain how it would fill any gaps before any gaps are identified.

Vacatur would disrupt Pentagon operations. Vacating the security-risk provisions would leave the Department without any mechanism to deny PFACs to individuals who pose genuine security threats during the period before a new policy could be promulgated. The internal security controls within the Pentagon assume PFAC holders are not security risks; those controls may be inadequate without the ability to screen applicants. Requiring the Department to rescind its PFAC Policy and issue PFACs without any screening could compromise the safety of the Pentagon, halt the processing of any future PFACs as there will not be a PFAC Policy, and restrict the Pentagon from revoking PFACs because there will be no written policy in place for the revocation or non-renewal of PFACs.

Plaintiffs are not entitled to an injunction. The D.C. Circuit "has set a high standard for irreparable injury." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). The moving party must demonstrate an injury "both certain and great" and "of such *imminence* that there is a 'clear and present' need for equitable relief in order to prevent irreparable harm." *Id.* (citation omitted). Plaintiffs have not applied for a PFAC under the new Policy, let alone been denied one. Their case law, which relates to reporters who had press passes denied or revoked, is inapplicable to this facial challenge based on speculative future harm. The Acknowledgement they refuse to sign explicitly states it "does not waive any rights" and does not require agreement with the Policy's terms. AR-14. Unless and until they sign the PFAC Acknowledgement and are then denied a PFAC, their harm has not materialized, and may never materialize, because there has not been any viewpoint or content discrimination, nor would the PFAC Policy have been applied in a discriminatory way. To be clear, Plaintiffs may bring a facial challenge to the Policy without first applying for a PFAC. *See City of Lakewood*, 486 U.S. at 755–56. But the absence of any

application or denial is directly relevant to whether Plaintiffs have demonstrated the "certain and great" injury required for injunctive relief. *Chaplaincy*, 454 F.3d at 297.

The balance of harms and the public interest tilt decisively against an injunction. Enjoining the Department would hamper its ability to manage security risks, ensure the integrity of military operations, and protect the lives and safety of American servicemembers.

## CONCLUSION

At bottom, Plaintiffs ask this Court to hold that the First Amendment prohibits the Department from putting existing federal law into a written policy and asking journalists who are granted the privilege of unescorted access to the headquarters of the American military to acknowledge that they understand it. The Constitution requires no such result.

For the foregoing reasons, the Court should enter judgment for Defendants. If the Court enters judgment and an injunction for Plaintiffs, Defendants request a seven-day administrative stay for time to appeal, should any be authorized by the Solicitor General.


DATED: February 27, 2026                    Respectfully submitted,

                                            BRETT A. SHUMATE
                                            Assistant Attorney General

                                            JOSEPH E. BORSON
                                            Assistant Branch Director

                                            */s/ Michael Bruns*
                                            Michael Bruns
                                            Trial Attorney
                                            United States Department of Justice
                                            Civil Division, Federal Programs Branch
                                            1100 L Street, N.W.
                                            Washington, DC 20005
                                            michael.bruns@usdoj.gov

                                            *Counsel for Defendants*

25