## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

THE NEW YORK TIMES COMPANY, et al.,

*Plaintiffs*,

v.

UNITED STATES DEPARTMENT OF DEFENSE, et al.,

*Defendants.*

Civil Action No. 1:25-cv-04218-DLF

## DECLARATION OF CHRISTOPHER C. GARVER

I, Christopher C. Garver, hereby declare as follows:

1. I am the Acting Director and Deputy Director of Pentagon Press Operations within the Office of the Assistant to the Secretary of War for Public Affairs (OATSW(PA)).  I make this declaration based upon my personal knowledge and upon my review of information available to me in my official capacity.

2. I have served as Deputy Director of Pentagon Press Operations since October 15, 2019 and as Acting Director since November 24, 2025.  My official duties involve overseeing the Office of the Secretary of War's official interactions with members of the news media who report on news concerning the Department of War.  My responsibilities include, but are not limited to, supervising a team of spokespersons who provide official Department information to members of the news media and implementing Department policies and procedures concerning access to the Pentagon by members of the news media.

3. Following the Department's issuance of the PFAC Policy on October 6, 2025, which required the signing of the Acknowledgement contained therein as a condition of holding

a PFAC, representatives of numerous media outlets refused to sign the Acknowledgement and turned in their previously issued PFACs. Of the more than 100 members of the news media who held a PFAC on October 6, 2025, approximately 15 signed the Acknowledgement. Among the outlets whose representatives refused to sign the Acknowledgement were *The New York Times*, *The Washington Post*, Cable News Network (CNN), National Public Radio (NPR), Fox News Channel, Newsmax, *The Washington Times*, the *Washington Examiner*, and the *Daily Caller*.

4. In the course of my duties, I have learned that a prior Basic Field Manual governing war correspondents, issued in the 1940s, required accredited journalists to sign an agreement swearing to "submit[] for the purposes of censorship all statements, written material, and all photography intended for publication or release, either while with the Army or after my return." Exhibit 1 at 4. Correspondents were further required to ensure that the articles they publish were "accurate in statement and implication," and did not "supply military information to the enemy . . . injure the morale of our forces, the people are home or our allies [or] . . . embarrass the United States, its allies, or neutral countries." *Id.* at 6. Attached as Exhibit 1 is a copy of the War Department's Basic Field Manual, Regulations for Correspondents Accompanying U.S. Army Forces in the Field (Jan. 21, 1942).

5. In February 2003, the Department issued Public Affairs Guidance (PAG) on Embedding Media During Possible Future Operations/Deployments in the U.S. Central Commands (CENTCOM) Area of Responsibility (AOR). In that issuance, the Department conditioned media access in the CENTCOM AOR on compliance with operational security ground rules, which included restrictions on publishing "the specific number of

troops," "information regarding future operations," and "specific information on friendly force troop movement… and dispositions that would jeopardize operational security or lives." Exhibit 2 at 4, 6-7. Violations of the ground rules could result termination of access. *Id.* at 4. Attached as Exhibit 2 is a copy of this issuance.

***

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 27th day of February 2026.

Christopher C. Garver

# EXHIBIT 1

MHI
Copy 3

## WAR DEPARTMENT

## BASIC FIELD MANUAL

# REGULATIONS
# FOR CORRESPONDENTS
# ACCOMPANYING
# U. S. ARMY FORCES
# IN THE FIELD

### January 21, 1942

Including C 1, 24 April 1942; C 2, 25 July 1942; and C 3, 23 December 1942.

Note: This is not a revision; this manual contains only the above changes to the 21 January 1942 edition placed at back following original text, and will not be issued to individuals possessing that edition.

**FM 30-26**

# BASIC FIELD MANUAL

❧

## REGULATIONS FOR CORRESPONDENTS ACCOMPANYING U. S. ARMY FORCES IN THE FIELD

Prepared under direction of the
Chief of Staff



Including C 1, 24 April 1942; C 2, 25 July 1942; and C 3, 23 December 1942.

Note: This is not a revision; this manual contains only the above changes to the 21 January 1942 edition placed at back following original text, and will not be issued to individuals possessing that edition.

## TABLE OF CONTENTS

| | Paragraph |
|---|---|
| General | 1 |
| Definition | 2 |
| Status of correspondents | 3 |
| Privileges | 4 |
| Application | 5 |
| Limit on number | 6 |
| Agreement | 7 |
| Credentials | 8 |
| Uniform | 9 |
| Transportation | 10 |
| Reporting upon arrival | 11 |
| Filing of material | 12 |
| Censorship of articles for publication | 13 |
| Photographic censorship | 14 |
| Signal and mail service | 15 |
| Relief from appointment | 16 |
| Discipline | 17 |
| Visiting correspondent | 18 |

WAR DEPARTMENT,
Washington, January 21, 1942.

FM 30–26, Regulations for Correspondents Accompanying U. S. Army Forces in the Field, is published for the information and guidance of all concerned.

[A. G. 062.11 (12–24–41).]

BY ORDER OF THE SECRETARY OF WAR:

G. C. MARSHALL,
*Chief of Staff.*

OFFICIAL:

E. S. ADAMS,
*Major General,*
*The Adjutant General.*

DISTRIBUTION:

X.

(For explanation of symbols see FM 21–6.)

# BASIC FIELD MANUAL

## REGULATIONS FOR CORRESPONDENTS ACCOMPANY-ING U. S. ARMY FORCES IN THE FIELD

■ 1. GENERAL.—The Army recognizes that correspondents perform an undoubted public function in the dissemination of news concerning the operations of the Army in time of war. Correspondents accompanying troops in the field occupy a dual and delicate position, being under the necessity of truthfully disclosing to the people the facts concerning the operations of the Army, and at the same time of refraining from disclosing those things which, though true, would be disastrous to us if known to the enemy. It is apparent that this important function can only be properly performed under reasonable rules and regulations.

■ 2. DEFINITION.—The term "correspondent" as used in this manual includes journalists, feature writers, radio commentators, motion picture photographers, and still picture photographers accredited by the War Department to a theater of operations or a base command within or without the territorial limits of the United States in time of war. Correspondents are classed as "accredited" and "visiting." This manual pertains principally to the former. See paragraph 18 for instructions concerning visiting correspondents.

■ 3. STATUS OF CORRESPONDENTS.—*a.* Correspondents in time of war accompanying the armies of the United States, both within and without the territorial jurisdiction of the United States, although not in the military service, are subject to military law (AW 2(*d*)) and are under the control of the commander of the Army force which they accompany.

*b.* They are not entitled to the benefits provided by laws enacted exclusively for persons in the military service and they are subject to the provisions of the Selective Training and Service Act of 1940, and regulations prescribed thereunder.

*c*. In the event of capture by enemy forces they are entitled to be treated as prisoners of war, provided they are in possession of a certificate from the military authorities of the armed forces which they are accompanying. (Geneva Conference, July 27, 1929, Title VII, Art. 81.)

*d*. Correspondents will not exercise command, be placed in a position of authority over military personnel, nor will they be armed. They are under the same restrictions as other military personnel as regards the settlement of accounts, compliance with standing orders, and the conducting of themselves with dignity and decorum.

*e*. A correspondent becomes subject to military law from the time at which he commences to accompany troops or personnel who are on active service. This will generally be upon his arrival at the field force to which he is accredited, but may commence earlier if he travels to the field force via Government transportation.

■ 4. PRIVILEGES.—*a*. Correspondents will be given the same privileges as commissioned officers in the matter of accommodations, transportation, and messing facilities. All courtesies extended them in such matters must be without expense to the Government.

*b*. Every reasonable facility and all possible assistance will be given correspondents to permit them to perform efficiently and intelligently their work of keeping the public informed of the activities of our forces within the limits dictated by military necessities.

*c*. So far as the exigencies of the service permit, correspondents will receive, without charge, the same medical treatment as that accorded officers.

*d*. Correspondents are free to converse with troops whenever they wish to do so, subject to the approval of the officer present with the troops in question. They are requested and expected, however, to refrain from conversing with troops at work or on guard, or from discussing subjects or soliciting answers to matters which are clearly secret.

■ 5. APPLICATION.—*a*. Application to accompany U. S. Army forces in the field will be submitted by the individual or by the agency concerned to the Director, War Department Bureau of Public Relations, Washington, D. C.

*b.* The application will state the name and address of the individual; qualifications and past experience in his field of work, including names of former agencies for which he worked; citizenship and place and date of birth; general health condition; the particular force it is desired he accompany; and any other pertinent information which will assist in the consideration of his application.

■ 6. LIMIT ON NUMBER.—*a.* The number of correspondents which will be accredited to a particular field force will be within the quota set by the War Department and based upon the recommendation of the force commander as determined by the size of the force, the distance from the usual media of news dissemination, and the availability of accommodations within the command or adjacent communities.

*b.* Representation with any one field force will be limited to one correspondent each from press associations, publications, radio, news, and picture syndicates; sole exception to this ruling will be the accrediting of a two man crew in the case of news reels. The War Department objective being the widest possible distribution of information to the American people, preferences in the consideration of applications will be given to agencies representing the largest possible news or picture dissemination.

*c.* In view of the importance of the work of correspondents in the field, and the necessary limitations as to the numbers of correspondents accredited to the field forces in any one theater of operations, the War Department will accredit only experienced newspaper men; all other conditions being equal, preference will be given to newspaper men with past military experience or past experience in the coverage of large maneuvers.

*d.* No officer, enlisted man, or civilian employee of the military forces serving in the theater of operations will be permitted to be a correspondent for any publication without the written permission of the theater or base commander. Correspondents will not use military titles in signing dispatches.

■ 7. AGREEMENT.—Before final acceptance a correspondent will be required to sign an agreement, in triplicate, as follows:

BASIC FIELD MANUAL

## WAR DEPARTMENT

### Bureau of Public Relations

#### Washington

--------------
(Date)

### AGREEMENT

In connection with authority granted by the War Department to me, the undersigned, to accompany _____ for the pur-
(Name of field force)
pose of securing news or story material, still or motion pictures, or to engage in radio broadcasting, I subscribe to the following conditions:

1. That, as a civilian accredited to the Army of the United States within or without the territorial limits of the United States, I am subject to the Articles of War and all regulations for the Government of the Army issued pursuant to law.

