**THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

THE NEW YORK TIMES COMPANY, *et al.*

                           *Plaintiffs*,

         v.

DEPARTMENT OF DEFENSE A/K/A
DEPARTMENT OF WAR,
*et al.*,

                         *Defendants*.

Civil Case No. 25-cv-04218 (PLF)

## MOTION TO COMPEL COMPLIANCE WITH THE COURT'S ORDER

On March 20, 2026, this Court entered an order declaring specific provisions of the Department's policy pertaining to Pentagon Facilities Alternate Credentials ("PFACs") to be unlawful and in violation of the First and Fifth Amendments to the United States Constitution. ECF No. 34 (the "Order"). The Court vacated and set aside the Challenged Provisions of the Policy as to The New York Times Company ("The Times") and Julian E. Barnes (together, "Plaintiffs") and all regulated parties. *Id*. at 1–3. The Court also issued an injunction requiring the immediate reinstatement of The Times reporters' PFACs, and it permanently enjoined Defendants from implementing or enforcing the Policy's unconstitutional Challenged Provisions, and from "deny[ing], revok[ing], suspend[ing], or not renew[ing] a PFAC pursuant to" those provisions. *Id*. at 3. Rather than comply with the Court's Order and accompanying Opinion, Defendants are contemptuously defying it—both in letter and spirit in a newly released "interim" policy. Among other things, for the first time in history, the Interim Policy bars reporters with press passes from entering the building without an escort, sets up unprecedented rules governing when a reporter can offer anonymity to a source, and leaves in place provisions that this Court's Order struck. Defendants' counsel, Cmdr. Timothy Parlatore, candidly admitted that this revised,

1

interim policy simply "use[s] more words to say the same thing."[1]  *See* Second Supplemental Boutrous Decl., Ex. 1 (the "Interim Policy").  That is the definition of contempt.

The intent is obvious:  The Interim Policy is an attempted end-run around this Court's ruling. In its memorandum accompanying the Interim Policy, the Department does not hide its disregard for this Court's Order. It accuses the Court of "mischaracterize[ing]" and engaging in "creative misinterpretations" of the Policy, and announces its "disagree[ment]" with the Court's ruling and its intent to appeal.

Ignoring this Court's determination that vacating the Challenged Provisions of the Policy would "leav[e] in place requirements that are no less stringent than in the previous regime," and the Court's explicit rejection of Defendants' argument that vacatur would "compromise the safety of the Pentagon" as "unfounded," ECF No. 35 ("Op.") at 39, Defendants assert their Interim Policy is needed to, in their words, "preserv[e] the Department's legitimate security interests and its statutory obligation to ensure the safe, efficient, and secure operation of the Pentagon Reservation." Interim Policy at 1.  But as this Court recognized in its Opinion, the Policy was never motivated by any legitimate safety or security concern.  And, indeed, as Cmdr. Parlatore made clear in describing the purpose of the Interim Policy, Defendants' end goal has not changed.  According to Cmdr. Parlatore, the Interim Policy will allow Department officials to limit newsgathering on Pentagon grounds to official press conferences and scheduled events, and prevent journalists from being able to "talk in the hallways" and to "induce unauthorized disclosures, which," according to Cmdr. Parlatore "was really our whole concern from the beginning."  Second Supp. Boutrous Decl., Ex. 6.  Simply put, despite Defendants' assertion that they are acting "in accordance with the

---

[1] Second Supp. Boutrous Decl., Ex. 6 (Erik Wemple, *Pentagon Adopts New Limits for Journalists After Court Loss*, N.Y. Times (Mar. 23, 2026)).

Court's decision," the Interim Policy is nothing more than a thinly veiled attempt to flout this Court's ruling and prevent journalists and news organizations whose editorial viewpoints Defendants dislike from engaging in independent, protected newsgathering and reporting at the Pentagon.

In addition to simply repackaging provisions of the Policy that this Court expressly held were unconstitutional—including the threat that reporters' PFACs could be suspended, revoked, or not renewed if they solicit information from any source not officially designated or pre-authorized by the Department—the Interim Policy adds *new* restrictions on Plaintiffs' and other reporters' First Amendment rights to gather and report the news, including by implementing a "rebuttable presumption" that a reporter who offers a Department source "anonymity or privacy protection" has committed a so-called "intentional inducement of unauthorized disclosure." Interim Policy at 14. And worse, the Department's Interim Policy, for the first time since the building was opened, *bars PFAC holders from entering the Pentagon without a Department escort*—a plainly retaliatory measure designed to nullify the effect of this Court's Order. *Id.* at 3, 7.

