THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

THE NEW YORK TIMES COMPANY, *et al.*

　　　　　　　　　　　　　*Plaintiffs*,

　　　　v.

DEPARTMENT OF DEFENSE A/K/A
DEPARTMENT OF WAR,
*et al.*,

　　　　　　　　　　　　　*Defendants*.

Civil Case No. 25-cv-04218 (PLF)

**REPLY IN SUPPORT OF PLAINTIFFS' MOTION TO COMPEL**
**COMPLIANCE WITH THE COURT'S ORDER**

This Court's Order was clear. It declared unconstitutional, vacated, and set aside the Challenged Provisions of the Department's Policy regarding press credentials; declared unlawful "all actions" Defendants took to implement those provisions; permanently enjoined Defendants from implementing or enforcing them; and required Defendants to "immediately reinstate" the credentials of Plaintiff Julian Barnes and six other journalists with The New York Times ("The Times"). ECF No. 34 ("Order") at 1–3. By vacating the Challenged Provisions, the Court "re-establish[ed] the status quo." *Las Ams. Immigrant Advoc. Ctr. v. Dep't of Homeland Sec.*, 783 F. Supp. 3d 200, 233 (D.D.C. 2025); *see also* ECF No. 35 ("Op.") at 39 (explaining that the Order "le[ft] in place requirements that are no less stringent than in the previous regime"). It also rejected the Department's request for a remand for the Department to clarify the Policy's unconstitutional provisions and specifically found the Department's claimed need to restrict lawful newsgathering on Pentagon grounds for "security" and "safety" was "unfounded." *Id*. at 38–39; Hr'g Tr. at 57–59. As Plaintiffs' counsel told the Court at the summary judgment hearing, if the Court merely remanded without vacatur, "I can just see what's going to happen. They'll come up with another pretextual discriminatory policy. We will be back in court." *Id*. at 62–63. Despite the Court's

1

vacatur of the Challenged Provisions, Defendants have done just that.  They have flouted the Court's Order, as their Response confirms.

Defendants understand what this Court's Order required them to do; they simply don't want to do it.  Commander Parlatore complained that the Court's Order had "excised all of the security provisions and enforcement mechanisms" and required the reinstatement of reporters' access under the purportedly "toothless" policy that existed before.  ECF No. 37-7 (Second Supp. Boutrous Decl., Ex. 6).  But rather than appeal that order, and unwilling to return to the status quo as the Court directed, the Department instead hastily announced an Interim Policy to reinstate in new and more words certain of the Challenged Provisions that this Court held violate the First Amendment and Due Process Clause.  Specifically, as the Supplemental Declaration of Julian Barnes attests, the Interim Policy purports to reimpose the Department's prohibition on journalists asking questions of Department personnel outside of press conferences—lawful newsgathering activity it now calls "intentional inducement of unauthorized disclosure" instead of "criminal solicitation." Supp. Barnes Decl., ¶¶ 16–17.  And to ensure, despite this Court's ruling, that no journalist whose editorial viewpoint the Department disagrees with will have access to the Pentagon, the Department went a step further:  It shut down the Correspondents' Corridor essentially overnight, barred journalists' unescorted access to the Pentagon as a pretext to keeping disfavored journalists from engaging in independent newsgathering, and required PFAC holders to request such an escort at least 24 hours in advance.  And such requests may be denied for any reason, including on the basis of newsgathering and reporting that takes place anywhere in the world, not merely on Pentagon grounds.  *See* ECF No. 37-7.  These actions serve no purpose other than to strip PFACs of any value and circumvent the Court's Order.

Defendants' Response does nothing to dispel what is obvious for all to see: Defendants are flouting this Court's ruling and challenging its authority.[1]  Defendants' hollow protestations of good faith, and their effort to distance themselves from Commander Parlatore and his candid descriptions of the true purpose of the Interim Policy,[2] cannot be taken at face value.  Indeed, as the Court concluded based on undisputed facts, the "Department's previous PFAC requirements served its proffered interests in safety and security for decades and [] nothing in particular triggered the need for increased measures."  Op. at 39.  Defendants are in violation of this Court's Order and Opinion.  The Court should compel their compliance.

