IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

THE NEW YORK TIMES COMPANY, *et al.*

*Plaintiffs*,

v.

DEPARTMENT OF DEFENSE A/K/A
DEPARTMENT OF WAR,
*et al.*,

*Defendants*.

Civil Case No. 25-cv-04218 (PLF)

**SUPPLEMENTAL DECLARATION OF JULIAN E. BARNES**

I, Julian E. Barnes, hereby declare as follows:

1.      I am over the age of 18 and make this declaration based upon my personal knowledge and experience.  If called to do so, I could and would competently testify to these matters under oath.

2.      I am a plaintiff in the above-captioned case.  I make this declaration in support of Plaintiffs' Motion to Compel Compliance with the Court's Order granting Plaintiffs' Motion for Summary Judgment.

3.      I am a national security reporter with The New York Times ("The Times").  I have worked for The Times since June 2018 and am assigned to The Times's Washington Bureau.  My work for The Times focuses on the Pentagon, United States intelligences agencies, and international security, among other subjects.

4.      As detailed in my prior declaration filed in this matter, I am one of seven Times reporters who held Pentagon Facility Alternate Credentials ("PFACs") issued by the Department of Defense (the "Department") before the Department adopted a new policy relating to PFACs in October 2025.

1

5.      On March 20, 2026, I learned that the Court had granted Plaintiffs' Motion for Summary Judgment and ordered the Department to vacate the unconstitutional provisions of its PFAC policy and to reinstate the PFACs previously held by me and my colleagues at The Times. I was enthusiastic about the prospect of regaining access to the Pentagon, which is extremely valuable to my work as a reporter.  I immediately sent an email to the Pentagon Press Office inquiring about how to pick up my reinstated PFAC so that I could access the Pentagon on the next business day, Monday, March 23.  Lawyers for The Times also sent inquiries asking how reporters from The Times could obtain their reinstated PFACs.

6.      On Monday, March 23, I received an email from the Pentagon saying I could pick up my PFAC between 6:00 am and 6:00 pm Eastern time from the Pentagon Press Office.  When I arrived at 8:00 am, a Pentagon public affairs officer told me that despite the email I received they could not give me a pass.  Instead, there was a set time between noon and 3:00 pm that the badge office would issue New York Times reporters new PFACs.  The public affairs officer told me this information was supposed to have been included in another email but had inadvertently been omitted.  I left and returned to the Pentagon visitor center at 1:00 pm.  I was escorted to the badge office where four other New York Times reporters were waiting to retrieve their reinstated PFACs. That same afternoon, I was notified that the Department had issued a revised "interim" policy (the "Interim Policy") governing PFACs and reporters' access to the Pentagon.  When I arrived at the Pentagon visitor center I was handed a copy of the Interim Policy.

7.      After my colleagues and I arrived at the badge office, we were given PFACs by Press Office staff.  The new PFACs were different from the ones we had previously held.  The Pentagon Press Office staff explained that, pursuant to the Interim Policy, the cards they were issuing to us would no longer give us access to the Pentagon:  While our previous PFACs, once

scanned, had enabled us to enter through the turnstiles at the Pentagon entrance, we were told that the new PFACs that were issued to us on March 23, 2026 did not.

8.    The Pentagon Press Office staff also told me and my colleagues from The Times that we, along with all other reporters, would no longer be allowed into the Pentagon without an escort from the Department, and that an escort would be provided only for pre-arranged interviews, press conferences, or other specified types of events.  We were also told that we would need to submit a request to attend such events at least one day in advance in order to obtain an escort, and that the request would need to be approved by the Department's Office of Public Affairs.

9.    The Pentagon Press Office staff also explained to me and my colleagues from The Times that our PFACs would enable us to access a new press area located in the Pentagon library, which is on the Pentagon grounds but in a separate building.  My colleagues and I asked how we could access the library because, to our knowledge, the only way to access it on foot is through a corridor that we were told we could no longer walk through.  The Pentagon Press Office staff indicated that they were unsure how we could access the library.  They suggested we could use a Pentagon shuttle bus but, as we pointed out, PFAC holders did not have permission to ride on the shuttle bus.  Ultimately, the Pentagon Press Office staff told us we needed to come back the next day for further instructions on how to access the library.  We were later told that PFAC holders would be given permission to ride on the shuttle bus.

