UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

THE NEW YORK TIMES COMPANY,
et al.,

Plaintiffs,

v.

DEPARTMENT OF DEFENSE a/k/a
DEPARTMENT OF WAR, et al.,

Defendants.

Civil Action No. 1:25-cv-04218-PLF

SUPPLEMENTAL DECLARATION OF JOEL MANUEL VALDEZ

I, Joel Manuel Valdez, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

**INTRODUCTION**

1. I am Deputy Press Secretary within the Office of the Assistant to the Secretary of War for Public Affairs (OATSW(PA)). I previously submitted a declaration in this matter on March 27, 2026 (ECF No. 41-3). I submit this Supplemental Declaration in response to the Supplemental Declaration of Julian E. Barnes (ECF No. 44-1, "Barnes Supp. Decl.") filed on March 29, 2026, and the Second Supplemental Declaration of Julian E. Barnes (ECF No. 45, "Second Supp. Barnes Decl.") filed on March 31, 2026.

2. I have personal knowledge of the matters stated herein, and if called as a witness, I could and would testify competently thereto. My official duties include advising the Chief Pentagon Spokesman and Press Secretary on strategic communication, serving as the principal liaison between Pentagon Press Operations (PPO) desk officers and the Press Secretary, and overseeing the implementation of the Department's press access policies.

1

3. Throughout his supplemental declaration, Mr. Barnes attributes various claims to unnamed "Pentagon Press Office staff" and "a Pentagon public affairs officer" without identifying these individuals by name. Barnes Supp. Decl. ¶¶ 6, 7, 8, 9. These sources are unnamed not because they requested anonymity, but because Mr. Barnes did not identify them.

### A.  TIMELINE

4. Mr. Barnes's Supplemental Declaration indicated he picked up his PFAC and received a copy of the Interim Policy at around 1pm on "Monday, March 23." Barnes Supp. Decl. ¶ 6. That was incorrect, for two reasons.

5. First, Mr. Barnes could not have received a copy of the Interim Policy at 1:00 PM on Monday, because the policy had not been finalized or adopted at that time. The Interim Policy was not signed until approximately 4:15 PM Eastern on Monday, March 23. The Interim Policy was transmitted to Plaintiffs' counsel promptly upon signing. *See* ECF No. 37-6 (email to Plaintiff's counsel attaching revised policy, received by Plaintiff's counsel at 1:15 PM Pacific time—4:15 PM Eastern time—on Monday, March 23).

6. Second, Mr. Barnes—together with four other New York Times journalists—picked up his PFAC on Tuesday, March 24, not on Monday, March 23. Mr. Barnes corrected the date in his Second Supplemental Declaration.

7. On Monday, March 23, Commander Parlatore sent representatives from The New York Times a point of contact at the Pentagon Press Office — Major Andrea L. Kelly, PPO Operations Officer — to schedule PFAC pickup for Tuesday, March 24. Mr. Barnes's colleagues, New York Times journalists Helene Cooper and John Ismay, contacted Major

Kelly to schedule a pickup time and received instructions to pick up their PFACs between 12:00 PM and 3:00 PM.

8. Mr. Barnes did not schedule a pickup time through Major Kelly. Instead, he arrived at the Pentagon at 8:00 AM without having communicated with Major Kelly or other Pentagon staff.

9. Mr. Barnes declares that he "received an email from the Pentagon saying I could pick up my PFAC between 6:00 am and 6:00 pm Eastern time." Barnes Supp. Decl. ¶ 6. The email Mr. Barnes is referring to is an automated notification from the Pentagon Visitor Management System (VMS). PPO submitted Mr. Barnes into the VMS for arrival between 6:00 AM to 6:00 PM in order to ensure scheduling flexibility in the event Mr. Barnes had limited availability and could not pick up his PFAC between 12:00 PM to 3:00 PM.

**B.  <u>GRAPHIC DESIGN AND ACCESS</u>**

10. Mr. Barnes declares that the PFACs issued to him and his colleagues were "different from the ones we had previously held." Barnes Supp. Decl. ¶ 7. The PFACs issued on Tuesday, March 24 are the current PFAC version. The appearance of PFACs was updated in October 2025 to include a red banner with "PRESS" reflected in white text. The previous version that Mr. Barnes held did not have this red banner.

11. This graphic design change was announced in the October 6, 2025 Policy, which stated: "The new PFACs will have 'PRESS' clearly imprinted on them in red letters both vertically and horizontally to assist in identifying members of the press within the Pentagon." AR at 2.

