UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE NEW YORK TIMES COMPANY, et al., <br><br> Plaintiffs, <br><br> v. <br><br> DEPARTMENT OF DEFENSE a/k/a DEPARTMENT OF WAR, et al., <br><br> Defendants. | Civil Action No. 1:25-cv-04218-PLF |

SECOND SUPPLEMENTAL DECLARATION OF JOEL MANUEL VALDEZ

I, Joel Manuel Valdez, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

**INTRODUCTION**

1. I am Deputy Press Secretary within the Office of the Assistant to the Secretary of War for Public Affairs (OATSW(PA)). I previously submitted declarations in this matter on March 27, 2026 (ECF No. 41-3) and March 31, 2026 (ECF No. 46). I submit this Second Supplemental Declaration in response to the Third Supplemental Declaration of Julian E. Barnes (ECF No. 48-2) filed on April 2, 2026, and the Post-Hearing Brief (ECF No. 48-1) filed the same day.

2. I have personal knowledge of the matters stated herein, and if called as a witness, I could and would testify competently thereto.

**MR. BARNES'S ACCOUNT OF THE PLC2 CONVERSATION**

3. Mr. Barnes declares that "Mr. Valdez was not present when that conversation took place, and I stand by the accuracy of my statements." Third Barnes Decl. ¶ 3. I was not present during Mr. Barnes's conversation with PPO staff on March 24, 2026. However, before

1

submitting my first Supplemental Declaration, I spoke with both PPO staffers who interacted with Mr. Barnes on that day. Both confirmed the account I provided to the Court. My declaration was based on the facts—not on speculation.

**THE MARCH 31 INTERVIEW WITH A SENIOR DEPARTMENT OFFICIAL**

4. Mr. Barnes declares that on Monday, March 30, 2026, he scheduled an interview with "a Department official" for Tuesday, March 31, 2026. Third Barnes Decl. ¶ 5. This is correct. In response to an interview request made by Mr. Barnes, a senior Department official granted an interview. OATSW(PA) facilitated the logistics of the interview as a liaison but was not involved in setting the terms of the interview.

5. Mr. Barnes declares that "the press office later requested that interview be on background — meaning he would be an anonymous source." Third Barnes Decl. ¶ 5. To clarify: the senior official's office requested that the interview be conducted on background. This was the official's preference, not a request from OATSW(PA) or the Pentagon Press Office. The decision to conduct an interview on background is a routine matter between the official and the journalist. It is not uncommon for senior Department officials to speak with reporters on background, and the decision to do so is made by the official — not by the press office.

6. This fact is relevant to the anonymity presumption in the Interim Policy. The presumption is triggered when a journalist *offers* anonymity or privacy protection to a Department employee "in exchange for information." ECF No. 37-2 at 14. Here, the official's office requested background treatment — the journalist did not offer it as an inducement. This is precisely the distinction the Interim Policy draws: when the source initiates the request for anonymity, the journalist is not "offering" anything. The presumption does not apply.

2

7. If that were not enough, the interview is also covered, in its entirety, by safe harbor (e), which applies to "interviews arranged through public affairs offices." ECF 37-2 at 15.

## MR. BARNES'S ESCORT ON MARCH 31

8. Mr. Barnes declares that on March 31, 2026, he arrived at the Pentagon Visitor Center for his scheduled interview, was told that PFAC holders must enter through Corridor 8, and was unable to meet his escort in the Visitor's Center as planned. Third Barnes Decl. ¶ 6.

9. This was a one-off event, not a result dictated by the Interim Policy. Mr. Barnes's escort had not been fully briefed on the access procedures for PFAC holders under the Interim Policy. Going forward, OATSW(PA) and PFPA will permit reporters visiting the Pentagon to be escorted through either the Visitor's Center or Corridor 8, reducing the risk for any confusion in the future.

10. Mr. Barnes also declares that "the interview was postponed, and I was immediately escorted out of the building." Third Barnes Decl. ¶ 6. The interview was postponed because the senior official was in a meeting that overlapped with Mr. Barnes's scheduled interview time and could not leave in time to conduct the interview. This was a routine scheduling conflict, not a consequence of the Interim Policy or any restriction on Mr. Barnes's access. The interview has been rescheduled.

## THE MARCH 31 PRESS CONFERENCE

11. Mr. Barnes declares that his colleague's experience of the March 31 press conference was not "seamless" and describes various security requirements, including early arrival, wristbands, and restrictions on restroom access. Third Barnes Decl. ¶ 11.

12. The aspects of the press conference about which Mr. Barnes's colleague complains—the arrival time and wristbands—are standard security protocols for events involving the Secretary. They are not new, and they are not imposed by the Interim Policy.

