THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

THE NEW YORK TIMES CO., *et al.*

　　　　　　　　　　　*Plaintiffs*,

　　　　v.

DEPARTMENT OF DEFENSE A/K/A
DEPARTMENT OF WAR, *et al.*,
　　　　　　　　　　　*Defendants*.

Civil Case No. 25-cv-04218 (PLF)

### POST-HEARING BRIEF IN SUPPORT OF PLAINTIFFS' MOTION TO COMPEL COMPLIANCE WITH THE COURT'S ORDER

The Supplemental Declaration of Deputy Press Secretary Joel Manuel Valdez, ECF No. 46, neither refutes the testimony of Plaintiff Julian E. Barnes nor demonstrates that Defendants are in compliance with this Court's Order of March 20, ECF No. 34.  To the contrary, Mr. Valdez's declaration, as well as Defendants' actions since the hearing on March 30, only further illustrate that Defendants are openly flouting this Court's ruling.

First, Mr. Valdez confirms that the PFACs issued to Mr. Barnes and other journalists with The New York Times ("The Times") last week no longer allow them to access Pentagon press areas—including the press briefing room and public affairs offices—which flies in the face of this Court's March 20 ruling.  The new PFACs grant them access only to a shuttle bus and a separate building containing a library and conference center.  Supp. Valdez Decl. ¶ 12; Supplemental Declaration of Julian E. Barnes, ECF No. 44-1, ¶¶ 9–15.  Now, PFAC holders may access the Pentagon only when invited or when their visit is otherwise approved by the Department, and only if they are accompanied by an escort at all times—effectively establishing a new ad hoc, unbridled-discretionary licensing regime in response to this Court's order striking down the previous one. *Id.* ¶¶ 22–24.  Mr. Valdez states that PFAC holders can forego one background check requirement, such that their visits, theoretically, can be arranged on short notice (upon invitation or approval).

*Id.* ¶¶ 24–27.  But that does not provide PFAC holders with the ability to enter the Pentagon or obtain an escort absent express authorization from the Department, which can be denied for any or no reason without application of any discernible standards; moreover, as the Interim Policy arbitrarily states, only three PFAC holders from The Times may be granted such access at one time, ECF No. 37-2 (Interim Policy) at 8–9.  Plaintiffs' access to and ability to speak with Pentagon personnel inside of the building are therefore limited to official press events and must be expressly approved by leadership based on their whims about who should be allowed to enter the building on any given day.  This is a radical departure from the longstanding status quo that existed prior to the Department's issuance of its unconstitutional Policy.  For decades, Plaintiffs and other reporters were able to move throughout the building and engage with Pentagon press officials and other personnel in order to provide timely reporting to the American public; and they did so without posing any safety or security risk to the Pentagon.  Pl. MSJ, ECF No. 10-1, at 13–17.

The Interim Policy is an affront to the authority of this Court—another attempt by the Department to engage in the sort of editorial viewpoint discrimination that just two days ago the Supreme Court again recognized as "egregious" and that a court in this District explained was on full display by the Administration against two other media outlets.  *See Chiles v. Salazar*, — U.S. —, 2026 WL 872307, at *9 (2026); *Nat'l Pub. Radio, Inc. v. Trump*, — F. Supp. 3d —, 2026 WL 877434, at *20–21 (D.D.C. Mar. 31, 2026) ("[T]he Executive Order [against NPR and PBS] discriminates based on viewpoint," against "bedrock principles of First Amendment jurisprudence").  This Court likewise found the original Policy was motivated by unlawful viewpoint discrimination and violated the First Amendment.  MSJ Op., ECF No. 35, at 30 ("[T]he Policy discriminates not based on political viewpoint but rather based on editorial viewpoint—that is, whether the individual or organization is willing to publish only stories that are favorable to or

spoon-fed by Department leadership."). The Interim Policy's effort is to carry out the same goal, directly contrary to this Court's judgment and injunction. *See*, *e.g.*, Op. at 3–4, 26 & n.6, 39–40.

Second, Mr. Valdez's declaration makes plain that the Interim Policy presumptively strips PFAC holders of their credentials for asking questions. Supp. Valdez Decl. ¶ 29 ("the [anonymity] presumption addresses a . . . situation . . . where the journalist proactively offers anonymity as an inducement to get someone to talk who otherwise would not").[1] It does so despite this Court concluding both (1) that the government cannot constitutionally punish a journalist simply for asking questions, Op. at 21–22, and (2) that the desire to exclude journalists who insist on engaging in independent journalism, including asking questions of Department personnel, is viewpoint discrimination, *id.* at 29–30. That the Policy purports to apply this regime only to certain types of questions asked to certain types of Pentagon personnel in no way makes it compliant with that mandate. Mr. Valdez—who has worked in a public affairs role for the Department for less than one year, and has no journalism experience or prior experience in a public affairs role for any other government agency—contemplates a sharp distinction between situations when someone comes to a journalist with specific information and demands anonymity to disclose it, and those when the journalist comes to the source requesting a specific piece of information and offers anonymity. *See* Third Supp. Declaration of Julian Barnes ¶ 10. As Mr. Barnes explains, however, in the real world, journalists have conversations with sources that may span multiple topics that go on and off the

