UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| THE NEW YORK TIMES COMPANY, et al., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 25-04218 (PLF) |
| DEPARTMENT OF DEFENSE, et al. | ) ) | |
| Defendants. | ) ) ) | |

OPINION

Proposed by Congress in 1789, and ratified in 1791, the First Amendment to the

Constitution of the United States provides:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

U.S. Const. amend. I.

The First Amendment empowers the press to publish what it will and the public to

read what it chooses, free of official proscription.  In the words of Justice Black:

> In the First Amendment the Founding Fathers gave the free press the protection it must have to fulfill its essential role in our democracy. The press was to serve the governed, not the governors.  The Government's power to censor the press was abolished so that the press would remain forever free to censure the Government.  The press was protected so that it could bare the secrets of government and inform the people.  Only a free and unrestrained press can effectively expose deception in government.  And paramount among the responsibilities of a free press is the duty to prevent any part of the government from deceiving the people . . . .

N.Y. Times Co. v. United States, 403 U.S. 713, 717 (1971) (Black, J., concurring).  As the

Supreme Court recently affirmed, "[t]he First Amendment is no word game.  And the rights it

protects cannot be renamed away or their protections nullified by 'mere labels.'"  Chiles v.

Salazar, 607 U.S. ____, 2026 WL 872307, at *9 (Mar. 31, 2026) (quoting NAACP v. Button,

371 U.S. 415, 429 (1963)).

On the evening of Friday, March 20, 2026, this Court entered an Order declaring

specific provisions of a policy newly issued by the Department of Defense (the "Department)

regarding Pentagon Facilities Alternate Credentials ("PFACs") (the "Policy") to be unlawful and

in violation of the First and Fifth Amendments to the United States Constitution.  See Order of

March 20, 2026 ("Order") [Dkt. No. 34].[1]  The Court vacated and set aside those provisions (the

"Challenged Provisions") as to The New York Times Company ("The Times") and Julian E.

Barnes, a long-time national security reporter with The Times, as well as all regulated parties.

Id. at 1-3.  The Court also permanently enjoined the defendants from implementing or enforcing

---

[1]    The documents reviewed by the Court in connection with the pending motion include:  Plaintiffs' Motion to Compel Compliance with the Court's Order ("Pls. Mot.") [Dkt. No. 37]; Second Supplemental Declaration of Theodore J. Boutrous ("Second Supp. Boutrous Decl.") [Dkt. No. 37-1] and Exhibits [Dkt. Nos. 37-2 to -9]; [Corrected] Brief of Pentagon Press Association as Amicus Curiae in Supp. of Pls.' Mot. to Compel Compliance [Dkt. No. 39]; Defendants' Opposition to Plaintiffs' Motion to Compel Compliance with the Court's Order ("Defs. Opp.") [Dkt. No. 41]; Declaration of Michael Bruns ("Bruns Decl.") [Dkt. No. 41-1]; Declaration of Joel Manuel Valdez [Dkt. No. 41-3]; Plaintiffs' Reply to Opposition to Plaintiffs' Motion to Compel Compliance with the Court's Order ("Reply") [Dkt. No. 44]; Supplemental Declaration of Julian E. Barnes ("Supp. Barnes Decl.") [Dkt. No. 44-1]; Second Supplemental Declaration of Julian E. Barnes [Dkt. No. 45]; Supplemental Declaration of Joel Manuel Valdez ("Supp. Valdez Decl.") [Dkt. No. 46]; Plaintiffs' Post-Hearing Brief in Support of Plaintiffs' Motion to Compel Compliance with the Court's Order ("Pls. Supp. Br.") [Dkt. No. 48-1]; Third Supplemental Declaration of Julian E. Barnes ("Third Supp. Barnes Decl."); Defendants' Response to Plaintiffs' Supplemental Brief ("Defs. Supp. Br.") [Dkt. No. 51]; Second Supplemental Declaration of Joel Manuel Valdez ("Second Supp. Valdez Decl.") [Dkt. No. 51-1]; and Transcript of Oral Argument on Plaintiffs' Motion to Compel Compliance with the Court's Order ("OA Tr.").

those provisions "to deny, suspend, revoke, or not renew the PFAC of" any journalist from The Times, and it ordered the immediate reinstatement of the PFACs previously held by The Times' reporters. Id. at 3.

