APPEAL,TYPE–L

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: <u>1:25–cv–04218–PLF</u>
### *Internal Use Only*

| | |
|---|---|
| NEW YORK TIMES COMPANY et al v. DEPARTMENT OF DEFENSE et al | Date Filed: 12/04/2025 |
| | Jury Demand: None |
| Assigned to: Judge Paul L. Friedman | Nature of Suit: 440 Civil Rights: Other |
| Cause: 05:702 Administrative Procedure Act | Jurisdiction: U.S. Government Defendant |

**<u>Plaintiff</u>**

| | | |
|---|---|---|
| **NEW YORK TIMES COMPANY** | represented by | **KatieLynn Boyd Townsend** |

GIBSON DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
213–229–7839
Email: ktownsend@gibsondunn.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lee Ross Crain**
GIBSON, DUNN & CRUTCHER, LLP
200 Park Avenue
47th Floor
New York City, NY 10166–0193
212–351–2454
Email: lcrain@gibsondunn.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Susan Pelletier**
GIBSON, DUNN & CRUTCHER
1700 M Street, NW
Washington, DC 20895
202–887–3541
Email: spelletier@gibsondunn.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Theodore J. Boutrous , Jr.**
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
(213) 229–7804
Fax: (213) 229–6804
Email: tboutrous@gibsondunn.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**JULIAN E. BARNES**                    represented by    **KatieLynn Boyd Townsend**
                                                          (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Lee Ross Crain**
                                                          (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Susan Pelletier**
                                                          (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *PRO HAC VICE*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Theodore J. Boutrous , Jr.**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*


V.

**Defendant**

**DEPARTMENT OF DEFENSE**               represented by    **Michael Benjamin Bruns**
*also known as*                                           DOJ–Civ
DEPARTMENT OF WAR                                         1100 L St NW
                                                          Washington, DC 20005
                                                          202–514–4011
                                                          Email: michael.bruns@usdoj.gov
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Sarah Welch**
                                                          DOJ–Civ
                                                          Civil Division
                                                          950 Pennsylvania Ave.
                                                          Ste 3612
                                                          Washington, DC 22202
                                                          202–514–3180
                                                          Email: sarah.e.welch@usdoj.gov
                                                          *ATTORNEY TO BE NOTICED*


**Defendant**

**PETE HEGSETH**                        represented by    **Michael Benjamin Bruns**
*in his official capacity as Secretary of*               (See above for address)
*Defense*                                                *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Sarah Welch**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**SEAN PARNELL**
*in his official capacity as Chief Pentagon Spokesman*

represented by **Michael Benjamin Bruns**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sarah Welch**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**STATE OF NEW YORK**

represented by **Ester Murdukhayeva**
ATTORNEY GENERAL'S OFFICE/NY
28 Liberty Street
New York, NY 10005
212–416–6279
Email: ester.murdukhayeva@ag.ny.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**PENTAGON PRESS ASSOCIATION**

represented by **David A. Schulz**
YALE LAW SCHOOL
Media Freedom & Information Access
Clinic
127 Wall Street
New Haven, CT 06511
212–663–6162
Email: david.schulz@yale.edu
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS**
*and 23 other Medial Organizations*

represented by **Bruce D. Brown**
REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS
1156 15th St, NW
Suite 1020
Washington, DC 20005
(202) 795–9301
Fax: (202) 795–9310
Email: bruce.brown@rcfp.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

represented by

3

**AMERICAN CIVIL LIBERTIES UNION OF THE DISTRICT OF COLUMBIA**

**Scott Michelman**
ACLU FOUNDATION OF THE DISTRICT OF COLUMBIA
529 14th Street NW, Suite 722
Washington, DC 20045
202–601–4267
Email: smichelman@acludc.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**AMERICAN CIVIL LIBERTIES UNION**

represented by **Scott Michelman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 12/04/2025 | 1 | COMPLAINT *for Declaratory and Injunctive Relief* against DEPARTMENT OF DEFENSE, PETE HEGSETH, SEAN PARNELL ( Filing fee $ 405 receipt number ADCDC–12113704) filed by THE NEW YORK TIMES COMPANY, JULIAN E. BARNES. (Attachments: # 1 Exhibit A – Oct. 6, 2025 Policy, # 2 Exhibit B – RCFP Letter to Parnell, # 3 Exhibit C – Parnell Letter to RCFP, # 4 Exhibit D – Redlined Acknowledgment, # 5 Exhibit E – Sept. 18, 2025 Policy, # 6 Exhibit F – Updated Physical Control Measures, # 7 Civil Cover Sheet, # 8 Summons – Attorney General Pamela J. Bondi, # 9 Summons – Department of Defense a/k/a Department of War, # 10 Summons – Pete Hegseth, in his official capacity as Secretary of Defense, # 11 Summons – Sean Parnell, in his official capacity as Chief Pentagon Spokesman, # 12 Summons – Jeanine F. Pirro, U.S. Attorney for the District of Columbia)(Boutrous, Theodore) (Entered: 12/04/2025) |
| 12/04/2025 | 2 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by THE NEW YORK TIMES COMPANY (Boutrous, Theodore) (Entered: 12/04/2025) |
| 12/04/2025 | 3 | NOTICE of Appearance by Lee Ross Crain on behalf of JULIAN E. BARNES, THE NEW YORK TIMES COMPANY (Crain, Lee) (Entered: 12/04/2025) |
| 12/04/2025 | 4 | NOTICE of Appearance by KatieLynn Boyd Townsend on behalf of JULIAN E. BARNES, THE NEW YORK TIMES COMPANY (Townsend, KatieLynn) (Entered: 12/04/2025) |
| 12/04/2025 | | Case Assigned to Judge Paul L. Friedman. (zhcn) (Entered: 12/04/2025) |
| 12/04/2025 | 5 | SUMMONS (5) Issued Electronically as to All Defendants, U.S. Attorney and U.S. Attorney General (Attachments: # 1 Notice and Consent)(zhcn) (Entered: 12/04/2025) |
| 12/04/2025 | 6 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Susan M. Pelletier, Filing fee $ 100, receipt number ADCDC–12115912. Fee Status: Fee Paid. by JULIAN E. BARNES, NEW YORK TIMES COMPANY. (Attachments: # 1 Declaration of Susan M. Pelletier in Support of Motion for Admission Pro Hac Vice, # 2 Exhibit B – District of Columbia Certificate of Good Standing, # 3 Text of Proposed Order for Admission Pro Hac Vice of Susan M. Pelletier)(Boutrous, Theodore) |

| | | |
|---|---|---|
| | | (Entered: 12/04/2025) |
| 12/05/2025 | 7 | NOTICE of Appearance by Michael Benjamin Bruns on behalf of All Defendants (Bruns, Michael) (Entered: 12/05/2025) |
| 12/05/2025 | | MINUTE ORDER granting 6 Motion for Leave to Appear Pro Hac Vice. **Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a).** Click for instructions. Signed by Judge Paul L. Friedman on December 5, 2025. (lcao) (Entered: 12/05/2025) |
| 12/17/2025 | 8 | Joint MOTION for Briefing Schedule */ JOINT MOTION FOR ENTRY OF A BRIEFING SCHEDULE FOR EXPEDITED SUMMARY JUDGMENT AND OTHER RELATED RELIEF* by JULIAN E. BARNES, NEW YORK TIMES COMPANY. (Boutrous, Theodore) (Entered: 12/17/2025) |
| 12/23/2025 | | MINUTE ORDER granting the parties' 8 Joint Motion for Entry of a Briefing Schedule. Defendants shall serve the administrative record on plaintiffs on or before December 23, 2025. Plaintiffs shall file their motion for summary judgment on or before January 5, 2026. Plaintiff–side amicus briefs, if any, shall be filed on or before January 15, 2026. Defendants shall file their response and cross–motion for summary judgment on or before January 30, 2026. Defendant–side amicus briefs, if any, shall be filed on or before February 10, 2026. Plaintiffs shall file their response and reply on or before February 18, 2026. Defendants shall file their reply on or before February 27, 2026. Defendants' deadline to answer the complaint shall be extended until 21 days after the Court rules on the parties' cross–motions for summary judgment. The Court dispenses with the requirement that the parties appear for a Rule 26(f) conference. Signed by Judge Paul L. Friedman on December 23, 2025. (lcao) (Entered: 12/23/2025) |
| 12/23/2025 | | MINUTE ORDER: it is hereby ORDERED that the parties shall appear for oral argument on their cross–motions for summary judgment at 10:00 a.m. on Friday, March 6, 2026, in Courtroom 29 in the William B. Bryant Annex to the E. Barrett Prettyman Courthouse at 333 Constitution Avenue N.W., Washington, D.C. 20001. SO ORDERED. Signed by Judge Paul L. Friedman on December 23, 2025. (lcao) (Entered: 12/23/2025) |
| 12/23/2025 | 9 | NOTICE *of Production of Administrative Record* by DEPARTMENT OF DEFENSE, PETE HEGSETH, SEAN PARNELL (Attachments: # 1 Affidavit certifying AR, # 2 Exhibit AR Index)(Bruns, Michael) (Entered: 12/23/2025) |
| 12/29/2025 | | Set/Reset Deadlines/Hearings: Amicus Brief due by 1/15/2026. Summary Judgment motions due by 1/5/2026. Response to Motion for Summary Judgment due by 1/30/2026. Reply to Motion for Summary Judgment due by 2/18/2026. Cross Motions due by 1/30/2026. Response to Cross Motions due by 2/18/2026. Reply to Cross Motions due by 2/27/2026. Motion Hearing set for 3/6/2026 at 10:00 AM in Courtroom 29A– In Person before Judge Paul L. Friedman. (tj) (Entered: 12/29/2025) |
| 01/05/2026 | 10 | MOTION for Summary Judgment *and Declaratory and Permanent Injunctive Relief* by JULIAN E. BARNES, NEW YORK TIMES COMPANY. (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order, # 3 Declaration of Julian E. Barnes, # 4 Declaration of Robert Burns, # 5 Declaration of Richard W. Stevenson, # 6 Declaration of Pete Williams, # 7 Exhibit A, # 8 Declaration of Theodore J.Boutrous, Jr., # 9 Exhibit 1, # 10 Exhibit 2, # 11 Exhibit 3, # 12 Exhibit 4, # 13 Exhibit 5, # 14 Exhibit 6, # 15 Exhibit 7, # 16 Exhibit 8, # 17 Exhibit 9, # 18 Exhibit 10, # 19 Exhibit 11, # 20 Exhibit 12, # 21 Exhibit 13, # 22 Exhibit 14, # 23 Exhibit 15, # 24 Exhibit 16, |

| | | |
|---|---|---|
| | | # 25 Exhibit 17, # 26 Exhibit 18, # 27 Exhibit 19, # 28 Exhibit 20, # 29 Exhibit 21, # 30 Exhibit 22, # 31 Exhibit 23, # 32 Exhibit 24, # 33 Exhibit 25, # 34 Exhibit 26, # 35 Exhibit 27, # 36 Statement of Facts)(Boutrous, Theodore) Modified on 1/7/2026, sealed exhibit pursuant to Theodore Boutrous (mg). Added MOTION for Permanent Injunction on 1/9/2026 (znmw). (Entered: 01/05/2026) |
| 01/06/2026 | 11 | NOTICE of Appearance by Susan Pelletier on behalf of JULIAN E. BARNES, NEW YORK TIMES COMPANY (Pelletier, Susan) (Entered: 01/06/2026) |
| 01/07/2026 | 12 | DECLARATION *of Pete Williams in Support of Motion for Summary Judgment and Declaratory and Permanent Injunctive Relief* by JULIAN E. BARNES, NEW YORK TIMES COMPANY re 10 MOTION for Summary Judgment *and Declaratory and Permanent Injunctive Relief*. (Attachments: # 1 Exhibit A [Redacted])(Boutrous, Theodore) (Entered: 01/07/2026) |
| 01/15/2026 | 13 | AMICUS BRIEF *in support of plaintiff's motion for summary judgment* by STATE OF NEW YORK. (Murdukhayeva, Ester) (Entered: 01/15/2026) |
| 01/15/2026 | 14 | NOTICE of Appearance by David A. Schulz on behalf of Pentagon Press Association (Schulz, David) (Entered: 01/15/2026) |
| 01/15/2026 | 15 | Unopposed MOTION for Leave to File Amicus Brief by Pentagon Press Association. (Attachments: # 1 Exhibit Proposed Amicus Brief, # 2 Exhibit Text of Proposed Order)(Schulz, David) (Entered: 01/15/2026) |
| 01/15/2026 | 16 | NOTICE of Appearance by Bruce D. Brown on behalf of The Reporters Committee for Freedom of the Press, The Reporters Committee for Freedom of the Press and 23 Other Media Organizations (Brown, Bruce) (Entered: 01/15/2026) |
| 01/15/2026 | 17 | Consent MOTION for Leave to File Amicus Brief by REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS. (Attachments: # 1 Memorandum in Support Proposed Amici Curiae Brief)(Brown, Bruce) (Entered: 01/15/2026) |
| 01/15/2026 | 18 | Consent MOTION for Leave to File Amicus Brief *in Support of Plaintiffs* by AMERICAN CIVIL LIBERTIES UNION OF THE DISTRICT OF COLUMBIA, AMERICAN CIVIL LIBERTIES UNION. (Attachments: # 1 Proposed Amicus Brief, # 2 Text of Proposed Order)(Michelman, Scott) (Entered: 01/15/2026) |
| 01/16/2026 | | MINUTE ORDER granting the Pentagon Press Association's 15 Unopposed Motion for Leave to File Amicus Curiae Brief in Support of Plaintiffs' Motion for Summary Judgment. The Clerk of Court is directed to file on the docket the Proposed Amicus Brief that is attached to the motion [15−1]. Signed by Judge Paul L. Friedman on January 16, 2026. (lcao) (Entered: 01/16/2026) |
| 01/16/2026 | | MINUTE ORDER granting the Reporters Committee for Freedom of the Press and 23 Other Media Organizations' 17 Consent Motion for Leave to File Amicus Curiae Brief in Support of Plaintiffs' Motion for Summary Judgment. The Clerk of Court is directed to file on the docket the Proposed Amicus Brief that is attached to amici's motion [17−1]. Signed by Judge Paul L. Friedman on January 16, 2026. (lcao) (Entered: 01/16/2026) |
| 01/16/2026 | | MINUTE ORDER granting the American Civil Liberties Union and the American Civil Liberties Union of the District of Columbia's 18 Consent Motion for Leave to File Amicus Curiae Brief in Support of Plaintiffs' Motion for Summary Judgment. The Clerk of Court is directed to file on the docket the Proposed Amicus Brief that is attached to amici's motion [18−1]. Signed by Judge Paul L. Friedman on January 16, |

| | | |
|---|---|---|
| | | 2026. (lcao) (Entered: 01/16/2026) |
| 01/16/2026 | 19 | AMICUS BRIEF by PENTAGON PRESS ASSOCIATION. (zjm) (Entered: 01/26/2026) |
| 01/16/2026 | 20 | AMICUS BRIEF by REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS. (zjm) (Entered: 01/26/2026) |
| 01/16/2026 | 21 | AMICUS BRIEF by AMERICAN CIVIL LIBERTIES UNION, AMERICAN CIVIL LIBERTIES UNION OF THE DISTRICT OF COLUMBIA. (zjm) (Entered: 01/26/2026) |
| 01/30/2026 | 22 | Cross MOTION for Summary Judgment by DEPARTMENT OF DEFENSE, PETE HEGSETH, SEAN PARNELL. (Attachments: # 1 Memorandum in Support, # 2 Statement of Facts, # 3 Text of Proposed Order)(Bruns, Michael) (Entered: 01/30/2026) |
| 01/30/2026 | 23 | Memorandum in opposition to re 10 MOTION for Summary Judgment *and Declaratory and Permanent Injunctive Relief* MOTION for Permanent Injunction filed by DEPARTMENT OF DEFENSE, PETE HEGSETH, SEAN PARNELL. (Bruns, Michael) (Entered: 01/30/2026) |
| 02/18/2026 | 24 | Memorandum in opposition to re 22 Cross MOTION for Summary Judgment filed by JULIAN E. BARNES, NEW YORK TIMES COMPANY. (Attachments: # 1 Declaration /Supplemental Declaration of Theodore J. Boutrous, Jr. in Opposition to Defendants' Cross−Motion for Summary Judgment, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7)(Boutrous, Theodore) (Entered: 02/18/2026) |
| 02/18/2026 | 25 | REPLY to opposition to motion re 10 Motion for Summary Judgment,,,,, Motion for Permanent Injunction,,,, filed by JULIAN E. BARNES, NEW YORK TIMES COMPANY. (Boutrous, Theodore) (Entered: 02/18/2026) |
| 02/23/2026 | 26 | ORDER directing parties to file a joint report on or before March 4, 2026. See Order for details. Signed by Judge Paul L. Friedman on February 23, 2026. (lccm) (Entered: 02/23/2026) |
| 02/23/2026 | | Set/Reset Deadlines: Joint Report due by 3/4/2026. (tj) (Entered: 02/23/2026) |
| 02/27/2026 | 27 | REPLY to opposition to motion re 22 Motion for Summary Judgment filed by DEPARTMENT OF DEFENSE, PETE HEGSETH, SEAN PARNELL. (Attachments: # 1 Declaration of Christopher C. Garver)(Bruns, Michael) (Entered: 02/27/2026) |
| 03/03/2026 | | MINUTE ORDER: the Court will connect the public−access telephone line for the motions hearing scheduled for March 6, 2026 at 10:00 a.m. Any member of the public or media may access the public−access line by dialing (833) 990−9400 and using meeting ID 492497252. As a reminder, any use of the public−access telephone line requires adherence to the general prohibition against recording, livestreaming, and rebroadcasting of court proceedings (including those held by videoconference). Violation of these prohibitions may result in sanctions, including removal of court−issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or other sanctions deemed necessary by the Court. Signed by Judge Paul L. Friedman on March 3, 2026. (lccm) (Entered: 03/03/2026) |
| 03/03/2026 | 28 | Joint STATUS REPORT *re: March 6, 2026 Hearing on Cross−Motion for Summary Judgment [ECF. 26]* by JULIAN E. BARNES, NEW YORK TIMES COMPANY. |

