UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| THE NEW YORK TIMES COMPANY, et al.,<br><br>Plaintiffs-Appellees,<br><br>v.<br><br>DEPARTMENT OF DEFENSE a/k/a DEPARTMENT OF WAR, et al.,<br><br>Defendants-Appellants. | No. [_____] |

DECLARATION OF KINGSLEY WILSON IN SUPPORT OF DEFENDANTS'
EMERGENCY MOTION FOR STAY PENDING APPEAL

I, Kingsley Wilson, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

**BACKGROUND**

1. I am the Pentagon Press Secretary. I have served in this position since May 2025. In this role, I am responsible for managing press interactions with the Department of Defense (the "Department"), overseeing the Pentagon Press Operations office ("PPO"), and serving as the Department's principal liaison with credentialed journalists. I report directly to the Assistant to the Secretary of War for Public Affairs.

2. I have personal knowledge of the matters stated herein, and if called as a witness, I could and would testify competently thereto. In particular, I have personal knowledge of the frequency and nature of press inquiries involving classified information because such inquiries are directed to my office or are reported to me by my staff.

3. I submit this declaration in support of the Department's emergency motion for a stay pending appeal of the district court's Orders of March 20, 2026 and April 9, 2026.

1

Specifically, the Department seeks a stay of the requirement that the Department provide unescorted access to the Pentagon for holders of Pentagon Facility Alternate Credentials ("PFACs").

## THE FREQUENCY OF SENSITIVE INFORMATION REACHING JOURNALISTS BEFORE THE POLICY

4. Before the Department implemented the PFAC Policy in October 2025, my office was contacted by journalists on a regular basis — often monthly, and sometimes multiple times per month — regarding information they had obtained that was sensitive or classified, including information relating to operational plans, intelligence assessments, diplomatic communications, and force posture decisions. These contacts came from journalists at multiple news outlets, including the New York Times. Many of these journalists, including New York Times journalists, were PFAC holders.

5. Controlled unclassified information and classified information was reaching journalists with a frequency that raised serious concerns about the security of information within the Pentagon.

6. To be clear, the Department encourages journalists who come into possession of controlled or classified information to contact the press office before publishing, and these contacts are not themselves improper. Nor does the Department know or opine on whether each instance involved information that was solicited by the journalist, because the Department does not know the source in each case. The concern is the frequency with which journalists were coming into possession of sensitive, controlled or classified information.

**THE CONNECTION BETWEEN PHYSICAL ACCESS AND THE PATTERN**

7. Based on my experience and the reports of my staff, I believe that unescorted access to the Pentagon was a significant contributing factor to the frequency with which controlled and classified information was reaching journalists. Unescorted access allowed journalists to maintain a persistent physical presence near sensitive spaces within the Pentagon. This presence enabled journalists to observe activity patterns — such as which officials were meeting, when, and in what configuration — that could be used to identify individuals with access to specific sensitive information and to time inquiries accordingly.

8. The Correspondents' Corridor was located next to the office space for the Joint Chiefs of Staff—the military advisors to the President, National Security Council, Homeland Security Council, and Secretary of Defense. *See* 10 U.S.C. § 151. Journalists, including journalists who regularly called my office regarding controlled or classified information they had obtained, frequently used their access to closely monitor activity in and out of the Joint Staff spaces.

9. The Department assessed that the combination of unescorted access and the absence of security screening criteria contributed to the frequency with which classified information was reaching journalists. The escort requirement adopted as part of the Interim Policy was specifically designed to address this assessment after the district court invalidated the PFAC Policy.

**THE CHANGE AFTER THE POLICY**

10. Following the implementation of the PFAC Policy in October 2025, the frequency with which my office was contacted by journalists regarding sensitive, controlled or classified

3

information dropped dramatically. While there have been a small number of isolated incidents, the regular pattern of contacts involving such information largely ceased.

11. I attribute this reduction primarily to the fact that many journalists were not present in the Pentagon because they surrendered their PFACs following the implementation of the PFAC Policy, meaning they were unable to maintain a persistent, unescorted presence near sensitive spaces within the Pentagon. The PFAC Policy was not intended to exclude journalists from the Pentagon. But when journalists surrendered their PFACs and accompanying Pentagon access, the Department was able to observe a dramatic decrease in journalists obtaining sensitive, controlled or classified information that should never have been released to them. Without the ability to observe activity patterns and time their inquiries accordingly, the systematic pattern was disrupted.

**THE IMPACT ON NATIONAL SECURITY**

12. The regular receipt and publication of classified information by journalists posed serious risks to national security. The unauthorized disclosure of operational plans, intelligence assessments, and force posture decisions has the potential to put American lives in danger and to compromise ongoing military and intelligence operations. When classified information about military operations is published, adversaries can adjust their tactics, techniques, and procedures in response — potentially endangering the servicemembers conducting those operations.

13. The current national security environment makes the protection of classified information particularly critical. United States military personnel are currently deployed and stand ready to support military operations in Iran should the ceasefire break. The unauthorized disclosure of classified information relating to this operation could have immediate and

4

irreversible consequences for the safety of American servicemembers and the success of military objectives.

### THE HARM FROM RESTORING UNESCORTED ACCESS

14. Based on my experience as Pentagon Press Secretary, I believe that restoring unescorted access to the Pentagon for PFAC holders — especially without the security screening criteria and the prohibition on intentional inducement of unauthorized disclosures that the district court vacated — will almost certainly result in the resumption of the pattern I have described: a return to the regular, frequent receipt of controlled or classified information by journalists.

15. The escort requirement would disrupt this pattern by limiting journalists' ability to maintain a persistent, unescorted presence near sensitive spaces — the presence that enabled the observation of activity patterns and the targeting of specific personnel. Without the escort requirement or even a prohibition on intentionally inducing unauthorized disclosures, the Department has no effective means of managing this specific security risk while still providing journalists with access to the Pentagon for press briefings, press conferences, interviews, and other legitimate newsgathering activities.

16. If sensitive, controlled or classified information is compromised during the pendency of this appeal, the harm cannot be undone. Such information, once disclosed, cannot be recalled. The potential consequences — including the endangerment of American lives and the compromise of ongoing operations — are irreversible.

## THE DEPARTMENT'S GOOD-FAITH COMPLIANCE

17. Following the district court's March 20, 2026 Order, the Department took prompt steps to comply. The Department reinstated the PFACs of all seven New York Times journalists identified in the Order. The Department issued a revised Interim Policy that addressed the concerns identified in the Court's Opinion — including a different defined term, a knowledge requirement, six safe harbors protecting routine newsgathering, exhaustive factors, evidentiary standards, mandatory timelines, judicial review, and an explicit content-neutrality provision. The Department provided workspace for PFAC holders at the Pentagon Library and Conference Center and arranged shuttle bus transportation. The Department also processed PFAC applications from the Associated Press, CNN, The Washington Post, The Wall Street Journal, USA Today, and CBS News — none of which withdrew their applications after the Interim Policy was issued.

18. The escort requirement was adopted in good faith to address the security gap created by the Court's vacatur of the Policy's security screening provisions. It was not adopted to circumvent the Court's Order or to retaliate against any journalist or news organization. The escort requirement applies equally to all PFAC holders, regardless of their news organization or the content of their reporting.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on April 10, 2026 at Washington, D.C.

[ *Kingsley Wilson* ]
Kingsley Wilson
Pentagon Press Secretary
1400 Defense Pentagon
Washington, D.C. 20301-1400

6