2. That, I will govern my movements and actions in accordance with the instructions of the War Department and the commanding officer of the Army unit to which I am accredited, which includes the submitting for the purposes of censorship all statements, written material, and all photography intended for publication or release either while with the Army or after my return, if the interviews, written matter, or photography are based on my observations made during the period or pertain to the places visited under this authority.

3. That, I waive all claims against the United States for losses, damages, or injuries which may be suffered as a result of this authority.

4. That, this authority is for the period _____ to _____, and subject to revocation at any time.

Signed: _____
Representing: _____
(Company, syndicate, or agency)
Witnessing officer: _____
(Name)
--------------
(Grade and organization)

This form will be executed in triplicate for disposition as follows:

　　1 copy to War Department Bureau of Public Relations, for file.

　　1 copy to GHQ for transmittal to the commanding general of the field force concerned.

　　1 copy to correspondent.

■ 8. CREDENTIALS.—*a.* When an application for appointment as a correspondent is approved, the applicant will be furnished credentials and a Correspondent's Identification Card by the director of the War Department Bureau of Public Relations. The card is similar to W. D., A. G. O. Form No. 65–1 (Identification Card—Officers, Army of the United

4

States), but green in color, and identifies him as an accredited correspondent.

*b.* Correspondents will produce their identification cards whenever called for by any officer, warrant officer, or enlisted man in the execution of his duty. Failure to do so will subject the correspondent to arrest or detention.

c. In addition to the War Department credentials, the particular field force commander may issue a pass or credentials with regulations governing their use.

■ 9. UNIFORM.—*a.* The proper uniform for accredited correspondents is that of an officer, but less all insignia of grade or arm or service, and without black and gold piping on field caps, officers' hat cords, or officers' insignia on the garrison cap if worn.

*b.* The uniform includes the wearing of the official brassard on the left arm. The brassard is a green cloth band, 4 inches wide, with the appropriate word, "Correspondent," "Photographer," "Radio Commentator," "Correspondent Chauffeur," "Photographer Chauffeur," "Radio News Chauffeur," "Correspondent Messenger," "Photographer Messenger," or "Radio News Messenger," in white block letters $1\frac{1}{4}$ inches in height. This will be furnished by the War Department Bureau of Public Relations at the time of appointment.

c. Articles of special clothing and equipment which are issued to officers and enlisted men in cold climates may be issued to correspondents. These articles must be turned in prior to departure from the theater of operations or base command.

*d.* Accredited correspondents will not wear civilian clothing while serving with the field force.

■ 10. TRANSPORTATION.—*a.* Government transportation may be given accredited correspondents with the accommodations of an officer whenever such transportation—water, troop train, air, or automobile—is available and essential military personnel is not displaced or inconvenienced.

*b.* The baggage of correspondents will be moved with that of the headquarters to which attached. Its weight will be within the limits prescribed by the commander concerned.

■ 11. REPORTING UPON ARRIVAL.—*a.* Upon arrival in the theater of operations or base command to which accredited, correspondents will report to the intelligence officer of the com-

mand, presenting their credentials. It is the intelligence officer, or his assistant in charge of public relations, who will exercise control of correspondents in the name of the field force commander, and it is to him correspondents should turn for assistance and guidance, or to register complaints if believed justified.

*b*. All correspondents are officially attached to the headquarters of the field force commander. They may, however, at their own request be placed on duty with a subordinate headquarters nearer to the scene of action. All changes of their base of operations will be done only upon the approval of the field force commander and contingent upon the availability of accommodations at the unit they wish to accompany.

■ 12. FILING OF MATERIAL.—*a*. All dispatches will be delivered, in duplicate, to the intelligence officer, or his assistant, for censorship prior to filing or mailing. In the process of censorship no changes will be made by the censor in dispatches except through deletion. Correspondents, unless the occasion is unusual, will be permitted to see their dispatches after being censored in the event they desire to make a revision, or to note the objectionable portions for future avoidance, or to recheck on wordage for cable charges.

*b*. Copy must be submitted for censorship on all broadcast interviews or news broadcasts.

■ 13. CENSORSHIP OF ARTICLES FOR PUBLICATION.—*a. General*.—In general, articles may be released for publication to the public provided—

(1) They are accurate in statement and implication.

(2) They do not supply military information to the enemy.

(3) They will not injure the morale of our forces, the people at home, or our allies.

(4) They will not embarrass the United States, its allies, or neutral countries.

*b. Time element*.—Intelligence officers charged with the censorship of articles for publication will take into consideration the time interval between the occurrence of events reported and the publication of the article concerning these events. If events are reported by cable, telegraph, or radio very shortly after their occurrence, the closest supervision will be necessary. If, on the other hand, the articles are forwarded by mail for printing in magazines or books, the time

interval may be such as to render the information contained in the articles of little value to the enemy. Censorship regulations will be applied after consideration of this time element.

*c. Specific rules governing censorship of articles for publication.*—(1) The identity of organizations in the combat zone and in the communications zone will be announced only in official communiqués. When announced, they will never be associated with the name of a place.

(2) The name of an individual may be used whenever an article is materially helped by its use.

(3) Officers will not be quoted directly or indirectly nor anonymously on military matters except as specifically authorized by the theater commander.

(4) Within the combat zone no sector will be said to have any American troops in it until the enemy has established this as a fact.

(5) No town or village in the combat zone will be identified as holding American or allied forces except as an essential part of a story of an engagement and after the fact.

(6) No base port or communication center or other point of a line of communication will be mentioned by name or description as having anything to do with the activities of our forces.

(7) Ship or rail movements, real or possible, will not be discussed except as authorized by official communiqués.

(8) Plans of the Army, real or possible, will not be discussed.

(9) Numbers of troops as a total or as classes will not be discussed except as authorized by official communiqués.

(10) The effect of enemy fire or bombardment will not be discussed except as authorized by official communiqués.

(11) Articles for publication in the theater of operations or in allied countries or in neutral countries contiguous to the theater will be scrutinized carefully to make sure they do not hold possibilities of danger which the same stories printed in the United States would not hold. This applies not only to military information, which would thus be in the hands of the enemy within the day of writing, but also to an emphasis on small exploits which it may be extremely desirable to print in the United States but quite undesirable in the theater.

(12) Exaggerations of our activities accomplished or contemplated are prohibited.

(13) References to numbers of our own casualties will be based on the statements in official communiqués. Individual dead or wounded may be mentioned by name only when it is reasonably certain that the facts are correct and that some definite good end, such as offering examples of heroism, will be served by printing them. Mention by name will be allowed not earlier than 24 hours after the official cablegram announcement of such individual casualties has been sent to the War Department.

■ 14. PHOTOGRAPHIC CENSORSHIP.—*a. Still pictures.*—(1) All photographic negatives taken by official or accredited civilian photographers may be processed in the Signal Corps field laboratory or in such other laboratory installations as the theater commander may designate. Photographs will then be censored by a representative of G–2.

(2) No negatives or prints will be released except by authority of the theater commander. Such released prints or negatives will bear the censorship stamp and will be accompanied by suitable captions. A record of all such releases will be kept.

(3) Negatives and prints of accredited commercial correspondents not released by the censor will become the property of the United States Government, and will be forwarded through channels to the Military Intelligence Division, War Department General Staff, Washington, D. C., accompanied by full information sheet as to captions and the agency which took the photographs.

(4) Films or prints which cannot be processed locally, such as color film, will be delivered to a representative of G–2 marked, "Undeveloped film. Do not open." This will be forwarded by the fastest practicable means to the Military Intelligence Division, War Department General Staff, Washington, D. C.

(5) Regardless of the number of accredited correspondents any one agency has in the field, photographs from theaters of operation by newspaper photographers will be "rotoed." Photographs from theaters of operation of weekly magazine photographers will be rotoed.

*b. Motion pictures.*—(1) All exposed and undeveloped negative together with the dope sheets of accredited cameramen will be turned over to a representative of G–2 marked, "Unexposed film. Do not open."

(2) G–2 will forward this negative by the fastest practicable means to the Military Intelligence Division, War Department General Staff, Washington, D. C.

(3) In certain tropical climates where motion picture film deteriorates rapidly, it may be processed under the supervision of G–2 and the developed negative forwarded as directed in (2) above.

(4) By agreement between the War Department and the newsreel companies, all newsreel film from the theaters of operation will be rotoed by the Bureau of Public Relations, War Department, Washington, D. C.

*c.* Writers accredited as correspondents will not be permitted to take photographs. Photographers accredited as correspondents will not be permitted to file stories.

*d.* For the privileges of "exclusive" photographs, see paragraph 18.

■ **15.** SIGNAL AND MAIL SERVICE.—*a.* The signal system will be open to correspondents' dispatches, after censoring, when such use does not interfere with military needs. Dispatches will be sent in the order of filing. The intelligence officer under whom the correspondent serves is authorized to limit the number of words or otherwise to make an equitable adjustment of the use of the signal system among the correspondents when the system is inadequate to carry the complete text of all dispatches submitted. If commercial cable or telegraph facilities are available, credit cards may be useful.

*b.* All mail, including personal letters, will be through the established censorship system. The use of "blue envelopes" for the censoring of personal mail by the base censor is authorized, but these may not be used to mail photographs or dispatches for publication to avoid censoring by the immediate headquarters under which the correspondent serves.

■ **16.** RELIEF FROM APPOINTMENT.—*a.* An accredited correspondent will not leave the theater of operations or base command without the written permission of the commander.

*b.* If serving with troops beyond the territorial limits of the United States, relief does not become effective until arrival in the United States, if the journey is made by Government transportation.

*c.* Upon termination of appointment as a correspondent, either on the application of the individual or his employer, by the request of the commander concerned, or by the expiration of the period of the appointment, the individual will surrender his credentials to the War Department Bureau of Public Relations and will cease wearing the official uniform of a correspondent.

■ 17. DISCIPLINE.—*a.* A correspondent will be suspended from all privileges for the distortion of his dispatches *in the office of the publication which he represents,* and also for the use of words or expressions conveying a hidden meaning which would tend to mislead or deceive the censor and cause the approval by him of otherwise objectionable dispatches.

*b.* In the presence of the enemy he will conform to the actions of the troops, and will not jeopardize the safety of the command or compromise the scheme of maneuver in progress.

*c.* He may be subject to disciplinary action because of an intentional violation of these and other regulations, either in letter or in spirit, and in extreme cases of offense, where investigation proves the circumstances warrant, the correspondent may be placed in arrest to await deportation or trial by a court martial.