In sum, instead of complying with the Court's Order, Defendants are attempting to circumvent it, and to deprive Plaintiffs of the relief they are entitled to. The Department's open defiance of this Court's Order is improper, retaliatory, prejudicial to Plaintiffs, and disrespectful to the Court, the Constitution, and the American public—who, as the Court explained, relies on independent reporting about the Department and its leadership in order to obtain "information from

a variety of perspectives about what its government is doing." Op. at 39. For the reasons herein, the Court should compel Defendants' immediate compliance with its Order and Opinion.[2]

**ARGUMENT**

**I.    The Department's Interim Policy Defies this Court's Order.**

Immediately after the Court issued its Order and Opinion on March 20, 2026, Plaintiffs inquired with the Department about its plans for complying with the Order and reinstating reporters' PFACs. *See* Second Supp. Boutrous Decl., Ex. 4. The next day, March 21, 2026, The Times sent a letter to the Department asking how the seven Times reporters identified by name in the Order would obtain their reinstated PFACs. *Id*. Counsel for *amici* the Pentagon Press Association ("PPA") also wrote to the Department, asking "when and how the Department will return the revoked PFACs and restore the access it revoked on October 15, 2025[.]" *Id*., Ex. 3 at 3. The Department initially told counsel for The Times it would provide "more information" by "mid morning" on Monday, March 23, but it did not provide a substantive response until 4:15 p.m. Eastern that day. *Id*., Ex. 5 at 2–3. At that time, counsel for the Department sent an email to counsel for The Times providing contact information for Times journalists to "schedule pickup" of their physical credentials. *Id*. In that same email communication, the Department for the first time provided The Times with an "attached revised policy, in accordance with the Court's decision"—the Interim Policy. *Id*.

The Interim Policy consists of a "Memorandum for Senior Pentagon Leadership" from Defendant Sean Parnell (the "Memorandum"), a "Pentagon Reservation In-Brief for Media Members" (the "In-Brief"), and an Appendix. The Memorandum states that the Department

---

[2] Plaintiffs reserve all rights in connection with the Department's refusal to comply with the Court's Order, including their right to seek sanctions, to move that the Department be held in contempt, and/or to directly challenge the provisions of the Interim Policy.

"disagrees with the Court's decision and is pursuing an appeal"[3] and accuses the Court of "mischaracteriz[ing]" the Policy's Challenged Provisions.  Interim Policy at 1.  It further states that, "[i]n the interim," while its anticipated appeal is pending, the Interim Policy will be in effect purportedly to "preserv[e] the Department's legitimate security interests and its statutory obligation to ensure the safe, efficient, and secure operation of the Pentagon Reservation."  *Id*. According to the Memorandum, "the revised in-brief addresses the provisions the Court vacated while retaining all physical access restrictions, conduct requirements, and security measures that were not at issue in the litigation."  *Id*.  It also states that "[t]he Court characterized the original Policy's provisions in ways the Department believes were inaccurate" and that the Interim Policy "includes targeted clarifications to correct these mischaracterizations."  *Id*.  The Interim Policy defies both the letter and spirit of this Court's Order in multiple respects.

### A.  The Interim Policy Repackages Unconstitutional Provisions Vacated By the Court.

The Department has flagrantly ignored the Court's clear directive that it *remove* and *refrain from enforcing* those provisions of the Policy the Court held were unconstitutional.  Instead, the Department has sought to evade the Order by retaining, in rewritten form, a core unlawful feature of the Policy:  The threatened revocation, denial, or non-renewal of a PFAC based on a reporter's solicitation of unauthorized information about the Department.