## I.    This Court Should Compel the Department to Comply with the Court's Judgment.

The Department concedes, as it must, that this Court has "the authority to enforce the terms of [its] mandate[]"—including granting relief as to a purportedly "new" policy that violates the Court's Order.  Response, ECF No. 41, at 1, 3–4.  But in construing that "authority," the Department claims this Court is limited to the exact, literal terms of its Order.  Not so.  In determining whether Defendants are violating its ruling, the Court has "the power to construe and interpret the language of [its] judgment," *Sierra Club v. McCarthy*, 61 F. Supp. 3d 35, 39 (D.D.C.

---

[1] This is by no means the first time in recent months that the government has done so.  *See, e.g.*, *AIDS Vaccine Advoc. Coal. v. Dep't of State*, 768 F. Supp. 3d 1, 4 (D.D.C. 2025) (enforcing temporary restraining order where the government was "continu[ing] . . . the very action that the Court temporarily enjoined"); *National Council of Nonprofits v. OMB*, 763 F. Supp. 3d 36, 50 (D.D.C. 2025) (the government "sought to overcome a judicially imposed obstacle without actually ceasing the challenged conduct," in what "appear[ed] to be nothing more than a thinly veiled attempt to prevent this court from granting relief"); *J.G.G. v. Trump*, 2026 WL 391937, at *1 (D.D.C. Mar. 12, 2026) (expressing concern that "the Government's responses essentially told the Court to pound sand"); *In re Search of One Device and Two Individuals Under Rule 41*, 784 F. Supp. 3d 234, 244 n.10 (D.D.C. 2025) (noting that due to the government's actions "[t]rust that had been earned over generations has been lost in weeks. . . . High deference is out; trust, but verify is in").

[2] ECF No. 41 ("Resp.") at 7 n.1 (stating that "Commander Parlatore" is "not litigation counsel"). Title aside, Commander Parlatore was the architect of the Policy and the Interim Policy and appeared for the Department at the hearing on the parties' cross-motions for summary judgment.

2014), and is "guided not only by the text of [its] order but also by its related opinions," *Garcia Ramirez v. Immigr. & Customs Enf't*, 2025 WL 3563183, at \*7 (D.D.C. Dec. 12, 2025) (citing *City of Cleveland v. Fed. Power Comm'n*, 561 F.2d 344, 346–47 (D.C. Cir. 1977)); *see also, e.g.*, *United States v. Facebook, Inc.*, 136 F.4th 1129, 1133–34 (D.C. Cir. 2025) ("A court order is not an isolated, self-contained writing but an order with the gloss of an accompanying opinion," and "injunctions should be read with all the connotations that are infused into their terms by the opinions of the issuing court." (cleaned up)); Mot. at 15–16.

After an agency's policy has been vacated, the agency may not resume the same policy based on an already discredited rationale, *Int'l Ladies' Garment Workers' Union v. Donovan*, 733 F.2d 920, 923 (D.C. Cir. 1984), nor "avoid[] . . . [an] injunction" either "through a mere change of terminology," *United States v. Christie Indus., Inc.*, 465 F.2d 1002, 1007 (3d Cir. 1972), or "experimentation with disobedience of the law," *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 192 (1949); *see* Mot. at 15–16. Enforcing a prior judgment against application of a new agency policy "is particularly appropriate" "where an administrative agency plainly neglects the terms of [an order], and the case then returns to the court—under the same docket number and involving the same parties—on a motion to enforce the original [order]." *Donovan*, 733 F.2d at 922. Injunctive relief is available in APA cases precisely to foreclose such violative conduct. *See Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*, 793 F. Supp. 3d 19, 109 (D.D.C. 2025).

**A. The Interim Policy resurrects Challenged Provisions this Court expressly vacated.**

The Department acknowledges that the Order expressly "vacated" the Challenged Provisions and enjoined Defendants from "implementing or enforcing [them]." Resp. at 3. And it does not appear to dispute that implementing those Provisions anew would violate the Court's Order. *Id.* at 4. Nor could it. *See, e.g.*, *Donovan*, 733 F.2d at 922–23. Instead, the Department

4

insists it has technically complied.  Resp. at 3.  But even through that purely technical lens, it plainly has not.