10.    It was readily apparent to me that the Pentagon Press Office was unprepared for the changes effectuated by the Interim Policy.  It was clear to me that these new rules had been implemented hastily and in response to the Court's March 20, 2026 ruling that required reinstatement of our PFACs.

11.     For more than 20 years, I have regularly accessed the Pentagon in the course of my work as a reporter.  To my knowledge, this is the first time that the Department has ever barred reporters with PFACs from entering the Pentagon without an escort, a reservation, or an invitation to a specific press conference or event.

12.     The Interim Policy states that the Correspondents' Corridor—the area in the Pentagon where reporters used to work—is closed effective immediately.  Within the last few days, I have seen what I understand to be a photograph of the entrance to the Correspondents' Corridor which shows that the old signage, which said "Correspondents' Corridor," has been torn down.

13.     In my view, the new rules and restrictions imposed by the Interim Policy make the reinstated PFACs that were issued to me and my colleagues this week essentially worthless.  All reporters, whether or not they hold a PFAC, can access the Pentagon if they obtain pre-approval to attend a specific press conference, event, or a pre-arranged interview.  The point of a PFAC is to give journalists who regularly cover the Department, the United States military, and national security the ability to regularly work from the Pentagon.  Under the Interim Policy, that is no longer the case.

14.     No longer being able to access the Public Affairs Offices in the main Pentagon building is particularly frustrating for me.  Before the Department implemented new PFAC rules and restrictions last fall, I would frequently spend my days going from one Public Affairs Office to another to talk with Public Affairs staff.  There are numerous Public Affairs Offices within the Pentagon:  Among others, the Department of Defense, Joint Staff, Army, Navy, Air Force, and Marine Corps each have their own Public Affairs Office within the Pentagon, each of which is staffed by separate Public Affairs officials whose job is to liaise with the media.  In addition,

4

military intelligence agencies and combatant commands sometimes have public affairs officers within their Pentagon liaison offices.

15.     Before the Department implemented new PFAC rules and restrictions, the staff of these various Public Affairs Offices were frequent sources of information for my reporting.  Those are individuals who are expressly authorized to talk to the press.  In fact, it is in their job description.

16.     The Interim Policy says that the Department may deny, revoke, or not renew reporters' PFACs based on the "intentional inducement of unauthorized disclosures."  This would suggest that "authorized" and "unauthorized" disclosures can be easily distinguished from one another.  But in my experience, that distinction is much blurrier—particularly when it comes to conversations with Public Affairs staff who are authorized to talk to the press, but who may have a specific set of talking points that they may decide to deviate from, clarify, or expand upon.  Would I be "intentional[ly] induc[ing]" an "unauthorized disclosure" simply by asking a Public Affairs representative follow-up questions or seeking clarification in a way that pushes beyond that person's pre-approved talking points?  I do not know—but I do know that asking those kinds of questions, and seeking information that clarifies, contextualizes, or digs deeper than pre-approved talking points is in integral part of my job as a journalist.

17.     The Interim Policy also creates a "presumption" that when a reporter agrees to keep a source's identity anonymous or confidential, that reporter is intentionally inducing an unauthorized disclosure of information.  But in my experience, many *authorized* sources, including high-ranking officials and Public Affairs Office staff, often ask for anonymity or agree to speak only on background, with their name withheld—even if they are authorized to speak with me about the information in question.  There are various reasons why a source may wish not to have their

name published in connection with the information they provided, and honoring those preferences is often integral to my ability to gather and report the news.

18.    The Interim Policy, like the policy the Department put in place last fall, states that reporters' PFACs may be revoked, denied, or not renewed if the reporter solicits classified national security information or "controlled unclassified information." But I would not know the classification status of information unless it was told to me. And even after more than two decades as a national security and intelligence reporter, I do not know all the various kinds of information that qualify as "controlled unclassified information." That is not a designation that means anything to me, and I would not know how to avoid soliciting that information—other than by avoiding all information-gathering activities altogether.

19.    The Interim Policy continues to proscribe and threaten to punish routine newsgathering and, for the first time, it also deprives reporters of any meaningful Pentagon access at all. As with the PFAC policy the Department put in place last fall, I do not know how I would comply with the Interim Policy while continuing to do my job.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 27 day of March 2026 in ___Washington, D.C.___

Julian E. Barnes

6