12. The access granted by the PFACs issued on March 24 aligns with the Interim Policy. Specifically, the PFACs grant access to the Pentagon Library and Conference Center (PLC2) and the Corridor 8 Pedestrian Bridge Access Point. Access to the main Pentagon building requires escort by authorized Department personnel, consistent with the Interim Policy. The PFACs are configured to reflect the access arrangements described in the Interim Policy.

13. PFAC holders can enter the Pentagon and access PLC2 with their PFACs via a pedestrian bridge. *See* ¶¶ 15-21 below.

14. By Monday, March 23, I personally witnessed confirmation from the Pentagon's library leadership that a temporary workspace for PFAC holders, in PLC2, was ready for use. I was shown the spaces during a walkthrough.

### C. <u>PFAC HOLDERS HAVE UNESCORTED ACCESS TO PLC2</u>

15. Mr. Barnes declares that he and his colleagues "asked how we could access the library because, to our knowledge, the only way to access it on foot is through a corridor that we were told we could no longer walk through" and that "the Pentagon Press Office staff indicated that they were unsure how we could access the library." Barnes Supp. Decl. ¶ 9. Both of these statements are inaccurate, and the information necessary to correct them was available to Mr. Barnes in the policy document he received and from the personnel he had access to.

16. First, the PLC2 is not accessible only through the Pentagon. The PLC2 is accessible via the Corridor 8 Pedestrian Bridge, which connects the Pentagon's North Parking Lot to the PLC2. A PFAC holder does not need to enter the Pentagon to reach the PLC2. The PFAC holder can walk, drive, carpool, rideshare, or take the Pentagon shuttle bus to the North

Parking Lot and then cross the Corridor 8 Pedestrian Bridge to the PLC2. Journalists may park in the designated press parking area at the Connector Lot and proceed from there to the North Parking Lot by foot or by shuttle bus. In approaching the PLC2, a PFAC badge holder will be required to present the PFAC badge to access the PLC2 as is required of any and all badge holders with access to the PLC2.

17. Second, PPO staff did not indicate that they were "unsure how [Mr. Barnes and his colleagues] could access the library." PPO staff explained the access options to Mr. Barnes and his colleagues and stated that the decision on how to arrive at the Pedestrian Bridge — whether by walking, driving, or shuttle bus — was up to the journalists.

18. Third, the Interim Policy that Mr. Barnes received itself described PLC2 as the designated workspace and breaking news gathering point. The Interim Policy states that "[i]n breaking news situations, PFAC holders will gather at the Pentagon Library and Conference Center and be escorted into the Pentagon by authorized DoW personnel." ECF No. 37-2 at 7. The Interim Policy further states that "[a] new press workspace will be established in an annex facility outside the Pentagon." ECF No. 37-2 at 7. And the Interim Policy references Appendix D, which "shall be updated to reflect the relocation of the press workspace to the Pentagon Library and Conference Center." ECF No. 37-2 at 15.

19. Fourth, on the morning of Wednesday, March 25—two days before Mr. Barnes signed his Supplemental Declaration—PPO staff provided Mr. Barnes with photos and Google Maps screenshots to show him where to access PLC2.

20. Fifth, regardless, Mr. Barnes had multiple avenues to obtain accurate information about PLC2 access. His designated point of contact, Major Kelly, could have answered any questions. Indeed, his colleagues Cooper and Ismay used the designated POC and received proper instructions. Or he could have asked his counsel to confer with counsel for the defendants in this matter to raise concerns or seek clarification. Verifying information should be routine for a veteran Pentagon reporter.

21. Mr. Barnes also declares that "PFAC holders did not have permission to ride on the shuttle bus." Barnes Supp. Decl. ¶ 9. This is incorrect. Before the New York Times reporters received their PFACs, OATSW(PA) had already arranged for the Pentagon shuttle bus to transport PFAC holders to the PLC2. The shuttle bus route includes a stop near the Pentagon Library and Conference Center, as shown on the Pentagon Circulator flyer attached hereto as Exhibit A. Mr. Barnes was told that PFAC holders could use the shuttle bus and that the signage — which currently states "Common Access Card (CAC) required to ride DoD Shuttles" — would be updated to include PFAC holders. Despite being told he could ride the shuttle bus, Mr. Barnes presented the outdated signage to the Court as if it prohibited him from riding. The accommodation was already in place, and Mr. Barnes was informed of it well before he signed his supplemental declaration on March 27.