13. As is the case with all bilateral meetings when the Secretary of War is present, reporters who have received confirmation to attend must arrive no later than 7:00 AM Eastern in order to be properly screened. The wristbands indicate to security personnel that the wearer has been screened and does not require additional security checks. These requirements apply to all media — credentialed and non-credentialed alike — and are standard security protocols for events involving the Secretary. In every media advisory announcing a morning press briefing, the email clearly indicates that press must arrive no later than 7:00 AM, briefings begin at 8:00 AM, and reporters must be in their seats no later than 7:30 AM.

14. Mr. Barnes also states that his colleague was "told they need to have an escort to use the restrooms and could not use the restrooms after 7:30 a.m. because it would present a security risk." Third Barnes Decl. ¶ 11. The restrooms nearest to the Pentagon Briefing Room are located down the hall in proximity to the Joint Chiefs of Staff corridor — a restricted area. Journalists require an escort to access that area. PPO staff informed reporters of this logistical reality and recommended that they use the restrooms before 7:30 AM — when escorts were readily available — to avoid delays once the briefing commenced. This was a practical accommodation, not a punitive restriction. The fact that every reporter whose RSVP was confirmed was screened, escorted into the building, and prepared for the press briefing by 8:00 AM confirms that the process functioned as intended.

4

## THE ANONYMITY DISTINCTION IN PRACTICE

15. Mr. Barnes declares that the distinction between a journalist offering anonymity and a source requesting it is "blurry" in practice, and that "conversations sometimes go on and off the record, with it unclear exactly who initiated what." Third Barnes Decl. ¶ 10. The Interim Policy's anonymity presumption addresses a specific, identifiable situation: where a journalist proactively offers anonymity or privacy protection to a Department employee as an inducement to disclose information the employee is not authorized to disclose. It does not address the fluid, conversational dynamics Mr. Barnes describes — where parties negotiate terms of engagement as a conversation unfolds, or where a source independently requests that his or her name not be used.

16. When an employee voluntarily chooses to provide information and asks that his or her name not be used, the employee is the initiator of the disclosure — not the journalist. This is consistent with safe harbor (b), which protects the receipt of unsolicited information. Just as the receipt of unsolicited information is protected, so too is the receipt of information from a source who voluntarily discloses and independently requests anonymity. The presumption addresses a fundamentally different situation: where the journalist proactively offers anonymity as an inducement to get someone to talk who otherwise would not.

17. As I explained in my prior Supplemental Declaration, the Department does not actively monitor published stories to identify anonymous sources. The enforcement mechanism is employee-initiated: if a Department employee believes a journalist has attempted to induce the employee to disclose unauthorized information, the employee reports the attempt through the Department's existing security reporting channels. Because the

5

Interim Policy requires identification of "a specific Department employee," the Department cannot act without a specific employee report identifying a specific journalist's specific conduct. The publication of a story with anonymous sources does not, standing alone, provide the Department with sufficient information to act.

**MR. BARNES'S CHARACTERIZATION OF THE SCHEDULING PROCESS**

18. Mr. Barnes declares that "going through a sometimes-lengthy process of scheduling official appointments in order to ask even one or two questions to an official… does not allow for meaningful engagement with Department personnel on a timeline consistent with news reporting." Third Barnes Decl. ¶ 8. As I explained in my prior Supplemental Declaration, PFAC holders are pre-cleared in the system and do not need to undergo a background check each time they wish to access the Pentagon. A PFAC holder requires only an escort, which can be arranged on short notice — including immediately, if needed.

19. To the extent Mr. Barnes experiences delays in scheduling interviews with Department officials, those delays are attributable to the officials' own schedules — not to the Interim Policy. Before the Interim Policy, if Mr. Barnes wished to interview a specific Department official, he still had to schedule through that official's office and wait for the official to be available. The Interim Policy does not change the officials' scheduling process. The only additional step is the escort from PLC2 to the official's office, which can be arranged immediately once the official is available. Mr. Barnes's own experience last week demonstrates this: he scheduled an interview with a senior Department official on Monday and the interview was arranged for Tuesday — with less than 24 hours' notice.

6

20. Mr. Barnes also declares that "Pentagon officials and personnel are not permitted to and do not discuss classified or national-security sensitive information in Pentagon hallways." Third Barnes Decl. ¶ 9. Pentagon officials and personnel are not permitted to discuss classified or national-security sensitive information with reporters in any setting. However, the security concern addressed by the escort requirement is not limited to the verbal disclosure of classified information in hallways. Unescorted access to hallways near sensitive spaces can provide information about activity patterns within the Pentagon — such as which officials are meeting, when, and in what configuration — that may be used to identify and target sources for unauthorized disclosures of non-public information. The escort requirement addresses this broader information-security concern.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on April 6, 2026 at Washington, D.C.

*Joel Valdez*
JOEL MANUEL VALDEZ
Deputy Press Secretary
Office of the Assistant to the Secretary of War for
Public Affairs
1400 Defense Pentagon
Washington, D.C. 20301-1400