---

[1] Following the hearing on March 30, Commander Parlatore—the architect of the Policy and Interim Policy who transmitted the Interim Policy to Plaintiffs—made clear the Department will continue to hold journalists responsible for any unauthorized disclosures by Pentagon officials and view routine journalistic activity as criminal. @ErikWemple, (Mar. 30, 2026), https://x.com/erikwemple/status/2038721445182779573?s=43 (Commander Parlatore stating, in response to a reporter's question regarding the Court's observation that Department officials can "just say no" if asked for information they are not permitted to disclose: "Yes, just like it's on the hit man to say, 'No,' when somebody asks them, 'Hey if I pay you, can you kill this person?'").

record, with it unclear exactly who initiated what or how a mutual agreement about proceeding without attribution affected the individual's willingness to share information. *Id.*

Nor does Mr. Valdez's assurance—found nowhere in the Interim Policy—that it will be enforced only upon a complaint by a Department employee, Supp. Valdez Decl. ¶¶ 30–33, lessen its unconstitutional chill. Plaintiffs have no way to hold the Department to Mr. Valdez's latest proffered interpretation of the Interim Policy and, particularly in light of the Department's lack of good-faith compliance with the Court's Order, Plaintiffs have no reason to trust that officials will not follow the Interim Policy's express language and revoke PFACs based on information in Plaintiffs' reporting whenever it is not tied to a specific, authorized source.

The remainder of Mr. Valdez's declaration amounts to a weak attempt to discredit Mr. Barnes's testimony. Notably, however, it does not contradict it. Mr. Valdez claims that it is "inaccurate" that Pentagon Press Office personnel said the only way to access the Pentagon library was through an inaccessible corridor and that they were "unsure" how the library could be accessed by PFAC holders. Supp. Valdez Decl. ¶¶ 15–17. Mr. Valdez, who was not present during that conversation and has no personal knowledge of what statements were made to Mr. Barnes and his colleagues, throws the press official under the bus. Mr. Barnes also readily acknowledged, in his Supplemental Declaration, that he was *later* informed that PFAC holders would be given access to the shuttle bus, *see* ECF No. 44-1 at ¶ 9; *contra* Supp. Valdez Decl. ¶ 21. At best, Mr. Valdez's testimony only makes clear that Pentagon Press Office personnel were confused by what the Interim Policy required, underscoring not only its unintelligible language but also the hasty way in which the Department rushed to implement it. And its implementation in the days since, as Mr. Barnes attests, has been far from "seamless[]" as Mr. Valdez claims. Third Supp. Declaration of Julian Barnes ¶ 11 (averring that he was prohibited from entering the Pentagon to meet his escort

4

in the Visitor's Center, the agreed location, for an approved interview, and noting the Department's refusal to allow journalists attending a press conference to go to the bathroom without an escort).

The Department's latest interpretations of the Interim Policy proffered in Mr. Valdez's declaration, Supp. Valdez Decl. ¶¶ 28–34, do nothing to undermine Mr. Barnes's testimony. Instead, they betray the Department's fundamental misunderstanding about how journalism works and lack of respect for the role of a free press in our democracy. *See* Third Supp. Declaration of Julian Barnes. In the end, Mr. Valdez's representations are irrelevant. The Court did not just vacate the original PFAC Policy. It also enjoined Defendants from enforcing its unconstitutional measures, and mandated that Plaintiffs' credentials (and, necessarily, the access and same bundle of liberty and property rights those credentials provided) be reinstated.[2] Order at 3. Accordingly, what matters for purposes of Plaintiffs' pending motion is whether Defendants have complied with that mandate. The Interim Policy, counsel's arguments, and both Mr. Barnes's and Mr. Valdez's declarations all make clear that it has not. The Department has used more and slightly different words to achieve the same unconstitutional result. But "[t]he First Amendment is no word game." *Chiles*, 2026 WL 872307, at *9. The Interim Policy still "censors speech based on viewpoint"— which "the First Amendment stands as a shield against." *Id.* at *13.

## CONCLUSION

Plaintiffs respectfully ask that this Court enforce its Order and Opinion.

---

[2] This distinguishes the present motion from those at issue in *Neguse v. U.S. Immigr. & Customs Enf't*, No. 25-CV-2463, 2026 WL 137017, at *1 (D.D.C. Jan. 19, 2026), and *Asylum Seeker Advoc. Project v. U.S. Citizenship & Immigr. Servs.*, No. 25-cv-3299 (D. Md. Jan. 13, 2026), ECF 70, which Defendants rely on. In neither matter had the agency adopted a new policy that violated *a permanent injunction*, as is the case here. By contrast, and in more analogous circumstances, the D.C. Circuit has explained that an agency cannot evade a motion to enforce simply because it codifies its non-compliance in a new or interim policy adopted following judgment. *See Int'l Ladies' Garment Workers' Union v. Donovan*, 733 F.2d 920, 923 (D.C. Cir. 1984).

Dated: April 2, 2026

Respectfully submitted,

*/s/ Theodore J. Boutrous, Jr.*
Theodore J. Boutrous, Jr. (D.D.C. Bar No. 420440)
Katie Townsend (D.D.C. Bar No. 1026115)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
(213) 229-7000
TBoutrous@gibsondunn.com
KTownsend@gibsondunn.com

Lee R. Crain (D.D.C. Bar No. NY0337)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
(212) 351-4000
LCrain@gibsondunn.com

Susan M. Pelletier*
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, NW
Washington, DC 20036-5306
(202) 955-8500
SPelletier@gibsondunn.com
*admitted pro hac vice*

*Counsel for Plaintiffs The New York Times Company and Julian E. Barnes.*

6