Four days later, the plaintiffs returned to Court to file the instant motion to compel compliance with the Court's Order. See Pls. Mot. The plaintiffs assert that the Department has attempted an "end-run around this Court's ruling" by hastily issuing a new "interim" policy that defies the Court's Order in both "letter and spirit." Id. at 1-2. In response, the defendants argue that the Department has refrained from implementing or enforcing the Challenged Provisions, as the Court's Order required. See Defs. Opp. at 1-2. But the defendants maintain that the Order does not preclude the Department from issuing a new policy, which they contend is what the Department has done. See id. After considering the parties' written submissions, their oral arguments, and the relevant caselaw, the Court concludes that the defendants have failed to comply with its Order.

## I. BACKGROUND

The Court discussed the background of this case at length in its Opinion issued on March 20, 2026. See Opinion of March 20, 2026 ("Op.") [Dkt. No. 35]. For purposes of the instant motion, it is sufficient to note the following. On March 21, 2026, the day after this Court issued its Order and Opinion, the plaintiffs sent a letter to the Department asking how the seven Times reporters identified by name in the Order could obtain their reinstated PFACs. See Second Supp. Boutrous Decl. at Ex. 4. Counsel for amici the Pentagon Press Association also wrote to the Department to ask "when and how the Department will return the revoked PFACs and restore the access it revoked on October 15, 2025." Id. at Ex. 3. Following a few additional inquiries, counsel for the Department emailed counsel for the plaintiffs late in the afternoon of

Monday, March 23, providing contact information for The Times' journalists to "schedule pickup" of their physical credentials.  Id. at Ex. 5.  In that same email communication, the Department provided the plaintiffs with a "revised policy, in accordance with the Court's decision."  Id.

The "revised policy" consists of a "Memorandum for Senior Pentagon Leadership" from Chief Pentagon Spokesman Sean Parnell (the "Memorandum" or "Mem."), a "Pentagon Reservation In-Brief for Media Members" (the "In-Brief"), and an Appendix (together with the In-Brief, the "Interim Policy").  See Second Supp. Boutrous Decl. at Ex. 1 [Dkt. No. 37-2].  The Memorandum states that the Department "disagrees with the Court's decision and is pursuing an appeal."  Mem. at 1.[2]  But "[i]n the interim," the Memorandum explains, the Interim Policy will be in effect to "preserv[e] the Department's legitimate security interests and its statutory obligation to ensure the safe, efficient, and secure operation of the Pentagon Reservation."  Id.  The Memorandum further states that the Interim Policy "addresses the provisions the Court vacated while retaining all physical access restrictions, conduct requirements, and security measures that were not at issue in the litigation."  Id.  In addition, the Memorandum asserts that "[t]he Court characterized the original Policy's provisions in ways the Department believes were inaccurate" and that the Interim Policy "includes targeted clarifications to correct these mischaracterizations."  Id.

The In-Brief provides in pertinent part that "PFACs may be denied, revoked, or not renewed if a person meets any of the criteria set forth in Appendix A."  Interim Policy at 6.  Appendix A outlines certain conviction-based grounds for a PFAC denial, revocation, or

---

[2]     As of the date of this Opinion, no appeal from the Court's March 20, 2026 Order has been filed.

non-renewal, as well as "[c]onduct-[b]ased [g]rounds." Id. at 12-13.  The conviction-based grounds are not at issue.  Relevant here, the conduct-based grounds include the "inducement of unauthorized disclosure as defined in" the In-Brief.  Id. at 12.  The In-Brief, in turn, states that "[t]o correct the Court's mischaracterization" of the Policy, "the Department has replaced the term 'solicitation' with 'intentional inducement of unauthorized disclosure.'"  Id. at 10.  "[I]ntentional inducement of unauthorized disclosure" is defined as "intentionally encouraging, inducing, or requesting that a specific Department employee disclose classified national security information or [controlled unclassified information] that the journalist knows that the specific Department employee is not authorized to disclos[e] under" one of three specified statutes.  Id.  The In-Brief then states that "[a] journalist's offer of anonymity or privacy protection to a Department employee in exchange for information shall create a rebuttable presumption that the journalist knew the employee was not authorized to disclose the information sought."  Id.

The same section of the In-Brief outlines six "safe harbors" that "do not constitute 'intentional inducement of unauthorized disclosure' under" the Interim Policy.  Interim Policy at 11; see Defs. Opp. at 6.  Those safe harbors are:

    (a) Asking questions of Department personnel who are authorized to speak with the press, including Public Affairs Officers, designated spokespersons, and other personnel speaking on the record in their official capacity, regardless of the subject matter of the question;

    (b) Receiving unsolicited information, including classified national security information or controlled unclassified information;

    (c) Publishing calls for tips or other general appeals to the public at large that are not specifically directed at Department personnel;

    (d) Developing source relationships outside the Pentagon through independent reporting;

    (e) Communicating with Department personnel through official channels for public disclosure of information, including press

> briefings, press conferences, interviews arranged through public affairs offices, and Freedom of Information Act requests;

> (f) Asking questions of any Department employee where the journalist does not know that the employee is not authorized to disclose the information sought.