| | | |
|---|---|---|
| | | (Boutrous, Theodore) (Entered: 03/03/2026) |
| 03/04/2026 | 29 | JOINT APPENDIX *pursuant to LCvR 7* by JULIAN E. BARNES, NEW YORK TIMES COMPANY. (Boutrous, Theodore) (Entered: 03/04/2026) |
| 03/05/2026 | | MINUTE ORDER: The Court adopts the proposal for the March 6, 2026 hearing on the parties' cross–motions for summary judgment outlined in the parties' 28 Joint Status Report. Signed by Judge Paul L. Friedman on March 5, 2026. (lccm) (Entered: 03/05/2026) |
| 03/06/2026 | | Minute Entry for Motions Hearing held on 3/6/2026 before Judge Paul L. Friedman: The matter was before the court on the parties' cross–motions for summary judgment. Theodore J. Boutrous, Jr., KatieLynn B. Townsend, and Susan Pelletier present on behalf of Plaintiffs. David A. Schulz present on behalf of Pentagon Press Association. Michael B. Bruns and Timothy Parlatore present on behalf of Defendants. The matters were fully briefed, argued, and taken under advisement. As stated from the bench, the parties shall file revised proposed orders of relief by the end of day, Monday, March 9, 2026. (Court Reporter Lorraine Herman)(mhp) (Entered: 03/06/2026) |
| 03/09/2026 | 30 | NOTICE of Proposed Order by DEPARTMENT OF DEFENSE, PETE HEGSETH, SEAN PARNELL re Motion Hearing,,, Terminate Motion and R&R Deadlines/Hearings,,, Terminate Scheduling Order Deadlines,,, Terminate Trial Management Order Deadlines,, (Bruns, Michael) (Entered: 03/09/2026) |
| 03/09/2026 | 31 | NOTICE of Proposed Order */ FILING OF REVISED PROPOSED ORDER* by JULIAN E. BARNES, NEW YORK TIMES COMPANY (Attachments: # 1 Text of Proposed Order – Revised Proposed Order, # 2 Addendum A)(Boutrous, Theodore) (Entered: 03/09/2026) |
| 03/12/2026 | 32 | NOTICE *of Clarification Regarding Statements Made at Oral Argument* by DEPARTMENT OF DEFENSE, PETE HEGSETH, SEAN PARNELL (Bruns, Michael) (Entered: 03/12/2026) |
| 03/13/2026 | 33 | RESPONSE re 32 Notice (Other) */Plaintiffs' Response to Defendants' "Notice of Clarification"* filed by JULIAN E. BARNES, NEW YORK TIMES COMPANY. (Boutrous, Theodore) (Entered: 03/13/2026) |
| 03/20/2026 | 34 | ORDER granting plaintiffs' 10 Motion for Summary Judgment and denying defendants' 22 Cross Motion for Summary Judgment. Defendants shall file a status report on or before March 27, 2026. See Order for details. Signed by Judge Paul L. Friedman on March 20, 2026. (lccm) (Entered: 03/20/2026) |
| 03/20/2026 | 35 | OPINION granting plaintiffs' 10 Motion for Summary Judgment and denying defendants' 22 Cross Motion for Summary Judgment. Defendants shall file a status report on or before March 27, 2026. See Opinion for details. Signed by Judge Paul L. Friedman on March 20, 2026. (lccm) (Entered: 03/20/2026) |
| 03/23/2026 | 36 | TRANSCRIPT OF MOTION HEARING PROCEEDINGS before Judge Paul L. Friedman, held on March 6, 2026. Page Numbers: 1–72. Date of Issuance: March 23, 2026. Court Reporter: Lorraine Herman. Email: Lorraine_Herman@dcd.uscourts.gov. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, |

| | | |
|---|---|---|
| | | (multi−page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty−one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 4/13/2026. Redacted Transcript Deadline set for 4/23/2026. Release of Transcript Restriction set for 6/21/2026.(Herman, Lorraine) Modified to correct judge on 3/23/2026 (znmw). (Entered: 03/23/2026) |
| 03/23/2026 | | Set/Reset Deadlines: Status Report due by 3/27/2026 (tj) (Entered: 03/23/2026) |
| 03/24/2026 | 37 | MOTION to Compel *Compliance with the Court's Order* by JULIAN E. BARNES, NEW YORK TIMES COMPANY. (Attachments: # 1 Declaration // Second Supplemental Declaration of Theodore J. Boutrous, Jr., # 2 Exhibit 1 − Interim PFAC Policy, # 3 Exhibit 2 − Redline of Interim PFAC Policy, # 4 Exhibit 3 − 3/20/2026 MFIA Letter to AUSA, # 5 Exhibit 4 − 3/21/2026 NYT letter to AUSA, # 6 Exhibit 5 − 3/23/2026 Parlatore Email to NYT, # 7 Exhibit 6 − 3/23/2026 NYT Article, # 8 Exhibit 7 − 3/23/2026 Parnell Tweet, # 9 Exhibit 8 − 3/24/2026 Boutrous Email to Parlatore)(Boutrous, Theodore) (Entered: 03/24/2026) |
| 03/25/2026 | | MINUTE ORDER: Defendants shall respond to Plaintiffs' 37 Motion to Compel on or before 12:00 p.m. on Friday, March 27, 2026. The parties shall appear for a hearing on Plaintiffs' Motion to Compel at 9:30 a.m. on Monday, March 30, 2026, in Courtroom 29 in the William B. Bryant Annex to the E. Barrett Prettyman Courthouse at 333 Constitution Avenue N.W., Washington, D.C. 20001. Signed by Judge Paul L. Friedman on March 25, 2026.(lccm) (Entered: 03/25/2026) |
| 03/25/2026 | | Set/Reset Hearings: Motion Hearing set for 3/30/2026 at 09:30 AM in Courtroom 29A− In Person before Judge Paul L. Friedman. (tj) (Entered: 03/25/2026) |
| 03/25/2026 | 38 | Consent MOTION for Leave to File Amicus Brief by PENTAGON PRESS ASSOCIATION. (Attachments: # 1 Exhibit Proposed Amicus Brief, # 2 Text of Proposed Order)(Schulz, David) (Entered: 03/25/2026) |
| 03/25/2026 | | MINUTE ORDER granting the Pentagon Press Association's 38 Consent Motion for Leave to File Amicus Curiae Brief in Support of Plaintiffs' Motion to Compel Compliance. The Clerk of Court is directed to file on the docket the Proposed Amicus Brief that is attached to the motion [38−1]. Signed by Judge Paul L. Friedman on March 25, 2026. (lccm) (Entered: 03/25/2026) |
| 03/26/2026 | 39 | AMICUS BRIEF *[CORRECTED]* by PENTAGON PRESS ASSOCIATION. (Schulz, David) (Entered: 03/26/2026) |
| 03/26/2026 | | MINUTE ORDER: The Court will connect the public−access telephone line for the hearing now scheduled for March 30, 2026 at 9:30 a.m. Any member of the public or media may access the public−access line by dialing (833) 990−9400 and using meeting ID 492497252. As a reminder, any use of the public−access telephone line requires adherence to the general prohibition against recording, livestreaming, and rebroadcasting of court proceedings (including those held by videoconference). Violation of these prohibitions may result in sanctions, including removal of court−issued media credentials, restricted entry to future hearings, denial of entry to |

9

| | | |
|---|---|---|
| | | future hearings, or other sanctions deemed necessary by the Court. Signed by Judge Paul L. Friedman on March 26, 2026.(lccm) (Entered: 03/26/2026) |
| 03/26/2026 | 40 | ENTERED IN ERROR.....TRANSCRIPT OF MOTION HEARING PROCEEDINGS before Judge Ana C. Reyes, held on March 23, 2026. Page Numbers: 1–25. Date of Issuance: March 26, 2026. Court Reporter: Lorraine T. Herman. EMAIL: lorraine_herman@dcd.uscourts.gov. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi−page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty−one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 4/16/2026. Redacted Transcript Deadline set for 4/26/2026. Release of Transcript Restriction set for 6/24/2026.(Herman, Lorraine) Modified on 3/26/2026; filed in wrong case (znmw). (Entered: 03/26/2026) |
| 03/27/2026 | 41 | RESPONSE re 37 MOTION to Compel *Compliance with the Court's Order* filed by DEPARTMENT OF DEFENSE, PETE HEGSETH, SEAN PARNELL. (Attachments: # 1 Affidavit of Michael Bruns, # 2 Exhibit A, # 3 Affidavit of Joel Manuel Valdez)(Bruns, Michael) (Entered: 03/27/2026) |
| 03/27/2026 | 42 | NOTICE of Appearance by Sarah Welch on behalf of All Defendants (Welch, Sarah) (Entered: 03/27/2026) |
| 03/27/2026 | 43 | SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL filed by DEPARTMENT OF DEFENSE, PETE HEGSETH, SEAN PARNELL (This document is SEALED and only available to authorized persons.) (Attachments: # 1 Text of Proposed Order, # 2 Exhibit A, # 3 Exhibit A Redacted)(Bruns, Michael) (Entered: 03/27/2026) |
| 03/27/2026 | 52 | SEALED DOCUMENT – Exhibit filed by DEPARTMENT OF DEFENSE, PETE HEGSETH, SEAN PARNELL. re 41 Response to motion,. (This document is SEALED and only available to authorized persons.)(zjm) (Entered: 04/09/2026) |
| 03/29/2026 | 44 | REPLY to opposition to motion re 37 Motion to Compel,, *Compliance with the Court's Order* filed by JULIAN E. BARNES, NEW YORK TIMES COMPANY. (Attachments: # 1 Declaration of Julian E. Barnes in Support of Plaintiffs' Motion to Compel Compliance with the Court's Order)(Boutrous, Theodore) (Entered: 03/29/2026) |
| 03/30/2026 | | Minute Entry for proceedings held before Judge Paul L. Friedman: Motion Hearing held on 3/30/2026 re 37 MOTION to Compel *Compliance with the Court's Order* filed by JULIAN E. BARNES and NEW YORK TIMES COMPANY. Oral argument heard, and the court takes the motion under advisement. For reasons stated on the record, the government shall file a declaration by the end of the day on Tuesday, March 31, 2026. |

| | | (Court Reporter: Rebecca Monroe.) (tj) (Entered: 03/30/2026) |
|---|---|---|
| 03/31/2026 | 45 | DECLARATION // Second Supplemental Declaration of Julian E. Barnes by JULIAN E. BARNES, NEW YORK TIMES COMPANY re 37 MOTION to Compel Compliance with the Court's Order. (Boutrous, Theodore) (Entered: 03/31/2026) |
| 03/31/2026 | 46 | DECLARATION of Joel Manuel Valdez, Supplemental by DEPARTMENT OF DEFENSE, PETE HEGSETH, SEAN PARNELL re Motion Hearing,. (Attachments: # 1 Exhibit A)(Bruns, Michael) (Entered: 03/31/2026) |
| 04/02/2026 | 47 | NOTICE of Proposed Order by DEPARTMENT OF DEFENSE, PETE HEGSETH, SEAN PARNELL re 41 Response to motion, (Bruns, Michael) (Entered: 04/02/2026) |
| 04/02/2026 | 48 | MOTION for Leave to File a Post–Hearing Brief in Support of Plaintiffs' Motion to Compel Compliance with the Court's Order by JULIAN E. BARNES, NEW YORK TIMES COMPANY. (Attachments: # 1 Post–Hearing Brief, # 2 Declaration – Third Supplemental Declaration of Julian E. Barnes)(Boutrous, Theodore) (Entered: 04/02/2026) |
| 04/02/2026 | 49 | NOTICE of Proposed Order by JULIAN E. BARNES, NEW YORK TIMES COMPANY re 37 MOTION to Compel Compliance with the Court's Order (Boutrous, Theodore) (Entered: 04/02/2026) |
| 04/03/2026 | | MINUTE ORDER granting Plaintiffs' 48 Motion for Leave to File a Post–Hearing Brief in Support of Plaintiffs' Motion to Compel Compliance with the Court's Order. The Clerk of Court is directed to file on the docket the Post–Hearing Brief that is attached to the Motion [48–1]. Defendants may file a responsive brief of up to five pages on or before April 6, 2026. Signed by Judge Paul L. Friedman on April 3, 2026.(lccm) (Entered: 04/03/2026) |
| 04/03/2026 | 50 | TRANSCRIPT OF PROCEEDINGS before Judge Paul L. Friedman held on 3/30/26 – morning session; Page Numbers: 1 – 61. Date of Issuance:April 3, 2026. Court Reporter: Rebecca Monroe, email: rebecca_monroe@dcd.uscourts.gov, Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>NOTICE RE REDACTION OF TRANSCRIPTS: The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 4/24/2026. Redacted Transcript Deadline set for 5/4/2026. Release of Transcript Restriction set for 7/2/2026.(Monroe, Rebecca) (Entered: 04/03/2026) |
| 04/03/2026 | 53 | MEMORANDUM – Post Hearing Brief re 37 MOTION to Compel Compliance with the Court's Order by JULIAN E. BARNES, NEW YORK TIMES COMPANY. (zjm) (Entered: 04/09/2026) |

| 04/06/2026 | 51 | REPLY re 48 MOTION for Leave to File *a Post–Hearing Brief in Support of Plaintiffs' Motion to Compel Compliance with the Court's Order* filed by DEPARTMENT OF DEFENSE, PETE HEGSETH, SEAN PARNELL. (Attachments: # 1 Affidavit Second Supplemental Declaration of Joel Valdez)(Bruns, Michael) (Entered: 04/06/2026) |
|---|---|---|
| 04/09/2026 | 54 | ORDER granting 37 Plaintiffs' Motion to Compel. Defendants shall file a status report on or before April 16, 2026. See Order for details. Signed by Judge Paul L. Friedman on April 9, 2026. (lccm) (Entered: 04/09/2026) |
| 04/09/2026 | 55 | OPINION granting 37 Plaintiffs' Motion to Compel. Defendants shall file a status report on or before April 16, 2026. See Opinion for details. Signed by Judge Paul L. Friedman on April 9, 2026. (lccm) (Entered: 04/09/2026) |
| 04/10/2026 | 56 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 54 Order, Memorandum & Opinion, 34 Order,, Memorandum & Opinion, by DEPARTMENT OF DEFENSE, PETE HEGSETH, SEAN PARNELL. Fee Status: No Fee Paid. (Bruns, Michael) (Entered: 04/10/2026) |

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| THE NEW YORK TIMES COMPANY, et al., <br><br> *Plaintiffs*, <br><br>  v. <br><br> UNITED STATES DEPARTMENT OF DEFENSE, et al., <br><br> *Defendants*. | Civil Action No. 1:25-cv-04218-PLF |

## NOTICE OF APPEAL

PLEASE TAKE NOTICE that all Defendants hereby appeal to the United States Court of

Appeals for the District of Columbia from this Court's March 20, 2026, Order on Plaintiffs' Motion

for Summary Judgment (ECF No. 34) and this Court's April 9, 2026, Order on Plaintiffs' Motion

to Compel Compliance (ECF 54).

DATED: April 10, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

SARAH WELCH
Counsel to the Assistant Attorney General

JOSEPH E. BORSON
Assistant Branch Director

*/s/ Michael Bruns*
MICHAEL BRUNS
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
michael.bruns@usdoj.gov

1

2

*Counsel for Defendants*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

THE NEW YORK TIMES COMPANY,
et al.,

        Plaintiffs,

    v.

DEPARTMENT OF DEFENSE, et al.,

        Defendants.

Civil Action No. 25-04218   (PLF)

ORDER

For the reasons set forth in the Opinion issued this same day, it is hereby

ORDERED that Plaintiffs' Motion for Summary Judgment [Dkt. No. 10] is GRANTED; it is

FURTHER ORDERED that Defendants' Motion for Summary Judgment [Dkt. No. 22] is DENIED; it is

FURTHER ORDERED that Defendants' request for a seven-day administrative stay is DENIED; it is

DECLARED that portions (the "Challenged Provision") of the policy pertaining to Pentagon Facility Alternate Credentials ("PFACs") that was promulgated by the Department of Defense (the "Department") on October 6, 2025 in a Memorandum for Senior Pentagon Leadership with the subject line "Implementation of New Media In-brief," Administrative Record ("AR") at 1-21 (the "Policy") are unlawful because they violate the First and Fifth Amendments to the United States Constitution.  The Challenged Provisions are the following:

- The following sentence in the first paragraph of the "Pentagon Reservation In-Brief for Media Members ("In-Brief"): "Failure to abide by these rules may result in suspension of your PFAC and loss of access." AR at 3.

- The first paragraph of the In-Brief section entitled "General Security" as well as the following sentence in the second paragraph: "This framework establishes that access is not open to the public or the press as a matter of right but is instead a controlled privilege." AR at 3.

- The final three paragraphs of the In-Brief section entitled "Public Release of DoW Information and the Protection of Classified National Security Information and Controlled Unclassified Information." AR at 6.

- The following phrase found in both the second and third paragraphs of the In-Brief section entitled "PFAC Issuance and Renewals": ". . . and who have not posed a security or safety risk to DoW personnel or property. . . ." AR at 7.

- The final paragraph of the In-Brief section entitled "PFAC Issuance and Renewals," save its last sentence. AR at 8.

- The In-Brief section entitled "Security Risks" in its entirety. AR at 12-13.

- The "Acknowledgment," AR at 14, and the mandate that PFAC holders sign it, AR at 1.

- Paragraph A of Appendix A to the In-Brief entitled "Denial, Revocation, or Non-Renewal of Pentagon Facility Alternative Credentials" in its entirety. AR at 15.

- The following two phrases found in Paragraph B of Appendix A to the In-Brief entitled "Procedures for Denial, Revocation, or Non-Renewal": (1) ". . . or suspended for the reasons outlined above . . ."; and (2) ". . . unrelated to any security or safety risk . . . ." AR at 15.

2

- The following sentence found in subparagraph 6 of Paragraph B of Appendix A to the In-Brief entitled "Procedures for Denial, Revocation, or Non-Renewal": "The Director, PFPA, or designee, shall exercise final review authority in the matter." AR at 16.  It is

FURTHER DECLARED that all actions by Defendants implementing the Challenged Provisions of the Policy are unlawful and that Defendants may not lawfully deny, revoke, suspend, or not renew a PFAC pursuant to the Challenged Provisions of the Policy; it is

FURTHER ORDERED that the Challenged Provisions of the Policy are VACATED and SET ASIDE and that such vacatur applies to all regulated parties; it is

FURTHER ORDERED that Defendants and all persons acting in concert with them are permanently ENJOINED from implementing or enforcing the Challenged Provisions of the Policy to deny, suspend, revoke, or not renew the PFAC of Plaintiff Julian E. Barnes or any other person who holds, will hold, or will apply for a PFAC, who is employed by, working on behalf of, or otherwise associated with The New York Times; it is

FURTHER ORDERED that Defendants shall immediately reinstate the PFACs of Mr. Barnes and the following journalists with The New York Times, all of whom held a PFAC as of October 6, 2025: Eric Schmitt, Helene Cooper, Greg Jaffe, John Ismay, Carol Rosenberg, and W.J. Hennigan; it is

FURTHER ORDERED that Defendants shall file a status report on or before March 27, 2026, describing the steps taken to ensure compliance with this Order and certifying compliance with its requirements; and it is

3

FURTHER ORDERED that this Court shall retain jurisdiction to enforce this

Order.