■ 18. VISITING CORRESPONDENT.—*a.* A visiting correspondent, as differentiated from an accredited correspondent, is one who has permission from the Commander in Chief or the Secretary of War to visit the field force for the purpose of securing information or photographic material for publication *after* return from the visit.

*b.* Visiting correspondents will be limited to a specific itinerary as outlined in their letter of authorization, and will be accompanied ordinarily by a conducting officer. When not so accompanied, they will carry a letter from the intelligence officer of the field force. They are treated more in the nature of visitors than correspondents. They will comply with the regulations governing accredited correspondents, with the following modifications:

(1) They will not be required to wear the prescribed uniform but will wear the proper brassard.

(2) As a measure of protection to the accredited correspondents serving with the field forces, visiting correspond-

ents will not be permitted to mail or file dispatches or photographs intended for publication or release *during* the period of their visit. So-called "spot" news will be reserved for the accredited correspondents.

(3) Visiting photographers will have exclusive right to their photographs and may not be required to "roto."

FM 30–26
C 1

# BASIC FIELD MANUAL

## REGULATIONS FOR CORRESPONDENTS ACCOMPANY-
## ING U. S. ARMY FORCES IN THE FIELD

| | |
|---|---|
| CHANGES ⎫<br>No. 1 ⎰ | WAR DEPARTMENT,<br>WASHINGTON, April 24, 1942. |

FM 30–26, January 21, 1942, is changed as follows:

■ 9. UNIFORM.

\*        \*        \*        \*        \*        \*        \*

*b.* The uniform includes the wearing of the official brassard on the left arm. The brassard is a green cloth band, 4 inches wide, with a white block letter, 2 inches in height, "C" for journalists, feature writers, and radio commentators; "P" for photographers. This brassard will be furnished by the War Department Bureau of Public Relations at the time of appointment.

\*        \*        \*        \*        \*        \*        \*

[A. G. 062.11 (2–6–42).]     (C 1, April 24, 1942.)

BY ORDER OF THE SECRETARY OF WAR:

G. C. MARSHALL,
*Chief of Staff.*

OFFICIAL:

J. A. ULIO,
*Major General,*
*The Adjutant General.*

FM 30–26
C 2

# BASIC FIELD MANUAL

## REGULATIONS FOR CORRESPONDENTS ACCOMPANY-ING U. S. ARMY FORCES IN THE FIELD

CHANGES }                    WAR DEPARTMENT,
No. 2   }                    WASHINGTON, July 25, 1942.

FM 30–26, January 21, 1942, is changed as follows:

■ 2. DEFINITION.—The term "correspondent" as used  *  *  *
pertains principally to the former.  See paragraph 18 for
instructions concerning visiting correspondents.  Correspond-
ents have the status of noncombatants.

[A. G. 062.11 (7–20–42).]    (C 2, July 25, 1942.)

■ 7. AGREEMENT.—*a. Accredited correspondents.*—Before final
acceptance an accredited correspondent will be required to sign
an agreement, in triplicate, as follows:

\*        \*        \*        \*        \*        \*        \*        .

5. That at the termination of my assignment, I will sur-
render my credentials without delay to the Bureau of Public
Relations, War Department.

\*        \*        \*        \*        \*        \*        \*

—————————————————————————————————
(Grade and organization)

*b. Visiting correspondents.*—Visiting correspondents will
sign the following form:

WAR DEPARTMENT
Bureau of Public Relations
Washington

—————————————————————————————————
Date

## AGREEMENT (Visiting)

In connection with recognition as a war correspondent out-
side the continental limits of the United States, granted by
the War Department to me, the undersigned, for purpose of
securing news or story material, still or motion pictures, or
to engage in radio broadcasting I subscribe to the following
conditions with reference to United States military and naval
activities:

14

**BASIC FIELD MANUAL**

1. That as a civilian recognized as a war correspondent outside the continental limits of the United States, I am subject to the Articles of War and all regulations for the government of the Army issued pursuant to law, when with such forces.

2. That I will govern my movements and actions in accordance with the instructions of the War Department and the commanding officer of any Army or Navy unit which I may visit or observe, which includes the submitting, for purposes of censorship, all statements, written material intended for publication, and the undeveloped negatives of all film exposed while visiting or observing any Army or Navy unit. I further agree that I will submit for purposes of censorship all such material even though written after my return, if the interviews, written matter, or other material, including photographic prints, are based on my observations made during the period or pertain to the units visited or observed under this authority.

It is further understood and agreed that undeveloped film which cannot be processed and passed by the unit intelligence officer will be forwarded by him to the War Department.

3. That I waive all claims against the United States for losses, damages, or injuries which may be suffered as a result of this authority.

4. That this authority is subject to revocation at any time.

5. That at the termination of my assignment I will surrender my credentials without delay to the Bureau of Public Relations, War Department.

Signed: _____

Representing: _____
(Company, syndicate, or agency)

Witnessing officer: _____
(Name)

_____
(Grade and organization)

*c. Disposition.*—These forms will be executed in triplicate for disposition as follows:

\*     \*     \*     \*     \*     \*     \*

[A. G. 062.11 (7–20–42).]    (C 2, July 25, 1942.)

9. UNIFORM.

•     •     •     •     •     •     •

REGULATIONS FOR CORRESPONDENTS

*b.* The uniform includes the official brassard worn on the left sleeve. This is a green cloth band, 4 inches wide, with a 2-inch white block letter "C" or "P", indicating the function of the correspondent. Journalists, feature writers, and radio commentators will wear "C" brassards. Photographers operating still or motion equipment will wear "P" brassards.

&ast;   &ast;   &ast;   &ast;   &ast;   &ast;   &ast;

[A. G. 062.11 (7–20–42).]    (C 2, July 25, 1942.)

BY ORDER OF THE SECRETARY OF WAR:

G. C. MARSHALL,
*Chief of Staff.*

OFFICIAL:

J. A. ULIO,
*Major General,*
*The Adjutant General.*

FM 30-26
C 3

# BASIC FIELD MANUAL

## REGULATIONS FOR CORRESPONDENTS ACCOMPANY-ING U. S. ARMY FORCES IN THE FIELD

CHANGES }
No. 3 }

WASHINGTON, December 23, 1942.
WAR DEPARTMENT,

FM 30–26, January 21, 1942, is changed as follows:

■ 7. (As changed by C 2.)  AGREEMENT.—*a. Accredited corre-spondents.*

\*         \*         \*         \*         \*         \*         \*

WAR DEPARTMENT

Bureau of Public Relations

Washington

-------------------
(Date)

AGREEMENT

\*         \*         \*         \*         \*         \*         \*

2. That, I will govern  \*  \*  \*  under this authority.  I further agree that I will submit for purposes of censorship all such material even though written after my return, if the interviews, written material, or statements are based on my observations made during the period or pertain to the places visited under this authority.  This includes all lectures, public talks, "off the record" speeches, and all photography intended for publication or release, either while with the armed forces or after my return, if they are based upon my observations during this period or pertain to the places visited.

*b. Visiting correspondents.*

\*         \*         \*         \*         \*         \*         \*

WAR DEPARTMENT

Bureau of Public Relations

Washington

-------------------
(Date)

BASIC FIELD MANUAL

## AGREEMENT (Visiting)

\*     \*     \*     \*     \*     \*     \*

2. That, I will govern my movements and actions in accordance with the instructions of the War Department and the commanding officer of the Army unit to which I am accredited, which includes submitting, for purposes of censorship, all statements or written material, lectures, public talks, "off the record" speeches, and all photography intended for publication or release either while with the Army or after my return, if the interviews, written matter, lectures, public talks, or "off the record" speeches are based on my observations made during the period or pertain to the places visited under this authority.

It is further  \*  \*  \*  the War Department.

\*     \*     \*     \*     \*     \*     \*

[A. G. 062.11 (11–19–42.)]  (C 3, Dec. 23, 1942.)

BY ORDER OF THE SECRETARY OF WAR:

G. C. MARSHALL,
*Chief of Staff.*

OFFICIAL:

J. A. ULIO,
*Major General,*
*The Adjutant General.*

O

# EXHIBIT 2

101900Z FEB 03
FM SECDEF WASHINGTON DC//OASD-PA//
TO SECDEF WASHINGTON DC//CHAIRS//
AIG 8777
HQ USEUCOM VAIHINGEN GE//PA//
USCINCEUR VAIHINGEN GE//ECPA//
JOINT STAFF WASHINGTON DC//PA//
SECSTATE WASHINGTON DC//PA//
CJCS WASHINGTON DC//PA//
NSC WASHINGTON DC
WHITE HOUSE SITUATION ROOM
INFO SECDEF WASHINGTON DC//OASD-PA/DPO//

UNCLAS

SUBJECT:  PUBLIC AFFAIRS GUIDANCE (PAG) ON EMBEDDING MEDIA DURING
POSSIBLE FUTURE OPERATIONS/DEPLOYMENTS IN THE U.S. CENTRAL COMMANDS
(CENTCOM) AREA OF RESPONSIBILITY (AOR).

REFERENCES:  REF. A.  SECDEF MSG, DTG 172200Z JAN 03, SUBJ:  PUBLIC
AFFAIRS GUIDANCE (PAG) FOR MOVEMENT OF FORCES INTO THE CENTCOM AOR FOR
POSSIBLE FUTURE OPERATIONS.

1.  PURPOSE.  THIS MESSAGE PROVIDES GUIDANCE, POLICIES AND PROCEDURES
ON EMBEDDING NEWS MEDIA DURING POSSIBLE FUTURE OPERATIONS/DEPLOYMENTS
IN THE CENTCOM AOR.  IT CAN BE ADAPTED FOR USE IN OTHER UNIFIED COMMAND
AORS AS NECESSARY.