The In-Brief provides in pertinent part that "PFACs may be denied, revoked, or not renewed if a person meets any of the criteria set forth in Appendix A."  Interim Policy at 9. Appendix A, in turn, sets forth certain conviction-based grounds for PFAC denial, revocation, or

---

[3] Despite publicly stating that it would "pursu[e] an immediate appeal," *see* Second Supp. Boutrous Decl., Ex. 7 (Sean Parnell (@SeanParnellASW), X (Mar. 20, 2026), https://x.com/SeanParnellASW/status/2035134876639265081), as of this filing the Department has not filed a notice of appeal.  It also has not sought a stay of this Court's Order.

non-renewal, as well as so-called "[c]onduct-[b]ased [g]rounds," including the "inducement of unauthorized disclosure as defined in" the In-Brief. *Id*. at 16. According to the In-Brief, purportedly "[t]o correct the Court's mischaracterization" of the Policy, "the Department has replaced the term 'solicitation' with 'intentional inducement of unauthorized disclosure.'" *Id*. at 14. The Interim Policy defines "intentional inducement of unauthorized disclosure" to mean "intentionally encouraging, inducing, or requesting that a specific Department employee disclose classified national security information or [controlled unclassified information] that the journalist knows that the specific Department employee is not authorized to disclosing [sic] under Article 92 of the Uniform Code of Military Justice (10 U.S.C. § 892), 18 U.S.C. § 1905, or 5 U.S.C. § 552a." *Id*.

As the Court explained in the Opinion, "the Policy's limitations on journalists accessing or attempting to access non-public information" are unconstitutional because "[t]he considerations that may or may not lead to a reporter being deemed 'a security or safety risk' include obtaining or attempting to obtain any information that the Department has not approved for release, regardless of whether that information is classified." Op. at 20–21. As the Court recognized, "obtaining and attempting to obtain information is what journalists do," and a prohibition on the solicitation of non-public information would chill and punish "essential journalistic practices that the plaintiffs and others engage in every day." *Id*. at 21.

The Court squarely rejected the Department's argument that it had merely "proscribe[d] criminal solicitation," noting that "the Policy does not clearly distinguish between any such impermissible solicitation and plainly lawful journalistic practices"—in part (but not only) because it proscribed the solicitation of "not just classified information, but any 'non-public information' released 'without proper authorization.'" *Id*. at 21–22 (emphasis in original). As the Court held,

this was untenable under both the First and Fifth Amendments:  It amounted to viewpoint discrimination "based on editorial viewpoint—that is, whether the individual or organization is willing to publish only stories that are favorable to or spoon-fed by Department leadership."  *Id*. at 30.  And it was also void for vagueness because it could lead to PFAC revocation, denial, or non-renewal merely because a "journalist happens to ask a question that results in the disclosure of unauthorized information by a Department employee," including information falling within "113 categories of [controlled unclassified information]," that "[a] journalist cannot possibly" be expected to "know."  *Id*. at 22.  And, in rejecting the Department's request for remand without vacatur, the Court expressly rejected the argument that the Department could "cure the[se] constitutional deficiencies" merely by "'provid[ing] additional explanation' on remand."  *Id*. at 38.

The Interim Policy does exactly what the Court expressly held the Department could not do:  Attempt to "clarif[y]" the Policy's unconstitutional provisions rather than vacating and refraining from enforcing them.  Interim Policy at 1.  Under the Interim Policy, a reporter's solicitation of non-public information from a Department source who is not formally authorized to disclose it is still grounds for revocation, denial, or non-renewal of that reporter's PFAC.  *See* Interim Policy at 13–14.  And the so-called "safe harbors" set forth in the Interim Policy, *id*. at 1, 15, only confirm that the Department continues to make PFACs contingent on reporters seeking out only information that is affirmatively authorized for public release—*i.e.*, information "spoon-fed by Department leadership," Op. at 30.  The Interim Policy continues to threaten the revocation, denial, or non-renewal of journalists' PFACs based on their solicitation of *any* unauthorized information, including non-classified information that falls within 113 categories of controlled unclassified information, Interim Policy at 14; Op. at 22, notwithstanding that "[a] journalist

cannot possibly know every piece of information that falls into one of those 113 categories," Op. at 22.

The Department makes a half-hearted attempt to disguise this unconstitutional limitation on core newsgathering by providing that the revocation, denial, or non-renewal of a PFAC will follow only from the *intentional* solicitation of non-public information, not the accidental solicitation of such information. But that is an illusory limit at best, particularly because the Interim Policy states that solicitation of non-public information will be treated as *presumptively intentional* whenever the source's identity is kept anonymous or the reporter offers "privacy protection." Interim Policy at 14.