The crux of the Court's Order was to strike Defendants' regulation of journalists' newsgathering.  Yet, the Interim Policy continues expressly to provide that a reporter's violation of the Policy's restrictions on newsgathering "may result in suspension or revocation of your PFAC and loss of access to the Pentagon."  ECF No. 37-3 at 6.  The Interim Policy further provides that "PFACs may be denied, revoked, or not renewed if a person" violates its limitations on newsgathering, which are functionally identical to the limitations this Court vacated and enjoined. *Id*. at 4, 11, 16.  It also continues to state that "[m]embers of the news media do not possess a legal right to access the Pentagon; rather, such access is a privilege . . . extended by the government." *Id*. at 6.  The Court vacated those provisions.  Order at 2–3.  The Interim Policy purports to reinstate them.  That choice by the Department in particular—refusing to recognize that the granting of press credentials is subject to legal bounds, not merely a privilege or courtesy—underscores the Department's willful disregard for the law.

Those are far from the only examples.  As the Department's own redlines demonstrate, *see* Resp. at 8–12, the Interim Policy retains numerous sentences and paragraphs the Court vacated— sometimes making superficial, partial revisions or adding additional language conveying the same meaning, while retaining other vacated language verbatim.[3]  Thus, in even the most literal, hyper- technical sense, the Department has not complied with the Order; it has revived the very language this Court vacated and enjoined.

---

[3] *See* Resp. at 8 (retaining edited version of a vacated sentence at AR 3); *id*. at 8–9 (retaining edited version of a vacated paragraph at AR 3); *id*. at 9–10 (retaining two vacated paragraphs, with edits to one but not the other, at AR 6); *id*. at 10–11 (retaining edited version of vacated paragraph at AR 8); *id*. at 11 (retaining edited version of vacated paragraph at AR 15); *id*. at 12 (replacing two vacated phrases at AR 15 with substantially similar language).

**B. The Interim Policy's renaming of "solicitation" as "inducement" is a fig leaf attempting to mask the Department's violations of the Order.**

Defendants insist that the Interim Policy's prohibition on "intentional inducement of unauthorized disclosure" is beyond the scope of the Order, claiming it "is meaningfully, substantially different" than the "solicitation" provision this Court vacated. Resp. at 6. In reality, the Department is just using "more words to say the same thing"—effectively pretending this Court remanded to the Department to clarify the Policy's unconstitutional 'solicitation' provision, rather than vacate it and enjoin its enforcement against Plaintiffs. Second Supp. Boutrous Decl., ¶ 8, Ex. 6.

The Interim Policy's purported ban on "inducing" Department personnel to share unauthorized information continues to punish protected expression and to give the Department the same unbridled discretion this Court found unlawful. As this Court concluded, the Policy was unconstitutional because it swept "lawful journalistic practices" and "virtually any newsgathering" into its ambit, leaving reporters uncertain about what was forbidden and enabling the Department to make ad hoc decisions in favor of its preferred reporters and viewpoints. Op. at 23. The Department claims the Interim Policy fixes this problem by including a "scienter" requirement that supposedly allows it to treat asking questions as a violation. Resp. at 15.

As an initial matter, the requirement is a mirage. The Interim Policy *presumes* "scienter" whenever a journalist grants anonymity, or agrees to speak with a source on background or not for attribution, Resp. at 18—even though those journalistic practices are common and entirely lawful. The Department claims that presumption is reasonable because "the most obvious reason to offer anonymity" is that "the journalist knows the employee is not authorized by law to disclose the information sought." *Id.* at 19. That claim is baseless and wholly unsupported by the administrative record. And it is entirely wrong. As veteran Times journalist Barnes explains,

6

"many *authorized* sources, including high-ranking officials and Public Affairs Office staff, often ask for anonymity or agree to speak only on background, with their name withheld," for "various reasons." Supp. Barnes Decl., ¶ 17. Indeed, as the Department's press policies show, Department employees wanting anonymity undoubtedly know that they work for senior officials who cannot handle even the mildest of criticism.