### D.  PFACs PROVIDE SIGNIFICANT ADVANTAGES OVER DAY PASSES

22. Mr. Barnes declares that the reinstated PFACs are "essentially worthless" because "[a]ll reporters, whether or not they hold a PFAC, can access the Pentagon if they obtain pre-approval to attend a specific press conference, event, or a pre-arranged interview."

Barnes Supp. Decl. ¶ 13. This is incorrect. There are significant differences between holding a PFAC and obtaining a day pass.

23. A day pass requires at least 24 hours advance notice and a background check conducted by the Pentagon Force Protection Agency (PFPA). A journalist without a PFAC who wishes to attend a press event must submit a request at least 24 hours in advance, undergo a background check, and wait for PFPA approval before being granted access.

24. A PFAC holder, by contrast, is already pre-cleared in the system. A PFAC holder does not need to undergo a background check each time he or she wishes to access the Pentagon. A PFAC holder requires only an escort, which can be arranged on short notice — including immediately, if needed. If a PFAC holder in the PLC2 workspace decides to interview a Department official or speak with Public Affairs staff (which Mr. Barnes "would frequently spend [his] days" doing as a PFAC holder, Barnes Supp. Decl. at ¶ 14), all the PFAC holder needs to do is contact that official's office or the Pentagon Press Office to arrange the interview, or reach out to the Public Affairs staff member. If the official or staff member is available, a staff member can escort the PFAC holder into the Pentagon immediately, with no waiting period.

25. Mr. Barnes declares that reporters "would need to submit a request to attend such events at least one day in advance in order to obtain an escort." Barnes Supp. Decl. ¶ 8. The Interim Policy contains no such requirement for PFAC holders. The 24-hour advance notice requirement applies to day passes — not to PFACs. *See* ECF No. 37-2 at 8-9 (Interim Policy specifying that a PFAC "affords escort privileges for up to three visiting media members from the [PFAC holder's] same media outlet," although such "[v]isiting media members must be entered into the PFPA Visitor Management System (VMS) …

no later than one business day in advance for U.S. citizens."). Mr. Barnes apparently did not seek clarification from his designated point of contact or by having his attorneys confer with counsel for the defendants in this matter.

26. To be clear, the Interim Policy does not require PFAC holders to submit requests to attend events or obtain escorts "at least one day in advance."

27. Just this morning, for example, the Department held a press briefing that was announced at approximately 3 PM Eastern yesterday. New York Times journalist and PFAC holder Greg Jaffe attended the press conference. Attending journalists, including Mr. Jaffe, were escorted to and from the press briefing seamlessly.

### E. THE INTERIM POLICY'S PROVISIONS ARE CLEAR

28. Mr. Barnes declares that the Interim Policy's prohibition on "intentional inducement of unauthorized disclosure" is unclear, and asks whether he would be in violation "simply by asking a Public Affairs representative follow-up questions or seeking clarification in a way that pushes beyond that person's pre-approved talking points." Barnes Supp. Decl. ¶ 16. The answer is no. Safe harbor (a) of the Interim Policy expressly protects "[a]sking questions of Department personnel who are authorized to speak with the press, including Public Affairs Officers, designated spokespersons, and other personnel speaking on the record in their official capacity, regardless of the subject matter of the question." ECF No. 37-2 at 15 (emphasis added). Follow-up questions, probing questions, and questions that push beyond talking points are all "questions" within the meaning of safe harbor (a). The safe harbor contains no limitation on the type, tone, or persistence of questions directed at authorized personnel. The copy of the Interim Policy that Mr. Barnes received makes this clear.

8

29. Mr. Barnes also declares that "many authorized sources, including high-ranking officials and Public Affairs Office staff, often ask for anonymity or agree to speak only on background, with their name withheld — even if they are authorized to speak with me about the information in question." Barnes Supp. Decl. ¶ 17. That situation raises no concerns under the policy, for two reasons. First, even if the presumption applied, safe harbor (a) protects "[a]sking questions of Department personnel who are authorized to speak with the press," "regardless of the subject matter of the question." ECF No. 37-2 at 15. That safe harbor applies whether or not the Public Affairs Office staff member is speaking on background, anonymously, off the record, or on the record with full attribution. Second, the presumption addresses a fundamentally different situation: where the journalist proactively offers anonymity as an inducement to get someone to talk who otherwise would not. When an employee voluntarily chooses to provide information and asks that his or her name not be used, the employee is the initiator of the disclosure — not the journalist. This is consistent with safe harbor (b), which protects "[r]eceiving unsolicited information, including classified national security information or controlled unclassified information." ECF No. 37-2 at 15. Just as the receipt of unsolicited information is protected, so too is the receipt of information from a source who voluntarily discloses and independently requests anonymity.