Interim Policy at 11.

Finally, the Interim Policy provides that the Correspondents' Corridor—the designated space in the Pentagon for reporters to work, Supp. Barnes Decl. ¶ 12—is closed effective immediately. Interim Policy at 3. According to the Interim Policy, "[a] new press workspace will be established" at some point in the future "in an annex facility outside the Pentagon," and PFAC holders will be notified once that space is "operational." Id. That space is not yet available for journalists to use, and the Interim Policy does not say when it will be. See id. In the meantime, PFAC holders are permitted to work from a building separate from the Pentagon that contains a library and conference center. See Supp. Valdez Decl. ¶ 12; Supp. Barnes Decl. ¶ 9. The Memorandum further states that PFAC holders will be able to access the Pentagon only "for scheduled press briefings, press conferences, and interviews arranged through public affairs offices" and only if they are "escort[ed] by authorized [Department] personnel at all times." Mem. at 2. The Memorandum provides as the reason for this change that "following the Court's vacatur of the PFAC Policy's security screening provisions, the Department determined that unescorted access to the Pentagon cannot be responsibly maintained without the ability to screen PFAC holders for security risks." Id.

On Tuesday, March 24, 2026, the plaintiffs filed a motion to compel compliance with the Court's Order. See Pls. Mot. The defendants filed an opposition on March 27, see Defs. Opp., and the plaintiffs filed a reply on March 29, see Reply. The Court heard oral argument on the motion to compel on March 30. With the Court's permission, the plaintiffs filed

6

a post-hearing brief on April 3, see Pls. Supp. Br., and the defendants filed a response on April 6, see Defs. Supp. Br.

## II. LEGAL STANDARD

This Court has the "jurisdiction" and "inherent power to enforce its judgments." Peacock v. Thomas, 516 U.S. 349, 356 (1996); see Order at 4 (retaining "jurisdiction to enforce this Order"). That authority is grounded in "the interest of the judicial branch in seeing that an unambiguous mandate is not blatantly disregarded by parties to a court proceeding." Int'l Ladies' Garment Workers' Union v. Donovan ("Donovan"), 733 F.2d 920, 922 (D.C. Cir. 1984). Fundamental to that authority is the power of the Court "to construe and interpret the language of the judgment." Anglers Conservation Network v. Ross, 387 F. Supp. 3d 87, 93 (D.D.C. 2019) (quoting Heartland Hosp. v. Thompson, 328 F. Supp. 2d 8, 11-12 (D.D.C. 2004)). In determining whether an agency has complied with the terms of an order, "the Court is guided not only by the text of that order but also by its relevant opinions." Id.; see also, e.g., Afghan & Iraqi Allies Under Serious Threat Because of Their Faithful Serv. to the U.S. v. Rubio, No. 18-CV-1388 (TSC), 2026 WL 322996, at *4 (D.D.C. Feb. 6, 2026). "Success on a motion to enforce a judgment gets a plaintiff only the relief to which the plaintiff is entitled under its original action and the judgment entered therein." Anglers Conservation Network v. Ross, 387 F. Supp. 3d at 93 (citation modified).

## III. DISCUSSION

The plaintiffs challenge two aspects of the Interim Policy: the prohibition on the "inducement of unauthorized disclosure" and the closure of the Correspondents' Corridor coupled with the escort requirement. See Pls. Mot. at 5-15. The defendants contend as a threshold matter that neither challenge is appropriately raised in a motion to compel. See Defs.

7

Opp. at 3-4.[3]   In the defendants' view, the Department was prohibited from retaining and enforcing the language of the Challenged Provisions but was otherwise free to act as it saw fit. See id. at 4-5.  The defendants maintain that if the plaintiffs wish to challenge the substance of the Interim Policy, they must do so by amending their complaint and filing a new substantive motion rather than by moving to compel compliance with the Court's Order.  See id. at 2.  The Court disagrees.