This is a final appealable order.  See FED. R. APP. P. 4(a).

SO ORDERED.

PAUL L. FRIEDMAN
United States District Judge

DATE:   3|20|26

4

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| THE NEW YORK TIMES COMPANY, et al., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 25-04218  (PLF) |
| DEPARTMENT OF DEFENSE, et al., | ) ) ) | |
| Defendants. | ) ) | |

OPINION

A primary purpose of the First Amendment is to enable the press to publish what

it will and the public to read what it chooses, free of any official proscription.  Those who drafted

the First Amendment believed that the nation's security requires a free press and an informed

people and that such security is endangered by governmental suppression of political speech.

That principle has preserved the nation's security for almost 250 years.  It must not be

abandoned now.

As the Supreme Court said fifty years ago in Nebraska Press Association:

> We have learned, and continue to learn, from what we view as the
> unhappy experiences of other nations where government has been
> allowed to meddle in the internal editorial affairs of newspapers.
> Regardless of how beneficent-sounding the purposes of controlling
> the press might be, we . . . remain intensely skeptical about those
> measures that would allow government to insinuate itself into the
> editorial rooms of this Nation's press.

Neb. Press Ass'n v. Stuart, 427 U.S. 539, 560-61 (1976) (alteration in original) (quoting Mia.

Herald Publ'g Co. v. Tornillo, 418 U.S. 241, 259 (1974) (White, J., concurring)).

19

The New York Times ("The Times") and its reporter Julian E. Barnes have brought this lawsuit to preserve and defend these principles against overzealous actions by the Secretary of Defense and the Department he leads. To do so, they have filed a motion for summary judgment seeking an order vacating, declaring unconstitutional, and permanently enjoining the enforcement of certain provisions of a policy newly implemented by the United States Department of Defense (the "Department"). The plaintiffs argue that those provisions violate their rights under the First and Fifth Amendments and are contrary to the Administrative Procedure Act ("APA"). Defendants the Department, Pete Hegseth in his official capacity as Secretary of Defense, and Sean Parnell in his official capacity as Chief Pentagon Spokesman have filed a cross-motion for summary judgment. The motions have been fully briefed and argued and are now ripe for decision.[1]

---

[1] The documents reviewed by the Court in connection with the pending motions include: Complaint for Declaratory and Injunctive Relief ("Compl.") [Dkt. No. 1]; Plaintiffs' Motion for Summary Judgment and Declaratory and Permanent Injunctive Relief [Dkt. No. 10]; Memorandum of Law in Support of Plaintiffs' Motion for Summary Judgment ("Pls. Mot.") [Dkt. No. 10-1]; Declaration of Julian E. Barnes ("Barnes Decl.") [Dkt. No. 10-3]; Declaration of Robert Burns ("Burns Decl.") [Dkt. No. 10-4]; Declaration of Pete Williams ("Williams Decl.") [Dkt. No. 10-6]; Declaration of Theodore Boutrous ("Boutrous Decl.") [Dkt. No. 10-8]; Statement of Undisputed Material Facts in Support of Plaintiffs' Motion for Summary Judgment ("SUMF") [Dkt. No. 10-36]; Brief for State of New York as Amicus Curiae in Support of Plaintiffs' Motion for Summary Judgment [Dkt. No. 13]; Brief of Amicus Curiae Pentagon Press Association in Support of Plaintiffs' Motion for Summary Judgment ("Press Ass'n Br.") [Dkt. No. 19]; Brief of Proposed Amici Curiae the Reporters Committee for Freedom of the Press and 23 Media Organizations in Support of Plaintiffs' Motion for Summary Judgment ("Committee Br.") [Dkt. No. 20]; Brief of Amici Curiae American Civil Liberties Union and American Civil Liberties Union of the District of Columbia in Support of Plaintiffs [Dkt. No. 21]; Defendants' Motion for Summary Judgment [Dkt. No. 22]; Defendants' Cross Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment ("Defs. Mot.") [Dkt. No. 22-1]; Defendants' Response to Plaintiffs' Statement of Undisputed Material Facts ("Defs. Resp. to SUMF") [Dkt. No. 22-2]; Combined Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment and in Further Support of Plaintiffs' Motion for Summary Judgment ("Pls. Reply") [Dkt. No. 24]; Supplemental Declaration of Theodore Boutrous ("Supp. Boutrous Decl.") [Dkt. No. 24-1]; Defendants' Reply in Support of Their Motion for Summary Judgment ("Defs. Reply") [Dkt. No. 27]; Administrative Record,

2

For the reasons explained in this Opinion, the Court will grant the plaintiffs' motion and deny the defendants' motion.

## I.  FACTUAL AND PROCEDURAL HISTORY

### A.  *Factual Background*[2]

#### 1. The Parties

This case centers on Pentagon Facilities Alternate Credentials ("PFACs"), press credentials that members of the media are issued to access the Pentagon.  SUMF at 1 (¶ 1).  For decades, journalists from news organizations across the country have covered the Department from the Pentagon's grounds, which they have accessed using their PFACs.  Id. at 1-2 (¶¶ 2, 5).  The New York Times is one such news organization.  Id. at 4 (¶ 22).  For more than forty years, multiple Times reporters with PFACs have worked regularly at the Pentagon.  Id.  Having a consistent presence at the Pentagon has enabled and enhanced the ability of the plaintiffs and other journalists to report on the Department and its leadership during some of the most consequential moments in American history.  Id. at 1-2 (¶ 3).  For The Times, having journalists with access to the Pentagon has enhanced the depth, detail, quality, and accuracy of its coverage of the Department, the U.S. military, and national security issues.  Id. at 5 (¶ 29).

Julian Barnes is a national security reporter with The Times who focuses on the Pentagon, U.S. intelligence agencies, and international security, among other subjects.  SUMF

---

NYTIMES-DOW-25cv04218-0000001-78 ("AR") [Dkt. No. 29]; Defendants' Notice of Clarification Regarding Statements at Oral Argument ("Notice of Clarification") [Dkt. No. 32]; Plaintiffs' Response to Defendants' "Notice of Clarification" [Dkt. No. 33]; and the Transcript of Oral Argument ("OA Tr.").

[2]        The parties agree that these facts are undisputed.  See SUMF; Defs. Resp. to SUMF.

at 5 (¶ 24).  He has held a PFAC almost continuously since 2004.  Id. (¶ 25).  Since then, he has attended hundreds of Pentagon press briefings and had countless discussions with Department officials in connection with his reporting.  Id. (¶ 26).  Mr. Barnes's access to and regular presence at the Pentagon allowed him to join press briefings scheduled on short notice, ask follow-up questions of Department spokespeople during and after press conferences, and ask questions of the public affairs representatives of every branch of the U.S. military.  Id. (¶ 27).  He and six other reporters with The Times held PFACs for most of 2025.  Id. (¶ 23).

By law, the Pentagon is under the "jurisdiction, custody, and control" of the "Secretary of Defense," who is required to "protect [its] buildings, grounds, and property" and is empowered to prescribe rules and regulations "to ensure [its] safe, efficient, and secure operation."  10 U.S.C. § 2674(a)-(c).  Pete Hegseth has served as Secretary of Defense since his confirmation by the Senate on January 24, 2025.  SUMF at 6 (¶ 33).  Before and during Secretary Hegseth's confirmation process, news outlets, including The Times, reported extensively on his background, including allegations of past sexual assault, excessive drinking, and marital infidelity, as well as questions about his lack of relevant experience.  Id. (¶ 34).  Throughout Secretary Hegseth's tenure, the Secretary and other Department officials have complained openly about reporting that they perceive as unfavorable to them and the Department.  Id. (¶ 35).

2. The History of News Organizations at the Pentagon

There has long been a process by which the Department issues PFACs to journalists to access the Pentagon.  SUMF at 2 (¶ 5).  For decades, that process required PFAC applicants to submit a letter confirming their employment and assignment with a news organization and undergo a standard background check.  Id.  Beginning in the early 2000s,

4

reporters who received PFACs were also asked to sign a one-page form setting forth certain "basic, noncontroversial" requirements related to PFACs.  Id. (¶ 8).  Those requirements included that the credential should be "visible and worn above the waist at all times while in the Pentagon" and that "[l]ost PFACs should immediately be reported to the Public Affairs Operations."  Id.  Reporters with PFACs were also restricted from accessing certain secure areas within the Pentagon, and reporters respected those boundaries.  Id. at 3 (¶ 10).  In addition, the Department has long provided dedicated physical workspace for news organizations within the Pentagon.  Id. at 2 (¶ 7).

The regular presence of PFAC holders at the Pentagon has enhanced the ability of journalists and news organizations to keep Americans informed about the U.S. military while posing no security or safety risk to Department property or personnel.  SUMF at 3 (¶ 11).  From the Pentagon, reporters historically have been able to cover official press briefings, including those called on short notice (or without notice), and to ask questions of Pentagon officials at (and before and after) those briefings.  Id. (¶ 12).  Reporters at the Pentagon also have engaged in additional semi-formal and informal conversations with senior Department officials and their aides, as well as public affairs staff.  Id. (¶ 13).  These in-person interactions can be crucial to obtaining the context and detail needed to report accurately and effectively about defense policy and military operations.  Id.  In addition, these interactions enable reporters at the Pentagon to establish professional relationships and foster trust with Department officials.  Id. (¶ 15).

Over the past several decades, there have been times when PFAC holders have published news stories critical of the Department or reported information that Department officials believed had come out too soon or would have preferred had not been made public at all.  SUMF at 4 (¶ 19).  The publication of such stories has led to scrutiny of the Department and

5

its officials by lawmakers and the public, and it has sometimes spurred beneficial reform.  Id.

Historically, though, even when Department leaders disliked a journalist's reporting, they did not

consider suspending, revoking, or not renewing the journalist's press credentials in response to

that reporting.  Id. (¶ 20).  Julian Barnes, Pete Williams, and Robert Burns—reporters who have

spent decades covering the Pentagon—as well as former Pentagon officials, are not aware of the

Department ever suspending, revoking, or not renewing a journalist's credentials due to concern

over the safety or security of Department personnel or property or based on the content of their

reporting.  Id. (¶ 21); see Barnes Decl. ¶ 7; Williams Decl. ¶ 10; Burns Decl. ¶¶ 16-17.[3]

### 3. The Department Announces a New PFAC Policy

In May 2025, the Department issued a memorandum entitled "Updated Physical

Control Measures for Press/Media Access Within the Pentagon," which imposed new restrictions

on journalists' physical access to specific areas within the Pentagon.  SUMF at 6-7 (¶ 38); see

---

[3]    For example, during the heated controversy over the publication of the Pentagon
Papers, the government fought The Times and The Washington Post in court rather than
retaliating by attempting to exclude journalists from those organizations from the Pentagon.
Notwithstanding the Department's strong desire to prevent the Pentagon Papers' release, the
Department did not threaten to revoke the reporters' credentials, and press briefings continued as
normal.  See Press Ass'n Br. at 6.  Likewise, the Department did not attempt to exclude
journalists from the Pentagon following the publication of stories describing the toxicity of
Agent Orange used during the Vietnam War, or the reporting on the "Fat Leonard" corruption
scandal involving serious threats to national security, or a host of other revelations from the
media.  See Committee Br. at 13-15.  And as counsel for the Pentagon Press Association as
amicus curiae recounted at oral argument:

> When General Westmoreland was upset that CBS was reporting
> misinformation about the Vietnam War, he sued.  But no reporter
> lost their credentials.  When 60 Minutes published photos of Abu
> Ghraib, they did a public service.  The Pentagon was upset, it was a
> disclosure of unauthorized information.  But no one reached out to
> yank credentials.

OA Tr. at 31.

AR at 46-47.  Specifically, the May memorandum prohibited journalists from being in the areas around the Secretary's office and stated that access to other sections of the building would require an official escort.  SUMF at 7 (¶ 40).  According to the memorandum, these "updated security measures" were "needed to reduce the opportunities for in-person inadvertent and unauthorized disclosures."  Id. (¶ 39).

Four months later, in September 2025, Mr. Parnell issued a memorandum entitled "Implementation of New Media In-brief," which purported to implement the Department's "Updated Physical Control Measures" from May.  SUMF at 7 (¶ 42); see AR at 22-23.  The September memorandum stated that "[a]ll members of the press issued a [PFAC] will be required to read and sign a new in-brief form outlining information security requirements, the new physical control measures, and [Department] expectations of their compliance with safety and security requirements."  SUMF at 7 (¶ 43).  The Department did not identify any breach of physical security or other incident necessitating new restrictions or requirements, and journalists, including Mr. Barnes, are not aware of any such incident.  Id. at 7-8 (¶ 44).

Attached to the September memorandum was a "Reservation In-Brief" (the "September In-Brief"), which announced new rules relating to PFACs.  SUMF at 8 (¶ 45).  The September In-Brief stated that "PFACs may be denied, revoked, or not renewed if a person is reasonably determined to pose a security or safety risk to [Department] personnel or property." Id. (¶ 46).  The September In-Brief further provided that such a determination may be "based on the unauthorized access, attempted unauthorized access, or unauthorized disclosure of" Department information and on grounds that "includ[ed], but [were] not limited to," "attempts to improperly obtain" Department information or "being found in physical possession of" such information "without reporting it."  Id.  Appendix A to the September In-Brief provided

additional grounds upon which the Department could "deny, revoke, or refuse to renew a PFAC," which "include[d], but [we]re not limited to," convictions for specific offenses. AR at 34-35. Finally, the September In-Brief included a series of "Acknowledgements" that journalists would be required to sign to obtain or maintain a PFAC. SUMF at 8 (¶ 47). Those Acknowledgements included statements affirming that the journalist had received the In-Brief and "underst[ood]" its requirements. AR at 32-33.

4. The Department and Members of the Press Engage on the New PFAC Policy

On September 22, 2025, the Reporters Committee for Freedom of the Press (the "Committee") sent a letter to Mr. Parnell "seeking clarity about the meaning of the [September In-Brief] and its implications for" journalists. AR at 44-45. The Committee's letter posed three broad questions and concerns. See id. First, the Committee asked whether the September In-Brief purported to require credentialed reporters to seek permission to disclose Department information. Id. at 44. Second, the Committee asked whether, by signing the Acknowledgements, "the PFAC holder is acknowledging that he or she will not take those actions, or that the PFAC holder is merely acknowledging that this is the Pentagon's policy." Id. at 45. Third, the Committee noted that, in its view, the September In-Brief "does not make clear whether a PFAC holder's disclosure of classified national security information or controlled unclassified information 'shall' or 'may' – in the Department's discretion – result in the denial or revocation of a PFAC." Id.

In a response letter dated September 24, 2025, Mr. Parnell wrote to "clarify" the application of the September In-Brief. SUMF at 9 (¶ 49); see AR at 41-43. Regarding the Committee's first concern, Mr. Parnell stated that the September In-Brief's requirement that "information must be approved for public release" was directed at Pentagon officials and did

8

"not impose restrictions on journalistic activities, such as investigating, reporting, or publishing stories." SUMF at 9 (¶ 49). The "focus" of the new policy, Mr. Parnell explained, was "on preventing active solicitation that encourages [Department] personnel to violate [the Department's] disclosure rules, as such conduct is not always protected by the First Amendment." Id. (¶ 50). As for the Committee's second concern, Mr. Parnell stated that the "Acknowledgements" are intended as "acknowledgments of [Department] policies and potential grounds for discretionary action, not as commitments by reporters to refrain from newsgathering or disclosure." AR at 42. He further stated that "[r]eceipt of unsolicited information and subsequent publication" "would not normally, on its own, trigger revocation" of a PFAC but that in "rare, extreme cases," such receipt "could factor into an assessment" of whether the reporter "poses a security risk." Id. Regarding the Committee's third concern, Mr. Parnell stated that the September In-Brief "does not mandate ('shall') that a PFAC holder's disclosure of" Department information "result in denial or revocation; rather it 'may' do so in the Department's discretion." Id.

Following additional discussions between Department officials and various media outlets, see AR at 48-74, The Times and other media organizations informed the Pentagon that provisions of the new PFAC policy were incompatible with the First Amendment and the responsibilities of members of the press. SUMF at 9 (¶ 53). The reporters therefore advised the Pentagon that they could not sign the Acknowledgement. Id.

### 5. The Department Issues a Final PFAC Policy

On October 6, 2025, the Department issued a new PFAC policy that included final versions of the In-Brief and Acknowledgment (the "Policy"). SUMF at 10 (¶ 54); see AR at 1-21. The Policy provides that a PFAC "may be denied, revoked, or not renewed if a person is

9

reasonably determined to pose a security or safety risk to [Department] personnel or property"

and that "[s]uch an initial determination may result in an immediate suspension of [a journalist's]

Pentagon access while the procedures preceding a final determination are pending."  SUMF at 10

(¶ 55).  The Policy states that "[s]uch determination may be based on factors including, but not

limited to, the unauthorized access, attempted unauthorized access, or unauthorized disclosure

of" classified national security information ("CNSI") or controlled unclassified information

("CUI") "based on a reasonable assessment informed by the unique facts and circumstances of

each case" and that "[a]ll determinations under th[e] Policy are undertaken on a case-by-case

basis reviewing the totality of the circumstances."  Id. (¶¶ 56-57).  The Policy further provides

that a journalist's receipt, publication, or "solicitation" of CUI, which "may include, but is not

limited to, information protected by the Privacy Act, information that is law enforcement-

sensitive, and certain operational security information," may result in the immediate suspension

or revocation of a PFAC.  Id. (¶ 58).  The examples of "solicitation" provided in the Policy

> include direct communications with specific [Department] personnel or general appeals, such as public advertisements or calls for tips encouraging [Department] employees to share non-public [Department] information.  For example, an advertisement or social media post by an individual journalist or media outlet that directly targets [Department] personnel to disclose non-public information without proper authorization would constitute a solicitation that could lead to revocation.  Additionally, publication that recklessly endangers American lives could factor into an assessment of whether continued unescorted access to the Pentagon poses a security risk.