2.  POLICY.

2.A.  THE DEPARTMENT OF DEFENSE (DOD) POLICY ON MEDIA COVERAGE OF
FUTURE MILITARY OPERATIONS IS THAT MEDIA WILL HAVE LONG-TERM, MINIMALLY
RESTRICTIVE ACCESS TO U.S. AIR, GROUND AND NAVAL FORCES THROUGH
EMBEDDING.  MEDIA COVERAGE OF ANY FUTURE OPERATION WILL, TO A LARGE
EXTENT, SHAPE PUBLIC PERCEPTION OF THE NATIONAL SECURITY ENVIRONMENT
NOW AND IN THE YEARS AHEAD.  THIS HOLDS TRUE FOR THE U.S. PUBLIC; THE
PUBLIC IN ALLIED COUNTRIES WHOSE OPINION CAN AFFECT THE DURABILITY OF
OUR COALITION; AND PUBLICS IN COUNTRIES WHERE WE CONDUCT OPERATIONS,
WHOSE PERCEPTIONS OF US CAN AFFECT THE COST AND DURATION OF OUR
INVOLVEMENT.  OUR ULTIMATE STRATEGIC SUCCESS IN BRINGING PEACE AND
SECURITY TO THIS REGION WILL COME IN OUR LONG-TERM COMMITMENT TO
SUPPORTING OUR DEMOCRATIC IDEALS.  WE NEED TO TELL THE FACTUAL STORY -
GOOD OR BAD - BEFORE OTHERS SEED THE MEDIA WITH DISINFORMATION AND
DISTORTIONS, AS THEY MOST CERTAINLY WILL CONTINUE TO DO.  OUR PEOPLE IN
THE FIELD NEED TO TELL OUR STORY - ONLY COMMANDERS CAN ENSURE THE MEDIA
GET TO THE STORY ALONGSIDE THE TROOPS.  WE MUST ORGANIZE FOR AND
FACILITATE ACCESS OF NATIONAL AND INTERNATIONAL MEDIA TO OUR FORCES,
INCLUDING THOSE FORCES ENGAGED IN GROUND OPERATIONS, WITH THE GOAL OF
DOING SO RIGHT FROM THE START.  TO ACCOMPLISH THIS, WE WILL EMBED MEDIA
WITH OUR UNITS.  THESE EMBEDDED MEDIA WILL LIVE, WORK AND TRAVEL AS
PART OF THE UNITS WITH WHICH THEY ARE EMBEDDED TO FACILITATE MAXIMUM,
IN-DEPTH COVERAGE OF U.S. FORCES IN COMBAT AND RELATED OPERATIONS.
COMMANDERS AND PUBLIC AFFAIRS OFFICERS MUST WORK TOGETHER TO BALANCE
THE NEED FOR MEDIA ACCESS WITH THE NEED FOR OPERATIONAL SECURITY.

2.B.  MEDIA WILL BE EMBEDDED WITH UNIT PERSONNEL AT AIR AND GROUND
FORCES BASES AND AFLOAT TO ENSURE A FULL UNDERSTANDING OF ALL

OPERATIONS.  MEDIA WILL BE GIVEN ACCESS TO OPERATIONAL COMBAT MISSIONS,
INCLUDING MISSION PREPARATION AND DEBRIEFING, WHENEVER POSSIBLE.

2.C.  A MEDIA EMBED IS DEFINED AS A MEDIA REPRESENTATIVE REMAINING WITH
A UNIT ON AN EXTENDED BASIS - PERHAPS A PERIOD OF WEEKS OR EVEN MONTHS.
COMMANDERS WILL PROVIDE BILLETING, RATIONS AND MEDICAL ATTENTION, IF
NEEDED, TO THE EMBEDDED MEDIA COMMENSURATE WITH THAT PROVIDED TO
MEMBERS OF THE UNIT, AS WELL AS ACCESS TO MILITARY TRANSPORTATION AND
ASSISTANCE WITH COMMUNICATIONS FILING/TRANSMITTING MEDIA PRODUCTS, IF
REQUIRED.

2.C.1.  EMBEDDED MEDIA ARE NOT AUTHORIZED USE OF THEIR OWN VEHICLES
WHILE TRAVELING IN AN EMBEDDED STATUS.

2.C.2.  TO THE EXTENT POSSIBLE, SPACE ON MILITARY TRANSPORTATION WILL
BE MADE AVAILABLE FOR MEDIA EQUIPMENT NECESSARY TO COVER A PARTICULAR
OPERATION.  THE MEDIA IS RESPONSIBLE FOR LOADING AND CARRYING THEIR OWN
EQUIPMENT AT ALL TIMES.  USE OF PRIORITY INTER-THEATER AIRLIFT FOR
EMBEDDED MEDIA TO COVER STORIES, AS WELL AS TO FILE STORIES, IS HIGHLY
ENCOURAGED.  SEATS ABOARD VEHICLES, AIRCRAFT AND NAVAL SHIPS WILL BE
MADE AVAILABLE TO ALLOW MAXIMUM COVERAGE OF U.S. TROOPS IN THE FIELD.

2.C.3.  UNITS SHOULD PLAN LIFT AND LOGISTICAL SUPPORT TO ASSIST IN
MOVING MEDIA PRODUCTS TO AND FROM THE BATTLEFIELD SO AS TO TELL OUR
STORY IN A TIMELY MANNER.  IN THE EVENT OF COMMERCIAL COMMUNICATIONS
DIFFICULTIES, MEDIA ARE AUTHORIZED TO FILE STORIES VIA EXPEDITIOUS
MILITARY SIGNAL/COMMUNICATIONS CAPABILITIES.

2.C.4.  NO COMMUNICATIONS EQUIPMENT FOR USE BY MEDIA IN THE CONDUCT OF
THEIR DUTIES WILL BE SPECIFICALLY PROHIBITED.  HOWEVER, UNIT COMMANDERS
MAY IMPOSE TEMPORARY RESTRICTIONS ON ELECTRONIC TRANSMISSIONS FOR
OPERATIONAL SECURITY REASONS.  MEDIA WILL SEEK APPROVAL TO USE
ELECTRONIC DEVICES IN A COMBAT/HOSTILE ENVIRONMENT, UNLESS OTHERWISE
DIRECTED BY THE UNIT COMMANDER OR HIS/HER DESIGNATED REPRESENTATIVE.
THE USE OF COMMUNICATIONS EQUIPMENT WILL BE DISCUSSED IN FULL WHEN THE
MEDIA ARRIVE AT THEIR ASSIGNED UNIT.

3.  PROCEDURES.

3.A.  THE OFFICE OF THE ASSISTANT SECRETARY OF DEFENSE FOR PUBLIC
AFFAIRS (OASD(PA) IS THE CENTRAL AGENCY FOR MANAGING AND VETTING MEDIA
EMBEDS TO INCLUDE ALLOCATING EMBED SLOTS TO MEDIA ORGANIZATIONS.  EMBED
AUTHORITY MAY BE DELEGATED TO SUBORDINATE ELEMENTS AFTER THE
COMMENCEMENT OF HOSTILITIES AND AT THE DISCRETION OF OASD(PA).  EMBED
OPPORTUNITIES WILL BE ASSIGNED TO MEDIA ORGANIZATIONS, NOT TO
INDIVIDUAL REPORTERS.  THE DECISION AS TO WHICH MEDIA REPRESENTATIVE
WILL FILL ASSIGNED EMBED SLOTS WILL BE MADE BY THE DESIGNATED POC FOR
EACH NEWS ORGANIZATION.

3.A.1.  IAW REF. A, COMMANDERS OF UNITS IN RECEIPT OF A DEPLOYMENT
ORDER MAY EMBED REGIONAL/LOCAL MEDIA DURING PREPARATIONS FOR
DEPLOYMENT, DEPLOYMENT AND ARRIVAL IN THEATER UPON RECEIPT OF THEATER
CLEARANCE FROM CENTCOM AND APPROVAL OF THE COMPONENT COMMAND.
COMMANDERS WILL INFORM THESE MEDIA, PRIOR TO THE DEPLOYING EMBED, THAT
OASD(PA) IS THE APPROVAL AUTHORITY FOR ALL COMBAT EMBEDS AND THAT THEIR
PARTICULAR EMBED MAY END AFTER THE UNIT'S ARRIVAL IN THEATER.  THE
MEDIA ORGANIZATION MAY APPLY TO OASD(PA) FOR CONTINUED EMBEDDING, BUT

THERE IS NO GUARANTEE AND THE MEDIA ORGANIZATION WILL HAVE TO MAKE
ARRANGEMENTS FOR AND PAY FOR THE JOURNALISTS' RETURN TRIP.

3.B.  WITHOUT MAKING COMMITMENTS TO MEDIA ORGANIZATIONS, DEPLOYING
UNITS WILL IDENTIFY LOCAL MEDIA FOR POTENTIAL EMBEDS AND NOMINATE THEM
THROUGH PA CHANNELS TO OASD(PA) (POC:  MAJ TIM BLAIR, DSN 227-1253;
COMM. 703-697-1253; EMAIL TIMOTHY.BLAIR@OSD.MIL). INFORMATION REQUIRED
TO BE FORWARDED INCLUDES MEDIA ORGANIZATION, TYPE OF MEDIA AND CONTACT
INFORMATION INCLUDING BUREAU CHIEF/MANAGING EDITOR/NEWS DIRECTOR'S
NAME; OFFICE, HOME AND CELL PHONE NUMBERS; PAGER NUMBERS AND EMAIL
ADDRESSES.  SUBMISSIONS FOR EMBEDS WITH SPECIFIC UNITS SHOULD INCLUDE
AN UNIT'S RECOMMENDATION AS TO WHETHER THE REQUEST SHOULD BE HONORED.

3.C.  UNIT COMMANDERS SHOULD ALSO EXPRESS, THROUGH THEIR CHAIN OF
COMMAND AND PA CHANNELS TO OASD(PA), THEIR DESIRE AND CAPABILITY TO
SUPPORT ADDITIONAL MEDIA EMBEDS BEYOND THOSE ASSIGNED.

3.D.  FREELANCE MEDIA WILL BE AUTHORIZED TO EMBED IF THEY ARE SELECTED
BY A NEWS ORGANIZATION AS THEIR EMBED REPRESENTATIVE.

3.E. ' UNITS WILL BE AUTHORIZED DIRECT COORDINATION WITH MEDIA AFTER
ASSIGNMENT AND APPROVAL BY OASD(PA).

3.E.1.UNITS ARE RESPONSIBLE FOR ENSURING THAT ALL EMBEDDED MEDIA AND
THEIR NEWS ORGANIZATIONS HAVE SIGNED THE "RELEASE, INDEMNIFICATION, AND
HOLD HARMLESS AGREEMENT AND AGREEMENT NOT TO SUE", FOUND AT
HTTP://WWW.DEFENSELINK.MIL/NEWS/FEB2003/D20030210EMBED.PDF.  UNITS MUST
MAINTAIN A COPY OF THIS AGREEMENT FOR ALL MEDIA EMBEDDED WITH THEIR
UNIT.