For all practical purposes, the Interim Policy leaves in place exactly what this Court found to violate the First Amendment: an outright prohibition on the solicitation of any information that the Department has not authorized for disclosure. The only exception is for reporters who somehow obtain such information *by accident*, while attempting to gather only information authorized for disclosure by Department officials. In this way, the Interim Policy remains plagued by vagueness problems and continues to treat the mere asking of questions as a violation—even though Department officials could simply decline to answer. And it perpetuates the viewpoint discrimination—favoring journalists who are "on board and willing to serve our commander in chief"—that this Court condemned. Op. at 30.

In any event, the Department already tried to assert that the original Policy was limited in the very ways supposedly "clarified" by the Interim Policy. For instance, it asserted in its post-argument "Notice of Clarification" that "solicitation" meant only the intentional attempt to gain access to classified or controlled unclassified information, and that it would rely on promises of anonymity as indicia of intent. *See* Dkt. 32 at 1. This argument was before the Court when it

8

rejected not just that post-hoc narrowing, but also the assertion that a Policy so narrowed would not infringe Plaintiffs' First and Fifth Amendment rights. *See* Op. at 22–23 ("This ostensible limiting interpretation by the government does not clarify or limit the Policy's criteria because that interpretation itself encompasses within its prohibitions more than criminal solicitation.").[4]

The Interim Policy also retains specific language that this Court expressly held was unlawful. For example, the Court struck from the Policy language stating that "[m]embers of the news media do not possess a legal right to access the Pentagon; rather, such access is a privilege, subject to the discretion of government authorities." *See* Order at 2; *see also* Dkt. 31-2 at 3. The Interim Policy contains the same language. *See* Interim Policy at 5 ("Members of the news media do not possess a legal right to access the Pentagon; rather, such access is a privilege extended by the Government."). The Interim Policy also retains language regarding controlled unclassified information that the Court struck from the Policy. *See* Order at 2; Dkt. 31-2 at 6; Interim Policy at 8. The Court vacated the Policy's statement that "PFACs may be denied, revoked, or not renewed if a person is reasonably determined to pose a security or safety risk to DoW personnel or property, or is not meeting the frequency requirements." Order at 2; Dkt. 31-2 at 8. The Interim Policy contains a substantively identical provision. *See* Interim Policy at 10 ("PFACs may be denied, revoked, or not renewed if a person meets any of the criteria set forth in Appendix A, or is not meeting the frequency requirements.").

---

[4] Supreme Court precedent makes clear that merely "encouraging" or "requesting" information—which the Interim Policy treats as a basis for suspension, revocation, denial or non-renewal of a PFAC—is not criminal solicitation. *See Counterman v. Colorado*, 600 U.S. 66, 76 (2023); *Brandenburg v. Ohio*, 395 U.S. 444, 447–49 (1969).

**B. The Interim Policy Adds New Unconstitutional Provisions Inconsistent with the Court's Ruling.**

The In-Brief also adds a new, blatantly unconstitutional provision that Defendants floated in their post-hearing "Notice of Clarification," *see* Dkt. 32: namely, that "[a] journalist's offer of anonymity or privacy protection to a Department employee in exchange for information shall create a rebuttable presumption that the journalist knew the employee was not authorized to disclose the information sought." Interim Policy at 13. The In-Brief then lists six activities that "do not constitute 'intentional inducement of unauthorized disclosure' under" the Interim Policy, including (a) "[a]sking questions of Department personnel who are authorized to speak with the press," (b) "[r]eceiving unsolicited information," (c) "[p]ublishing calls for tips or other general appeals to the public at large that are not specifically directed at Department personnel," (d) "[d]eveloping source relationships outside the Pentagon through independent reporting," (e) "[c]ommunicating with Department personnel through official channels for public disclosure of information," such as press briefings and interviews arranged by public affairs offices, and (f) "[a]sking questions of any Department employee where the journalist does not know that the employee is not authorized to disclose the information sought." *Id*. at 13–14.