Given that journalists "frequently" grant anonymity to sources, *see Zerilli v. Smith*, 656 F.2d 705, 711 (D.C. Cir. 1981), including ones unauthorized to speak to the press on the Department's behalf, and in light of the large swaths of information that may or may not meet the definition of "controlled unclassified information," Supp. Barnes Decl. ¶ 18, every *bona fide* Pentagon reporter routinely will be presumptively in violation of the Interim Policy. Although that presumption can theoretically be defeated "by evidence that the journalist did not know that the employee was unauthorized to disclose the information [sought]," ECF No. 37-2 at 14–15, the Interim Policy gives no clue what evidence will suffice, imposes no guardrails to ensure consistent enforcement, establishes no process for fair adjudication, fails to justify why journalists are presumptively guilty unless they prove themselves innocent, and expressly provides that any doubts will be resolved in the Department's favor. That leaves the Department where it started: free to decide when its "presumption" applies, when it has been rebutted, and ultimately who can maintain a PFAC *anytime* a reporter publishes information without identifying a source. This is precisely the standardless, unbridled discretion both the First and Fifth Amendments—and this Court's decision—forbid. *See* Op. at 23–25, 34–35.

In any event, even absent that "presumption," the Interim Policy's ban on "inducement" flouts this Court's emphatic determination that "a journalist asking questions is not a crime!" *Id.* at 22. Like criminal solicitation, *id.* at 21–22, inducement has a specific meaning in the criminal

law context.  It is not satisfied by merely posing a question, *see, e.g.*, *United States v. McKinley*, 70 F.3d 1307, 1312 (D.C. Cir. 1995); *Brandenburg v. Ohio*, 395 U.S. 444, 447–49 (1969)—much less in the context of newsgathering, *see* Op. at 21 ("The role of a journalist is to solicit information"); *cf. United States v. Al-Timimi*, 164 F.4th 292, 309 (4th Cir. 2026) ("Whether speech is framed as inciting imminent lawlessness under *Brandenburg* or constituting criminal solicitation or facilitation, that speech must do more than simply urge unlawful conduct.").[4] Despite its empty promises of respecting "ordinary newsgathering," the Department is in effect penalizing the asking of questions when, as this Court recognized, the proper way to protect secrets in a democracy with a free press is for government personnel to say no.

### C. The Interim Policy denies Plaintiffs the access this Court's Order required.

In ordering the Department to "immediately reinstate the PFACs of Barnes and" six other Times journalists, Order at 3, the Court recognized and vindicated Plaintiffs' constitutional rights to engage in protected newsgathering activity in a nonpublic forum free from vague, unreasonable, and viewpoint-discriminatory restraints—not a right to possess a piece of plastic that has no real-world effect.  *See Sherrill v. Knight*, 569 F.2d 124, 129 (D.C. Cir. 1977).  As the Court explained, PFACs are "press credentials that members of the media are issued *to access the Pentagon*."  Op. at 3 (emphasis added); *see also id*. at 4–5 (reporters use PFACs "to access the Pentagon," aside from "certain secure areas" that they are "restricted from accessing"); *id*. at 26 n.6 ("[T]he protection afforded newsgathering under the first amendment guarantee of freedom of the press . . . requires that this *access* not be denied arbitrarily or for less than compelling reasons.") (emphasis added) (quoting *Sherrill*, 569 F.2d at 129).  And this Court vacated the Policy's relevant provisions,

---

[4] The Department's shocking claim that a journalist pursuing information about the actions of the Department during a time of war "has no social value," Resp. at 17, is absurd, indicative of its improper purpose, and inconsistent with this Court's decision and the Constitution, Op. at 39–40.

restoring the status quo ante, *and* granted further injunctive relief because it found that Plaintiffs would suffer irreparable harm without such *access*: Plaintiffs' "arbitrar[y] exclu[sion] from sources of information" caused them "irreparable First Amendment harm," Op. at 37 (quoting *Sherrill*, 569 F.2d at 129–30), because "[w]ithout their PFACs, the plaintiffs lack 'the access to pursue [journalistically productive] conversations,'" *id*. at 37 (quoting *Karem v. Trump*, 404 F. Supp. 3d 203, 217 (D.D.C. 2019)); *see also Las Ams. Immigrant Advoc. Ctr.*, 783 F. Supp. 3d at 233 (vacatur "re-establish[es] the status quo absent the unlawful agency action") (quoting *Texas v. United States*, 40 F.4th 205, 209–20 (5th Cir. 2022)). "The only way to remedy the injury [from the loss of a press credential] is to return the hard pass *and the access that comes with it*." Op. at 37 (quoting *Karem*, 404 F. Supp. 3d at 217) (emphasis added) (alteration in original).