30. To be clear about how the "intentional inducement" provision operates in practice: the Department does not actively monitor published stories to identify anonymous sources, and the publication of a story with an anonymous source does not necessarily suggest a violation of the policy. For example, the anonymous source may have been a Press Office staffer (as Mr. Barnes says is "often" the case, *see* Barnes Supp. Decl. ¶ 17), the

anonymous source may have offered the information to the journalist (*see* ¶ 29 above), or the anonymous source may have been a "source relationship[]" developed "outside the Pentagon through independent reporting (Interim Policy safe harbor (d), ECF No. 37-2 at 15).

31. Department employees receive training on reporting attempted security breaches, including information security breaches. If a Department employee believes that anyone has attempted to induce the employee to disclose information the employee is not authorized to disclose, the proper means to report that attempt is through the Department's security reporting channels.

32. If an employee reports such an attempt, and the report identifies a specific journalist who offered anonymity or privacy protection to induce the employee to disclose information not authorized for release, the presumption may apply. The presumption is rebuttable— the journalist may provide evidence that he or she did not know the employee was not authorized to disclose the information, notwithstanding the offer of anonymity.

33. Critically, because the Interim Policy defines "intentional inducement of unauthorized disclosure" as inducing "a specific Department employee," the Department cannot act on this provision without identifying that specific employee. The publication of a story relying on anonymous sources does not, standing alone, provide the Department with sufficient information to satisfy the "specific Department employee" element. The only way the Department can identify the specific employee is through the employee's own report — not by reading a published story. Without a specific employee report identifying a specific journalist's specific conduct, the Department has no basis for action under this

provision. There is no "inquisition panel" that reviews published stories. The enforcement mechanism is employee-initiated, not Department-initiated.

34. Mr. Barnes declares that he does not "know all the various kinds of information that qualify as 'controlled unclassified information'" and that he "would not know how to avoid soliciting that information — other than by avoiding all information-gathering activities altogether." Barnes Supp. Decl. ¶ 18. Safe harbor (f) of the Interim Policy directly addresses this concern. It provides that "asking questions of any Department employee where the journalist does not know that the employee is not authorized to disclose the information sought" does not constitute "intentional inducement of unauthorized disclosure." ECF No. 37-2 at 15. If Mr. Barnes does not know whether information qualifies as CUI, and does not know whether the employee he is speaking with is authorized to disclose it, safe harbor (f) protects him. The intentional inducement provision applies only where the journalist *knows* the employee is prohibited from disclosing the information by "Article 92 of the [UCMJ] (10 U.S.C. §892), 18 U.S.C. § 1905, or 5 U.S.C. § 552a." ECF No. 37-2 at 14. Mr. Barnes's professed lack of knowledge about CUI categories is precisely the situation the safe harbor was designed to address.

### F.   THE DEPARTMENT'S WEEKEND COORDINATION

35. Mr. Barnes declares that "[i]t was readily apparent to me that the Pentagon Press Office was unprepared for the changes effectuated by the Interim Policy" and that "these new rules had been implemented hastily and in response to the Court's March 20, 2026 ruling." Barnes Supp. Decl. ¶ 10. The Department issued PFACs, prepared a workspace, and adopted the Interim Policy within two business days of the Court's order. That the

Department moved quickly to comply with a judicial order does not mean it was unprepared — it means the Department took the Court's order seriously and devoted significant resources to compliance on an expedited timeline.

## **EXHIBIT**

36. Attached hereto as **Exhibit A** is a true and correct copy of the Pentagon Circulator Service flyer, showing the shuttle bus route including the stop near the Pentagon Library and Conference Center.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on March 31, 2026 at Washington, D.C.

*Joel Valdez*
JOEL MANUEL VALDEZ
Deputy Press Secretary
Office of the Assistant to the Secretary of War for
Public Affairs
1400 Defense Pentagon
Washington, D.C. 20301-1400