To be sure, the defendants are correct that once a court has invalidated an agency's policy, the agency is empowered to "deal[] with the problem afresh by taking new agency action that [i]s consistent with the legal principles as articulated in the [c]ourt's opinion." Neguse v. U.S. Immigr. & Customs Enf't, Civil Action No. 25-2463 (JMC), 2026 WL 137017, at *1 (D.D.C. Jan. 19, 2026) (citation modified); see also NAACP v. Donovan, 737 F.2d 67, 72 (D.C. Cir. 1984).  The problem for the defendants, however, is that the Department has not in fact taken "new" action, at least with respect to the proscription on the "inducement of unauthorized disclosure."  To the contrary, as explained in detail below, that proscription contained in the Interim Policy amounts to—in the Department's words—a "clarification[]" of the prohibitions contained in the original Policy that this Court held to be unconstitutional. Mem. at 1.  The Department cannot simply reinstate an unlawful policy under the guise of taking "new" action and expect the Court to look the other way.  See Donovan, 733 F.2d at 922

---

[3]    The defendants also assert that the plaintiffs did not confer in good faith prior to filing their motion to compel, in violation of Local Civil Rule 7(m).  See Defs. Opp. at 3; see also LCvR 7(m) ("Before filing any nondispositive motion in a civil action, counsel shall discuss the anticipated motion with opposing counsel in a good-faith effort to determine whether there is any opposition to the relief sought and, if there is, to narrow the areas of disagreement.").  The record reflects, however, that the plaintiffs sought the defendants' position on their anticipated motion to compel and provided the substantive basis for their requested relief.  See Bruns Decl. at Ex. A.  The plaintiffs thus have satisfied their obligations under Rule 7(m).

(holding that enforcing a prior judgment against the application of a new agency policy "is particularly appropriate . . . where an administrative agency plainly neglects the terms of [an order], and the case then returns to the court—under the same docket number and involving the same parties—on a motion to enforce the original [order]"); United States v. Christie Indus., Inc., 465 F.2d 1002, 1007 (3d Cir. 1972) (explaining that a litigant cannot "avoid[] . . . [an] injunction through a mere change of terminology").

Nor can the Department take steps to circumvent the Court's injunction and expect the Court to turn a blind eye. But that is exactly what the defendants have done by closing the Correspondents' Corridor and imposing an escort requirement. The Court's Order requires the Department to restore the plaintiffs' access to the Pentagon. Rather than comply with that Order, the Department has cut off all PFAC holders' meaningful access to the Pentagon. When assessing a litigant's compliance in the posture of an enforcement motion, a court need not accept a "dubious literal interpretation of the injunction, particularly where that interpretation is designed to evade the injunction's goals." Epic Games, Inc. v. Apple Inc., 781 F. Supp. 3d 943, 990-91 (N.D. Cal.), aff'd in relevant part, 161 F.4th 1162 (9th Cir. 2025). Where an enjoined party engages in such evasive conduct, a motion to compel is the proper means of bringing that party into compliance. See id. at 990-92 (granting a motion to enforce an injunction where the court "prohibited certain of [the enjoined party's] policies that prevented meaningful competition" and the enjoined party "rewrote those policies by choosing a different anticompetitive path"); AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State, 768 F. Supp. 3d 1, 3 (D.D.C. 2025) (granting a motion to enforce a temporary restraining order where the government "ha[d] continued . . . the very action that the [order] enjoined").

At bottom, the defendants ask this Court to hold that so long as the Department does not reinstate the exact words of the Challenged Provisions, and so long as it restores The Times' reporters' physical credentials, it has done enough.[4] If the Department immediately uses new words to do the same thing? Too bad. The plaintiffs need to start over while the Court stands idly by. If the Department immediately takes steps to undermine the purpose of the reporters' credentials, namely, entry to the Pentagon? Again, too bad. The Court need not embrace such a narrow interpretation of its authority and permit such a blatant attempt to circumvent a lawful order of the Court to succeed. See Donovan, 733 F.2d at 923; Epic Games, Inc. v. Apple Inc., 781 F. Supp. 3d at 991 (observing that such an "approach would require courts to effectively engage in a 'whack-a-mole' game to require compliance").

*A. Inducement of Unauthorized Disclosure*

The Court carefully considered the Policy's constraint on "solicitation" and the arguments for and against its permissibility. In the context of the plaintiffs' Fifth Amendment void for vagueness argument, the Court determined that the constraint was unacceptable because it encompassed "obtaining or attempting to obtain any information that the Department has not approved for release, regardless of whether that information is classified." Op. at 20-21. The Court recognized that "obtaining and attempting to obtain information is what journalists do" and that "[a] primary way in which journalists obtain information is by asking questions." Id. at 21. Punishing journalists for requesting and receiving non-public information thus would chill and penalize "essential journalistic practices that the plaintiffs and others engage in every day."

---

[4]     Ironically, the defendants' own brief makes clear that the Department continues to use many of the words of the Challenged Provisions that this Court vacated. See Defs. Opp. at 8-12.