Id. at 11 (¶ 60).

Appendix A, Part A of the Policy provides that "[p]ersons presumed to present" a

"security or safety risk to [Department] personnel or property" will "include, but are not limited

to, those who have been convicted of any offense involving," among other things, national

defense, theft, trespassing, fraud, deceit, and "[u]nprofessional conduct that might serve to

10

disrupt Pentagon operations." SUMF at 11 (¶ 61). The Appendix also states that "actions other than convictions may be deemed to pose a security or safety risk, such as discussed in the [In-Brief]." Id. (¶ 62). In addition, Appendix A, Part B sets forth "[p]rocedures for [d]enial, [r]evocation, or [n]on-[r]enewal" of a PFAC. Id. (¶ 63). Those procedures allow for an appeal following the "immediate suspension" of a reporter's PFAC and authorize the Department to "conduct [an] inquiry as deemed appropriate" after receiving a reporter's "written or oral response to the proposed denial, revocation, or non-renewal." Id. at 12 (¶¶ 64-65). Finally, the Policy includes the following "Acknowledgement":

> I have received, read, and understand the "Pentagon Reservation In-brief for Media Members," with Appendices A-E, including Appendix A, which addresses the standard and procedures for denying, revoking, or not renewing a PFAC. The in-brief describes [Department] policies and procedures. My signature represents my acknowledgement and understanding of such [Department] policies and procedures, even if I do not necessarily agree with such policies and procedures. Signing this acknowledgment does not waive any rights I may have under law.

Id. (¶ 67).

After the Policy was issued, PFAC holders were informed that their PFACs would be revoked if they did not sign the Acknowledgement by October 15, 2025. SUMF at 12 (¶ 68). Seven journalists with The Times, including Mr. Barnes, as well as most other journalists who held PFACs at the time, refused to sign the Acknowledgement. Id. (¶ 69). Mr. Barnes and his colleagues at The Times turned in their PFACs on or around October 15, 2025. Id. (¶ 70). Mr. Barnes has not been back to the Pentagon since that date. Id. at 13 (¶ 71).

### 6. The New "Pentagon Press Corps"

On October 22, 2025, in a post on his official X account, Mr. Parnell "announce[d] the next generation of the Pentagon press corps." SUMF at 13 (¶ 73). In that post,

11

Mr. Parnell wrote that the "[n]ew media outlets" that "signed the . . . media access policy" "circumvent the lies of the mainstream media and get real news to the American people." Id. (¶ 74). Mr. Parnell also wrote that "[t]heir reach and impact collectively are far more effective and balanced than the self-righteous media who chose to self-deport from the Pentagon," and he referred to those former PFAC holders as "activists who masquerade as journalists." Id. The new PFAC holders that the Department selected "were individuals and outlets who had expressed ideological agreement with and support for the Trump administration in the past." Id. (¶ 75). Those new holders include reporters from the National Pulse, an "industry mag/site for MAGA world"; Laura Loomer, an "influential pro-Trump activist"; Matt Gaetz, President Trump's one-time choice for Attorney General; James O'Keefe, the founder of the conservative group Project Veritas, who had pleaded guilty to federal charges for entering federal property under false pretenses and was under federal investigation for an unrelated offense; Mike Lindell, the CEO of MyPillow; Libby Emmons, the editor-in-chief of Human Events and the Post Millennial; and Tim Pool, a conservative political commentator and podcaster. Id. at 13-15 (¶¶ 76-82, 90).

Following the approval of his PFAC application, Mike Lindell promised to make the Trump administration "proud" of his coverage of the Pentagon. SUMF at 14 (¶ 80). Libby Emmons, who received an "unsolicited invitation to apply for credentials," stated that there should be a place for reporting on what they are doing [at the Pentagon] without always trying to expose the dark underbelly." Id. (¶ 81). Tim Pool stated that his outlet, which was granted a PFAC, was "not an investigative news organization" and did "not intend to maintain a significant presence in the Pentagon." Id. (¶ 82).

12

In her post on X announcing that her platform LOOMERED "is now a credentialed outlet at the Pentagon," Laura Loomer stated: "I have developed a Rolodex of sources and if you have any tips, feel free to contact the Loomered Tip Line: the most influential Tip Line in all of DC." SUMF at 15 (¶ 87). In response to a question regarding whether Ms. Loomer's "request for tips violates" the Policy, the Department issued a statement on November 4, 2025, attributed to Pentagon Press Secretary Kingsley Wilson, asserting that Loomer's call for tips is "a general tip line, which is constitutionally permissible." Id. (¶ 88). By contrast, the Department stated that a tip line frequently published alongside Pentagon-related stories by The Washington Post violated the Policy because it "targets military personnel and [Department] employees." Id.

In December 2025, at the first in-person press event on Pentagon grounds since the Policy took effect, Press Secretary Wilson described the new PFAC recipients as people who "actually reach Americans, ask real questions, and don't pursue a biased agenda." SUMF at 14 (¶ 83). Ms. Wilson called journalists and news organizations who had previously held PFACs "propagandists" who "stopped telling the truth" and who "continue[] to lie." Id. at 14-15 (¶ 84). And in response to a question from James O'Keefe regarding his surreptitiously recording a Pentagon official's criticism of President Trump, Ms. Wilson stated: "That's why the work you all do is so important . . . . [W]e want to make sure that we have the absolute best people working in it to protect Americans . . . [and] that they're on board and willing to serve our commander in chief." Id. at 16 (¶ 91).

### 7. The Harm to the Plaintiffs

As of November 2025, The Times had more than twelve million subscribers across its print and digital products, including news. SUMF at 16 (¶ 92). The Times' website is

13

the most visited news website in the United States.  Id. (¶ 93).  The Times has multiple reporters dedicated to covering national security, the Department of Defense, and the U.S. military.  Id. (¶ 94).  Yet no reporter from The Times has held a PFAC since October 15, 2025.  Id. (¶ 95).

The loss of PFACs has created an unprecedented and significant impediment to The Times' ability to cover the Department and its leadership, national security, and the U.S. military.  SUMF at 16 (¶ 96).  For example, the Pentagon has held press events, including a press conference in the Pentagon Press Briefing Room in which Pentagon staff discussed military strikes on Venezuelan boats and Venezuela itself, that Times reporters could not attend because they no longer have PFACs.  Id. (¶ 97); Barnes Decl. ¶¶ 19-20.  While The Times and Mr. Barnes have continued to cover the Pentagon since October 15, 2025, doing so has been more difficult and burdensome.  SUMF at 17 (¶ 103).

### B. Procedural History

The plaintiffs filed this lawsuit on December 4, 2025.  See Compl.  The plaintiffs advance seven counts: two counts under the Fifth Amendment, three counts under the First Amendment, one count under both the First and Fifth Amendments, and one count under the APA.  See id. ¶¶ 60-134.  They seek an order that (i) declares that certain provisions of the Policy are unlawful and unconstitutional; (ii) vacates and preliminarily and permanently enjoins the defendants from implementing or seeking to enforce those provisions; and (iii) directs the defendants to reinstate the PFACs formerly held by Mr. Barnes and The Times' other reporters. See id. at 39.

On January 5, 2026, the plaintiffs moved for summary judgment on all counts. See Pls. Mot.  The defendants filed an opposition to the plaintiffs' motion and a cross-motion for summary judgment on January 30.  See Defs. Mot.  The plaintiffs filed an opposition and reply

14

on February 18, see Pls. Reply, and the defendants filed a reply on February 27, see Defs. Reply. The Court heard oral arguments on the parties' cross-motions for summary judgment on March 6, 2026.

## II. LEGAL STANDARDS

A party is entitled to summary judgment only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). In evaluating a motion for summary judgment, "[t]he evidence is to be viewed in the light most favorable to the nonmoving party and the court must draw all reasonable inferences" in that party's favor. Talavera v. Shah, 638 F.3d 303, 308 (D.C. Cir. 2011). "When parties file cross-motions for summary judgment, each motion is viewed separately, in the light most favorable to the [nonmoving] party, with the court determining, 'for each side, whether a judgment may be entered in accordance with the Rule 56 standard.'" Howard Town Ctr. Dev., LLC v. Howard Univ., 267 F. Supp. 3d 229, 236 (D.D.C. 2017) (quoting Auto-Owners Ins. Co. v. Stevens & Ricci Inc., 835 F.3d 388, 402 (3d Cir. 2016)). The defendants dispute only four of the statements in the plaintiffs' statement of undisputed material facts, and the facts that the defendants do contest are not material. The Court therefore can resolve the case at this stage as a matter of law.

The plaintiffs acknowledge that they are challenging provisions of the Policy as unconstitutional "on their face." Pls. Reply at 1. "To succeed in a typical facial attack," a plaintiff "must establish 'that no set of circumstances exists under which [the statute] would be valid or that the statute lacks any plainly legitimate sweep.'" Edwards v. District of Columbia, 755 F.3d 996, 1001 (D.C. Cir. 2014) (quoting United States v. Stevens, 559 U.S. 460, 472 (2010)). That requirement is relaxed in the First Amendment context, and a plaintiff must show

15

that "a substantial number of [the statute's] applications are unconstitutional, judged in relation to [its] plainly legitimate sweep." Id. (quoting Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 449 n.6 (2008)).

## III. DISCUSSION

The plaintiffs argue that the Policy is unconstitutional under both the First and Fifth Amendments and that it is contrary to the APA. See Pls. Mot. The Court agrees with the plaintiffs on their constitutional arguments and thus does not address the plaintiffs' argument under the APA.[4]

### A. The Policy Violates the Fifth Amendment

To press their due process claims under the Fifth Amendment, the plaintiffs must establish that they have "been deprived of a protected interest in 'liberty' or 'property.'" NB ex rel. Peacock v. District of Columbia, 794 F.3d 31, 41 (D.C. Cir. 2015) (quoting Gen. Elec. Co. v. Jackson, 610 F.3d 110, 117 (D.C. Cir. 2010)). Relying on Sherrill v. Knight ("Sherrill"), 569 F.2d 124 (D.C. Cir. 1977), the plaintiffs contend that "'the interest of a bona fide . . . correspondent' in obtaining or retaining a press credential is not only 'protected by the first amendment,' but also 'undoubtedly qualifies as [a] liberty [interest] which may not be denied without due process of law under the fifth amendment.'" Pls. Mot. at 23 (second and third alterations in original) (quoting Sherrill, 569 F.2d at 130-31). Although the media credential at issue in Sherrill was a White House press pass rather than a Defense Department PFAC, the Court discerns no reason why that factual difference would be material, and the defendants

---

[4] The Court notes, however, that the plaintiffs' argument that the Policy is arbitrary and capricious under the APA largely is coextensive with their constitutional arguments.

identify none.  See Defs. Mot. at 13-24.  The plaintiffs have established that they have a protected liberty interest in their PFACs, which forms the basis for their due process challenge.

The plaintiffs' primary due process contention is that the Policy is so vague as to render it constitutionally deficient.  See Pls. Mot. at 24-28.  A law or regulation "is unconstitutionally vague if it 'fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement.'"  Woodhull Freedom Found. v. United States, 72 F.4th 1286, 1303 (D.C. Cir. 2023) (quoting United States v. Williams, 553 U.S. 285, 304 (2008)).  Put differently, "[r]egulated parties should know what is required of them so they may act accordingly[,] [and] precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way."  FCC v. Fox Television Stations, Inc., 567 U.S. 239, 253 (2012).  These concerns are particularly acute in the First Amendment context because "[u]ncertain meanings inevitably lead citizens to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked."  Grayned v. City of Rockford, 408 U.S. 104, 109 (1972) (citation modified).  So when a law implicates First Amendment rights, "a more stringent vagueness test" is applied.  Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc., 455 U.S. 489, 499 (1982); see Karem v. Trump ("Karem"), 960 F.3d 656, 665 (D.C. Cir. 2020).

The plaintiffs maintain that the Policy violates due process vagueness principles because it "fails to give fair notice of the conduct it prohibits—a 'fundamental principle in our legal system.'"  Pls. Mot. at 25 (quoting FCC v. Fox Television Stations, Inc., 567 U.S. at 253).  They argue that the Policy "is unconstitutionally vague . . . because it does not tell journalists and news organizations what routine reporting and newsgathering . . . will (or will not) cause them to lose their PFACs."  Pls. Reply at 3.  In making this argument, the plaintiffs rely heavily on the

17

D.C. Circuit's decisions in <u>Sherrill v. Knight</u>, 569 F.2d 124 (D.C. Cir. 1977), and <u>Karem v. Trump</u>, 960 F.3d 656 (D.C. Cir. 2020).

In <u>Sherrill</u>, the plaintiff, Robert Sherrill, was a Washington correspondent for The Nation. <u>Sherrill</u>, 569 F.2d at 126. He applied for and was denied a White House press pass for "reasons of security." <u>Id</u>. at 126-27. In weighing the plaintiff's challenge to that denial, the D.C. Circuit explained that the government's decision to establish press facilities for correspondents who need to report from the White House implicates the First Amendment rights of both journalists and the general public and that access to those spaces cannot "be denied arbitrarily or for less than compelling reasons." <u>Id</u>. at 129. Given the interests at stake, the court elaborated that the government must meaningfully "inform the public [and] other potential applicants of the basis for exclusion of journalists from" those spaces. <u>Id</u>. at 130. But the mere invocation of "reasons of security," the court explained, does not suffice to inform the interested parties because that phrase "is unnecessarily vague and subject to ambiguous interpretation." <u>Id</u>. With all this in mind, the court held that the White House's "failure to articulate and publish an explicit and meaningful standard governing denial of White House press passes for security reasons" violated the Due Process Clause. <u>Id</u>. at 131.

In <u>Karem</u>, the White House suspended a journalist's press pass for one month based on his conduct at a Rose Garden event. <u>Karem</u>, 960 F.3d at 662-63. Considering the journalist's constitutional challenge to that suspension, the court of appeals held that a "duly issued [press] pass may not be suspended without due process." <u>Id</u>. at 665. The court elaborated that because the suspension of a press pass "implicates important first amendment rights," it must be evaluated "under a particularly stringent vagueness and fair-notice test." <u>Id</u>. (citation modified). Concluding that the White House had not fairly informed the journalist of the

18

behavior that would subject him to punishment and the severity of the penalty that might be imposed, the D.C. Circuit held that the suspension of the journalist's press pass likely contravened due process protections.  Id.

These two decisions heavily inform this Court's analysis.  Indeed, the parallels between this case and those precedents are hard to miss.  In this case, the Policy states that "[a] PFAC may be denied, revoked, or not renewed if a person is reasonably determined to pose a security or safety risk to [Department] personnel or property."  AR at 12.  As the plaintiffs point out, this standard "echo[es] the approach struck down in Sherrill."  Pls. Mot. at 25.  In Sherrill, the D.C. Circuit explicitly held that the government may not point to unspecified "reasons of security" to deny an application for a press pass because such an explanation is "unnecessarily vague and subject to ambiguous interpretation."  Sherrill, 569 F.2d at 130; see also N.Y. Times Co. v. United States, 403 U.S. 713, 719 (1971) (Black, J., concurring) (explaining that "the word 'security' is a broad, vague generality").  Yet that is precisely what the Department has done in the Policy.

The defendants argue that the D.C. Circuit's reasoning in Sherrill actually supports their position because the court there "rejected the contention that the White House was required to articulate 'detailed criteria upon which the granting or denial of White House press passes is to be based.'"  Defs. Mot. at 18 (quoting Sherrill, 569 F.2d at 128).  To be sure, the court in Sherrill agreed with the White House that its reason for regulating press access—the "protection of the President"—"does not lend itself to detailed articulation of narrow and specific standards."  Sherrill, 569 F.2d at 130.  But the court did so while noting that a standard for the issuance of White House press credentials based on "whether the applicant presents a potential source of physical danger to the President and/or his immediate family so serious as to justify his

19

exclusion" would be "sufficiently circumspect" to provide journalists with constitutionally adequate notice.  Id.  That is, unlike the "reasons of security" standard, the "physical danger to the President" standard would be "explicit and meaningful."  Id. at 130-31.  The Court agrees with the plaintiffs that the standard outlined in the Policy allowing Department officials to revoke or deny the PFAC of any journalist deemed a "security or safety risk" for virtually any reason is a "far cry from the 'circumspect' hypothetical standard discussed in Sherrill."  Pls. Reply at 4.  While the Department need not "predict every conceivable form that a potential security risk might take," Defs. Mot. at 18, the reasoning in Sherrill dictates that the Department is required to articulate a standard that is more specific and meaningful than mere considerations of "security."  See Sherrill, 569 F.2d at 130.

Nonetheless, the defendants assert that the Policy is not impermissibly vague because it "extensively details the criteria that will be considered" in determining whether a journalist is a "security or safety risk."  Defs. Reply at 3.  According to the defendants, those criteria include "soliciting the disclosure of CNSI or CUI or encouraging Department personnel to violate" disclosure laws.  Defs. Mot. at 15.  In addition, the defendants note that the Policy provides "examples of what . . . solicitation might look like: general appeals, direct communications, and advertisements that directly target Department personnel to disclose information without authorization."  Id.  In the defendants' view, that "is more than enough" to put a person "of ordinary intelligence" on notice.  Id.

The problem for the defendants—as the plaintiffs point out—is that these criteria are themselves open to ambiguous interpretation.  See Pls. Mot. at 26; Pls. Reply at 6.  The considerations that may or may not lead to a reporter being deemed "a security or safety risk" include obtaining or attempting to obtain any information that the Department has not approved

20

for release, regardless of whether that information is classified.  See AR at 12-13.  But to state

the obvious, obtaining and attempting to obtain information is what journalists do.  A primary

way in which journalists obtain information is by asking questions.  Indeed, "[t]he freedom to

ask questions of public officials is fundamental to the work of journalism."  Committee Br. at 7.

Under the Policy's terms, then, essential journalistic practices that the plaintiffs and others

engage in every day—such as asking questions of Department employees—could trigger a

determination by the Department that a journalist poses a security or safety risk.