3.F.  EMBEDDED MEDIA OPERATE AS PART OF THEIR ASSIGNED UNIT. AN ESCORT
MAY BE ASSIGNED AT THE DISCRETION OF THE UNIT COMMANDER. THE ABSENCE
OF A PA ESCORT IS NOT A REASON TO PRECLUDE MEDIA ACCESS TO OPERATIONS.

3.G.  COMMANDERS WILL ENSURE THE MEDIA ARE PROVIDED WITH EVERY
OPPORTUNITY TO OBSERVE ACTUAL COMBAT OPERATIONS. THE PERSONAL SAFETY
OF CORRESPONDENTS IS NOT A REASON TO EXCLUDE THEM FROM COMBAT AREAS.

3.H.  IF, IN THE OPINION OF THE UNIT COMMANDER, A MEDIA REPRESENTATIVE
IS UNABLE TO WITHSTAND THE RIGOROUS CONDITIONS REQUIRED TO OPERATE WITH
THE FORWARD DEPLOYED FORCES, THE COMMANDER OR HIS/HER REPRESENTATIVE
MAY LIMIT THE REPRESENTATIVES PARTICIPATION WITH OPERATIONAL FORCES TO
ENSURE UNIT SAFETY AND INFORM OASD(PA) THROUGH PA CHANNELS AS SOON AS
POSSIBLE.  GENDER WILL NOT BE AN EXCLUDING FACTOR UNDER ANY
CIRCUMSTANCE.

3.I.  IF FOR ANY REASON A MEDIA REPRESENTATIVE CANNOT PARTICIPATE IN AN
OPERATION, THEY WILL BE TRANSPORTED TO THE NEXT HIGHER HEADQUARTERS FOR
THE DURATION OF THE OPERATION.

3.J.  COMMANDERS WILL OBTAIN THEATER CLEARANCE FROM CENTCOM/PA FOR
MEDIA EMBARKING ON MILITARY CONVEYANCE FOR PURPOSES OF EMBEDDING.

3.K.  UNITS HOSTING EMBEDDED MEDIA WILL ISSUE INVITATIONAL TRAVEL
ORDERS, AND NUCLEAR, BIOLOGICAL AND CHEMICAL (NBC) GEAR.  SEE PARA. 5.
FOR DETAILS ON WHICH ITEMS ARE ISSUED AND WHICH ITEMS THE MEDIA ARE
RESPONSIBLE TO PROVIDE FOR THEMSELVES.

3.L.   MEDIA ARE RESPONSIBLE FOR OBTAINING THEIR OWN PASSPORTS AND
VISAS.

3.M.   MEDIA WILL AGREE TO ABIDE BY THE CENTCOM/OASD(PA) GROUND RULES
STATED IN PARA. 4 OF THIS MESSAGE IN EXCHANGE FOR COMMAND/UNIT-PROVIDED
SUPPORT AND ACCESS TO SERVICE MEMBERS, INFORMATION AND OTHER
PREVIOUSLY-STATED PRIVILEGES.  ANY VIOLATION OF THE GROUND RULES COULD
RESULT IN TERMINATION OF THAT MEDIA'S EMBED OPPORTUNITY.

3.N.   DISPUTES/DIFFICULTIES.  ISSUES, QUESTIONS, DIFFICULTIES OR
DISPUTES ASSOCIATED WITH GROUND RULES OR OTHER ASPECTS OF EMBEDDING
MEDIA THAT CANNOT BE RESOLVED AT THE UNIT LEVEL, OR THROUGH THE CHAIN
OF COMMAND, WILL BE FORWARDED THROUGH PA CHANNELS FOR RESOLUTION.
COMMANDERS WHO WISH TO TERMINATE AN EMBED FOR CAUSE MUST NOTIFY
CENTCOM/PA PRIOR TO TERMINATION.  IF A DISPUTE CANNOT BE RESOLVED AT A
LOWER LEVEL, OASD(PA) WILL BE THE FINAL RESOLUTION AUTHORITY.  IN ALL
CASES, THIS SHOULD BE DONE AS EXPEDITIOUSLY AS POSSIBLE TO PRESERVE THE
NEWS VALUE OF THE SITUATION.

3.O.   MEDIA WILL PAY THEIR OWN BILLETING EXPENSES IF BILLETED IN A
COMMERCIAL FACILITY.

3.P.   MEDIA WILL DEPLOY WITH THE NECESSARY EQUIPMENT TO COLLECT AND
TRANSMIT THEIR STORIES.

3.Q.   THE STANDARD FOR RELEASE OF INFORMATION SHOULD BE TO ASK "WHY NOT
RELEASE" VICE "WHY RELEASE."  DECISIONS SHOULD BE MADE ASAP, PREFERABLY
IN MINUTES, NOT HOURS.

3.R.   THERE IS NO GENERAL REVIEW PROCESS FOR MEDIA PRODUCTS.  SEE PARA
6.A. FOR FURTHER DETAIL CONCERNING SECURITY AT THE SOURCE.

3.S.   MEDIA WILL ONLY BE GRANTED ACCESS TO DETAINEES OR EPWS WITHIN THE
PROVISIONS OF THE GENEVA CONVENTIONS OF 1949.  SEE PARA. 4.G.17. FOR
THE GROUND RULE.

3.T.   HAVING EMBEDDED MEDIA DOES NOT PRECLUDE CONTACT WITH OTHER MEDIA.
EMBEDDED MEDIA, AS A RESULT OF TIME INVESTED WITH THE UNIT AND GROUND
RULES AGREEMENT, MAY HAVE A DIFFERENT LEVEL OF ACCESS.

3.U.   CENTCOM/PA WILL ACCOUNT FOR EMBEDDED MEDIA DURING THE TIME THE
MEDIA IS EMBEDDED IN THEATER.  CENTCOM/PA WILL REPORT CHANGES IN EMBED
STATUS TO OASD(PA) AS THEY OCCUR.

3.V.   IF A MEDIA REPRESENTATIVE IS KILLED OR INJURED IN THE COURSE OF
MILITARY OPERATIONS, THE UNIT WILL IMMEDIATELY NOTIFY OASD(PA), THROUGH
PA CHANNELS.  OASD(PA) WILL CONTACT THE RESPECTIVE MEDIA
ORGANIZATION(S), WHICH WILL MAKE NEXT OF KIN NOTIFICATION IN ACCORDANCE
WITH THE INDIVIDUAL'S WISHES.

3.W.   MEDIA MAY TERMINATE THEIR EMBED OPPORTUNITY AT ANY TIME.  UNIT
COMMANDERS WILL PROVIDE, AS THE TACTICAL SITUATION PERMITS AND BASED ON
THE AVAILABILITY OF TRANSPORTATION, MOVEMENT BACK TO THE NEAREST
LOCATION WITH COMMERCIAL TRANSPORTATION.

3.W.1. DEPARTING MEDIA WILL BE DEBRIEFED ON OPERATIONAL SECURITY CONSIDERATIONS AS APPLICABLE TO ONGOING AND FUTURE OPERATIONS WHICH THEY MAY NOW HAVE INFORMATION CONCERNING.

4. GROUND RULES. FOR THE SAFETY AND SECURITY OF U.S. FORCES AND EMBEDDED MEDIA, MEDIA WILL ADHERE TO ESTABLISHED GROUND RULES. GROUND RULES WILL BE AGREED TO IN ADVANCE AND SIGNED BY MEDIA PRIOR TO EMBEDDING. VIOLATION OF THE GROUND RULES MAY RESULT IN THE IMMEDIATE TERMINATION OF THE EMBED AND REMOVAL FROM THE AOR. THESE GROUND RULES RECOGNIZE THE RIGHT OF THE MEDIA TO COVER MILITARY OPERATIONS AND ARE IN NO WAY INTENDED TO PREVENT RELEASE OF DEROGATORY, EMBARRASSING, NEGATIVE OR UNCOMPLIMENTARY INFORMATION. ANY MODIFICATION TO THE STANDARD GROUND RULES WILL BE FORWARDED THROUGH THE PA CHANNELS TO CENTCOM/PA FOR APPROVAL. STANDARD GROUND RULES ARE:

4.A. ALL INTERVIEWS WITH SERVICE MEMBERS WILL BE ON THE RECORD. SECURITY AT THE SOURCE IS THE POLICY. INTERVIEWS WITH PILOTS AND AIRCREW MEMBERS ARE AUTHORIZED UPON COMPLETION OF MISSIONS; HOWEVER, RELEASE OF INFORMATION MUST CONFORM TO THESE MEDIA GROUND RULES.

4.B. PRINT OR BROADCAST STORIES WILL BE DATELINED ACCORDING TO LOCAL GROUND RULES. LOCAL GROUND RULES WILL BE COORDINATED THROUGH COMMAND CHANNELS WITH CENTCOM.

4.C. MEDIA EMBEDDED WITH U.S. FORCES ARE NOT PERMITTED TO CARRY PERSONAL FIREARMS.

4.D. LIGHT DISCIPLINE RESTRICTIONS WILL BE FOLLOWED. VISIBLE LIGHT SOURCES, INCLUDING FLASH OR TELEVISION LIGHTS, FLASH CAMERAS WILL NOT BE USED WHEN OPERATING WITH FORCES AT NIGHT UNLESS SPECIFICALLY APPROVED IN ADVANCE BY THE ON-SCENE COMMANDER.

4.E. EMBARGOES MAY BE IMPOSED TO PROTECT OPERATIONAL SECURITY. EMBARGOES WILL ONLY BE USED FOR OPERATIONAL SECURITY AND WILL BE LIFTED AS SOON AS THE OPERATIONAL SECURITY ISSUE HAS PASSED.

4.F. THE FOLLOWING CATEGORIES OF INFORMATION ARE RELEASABLE.

4.F.1. APPROXIMATE FRIENDLY FORCE STRENGTH FIGURES.

4.F.2. APPROXIMATE FRIENDLY CASUALTY FIGURES BY SERVICE. EMBEDDED MEDIA MAY, WITHIN OPSEC LIMITS, CONFIRM UNIT CASUALTIES THEY HAVE WITNESSED.

4.F.3. CONFIRMED FIGURES OF ENEMY PERSONNEL DETAINED OR CAPTURED.