Speaking with anonymous sources, as well as agreeing to speak to sources on background or off the record, is a "frequent[]" and "often essential" element of newsgathering. *Zerilli v. Smith*, 656 F.2d 705, 711 (D.C. Cir. 1981). Threatening reporters with adverse consequences for engaging in that "paradigmatically 'routine newspaper reporting technique,'" *The Florida Star v. B.J.F.*, 491 U.S. 524, 538 (1989) (quoting *Smith v. Daily Mail Pub. Co.*, 443 U.S. 97, 103 (1979)), chills First Amendment-protected activity, *see Counterman v. Colorado,* 600 U.S. 66, 76 (2023), and violates the First Amendment. *See, e.g., Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 576–77 (1980) (the First Amendment protects "a 'right to gather information'" because "'without some

protection for seeking out the news, freedom of the press could be eviscerated'" (quoting *Branzburg v. Hayes*, 408 U.S. 665, 681 (1972))).  As the D.C. Circuit stated in *Zerilli*, "[w]ithout an unfettered press, citizens would be far less able to make informed political, social, and economic choices. But the press' function as a vital source of information is weakened whenever the ability of journalists to gather news is impaired." 656 F.2d at 711.

As the Court's Opinion explains, reporters have a liberty interest in their press credentials and the access those credentials afford them to work within the Pentagon.  Op. at 16–17.  "Because the Department has long chosen to allow press access to the Pentagon, it cannot deny that access unreasonably or on the basis of viewpoint."  Op. at 26 n.6 (citing *Ateba v. Leavitt*, 133 F.4th 114, 123, 129 (D.C. Cir. 2025); *see also Sherrill v. Knight*, 569 F.2d 124 (D.C. Cir. 1977) ("[W]here the White House has voluntarily decided to establish press facilities for correspondents who need to report therefrom . . . the protection afforded newsgathering under the first amendment guarantee of freedom of the press . . . requires that this access not be denied arbitrarily or for less than compelling reasons.").  Notwithstanding the important First and Fifth Amendment rights at stake, the Interim Policy doubles down on the Department's pretextual assertion that it must bar reporters who seek to obtain and publish non-public information about the Department to protect a "legitimate security interest[]" and "ensure the safe, efficient, and secure operation of the Pentagon Reservation."  Interim Policy at 1.  The Court squarely rejected the Department's argument that it could justify the Policy's restrictions on press access to and newsgathering activity within the Pentagon merely by baldly asserting a generalized interest in "safety" and "security":  It held that "the government may not point to unspecified 'reasons of security' to deny an application for a press pass.'" Op. at 19 (quoting *Sherrill*, 569 F.2d at 130).  As the Court concluded, it is undisputed "that the Department's previous PFAC requirements served its proffered interests in safety and

security for decades and that nothing in particular triggered the need for increased measures[.]" *Id.* at 39. Defendants' insistence that "vacatur" of the Policy's Challenged Provisions "would 'compromise the safety of the Pentagon'" is, as the Court already concluded, "unfounded." *Id.*.

### C. The Interim Policy Seeks to Nullify the Court's Order By Cutting Off PFAC Holders' Unescorted Access to the Pentagon.

Defendants have taken an additional, truly extraordinary action to thwart the Court's ruling: stripped credentialed journalists from independent physical access to the Pentagon building itself. In the face of this Court's findings based on undisputed facts that, among other things, "[t]he regular presence of PFAC holders at the Pentagon has enhanced the ability of journalists and news organizations to keep Americans informed about the U.S. military while posing no security or safety risk to Department property or personnel," and that "[t]hese in-person interactions can be crucial to obtaining the context and detail needed to report accurately and effectively about defense policy and military operations," Op. at 5, Defendants' Interim Policy cuts off such access altogether. The Department thumbs its nose at the Court's ruling by announcing—out of the blue and apparently in direct response to this Court's Order—the closure of "the Correspondents' Corridor" in the Pentagon. Interim Policy at 2. Specifically, it states that "[e]ffective immediately, the Correspondents' Corridor is closed" and that PFAC holders will be able to access "[a] new press workspace . . . in an annex facility outside the Pentagon" once it is "operational." *Id.* The Department's Memorandum further states that "[i]n the interim, PFAC holders" will be able to access the Pentagon only "for scheduled press briefings, press conferences, and interviews arranged through the public affairs offices," and only if they are "escort[ed] by authorized [Department] personnel at all times." *Id.* at 3. Under the Interim Policy, "all journalist access to the Pentagon will require [an] escort[,]" and, "[w]hen in the Pentagon," PFAC holders "must remain with [their] escort at all times." *Id.* According to the Interim Policy, no more than "three

visiting media members from the same media outlet" may obtain "escort privileges." *Id*. at 7–8. In other words, in response to this Court's Order enforcing the Due Process Clause and First Amendment to ensure that journalists and news organizations, including Plaintiffs, are able to engage in independent, traditional journalistic activity at the Pentagon in order to keep the American public informed at a time of war, Defendants have sharply restricted that activity even further, in direct contravention of this Court's directives and longstanding tradition and historical practice.