The Department is blatantly violating the Court's Order by eliminating the very access this Court compelled the Department to restore. The Department's statement that "[t]he specified journalists' PFACs have been reinstated," Resp. at 22, is false—or, at a minimum, true in only the most hollow and superficial sense. While it issued PFAC *cards* to Barnes and his colleagues, it simultaneously stripped them of the very access this Court directed be reinstated. Resp. at 1, 8–12. Far from "re-establish[ing] the status quo," *see Las Ams. Immigrant Advoc. Ctr.*, 783 F. Supp. 3d at 233, the Department has issued PFACs that appear to afford no access at all, other than possibly the right to access "workspace available at the Pentagon Library and Conference Center," Resp. at 24, which is located in a separate building, Supp. Barnes Decl. ¶ 9, or an "annex" that does not yet exist, Second Supp. Boutrous Decl. ¶ 9, Ex. 7. As Barnes explains in his declaration, the PFACs issued to journalists *before* the Court's Order "once scanned, had enabled [them] to enter through the turnstiles at the Pentagon entrance"; the PFACs issued by the Department this week do not. Supp. Barnes Decl. ¶ 7; *see also id*. ¶ 8 (stating that PFAC holders will "no longer

9

be allowed into the Pentagon without an escort from the Department"). "The point of a PFAC is to give journalists who regularly cover the Department, the United States military, and national security the ability to regularly work from the Pentagon." *Id*. ¶ 13. The PFACs reissued to Plaintiffs do not allow for that. In Barnes's words, the Interim Policy "make[s] the reinstated PFACs that were issued to me and my colleagues this week essentially worthless." *Id*.

The Interim Policy's requirement that PFAC holders can enter the Pentagon only for pre-approved events or appointments, accompanied by a Department escort, is not a reinstatement of Plaintiffs' right of access—it is a further muzzling of the free press and a resurrection of the Department's unfettered discretion. As Barnes explains, "[a]ll reporters, whether or not they hold a PFAC, can access the Pentagon if they obtain pre-approval to attend a specific press conference, event, or a pre-arranged interview." Supp. Barnes Decl. ¶ 13. Indeed, even under the provisions of the prior Policy, reporters without PFACs could apply for a "day pass" to attend a specified press conference, interview, or event, freely without escort. Stevenson Decl., ECF No. 10-5, ¶ 12. While the Policy previously contemplated the creation of an "annex," it never suggested that it would bar unescorted access to the Pentagon once such an "annex" was created. This brand new, unprecedented restriction on access is plainly retaliatory. *See Media Matters for Am. v. Paxton*, 138 F.4th 563, 570 (D.C. Cir. 2025) ("retaliation against a media company" for engaging in protected conduct violates the First Amendment (emphasis omitted)).

The escort requirement also confirms that the Department has retained the Policy's "vagueness and unbridled discretion" problems, Op. at 35, under a new label. The Interim Policy does not guarantee that requests for escorted access will be granted or specify any standards to govern the adjudication of such requests. Thus, the Interim Policy continues to "vest[] Department officials with 'unbridled discretion'" to determine which reporters to let in and which reporters to

10

keep out; it "provides no meaningful limitations," Op. at 31, 33, giving rise to the same, precise concerns about arbitrary and discriminatory enforcement and viewpoint discrimination that animated this Court's Order and Opinion.