10

Id. In no uncertain terms, the Court rejected the Department's assertion that the Policy was permissible because it proscribed only criminal solicitation, concluding that the Policy punished "plainly lawful journalistic practices." Id. at 22; see also id. at 21 (explaining that the defendants' argument that the Policy's prohibition on solicitation was acceptable because it "simply proscribe[s] criminal solicitation . . . is just plain wrong"). The Court also held in the context of the plaintiffs' First Amendment forum argument that the Policy's restrictions on journalists seeking information were unreasonable in light of the purpose of the Pentagon's press spaces and that the Policy amounted to viewpoint discrimination "based on editorial viewpoint— that is, whether the individual or organization is willing to publish only stories that are favorable to or spoon-fed by Department leadership." Id. at 30-36. In rejecting the defendants' argument that the Court should simply remand to the Department for clarification rather than vacate the Challenged Provisions in their entirety, the Court concluded that in light of the Policy's "extremely serious" constitutional defects, "'additional explanations' on remand would not suffice." Id. at 38 (citation omitted).

Because the Court vacated the Challenged Provisions, it was appropriate for the Department to issue a new policy, so long as the new policy "was consistent with the legal principles as articulated in the Court's opinion." Neguse v. U.S. Immigr. & Customs Enf't, 2026 WL 137017, at *1. But the Department has done precisely what this Court expressly forbade it from doing: it has endeavored to "cure" the impermissible restrictions on a journalist seeking information not authorized for release by providing "targeted clarifications." Mem. at 1; see Op. at 38. Specifically, the Interim Policy replaces the prohibition on "soliciting" non-public or unauthorized classified or unclassified information with a prohibition on "encouraging, inducing, or requesting" the disclosure of that non-public or unauthorized information. Interim Policy

at 10.  That is simply using revised language to proscribe the same "lawful journalistic practices" that the vacated provisions encompassed.  Op. at 23.  Remarkably, even the Department acknowledges as much.  For example, the Interim Policy explains that the wording change was simply an effort "[t]o correct the Court's mischaracterization" of the Policy.  Mem. at 1; Interim Policy at 10.  Commander Timothy Parlatore, Special Advisor to the Secretary of Defense, similarly explained that the Interim Policy responds to the Court's Order by "us[ing] more words to say the same thing and to foreclose creative misinterpretations."  Second Supp. Boutrous Decl. at Ex 6.

The defendants suggest that the Department has solved the constitutional problems identified in the Court's Opinion by inserting a "scienter requirement": an adverse PFAC determination will be triggered only if the journalist attempts to obtain information that the journalist "knows" the Department employee is forbidden to disclose by law.  Defs. Opp. at 15-16; see Interim Policy at 10.  This addition, however, does not render the Interim Policy permissible.  For one, the supposed requirement is illusory—in the plaintiffs' words, "a mirage," Reply at 6—because it presumes scienter and provides no clear path to rebut that presumption. The Interim Policy provides that a journalist's knowledge is presumed if the journalist offers a Department employee "anonymity or privacy protection."  Interim Policy at 10.  The Department thus need not establish that a journalist actually knows anything to find the journalist presumptively in violation of the Interim Policy.  See id.  Considering that journalists "frequently" grant anonymity to sources, see Zerilli v. Smith, 656 F.2d 705, 711 (D.C. Cir. 1981), including sources authorized to speak to the press on the Department's behalf, see Supp. Barnes Decl. ¶ 18, every Pentagon reporter routinely will be presumptively in violation of the

12

Interim Policy.[5]  While that presumption ostensibly is rebuttable, it is unclear just how a

journalist would go about rebutting it.  The Interim Policy certainly does not indicate what

evidence would suffice for journalists to prove what they did not know.  And as the plaintiffs

point out, the Interim Policy "expressly provides that any doubts will be resolved in the

Department's favor."  Reply at 7; see Interim Policy at 13-14.

   The defendants attempt to justify the presumption by asserting that "the most

obvious reason to offer anonymity to a Department employee is because the journalist knows the

employee is not authorized by law to disclose the information sought."  Defs. Opp. at 19.  That

contention is unsupported and simply wrong.  There are myriad reasons why a source may wish

to remain anonymous—most apparently, a source may fear retaliation for disclosing information

that is "unflattering," even if not unauthorized by law.  Cf. Op. at 35 n.7 (observing "that the

Pentagon has barred press photographers from briefings on the ongoing U.S.-Israeli war with

Iran after they published photos of Secretary Hegseth that his staff deemed 'unflattering'").  As

Mr. Barnes suggested, "[t]here are various reasons why a source may wish not to have their

name published in connection with the information they provided, and honoring those

preferences is often integral to [his] ability to gather and report the news."  Supp. Barnes Decl.