Perhaps contending with that reality, the defendants argue in their reply brief that

the Policy's limitations on journalists accessing or attempting to access non-public information

are sufficiently clear because they do not in fact "create any new restriction on journalists'

conduct."  Defs. Reply at 4.  Instead, the defendants assert that the Policy does no more than

incorporate "existing federal criminal law" prohibiting the disclosure of certain Department

information.  Id. (emphasis omitted).  The Policy's constraints on "solicitation," in the

defendants' telling, simply proscribe criminal solicitation—that is, "the solicitation of conduct

that is independently unlawful for Department personnel."  Id. at 5 (emphasis omitted).  And

that—the defendants say—"is precisely the category of speech that the Supreme Court held is

unprotected" in United States v. Hansen ("Hansen"), 599 U.S. 762, 783 (2023).  Defs. Reply

at 5.

This argument, simply put, is just plain wrong.  "Criminal solicitation is the

intentional encouragement of an unlawful act."  Hansen, 599 U.S. at 771.  But to "solicit" in the

everyday sense means "to approach (someone) with a request or plea."  Solicit, Merriam-

Webster, https://perma.cc/73MD-6DF8.  For example, one can solicit donations or solicit

volunteers.  A lawyer can solicit clients.  The role of a journalist is to solicit information.  All of

21

these acts fall within the everyday meaning of the word "solicitation."  A charity requesting donations, a community organizer calling on volunteers, or a journalist asking questions is not a crime!

Even assuming that in some narrow circumstances a journalist's conduct could amount to criminal solicitation as defined in Hansen, the Policy does not clearly distinguish between any such impermissible solicitation and plainly lawful journalistic practices.  For example, the Policy's illustrations of impermissible "solicitation" include obtaining not just classified information, but any "non-public information" released "without proper authorization."  AR at 12-13.  But a journalist would have no way of knowing what information has been authorized for release and what has not.  Under the Policy, if the journalist happens to ask a question that results in the disclosure of unauthorized information by a Department employee, that question could lead to the journalist being deemed a "security or safety risk."  Similarly, the Policy encompasses something called "controlled unclassified information," or CUI, which—by the Policy's definition—"may include, but is not limited to, information protected by the Privacy Act, information that is law enforcement-sensitive, and certain operational security information."  AR at 6.  The plaintiffs point out that the Department recognizes 113 categories of CUI.  See Pls. Reply at 6 & n.1.  A journalist cannot possibly know every piece of information that falls into one of those 113 categories.  But again, if a journalist asks a question that leads to the disclosure of CUI by a Department employee, the journalist's PFAC could be revoked under the terms of the Policy.

As a last resort, counsel for the defendants made the following "representation" at oral argument: "The Department will only consider solicitation where the disclosure by Department of [Defense] personnel would be a criminal act, and only where the criminal act

22

violates one of the statutes explicitly listed in the policy." OA Tr. at 47-48.  Immediately after making that representation, though, counsel noted that it is not the defendants' position that if a journalist asks a question that seeks information, the providing of which would violate a criminal statute listed in the Policy, the journalist necessarily has engaged in criminal solicitation.  See id. at 48.  This ostensible limiting interpretation by the government does not clarify or limit the Policy's criteria because that interpretation itself encompasses within its prohibitions more than criminal solicitation.  And in any event, counsel's representation is flatly inconsistent with the explicit language of the Policy.  See AR at 12-13.  If anything, the fact that the defendants felt compelled to make such a representation underscores just how impenetrable the Policy is.  If the defendants themselves equivocate on the Policy's meaning, how can journalists possibly know what they can and cannot do under its terms?

In short, the Policy fails to provide fair notice of what routine, lawful journalistic practices will result in the denial, suspension, or revocation of a PFAC.  In the plaintiffs' words, "[i]n practice, virtually any newsgathering could be characterized as prohibited 'solicitation,'" if the Department so chooses.  Pls. Reply at 6.  Given this uncertainty, one could easily predict that journalists would opt not to ask any questions rather than risk losing their PFACs.  Indeed, Mr. Barnes averred that "[i]t is not clear to [him], based on the language of the new PFAC policy, what steps [he] would need to take to ensure that [his] PFAC was not subject to revocation, suspension, or non-renewal—other than to stop reporting on the Pentagon and the United States military."  Barnes Decl. ¶ 15.  The vagueness doctrine is intended to protect against precisely that chilling effect.  See Grayned v. City of Rockford, 408 U.S. at 109.

The plaintiffs also argue that "the Policy is unconstitutionally vague for the additional reason that it 'is so standardless that it authorizes or encourages seriously

23

discriminatory enforcement.'"  Pls. Mot. at 27 (quoting United States v. Williams, 553 U.S. at 304).  The plaintiffs assert specifically that the Policy does not provide Department officials with clear standards to guide the determination of whether a journalist's PFAC should or should not be suspended, revoked, or not renewed, "thereby empowering Department officials to do whatever they want, depending on their own personal predilections."  Id. at 27-28.  As the D.C. Circuit has recognized, this argument is closely related to the argument that the Policy is unreasonable because it grants Department officials unbridled enforcement discretion.  See Am. Freedom Def. Initiative v. Wash. Metro. Area Transit Auth., WMATA ("AFDI"), 901 F.3d 356, 372 (D.C. Cir. 2018) ("[T]he overlap in analysis between unbridled discretion and vagueness is clear; both doctrines require a court to determine whether a decisionmaker's exercise of discretion in allowing or disallowing speech is based upon objective and clear standards."); Act Now to Stop War & End Racism Coal. & Muslim Am. Soc'y Freedom Found. v. District of Columbia, 846 F.3d 391, 412 (D.C. Cir. 2017) (addressing "the analogous context of a facial First Amendment challenge to a licensing scheme" as part of a vagueness challenge). The Court agrees with the plaintiffs that the Policy does not provide Department officials with the requisite "objective and clear standards" for determining whether to deny, revoke, or suspend a journalist's PFAC, thereby permitting—and even encouraging—arbitrary and discriminatory enforcement.  See AFDI, 901 F.3d at 372.  The Policy therefore contravenes due process.[5]

---

[5]     The plaintiffs also argue that the Policy violates due process "by failing to provide sufficient process before the immediate suspension of a reporter's PFAC."  Pls. Mot. at 28.  While the Court is skeptical that the plaintiffs have established their entitlement to pre-deprivation process, it has no occasion to decide that issue because the provisions of the Policy allowing for the "immediate suspension of a reporter's PFAC," id., as just discussed, are themselves constitutionally deficient.

24

In sum, the Policy on its face makes any newsgathering and reporting not blessed by the Department a potential basis for the denial, suspension, or revocation of a journalist's PFAC. It provides no way for journalists to know how they may do their jobs without losing their credentials. The Policy therefore is vague in violation of the Fifth Amendment.

### B. The Policy Violates the First Amendment

The plaintiffs assert that the Policy contravenes the First Amendment in two ways. First, they argue that the Policy imposes unreasonable and viewpoint-discriminatory restrictions in a nonpublic forum. See Pls. Mot. at 38-40. Second, the plaintiffs contend that the Policy impermissibly regulates the content of newsgathering, reporting, and publication off Pentagon grounds. See id. at 34-38. The Court agrees with the plaintiffs' first argument and therefore need not reach their alternative argument.

The First Amendment limits the restrictions that the government may impose on speech, including speech on government property. See Cornelius v. NAACP Legal Def. & Educ. Fund, Inc. ("Cornelius"), 473 U.S. 788, 799-800 (1985). The level of scrutiny applicable to those restrictions depends on the type of forum for speech that the government has created. See Ateba v. Leavitt, 133 F.4th 114, 121 (D.C. Cir. 2025) ("As a general principle, the extent to which the government can control access to a forum it owns or controls depends on the nature of the relevant forum." (citation modified)). The Supreme Court has recognized "three types of government-controlled spaces: traditional public forums, designated public forums, and nonpublic forums." Minn. Voters All. v. Mansky ("Mansky"), 585 U.S. 1, 11 (2018).

The parties agree that the Pentagon's press spaces are nonpublic forums. See Pls. Mot. at 39; Defs. Mot. at 37. "A nonpublic forum is government property 'that is not by tradition or designation a forum for public communication,' such as a government office

25

building."  Ateba v. Leavitt, 133 F.4th at 121-22 (quoting Mansky, 585 U.S. at 11).  While the

government need not "open such spaces for any speech at all, the government creates a

'nonpublic forum' when it provides 'selective access for individual speakers.'"  Id. at 122

(quoting Bryant v. Gates, 532 F.3d 888, 895 (D.C. Cir. 2008)).  "As a nonpublic forum, access to

the [Pentagon] 'can be restricted as long as the restrictions are' viewpoint neutral and

reasonable."  Id. at 123 (quoting Cornelius, 473 U.S. at 800); see Mansky, 585 U.S. at 12.[6]  The

Court will consider each requirement in turn.

1. The Policy Is Viewpoint Discriminatory

"It is axiomatic that the government may not regulate speech based on its

substantive content or the message it conveys."  Rosenberger v. Rector & Visitors of Univ. of

Va., 515 U.S. 819, 828 (1995).  "Content-based laws—those that target speech based on its

communicative content—are presumptively unconstitutional and may be justified only if the

government proves that they are narrowly tailored to serve compelling state interests."  Reed v.

Town of Gilbert, 576 U.S. 155, 163 (2015).  Viewpoint discrimination is an "egregious form of

content discrimination" in which "the government targets not subject matter, but particular views

taken by speakers on a subject."  Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S.

at 829.  Restrictions "based on viewpoint are prohibited."  Mansky, 585 U.S. at 11.  A speech

---

[6]    For this reason, the defendants' insistence that "access to the Pentagon is a privilege, not a right" and that the Department "could have decided not to allow any press access to the Pentagon," Defs. Mot. at 1, is irrelevant.  Because the Department has long chosen to allow press access to the Pentagon, it cannot deny that access unreasonably or on the basis of viewpoint.  See Ateba v. Leavitt, 133 F.4th at 123; see also Sherrill, 569 F.2d at 129 ("[W]here the White House has voluntarily decided to establish press facilities for correspondents who need to report therefrom . . . the protection afforded newsgathering under the first amendment guarantee of freedom of the press . . . requires that this access not be denied arbitrarily or for less than compelling reasons.").

26

regulation that is neutral on its face may nonetheless be viewpoint discriminatory if it was adopted "because of disagreement with the message [the speech] conveys." Sorrell v. IMS Health, Inc., 564 U.S. 552, 566 (2011) (quoting Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989)).  Stated differently, the government may not impose speech restrictions that reflect "an effort to suppress expression merely because public officials oppose the speaker's view."  Mansky, 585 U.S. at 12 (quoting Perry Educ. Ass'n. v. Perry Local Educators' Ass'n., 460 U.S. 37, 46 (1983)).

The plaintiffs argue that the Policy is viewpoint discriminatory because "both [its] purpose and [its] effect . . . is to chill" speech that the Department perceives as unfavorable or biased.  Pls. Mot. at 35.  In support, the plaintiffs point to a host of unchallenged public statements about the media made by Secretary Hegseth, Mr. Parnell, and other members of the Department's leadership.  See id. at 36; Pls. Reply at 13-14; SUMF at 14-15 (¶¶ 83-89).

The plaintiffs are correct: "The record is replete with undisputed evidence that the Policy is viewpoint discriminatory."  Pls. Reply at 13.  That evidence tells the story of a Department whose leadership has been and continues to be openly hostile to the "mainstream media" whose reporting it views as unfavorable, but receptive to outlets that have expressed "support for the Trump administration in the past."  SUMF at 6, 13 (¶¶ 35, 74-75).  The story begins prior to the adoption of the Policy, when—following extensive reporting on Secretary Hegseth's background and qualifications during his confirmation process—Secretary Hegseth and Department officials "openly complained about reporting they perceive[d] as unfavorable to them and the Department."  Id. at 6 (¶ 35).  Then, in the weeks and months leading up to the issuance of the Policy, Department officials repeatedly condemned certain news organizations— including The Times—for their coverage of the Department.  For example, in response to

27

reporting by The Times on Secretary Hegseth's alleged misuse of the messaging platform Signal, Mr. Parnell posted on X to call out The Times "and all other Fake News that repeat their garbage." Supp. Boutrous Decl. at Ex. 7. Mr. Parnell decried these news organizations as "Trump-hating media" who "continue[] to be obsessed with destroying anyone committed to President Trump's agenda." Id. In other social media posts leading up to the issuance of the Policy, Department officials referred to journalists from The Washington Post as "scum" and called for their "severe punishment" in response to reporting on Secretary Hegseth's security detail. See id. at Exs. 2-4.

The story continues following the issuance of the Policy. When The Times announced on X that its journalists were declining to sign the Policy's Acknowledgement and instead would be handing in their PFACs, Secretary Hegseth responded with a waving-hand emoji. See Supp. Boutrous Decl. at Ex. 1. In a press conference shortly after the Policy was issued, Ms. Wilson referred to journalists and news organizations who had previously held PFACs as "propagandists" who "stopped telling the truth" and who "continue[] to lie." SUMF at 14-15 (¶ 84). Other comments from Department officials referred to previous PFAC holders as "biased," "adversarial," "unprofessional," and lacking "a brain." Id. at 14-15 (¶¶ 83, 85-86, 89). By contrast, in a post on X announcing the "next generation of the Pentagon press corps," Mr. Parnell praised those willing to sign onto the Policy as "circumvent[ing] the lies of the mainstream media and get[ting] real news to the American people." Id. at 13 (¶¶ 73-74). Ms. Wilson praised those new PFAC holders as "the absolute best people" and commended them for being "on board and willing to serve our commander in chief." Id. at 16 (¶ 91); see also id. at 14 (¶¶ 80-82) (statements by new PFAC holders).

28

The defendants make little effort to respond to this voluminous record evidence, dismissing the aforementioned statements as mere "characterizations of different media outlets" or "praising one set of journalists and criticizing another." Defs. Mot. at 32. Instead, the defendants argue that the record does not support an "aim" to drive disfavored speakers and their disfavored journalism out of the Pentagon because "the PFAC Policy itself does not contain this aim." Id. at 31. That argument, of course, ignores the reality that a policy can be viewpoint discriminatory even if it is facially viewpoint neutral. See Cornelius, 473 U.S. at 812 (observing that facially neutral "justifications cannot save an exclusion that is in fact based on the desire to suppress a particular point of view"); see also Sorrell v. IMS Health, Inc., 564 U.S. at 566; Ward v. Rock Against Racism, 491 U.S. at 791.

The defendants also contend that the Policy cannot be viewpoint discriminatory because "the Department conferred with the major news outlets and journalist professional organizations on revisions" to the Policy and "made particular changes . . . in response to such concerns." Defs. Mot. at 31. True, the record reflects that the Department made edits to the Policy in response to pushback from news organizations. See generally AR at 48-74. But those revisions appear to be largely superficial—for example, moving language from one section to another while retaining the substance of the provisions. See id. at 52-63. The record does not support any suggestion that those changes altered the substance of the Policy or addressed the thrust of the expressed concerns—that the Policy's prohibition on "solicitation" was unclear and the Acknowledgment required journalists to confirm their "understanding" of the Policy's unclear provisions. See e.g., id. at 50. To the extent that any conclusion can be drawn from the back-and-forth between the Department and news organizations, it is just as reasonable to

29

conclude that the Department knew the majority of existing PFAC holders would not agree to the Policy, yet it implemented it anyway.

In their reply brief, the defendants say that the Policy is not viewpoint discriminatory because journalists from across the political spectrum declined to sign onto it, including not just The Times but also CNN, Fox News, Newsmax, the Washington Examiner, and the Daily Caller. See Defs. Reply at 11. True, but beside the point. The record evidence supports the conclusion that the Policy discriminates not based on political viewpoint but rather based on editorial viewpoint—that is, whether the individual or organization is willing to publish only stories that are favorable to or spoon-fed by Department leadership. See, e.g., SUMF at 16 (¶ 91) (Ms. Wilson praising the new PFAC holders for being "on board and willing to serve our commander in chief"). As counsel for the plaintiffs put it at oral argument, the difference between the prior and current PFAC holders is their viewpoint on "the nature of the role of the journalists covering the Pentagon." OA Tr. at 16-17.

In sum, the undisputed evidence reflects the Policy's true purpose and practical effect: to weed out disfavored journalists—those who were not, in the Department's view, "on board and willing to serve," SUMF at 16 (¶ 91)—and replace them with news entities that are. That is viewpoint discrimination, full stop. And this viewpoint-discriminatory Policy represents a sea change in the Department's relationship with the media. In the past, respected journalists viewed themselves as neutral, independent reporters of news. See Wilson Decl. ¶¶ 14, 16-17; Barnes Decl. ¶ 21; Burns Decl. ¶¶ 18-21. And even when they were critical of the Defense Department or other government officials, their credentials were not revoked. See Wilson Decl. ¶ 16. As Mr. Burns said, no matter how critical he was, "I never experienced any threats—direct or indirect—to my credential or access to the Pentagon, and I never perceived any risk that

30

my reporting would trigger retaliation." Burns Decl. ¶ 17. The Policy thus violates the First Amendment.

### 2. The Policy Is Unreasonable

To withstand First Amendment scrutiny, a policy regulating a nonpublic forum must be "reasonable in light of the purpose served by the forum." Mansky, 585 U.S. at 13 (quoting Cornelius, 473 U.S. at 806). The obvious purpose of the press areas of the Pentagon is to facilitate newsgathering and reporting on the Department for the benefit of the American people—or, as the defendants put it, to promote "transparency." Defs. Mot. at 1. The plaintiffs contend that the Policy is unreasonable in light of that purpose because it vests Department officials with "unbridled discretion" to enforce the Policy and fails to provide objective, workable standards for that enforcement. See Pls. Mot. at 40.

The D.C. Circuit has held "that a restriction is not reasonable under the First Amendment if it provides the decisionmaker with unbridled discretion to suppress expression— that is, when the rule is so broad as to provide no meaningful constraint upon the government's exercise of the power to squelch speech." Ateba v. Leavitt, 133 F.4th at 124-25 (citation modified); see City of Lakewood v. Plain Dealer Publ'g Co. ("City of Lakewood"), 486 U.S. 750, 764 (1988) (holding that the government may not "condition . . . speech on obtaining a license or permit from a government official in that official's boundless discretion" (emphasis omitted)). The "unbridled discretion" doctrine recognizes that "the mere existence . . . of unfettered discretion . . . intimidates parties into censoring their own speech, even if the discretion and power are never actually abused." City of Lakewood, 486 U.S. at 757; see also AFDI, 901 F.3d at 372 ("[T]he 'danger of censorship and of abridgment of our precious First Amendment freedoms is too great where officials have unbridled discretion over a forum's use.'"