4.F.4. SIZE OF FRIENDLY FORCE PARTICIPATING IN AN ACTION OR OPERATION CAN BE DISCLOSED USING APPROXIMATE TERMS. SPECIFIC FORCE OR UNIT IDENTIFICATION MAY BE RELEASED WHEN IT NO LONGER WARRANTS SECURITY PROTECTION.

4.F.5. INFORMATION AND LOCATION OF MILITARY TARGETS AND OBJECTIVES PREVIOUSLY UNDER ATTACK.

4.F.6. GENERIC DESCRIPTION OF ORIGIN OF AIR OPERATIONS, SUCH AS "LAND-BASED."

4.F.7. DATE, TIME OR LOCATION OF PREVIOUS CONVENTIONAL MILITARY MISSIONS AND ACTIONS, AS WELL AS MISSION RESULTS ARE RELEASABLE ONLY IF DESCRIBED IN GENERAL TERMS.

4.F.8. TYPES OF ORDNANCE EXPENDED IN GENERAL TERMS.

4.F.9. NUMBER OF AERIAL COMBAT OR RECONNAISSANCE MISSIONS OR SORTIES FLOWN IN CENTCOM'S AREA OF OPERATION.

4.F.10. TYPE OF FORCES INVOLVED (E.G., AIR DEFENSE, INFANTRY, ARMOR, MARINES).

4.F.11. ALLIED PARTICIPATION BY TYPE OF OPERATION (SHIPS, AIRCRAFT, GROUND UNITS, ETC.) AFTER APPROVAL OF THE ALLIED UNIT COMMANDER.

4.F.12. OPERATION CODE NAMES.

4.F.13. NAMES AND HOMETOWNS OF U.S. MILITARY UNITS.

4.F.14. SERVICE MEMBERS' NAMES AND HOME TOWNS WITH THE INDIVIDUALS' CONSENT.

4.G. THE FOLLOWING CATEGORIES OF INFORMATION ARE NOT RELEASABLE SINCE THEIR PUBLICATION OR BROADCAST COULD JEOPARDIZE OPERATIONS AND ENDANGER LIVES.

4.G.1. SPECIFIC NUMBER OF TROOPS IN UNITS BELOW CORPS/MEF LEVEL.

4.G.2. SPECIFIC NUMBER OF AIRCRAFT IN UNITS AT OR BELOW THE AIR EXPEDITIONARY WING LEVEL.

4.G.3. SPECIFIC NUMBERS REGARDING OTHER EQUIPMENT OR CRITICAL SUPPLIES (E.G. ARTILLERY, TANKS, LANDING CRAFT, RADARS, TRUCKS, WATER, ETC.).

4.G.4. SPECIFIC NUMBERS OF SHIPS IN UNITS BELOW THE CARRIER BATTLE GROUP LEVEL.

4.G.5. NAMES OF MILITARY INSTALLATIONS OR SPECIFIC GEOGRAPHIC LOCATIONS OF MILITARY UNITS IN THE CENTCOM AREA OF RESPONSIBILITY, UNLESS SPECIFICALLY RELEASED BY THE DEPARTMENT OF DEFENSE OR AUTHORIZED BY THE CENTCOM COMMANDER. NEWS AND IMAGERY PRODUCTS THAT IDENTIFY OR INCLUDE IDENTIFIABLE FEATURES OF THESE LOCATIONS ARE NOT AUTHORIZED FOR RELEASE.

4.G.6. INFORMATION REGARDING FUTURE OPERATIONS.

4.G.7. INFORMATION REGARDING FORCE PROTECTION MEASURES AT MILITARY INSTALLATIONS OR ENCAMPMENTS (EXCEPT THOSE WHICH ARE VISIBLE OR READILY APPARENT).

4.G.8. PHOTOGRAPHY SHOWING LEVEL OF SECURITY AT MILITARY INSTALLATIONS OR ENCAMPMENTS.

4.G.9. RULES OF ENGAGEMENT.

4.G.10. INFORMATION ON INTELLIGENCE COLLECTION ACTIVITIES COMPROMISING TACTICS, TECHNIQUES OR PROCEDURES.

4.G.11.   EXTRA PRECAUTIONS IN REPORTING WILL BE REQUIRED AT THE
COMMENCEMENT OF HOSTILITIES TO MAXIMIZE OPERATIONAL SURPRISE. LIVE
BROADCASTS FROM AIRFIELDS, ON THE GROUND OR AFLOAT, BY EMBEDDED MEDIA
ARE PROHIBITED UNTIL THE SAFE RETURN OF THE INITIAL STRIKE PACKAGE OR
UNTIL AUTHORIZED BY THE UNIT COMMANDER.

4.G.12.   DURING AN OPERATION, SPECIFIC INFORMATION ON FRIENDLY FORCE
TROOP MOVEMENTS, TACTICAL DEPLOYMENTS, AND DISPOSITIONS THAT WOULD
JEOPARDIZE OPERATIONAL SECURITY OR LIVES.   INFORMATION ON ON-GOING
ENGAGEMENTS WILL NOT BE RELEASED UNLESS AUTHORIZED FOR RELEASE BY ON-
SCENE COMMANDER.

4.G.13.   INFORMATION ON SPECIAL OPERATIONS UNITS, UNIQUE OPERATIONS
METHODOLOGY OR TACTICS, FOR EXAMPLE, AIR OPERATIONS, ANGLES OF ATTACK,
AND SPEEDS; NAVAL TACTICAL OR EVASIVE MANEUVERS, ETC. GENERAL TERMS
SUCH AS "LOW" OR "FAST" MAY BE USED.

4.G.14.   INFORMATION ON EFFECTIVENESS OF ENEMY ELECTRONIC WARFARE.

4.G.15.   INFORMATION IDENTIFYING POSTPONED OR CANCELED OPERATIONS.

4.G.16.   INFORMATION ON MISSING OR DOWNED AIRCRAFT OR MISSING VESSELS
WHILE SEARCH AND RESCUE AND RECOVERY OPERATIONS ARE BEING PLANNED OR
UNDERWAY.

4.G.17.   INFORMATION ON EFFECTIVENESS OF ENEMY CAMOUFLAGE, COVER,
DECEPTION, TARGETING, DIRECT AND INDIRECT FIRE, INTELLIGENCE
COLLECTION, OR SECURITY MEASURES.

4.G.18.   NO PHOTOGRAPHS OR OTHER VISUAL MEDIA SHOWING AN ENEMY PRISONER
OF WAR OR DETAINEE'S RECOGNIZABLE FACE, NAMETAG OR OTHER IDENTIFYING
FEATURE OR ITEM MAY BE TAKEN.

4.G.19.   STILL OR VIDEO IMAGERY OF CUSTODY OPERATIONS OR INTERVIEWS
WITH PERSONS UNDER CUSTODY.

4.H.   THE FOLLOWING PROCEDURES AND POLICIES APPLY TO COVERAGE OF
WOUNDED, INJURED, AND ILL PERSONNEL:

4.H.1.   MEDIA REPRESENTATIVES WILL BE REMINDED OF THE SENSITIVITY OF
USING NAMES OF INDIVIDUAL CASUALTIES OR PHOTOGRAPHS THEY MAY HAVE TAKEN
WHICH CLEARLY IDENTIFY CASUALTIES UNTIL AFTER NOTIFICATION OF THE NOK
AND RELEASE BY OASD(PA).

4.H.2.   BATTLEFIELD CASUALTIES MAY BE COVERED BY EMBEDDED MEDIA AS LONG
AS THE SERVICE MEMBER'S IDENTITY IS PROTECTED FROM DISCLOSURE FOR 72
HOURS OR UPON VERIFICATION OF NOK NOTIFICATION, WHICHEVER IS FIRST.

4.H.3.   MEDIA VISITS TO MEDICAL FACILITIES WILL BE IN ACCORDANCE WITH
APPLICABLE REGULATIONS, STANDARD OPERATING PROCEDURES, OPERATIONS
ORDERS AND INSTRUCTIONS BY ATTENDING PHYSICIANS.   IF APPROVED, SERVICE
OR MEDICAL FACILITY PERSONNEL MUST ESCORT MEDIA AT ALL TIMES.

4.H.4.   PATIENT WELFARE, PATIENT PRIVACY, AND NEXT OF KIN/FAMILY
CONSIDERATIONS ARE THE GOVERNING CONCERNS ABOUT NEWS MEDIA COVERAGE OF

WOUNDED, INJURED, AND ILL PERSONNEL IN MEDICAL TREATMENT FACILITIES OR OTHER CASUALTY COLLECTION AND TREATMENT LOCATIONS.

4.H.5. MEDIA VISITS ARE AUTHORIZED TO MEDICAL CARE FACILITIES, BUT MUST BE APPROVED BY THE MEDICAL FACILITY COMMANDER AND ATTENDING PHYSICIAN AND MUST NOT INTERFERE WITH MEDICAL TREATMENT. REQUESTS TO VISIT MEDICAL CARE FACILITIES OUTSIDE THE CONTINENTAL UNITED STATES WILL BE COORDINATED BY THE UNIFIED COMMAND PA.

4.H.6. REPORTERS MAY VISIT THOSE AREAS DESIGNATED BY THE FACILITY COMMANDER, BUT WILL NOT BE ALLOWED IN OPERATING ROOMS DURING OPERATING PROCEDURES.

4.H.7. PERMISSION TO INTERVIEW OR PHOTOGRAPH A PATIENT WILL BE GRANTED ONLY WITH THE CONSENT OF THE ATTENDING PHYSICIAN OR FACILITY COMMANDER AND WITH THE PATIENT'S INFORMED CONSENT, WITNESSED BY THE ESCORT.

4.H.8. "INFORMED CONSENT" MEANS THE PATIENT UNDERSTANDS HIS OR HER PICTURE AND COMMENTS ARE BEING COLLECTED FOR NEWS MEDIA PURPOSES AND THEY MAY APPEAR NATIONWIDE IN NEWS MEDIA REPORTS.

4.H.9. THE ATTENDING PHYSICIAN OR ESCORT SHOULD ADVISE THE SERVICE MEMBER IF NOK HAVE BEEN NOTIFIED.