This Court made clear that the Department may not restrict reporters' access to the Pentagon on the basis of editorial viewpoint, emphasizing that ensuring equal access to the Pentagon by reporters with varying perspectives was critical—and more important now, in a time of war, than ever. *See* Op. at 39. The Department's response to this Court's explanation that such access is integral to democracy and serves the interests of the American public was to bar *all PFAC holders* from the Pentagon, except to the extent they obtain a Department escort for official briefings or events. *See* Interim Policy at 2, 6–7. This retaliatory action does not restore Plaintiffs' credentials and access in any meaningful sense, and it transparently undermines the First Amendment values that the Court's Order and Opinion sought to protect.

On March 23, the same day that the Department sent The Times the Interim Policy, Defendant Parnell also announced it in a post on X that further illuminated Defendants' violations of the Court's Order and Opinion. Second Supp. Boutrous Decl., Ex. 7. While Parnell's post claimed the Interim Policy was "in compliance with the court's order," it then described the Department's decision to now limit PFAC holders' access to the Pentagon to escorted visits for "scheduled press briefings, press conferences, and interviews arranged through public affairs offices." *Id*. Parnell's post asserted that the Department had determined these changes were

13

necessary to ensure Pentagon security in light of the Court's Order—asserting that "[i]n assessing the Department's security posture following the court's removal of all security screening authority, the Department determined that unescorted access to the Pentagon cannot be responsibly maintained without the ability to screen credential holders for security risks."  *Id*.  Parnell's post thus expressly attributes the Interim Policy to the Court's Order—making clear that it is retaliatory and aimed at ensuring that Plaintiffs are kept out, notwithstanding that the Court expressly ruled they must be let in.  The X post also expressly mischaracterizes the Court's Order—this Court did not "remov[e] all security screening authority"—and doubles down on the same pretextual "security" rationale for restricting Plaintiffs' access that the Court squarely rejected in its Opinion. *See* Op. at 39.  Elsewhere, Cmdr. Parlatore repeated the same mischaracterization, asserting falsely that the ruling "excised all of the security provisions and enforcement mechanisms and ordered that we immediately issue passes under the revised, toothless policy."  Ex. 6.

This Court determined that the Policy's purpose of suppressing speech based on editorial viewpoint was unconstitutional.  Op. at 27–31.  The Department's attempt to achieve those same unlawful ends by excluding reporters from the Pentagon entirely is not compliance; it is unlawful contravention of this Court's Order through new, retaliatory means.  *See Media Matters for Am. v. Paxton*, 138 F.4th 563, 570 (D.C. Cir. 2025) ("retaliation against a media company" for engaging in protected conduct violates the First Amendment); *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 188, 190 (2024) (a government official can neither "use the power of the State to punish or suppress disfavored expression" nor "do indirectly what [he] is barred from doing directly").

While the Department made certain changes ostensibly responsive to the Court's Order, its Interim Policy does everything possible to counteract those changes by repackaging the Policy's unconstitutional restrictions and adding new restrictions designed to undo the effect of the Court's

ruling. In short, the Department has tried to do exactly what this Court rejected—amend the policy as if this Court remanded rather than vacated its Challenged Provisions. *See* Op. at 38 (rejecting "[t]he defendants' suggestion that the Department could 'provide additional explanation' on remand" and holding that vacatur is necessary to "cure the constitutional deficiencies").

## II.    The Court Should Compel Defendants' Immediate Compliance with its Order and Opinion.

This Court has the "jurisdiction" and "inherent power to enforce its judgments." *Peacock v. Thomas*, 516 U.S. 349, 356 (1996); *see* Dkt. 34 at 4 (retaining "jurisdiction to enforce this Order").[5] Because the Department, in the words of its own counsel who appeared before this Court, responded to the Order by "us[ing] more words to say the same thing,"[6] the Court should exercise that jurisdiction to put an end to the Department's defiance.