This Court also made clear that reporters' protected newsgathering does not give rise to any valid "security" concerns that would justify the restriction of reporters' access to the Pentagon. It found Defendants' "assertion that vacatur would compromise the safety of the Pentagon [to be] unfounded," Op. at 39, a conclusion that echoes recent judicial experience with the Department, *see Anthropic PBC v. U.S. Dep't of War*, No. 3:26-cv-1996, ECF No. 134 (N.D. Cal. Mar. 26, 2026), at 19–24 ("The Challenged Actions . . . far exceed the scope of what could reasonably address [the Department's asserted] national security interest."). Yet again, in its Response, the Department points to its purported "legitimate security interest in preventing inducement of criminal conduct" (*i.e.*, unauthorized disclosure of information) "in its own headquarters." Resp. at 24. And although the Department has conceded "that [its] previous PFAC requirements served its proffered interests in safety and security for decades and that nothing in particular triggered the need for increased measures," Op. at 39, it now asserts without evidence that reporters pose an inherently heightened security "risk," relative to "[c]ommercial vendors operating in designated retail areas of the Pentagon." Resp. at 25. This Court has already rejected the Department's baseless assertion that it is "dangerous" to permit PFAC holders to have any "unescorted access," Resp. at 20. And, indeed, contrary to the Department's unsupported claims, it is the *deprivation* of reporters' unescorted access that is "unprecedented" and, from a First Amendment standpoint, "dangerous." *Citizens United v. FEC*, 558 U.S. 310, 340–41 (2010) ("Premised on mistrust of governmental power, the First Amendment stands against attempts to disfavor certain subjects or viewpoints. . . . By taking the right to speak from some and giving it to others, the Government deprives the

11

disadvantaged person or class of the right to use speech to strive to establish worth, standing, and respect for the speaker's voice."). In this way, too, the Interim Policy flouts the Order.[5]

### D. The Interim Policy carries forward the Department's viewpoint discrimination.

The Policy denied PFACs to journalists who engaged in independent journalism by seeking information beyond Department talking points and rewarded those "willing to . . . [be] spoon-fed by Department leadership." Op. at 30. Its purpose was to cultivate a press corps "on board and willing to serve our commander in chief," and chill speech that did not adhere to that vision of journalism. *Id.* This Court correctly found that aim was viewpoint discriminatory and that restrictions based on it were prohibited. Op. at 26–27. The Interim Policy violates this Court's Order by implementing that same viewpoint discrimination in two ways.

*First*, the Interim Policy prohibits reporters from seeking "unauthorized" information from, or granting anonymity to, most Pentagon personnel while expressly protecting—i.e., "notwithstanding" that policy—reporters who "ask[] questions [only] of Department personnel who are authorized to speak with the press, . . . *regardless of the subject matter of the question.*" ECF No. 37-2 at 15 (emphasis added). The same is true for "[c]ommunicating with Department personnel through official channels," no matter how sensitive the information they disclose. *Id.* The Interim Policy's assertion of neutrality, *see* Resp. at 20, rings hollow when it codifies and indeed doubles down on the same viewpoint discrimination favoring "spoon-fed" reporting that was there all along, Op. at 30.[6] That the policy also applies to the "new" Pentagon

---

[5] Notably, the Department no longer appears to be adhering to its longstanding policy of conducting a criminal background check on potential PFAC holders, *see* Burns Decl., ECF No. 10-4 (Burns Decl.), ¶ 15. This further underscores the false and pretextual nature of the Department's purported "security" concerns.

[6] Defendants insist that this Court's finding of a viewpoint discriminatory purpose cannot possibly mean that "every press regulation undertaken by the Department is equally tainted by viewpoint-discriminatory animus." Resp. at 16 (deeming such outcome "plainly untenabl[e]"). While that may be true as a general matter, the record before this Court betrays the Department's ongoing aim

press corps that has already agreed not to ask employees questions does not make it viewpoint-neutral. They are collateral damage in the Department's single-minded viewpoint discrimination against Plaintiffs and the other journalists who refused to limit their reporting to only government-approved information.