¶ 17; see also Zerilli v. Smith, 656 F.2d at 710-11 (explaining that interference with a journalist's

use of "confidential source raises obvious First Amendment problems" because "journalists

---

   [5] The Court gives little credence to the assurances of Deputy Press Secretary Joel Manuel Valdez that the Department will enforce the Interim Policy only upon a complaint by a Department employee. See Supp. Valdez Decl. ¶¶ 30-33. The plaintiffs correctly point out that Mr. Valdez's proffered interpretation of the Interim Policy is not grounded in its text. See Pls. Supp. Br. at 4. Like the plaintiffs, the Court has "no reason to trust that officials will not follow the Interim Policy's express language and revoke PFACs based on information in [the] [p]laintiffs' reporting whenever it is not tied to a specific, authorized source." Id. In any event, the Court struggles to see how the enforcement regime that Mr. Valdez promises changes the illusory nature of the scienter requirement.

frequently depend on" such sources "to gather news, and confidentiality is often essential to establishing a relationship with" a source).

The defendants also emphasize the addition of six "safe harbors" as evidence that the Interim Policy is distinct from the original Policy in a way that complies with this Court's Opinion and Order. See Defs. Opp. at 16. But like the scienter "requirement," the safe harbors do not make clear that engagement in lawful journalistic practices will not trigger the revocation of a PFAC. See Op. at 21-22. As this Court has explained, asking questions is fundamental to the role of a journalist, and a journalist's ability to ask questions is protected. See id. at 21; see also id. at 22 ("[A] journalist asking questions is not a crime!"). Yet the "safe harbors" explicitly leave open the possibility that "[a]sking questions" on certain topics and to certain officials could trigger the revocation or denial of a PFAC. Interim Policy at 11. They provide, for example, that asking questions about any subject to a Department official who is "authorized to speak with the press" is permissible. Id. But how is a journalist to know who is authorized to speak? That uncertainty and lack of clarity is precisely what this Court held to be unacceptable.

In sum, there is little daylight between the Policy's unconstitutional "solicitation" prohibition and the Interim Policy's "inducement" prohibition, and the latter is impermissible for the same reasons as the former. Simply put, the Department's attempt to "clarif[y]" the Policy did not cure its constitutional infirmities. That, of course, is exactly why this Court determined it was necessary to vacate the Policy and "re-establish the status quo" as it existed prior to "the unlawful agency action." Las Ams. Immigrant Advoc. Ctr. v. U.S. Dep't of Homeland Sec., 783 F. Supp. 3d 200, 233 (D.D.C. 2025) (quoting Texas v. United States, 40 F.4th 205, 219-20 (5th Cir. 2022) (per curiam)). The Court explained that the Policy's deficiencies were so entrenched that there was no alternative but to require the Department to scrap its prior approach and start

14

afresh.  <u>See</u> Op. at 38-39.  By failing to do so, the Department has violated this Court's explicit mandate.

### B. Expulsion of PFAC Holders from the Pentagon

In its March 20, 2026 Order, the Court directed the defendants to "immediately reinstate the PFACs of" Julian Barnes and six other Times journalists, "all of whom held a PFAC as of October 6, 2025."  Order at 3.  Before doing so, the Court carefully considered the defendants' argument that the plaintiffs had not established their entitlement to injunctive relief. The Court ultimately disagreed with the defendants, concluding in relevant part that the plaintiffs had shown irreparable injury because "[w]ithout their PFACs, the plaintiffs lack 'the access to pursue [journalistically productive] conversations.'"  Op. at 36.  (quoting <u>Karem v. Trump</u>, 404 F. Supp. 3d 203, 217 (D.D.C. 2019)).  The Court observed that "the only way to remedy the injury [from the loss of a press credential] is to return the [credential] and the access that comes with it."  <u>Id</u>. at 36-37 (first alteration in original) (quoting <u>Karem v. Trump</u>, 404 F. Supp. 3d at 217).