31

(quoting Promotions, Ltd. v. Conrad, 420 U.S. 546, 553 (1975))).  "[W]hen a licensing statute allegedly vests unbridled discretion in a government official over whether to permit or deny expressive activity, one who is subject to the law may challenge it facially without the necessity of first applying for, and being denied, a license."  City of Lakewood, 486 U.S. at 755-56.

A credentialing scheme that has a "close enough nexus to expression, or to conduct commonly associated with expression, to pose a real and substantial threat" of censorship and that vests officials with "boundless discretion" thus violates the First Amendment.  City of Lakewood, 486 U.S. at 759, 764; see also Forsyth County v. Nationalist Movement, 505 U.S. 123, 130-33 (1992).  The plaintiffs assert that the Policy meets the sufficiently "close . . . nexus to expression" test because "the entire purpose of a PFAC is to facilitate certain First Amendment-protected activity by journalists on Pentagon grounds."  Pls. Mot. at 31.  The defendants counter that a PFAC merely facilitates entry to portions of the Pentagon, which they contend "is a noncommunicative, preparatory step in the production of speech."  Defs. Mot. at 25 (citing Price v. Garland, 45 F.4th 1059, 1068 (D.C. Cir. 2022)).  The defendants' argument is a non-starter because the D.C. Circuit already has recognized the application of the unbridled discretion doctrine to a press pass policy.  See Ateba v. Leavitt, 133 F.4th at 125.

Turning to the thrust of the arguments, the defendants acknowledge that the Policy vests Department officials with significant discretion, but they contend that the Department is entitled to "considerable leeway" in fashioning a press pass credentialing scheme.  Defs. Mot. at 27 (quoting Sherrill, 569 F.2d at 130).  The defendants are correct that "[i]t is not fatal to regulations that they endow officials with some measure of discretion."  Ateba v. Leavitt, 133 F.4th at 125 (citation modified).  But as the defendants themselves acknowledge,

32

"the unbridled discretion doctrine is concerned with making explicit the limits on an official's discretion." Defs. Mot. at 27. To that end, any regulations the government issues "must be reasonably specific and objective, and not leave the decision to the whim of the administrator." Ateba v. Leavitt, 133 F.4th at 125 (citation modified). The Department's Policy does not satisfy those requirements.

For one, as explained above, the Policy's operative standard—whether a journalist poses a "security or safety risk"—provides no meaningful limitations on Department officials. The defendants once again try to avoid this conclusion by invoking Sherrill to argue that "[t]he Department can hardly predict every conceivable form that a security risk in the Pentagon might take, and it is entitled to rely on standards at a sufficient level of generality to allow responsive action to be taken in cases presenting novel security risks." Defs. Mot. at 26; see Sherrill, 569 F.2d at 130. The Court has already explained why the D.C. Circuit's reasoning in Sherrill lends little support to the defendants' position, see supra Section III.A, and need not reiterate that explanation here.

What is more, even when the Policy purports to clarify the bases upon which a PFAC may be denied or revoked, it expressly retains authority for a Department official to make a different choice—for any reason or for no reason at all. As the plaintiffs summarize: "Information in specified categories 'may' (or may not) be 'controlled unclassified information'; prohibited '[s]olicitation may' (or may not) 'include direct communications with [Department] personnel or general appeals'; a reporter who receives or discloses 'unauthorized' information 'may' (or may not) be deemed a 'security or safety risk'; and a reporter who is deemed a 'security or safety' risk 'may' (or may not) lose his or her PFAC." Pls. Mot. at 32-33 (alterations in original) (citations omitted); see AR at 6, 12-13. On top of these layers upon layers of

33

discretion, the Policy contains the express caveat that a "security or safety risk" determination will be made "on a case-by-case basis reviewing the totality of the circumstances" and will turn on "the unique facts and circumstances of each case." AR at 12-13. The Policy thus supplies no concrete limitations, only "illusory 'constraints'" that can be invoked or ignored at the Department's pleasure. City of Lakewood, 486 U.S. at 769.

Indeed, the Department has already shown its discretion to be unconstrained by the Policy. For example, James O'Keefe applied for and was granted a PFAC notwithstanding that he pleaded guilty to crimes involving "trespassing" and "deceit"—offenses that the Policy explicitly provides as bases for "presumptive[ly]" deeming an applicant a "security or safety risk." AR at 15; see SUMF at 14 (¶ 79). The defendants offer no explanation for the Department's decision to give Mr. O'Keefe a PFAC despite his presumptive ineligibility, other than that "the Policy's presumptive disqualifiers . . . are not automatic." Defs. Reply at 16. "The Department's decision to grant O'Keefe a PFAC," the defendants say, "is consistent with the Policy's terms." Id. But that is precisely the problem. Nothing in the Policy prevents the Department from granting Mr. O'Keefe a PFAC, just like nothing in the Policy would prevent the Department from, say, denying the PFAC application of a journalist from The Times who pleaded guilty to the exact same crimes. Both scenarios would be consistent with the Policy because nothing in the Policy proscribes its arbitrary enforcement. See Forsyth County v. Nationalist Movement, 505 U.S. at 133.

As another example, the Department has stated that it understands the Policy's prohibition on solicitation "to forbid the Washington Post from stating publicly that it 'wants to hear from Defense Department civilians and service members about changes within the Pentagon and throughout the U.S. Military.'" Pls. Reply at 6; see Defs. Mot. at 27-28; SUMF at 15 (¶ 88).

34

Meanwhile, the Department deemed permissible a social media post by Laura Loomer that likewise called for tips in the context of a post in which Ms. Loomer stated, "LOOMERED is now a credentialed outlet at the Pentagon," and "I look forward to covering the Pentagon and breaking more stories that impact our country and our national security." Boutrous Decl. at Ex. 20; see SUMF at 15 (¶¶ 87-88). The defendants attempt to distinguish those two calls for tips on the grounds that The Washington Post's tip line "appears at the end of military defense related stories," whereas Ms. Loomer's post is supposedly more "general" and invites tips "on any matter." Defs. Mot. at 27-28. The Court is unpersuaded that there is any distinction between The Washington Post's tip line and Ms. Loomer's, other than that The Washington Post's motto is "Democracy Dies in Darkness," while Ms. Loomer's apparently is willingness to "serve [the] commander in chief." See SUMF at 14, 16 (¶¶ 83-84, 91). But the problem is that nothing in the Policy explicitly prevents the Department from treating these two nearly identical tip lines differently. As an example, even if the Department determined that Ms. Loomer's request for tips constituted "solicitation" under the Policy, it could still decide in its discretion not to revoke her PFAC for any reason or for no reason at all.[7]

The Policy also is unreasonable and therefore violates the First Amendment for the related reason that it is not "guided by objective, workable standards." Mansky, 585 U.S. at 21; see AFDI, 901 F.3d at 372 (observing that "whether the discretion vested in a government official to permit or prohibit speech is 'guided by objective, workable standards'" is a "related inquiry" to questions of vagueness and unbridled discretion (quoting Mansky, 585 U.S. at 21)).

---

[7]    In a similar vein, the Court is aware of recent reporting that the Pentagon has barred press photographers from briefings on the ongoing U.S.-Israeli war with Iran after they published photos of Secretary Hegseth that his staff deemed "unflattering." See Scott Nover, Pentagon Bars Press Photographers Over 'Unflattering' Hegseth Photos, WASH. POST (Mar. 11, 2026), https://perma.cc/CP92-234S.

As described throughout this Opinion, the Policy contains expansive and expressly noncommittal language that provides no objective basis upon which to judge the Department's decision to grant or deny a PFAC application.  For that reason, among the others described herein, it cannot stand.[8]

### C.  The Remedies

#### 1.  The Plaintiffs Are Entitled to Injunctive Relief

To obtain a permanent injunction, the plaintiffs must demonstrate:

> (1) that [they] ha[ve] suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff[s] and defendant[s], a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

Monsanto Co. v. Geertson Seed Farms, 561 U.S. 139, 156-57 (2010).  The Court determines that the injunction factors weigh in the plaintiffs' favor.

First, the plaintiffs stand to suffer immediate irreparable harm absent equitable relief.  As the D.C. Circuit has recognized in the context of the First Amendment's free speech guarantee, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  Pursuing Am.'s Greatness v. Fed. Election Comm'n, 831 F.3d 500, 511 (D.C. Cir. 2016) (citation modified) (quoting Elrod v. Burns, 427 U.S. 347, 373 (1976) (plurality opinion)); see also Karem, 960 F.3d at 667 ("As our court has explained, a prospective violation of a constitutional right constitutes irreparable injury for

---

[8]    When asked by the Court during oral argument whether "the standards here [are] objective," counsel for the defendants responded that the Policy's standards are "more subjective."  OA Tr. at 41.  The defendants subsequently submitted a notice to the Court purporting to walk back that response.  See Notice of Clarification.  The Court will give counsel the benefit of the doubt and assume that he simply misspoke during the argument.  In any event, neither counsel's statement at argument nor the subsequent "clarification" makes much of a difference to the Court's analysis because neither changes what the Policy actually says.

36

purposes of seeking equitable relief." (citation modified)).  In Sherrill, the D.C. Circuit held that a journalist "arbitrarily excluded from sources of information" suffers irreparable First Amendment harm.  Sherrill, 569 F.2d at 129-30.  This harm is "not merely . . . abstract" or "theoretical" because journalists' "First Amendment interest depends on [their] ability to freely pursue 'journalistically productive conversations.'"  Karem v. Trump, 404 F. Supp. 3d 203, 217 (D.D.C. 2019).  Without their PFACs, the plaintiffs lack "the access to pursue those conversations," and because "the news is time-sensitive and occurs spontaneously, that lack of access cannot be remedied retrospectively."  Id.

Second, the defendants do not meaningfully dispute that the remedies available at law are inadequate.  See Karem v. Trump, 404 F. Supp. 3d at 217 ("[T]he only way to remedy the injury [from the loss of a press credential] is to return the hard pass and the access that comes with it.").

Third and fourth, the balance of equities and public interest factors, which "merge when the Government is the opposing party," Nken v. Holder, 556 U.S. 418, 435 (2009), weigh in the plaintiffs' favor.  On the plaintiffs' side, the constitutional interests at stake are hard to overstate.  As Mr. Burns put it, "[t]he new policy makes accurate reporting more difficult, makes America less informed and less safe—particularly in times of crisis—and ultimately harms both the Department and the American public whom the Department serves."  Burns Decl. ¶ 23.  On the defendants' side, the Department surely has a legitimate interest in managing security risks at the Pentagon.  "The Constitution, however, does not permit [it] to prioritize any policy goal over the Due Process Clause" or the First Amendment, and "enforcement of an unconstitutional law is always contrary to the public interest."  Karem, 960 F.3d at 668 (alteration in original) (quoting Gordon v. Holder, 721 F.3d 638, 653 (D.C. Cir. 2013)); see also Legend Night Club v.

37

Miller, 637 F.3d 291, 302-03 (4th Cir. 2011) ("[The government] is in no way harmed by issuance of an injunction that prevents [it] from enforcing unconstitutional restrictions.").

The Court therefore will grant the plaintiffs' request for injunctive relief.

### 2. The Court Will Vacate the Policy

While remand without vacatur is sometimes appropriate, it is "[t]he ordinary practice" and "normal course" to "vacate unlawful agency action." United Steel v. Mine Safety & Health Admin., 925 F.3d 1279, 1287 (D.C. Cir. 2019). Courts will opt to remand without vacating only in "rare cases" where the "deficiencies of the [agency] action" are not "serious[]" or the "disruptive consequences of vacatur" are significant. Am. Bankers Ass'n v. Nat'l Credit Union Admin., 934 F.3d 649, 674 (D.C. Cir. 2019) (quoting United Steel v. Mine Safety & Health Admin., 925 F.3d at 1287). In this case, neither of those factors governing the exercise of the Court's discretion weighs against vacatur. See Anderson v. U.S. Dep't of Hous. & Urb. Dev., 731 F. Supp. 3d 19, 45 (D.D.C. 2024) ("[T]his case is not so exceptional that it warrants remand without vacatur." (citation modified)).

First, the Policy's deficiencies are extremely serious—indeed, the Policy contravenes both the First and Fifth Amendments. See Am. Bankers Ass'n v. Nat'l Credit Union Admin., 934 F.3d at 674. The defendants do not explain how the Department would "be able readily to cure" the defects identified in the Court's opinion. Reg'l Med. Ctr. v. Sebelius, 566 F.3d 193, 198 (D.C. Cir. 2009). The defendants' suggestion that the Department could "provide additional explanation" on remand, Defs. Mot. at 44, would not suffice to cure the constitutional deficiencies.

Second, in this case the "disruptive consequences of vacatur" are minimal. Am. Bankers Ass'n v. Nat'l Credit Union Admin., 934 F.3d at 674. Contrary to the defendants'

38

suggestion, the plaintiffs ask the Court to vacate not the entire Policy but only certain challenged provisions, leaving in place requirements that are no less stringent than in the previous regime. See Cath. Soc. Serv. v. Shalala, 12 F.3d 1123, 1128 (D.C. Cir. 1994) ("[C]ourts may 'set aside' only the part of a rule found to be invalid."). Given that the plaintiffs do not seek vacatur of the Policy's issuance and renewal guidelines, the Court discerns no reason why the Department could not continue "processing" PFACs. Moreover, the defendants do not dispute that the Department's previous PFAC requirements served its proffered interests in safety and security for decades and that nothing in particular triggered the need for increased measures. See SUMF at 4, 7-8 (¶¶ 21, 44). The defendants' assertion that vacatur would "compromise the safety of the Pentagon" therefore is unfounded. Defs. Mot. at 45.

In short, the defendants have not shown that the Department is entitled to a remand without vacatur. Accordingly, the Court will vacate the challenged provisions of the Policy.

## IV.  CONCLUSION

The Court recognizes that national security must be protected, the security of our troops must be protected, and war plans must be protected. But especially in light of the country's recent incursion into Venezuela and its ongoing war with Iran, it is more important than ever that the public have access to information from a variety of perspectives about what its government is doing—so that the public can support government policies, if it wants to support them; protest, if it wants to protest; and decide based on full, complete, and open information who they are going to vote for in the next election. As Justice Brandeis correctly observed, "sunlight is the most powerful of all disinfectants." N.Y. Times Co. v. Sullivan, 376 U.S. 254, 305 (1964) (Goldberg, J., concurring) (footnote omitted).

And as this Court said during oral argument:

> We all know that what seems to be important to people are certain issues which fluctuate from time to time. Issues like the economy. Issues like the country's security. And, you know, we've been through, in my lifetime, you know, the Vietnam War, where the public, I think it's fair to say, was lied to about a lot of things. We've been through 9/11. We've been through the Kuwait situation, Iraq, Guantanamo Bay.
>
> A lot of things need to be held tightly and secure [by the government], but openness and transparency allows members of the public to know what their government is doing in times of peace and more important, in times of war and upheaval . . . .
>
> [T]hat's what the First Amendment is all about . . . I think the public has a right to know a lot of things as [elections] approach and think about what their elected leaders in the legislative branch and the executive branch are doing.

OA Tr. at 58-59.

For the foregoing reasons, the Court will GRANT the plaintiffs' motion for summary judgment and DENY the defendants' cross-motion for summary judgment. An Order consistent with this Opinion will issue this same day.

SO ORDERED.

PAUL L. FRIEDMAN
United States District Judge

DATE: 3|20|26

40

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| THE NEW YORK TIMES COMPANY, et al., | ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Civil Action No. 25-04218 (PLF) |
| DEPARTMENT OF DEFENSE, et al. | ) ) ) | |
| Defendants. | ) ) ) | |

## ORDER

For the reasons set forth in the Opinion issued this same day, it is hereby

ORDERED that Plaintiffs' Motion to Compel Compliance with the Court's Order [Dkt. No. 37] is GRANTED; it is

DECLARED that by adopting and enforcing portions of the policy pertaining to Pentagon Facility Alternate Credentials ("PFACs") that was promulgated by the Department of Defense (the "Department") on March 23, 2026 in a Memorandum for Senior Pentagon Leadership with the subject line "Implementation of Revised Media In-Brief" (the "Interim Policy") [Dkt. No. 37-2], Defendants are in violation of the Order this Court issued on March 20, 2026 [Dkt. No. 34]. The violation encompasses adoption and enforcement of the following provisions:

- The entire four-paragraph section at pages 10-11 of the In-Brief, in full and including the list of so-called "safe harbors," that begins with the words "Intentional Inducement of Unauthorized Disclosure."

- The language in the last paragraph of page 12 of the In-Brief (under "Appendix A") that includes "inducement of unauthorized disclosure as defined in the 'Standards for PFAC Determinations' section of this in-brief'" as a "[c]onduct-[b]ased [g]round" for PFAC revocation, denial, or non-renewal.

- The escort requirements and access limitations set forth at pages 2-3 of the In-Brief, under the heading "New Media Physical Security Restrictions on the Pentagon Reservation," including all language beginning with, "Until the new workspace is operational . . ." and ending with, "When in the Pentagon, you must remain with your escort at all times."

- The entire section at pages 4-5 of the In-Brief under the heading "Escort Privileges and Procedures."

Imposing these standards and restrictions on access to the Pentagon for PFAC holders constitutes continued implementation and enforcement of those provisions of the Department's prior PFAC Policy that this Court vacated and that it enjoined the Defendants from enforcing against Julian E. Barnes and persons who hold, will hold, or will apply for a PFAC, who are employed by, working on behalf of, or otherwise associated with The New York Times. It is

FURTHER DECLARED that, by continuing to impose restrictions on the ability of PFAC holders to engage in the routine, lawful journalistic activity of asking questions, Defendants are in violation of the Court's Order; it is

FURTHER DECLARED that, by imposing restrictions on PFAC holders that forbid them from entering the main Pentagon building without prior approval and an escort, Defendants have failed to reinstate the PFACs of Julian E. Barnes and the following journalists with The New York Times: Eric Schmitt, Helene Cooper, Greg Jaffe, John Ismay, Carol

2

Rosenberg, and W.J. Hennigan, as ordered by this Court; it is

FURTHER ORDERED that, pursuant to the Court's Order and Opinion of March 20, 2026, Defendants and all persons acting in concert with them are permanently ENJOINED from enforcing the provisions listed above against Julian E. Barnes or any persons who hold, will hold, or will apply for a PFAC, who are employed by, working on behalf of, or otherwise associated with The New York Times; it is

FURTHER ORDERED that, pursuant to the Court's Order and Opinion of March 20, 2026, Defendants shall permit Julian E. Barnes and any other person who holds, will hold, or will apply for and otherwise qualifies for a PFAC, who is employed by, working on behalf of, or otherwise associated with The New York Times, to access the Pentagon in a manner commensurate with the access provided to PFAC holders on March 20, 2026, following this Court's Order vacating certain provisions of the prior PFAC Policy; it is

FURTHER ORDERED that Defendants shall file a status report on or before April 16, 2026, accompanied by an affidavit or declaration by a Department official with personal knowledge, describing the steps taken to ensure compliance with this Order and certifying compliance with its requirements; and it is

FURTHER ORDERED that this Court shall retain jurisdiction to enforce this Order.