5. IMMUNIZATIONS AND PERSONAL PROTECTIVE GEAR.

5.A. MEDIA ORGANIZATIONS SHOULD ENSURE THAT MEDIA ARE PROPERLY IMMUNIZED BEFORE EMBEDDING WITH UNITS. THE CENTERS FOR DISEASE CONTROL (CDC)-RECOMMENDED IMMUNIZATIONS FOR DEPLOYMENT TO THE MIDDLE EAST INCLUDE HEPATITIS A; HEPATITIS B; RABIES; TETANUS-DIPHTHERIA; AND TYPHOID. THE CDC RECOMMENDS MENINGOCOCCAL IMMUNIZATIONS FOR VISITORS TO MECCA. IF TRAVELING TO CERTAIN AREAS IN THE CENTCOM AOR, THE CDC RECOMMENDS TAKING PRESCRIPTION ANTIMALARIAL DRUGS. ANTHRAX AND SMALLPOX VACCINES WILL BE PROVIDED TO THE MEDIA AT NO EXPENSE TO THE GOVERNMENT (THE MEDIA OUTLET WILL BEAR THE EXPENSE). FOR MORE HEALTH INFORMATION FOR TRAVELERS TO THE MIDDLE EAST, GO TO THE CDC WEB SITE AT HTTP://WWW.CDC.GOV/TRAVEL/MIDEAST.HTM.

5.B. BECAUSE THE USE OF PERSONAL PROTECTIVE GEAR, SUCH AS HELMETS OR FLAK VESTS, IS BOTH A PERSONAL AND PROFESSIONAL CHOICE, MEDIA WILL BE RESPONSIBLE FOR PROCURING/USING SUCH EQUIPMENT. PERSONAL PROTECTIVE GEAR, AS WELL AS CLOTHING, WILL BE SUBDUED IN COLOR AND APPEARANCE.

5.C. EMBEDDED MEDIA ARE AUTHORIZED AND REQUIRED TO BE PROVIDED WITH, ON A TEMPORARY LOAN BASIS, NUCLEAR, BIOLOGICAL, CHEMICAL (NBC) PROTECTIVE EQUIPMENT BY THE UNIT WITH WHICH THEY ARE EMBEDDED. UNIT PERSONNEL WILL PROVIDE BASIC INSTRUCTION IN THE PROPER WEAR, USE, AND MAINTENANCE OF THE EQUIPMENT. UPON TERMINATION OF THE EMBED, INITIATED BY EITHER PARTY, THE NBC EQUIPMENT SHALL BE RETURNED TO THE EMBEDDING UNIT. IF SUFFICIENT NBC PROTECTIVE EQUIPMENT IS NOT AVAILABLE FOR EMBEDDED MEDIA, COMMANDERS MAY PURCHASE ADDITIONAL EQUIPMENT, WITH FUNDS NORMALLY AVAILABLE FOR THAT PURPOSE, AND LOAN IT TO EMBEDDED MEDIA IN ACCORDANCE WITH THIS PARAGRAPH.

6. SECURITY

6.A.   MEDIA PRODUCTS WILL NOT BE SUBJECT TO SECURITY REVIEW OR
CENSORSHIP EXCEPT AS INDICATED IN PARA. 6.A.1.  SECURITY AT THE SOURCE
WILL BE THE RULE.  U.S. MILITARY PERSONNEL SHALL PROTECT CLASSIFIED
INFORMATION FROM UNAUTHORIZED OR INADVERTENT DISCLOSURE.  MEDIA
PROVIDED ACCESS TO SENSITIVE INFORMATION, INFORMATION WHICH IS NOT
CLASSIFIED BUT WHICH MAY BE OF OPERATIONAL VALUE TO AN ADVERSARY OR
WHEN COMBINED WITH OTHER UNCLASSIFIED INFORMATION MAY REVEAL CLASSIFIED
INFORMATION, WILL BE INFORMED IN ADVANCE BY THE UNIT COMMANDER OR
HIS/HER DESIGNATED REPRESENTATIVE OF THE RESTRICTIONS ON THE USE OR
DISCLOSURE OF SUCH INFORMATION.  WHEN IN DOUBT, MEDIA WILL CONSULT WITH
THE UNIT COMMANDER OR HIS/HER DESIGNATED REPRESENTATIVE.

6.A.1.  THE NATURE OF THE EMBEDDING PROCESS MAY INVOLVE OBSERVATION OF
SENSITIVE INFORMATION, INCLUDING TROOP MOVEMENTS, BATTLE PREPARATIONS,
MATERIEL CAPABILITIES AND VULNERABILITIES AND OTHER INFORMATION AS
LISTED IN PARA. 4.G.  WHEN A COMMANDER OR HIS/HER DESIGNATED
REPRESENTATIVE HAS REASON TO BELIEVE THAT A MEDIA MEMBER WILL HAVE
ACCESS TO THIS TYPE OF SENSITIVE INFORMATION, PRIOR TO ALLOWING SUCH
ACCESS, HE/SHE WILL TAKE PRUDENT PRECAUTIONS TO ENSURE THE SECURITY OF
THAT INFORMATION.  THE PRIMARY SAFEGUARD WILL BE TO BRIEF MEDIA IN
ADVANCE ABOUT WHAT INFORMATION IS SENSITIVE AND WHAT THE PARAMETERS ARE
FOR COVERING THIS TYPE OF INFORMATION.  IF MEDIA ARE INADVERTENTLY
EXPOSED TO SENSITIVE INFORMATION THEY SHOULD BE BRIEFED AFTER EXPOSURE
ON WHAT INFORMATION THEY SHOULD AVOID COVERING.  IN INSTANCES WHERE A
UNIT COMMANDER OR THE DESIGNATED REPRESENTATIVE DETERMINES THAT
COVERAGE OF A STORY WILL INVOLVE EXPOSURE TO SENSITIVE INFORMATION
BEYOND THE SCOPE OF WHAT MAY BE PROTECTED BY PREBRIEFING OR DEBRIEFING,
BUT COVERAGE OF WHICH IS IN THE BEST INTERESTS OF THE DOD, THE
COMMANDER MAY OFFER ACCESS IF THE REPORTER AGREES TO A SECURITY REVIEW
OF THEIR COVERAGE.  AGREEMENT TO SECURITY REVIEW IN EXCHANGE FOR THIS
TYPE OF ACCESS MUST BE STRICTLY VOLUNTARY AND IF THE REPORTER DOES NOT
AGREE, THEN ACCESS MAY NOT BE GRANTED.  IF A SECURITY REVIEW IS AGREED
TO, IT WILL NOT INVOLVE ANY EDITORIAL CHANGES; IT WILL BE CONDUCTED
SOLELY TO ENSURE THAT NO SENSITIVE OR CLASSIFIED INFORMATION IS
INCLUDED IN THE PRODUCT.  IF SUCH INFORMATION IS FOUND, THE MEDIA WILL
BE ASKED TO REMOVE THAT INFORMATION FROM THE PRODUCT AND/OR EMBARGO THE
PRODUCT UNTIL SUCH INFORMATION IS NO LONGER CLASSIFIED OR SENSITIVE.
REVIEWS ARE TO BE DONE AS SOON AS PRACTICAL SO AS NOT TO INTERRUPT
COMBAT OPERATIONS NOR DELAY REPORTING.  IF THERE ARE DISPUTES RESULTING
FROM THE SECURITY REVIEW PROCESS THEY MAY BE APPEALED THROUGH THE CHAIN
OF COMMAND, OR THROUGH PA CHANNELS TO OASD/PA.  THIS PARAGRAPH DOES NOT
AUTHORIZE COMMANDERS TO ALLOW MEDIA ACCESS TO CLASSIFIED INFORMATION.

6.A.2.  MEDIA PRODUCTS WILL NOT BE CONFISCATED OR OTHERWISE IMPOUNDED.
IF IT IS BELIEVED THAT CLASSIFIED INFORMATION HAS BEEN COMPROMISED AND
THE MEDIA REPRESENTATIVE REFUSES TO REMOVE THAT INFORMATION NOTIFY THE
CPIC AND/OR OASD/PA AS SOON AS POSSIBLE SO THE ISSUE MAY BE ADDRESSED
WITH THE MEDIA ORGANIZATION'S MANAGEMENT.

7.  MISCELLANEOUS/COORDINATING INSTRUCTIONS:

7.A.  OASD(PA) IS THE INITIAL EMBED AUTHORITY.  EMBEDDING PROCEDURES
AND ASSIGNMENT AUTHORITY MAY BE TRANSFERRED TO CENTCOM PA AT A LATER
DATE.  THIS AUTHORITY MAY BE FURTHER DELEGATED AT CENTCOM'S DISCRETION.

7.B.  THIS GUIDANCE AUTHORIZES BLANKET APPROVAL FOR NON-LOCAL AND LOCAL
MEDIA TRAVEL ABOARD DOD AIRLIFT FOR ALL EMBEDDED MEDIA ON A NO-COST,

SPACE AVAILABLE BASIS.  NO ADDITIONAL COSTS SHALL BE INCURRED BY THE
GOVERNMENT TO PROVIDE ASSISTANCE IAW DODI 5410.15, PARA 3.4.

7.C.   USE OF LIPSTICK AND HELMET-MOUNTED CAMERAS ON COMBAT SORTIES IS
APPROVED AND ENCOURAGED TO THE GREATEST EXTENT POSSIBLE.

8. OASD(PA) POC FOR EMBEDDING MEDIA IS MAJ TIM BLAIR, DSN 227-1253,
CMCL 703-697-1253, EMAIL TIMOTHY.BLAIR@OSD.MIL.

REQUIREMENTS THROUGH COMPONENT OR CENTCOM J3/J39 CHANNELS.

8.1.2.  COMBAT CAMERA TEAMS WILL NOT BE USED AS MEDIA ESCORTS.

8.1.3.  COMBAT CAMERA TEAMS WILL BE GIVEN MAXIMUM ACCESS TO DOCUMENT OPERATIONS REGARDLESS OF CLASSIFICATION OR SENSITIVITY, WITHIN THEIR SECURITY CLEARANCE.  THEY WILL HAVE THE SAME ACCESS TO MATERIALS AS OTHER UNIT MEMBERS.

8.1.4.  SECURITY AND PUBLIC RELEASE REVIEW OF COMBAT CAMERA PRODUCTS WILL BE DONE AS EXPEDITIOUSLY AS POSSIBLE, PRIOR TO TRANSMISSION AND DISTRIBUTION.  CENTCOM/PA IS RELEASE AUTHORITY IN THEATER FOR COMBAT CAMERA IMAGERY.  THIS MAY BE DELEGATED FURTHER TO COMPONENT PAOS AS DESIGNATED BY CENTCOM/PA.