Further enforcement of the Court's order is necessary to protect both Plaintiffs' constitutional rights and the Court's remedial authority. The Department appears to believe that by adopting the same substance in a "revised" "interim" PFAC policy, it has managed to comply with a literal reading of the Court's injunction. The Department is wrong, for the reasons set forth above. But even if the Interim Policy did technically comply with a hyper-literal reading of the Order, it remains an unlawful attempt to circumvent this Court's ruling. A party may not "avoid[] … [an] injunction through a mere change of terminology." *United States v. Christie Indus., Inc.*, 465 F.2d 1002, 1007 (3d Cir. 1972). To ensure court rulings are not so easily thwarted, an injunction must be understood in "the context in which it is issued." *Apprio, Inc. v. Zaccari*, 2025 WL 1905643, at *5 (D.D.C. July 10, 2025) (quoting *United States v. Young*, 107 F.3d 903, 907–08 (D.C. Cir. 1997)). This context includes any "accompanying opinion," *id*., as well as "the relief

---

[5] And, "absent a stay," the Court will "retain[] jurisdiction" if and when there is an appeal of the Order. *In re Kuwait Ports Auth.*, 2026 WL 184894, at *5 n.1 (D.D.C. Jan. 16, 2026).
[6] Second Supp. Boutrous Decl. Ex. 6 at 5.

sought by the moving party, the evidence produced at the hearing on the injunction, and the mischief that the injunction seeks to prevent," *Christie*, 465 F.2d at 1007. Context can make clear that an injunction forbids the substance of an illegal policy, not just the name of the "specific plan" that was in place at the time of the Court's decision. *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 192 (1949). This precedent is fully applicable here.

When this Court enjoined the Department from enforcing its PFAC policy against The Times and its reporters, it explained why the Policy was not only unconstitutional, but incapable of being "readily … cure[d]" on remand. Op. at 38. That context makes plain that the Order does not permit the Department to adopt, on the next business day after the Court's Order, a rebranded policy with the same substantive provisions that violate the Constitution in identical ways. This attempted evasion violates the injunction. Were it otherwise, citizens would never be secure in their constitutional rights because the government could continue to issue new, "revised" policies that just use different "words to say the same thing." *Cf. Potter v. District of Columbia*, 2023 WL 6403852, at *2 (D.D.C. Aug. 31, 2023) ("Plaintiffs may well have proven that the [D.C. Fire] Department violated a clear and ambiguous order by issuing and enforcing a policy nearly identical to the enjoined Special Order . . . ."). The Court should put an end to this "experimentation with disobedience of the law." *McComb*, 336 U.S. at 192.

## CONCLUSION

The Court's Order required the Department to rescind and refrain from enforcing the Policy's unconstitutional provisions. The Department was required, by law, to comply with that Order fully and in good faith—not by attempting to nullify and evade that Order under the pretext of "clarifying" the Policy's unconstitutional provisions. This Court should enforce its Order and compel the Department's immediate and full compliance. While the Court's Order and Opinion are clear that the Defendants were required to reinstate and process PFACs under the policy as it

16

existed before the Department issued the Challenged Provisions, *see* Op. at 38–39, as the Department's counsel has acknowledged, *see* Ex. 6 (stating that the Court "ordered that [the Department] immediately issue passes under the revised, toothless policy"), the Court should expressly reiterate that directive in compelling compliance with the Order.[7] The Department's flagrant disobedience of this Court—and the Constitution—should not be countenanced.

Dated: March 24, 2026

Respectfully submitted,
*/s/ Theodore J. Boutrous*
Theodore J. Boutrous, Jr. (D.D.C. Bar No. 420440)
Katie Townsend (D.D.C. Bar No. 1026115)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
(213) 229-7000
TBoutrous@gibsondunn.com
KTownsend@gibsondunn.com

Lee R. Crain (D.D.C. Bar No. NY0337)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
(212) 351-4000
LCrain@gibsondunn.com

Susan M. Pelletier*
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, NW
Washington, DC 20036-5306
(202) 955-8500
SPelletier@gibsondunn.com
*admitted pro hac vice*

*Counsel for Plaintiffs The New York Times Company and Julian E. Barnes.*

---

[7] The Times journalists have picked up their physical credentials and, accordingly, upon enforcement of the Court's Order will be ready to immediately resume reporting from the Pentagon. *See* Second Supp. Boutrous Decl., Ex. 8.

17