*Second*, the Interim Policy excludes all PFAC holders from any meaningful access to the Pentagon, defeating the mandate under this Court's Order that returned press access at the Pentagon to the status quo ante. *See* ECF No. 37-2 at 2–3, 7–8. Whether or not the Department would ordinarily have authority to effectively shut down reporters' meaningful access to the Pentagon (it would not), it is certainly prohibited from doing so arbitrarily, unreasonably, or for an improper purpose. *See Sherrill*, 569 F.2d at 129; *Perry v. Sindermann*, 408 U.S. 593, 597 (1972) (even when the government may act "for any number of reasons, "the government may not rely … on a basis that infringes [someone's] constitutionally protected interests—especially, his interest in freedom of speech"). As the Supreme Court recently explained, government officials can neither "use the power of the State to punish or suppress disfavored expression" nor "do indirectly what [they are] barred from doing directly." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 188, 190 (2024). And just as Defendants cannot deploy the Challenged Provisions to chill independent newsgathering, they cannot constitutionally "change the nature of a forum in order to deny access to a particular speaker or point of view." *Am. Freedom Def. Initiative v. Wash. Metro. Area Transit Auth.*, 901 F.3d 356, 365 (D.C. Cir. 2018) ("*WMATA*"). The Department seeks to defy this Court's Order, undermine this Court's authority, retaliate against Plaintiffs for this lawsuit and their First

---

of suppressing expression within the Pentagon based on editorial viewpoint. *Cf.* Op. at 30. The actions taken by the Department since the Court's Order was entered are plainly motivated by the same viewpoint-discriminatory animus underlying its prior Policy.

Amendment activities, and carry out the viewpoint-discriminatory aim that this Court already found motivated the original policy.  None of these purposes is valid.[7]

The First Amendment requires that restrictions, including the closure or partial closure of, or other changes to the nature of a nonpublic forum, must be reasonable and viewpoint neutral. *WMATA*, 901 F.3d at 365; *see also, e.g.*, *Koala v. Khosla*, 931 F.3d 887, 903 (9th Cir. 2019) ("We agree that a government is not obligated to indefinitely maintain a limited public forum, but we know of no case in which the government has been allowed to define a forum one way at its inception, then redefine it in response to speech it deems offensive and close only the portion of the forum where that speech occurs." (citation omitted)); *United States v. Griefen*, 200 F.3d 1256, 1262 (9th Cir. 2000) (closure permissible where government had legitimate purpose); *Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 77 (1st Cir. 2004) (closure permissible if done in "good faith"); *see also* Op. at 31 ("[A] policy regulating a nonpublic forum must be 'reasonable in light of the purpose served by the forum.'" (quoting *Minn. Voters All. v. Mansky*, 585 U.S. 1, 13 (2018)).

The Department is wrong that it may divest reporters of access so long as it purports to do so even-handedly.  Resp. at 19–21.  As this Court already explained, "a speech regulation that is neutral on its face may nonetheless be viewpoint discriminatory if it was adopted 'because of disagreement with the message [the speech] conveys.'"  Op. at 26–27 (alteration in original) (quoting *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 566 (2011)).  The Court already found that the Department's motive for its Policy violates the First Amendment.  The Department defied that judgment by issuing an Interim Policy to exclude Plaintiffs from the Pentagon in order to prevent

---

[7] For the same reasons, the decision to change the nature of the forum is arbitrary and capricious and is not reasoned agency decision-making.  *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (agency's consideration of factors it was not permitted to consider violates the APA); *see also Dep't of Comm. v. New York*, 588 U.S. 752, 782, 784–85 (2019) (action justified by pretextual rationale violates APA).

them from engaging in the type of independent newsgathering and reporting that the First Amendment protects, even if it also excludes others that it would otherwise give access to in order to achieve its viewpoint-discriminatory objective.

## CONCLUSION

Plaintiffs ask that this Court enforce its Order and Opinion and restore access to the Pentagon unfettered by viewpoint discrimination aimed at independent reporting on the facts.

Dated: March 29, 2026

Respectfully submitted,

*/s/ Theodore J. Boutrous, Jr.*
Theodore J. Boutrous, Jr. (D.D.C. Bar No. 420440)
Katie Townsend (D.D.C. Bar No. 1026115)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
(213) 229-7000
TBoutrous@gibsondunn.com
KTownsend@gibsondunn.com

Lee R. Crain (D.D.C. Bar No. NY0337)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
(212) 351-4000
LCrain@gibsondunn.com

Susan M. Pelletier*
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, NW
Washington, DC 20036-5306
(202) 955-8500
SPelletier@gibsondunn.com
*admitted pro hac vice*

*Counsel for Plaintiffs The New York Times Company and Julian E. Barnes.*

16