The Department did not comply with the Court's Order.  Rather, the very next business day, the Department announced that it was immediately closing the "Correspondents' Corridor"—the area in the Pentagon from which journalists had worked for years.  <u>See</u> Mem. at 2; Interim Policy at 3; <u>see also</u> Supp. Barnes Decl. ¶ 12.  Instead, PFAC holders would be relegated to work from a space <u>outside</u> the Pentagon building.  <u>See</u> Supp. Valdez Decl. ¶ 12; Supp Barnes Decl. ¶ 9.  The Department further announced that journalists would no longer be permitted to access the Pentagon building at all without a Department escort and that even escorted access would be limited to specific events.  <u>See</u> Interim Policy at 3.  The justification offered by the Department for this sudden change is that this Court's Order "remov[ed] . . . all

security screening authority" and that "unescorted access to the Pentagon cannot be responsibly maintained without the ability to screen credential holders for security risks."  Second Supp. Boutrous Decl. at Ex. 7; see also id. at Ex. 6 (Commander Parlatore stating that the Court's ruling "excised all of the security provisions and enforcement mechanisms and ordered that [the Department] immediately issue press passes under the revised, toothless policy"); Mem. at 2.

In short, this is nonsense.  The Court did not "remove" or "excise" the Department's authority to screen PFAC holders.  For one, The Times' journalists named in the Court's Order have already been screened by the Department—for example, prior to the issuance of the Policy, Mr. Barnes had held a PFAC without issue for more than twenty years.  See Op. at 4; Supp. Barnes Decl. ¶ 11.  Moreover, the Court was clear in its Opinion that it was leaving intact the security measures that previously existed for PFAC holders and that "served [the Department's] proffered interests in safety and security for decades."  Op. at 39.  Based on the undisputed facts, the Court found that "[t]he regular presence of PFAC holders at the Pentagon has enhanced the ability of journalists and news organizations to keep Americans informed about the U.S. military while posing no security or safety risk to Department property or personnel." Id. at 5 (emphasis added).  There is no evidence whatsoever that the facts have changed in the weeks since this Court issued its summary judgment decision.  The rote invocation of "security" or "national security" has never been enough "to abrogate the fundamental law embodied in the First Amendment."  N.Y. Times Co. v. United States, 403 U.S. at 719 (Black, J., concurring).  As Judge Leon observed in a recent decision, "[b]ald assertions of 'national security' cannot excuse the Government's failure to follow the law."  Nat'l Trust for Historic Pres. in the U.S. v. Nat'l Park Serv., __ F. Supp. 3d ___, 2026 WL 877779, at *16 (D.D.C. Mar. 31, 2026).

16

In their opposition brief, the defendants state that the "relocation of the press workspace" is unconnected to the Court's ruling and instead simply "fulfills a commitment announced . . . before this lawsuit was filed."  Defs. Opp. at 20; see also Mem. at 2.  That assertion is undermined by the timing of the announced closure.  The Court cannot ignore the fact that the decision to bar all journalists from the Pentagon came the next business day after the Court ordered the Department to restore the plaintiffs' access to the Pentagon.  Further, the testimony of Mr. Barnes supports that Department officials were ill-prepared to facilitate this "relocation," suggesting that the Department had scrambled to close the Correspondents' Corridor in direct response to this Court's directives.  See Supp. Barnes Decl. ¶ 9; Third Supp. Barnes Decl. ¶ 6.[6]

In light of all this, the Court has no choice but to conclude that the Department's abrupt closure of the Correspondents' Corridor and its ban on credentialed journalists traveling unescorted through the Pentagon are not security measures or efforts to make good on prior commitments but rather transparent attempts to negate the impact of this Court's Order.  The point of the Court's injunction was to restore The Times journalists' access to the Pentagon, not merely to ensure that they have possession of a physical credential.  See Op. at 37.  But the access now available to PFAC holders in the wake of this Court's Order is not even close to as meaningful as the broad access that PFAC holders had previously been afforded.  The PFACs

---

[6]    Deputy Press Secretary Joel Manuel Valdez submitted a declaration purporting to refute Mr. Barnes' account of his interactions with Pentagon Press Office staff on the day he went to pick up his PFAC.  See Supp. Valdez Decl.  But Mr. Valdez's declaration does not contradict Mr. Barnes' testimony about his conversations with Department staff, for which Mr. Valdez was not present.  See id.; see also Third Supp. Barnes Decl. ¶ 3.  The only thing Mr. Valdez's declaration establishes is that some of the information given to Mr. Barnes was inaccurate.  See Supp. Valdez Decl. ¶¶ 15-21.  If anything, that fact supports the notion that Department officials were unsure of the parameters of the Interim Policy and were unprepared to implement it.  See id.

issued to Mr. Barnes and his colleagues permit them to access only a building separate from the

Pentagon.  See Supp. Valdez Decl. ¶ 12.  PFAC holders may enter the Pentagon only for limited

purposes approved by the Department, and only if the holder is accompanied by an escort at all

times.  See id. ¶¶ 22-25; see also Interim Policy at 3.  These restrictions make it exceedingly

difficult to cover the Department and the U.S. military from the Pentagon grounds, as the