SO ORDERED.

PAUL L. FRIEDMAN
United States District Judge

DATE: 4|9|26

3

61

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| THE NEW YORK TIMES COMPANY, et al., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 25-04218 (PLF) |
| DEPARTMENT OF DEFENSE, et al. | ) ) | |
| Defendants. | ) ) ) | |

## OPINION

Proposed by Congress in 1789, and ratified in 1791, the First Amendment to the

Constitution of the United States provides:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

U.S. Const. amend. I.

The First Amendment empowers the press to publish what it will and the public to

read what it chooses, free of official proscription.  In the words of Justice Black:

> In the First Amendment the Founding Fathers gave the free press the protection it must have to fulfill its essential role in our democracy. The press was to serve the governed, not the governors.  The Government's power to censor the press was abolished so that the press would remain forever free to censure the Government.  The press was protected so that it could bare the secrets of government and inform the people.  Only a free and unrestrained press can effectively expose deception in government.  And paramount among the responsibilities of a free press is the duty to prevent any part of the government from deceiving the people . . . .

N.Y. Times Co. v. United States, 403 U.S. 713, 717 (1971) (Black, J., concurring).  As the

Supreme Court recently affirmed, "[t]he First Amendment is no word game.  And the rights it

protects cannot be renamed away or their protections nullified by 'mere labels.'"  Chiles v.

Salazar, 607 U.S. ____, 2026 WL 872307, at *9 (Mar. 31, 2026) (quoting NAACP v. Button,

371 U.S. 415, 429 (1963)).

On the evening of Friday, March 20, 2026, this Court entered an Order declaring

specific provisions of a policy newly issued by the Department of Defense (the "Department)

regarding Pentagon Facilities Alternate Credentials ("PFACs") (the "Policy") to be unlawful and

in violation of the First and Fifth Amendments to the United States Constitution.  See Order of

March 20, 2026 ("Order") [Dkt. No. 34].[1]  The Court vacated and set aside those provisions (the

"Challenged Provisions") as to The New York Times Company ("The Times") and Julian E.

Barnes, a long-time national security reporter with The Times, as well as all regulated parties.

Id. at 1-3.  The Court also permanently enjoined the defendants from implementing or enforcing

---

[1]    The documents reviewed by the Court in connection with the pending motion include:  Plaintiffs' Motion to Compel Compliance with the Court's Order ("Pls. Mot.") [Dkt. No. 37]; Second Supplemental Declaration of Theodore J. Boutrous ("Second Supp. Boutrous Decl.") [Dkt. No. 37-1] and Exhibits [Dkt. Nos. 37-2 to -9]; [Corrected] Brief of Pentagon Press Association as Amicus Curiae in Supp. of Pls.' Mot. to Compel Compliance [Dkt. No. 39]; Defendants' Opposition to Plaintiffs' Motion to Compel Compliance with the Court's Order ("Defs. Opp.") [Dkt. No. 41]; Declaration of Michael Bruns ("Bruns Decl.") [Dkt. No. 41-1]; Declaration of Joel Manuel Valdez [Dkt. No. 41-3]; Plaintiffs' Reply to Opposition to Plaintiffs' Motion to Compel Compliance with the Court's Order ("Reply") [Dkt. No. 44]; Supplemental Declaration of Julian E. Barnes ("Supp. Barnes Decl.") [Dkt. No. 44-1]; Second Supplemental Declaration of Julian E. Barnes [Dkt. No. 45]; Supplemental Declaration of Joel Manuel Valdez ("Supp. Valdez Decl.") [Dkt. No. 46]; Plaintiffs' Post-Hearing Brief in Support of Plaintiffs' Motion to Compel Compliance with the Court's Order ("Pls. Supp. Br.") [Dkt. No. 48-1]; Third Supplemental Declaration of Julian E. Barnes ("Third Supp. Barnes Decl."); Defendants' Response to Plaintiffs' Supplemental Brief ("Defs. Supp. Br.") [Dkt. No. 51]; Second Supplemental Declaration of Joel Manuel Valdez ("Second Supp. Valdez Decl.") [Dkt. No. 51-1]; and Transcript of Oral Argument on Plaintiffs' Motion to Compel Compliance with the Court's Order ("OA Tr.").

2

those provisions "to deny, suspend, revoke, or not renew the PFAC of" any journalist from The Times, and it ordered the immediate reinstatement of the PFACs previously held by The Times' reporters. Id. at 3.

Four days later, the plaintiffs returned to Court to file the instant motion to compel compliance with the Court's Order. See Pls. Mot. The plaintiffs assert that the Department has attempted an "end-run around this Court's ruling" by hastily issuing a new "interim" policy that defies the Court's Order in both "letter and spirit." Id. at 1-2. In response, the defendants argue that the Department has refrained from implementing or enforcing the Challenged Provisions, as the Court's Order required. See Defs. Opp. at 1-2. But the defendants maintain that the Order does not preclude the Department from issuing a new policy, which they contend is what the Department has done. See id. After considering the parties' written submissions, their oral arguments, and the relevant caselaw, the Court concludes that the defendants have failed to comply with its Order.

## I. BACKGROUND

The Court discussed the background of this case at length in its Opinion issued on March 20, 2026. See Opinion of March 20, 2026 ("Op.") [Dkt. No. 35]. For purposes of the instant motion, it is sufficient to note the following. On March 21, 2026, the day after this Court issued its Order and Opinion, the plaintiffs sent a letter to the Department asking how the seven Times reporters identified by name in the Order could obtain their reinstated PFACs. See Second Supp. Boutrous Decl. at Ex. 4. Counsel for amici the Pentagon Press Association also wrote to the Department to ask "when and how the Department will return the revoked PFACs and restore the access it revoked on October 15, 2025." Id. at Ex. 3. Following a few additional inquiries, counsel for the Department emailed counsel for the plaintiffs late in the afternoon of

3

Monday, March 23, providing contact information for The Times' journalists to "schedule pickup" of their physical credentials.  Id. at Ex. 5.  In that same email communication, the Department provided the plaintiffs with a "revised policy, in accordance with the Court's decision."  Id.

The "revised policy" consists of a "Memorandum for Senior Pentagon Leadership" from Chief Pentagon Spokesman Sean Parnell (the "Memorandum" or "Mem."), a "Pentagon Reservation In-Brief for Media Members" (the "In-Brief"), and an Appendix (together with the In-Brief, the "Interim Policy").  See Second Supp. Boutrous Decl. at Ex. 1 [Dkt. No. 37-2].  The Memorandum states that the Department "disagrees with the Court's decision and is pursuing an appeal."  Mem. at 1.[2]  But "[i]n the interim," the Memorandum explains, the Interim Policy will be in effect to "preserv[e] the Department's legitimate security interests and its statutory obligation to ensure the safe, efficient, and secure operation of the Pentagon Reservation."  Id.  The Memorandum further states that the Interim Policy "addresses the provisions the Court vacated while retaining all physical access restrictions, conduct requirements, and security measures that were not at issue in the litigation."  Id.  In addition, the Memorandum asserts that "[t]he Court characterized the original Policy's provisions in ways the Department believes were inaccurate" and that the Interim Policy "includes targeted clarifications to correct these mischaracterizations."  Id.

The In-Brief provides in pertinent part that "PFACs may be denied, revoked, or not renewed if a person meets any of the criteria set forth in Appendix A."  Interim Policy at 6. Appendix A outlines certain conviction-based grounds for a PFAC denial, revocation, or

---

[2]    As of the date of this Opinion, no appeal from the Court's March 20, 2026 Order has been filed.

non-renewal, as well as "[c]onduct-[b]ased [g]rounds." Id. at 12-13. The conviction-based grounds are not at issue. Relevant here, the conduct-based grounds include the "inducement of unauthorized disclosure as defined in" the In-Brief. Id. at 12. The In-Brief, in turn, states that "[t]o correct the Court's mischaracterization" of the Policy, "the Department has replaced the term 'solicitation' with 'intentional inducement of unauthorized disclosure.'" Id. at 10. "[I]ntentional inducement of unauthorized disclosure" is defined as "intentionally encouraging, inducing, or requesting that a specific Department employee disclose classified national security information or [controlled unclassified information] that the journalist knows that the specific Department employee is not authorized to disclos[e] under" one of three specified statutes. Id. The In-Brief then states that "[a] journalist's offer of anonymity or privacy protection to a Department employee in exchange for information shall create a rebuttable presumption that the journalist knew the employee was not authorized to disclose the information sought." Id.

The same section of the In-Brief outlines six "safe harbors" that "do not constitute 'intentional inducement of unauthorized disclosure' under" the Interim Policy. Interim Policy at 11; see Defs. Opp. at 6. Those safe harbors are:

(a) Asking questions of Department personnel who are authorized to speak with the press, including Public Affairs Officers, designated spokespersons, and other personnel speaking on the record in their official capacity, regardless of the subject matter of the question;

(b) Receiving unsolicited information, including classified national security information or controlled unclassified information;

(c) Publishing calls for tips or other general appeals to the public at large that are not specifically directed at Department personnel;

(d) Developing source relationships outside the Pentagon through independent reporting;

(e) Communicating with Department personnel through official channels for public disclosure of information, including press

5

briefings, press conferences, interviews arranged through public affairs offices, and Freedom of Information Act requests;

(f) Asking questions of any Department employee where the journalist does not know that the employee is not authorized to disclose the information sought.

Interim Policy at 11.

Finally, the Interim Policy provides that the Correspondents' Corridor—the designated space in the Pentagon for reporters to work, Supp. Barnes Decl. ¶ 12—is closed effective immediately. Interim Policy at 3. According to the Interim Policy, "[a] new press workspace will be established" at some point in the future "in an annex facility outside the Pentagon," and PFAC holders will be notified once that space is "operational." Id. That space is not yet available for journalists to use, and the Interim Policy does not say when it will be. See id. In the meantime, PFAC holders are permitted to work from a building separate from the Pentagon that contains a library and conference center. See Supp. Valdez Decl. ¶ 12; Supp. Barnes Decl. ¶ 9. The Memorandum further states that PFAC holders will be able to access the Pentagon only "for scheduled press briefings, press conferences, and interviews arranged through public affairs offices" and only if they are "escort[ed] by authorized [Department] personnel at all times." Mem. at 2. The Memorandum provides as the reason for this change that "following the Court's vacatur of the PFAC Policy's security screening provisions, the Department determined that unescorted access to the Pentagon cannot be responsibly maintained without the ability to screen PFAC holders for security risks." Id.

On Tuesday, March 24, 2026, the plaintiffs filed a motion to compel compliance with the Court's Order. See Pls. Mot. The defendants filed an opposition on March 27, see Defs. Opp., and the plaintiffs filed a reply on March 29, see Reply. The Court heard oral argument on the motion to compel on March 30. With the Court's permission, the plaintiffs filed

6

a post-hearing brief on April 3, <u>see</u> Pls. Supp. Br., and the defendants filed a response on April 6, <u>see</u> Defs. Supp. Br.

## II. LEGAL STANDARD

This Court has the "jurisdiction" and "inherent power to enforce its judgments." <u>Peacock v. Thomas</u>, 516 U.S. 349, 356 (1996); <u>see</u> Order at 4 (retaining "jurisdiction to enforce this Order").  That authority is grounded in "the interest of the judicial branch in seeing that an unambiguous mandate is not blatantly disregarded by parties to a court proceeding."  <u>Int'l Ladies' Garment Workers' Union v. Donovan</u> ("<u>Donovan</u>"), 733 F.2d 920, 922 (D.C. Cir. 1984). Fundamental to that authority is the power of the Court "to construe and interpret the language of the judgment."  <u>Anglers Conservation Network v. Ross</u>, 387 F. Supp. 3d 87, 93 (D.D.C. 2019) (quoting <u>Heartland Hosp. v. Thompson</u>, 328 F. Supp. 2d 8, 11-12 (D.D.C. 2004)).  In determining whether an agency has complied with the terms of an order, "the Court is guided not only by the text of that order but also by its relevant opinions."  <u>Id.</u>; <u>see</u> <u>also</u>, <u>e.g.</u>, <u>Afghan & Iraqi Allies Under Serious Threat Because of Their Faithful Serv. to the U.S. v. Rubio</u>, No. 18-CV-1388 (TSC), 2026 WL 322996, at *4 (D.D.C. Feb. 6, 2026).  "Success on a motion to enforce a judgment gets a plaintiff only the relief to which the plaintiff is entitled under its original action and the judgment entered therein."  <u>Anglers Conservation Network v. Ross</u>, 387 F. Supp. 3d at 93 (citation modified).

## III. DISCUSSION

The plaintiffs challenge two aspects of the Interim Policy: the prohibition on the "inducement of unauthorized disclosure" and the closure of the Correspondents' Corridor coupled with the escort requirement.  <u>See</u> Pls. Mot. at 5-15.  The defendants contend as a threshold matter that neither challenge is appropriately raised in a motion to compel.  <u>See</u> Defs.

7

Opp. at 3-4.[3]  In the defendants' view, the Department was prohibited from retaining and enforcing the language of the Challenged Provisions but was otherwise free to act as it saw fit. See id. at 4-5.  The defendants maintain that if the plaintiffs wish to challenge the substance of the Interim Policy, they must do so by amending their complaint and filing a new substantive motion rather than by moving to compel compliance with the Court's Order.  See id. at 2.  The Court disagrees.

To be sure, the defendants are correct that once a court has invalidated an agency's policy, the agency is empowered to "deal[] with the problem afresh by taking new agency action that [i]s consistent with the legal principles as articulated in the [c]ourt's opinion." Neguse v. U.S. Immigr. & Customs Enf't, Civil Action No. 25-2463 (JMC), 2026 WL 137017, at *1 (D.D.C. Jan. 19, 2026) (citation modified); see also NAACP v. Donovan, 737 F.2d 67, 72 (D.C. Cir. 1984).  The problem for the defendants, however, is that the Department has not in fact taken "new" action, at least with respect to the proscription on the "inducement of unauthorized disclosure."  To the contrary, as explained in detail below, that proscription contained in the Interim Policy amounts to—in the Department's words—a "clarification[]" of the prohibitions contained in the original Policy that this Court held to be unconstitutional. Mem. at 1.  The Department cannot simply reinstate an unlawful policy under the guise of taking "new" action and expect the Court to look the other way.  See Donovan, 733 F.2d at 922

---

[3]    The defendants also assert that the plaintiffs did not confer in good faith prior to filing their motion to compel, in violation of Local Civil Rule 7(m).  See Defs. Opp. at 3; see also LCvR 7(m) ("Before filing any nondispositive motion in a civil action, counsel shall discuss the anticipated motion with opposing counsel in a good-faith effort to determine whether there is any opposition to the relief sought and, if there is, to narrow the areas of disagreement.").  The record reflects, however, that the plaintiffs sought the defendants' position on their anticipated motion to compel and provided the substantive basis for their requested relief.  See Bruns Decl. at Ex. A.  The plaintiffs thus have satisfied their obligations under Rule 7(m).

8

(holding that enforcing a prior judgment against the application of a new agency policy "is particularly appropriate . . . where an administrative agency plainly neglects the terms of [an order], and the case then returns to the court—under the same docket number and involving the same parties—on a motion to enforce the original [order]"); United States v. Christie Indus., Inc., 465 F.2d 1002, 1007 (3d Cir. 1972) (explaining that a litigant cannot "avoid[] . . . [an] injunction through a mere change of terminology").

Nor can the Department take steps to circumvent the Court's injunction and expect the Court to turn a blind eye. But that is exactly what the defendants have done by closing the Correspondents' Corridor and imposing an escort requirement. The Court's Order requires the Department to restore the plaintiffs' access to the Pentagon. Rather than comply with that Order, the Department has cut off all PFAC holders' meaningful access to the Pentagon. When assessing a litigant's compliance in the posture of an enforcement motion, a court need not accept a "dubious literal interpretation of the injunction, particularly where that interpretation is designed to evade the injunction's goals." Epic Games, Inc. v. Apple Inc., 781 F. Supp. 3d 943, 990-91 (N.D. Cal.), aff'd in relevant part, 161 F.4th 1162 (9th Cir. 2025). Where an enjoined party engages in such evasive conduct, a motion to compel is the proper means of bringing that party into compliance. See id. at 990-92 (granting a motion to enforce an injunction where the court "prohibited certain of [the enjoined party's] policies that prevented meaningful competition" and the enjoined party "rewrote those policies by choosing a different anticompetitive path"); AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State, 768 F. Supp. 3d 1, 3 (D.D.C. 2025) (granting a motion to enforce a temporary restraining order where the government "ha[d] continued . . . the very action that the [order] enjoined").

9

At bottom, the defendants ask this Court to hold that so long as the Department does not reinstate the exact words of the Challenged Provisions, and so long as it restores The Times' reporters' physical credentials, it has done enough.[4]  If the Department immediately uses new words to do the same thing?  Too bad.  The plaintiffs need to start over while the Court stands idly by.  If the Department immediately takes steps to undermine the purpose of the reporters' credentials, namely, entry to the Pentagon?  Again, too bad.  The Court need not embrace such a narrow interpretation of its authority and permit such a blatant attempt to circumvent a lawful order of the Court to succeed.  See Donovan, 733 F.2d at 923; Epic Games, Inc. v. Apple Inc., 781 F. Supp. 3d at 991 (observing that such an "approach would require courts to effectively engage in a 'whack-a-mole' game to require compliance").