8.1.5.  ENSURE ALL IMAGERY PRODUCTS ARE ASSIGNED A VISUAL INFORMATION RECORD IDENTIFICATION NUMBER (VIRIN), ARE FULLY CAPTIONED AND ARE TRANSMITTED AND/OR SHIPPED TO THE JOINT COMBAT CAMERA CENTER WITHIN 24 HOURS OF ACQUISITION WITH THE EXCEPTION OF CFSOCC COMBAT CAMERA ASSETS.

8.1.5.1.  CFSOCC-PA WILL MAKE EVERY EFFORT TO CLEAR IMAGERY WITHIN THE 24-HOUR WINDOW, INCLUDING IMAGERY ACQUIRED BY COMBAT CAMERA, VISUAL INFORMATION AND PUBLIC AFFAIRS DOCUMENTATION TEAMS.  USE SIPRNET OR OTHER SECURE MEANS TO FORWARD SENSITIVE OR CLASSIFIED IMAGERY.

8.2.  HOMETOWN NEWS RELEASE PROGRAMS.  ALL SERVICE MEMBERS ARE HIGHLY ENCOURAGED TO KEEP THEIR LOCAL HOMETOWNS INFORMED OF THEIR PARTICIPATION IN THIS OPERATION THROUGH THEIR SERVICE'S HOMETOWN NEWS RELEASE PROGRAM.  HOMETOWN NEWS RELEASE PROGRAMS WILL PREPARE TAILORED RELEASES FOR SOLDIERS, SAILORS, AIRMEN AND MARINES. SERVICES WILL CAPITALIZE ON THEIR HOMETOWN NEWS PROGRAMS BY ASSISTING HOMETOWN MEDIA IN CONNECTING WITH SERVICE MEMBERS FOR THEIR LOCAL AREAS FOR POTENTIAL INTERVIEWS.

8.3.  ALL INTERNAL STORIES AND NEWSLETTERS WILL BE FORWARDED TO LINDA.KOZARYN@OSD.MIL AND KRHEM@OSD.MIL FOR USE IN NATIONAL LEVEL INTERNAL INFORMATION PRODUCTS.

9.  LOGISTICS.

9.1.  UNITS SHOULD PLAN LIFT AND LOGISTICAL SUPPORT ON A SPACE AVAILABLE, NO ADDITIONAL COST TO THE GOVERNMENT BASIS, TO ASSIST IN MOVING INTERNAL AND EXTERNAL NEWS MEDIA REPRESENTATIVES AND PRODUCTS TO AND FROM THE BATTLEFIELD SO AS TO TELL OUR STORY IN A TIMELY MANNER, AS DISCUSSED IN REF. C.

9.1.1.  TO THE EXTENT POSSIBLE, SPACE ON MILITARY TRANSPORTATION WILL BE MADE AVAILABLE FOR INTERNAL, COMBAT CAMERA AND EXTERNAL NEWS MEDIA REPRESENTATIVES AND THEIR EQUIPMENT NECESSARY TO COVER OPERATIONS CONSISTENT WITH PARAGRAPH 7.B. OF REF B.  SEATS ABOARD VEHICLES, AIRCRAFT AND NAVAL SHIPS WILL BE MADE AVAILABLE ON A SPACE AVAILABLE, NO ADDITIONAL COST TO THE GOVERNMENT BASIS TO ALLOW MAXIMUM COVERAGE OF COALITION FORCES IN THE FIELD AND TO MEET THE SECDEF/CJCS INTENT IN REF C.  WITH THE EXCEPTION OF MILITARY AIRCRAFT WHERE A LOADMASTER IS RESPONSIBLE FOR CARGO, THE MEDIA IS RESPONSIBLE FOR LOADING AND

CARRYING THEIR OWN EQUIPMENT AT ALL TIMES.  AERIAL QUALIFIED COMBAT
CAMERA OPERATORS ARE AUTHORIZED TO PERFORM CAMERA DUTIES WHILE
FLYING.

9.1.2.  THIS GUIDANCE AUTHORIZES BLANKET APPROVAL FOR LOCAL MEDIA
TRAVEL, WITHIN THE CENTCOM AOR, ABOARD DOD AIRLIFT FOR ALL MEDIA ON A
NO-COST, SPACE AVAILABLE BASIS.  NO ADDITIONAL COSTS SHALL BE
INCURRED BY THE GOVERNMENT TO PROVIDE ASSISTANCE IAW DODI 5410.15,
PARA 3.4.

9.1.3.  INVITATIONAL TRAVEL ORDERS WILL BE PUBLISHED BY THE UNITS
BEING COVERED UNLESS THAT MEDIA IS DIRECTED BY THE CPIC.  IN THE CASE
OF CPIC-DIRECTED MEDIA, THE CPIC WILL PUBLISH ITOS ON THE MEDIA
REPRESENTATIVES.

9.1.4.  THE LOCAL PAO AND/OR COMMANDER'S REPRESENTATIVE WILL
COORDINATE MEDIA FLIGHTS WITH THE AERIAL PORT OR OTHER AIRLIFT
COORDINATING ACTIVITY.

9.2.  IN THE EVENT OF COMMERCIAL COMMUNICATIONS DIFFICULTIES, MEDIA
ARE AUTHORIZED TO FILE STORIES VIA EXPEDITIOUS MILITARY
SIGNAL/COMMUNICATIONS CAPABILITIES.

9.3.  UNILATERAL/INDEPENDENT AND/OR CPIC-DIRECTED MEDIA ARE
RESPONSIBLE FOR PROVIDING ANY DESIRED PERSONAL PROTECTIVE EQUIPMENT,
TO INCLUDE NBC EQUIPMENT.

10.  INTERVIEW GUIDANCE.  INTERNAL AND EXTERNAL MEDIA INTERVIEWS WITH
U.S. MILITARY PERSONNEL AND DOCUMENTATION OF U.S. MILITARY ACTIVITIES
ARE ENCOURAGED.  WHEN CONDUCTING MEDIA INTERVIEWS ASSOCIATED WITH
THIS OPERATION, THE FOLLOWING POINTS APPLY:

10.1.  ENSURE MILITARY PERSONNEL ARE THOROUGHLY BRIEFED BEFORE
SPEAKING TO THE MEDIA. SECURITY AT THE SOURCE WILL BE OBSERVED AT ALL
TIMES.

10.2.  CONFINE REMARKS TO MATTERS WITHIN THE INDIVIDUAL'S AREA OF
RESPONSIBILITY AND PERSONAL EXPERIENCE.

10.3.  ALL DISCUSSIONS WITH REPORTERS WILL BE "ON THE RECORD."

10.4.  EXERCISE CARE TO PROTECT SENSITIVE AND CLASSIFIED INFORMATION
AND PRESERVE OPERATIONAL SECURITY.  EXACT NUMBERS AND LOCATIONS OF
FORCES AND EQUIPMENT, ONGOING OR FUTURE OPERATIONS, AND RULES OF
ENGAGEMENT (ROE) ARE NOT RELEASABLE.

10.5.  AVOID SPECULATION (ANSWERING HYPOTHETICAL OR 'WHAT IF'
QUESTIONS).

10.6.  ALWAYS RESPECT REGIONAL POLITICAL AND CULTURAL SENSITIVITIES.
IF IN DOUBT, THE PUBLIC AFFAIRS REPRESENTATIVE AT THE APPROPRIATE
AMERICAN EMBASSY SHOULD BE CONSULTED FOR GUIDANCE.

10.7.  DO NOT DISCUSS SPECIFIC LOCATIONS OF U.S. OR FRIENDLY FORCES.
GIVE GENERAL LOCATIONS SUCH AS THE CENTRAL COMMAND THEATER OF
OPERATIONS, THE NORTHERN ARABIAN GULF, EASTERN MEDITERRANEAN, OR
ABOARD USS (SHIP'S NAME).

10.8.  STRESS THE VALUE IN COMBINING THE UNIQUE CAPABILITIES OF EACH BRANCH OF SERVICE IN JOINT OPERATIONS AND SUPPORTING NATIONS AS APPROPRIATE.

10.9.  THE GENERAL MISSION OF A PARTICULAR UNIT OR UNITS AND DATA RELATING TO WEAPONS, AIRCRAFT, SHIPS, SUBMARINES, ETC. MAY BE DISCUSSED IF NOT CLASSIFIED.

10.10.  SPECIFIC FORCE PROTECTION MEASURES WILL NOT BE DISCUSSED. PAOS MAY CONFIRM THE OBVIOUS GENERAL FORCE PROTECTION INITIATIVES (E.G., INCREASED SECURITY PATROLS, ADDITIONAL PHYSICAL SECURITY BARRIERS, ETC).

10.11.  DISCUSSION OR SPECULATION REGARDING THE INTRODUCTION OF ADDITIONAL FORCES (PERSONNEL, EQUIPMENT OR MUNITIONS) TO THE AOR IS PROHIBITED.

10.12.  SPECIFIC INFORMATION REGARDING RELOCATION OR MOVEMENT OF FORCES (E.G., SHIPS, AIRCRAFT, GROUND FORCES) WITHIN THE AOR WILL NOT BE DISCUSSED.

10.13.  SPECIFIC LOCATIONS OR INFORMATION REGARDING AIR DEFENSE CAPABILITIES (E.G., PATRIOT BATTERIES) WILL NOT BE DISCUSSED.

11.  MEDIA QUERIES BEYOND THE SCOPE OF THIS GUIDANCE WHICH ORIGINATE IN HOST COUNTRY WILL BE REFERRED, ALONG WITH RECOMMENDED RESPONSES, TO THE AMERICAN EMBASSY PA SECTION, CENTCOM/PA AND OASD(PA), INFO OCJCS/PA, USPACOM/PA AND USSOCOM/PA, AS APPROPRIATE.  MEDIA QUERIES OR REQUESTS BEYOND THE SCOPE OF THIS GUIDANCE THAT ORIGINATE IN AREAS OTHER THAN HOST COUNTRY, INCLUDING THE U.S., WILL BE REFERRED, ALONG WITH RECOMMENDED RESPONSES, TO CENTCOM/PA AND OASD(PA), INFO OCJCS/PA.

12.  OASD(PA) POC IS LT COL DAVE LAPAN, DSN 227-5333, COMM 703-697-5333, EMAIL DAVID.LAPAN@OSD.MIL.