April 2, 2026 declaration from Mr. Barnes illustrates:

> Going through a sometimes-lengthy process of scheduling official appointments in order to ask even one or two questions to an official—even assuming that request is granted and that official does not have to reschedule—does not allow for meaningful engagement with Department personnel on a timeline consistent with news reporting.  As I stated in a prior declaration, reporting from the Pentagon has historically necessitated speaking to upwards of a dozen officials and other personnel from different press offices in a given day, sometimes in response to rapidly developing events. While I used to be able to walk from press office to press office throughout the day, I now would have to return to the library, call or email for an appointment, and wait for a response and approval, and for arrangement for and arrival of an escort.  That means I will be spending hours of my day just waiting and walking back and forth— assuming I can get ahold of press offices and individuals and arrange interviews and be approved for an escort at all.  That process will dramatically interfere with my ability to meaningfully engage with anyone from the Department on Pentagon grounds, or to obtain the information necessary to inform the public in a timely manner.

Third Supp. Barnes Decl. ¶ 8.[7]  For decades, the plaintiffs and other reporters were permitted to

move throughout the building and engage with Pentagon press officials and other personnel to

---

[7]    On Monday, March 30, in response to a request that he had made three days earlier, on Friday, March 27, Mr. Barnes received an invitation to interview a Department official at the Pentagon the following day, Tuesday, March 31, at 12:45 p.m.  Third Supp. Barnes Decl. ¶ 5.  Mr. Barnes explained:

> On Tuesday, March 31, 2026, I arrived at the Pentagon at 12:10 p.m. and entered the Visitor Center security area.  I showed the attendant behind the glass my driver's license and the PFAC.  I entered my social security number upon his request.  I was advised that individuals holding PFACs must enter through corridor 8.  I replied

provide timely reporting to the American people.  See, e.g., Op. at 5-6.  That undisputedly is no longer the case.

In short, the Department has responded to the Court's express instruction to return the PFACs previously held by The Times' journalists and restore the access to the Pentagon that came with those credentials by instead cutting off that access for all journalists.  That response flouts the Court's explicit directives and disregards the constitutional principles at the heart of its Opinion.

*** 

The Court cannot conclude this Opinion without noting once again what this case is really about: the attempt by the Secretary of Defense to dictate the information received by the American people, to control the message so that the public hears and sees only what the Secretary and the Trump Administration want them to hear and see.  The Constitution demands better.  The American public demands better, too.  Over the past few weeks, the Court has received dozens of letters and postcards from people across the country explaining what the First Amendment means to them.  To quote one such letter:

> that I had an appointment and the escort was going to meet me in the Visitor's Center.  The supervisor repeated that anyone with a PFAC could enter only through corridor 8.  This was despite the fact that I was told to meet my escort in the Visitor's Center and the fact that before I could have simply entered through the main gate using my PFAC.  After I arrived at the Pentagon, the interview was postponed, and I was immediately escorted out of the building.

Id. ¶ 6.  This scenario exemplifies precisely the Kafkaesque nature of the Department's implementation of the Interim Policy that the Court raised during oral argument.  See OA Tr. at 37.  The only response to Mr. Barnes's declaration: "Mr. Barnes's escort had not been fully briefed on the access procedures for PFAC holders under the Interim Policy."  Second Supp. Valdez Decl. ¶ 9.  Really?

19

A free press is essential to the success of our democratic republic. The people are the government, and they cannot make good well-informed choices without all the facts. . . . A free press is an excellent place to start.

The protection of the freedoms enshrined in the First Amendment "is a fundamental principle of the American government. The First Amendment means that [g]overnment has no power to thwart the process of free discussion, to abridge the freedoms necessary to make that process work." Kleindienst v. Mandel, 408 U.S. 753, 775-76 (1972) (Marshall, J., dissenting) (citation modified); see also Abrams v. United States, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting) (observing that the "free trade in ideas . . . [is] the best test of truth"). Less than three weeks ago, this Court rejected the defendants' efforts to abridge those freedoms. With the issuance of the Interim Policy, the Department has invoked slightly different language to achieve that same unconstitutional result. The curtailment of First Amendment rights is dangerous at any time, and even more so in a time of war. Suppression of political speech is the mark of an autocracy, not a democracy—as the Framers recognized when they drafted the First Amendment.

## IV. CONCLUSION

For the foregoing reasons, the Court will grant the plaintiffs' motion to compel. An Order consistent with this Opinion will issue this same day.

SO ORDERED.

PAUL L. FRIEDMAN
United States District Judge

DATE: 4/9/26

20