*A. Inducement of Unauthorized Disclosure*

The Court carefully considered the Policy's constraint on "solicitation" and the arguments for and against its permissibility.  In the context of the plaintiffs' Fifth Amendment void for vagueness argument, the Court determined that the constraint was unacceptable because it encompassed "obtaining or attempting to obtain any information that the Department has not approved for release, regardless of whether that information is classified."  Op. at 20-21.  The Court recognized that "obtaining and attempting to obtain information is what journalists do" and that "[a] primary way in which journalists obtain information is by asking questions."  Id. at 21.  Punishing journalists for requesting and receiving non-public information thus would chill and penalize "essential journalistic practices that the plaintiffs and others engage in every day."

---

[4]    Ironically, the defendants' own brief makes clear that the Department continues to use many of the words of the Challenged Provisions that this Court vacated.  See Defs. Opp. at 8-12.

10

Id.  In no uncertain terms, the Court rejected the Department's assertion that the Policy was permissible because it proscribed only criminal solicitation, concluding that the Policy punished "plainly lawful journalistic practices."  Id. at 22; see also id. at 21 (explaining that the defendants' argument that the Policy's prohibition on solicitation was acceptable because it "simply proscribe[s] criminal solicitation . . . is just plain wrong").  The Court also held in the context of the plaintiffs' First Amendment forum argument that the Policy's restrictions on journalists seeking information were unreasonable in light of the purpose of the Pentagon's press spaces and that the Policy amounted to viewpoint discrimination "based on editorial viewpoint— that is, whether the individual or organization is willing to publish only stories that are favorable to or spoon-fed by Department leadership."  Id. at 30-36.  In rejecting the defendants' argument that the Court should simply remand to the Department for clarification rather than vacate the Challenged Provisions in their entirety, the Court concluded that in light of the Policy's "extremely serious" constitutional defects, "'additional explanations' on remand would not suffice."  Id. at 38 (citation omitted).

Because the Court vacated the Challenged Provisions, it was appropriate for the Department to issue a new policy, so long as the new policy "was consistent with the legal principles as articulated in the Court's opinion."  Neguse v. U.S. Immigr. & Customs Enf't, 2026 WL 137017, at *1.  But the Department has done precisely what this Court expressly forbade it from doing: it has endeavored to "cure" the impermissible restrictions on a journalist seeking information not authorized for release by providing "targeted clarifications."  Mem. at 1; see Op. at 38.  Specifically, the Interim Policy replaces the prohibition on "soliciting" non-public or unauthorized classified or unclassified information with a prohibition on "encouraging, inducing, or requesting" the disclosure of that non-public or unauthorized information.  Interim Policy

11

at 10.  That is simply using revised language to proscribe the same "lawful journalistic practices" that the vacated provisions encompassed.  Op. at 23.  Remarkably, even the Department acknowledges as much.  For example, the Interim Policy explains that the wording change was simply an effort "[t]o correct the Court's mischaracterization" of the Policy.  Mem. at 1; Interim Policy at 10.  Commander Timothy Parlatore, Special Advisor to the Secretary of Defense, similarly explained that the Interim Policy responds to the Court's Order by "us[ing] more words to say the same thing and to foreclose creative misinterpretations."  Second Supp. Boutrous Decl. at Ex 6.

The defendants suggest that the Department has solved the constitutional problems identified in the Court's Opinion by inserting a "scienter requirement": an adverse PFAC determination will be triggered only if the journalist attempts to obtain information that the journalist "knows" the Department employee is forbidden to disclose by law.  Defs. Opp. at 15-16; see Interim Policy at 10.  This addition, however, does not render the Interim Policy permissible.  For one, the supposed requirement is illusory—in the plaintiffs' words, "a mirage," Reply at 6—because it presumes scienter and provides no clear path to rebut that presumption. The Interim Policy provides that a journalist's knowledge is presumed if the journalist offers a Department employee "anonymity or privacy protection."  Interim Policy at 10.  The Department thus need not establish that a journalist actually knows anything to find the journalist presumptively in violation of the Interim Policy.  See id.  Considering that journalists "frequently" grant anonymity to sources, see Zerilli v. Smith, 656 F.2d 705, 711 (D.C. Cir. 1981), including sources authorized to speak to the press on the Department's behalf, see Supp. Barnes Decl. ¶ 18, every Pentagon reporter routinely will be presumptively in violation of the

12

Interim Policy.[5]  While that presumption ostensibly is rebuttable, it is unclear just how a journalist would go about rebutting it.  The Interim Policy certainly does not indicate what evidence would suffice for journalists to prove what they did not know.  And as the plaintiffs point out, the Interim Policy "expressly provides that any doubts will be resolved in the Department's favor."  Reply at 7; see Interim Policy at 13-14.

The defendants attempt to justify the presumption by asserting that "the most obvious reason to offer anonymity to a Department employee is because the journalist knows the employee is not authorized by law to disclose the information sought."  Defs. Opp. at 19.  That contention is unsupported and simply wrong.  There are myriad reasons why a source may wish to remain anonymous—most apparently, a source may fear retaliation for disclosing information that is "unflattering," even if not unauthorized by law.  Cf. Op. at 35 n.7 (observing "that the Pentagon has barred press photographers from briefings on the ongoing U.S.-Israeli war with Iran after they published photos of Secretary Hegseth that his staff deemed 'unflattering'").  As Mr. Barnes suggested, "[t]here are various reasons why a source may wish not to have their name published in connection with the information they provided, and honoring those preferences is often integral to [his] ability to gather and report the news."  Supp. Barnes Decl. ¶ 17; see also Zerilli v. Smith, 656 F.2d at 710-11 (explaining that interference with a journalist's use of "confidential source raises obvious First Amendment problems" because "journalists

---

5       The Court gives little credence to the assurances of Deputy Press Secretary Joel Manuel Valdez that the Department will enforce the Interim Policy only upon a complaint by a Department employee. See Supp. Valdez Decl. ¶¶ 30-33. The plaintiffs correctly point out that Mr. Valdez's proffered interpretation of the Interim Policy is not grounded in its text. See Pls. Supp. Br. at 4. Like the plaintiffs, the Court has "no reason to trust that officials will not follow the Interim Policy's express language and revoke PFACs based on information in [the] [p]laintiffs' reporting whenever it is not tied to a specific, authorized source." Id. In any event, the Court struggles to see how the enforcement regime that Mr. Valdez promises changes the illusory nature of the scienter requirement.

13

frequently depend on" such sources "to gather news, and confidentiality is often essential to establishing a relationship with" a source).

The defendants also emphasize the addition of six "safe harbors" as evidence that the Interim Policy is distinct from the original Policy in a way that complies with this Court's Opinion and Order. See Defs. Opp. at 16. But like the scienter "requirement," the safe harbors do not make clear that engagement in lawful journalistic practices will not trigger the revocation of a PFAC. See Op. at 21-22. As this Court has explained, asking questions is fundamental to the role of a journalist, and a journalist's ability to ask questions is protected. See id. at 21; see also id. at 22 ("[A] journalist asking questions is not a crime!"). Yet the "safe harbors" explicitly leave open the possibility that "[a]sking questions" on certain topics and to certain officials could trigger the revocation or denial of a PFAC. Interim Policy at 11. They provide, for example, that asking questions about any subject to a Department official who is "authorized to speak with the press" is permissible. Id. But how is a journalist to know who is authorized to speak? That uncertainty and lack of clarity is precisely what this Court held to be unacceptable.

In sum, there is little daylight between the Policy's unconstitutional "solicitation" prohibition and the Interim Policy's "inducement" prohibition, and the latter is impermissible for the same reasons as the former. Simply put, the Department's attempt to "clarif[y]" the Policy did not cure its constitutional infirmities. That, of course, is exactly why this Court determined it was necessary to vacate the Policy and "re-establish the status quo" as it existed prior to "the unlawful agency action." Las Ams. Immigrant Advoc. Ctr. v. U.S. Dep't of Homeland Sec., 783 F. Supp. 3d 200, 233 (D.D.C. 2025) (quoting Texas v. United States, 40 F.4th 205, 219-20 (5th Cir. 2022) (per curiam)). The Court explained that the Policy's deficiencies were so entrenched that there was no alternative but to require the Department to scrap its prior approach and start

14

afresh.  <u>See</u> Op. at 38-39.  By failing to do so, the Department has violated this Court's explicit mandate.

### B. Expulsion of PFAC Holders from the Pentagon

In its March 20, 2026 Order, the Court directed the defendants to "immediately reinstate the PFACs of" Julian Barnes and six other Times journalists, "all of whom held a PFAC as of October 6, 2025."  Order at 3.  Before doing so, the Court carefully considered the defendants' argument that the plaintiffs had not established their entitlement to injunctive relief. The Court ultimately disagreed with the defendants, concluding in relevant part that the plaintiffs had shown irreparable injury because "[w]ithout their PFACs, the plaintiffs lack 'the access to pursue [journalistically productive] conversations.'"  Op. at 36.  (quoting <u>Karem v. Trump</u>, 404 F. Supp. 3d 203, 217 (D.D.C. 2019)).  The Court observed that "the only way to remedy the injury [from the loss of a press credential] is to return the [credential] and the access that comes with it."  <u>Id</u>. at 36-37 (first alteration in original) (quoting <u>Karem v. Trump</u>, 404 F. Supp. 3d at 217).

The Department did not comply with the Court's Order.  Rather, the very next business day, the Department announced that it was immediately closing the "Correspondents' Corridor"—the area in the Pentagon from which journalists had worked for years.  <u>See</u> Mem. at 2; Interim Policy at 3; <u>see also</u> Supp. Barnes Decl. ¶ 12.  Instead, PFAC holders would be relegated to work from a space <u>outside</u> the Pentagon building.  <u>See</u> Supp. Valdez Decl. ¶ 12; Supp Barnes Decl. ¶ 9.  The Department further announced that journalists would no longer be permitted to access the Pentagon building at all without a Department escort and that even escorted access would be limited to specific events.  <u>See</u> Interim Policy at 3.  The justification offered by the Department for this sudden change is that this Court's Order "remov[ed] . . . all

15

security screening authority" and that "unescorted access to the Pentagon cannot be responsibly maintained without the ability to screen credential holders for security risks." Second Supp. Boutrous Decl. at Ex. 7; see also id. at Ex. 6 (Commander Parlatore stating that the Court's ruling "excised all of the security provisions and enforcement mechanisms and ordered that [the Department] immediately issue press passes under the revised, toothless policy"); Mem. at 2.

In short, this is nonsense. The Court did not "remove" or "excise" the Department's authority to screen PFAC holders. For one, The Times' journalists named in the Court's Order have already been screened by the Department—for example, prior to the issuance of the Policy, Mr. Barnes had held a PFAC without issue for more than twenty years. See Op. at 4; Supp. Barnes Decl. ¶ 11. Moreover, the Court was clear in its Opinion that it was leaving intact the security measures that previously existed for PFAC holders and that "served [the Department's] proffered interests in safety and security for decades." Op. at 39. Based on the undisputed facts, the Court found that "[t]he regular presence of PFAC holders at the Pentagon has enhanced the ability of journalists and news organizations to keep Americans informed about the U.S. military while posing no security or safety risk to Department property or personnel." Id. at 5 (emphasis added). There is no evidence whatsoever that the facts have changed in the weeks since this Court issued its summary judgment decision. The rote invocation of "security" or "national security" has never been enough "to abrogate the fundamental law embodied in the First Amendment." N.Y. Times Co. v. United States, 403 U.S. at 719 (Black, J., concurring). As Judge Leon observed in a recent decision, "[b]ald assertions of 'national security' cannot excuse the Government's failure to follow the law." Nat'l Trust for Historic Pres. in the U.S. v. Nat'l Park Serv., __ F. Supp. 3d ___, 2026 WL 877779, at *16 (D.D.C. Mar. 31, 2026).

16

In their opposition brief, the defendants state that the "relocation of the press workspace" is unconnected to the Court's ruling and instead simply "fulfills a commitment announced . . . before this lawsuit was filed."  Defs. Opp. at 20; see also Mem. at 2.  That assertion is undermined by the timing of the announced closure.  The Court cannot ignore the fact that the decision to bar all journalists from the Pentagon came the next business day after the Court ordered the Department to restore the plaintiffs' access to the Pentagon.  Further, the testimony of Mr. Barnes supports that Department officials were ill-prepared to facilitate this "relocation," suggesting that the Department had scrambled to close the Correspondents' Corridor in direct response to this Court's directives.  See Supp. Barnes Decl. ¶ 9; Third Supp. Barnes Decl. ¶ 6.[6]

In light of all this, the Court has no choice but to conclude that the Department's abrupt closure of the Correspondents' Corridor and its ban on credentialed journalists traveling unescorted through the Pentagon are not security measures or efforts to make good on prior commitments but rather transparent attempts to negate the impact of this Court's Order.  The point of the Court's injunction was to restore The Times journalists' access to the Pentagon, not merely to ensure that they have possession of a physical credential.  See Op. at 37.  But the access now available to PFAC holders in the wake of this Court's Order is not even close to as meaningful as the broad access that PFAC holders had previously been afforded.  The PFACs

---

[6]    Deputy Press Secretary Joel Manuel Valdez submitted a declaration purporting to refute Mr. Barnes' account of his interactions with Pentagon Press Office staff on the day he went to pick up his PFAC.  See Supp. Valdez Decl.  But Mr. Valdez's declaration does not contradict Mr. Barnes' testimony about his conversations with Department staff, for which Mr. Valdez was not present.  See id.; see also Third Supp. Barnes Decl. ¶ 3.  The only thing Mr. Valdez's declaration establishes is that some of the information given to Mr. Barnes was inaccurate.  See Supp. Valdez Decl. ¶¶ 15-21.  If anything, that fact supports the notion that Department officials were unsure of the parameters of the Interim Policy and were unprepared to implement it.  See id.

17

issued to Mr. Barnes and his colleagues permit them to access only a building separate from the

Pentagon.  See Supp. Valdez Decl. ¶ 12.  PFAC holders may enter the Pentagon only for limited

purposes approved by the Department, and only if the holder is accompanied by an escort at all

times.  See id. ¶¶ 22-25; see also Interim Policy at 3.  These restrictions make it exceedingly

difficult to cover the Department and the U.S. military from the Pentagon grounds, as the

April 2, 2026 declaration from Mr. Barnes illustrates:

> Going through a sometimes-lengthy process of scheduling official appointments in order to ask even one or two questions to an official—even assuming that request is granted and that official does not have to reschedule—does not allow for meaningful engagement with Department personnel on a timeline consistent with news reporting.  As I stated in a prior declaration, reporting from the Pentagon has historically necessitated speaking to upwards of a dozen officials and other personnel from different press offices in a given day, sometimes in response to rapidly developing events. While I used to be able to walk from press office to press office throughout the day, I now would have to return to the library, call or email for an appointment, and wait for a response and approval, and for arrangement for and arrival of an escort.  That means I will be spending hours of my day just waiting and walking back and forth— assuming I can get ahold of press offices and individuals and arrange interviews and be approved for an escort at all.  That process will dramatically interfere with my ability to meaningfully engage with anyone from the Department on Pentagon grounds, or to obtain the information necessary to inform the public in a timely manner.

Third Supp. Barnes Decl. ¶ 8.[7]  For decades, the plaintiffs and other reporters were permitted to

move throughout the building and engage with Pentagon press officials and other personnel to

---

[7]     On Monday, March 30, in response to a request that he had made three days earlier, on Friday, March 27, Mr. Barnes received an invitation to interview a Department official at the Pentagon the following day, Tuesday, March 31, at 12:45 p.m.  Third Supp. Barnes Decl. ¶ 5.  Mr. Barnes explained:

> On Tuesday, March 31, 2026, I arrived at the Pentagon at 12:10 p.m. and entered the Visitor Center security area.  I showed the attendant behind the glass my driver's license and the PFAC.  I entered my social security number upon his request.  I was advised that individuals holding PFACs must enter through corridor 8.  I replied

18

provide timely reporting to the American people.  See, e.g., Op. at 5-6.  That undisputedly is no longer the case.

In short, the Department has responded to the Court's express instruction to return the PFACs previously held by The Times' journalists and restore the access to the Pentagon that came with those credentials by instead cutting off that access for all journalists.  That response flouts the Court's explicit directives and disregards the constitutional principles at the heart of its Opinion.

\*\*\*

The Court cannot conclude this Opinion without noting once again what this case is really about: the attempt by the Secretary of Defense to dictate the information received by the American people, to control the message so that the public hears and sees only what the Secretary and the Trump Administration want them to hear and see.  The Constitution demands better.  The American public demands better, too.  Over the past few weeks, the Court has received dozens of letters and postcards from people across the country explaining what the First Amendment means to them.  To quote one such letter:

> that I had an appointment and the escort was going to meet me in the Visitor's Center.  The supervisor repeated that anyone with a PFAC could enter only through corridor 8.  This was despite the fact that I was told to meet my escort in the Visitor's Center and the fact that before I could have simply entered through the main gate using my PFAC.  After I arrived at the Pentagon, the interview was postponed, and I was immediately escorted out of the building.

Id. ¶ 6.  This scenario exemplifies precisely the Kafkaesque nature of the Department's implementation of the Interim Policy that the Court raised during oral argument.  See OA Tr. at 37.  The only response to Mr. Barnes's declaration: "Mr. Barnes's escort had not been fully briefed on the access procedures for PFAC holders under the Interim Policy."  Second Supp. Valdez Decl. ¶ 9.  Really?

19

A free press is essential to the success of our democratic republic. The people are the government, and they cannot make good well-informed choices without all the facts. . . . A free press is an excellent place to start.

The protection of the freedoms enshrined in the First Amendment "is a fundamental principle of the American government. The First Amendment means that [g]overnment has no power to thwart the process of free discussion, to abridge the freedoms necessary to make that process work." Kleindienst v. Mandel, 408 U.S. 753, 775-76 (1972) (Marshall, J., dissenting) (citation modified); see also Abrams v. United States, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting) (observing that the "free trade in ideas . . . [is] the best test of truth"). Less than three weeks ago, this Court rejected the defendants' efforts to abridge those freedoms. With the issuance of the Interim Policy, the Department has invoked slightly different language to achieve that same unconstitutional result. The curtailment of First Amendment rights is dangerous at any time, and even more so in a time of war. Suppression of political speech is the mark of an autocracy, not a democracy—as the Framers recognized when they drafted the First Amendment.

## IV. CONCLUSION

For the foregoing reasons, the Court will grant the plaintiffs' motion to compel. An Order consistent with this Opinion will issue this same day.

SO ORDERED.

PAUL L. FRIEDMAN
United States District Judge

DATE: 4/9/26

20

81